FILED 2008 JUL -3 PM 3:03
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

October 2007 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | SA CR 08 - 00180 |
| Plaintiff, ) | I N D I C T M E N T |
| v. ) | [18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 2: Aiding and Abetting/ Causing an Act To Be Done] |
| MOSES ONCIU, ) BEATA GIZELLA PRIORE, and ) IRENE PEMKOVA, ) | |
| Defendants. ) | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

A.   INTRODUCTION

At all times relevant to this Indictment:

1.   Defendant MOSES ONCIU was a resident of Fountain Hills, Arizona, and a director of David and Goliath International Ministries ("D&G").

2.   Defendant BEATA GIZELLA PRIORE was a resident of Glen Head, New York.

3.  Defendant IRENE PEMKOVA was a resident of Las Vegas, Nevada.

4.  Special agents of the Federal Bureau of Investigation (FBI) conducted an undercover investigation into fraudulent high yield investment schemes. The undercover investigation specifically targeted those persons who fraudulently offered substantial returns on investments with low or no risk of loss.

5.  As part of the undercover investigation, the FBI established an undercover entity (UCE) in Newport Beach, California that purported to be a financial advisory firm. FBI undercover agents (UCAs) posed either as partners of the UCE seeking to invest their own funds or as wealthy clients of the UCE seeking to invest substantial monies.

6.  A "High Yield Investment Program" (HYIP) is a general term given to fraud schemes that are known by various specific names, including "Prime Bank Guarantees," "Prime Bank Debenture Programs," "Medium Term Note Trading Programs," and "Roll Programs." Such programs do not exist as legitimate investment vehicles. In these schemes, the fraud perpetrator claims to have privileged access to secret financial trading programs, which are falsely represented to be sanctioned by the U.S. Federal Reserve Bank, the U.S. Treasury Department, the World Bank, or some other entity involved in international monetary transactions or policy. Claims are typically made that a privileged few are invited to participate in the trading of some form of bank security such as bank guarantees, notes, stocks, or debentures, which can be bought at a discount and sold at a premium. It is often claimed that there are only a few "traders" or "commitment holders" in the world who are authorized to resell these bank securities between the top 25 or 50 banks in the world, often falsely referred to as "Prime Banks." By conducting multiple "trades" in rapid succession, they claim to be able to produce

extraordinary rates of returns, far beyond any normal investment. It is often further claimed that one of the primary reasons these trading programs exist is to generate funds for humanitarian purposes and that a portion of the investor's profits must be used to provide humanitarian relief and aid somewhere.

7.  The perpetrators of HYIPs claim that a high degree of secrecy is required of the unsuspecting investor in order to participate in the program, and require the execution of various documents which have no meaning in legitimate financial transactions. Typically, the investor first is directed to provide a "Letter of Intent," a "Non-Solicitation Agreement," a "Confidentiality Agreement," a "Non-Circumvention Letter," a "Bank Proof of Funds," a "Client Information Summary," and a copy of the investor's passport. The investor is typically told that he must go through "compliance," which will purportedly be done by the FBI, Central Intelligence Agency, Federal Reserve Bank or some other government "compliance officer." The investor is also told that his funds must be verified on a "bank to bank" basis to make sure that they do exist and that the funds must be "good, clean, clear funds of non-criminal origin." The investor typically is assured that his funds are absolutely safe and never at risk in any way. The scheme is designed to gradually progress to its ultimate goal of gaining control of all or a portion of the investor's funds.

B.  OBJECT OF THE CONSPIRACY

8.  Beginning on or about November 29, 2006, and continuing to on or about March 7, 2007, in Orange County, within the Central District of California and elsewhere, defendants ONCIU, PRIORE, and PEMKOVA, together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed with each other to commit the following

offense against the United States: wire fraud, in violation of Title 18, United States Code, Section 1343, in connection with the promotion of fraudulent high yield investment schemes promising extremely high returns at little or no risk to principal.

C. MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the conspiracy included, among other things, the following:

9. Defendants made fraudulent representations and promises to the UCA about defendants' ability to place the UCA's client-investor into a select, secret HYIP.

10. Defendants fraudulently represented they had successfully closed previous deals in which extraordinary rates of return were realized by other investors.

11. Defendants fraudulently represented that they had access to a HYIP that would yield a 300% to 650% return in 30 to 45 days at no risk.

12. Defendants, for the purpose of promoting their fraudulent investment program, made telephone calls to the UCA in Orange County, California, and sent email transmissions to the UCA in Orange County, California.

D. OVERT ACTS

13. In furtherance of the conspiracy, and to accomplish its object of the conspiracy, defendants ONCIU, PRIORE, and PEMKOVA, together with others known and unknown to the Grand Jury, committed and willfully caused others to commit the following over acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1: On or about November 29, 2006, defendant PEMKOVA had a telephone conversation with the UCA.

  <u>Overt Act No. 2</u>:  On or about November 29, 2006, during a phone conversation with the UCA, defendant PEMKOVA stated, among other things, that:

  a.  The UCA could expect a call from a "Dr. Priore" in Europe who was working with the bank involved in the program; and

  b.  Defendant PEMKOVA had other clients in the program, which was a "working program," and who had already been paid.

  <u>Overt Act No. 3</u>:  On or about November 29, 2006, defendant PEMKOVA sent an email to the UCA.

  <u>Overt Act No. 4</u>:  On or about November 29, 2006, during a telephone conversation with the UCA, defendant PEMKOVA stated, among other things, that:

  a.  D&G was a humanitarian foundation under the Central Intelligence Agency (CIA) umbrella;

  b.  Defendant ONCIU was a former, highly placed CIA officer and a director of D&G; and

  c.  A humanitarian project was required for entry into the program.

  <u>Overt Act No. 5</u>:  On or about November 29, 2006, defendant PEMKOVA sent the UCA an email that stated, among other things, that the UCA could expect a call from defendant PRIORE the next day and that defendant PEMKOVA would arrange a phone conference with defendant ONCIU.

  <u>Overt Act No. 6</u>:  On or about November 30, 2006, during a phone conversation with the UCA, defendant PRIORE stated, among other things, that:

  a.  Defendant PRIORE was calling from the trading group in Frankfurt;

  b.  The investment program was run by the TSI Consulting

Group in Frankfurt;

  c. The program yields returns that are 6.5 times the original investment in 30 to 45 days;

  d. The investment is "pretty much risk free";

  e. Defendant PRIORE had been in the business of high-yielding investments for seven years and has seen people make these kinds of returns in the past; and

  f. The program required a minimum investment of $1 million;

  <u>Overt Act No. 7</u>: On or about November 30, 2006, defendant PRIORE sent the UCA an email.

  <u>Overt Act No. 8</u>: On or about December 1, 2006, defendant PRIORE sent the UCA an email.

  <u>Overt Act No. 9</u>: On or about December 1, 2006, defendant PRIORE sent the UCA an email.

  <u>Overt Act No. 10</u>: On or about December 4, 2006, during a telephone conference call with the UCA (the "12/4/06 Conference Call"), defendant ONCIU stated, among other things, that:

  a. Defendant Onciu usually doesn't do transactions of less than $100 million;

  b. Making a return of 100% per month is not abnormal;

  c. Defendant Onciu's role in this transaction is to provide the humanitarian element required for these transactions;

  d. The program is highly confidential and the government does not want people talking about such investment programs; and

  e. Defendant Onciu would reduce his fees if it would influence the UCA to invest in the program.

  <u>Overt Act No. 11</u>: On or about December 4, 2006, defendant PEMKOVA participated in the 12/4/06 Conference Call.

<u>Overt Act No. 12</u>:   On or about December 5, 2006, during a phone conversation with the UCA, defendant PRIORE stated, among other things, that a client of hers invested $1 million in the program and made a return of $6.5 million.

<u>Overt Act No. 13</u>:   On or about January 6, 2007, defendant PRIORE met with the UCA.

## COUNTS TWO THROUGH SIX

## (18 U.S.C. §§ 1343 and 2)

14. Paragraphs 1 through 13 are realleged and incorporated herein by reference, as if set forth in full.

15. Beginning on or about November 29, 2006, and continuing to on or about March 7, 2007 in Orange County, within the Central District of California, and elsewhere, defendants ONCIU, PRIORE, and PEMKOVA, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

16. On or about the dates set forth below, within the Central District of California and elsewhere, defendants ONCIU, PRIORE, and PEMKOVA, for the purpose of executing the above-described scheme to defraud, transmitted, willfully caused the transmission, and aided and abetted the transmission of, the following items by means of wire and radio communication in interstate and foreign commerce:

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| 2 | 11/29/06 | Email from defendant PEMKOVA, sent from amartyk@yahoo.com through a server in Las Vegas, Nevada to the UCA in Newport Beach, California |
| 3 | 11/29/06 | Email from defendant PEMKOVA, sent from amartyk@yahoo.com through a server in Las Vegas, Nevada to the UCA in Newport Beach, California |
| 4 | 11/30/06 | Email from defendant PRIORE, sent from drbpriore@maxfoundation.us, sent through a server in Arizona to the UCA in Newport Beach, California |
| 5 | 12/01/06 | Email from defendant PRIORE, sent from drbpriore@maxfoundation.us, sent through a server in Arizona to the UCA in Newport Beach, California |

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| 6 | 12/01/06 | Email from defendant PRIORE, sent from drbpriore@maxfoundation.us, sent through a server in Arizona to the UCA in Newport Beach, California |

A TRUE BILL

/S/
_____
FOREPERSON

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

DOUGLAS F. MCCORMICK
Assistant United States Attorney
Acting Chief, Santa Ana Office

IVY A. WANG
Assistant United States Attorney