**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACR NO. 08-0180-DOC |
| | ) Day 2, Volume III |
| IRENE PEMKOVA, | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

WEDNESDAY, MAY 27, 2015

1:30 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*DEBORAH D. PARKER, U.S. COURT REPORTER*

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

                    ANDRE BIROTTE, JR.
                    UNITED STATES ATTORNEY

                    DENNISE D. WILLETT
                    ASSISTANT UNITED STATES ATTORNEY
                    CHIEF, CRIMINAL DIVISION

                    LAWRENCE E. KOLE
                    ASSISTANT UNITED STATES ATTORNEY
                    UNITED STATES DISTRICT COURT
                    8000 RONALD REAGAN FEDERAL BUILDING
                    SANTA ANA, CALIFORNIA 92701
                    (714) 338-3500


    FOR DEFENDANT, IRENE PEMKOVA:

                    Irene Pemkova, aka Pimkova, *(pro se)*


    STANDBY COUNSEL FOR DEFENDANT, IRENE PEMKOVA:

                    H. DEAN STEWARD *(CJA appointed)*
                    LAW OFFICES OF H. DEAN STEWARD
                    107 AVENIDA MIRAMAR
                    SUITE C
                    SAN CLEMENTE, CALIFORNIA 92672
                    (949) 481-4900


    ALSO PRESENT:

        Thomas Reitz, FBI

I N D E X


PLAINTIFF'S WITNESSES:   DIRECT   CROSS   REDIRECT   RECROSS

 THOMAS REITZ                     5
                               6 4



E X H I B I T S

PLAINTIFF'S EXHIBITS:                   IDENTIFICATION   EVIDENCE

    3      CD                                                7

   14      CD                                               11

   24      CD                                               12

   25      CD                                               16

   30      CD                                               24

   31      CD                                               25

   33      CD                                               26

   34      CD                                               36

   35      CD                                               60

   36      CD                                               61

   37      CD                                               70

   38      CD                                               91

   39      CD                                               91

   40      CD                                               92

   41      CD                                               97

   42      CD                                               97

*DEBORAH D. PARKER, U.S. COURT REPORTER*

E X H I B I T S

| PLAINTIFF'S EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 93    E-MAIL | | 32 |
| 94    E-MAIL | | 44 |
| 95    E-MAIL | | 47 |
| 96    E-MAIL | | 51 |
| 97    E-MAIL | | 56 |
| 98 AND 99 E-MAILS | | 65 |
| 100    HEADER INFORMATION | | 69 |
| 101, 102 and 103 FAX, E-MAIL AND<br>INTERNET PROTOCOL HEADER<br>INFORMATION | | 84 |
| 104    E-MAIL | | 93 |
| 105    E-MAIL | | 94 |
| 106 and 107 E-MAILS | | 95 |
| 109    FAX | | 100 |
| 110    E-MAIL | | 100 |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

5

**SANTA ANA, CALIFORNIA; WEDNESDAY, MAY 27, 2015; 1:40 P.M.**

*(The following proceedings were had in open court*

*in the presence of the jury:)*

THE COURT:  The jury is present.  The alternates.

01:40:01   If you will have a seat, Agent Reitz.  Thank you.

Irene Pemkova and Mr. Kole and Mr. Steward are

present.

And if you would like to continue, please.

*(Pause.)*

01:40:14   THE COURT:  We're missing one juror.  Just one

moment.  My apologies.

*(Pause.)*

THE COURT:  All right.  The jury is present.

Ms. Pemkova is present, Mr. Steward, Mr. Kole and

01:41:53   the witness and the jurors and alternates.

Counsel, if you would like to continue, please.

THOMAS REITZ, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. KOLE:

01:41:57   Q    Agent Reitz, please take out Exhibit No. 3.

A    Okay.  I have that.

Q    What is it?

A    It's a recording from a telephone call from

February 27th.

01:42:15   Q    Is it actually a CD?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
01:42:17   1   A    Yes.   Sorry.   It is a CD containing the recording.

           2              MR. KOLE:  Your Honor, the Government certainly

           3   can go through it with each disk, if we would like; but I

           4   would suggest -- I can ask general -- what I would propose

01:42:28   5   is, I can ask general foundational questions about these

           6   disks, generally; and then, I can just offer each one.

           7              THE COURT:  That's acceptable.

           8   BY MR. KOLE:

           9   Q    Agent Reitz, we've looked at several of these CDs of

01:42:40  10   recordings.

          11              Do you remember that?

          12   A    Yes.

          13   Q    Are all of the CDs that contain recordings --

          14   Exhibits 1 through 90 -- were they all prepared in a similar

01:42:49  15   way?

          16   A    Yes.

          17   Q    And have you had a chance to review all of them and

          18   check their accuracy?

          19   A    Yes.  With the transcripts.

01:42:55  20   Q    With the transcripts?

          21   A    Yes.

          22   Q    And is Exhibit 3, in particular, an accurate -- true

          23   and accurate recording of a particular call on

          24   February 27th?

01:43:02  25   A    Yes.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

7

01:43:03   1          MR. KOLE:  Government offers Exhibit 3.

           2          THE COURT:  Received.

           3      *(Plaintiff's Exhibit 3 received in evidence.)*

           4      *(The audiotape was played.)*

01:43:18   5  BY MR. KOLE:

           6  Q    Just pausing the call there on page 2, Agent Reitz, did

           7  you recognize the voice of the person you were talking to on

           8  this call?

           9  A    Yes, I did.

01:44:44  10  Q    Was it Mr. William Elder again?

          11  A    Yes.

          12  Q    What were you asking him, right here:  *What do you know*

          13  *about this lady?*

          14          Who were you talking about?

01:44:53  15  A    Dr. Pemkova.

          16  Q    Were you trying to get more information about her?

          17  A    Yes.

          18      *(The audiotape was played.)*

          19  BY MR. KOLE:

01:45:14  20  Q    Pause in the call again there, at page 3.

          21          Did Elder give you any assurance -- reassurance

          22  about Ms. Pemkova?

          23  A    Yes.

          24  Q    What did he tell you?

01:45:23  25  A    He said that she operated at a very high level and

01:45:25  1  that -- people that she's put under these transactions have

2  made money and that she's been doing it -- that he has

3  worked for her for five years.

4  Q    And over that five years of experience, did he tell you

01:45:36  5  that she had been very successful?

6  A    Yes.

7      (*The audiotape was played.*)

8  BY MR. KOLE:

9  Q    In the course of your investigation, did you observe

01:45:57 10  people you spoke with to refer to "millions of dollars" as

11  "10M" or "1M" and "billions" as "1B" or "10B," that kind of

12  thing?

13  A    That was very common in dealing with all of the

14  high-yield investment schemes that were part of the

01:46:12 15  undercover.

16  Q    Did you have an impression as to, maybe, why that was

17  done?

18  A    As a shorthand.  Simply --

19      MS. PEMKOVA:  Objection.  It is speculation.  And

01:46:21 20  you made the comment that I was -- she is -- people who

21  she's successful with, it wasn't said on the call.

22      You are rephrasing it.

23      THE COURT:  Please continue.

24  BY MR. KOLE:

01:46:30 25  Q    Did it appear to be thrown out there in a casual way

01:46:34  1    like it's just normal to be talking about billions of

2    dollars?

3    A    Yes.

4         (*The audiotape was played.*)

01:46:40  5    BY MR. KOLE:

6    Q    Pause in the call, again, there at the bottom of

7    page 3.  That reference to "opening something up for under a

8    certain amount," is that something you heard frequently

9    during the course of this investigation?

01:47:03 10    A    Yes.  Typically, prospective investors are told that

11   the very large dollar amounts -- prospective investors are

12   told very large dollar amounts are easier to process than

13   very small dollar amounts, because then you're the single

14   person in the transaction.  They don't have to bring a bunch

01:47:27 15   of people together.  So the 1 million transactions are

16   actually more difficult to process than the billion dollar

17   transactions.

18   Q    Did you get the impression from that in your role as an

19   investor that the people you were talking to commonly dealt

01:47:43 20   in very, very large amounts?

21   A    Yes.

22        (*The audiotape was played.*)

23   BY MR. KOLE:

24   Q    Agent Reitz, directing your attention to the part of

01:48:56 25   the call where you asked about a company name.  Whose

01:49:00  1    company name were you asking about then?

2    A    Irene Pemkova.

3    Q    Would they -- would Elder tell you a name?

4    A    He didn't give me any specific name, no.

01:49:08  5    Q    And in your investigation of this matter, was that a --

6    was that a -- did that recur -- was that anything that was

7    common:  Not being told names of entities?

8    A    Yes.

9    Q    In the real -- in the economy and investments, do

01:49:25  10   people invest their money buying stocks or bonds?  Do they

11   typically have to buy something from an unknown, anonymous

12   company or entity?

13   A    No.

14         MS. PEMKOVA:  Objection.  Bonds and stocks is

01:49:38  15   one -- is an American investment.  And Mr. Elder was talking

16   about a foundation in Europe.  It's fair --

17         THE COURT:  Ms. Pemkova, this isn't the time for

18   evidence.  You're going to present evidence during your

19   case.

01:49:58  20        You can object to the evidence being presented.

21        MS. PEMKOVA:  Okay.

22        THE COURT:  Okay.  Thank you.

23   BY MR. KOLE:

24   Q    In your experience both investigating financial matters

01:50:09  25   as an FBI agent and when you were an accountant, were you

01:50:12   1   familiar with the concept of due diligence?

2   A    Yes.

3   Q    And does due diligence involve doing -- acquiring

4   information about a company?

01:50:20   5   A    Yes.

6   Q    Is it important when you're doing that to have names of

7   people and names of companies dealing with the entity you're

8   looking into?

9   A    Yes.   Especially to research them and find out they're

01:50:30   10   *bona fides*, their qualifications, and how they interact

11   within a transaction that could have hundreds of millions

12   involved in it.

13   Q    Please take out Exhibit 14.   We'll skip up to No. 14.

14   A    I have that.

01:50:51   15   Q    Is Exhibit 14 another CD with a recording?

16   A    Yes.

17   Q    Prepared similar -- in a similar way to the others?

18   A    Yes.

19        MR. KOLE:   Government offers Exhibit 14.

01:50:59   20        THE COURT:   Received.

21      *(Plaintiff's Exhibit CD received in evidence.)*

22      *(The audiotape was played.)*

23   BY MR. KOLE:

24   Q    Did in this -- was this a phone call that you had with

01:52:34   25   Ms. Pemkova?

01:52:34  1    A    Yes.

          2    Q    Did she tell you anything about her location?

          3    A    She said that she was in Las Vegas at that time.

          4    Q    In the state of Nevada?

01:52:42  5    A    Yes.

          6    Q    Please take out Exhibit 24.  We'll skip up to that one.

          7    A    Okay.  I have that.

          8    Q    Is Exhibit 24 another CD with a recording of one of

          9    your undercover telephone calls?

01:53:01 10    A    Yes.

         11            MR. KOLE:  Government offers Exhibit 24.

         12            THE COURT:  Received.

         13        (Plaintiff's Exhibit 24 received in evidence.)

         14    BY MR. KOLE:

01:53:12 15    Q    What date did this call occur?

         16    A    May 2nd, 2006.

         17    Q    And did you place this call?

         18    A    Yes.

         19    Q    Did you call the same phone number you had been using

01:53:29 20    for Ms. Pemkova on other occasions?

         21    A    Yes.

         22    Q    And between the other calls we were listening to

         23    earlier in 2006 and this one in May of 2006, did you have

         24    some further communication with her?

01:53:41 25    A    There was a little, yes.

01:53:44  1    Q    And in some of those, did she call you?

       2    A    Yes.

       3    Q    And some, did you call her?

       4    A    Yes.

01:53:49  5    Q    And was some just voicemail messages?

       6    A    Yes.

       7    Q    Did you have some discussion with her about possibly

       8    meeting in Los Angeles?

       9    A    Yes.

01:53:58 10    Q    And do you recall why that did not actually happen?

      11    A    She had other appointments and was very busy in

      12    Las Vegas.

      13    Q    Okay.

      14         (The audiotape was played.)

01:54:46 15    BY MR. KOLE:

      16    Q    Pausing the call at the bottom of page 1.

      17         Was Ms. Pemkova describing some problem to you?

      18    A    Yes.  She was saying that the issuance of small amounts

      19    in a particular investment was very complicated due to the

01:55:43 20    limited supply.

      21    Q    So did it sound like there was going to be some delay

      22    before your investment could be made?

      23    A    Yes.

      24         (The audiotape was played.)

      25    ////

01:55:50  1    BY MR. KOLE:

       2    Q    Pausing the call there at page 3.

       3           Did you have an understanding from Ms. Pemkova as

       4    to how much money you had to come up with to do this

01:57:27  5    investment?

       6    A    Yes.  The preferred amount was 25 million, but the

       7    absolute minimum would be 10 million.

       8           (The audiotape was played.)

       9    BY MR. KOLE:

01:59:25 10    Q    Pausing the call at the top of page 6 there.

      11           Did Ms. Pemkova, again, refer to being in

      12    Las Vegas?

      13    A    Yes.

      14    Q    And during your work on this matter, did you come to

01:59:34 15    understand where she lived?

      16    A    Yes.

      17    Q    Where was that?

      18    A    She lived in Las Vegas, Nevada.

      19    Q    What did you understand her to mean when she was saying

01:59:43 20    she is working mostly on the bigger deals?

      21    A    That she's working on transactions that involve very

      22    large dollar amounts, as opposed to the 1 million to

      23    10 million that I was talking about earlier.

      24           (The audiotape was played.)

      25    ////

01:59:57    1    BY MR. KOLE:

            2    Q    Directing your attention, Agent Reitz, to the part of

            3    that call at the end where Ms. Pemkova talks about the

            4    moment she gets more information she'll let you know.

02:01:43    5    A    Yes.

            6    Q    This is -- is this on May 2nd, 2006?

            7    A    Yes.

            8    Q    Were you then, after that, waiting to hear back from

            9    her for a while?

02:01:51   10    A    Yes.

           11    Q    And did a break in conversations with her then follow

           12    until a later date?

           13    A    Yes.

           14    Q    Was it not until late August that you talked to her

02:01:59   15    again?

           16    A    That's my recollection, yes.

           17    Q    During that time, did you reach out to her, try to lean

           18    on her to get her to give you an investment?

           19    A    No.  I don't recall that.

02:02:11   20    Q    And then did she call you on August 24th?

           21    A    Yes.

           22    Q    Did you do anything to trigger that call to try to get

           23    her to call you?

           24    A    Not that I recall.

02:02:19   25    Q    And please take Exhibit 25.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:02:26  1    A    *(Witness so complies.)*  I have it.

2    Q    Is this another CD containing an undercover recording

3    from the case?

4    A    Yes.

02:02:36  5          MR. KOLE:  Your Honor, the Government offers

6    Exhibit 25.

7          THE COURT:  Received.

8          *(Plaintiff's Exhibit 25 received in evidence.)*

9          *(The audiotape was played.)*

02:02:43  10   BY MR. KOLE:

11   Q    Pause in the call, right there.

12         Ms. Pemkova kind of explained to you why she was

13   suddenly getting in touch with you again?

14   A    Yes.

02:03:09  15   Q    What did she tell you?

16   A    That she had some exciting news for me that she'd been

17   waiting for, for a while -- both of us had been waiting for.

18   Q    Did she acknowledge that it had been quite a long time

19   since you had spoken?

02:03:23  20   A    Yes.

21   Q    Again, what's the date of this?

22   A    This is August 24.

23   Q    So, have we gone now from May to August without you

24   getting in touch with her or you trying to get her to give

02:03:36  25   you something?

17

02:03:36  1   A    That's my recollection, yes.

          2        (*The audiotape was played.*)

          3   BY MR. KOLE:

          4   Q    Pause in the call there, again, on page 1.

02:04:02  5        What was she calling about?

          6   A    She was saying that she had a million-plus transaction

          7   that was finally available and the trading entity,

          8   specifically, approved a smaller amount, but the higher

          9   amounts were better and had higher priority.

02:04:16 10        (*The audiotape was played.*)

         11        MS. PEMKOVA:  Objection to the interpretation of

         12   the call to Mr. Kole.

         13        THE COURT:  Please continue.

         14        (*The audiotape was played.*)

02:04:59 15   BY MR. KOLE:

         16   Q    Pause in the call.  Middle of page 2 there.

         17        Why were you asking who?

         18   A    I hadn't picked up the name she said of who I was

         19   supposed to call.

02:05:09 20   Q    But who was it that she said?

         21   A    William Elder.

         22        (*The audiotape was played.*)

         23   BY MR. KOLE:

         24   Q    Pausing at the bottom of page 2.

02:05:36 25        What's this term "SWIFT" that you see there, or

*DEBORAH D. PARKER, U.S. COURT REPORTER*

18

| | |
|---|---|
| 02:05:39 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 02:05:48 | 5 |
| | 6 |

1  heard in the call?

2  A    "SWIFT" is a way that banks can transfer money between

3  accounts and between financial institutions.  It's like a

4  wire.

5  Q    Especially in an electronic funds transfer?

6  A    Yes.

7  Q    Does the fact that it's "SWIFT" denote anything about

8  where in the world it's happening?

9  A    Generally, it's a term used for international

10  transactions.

11  Q    And in that same exchange, Ms. Pemkova refers to a

12  block funds letter and pinging the account.  Pinging,

13  P-I-N-G-I-N-G?

14  A    Yes.

15  Q    And did you understand what she meant, what those terms

16  were referring to?

17  A    Yes.

18  Q    What?

19  A    So a "block funds letter" in the common parlance,

20  high-field investments, is a document purportedly from a

21  financial institution stating that funds are in a particular

22  account and they cannot be moved -- that they're blocked in

23  that -- in that position.

24      And then, the "pinging account" -- again, in

25  high-yield investment parlance as been discussed -- people

02:06:48  1   can leave their money in their account and participate in

2   these investments.  So, to leave their money in the account,

3   there has to be some way for the trader to ensure the money

4   is there.  And so, that is what has been colloquially termed

02:07:04  5   a "pinging" of the account.

6        So that's sort of like in the old World War II

7   movies with submarines where they'd have to ping to find the

8   submarine, and the information would come back, *Oh, there's*

9   *something underneath there.*  This is what the trader is

02:07:18  10   going to do:  He's going to ping the account to see that the

11   money is actually there; and then, that would purportedly

12   allow him to move forward with the transaction.

13        (*The audiotape was played.*)

14   BY MR. KOLE:

02:08:22  15   Q    Pausing the call at the bottom of page 3.

16        Was Pemkova describing some type of investment

17   program to you?

18   A    Yes.

19   Q    What kind of profit was she talking about?

02:08:33  20   A    It would be 40 to 50 percent per week.

21   Q    And would you double your money in two weeks, then?

22   A    Yes.

23   Q    Did she talk about it lasting for 40 weeks?

24   A    Yes.

02:08:43  25   Q    And over that time, would you be able to make thousands

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
02:08:47   1   of percent return?

           2   A    On an annualized stated basis, yes.

           3   Q    In fact, by the end of --

           4        MS. PEMKOVA:  Objection.  Speculative.  I wasn't

02:09:00   5   talking about yearly.

           6   BY MR. KOLE:

           7   Q    Well, over 40 weeks, if you made 40 to 50 percent per

           8   week, would you make 16 to 20 times your original investment

           9   in 40 weeks?

02:09:11  10   A    Yes.

          11   Q    The pinging in the blocked funds -- specifically,

          12   leaving your money in the account and having somebody ping

          13   it -- would that be significant to an investor such as you

          14   were acting as then?

02:09:25  15   A    It would allow me to engage in an investment with no

          16   risk, because my money isn't moving and, yet, one that would

          17   be yielding 50 percent per week.  So that would be very

          18   important.

          19        (The audiotape was played.)

02:09:43  20   BY MR. KOLE:

          21   Q    Pausing it right there at the top of page 5, for a

          22   minute.

          23        Did Ms. Pemkova -- when you were talking to her

          24   about -- or she was talking to you about this investment,

02:10:42  25   did she tell you that she was just relying on something
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:10:46  1  somebody else told you, or she had no idea if it really was

2  working?

3  A     No.

4  Q     What did she tell you?

02:10:52  5  A     She said that they'd been doing small programs for

6  three or four years.

7  Q     And did she say to you whether the trader had actually

8  been able to provide these returns in the past?

9  A     Yes.  She said that they had long term -- she described

02:11:07  10  it as a long-term performing party.

11       (*The audiotape was played.*)

12  BY MR. KOLE:

13  Q     Stopping the call there at the bottom of page 5.

14            Did Pemkova tell you that there was some

02:12:06  15  connection to the U.S. Federal Government with these

16  investments, or this particular investment?

17  A     She said that this particular group with the long-term

18  success was receiving guidance by the Fed, which I took to

19  mean the Federal Reserve Bank of the United States, and the

02:12:22  20  CIA, which I took to mean the Central Intelligence Agency.

21  Q     And just in case -- I'm sure people are generally

22  familiar with it but in case there's somebody who is not,

23  the Federal Reserve Bank of the United States, what function

24  does that entity perform?

02:12:37  25  A     Basically, they control the money supply through

*DEBORAH D. PARKER, U.S. COURT REPORTER*

22

02:12:42   1    interest rate and bond purchasing and selling.

2    Q      Is that the central bank of the United States --

3    A      Yes.

4    Q      -- that, essentially, issues U.S. currency?

02:12:51   5    A      Yes.

6    Q      Did she make a reference to medium term note trading

7    during this -- earlier in this call?

8    A      Yes.

9    Q      And did you -- when she said that, did you have an

02:13:04  10    understanding of what a medium term note was or is?

11    A      Yes.

12    Q      What is your understanding?

13    A      It's a fairly generic description in the general

14    financial parlance of a note or a bond, an obligation due

02:13:17  15    between 3 to 10 years, something like that.  However, in

16    high-yield investment programs with this type of scheme that

17    I'm investigating, the abbreviation "MTN" is one that we see

18    all the time.  And "Medium Term Note" trading being

19    something that's routinely referred to as the vehicle that

02:13:39  20    generates these huge profits of 40 percent a week,

21    50 percent a week.

22    Q      And for clarification, if someone is not familiar with

23    it when we were talking about these debt instruments, notes,

24    is that a situation where a government or some other -- a

02:13:56  25    corporation, some entity needs to borrow money.  They,

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:13:59   1    basically, give a promise to repay money in the future and

2    someone buys that, such as lending the money and that's

3    reflected in a note or a bond?

4    A    Yes.

02:14:08   5    Q    And do those come in various lengths:  Short, medium

6    and long term?

7    A    Yes.

8    Q    Is the only difference between those is the length of

9    time until it is over and the money is paid back?

02:14:19  10    A    And the risk of the issuing company or bank, or

11   country.

12   Q    Is there more risk with the longer term one, because

13   the company, say, might go out of business?

14   A    Generally speaking, yes.

02:14:34  15   Q    Ms. Pemkova's reference to the Federal Reserve Bank and

16   the CIA in this call to you as Tom Moore, as an investor

17   thinking about this, did that have any significance?

18   A    Well, it sounds like -- since the Fed actually prints

19   the money, it sounds like my profits are pretty much locked

02:14:51  20   in.

21   Q    Can you, please, take out Exhibit 30.

22   A    *(Witness so complies.)*  I have that.

23   Q    And what is that?

24   A    This is a CD that contains a recording that I made on

02:15:12  25   September 22nd, 2006.

24

02:15:14  1    Q     Is this another one of your undercover phone calls?

        2    A     Yes.

        3          MR. KOLE:  Government offers Exhibit 30,

        4    Your Honor.

02:15:22  5          THE COURT:  Received.

        6          (Plaintiff's Exhibit 30 received in evidence.)

        7    BY MR. KOLE:

        8    Q   Now, do you remember the call we just listened to

        9    before, exhibit -- I think it was 25?  Yes, 25.

02:15:39 10          When did that occur?  What was the date of that

       11    one?

       12    A     August 24th.

       13    Q     And so Exhibit 30 that we've moved to now is

       14    approximately how much later?

02:15:47 15    A     Approximately a month.

       16    Q     So during that month or so, did you have some

       17    additional conversations with Ms. Pemkova?

       18    A     Yes.

       19    Q     Some messages?  Some calls?

02:15:55 20    A     Yes.

       21    Q     Did you -- she asked for financial information.

       22          Did you send that to her?

       23    A     Yes.

       24    Q     And then, let's turn our attention to Exhibit 30.

02:16:11 25          (The audiotape was played.)

*DEBORAH D. PARKER, U.S. COURT REPORTER*

25

```
02:16:25    1    BY MR. KOLE:

            2    Q    Agent Reitz, were you -- did Ms. Pemkova indicate that

            3    there was some -- again, some kind of a delay?

            4    A    Yes.

02:17:34    5    Q    And was she waiting for something?

            6    A    Yes.  She said she was waiting for new instructions

            7    regarding the million-plus program I had talked about.

            8    Q    And then, after this call --

            9         Actually, why don't you go ahead and take out

02:17:50   10    Exhibit 31 now.  Let me help you so that I may ask this next

           11    question.

           12    A    I have that.

           13    Q    After Exhibit 30, after the call on Exhibit 30 in

           14    September, was there another period of time, another break

02:18:02   15    in time before you had a conversation back and forth with

           16    Ms. Pemkova?

           17    A    Yes.  That's --

           18    Q    And was that, in fact, period of -- over two months?

           19    A    Yes.

02:18:14   20    Q    Is Exhibit 31, a CD, another recorded phone call in

           21    this case?

           22    A    Yes.

           23         MR. KOLE:  Government offers Exhibit 31.

           24         THE COURT:  Received.

02:18:23   25         (Plaintiff's Exhibit 31 received in evidence.)
```

26

| | | |
|---|---|---|
| 02:18:29 | 1 | (*The audiotape was played.*) |
| | 2 | BY MR. KOLE: |
| | 3 | Q    Was that a voicemail message that you received? |
| | 4 | A    Yes. |
| 02:19:10 | 5 | Q    Who did it sound like it was from? |
| | 6 | A    Dr. Pemkova. |
| | 7 | Q    Did it sound like she wanted to talk to you soon? |
| | 8 | A    Yes. |
| | 9 | Q    Now, this message from her on November 28th, after that |
| 02:19:24 | 10 | two-month period since the last call we listened to, did you |
| | 11 | reach out to her? |
| | 12 | Did you do anything to trigger her calling you? |
| | 13 | A    Not that I recall. |
| | 14 | Q    Take you to Exhibit 33, please. |
| 02:19:38 | 15 | A    I have -- |
| | 16 | (*Pause.*) |
| | 17 | THE WITNESS:  I have that. |
| | 18 | BY MR. KOLE: |
| | 19 | Q    And is that a CD with another recording -- undercover |
| 02:19:53 | 20 | recording from the case? |
| | 21 | A    Yes. |
| | 22 | MR. KOLE:  Government offers Exhibit 33, |
| | 23 | Your Honor. |
| | 24 | THE COURT:  Received. |
| 02:19:58 | 25 | (*Plaintiff's Exhibit 33 received in evidence.*) |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:19:58    1    BY MR. KOLE:

            2    Q    What's the date of the call on Exhibit 33?

            3    A    It's November 29th, 2006.

            4    Q    The day after the voicemail we just listened to?

02:20:06    5    A    Yes.

            6    Q    Did you call Ms. Pemkova back in response to her

            7    message?

            8    A    This --

            9    Q    We didn't listen to it, but did you call her back?  Do

02:20:17   10    you remember?

           11    A    Yes, I did.

           12    Q    Did you just -- did you just need something to refresh

           13    your recollection?

           14    A    Yes.

02:20:22   15    Q    Was that Exhibit 32-T?

           16    A    Yes.

           17    Q    So Exhibit 33, is that a conversation that you had with

           18    Ms. Pemkova after you returned her call?

           19    A    Yes.

02:20:39   20         (The audiotape was played.)

           21    BY MR. KOLE:

           22    Q    Just pausing it for a moment there in the middle of

           23    page 1.

           24         Was Ms. Pemkova asking you that question, because

02:21:16   25    it had been quite a while since you had spoken?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:21:19  1    A    Yes.

       2    Q    And, again, had you -- other than just returning her

       3    message, were you reaching out to her or trying to push her

       4    to do this?

02:21:27  5    A    No.

       6         (The audiotape was played.)

       7    BY MR. KOLE:

       8    Q    Pausing it there at the top of page 2.

       9         Did Ms. Pemkova explain why she was calling at

02:22:02 10    this time?

      11    A    Yes, she did.

      12    Q    What did she say?

      13    A    She said that an opportunity had arisen in a program

      14    that was essentially closed because a particular investor

02:22:13 15    wasn't approved, so there was a spot for a minimum of a

      16    million dollars.

      17         (The audiotape was played.)

      18    BY MR. KOLE:

      19    Q    Pausing the call at the top of page 3 there.

02:23:24 20         Did Ms. Pemkova tell you that there were certain

      21    requirements or things you would have to do, if you wanted

      22    to make this investment?

      23    A    Yes.  She talked about two requirements:  The first one

      24    being that I would have to travel to Germany and set up an

02:23:38 25    account.

02:23:39  1   Q    And what about your money?

2   A    That my money would have to move to that account in

3   Germany.

4   Q    And did she also say you had to send -- immediately

02:23:46  5   send a bank statement?

6   A    Yes.  I needed to send a tear sheet.

7        (*The audiotape was played.*)

8   BY MR. KOLE:

9   Q    Pausing the call at the top of page 5 there.

02:25:37 10        Did Ms. Pemkova describe to you the return

11   available on this million dollar investment?

12   A    Yes.

13   Q    What did she say?

14   A    She said that it's a 30-day program where you're making

02:25:49 15   300 percent of your money.

16   Q    So after one month, how much would your 1 million

17   yield, or give you?

18   A    3 million in return.

19   Q    And did it sound urgent to you?

02:25:59 20   A    Yes.

21   Q    In the part that we just listened to, she says that

22   there's something else she needs from you that she does not

23   have, bottom of page 4.

24        What was that?

02:26:12 25   A    She needs a copy of my passport and a current tear

02:26:16    1    sheet.

            2    Q    If you gave somebody your -- a copy of your passport

            3    and a bank statement or tear sheet, would they have some

            4    important information about you?

02:26:26    5    A    Yes, they would.

            6    Q    What types of things?

            7    A    They would have your passport number, your picture

            8    depiction, plus your date of birth and your place of birth.

            9    Q    And would they have the location of your bank?

02:26:40   10    A    And then with the tear sheet, they would have the

           11    location of your financial institution, where in this case I

           12    had a million dollars on deposit.

           13    Q    Would they have your bank account number?

           14    A    That as well, yes.

02:26:51   15    Q    Would they know how much money you had in the bank

           16    account?

           17    A    Yes.  From the statement.

           18    Q    Would they know your home address, presumably on that

           19    the statement?

02:26:59   20    A    Potentially, if it's on the statement, that's where the

           21    statements are mailed.

           22    Q    Have you ever heard of the term "identity theft"?

           23    A    Yes.

           24    Q    Have you ever worked on investigations related to that?

02:27:09   25    A    Yes.

31

02:27:09   1    Q    Are the things you just listed things that are

            2    important in identity theft matters?

            3                 MS. PEMKOVA:  Objection.

            4                 THE COURT:  Overruled.

02:27:19   5                 THE WITNESS:  Yes, they are.

            6    BY MR. KOLE:

            7    Q    Why is that?

            8    A    Identity theft is the taking of someone's personal

            9    identifying information and then utilizing that to engage in

02:27:30  10    some sort of scheme to defraud:  Either take money out of

           11    that person's bank, or get credit in that person's name, or

           12    engage in some other financial transaction.  And having a

           13    copy of a passport, plus all of the personal identifying

           14    information that's enclosed in that, is very hazardous and

02:27:48  15    people shouldn't give that information out.

           16    Q    Can you please take out a paper document at this time,

           17    Exhibit 93.

           18    A    *(Witness so complies.)*  I have that.

           19    Q    Do you recognize that?

02:28:09  20    A    Yes.

           21    Q    What is it?

           22    A    It's an e-mail that I sent to Dr. Pemkova that --

           23    Q    Consists of three pages?

           24    A    Three pages; that is, the tear sheet for my bank

02:28:24  25    account at Bank of America and a copy of the first open page

*DEBORAH D. PARKER, U.S. COURT REPORTER*

32

02:28:29   1    of my undercover passport.

2    Q    When did you send that?

3    A    On November 29th, 2006, at 9:10 a.m.

4    Q    Is that the same day of the phone call we just listened

02:28:43   5    to?

6    A    Yes.

7              MR. KOLE:  Your Honor, the Government offers

8    Exhibit 93.

9              THE COURT:  Received.

02:28:48  10        *(Plaintiff's Exhibit 93 received in evidence.)*

11             MR. KOLE:  I'm going to place the first page of it

12   on the camera.

13        *(The document was published in open court.)*

14   BY MR. KOLE:

02:29:02  15   Q    Do you see it on the screen there?

16   A    Yes.

17   Q    And the portion of the exhibit I put on the projector,

18   is that the e-mail you sent?

19   A    Yes.  Yes, it is.

02:29:18  20   Q    And I'll point.  Do you see my finger indicating on the

21   screen?

22   A    Yes.

23   Q    Does that have the date and time it was sent?

24   A    Yes.

02:29:26  25   Q    Okay.  I'm moving it over a little bit to the left, so

| | | |
|---|---|---|
| 02:29:29 | 1 | we can zoom in on the text. |
| | 2 | Does it identify you? |
| | 3 | A    Yes.   Thomas Moore, at the e-mail address: |
| | 4 | Investorthomasmoore@hotmail.com. |
| 02:29:40 | 5 | Q    And I'm indicating that area. |
| | 6 | That e-mail address, is that familiar to you? |
| | 7 | A    Yes. |
| | 8 | Q    Why? |
| | 9 | A    It was the e-mail address I used in the undercover |
| 02:29:49 | 10 | project when posing as Tom Moore. |
| | 11 | Q    In other words, that was your undercover e-mail |
| | 12 | address? |
| | 13 | A    Yes. |
| | 14 | Q    And so, it's cut off a little bit by the hole punch on |
| 02:29:59 | 15 | the copy on the screen. |
| | 16 | On yours, does it have an e-mail address, the |
| | 17 | e-mail it was going to? |
| | 18 | A    On mine, it's not complete.  But I recognize the |
| | 19 | A-M-A-R-T-Y-K@yahoo as being that of Dr. Pemkova. |
| 02:30:18 | 20 | Q    Down below, did you sign it in your "Tom Moore" |
| | 21 | identity? |
| | 22 | A    Yes. |
| | 23 | Q    Turn to the second page -- |
| | 24 | A    I see that. |
| 02:30:25 | 25 | Q    -- which I'm placing on the screen now. |

34

02:30:28  1              What do we have there?

2     A     This is the printout of my checking account, according

3     to that day's balance.

4     Q     At what bank?

02:30:40  5     A     At Bank of America.

6     Q     Was this the undercover bank account we were

7     discussing?

8     A     Yes.

9     Q     Does it show the balance -- the amount in the account?

02:30:52  10    A     Yes.

11    Q     And how much does it indicate?

12    A     $1,509,371.

13    Q     And please turn to the third page.

14    A     *(Witness so complies.)*

02:31:10  15    Q     Do you have it?

16    A     Yes.

17    Q     I'm placing that on the screen as well.

18              What is that?

19    A     That is a photocopy of the open page of the undercover

02:31:22  20    passport book I used as Thomas Moore.

21    Q     What do you mean by "undercover passport"?

22    A     Well, this passport was obtained through special

23    processes.  Once an undercover project is approved, then

24    agents can obtain a real passport from the Department of

02:31:43  25    State that has alias and false identities on it; and that's

*DEBORAH D. PARKER, U.S. COURT REPORTER*

35

| | |
|---|---|
| 02:31:47 | 1   what this is. |
| | 2   Q     And does this contain, at least in your undercover |
| | 3   persona, your photograph, the date of birth, place of birth |
| | 4   that you were using? |
| 02:31:58 | 5   A     Yes. |
| | 6   Q     Please take out exhibit -- oh, let me ask you one more |
| | 7   question about that:  Did you -- did you send those by |
| | 8   e-mail? |
| | 9   A     Yes. |
| 02:32:13 | 10  Q     Where were you when you sent the e-mail? |
| | 11  A     In Newport Beach, California. |
| | 12  Q     And you sent them to Dr. Pemkova's e-mail? |
| | 13  A     Yes. |
| | 14  Q     So I don't need to ask it over and over again, as we |
| 02:32:25 | 15  look at various e-mails in this case, if they were sent by |
| | 16  you from the investor Tom Moore account, were they always |
| | 17  sent from Newport, California? |
| | 18  A     Either Newport Beach or Costa Mesa. |
| | 19  Q     Somewhere in California? |
| 02:32:40 | 20  A     Yeah. |
| | 21  Q     Please take out Exhibit 34. |
| | 22  A     (Witness so complies.)  Okay.  I have that. |
| | 23  Q     What type of item is that? |
| | 24  A     This is a CD bearing the recording that I made in |
| 02:33:01 | 25  connection with this undercover project on November 29th, |

36

02:33:04  1    2006.

2    Q    And is this conversation from that same day we were

3    just talking about:  November 29th of '06?

4    A    Yes.

02:33:14  5         MR. KOLE:  The Government offers Exhibit 34,

6    Your Honor.

7         THE COURT:  Received.

8         *(Plaintiff's Exhibit 34 received in evidence.)*

9         *(The audiotape was played.)*

02:33:30 10   BY MR. KOLE:

11    Q    Pausing it there in the middle of page 1.

12         Again, did you recognize the voice you were

13    talking?

14    A    Yes, I did, as Dr. Pemkova.

02:34:04 15    Q    She said she had good news for you; is that right?

16    A    Yes.

17    Q    What was the good news?

18    A    The good news was that she, through her close contact

19    with the foundation president, was able to get an exemption

02:34:18 20   so that I would not have to travel to Germany to engage in

21    this transaction.

22    Q    How long did it take her that day to call you back and

23    give you that information?

24    A    Less than an hour.

02:34:37 25        *(The audiotape was played.)*

*DEBORAH D. PARKER, U.S. COURT REPORTER*

BY MR. KOLE:

Q    Pausing it again there, a little farther down on page 1.

Agent Reitz, did Ms. Pemkova tell you that this was something she just hoped you'd be able to do and somebody told her maybe it would work, that maybe you would be able to make money, but she didn't really know?

A    She didn't describe it that way.

Q    How did she describe it?

A    She described it as something that had already paid three people.

Q    And when you asked if it would happen in January -- when you asked if it would happen in January, what word did she use to respond to you to say whether it would happen?

A    Definitely.

Q    Was there any hesitation in that?

A    No.

(*The audiotape was played.*)

BY MR. KOLE:

Q    Pausing it again, in the middle of page 2 there.

Did you have an understanding as to what she was talking about when she said she got an exception from the foundation president?

A    Yes.  That she had talked to the president of the foundation.  Because this is a high-yielding transaction,

38

| | | |
|---|---|---|
| 02:36:13 | 1 | there'll be a foundation that's tied to a charity that will |
| | 2 | be involved in this; that she was able to contact that |
| | 3 | person and get me an exception so I would not have to travel |
| | 4 | to Germany. |
| 02:36:23 | 5 | Q    Did she say whether that person was known to her? |
| | 6 | A    Yes.  She said that he was. |
| | 7 | Q    Did you later find out from Ms. Pemkova what this |
| | 8 | particular foundation was? |
| | 9 | A    Yes. |
| 02:36:32 | 10 | Q    What was it? |
| | 11 | A    It was called David and Goliath Ministries also known |
| | 12 | as Hope Ministries. |
| | 13 | Q    Did you ever find out who this president was she was |
| | 14 | talking about? |
| 02:36:41 | 15 | A    It was an individual named Dr. Moses Onciu. |
| | 16 | Q    Is that O-N-C-I-U? |
| | 17 | A    Yes. |
| | 18 | (*The audiotape was played.*) |
| | 19 | BY MR. KOLE: |
| 02:37:23 | 20 | Q    Pausing it there at the top of page 3. |
| | 21 | At this point in the call, did Ms. Pemkova |
| | 22 | introduce to you another person involved in this? |
| | 23 | A    Yes, she did. |
| | 24 | Q    And I don't mean introduce personally but mention a |
| 02:37:37 | 25 | name? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:37:37   1    A     Yes.

         2    Q     What name was that?

         3    A     Dr. Priore.

         4    Q     And when you asked initially about this Priore, did you

02:37:47   5    make an assumption as to the gender of the person?

         6    A     Yes.

         7    Q     You assumed it was a man?

         8    A     Yes.

         9    Q     Did she appear to not have any idea who this person

02:37:55  10    was -- Ms. Pemkova?

        11    A     Ms. Pemkova appeared to have an idea who this person

        12    was.

        13    Q     How?  What did she tell you?

        14    A     She said that Dr. Priore is actually a lady in

02:38:10  15    New York.

        16    Q     That she knew was a woman?  She knew where she lived,

        17    right?

        18    A     Yes.  And that she would be dealing directly with the

        19    bank.

02:38:19  20    Q     Again, did Ms. Pemkova express some level of urgency to

        21    you here?

        22    A     Yes, she did.

        23    Q     Oh, did Ms. Pemkova seem to be familiar with what this

        24    Dr. Priore was going to be doing?

02:38:32  25    A     Yes.

40

```
02:38:36    1              MS. PEMKOVA:  Objection.  Speculation.
            2    BY MR. KOLE:
            3    Q    And earlier in the call, did Ms. Pemkova again
            4    reiterate the rate of return available with this investment?
02:38:46    5    A    When I said that it would be -- asked if it was around
            6    300 percent a month, she responded that it was something
            7    like that.
            8         (The audiotape was played.)
            9    BY MR. KOLE:
02:40:33   10    Q    Pause in the call there at page 4.
           11              There is that silence, that gap break in the
           12    discussion.  What did it appear to you was happening?
           13    A    Immediately before the break, Dr. Pemkova said, I'm
           14    sorry.  It's Dr. Priore.  And then there was a pause in our
02:40:51   15    conversation.
           16    Q    Did it appear that she had another call coming in and
           17    put you on call-waiting to take that call?
           18    A    Yes.
           19    Q    And did Ms. Pemkova tell you the other call was from
02:41:00   20    Priore?
           21    A    Yes, she did.
           22         (The audiotape was played.)
           23    BY MR. KOLE:
           24    Q    Pausing it there at the top of page 5.
02:41:33   25              Did it sound like you, as the investor, would have
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:41:36  1  time to, you know, research and check out this investment
        2  and talk to people before investing?
        3  A    No.  It sounded like an opportunity that would be
        4  quickly fleeting if I didn't act immediately.
02:41:47  5  Q    Which wouldn't really give you time to check out if it
        6  was legitimate?
        7  A    Yes.
        8  Q    Did Ms. Pemkova say some things that seemed to indicate
        9  that she was in close communication with and aware of what
02:41:59 10  Priore was doing?
       11  A    Yes.
       12  Q    What did she tell you?
       13  A    She said that she had been -- sorry.  That she would
       14  make sure that Dr. Priore wouldn't leave her office until my
02:42:11 15  file arrived that day.
       16  Q    And what about -- did she say anything about future
       17  contact between you and Priore, bottom of page 4?
       18  A    That I would be contacted by Dr. Priore, likely, the
       19  next morning.
02:42:28 20  Q    Did that actually happen?
       21  A    I believe it did, yes.
       22  Q    Are you looking at -- would it refresh your
       23  recollection to look at Exhibit 3070?
       24  A    Yes.  I have that.  Yes.  That was the next day that
02:42:52 25  Dr. Priore called me.

42

02:42:54  1   Q    Just as Pimkova said she would?

        2   A    Yes.

        3   Q    Now, at this time when you're talking to Pemkova and

        4   Ms. Pemkova mentions Priore to you, mentions the name, had

02:43:06  5   you had -- had you had by then any awareness of or contact

        6   with Priore?

        7   A    No.

        8   Q    Did you do anything to independently trigger Priore

        9   calling you?

02:43:17 10   A    No.

       11   Q    From your point of view, did it seem like the only

       12   reason that Priore was reaching out to you, was because of

       13   Ms. Pemkova's interactions?

       14   A    Yes.  Because of the documents that Dr. Pemkova was

02:43:30 15   instructing me to fill out, that would immediately go to

       16   Dr. Priore, which would result in a call from Dr. Priore to

       17   me.

       18        (*The audiotape was played.*)

       19   BY MR. KOLE:

02:44:08 20   Q    Excuse me.  Again, there in the middle of page 5.

       21        Did Ms. Pemkova again tell you that this was

       22   definitely a working program?

       23   A    Yes.

       24   Q    Did that indicate to you that this was some rumor, some

02:44:24 25   speculation or guess by her?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:44:25   1    A      No.

           2    Q      What did you take from that?

           3    A      That it was a program that was generating the profits

           4    in the area of 300 percent which I had discussed with

02:44:36   5    Pemkova and it was doing that for people.

           6              MS. PEMKOVA:  What page are you on right now?

           7              MR. KOLE:  That was page 5.

           8         (The audiotape was played.)

           9    BY MR. KOLE:

02:45:52  10    Q      Agent Reitz, did Ms. Pemkova again indicate to you that

          11    she was in Las Vegas, Nevada that day?

          12    A      Yes.

          13    Q      Was she planning to travel the next day to someplace?

          14    A      Yes.  To Scottsdale, Arizona.

02:46:04  15    Q      Did she indicate that she was leaving Nevada on this

          16    particular day, the day that you were talking, the 29th?

          17    A      No.  That she would be leaving the next day.

          18    Q      What time was the call we just listened to?  What time

          19    of the day?

02:46:17  20    A      9:40 a.m.

          21    Q      Please take out Exhibit 94.

          22    A      (Witness so complies.)  Okay.  I have that.

          23    Q      What is it?

          24    A      This is an e-mail dated November 29th, at 9:57 a.m.

02:46:37  25    from Dr. Pemkova to me.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

44

| | | |
|---|---|---|
| 02:46:40 | 1 | Q    When does that -- |
| | 2 | MR. KOLE:  Your Honor, the Government offers |
| | 3 | Exhibit 94. |
| | 4 | THE COURT:  Received. |
| 02:46:45 | 5 | *(Plaintiff's Exhibit 94 received in evidence.)* |
| | 6 | BY MR. KOLE: |
| | 7 | Q    When did this e-mail -- when was it sent?  When did it |
| | 8 | occur relative to the phone call we just listened to? |
| | 9 | A    Approximately 17 minutes later. |
| 02:46:59 | 10 | Q    And during the call, had Pemkova told you that she was |
| | 11 | going to send you something? |
| | 12 | A    Yes. |
| | 13 | Q    And did this e-mail appear to relate to that? |
| | 14 | A    Yes. |
| 02:47:07 | 15 | Q    How so? |
| | 16 | A    She said that she was going to send me a client |
| | 17 | information sheet, and that's basically what is attached to |
| | 18 | this document. |
| | 19 | MR. KOLE:  I'm going to place page 1 of Exhibit 94 |
| 02:47:20 | 20 | on the projector. |
| | 21 | *(The document was published in open court.)* |
| | 22 | BY MR. KOLE: |
| | 23 | Q    Do you see it there? |
| | 24 | A    Yes. |
| 02:47:34 | 25 | Q    And, first, directing your attention to the upper |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

45

02:47:37  1    right-hand corner, does it have the date and time?

       2    A     Yes.

       3    Q     And then over on the left side, in the upper left-hand

       4    corner, does it list who it's from?

02:47:50  5    A     It lists it as Dr. I, at the e-mail that I knew to be

       6    Dr. Pemkova.

       7    Q     Was the e-mail sent to your undercover e-mail address?

       8    A     Yes.

       9    Q     And does -- in the e-mail, does Ms. Pemkova say you

02:48:07 10    need to complete this attached document?

      11    A     Yes.  She says to complete the attached document and

      12    send it to her.

      13    Q     Did she care when you sent it?

      14    A     Yes.  She said that it needed to be no later than one

02:48:21 15    hour.

      16    Q     Take a look at the second page, please.

      17    A     (Witness so complies.)

      18    Q     What do we find there?

      19    A     This is a document that's described as a "Client

02:48:29 20    Information Form."

      21    Q     Do you see it on the screen?

      22    A     Yes.

      23    Q     Moving it down from the top portion that I'm showing

      24    you first, below the date area, what type of information

02:48:54 25    were you asked to give on this form?

46

02:48:57  1   A    A lot of personal identifying information similar to

2   this topic that I had mentioned previously; particularly,

3   date and place of birth, which is often used for identifying

4   information; a passport number and date of issue; the

02:49:16  5   registration numbers for corporations; officers of the

6   corporation, who's allowed to sign for the corporation under

7   the signatory title section.  So a lot of personal

8   identifying information.

9   Q    And then, if we turn to the last page, is it a

02:49:36 10   continuation of the form?

11   A    Yes.

12   Q    Does it ask for more information?

13   A    Yes, it does.

14   Q    Any important information about someone's finances

02:49:49 15   located there?

16   A    Yes.

17   Q    Like what?

18   A    Well, the name of the bank in which the million dollars

19   is held, the address of the same, the account number, the

02:50:00 20   account name, the signatory name and the bank telephone

21   number and the amount of money in the account.  And, of

22   course, I had already previously sent a passport to

23   Ms. Pemkova.

24   Q    Have you ever worked on an investigation involving bank

02:50:18 25   fraud?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

02:50:18    1    A     Yes.

            2    Q     If someone had this type of information, all this

            3    information about a person and their bank account, could it

            4    potentially be used to commit bank fraud?

02:50:30    5              MS. PEMKOVA:  Speculation.  Objection.

            6              THE COURT:  Overruled.

            7    BY MR. KOLE:

            8    Q     Potentially?

            9    A     Potentially, yes.

02:50:45   10    Q     Please take out Exhibit 95.

           11    A     *(Witness so complies.)*  All right.  I have that.

           12    Q     What is it?

           13    A     This is an e-mail from me to Dr. Pemkova, dated

           14    November 29th, at 10:57 a.m.

02:51:23   15              MR. KOLE:  Government offers Exhibit 95,

           16    Your Honor.

           17              THE COURT:  Received.

           18         *(Plaintiff's Exhibit 95 received in evidence.)*

           19              MR. KOLE:  Placing the first page on the

02:51:28   20    projector.

           21    BY MR. KOLE:

           22    Q     When did you send this relative to the e-mail we just

           23    looked at?

           24    A     Approximately an hour later.

02:51:40   25    Q     And can we, in fact, see that right on the e-mail?

48

02:51:43  1          If you look in the upper right-hand corner, does

2     it have your time sent:  10:37?

3     A    10:57.

4     Q    And then, on these e-mails that we're looking at in our

02:51:54  5     exhibits here, does it often have what we sometimes refer to

6     as an e-mail chain where there's an earlier message followed

7     by the next one, followed by the next one?

8     A    Yes.

9     Q    Do we see that here?

02:52:06  10    A    Yes.

11    Q    So down at the bottom -- is the first e-mail in the

12    chain at the bottom where you say, *Hopefully, they will be*

13    *reasonable*, and so on?

14    A    Yes.

02:52:17  15    Q    And then, does Ms. Pemkova respond by asking you to

16    complete the information sheet?

17    A    Yes.

18    Q    And you can -- so that text there that I'm pointing to

19    with my finger, the 9:57 text, was that the e-mail that we

02:52:33  20    just looked at before:  Exhibit 94?

21    A    Yes.

22    Q    And are you responding to that?

23    A    Yes.

24    Q    And what did you tell her at the top?

02:52:41  25    A    Very simple.  *As requested and attached, the document*

02:52:45  1    *filled out.*

2    Q    Please look at the second page.  Tell me what you have

3    there.

4    A    This is the client information form we just looked at,

02:52:56  5    with Tom Moore's relative information.

6    Q    Now, in this situation, the information that's put down

7    here is what you chose to put down as an undercover?

8    A    Yes.

9    Q    So it's not necessarily genuine?

02:53:16  10    A    Correct.

11    Q    Oh, by the way, do you see this company name that I'm

12    pointing to "New Mar Mesa"?

13    A    Yes.

14    Q    What is that?

02:53:25  15    A    That was the entity that was created as part of the

16    undercover that we would operate as.  Newport Beach,

17    Corona Del Mar, Costa Mesa.

18    Q    That was your undercover investment group, or firm?

19    A    I typically described it to people that I was speaking

02:53:46  20    with as a partnership that I operated on behalf of my family

21    to operate and control investments.

22    Q    Now, here you were acting in an undercover capacity; is

23    that right?

24    A    Yes.

02:54:00  25    Q    And you chose what to write here?

50

02:54:02   1   A     Yes.

2   Q     If this had gone to a real investor, would you expect

3   them to have put down their actual date of birth, place,

4   passport number, home address and all of that?

02:54:13   5   A     Yes.

6           MS. PEMKOVA:  Speculation.  Objection.

7           THE COURT:  Overruled.

8   BY MR. KOLE:

9   Q     And I'm moving the page up to show the rest of it.

02:54:21  10          In the bottom half of the page, did you put down

11   various business information?

12   A     Yes.

13   Q     And then, turning to the last page, page 3, did you

14   fill in bank information?

02:54:36  15   A     Yes.

16   Q     Do you see there's one item that's redacted or blacked

17   out?

18   A     Yes.

19   Q     Is that -- what type of information was that?

02:54:43  20   A     That was the account number that held the $1.5 million

21   at Bank of America.

22   Q     And then, was that an actual bank account?

23   A     Yes.

24   Q     Please take Exhibit 96.

02:54:58  25   A     *(Witness so complies.)*  I have that.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

51

```
02:55:10    1   Q    What is it?

            2   A    This is an e-mail dated November 29th, 2006, at

            3   12:37 p.m. that Dr. Pemkova sent to me.

            4   Q    It would probably be more efficient if you also would

02:55:28    5   pull out Exhibit 97, because I have some questions that are

            6   connected with that one.

            7   A    All right.  I have that.

            8   Q    Is -- Exhibit 96, was that an e-mail that you received

            9   in the operation?

02:55:39   10   A    Yes.

           11        MR. KOLE:  Government offers Exhibit 96,

           12   Your Honor.

           13        THE COURT:  Received.

           14        (Plaintiff's Exhibit 96 received in evidence.)

02:55:42   15   BY MR. KOLE:

           16   Q    Was this sent to you by Ms. Pemkova?

           17   A    Yes.

           18   Q    Placing the first page on the screen.

           19        Is this another e-mail in the chain that we've

02:55:52   20   been looking at?

           21   A    Yes.

           22   Q    Is this a response to your "as requested" e-mail?

           23   A    Yes, it is.

           24   Q    Sent a little later that day?

02:56:02   25   A    Correct.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

52

02:56:04  1    Q    And, specifically, was it sent at 12:37 p.m., on

          2    November 29th, 2006?

          3    A    Yes.

          4    Q    It lists a number of attachments at the top.

02:56:15  5             Do you see that?

          6    A    Yes.

          7    Q    Were those pages actually attached?

          8    A    Yes.

          9    Q    And do we find them in the rest of the exhibit?

02:56:23 10    A    Yes.

         11    Q    Can you just take us through after the e-mail and just

         12    tell us what types of documents did she attach.

         13    A    Attached were the client information form that I had

         14    previously sent to her, followed by a corporate resolution.

02:56:53 15    Q    Let me catch up with you here.

         16    A    Okay.

         17    Q    I've placed that one on the screen.

         18    A    Yes.

         19    Q    Did you have an understanding of what the purpose of

02:57:04 20    that was:  The corporate resolution?

         21    A    This was a document that was required to show that

         22    New Mar Mesa Group, my entity, as an entity had resolved to

         23    engage in this $1 million high-yield transaction.

         24    Q    Was it your understanding that if you were involved

02:57:23 25    with a business or an entity, you had to get the entity's

*DEBORAH D. PARKER, U.S. COURT REPORTER*

53

02:57:25  1   permission to make the investment?

2   A    Yes.

3   Q    And that Ms. Pemkova wanted to make sure that it did --

4        Did Ms. Pemkova give you the impression that she

02:57:35  5   wanted to make sure that your entity was also willing to

6   invest?

7   A    Yes.

8   Q    What's the next page?

9   A    Letter of intent.

02:57:50 10   Q    Does it reference the size of the investment?

11   A    Yes, it does.  $1 million.

12        THE COURT:  Are you still inside Exhibit 96?

13        MR. KOLE:  Yes, Your Honor.  This is page 6 of

14   Exhibit 96?

02:58:01 15        THE COURT:  That's fine.

16   BY MR. KOLE:

17   Q    What's the next document?

18   A    It's a noncircumvention, nondisclosure agreement.

19   Q    Have you read through that?

02:58:17 20   A    Yes.

21   Q    Did you have an understanding of what its purpose was?

22   A    Yes.

23   Q    What was that?

24   A    It was to prevent either party from discussing the

02:58:28 25   transaction with any other party unless prior permission had

54

02:58:33  1   been received.

2   Q    And then, the last two pages of Exhibit 96, directing

3   your attention to those, is there another type of document?

4   A    Yes.  Project Award Funding Agreement.

02:58:48  5   Q    And I'm placing the first of those two pages on the

6   screen, zooming in a little bit.  And I'll zoom a little

7   more on the little portion.

8          Is there a person's name that we've been talking

9   about in the trial?

02:59:06 10   A    Yes.

11   Q    Who is that?

12   A    Moses Onciu.

13   Q    And how is he described there?

14   A    He's described as the private placement -- sorry -- the

02:59:19 15   facilitator, or provider.

16   Q    And I would direct your attention to the first two

17   paragraphs.  Was there a reference there to that David and

18   Goliath that you talked about?

19   A    Yes.

02:59:34 20   Q    What does it say about that?

21   A    David and Goliath would receive part of the gross

22   earnings of this high investment, specifically 25 percent of

23   the gross income.

24   Q    Am I pointing to that right now on the screen?

02:59:48 25   A    Yes.

55

03:00:00  1    Q      Now, what is Exhibit 97?

       2    A      Exhibit 97 is what's typically called "header

       3    information," regarding Exhibit 96; that is, it is the

       4    routing information for the e-mail that describes the IP

03:00:17  5    addresses and dates and times that the e-mail traveled to

       6    get from point A to point B.

       7    Q      Did you do something to extract or obtain that

       8    information?

       9    A      Yes.  I right-clicked on the e-mail that was in the box

03:00:32 10    and then it displayed all this information, and I printed it

      11    out.

      12    Q      I'm going to place the first page of Exhibit 97 on the

      13    screen.

      14           Can you see all the text now on that page?

03:00:48 15    A      Yes.

      16    Q      And, first, I will zoom in on the more understandable

      17    wording towards the bottom:  *Mr. Moore, attached are*

      18    *submission documents.*

      19           Do you see that?

03:01:04 20    A      Yes.

      21    Q      Does that text there appear to be the same text that we

      22    saw on Exhibit 96?

      23    A      Yes.

      24    Q      But if you look above that, is there information that

03:01:24 25    you don't normally see when you look at an e-mail typically

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:01:29  1    on your computer?

2    A    Yes.  Again, this is the routing information that

3    describes the servers through which the e-mail passed.

4             MR. KOLE:  Your Honor, I'm not -- I think I

03:01:45  5    offered Exhibit 97.  I'm looking at my notes.  I'm not sure.

6    If I didn't, I offer Exhibit 97.

7             THE COURT:  It's received at this time.

8         *(Plaintiff's Exhibit 97 received in evidence.)*

9    BY MR. KOLE:

03:02:03 10    Q    Now, why were you -- were you looking at this?

11    A    My understanding of the law for wire fraud is that the

12    government would have to show that wire communications in

13    furtherance of the scheme would have to travel through

14    interstate communications.  So I'm trying to determine the

03:02:25 15    servers through which this e-mail passed and where they are

16    physically located.

17    Q    So you were looking for information about where the

18    e-mail went?

19    A    Yes.

03:02:36 20    Q    Now, if you look at the portion I zoomed in on, I'm

21    pointing with my pen to where it says "from."

22             Do you see that?

23    A    Yes.

24    Q    And if you follow down or look in that -- excuse me,

03:02:51 25    follow up from that address location where it says "received

*DEBORAH D. PARKER, U.S. COURT REPORTER*

57

```
03:02:54   1   from" I'm pointing to -- do you see that?
           2   A    Yes.
           3   Q    What are these numbers right after that?
           4   A    Those are IP addresses.
03:03:02   5   Q    And do you know what an "IP address" is?
           6   A    "IP" standing for "Internet Protocol," and it's a
           7   unique number that identifies the -- that can be used to
           8   identify the server through which that e-mail passed.
           9   Q    When someone is connected to the Internet, while they
03:03:22  10   are connected, do they have a unique IP address?
          11   A    Yes.  It's assigned by their IP -- their Internet
          12   Service Provider when they log in.
          13   Q    And can somebody -- would it be accurate to analogize,
          14   compare the IP address to a phone number when you're on the
03:03:39  15   phone in that it identifies your device uniquely in the
          16   world at that time?
          17   A    Yes.
          18   Q    So was that information of significance to you?
          19   A    Yes.
03:03:52  20   Q    What did you do with that information?
          21   A    There is a software -- sorry, a website called -- I
          22   believe it's "Who Is" that when you put in this information
          23   that's identified here, starting with the No. 71, it will
          24   identify the Internet Service Provider that has been
03:04:13  25   assigned this number to use for their servers.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:04:17  1   Q    And are you then able to make further inquiry or

2   question that provider to determine who that address

3   belonged to?

4   A    Yes.

03:04:26  5   Q    Below that, do you see a reference to the time of day:

6   12:37?

7   A    Yes.

8   Q    And then, "minus 0800"?

9   A    Yes.

03:04:40 10   Q    What is the minus 0800 talking about?

11   A    It's saying the time displayed, 12:37, represents

12   Pacific time; that is eight hours difference from Greenwich

13   time, or Universal time.

14   Q    So did you take this e-mail address -- this IP address,

03:05:00 15   7153164191, and then go ahead beyond looking up that website

16   you mentioned and make further checking on it?

17   A    Yes, I did.

18   Q    What did you do?

19   A    I found out that this was related to a specific

03:05:17 20   Internet provider.  I contacted them, and I spoke to someone

21   there.  And I asked them where the server that is assigned

22   this number was physically located.  And they told me that

23   it was located in Las Vegas, Nevada.

24   Q    Did that indicate to you anything about where the

03:05:37 25   e-mail would have electronically traveled before you got it

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:05:40  1    in California?

        2    A    That it at least traveled through Las Vegas, Nevada.

        3    Q    Was the company at that time who had that IP address

        4    called EMBARQ?

03:05:51  5    A    Yes.

        6    Q    Did that any later become acquired by some other

        7    company?

        8    A    Yes.

        9    Q    What company?

03:05:58 10    A    New Century.

       11    Q    Did you mean to say CenturyLink?

       12    A    Sorry.  CenturyLink.

       13    Q    And subsequent to that, did CenturyLink provide the

       14    government with some additional information about the

03:06:10 15    IP address?

       16    A    Yes.

       17    Q    Please take out Exhibit 35.  And you might as well get

       18    36, while you're at it.

       19             MS. PEMKOVA:  One more time, please.  The number?

03:06:30 20             MR. KOLE:  35 and 36.

       21       (Pause.)

       22             MS. PEMKOVA:  35 and 36.

       23             THE WITNESS:  I have those.  I have them.

       24    BY MR. KOLE:

03:06:48 25    Q    What are they?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

60

03:06:49  1    A     The Exhibit 35 is a CD, bearing a recording made in

2    connection with the undercover, November 29th -- sorry.

3    Yes, November 29th, 2006.

4    Q     Is that the same day we've been talking about quite a

03:07:10  5    bit in the last hour or so?

6    A     Yes.

7           MR. KOLE:  The Government offers Exhibit 35,

8    Your Honor?

9           THE COURT:  Received.

03:07:16  10    *(Plaintiff's Exhibit 35 received in evidence.)*

11    *(The audiotape was played.)*

12    BY MR. KOLE:

13    Q     Was that a message you received from Ms. Pemkova?

14    A     Yes.

03:07:51  15    Q     Did it appear to relate to the e-mail that we just were

16    looking at with all the header information and everything?

17    A     Yes, it did.

18    Q     And what is Exhibit 36?

19    A     Exhibit 36 is a CD containing a recorded phone call,

03:08:09  20    dated November 29th, 2006.

21    Q     Prepared in the same way and checked out by you in the

22    same way as the others?

23    A     Yes.

24           MR. KOLE:  Government offers Exhibit 36,

03:08:19  25    Your Honor.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:08:20  1            THE COURT:  Received.

        2        (Plaintiff's Exhibit 36 received in evidence.)

        3        (The audiotape was played.)

        4   BY MR. KOLE:

03:08:36  5   Q    Agent Reitz, just so people understand what's happening

        6   with this, sometimes did the recording device have some

        7   blank space at the beginning?

        8   A    Yes.  It was programmed to have buffers at the

        9   beginning and the end.

03:08:49 10   Q    So when I'm sometimes moving it forward, I'm trying

       11   to -- am I trying to get to the beginning of the actual

       12   voices?

       13   A    It appears so, yes.

       14        (The audiotape was played.)

03:09:09 15   BY MR. KOLE:

       16   Q    Was this another conversation that you had with

       17   Ms. Pemkova?

       18   A    Yes.

       19   Q    And I just paused the call on the bottom of page 1.

03:09:40 20   A    Uh-huh.

       21   Q    What were you asking her about?

       22   A    I was asking who David and Goliath International

       23   Ministries was, because I'd just gotten a document saying

       24   they were taking 25 percent of my profits.

03:09:57 25   Q    Did Ms. Pemkova tell you that David and Goliath had

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:10:01  1    some connection with the federal government?

       2    A    Yes.

       3    Q    What did she tell you?

       4    A    She said that it was the foundation under the umbrella

03:10:08  5    of the Central Intelligence Agency.

       6         (The audiotape was played.)

       7    BY MR. KOLE:

       8    Q    Pause in the call at the bottom of page 2.

       9              Did Pemkova tell you, make any statements to you

03:10:59 10    about Onciu's personal background?

      11    A    Yes.

      12    Q    What did she tell you about him?

      13    A    She said that he was a former, high place officer with

      14    the Central Intelligence Agency and that he was an advisor

03:11:11 15    for one of the Dragon families in China; meaning one of the

      16    very wealthy families in that area.

      17    Q    And did she, again, repeat that this investment was

      18    somehow overseen or operated by the CIA?

      19    A    Yes.  She said that the purposes of the humanitarian

03:11:38 20    projects are to help fund the projects that the CIA was

      21    operating.

      22         (The audiotape was played.)

      23    BY MR. KOLE:

      24    Q    Stopping the call there at the bottom of page 7.

03:16:03 25              THE COURT:  Right after this tape, Counsel, we'll

DEBORAH D. PARKER, U.S. COURT REPORTER

63

03:16:05  1    take a recess.

2    BY MR. KOLE:

3    Q    Agent Reitz, did Ms. Pemkova tell you that you would

4    get to talk to Onciu?

03:16:12  5    A    Yes.

6    Q    Did it sound like she would have any difficulty

7    tracking him down?

8    A    She knows -- no.  She said that she knows him

9    personally.

03:16:23  10   Q    Did she refer to having just had frequent contact with

11   him right then?

12   A    Yes.

13   Q    What did she tell you about that?  Bottom of page 7.

14   A    Yes.  She was aware that he was in a meeting and that

03:16:40  15   she had spoke to him several times that morning.

16   Q    Did she, in this call, again indicate to you that she

17   was physically in Las Vegas?

18        Did she say she was at the bank and going back to

19   her office?

03:16:56  20   A    Yes, she did.

21   Q    And this call, if you look at the time of it --

22   A    It's 2:11 in the afternoon.

23   Q    -- is this just shortly after the e-mail that we looked

24   at earlier was sent to you with the various attached

03:17:15  25   documents?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

```
03:17:16   1    A    Yes.

           2              MR. KOLE:  That's it for that exhibit.

           3              THE COURT:  Okay.  Why don't we take about a

           4    20-minute recess.  Just stretch for a moment.  And we'll see

03:17:27   5    you in about 20 minutes.

           6              Please don't discuss this matter amongst

           7    yourselves, nor form or express any opinion about the case.

           8              Have a nice recess.

           9              Mr. Reitz, you may step down.

03:17:40  10              Counsel, about 20 minutes, okay?

          11              MR. KOLE:  Thank you, Your Honor.

          12         (Jury out.)

          13         (Recess taken from 3:17 p.m. to 3:43 p.m.)

          14         (The following proceedings were had in open court

03:43:40  15          in the presence of the jury:)

          16              THE COURT:  The jury is present.  The alternates.

          17    All counsel.  The witness and Ms. Pemkova.

          18              And, Mr. Kole, if you would like to continue,

          19    please.

03:43:51  20              MR. KOLE:  Yes, Your Honor.

          21                        DIRECT EXAMINATION

          22    BY MR. KOLE:

          23    Q    Agent Reitz, do you have Exhibits 98 and 99 in front of

          24    you?

03:43:57  25    A    Yes.
```

03:43:58   1    Q    What are those documents?

         2    A    98 is an e-mail dated November 29th that I sent to

         3    Dr. Pemkova.

         4    Q    And is Exhibit 99 a response?

03:44:11   5    A    Yes.

         6    Q    Can you describe it a little bit more?

         7    A    It's a response dated the same date:  November 29th, at

         8    9:31 --

         9    Q    Is it an e-mail?

03:44:27  10    A    -- p.m.  Yes, an e-mail.

        11    Q    Are these e-mails that you sent and received in the

        12    undercover operation?

        13    A    Yes.

        14         MR. KOLE:  And Government offers Exhibits 98 and

03:44:36  15    99.

        16         THE COURT:  Both are received:  98 is received and

        17    99 is received.

        18         *(Plaintiff's Exhibits 98 and 99 received in*

        19         *evidence.)*

03:44:41  20    BY MR. KOLE:

        21    Q    Do you see Exhibit 98, the first page on the screen?

        22    A    Yes.

        23    Q    And what were you telling Ms. Pemkova in that e-mail?

        24    A    I was attaching the partnership resolution, so that's

03:45:08  25    what I was referring to "as discussed" and apologizing for

*DEBORAH D. PARKER, U.S. COURT REPORTER*

66

03:45:12  1    it being late and looking forward to speaking to Dr. Onciu.

2    Q    And which particular documents did you include as

3    attachments?

4    A    I included the noncircumvention nondisclosure

03:45:27  5    agreement, the resolution of the partnership, the project

6    funding agreement.

7    Q    Let's just stop on that one for just a moment.  That's

8    pages 6 and 7 -- is that right?

9    A    Yes.

03:45:44  10   Q    -- of the exhibit?

11   A    Yes.

12   Q    Do you see page 6, the first page of the funding

13   agreement on the screen?

14   A    Yes.

03:45:57  15   Q    And page 7, do you see that on the screen now?

16   A    Yes.

17   Q    Does it have your signature as Tom Moore?

18   A    Yes.

19   Q    Okay.  Then what comes after that document in the group

03:46:10  20   of attachments?

21   A    Letter of intent.

22   Q    And what's next?

23   A    That's followed by an account printout and so called

24   tear sheet and then a printout of the actual bank account.

03:46:29  25   Q    I have placed page 9 of the exhibit on the screen.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:46:34   1         Is that the so-called "tear sheet"?

  2   A    Yes.

  3   Q    Oh, and the last page, page 10, is that a statement

  4   page that would have been mailed, or something like that?

03:46:44   5   A    No.  I think that this is from the Internet, where you

  6   can print your statements.

  7   Q    And then Exhibit 99?

  8   A    Yes.

  9   Q    Did you receive that in response?

03:47:18 10   A    Yes, I did.

11   Q    From who did it appear to come?

12   A    From Dr. Pemkova.

13   Q    Do you see your initial e-mail, the text of it, at the

14   bottom?

03:47:32 15   A    Yes.

16   Q    Do you see the date and time that I zoomed in on?

17   A    Yes.

18   Q    And, again, can you tell when it was sent?

19   A    November 29th, 2006, at 9:31 p.m.

03:47:55 20   Q    Did -- in this e-mail to you -- oh, in the upper

21   left-hand corner, does it appear to be from the same e-mail

22   address of Ms. Pemkova's that you had seen before?

23   A    Yes.

24   Q    Do you see in the text any reference to some of the

03:48:18 25   other individuals who we've been discussing as part of this

03:48:21  1  arrangement?

2  A    Yes.  She said that my file had been submitted and that

3  I could expect a call from Dr. Priore the next day and as

4  well as a reference to arranging a phone call with

03:48:33  5  Dr. Onciu.

6  Q    Does Priore's first name come up for the first time

7  here?

8  A    No.  It's been mentioned before.

9  Q    Oh, okay.  Is it listed here, in any case?

03:48:44  10  A    Yes.

11  Q    What was it?

12  A    What was her name?  Dr. Beata Priore.

13  Q    But you had heard that first name before?

14  A    The first name -- that's the first time I heard the

03:48:57  15  first name.

16  Q    Did it appear from this e-mail that Ms. Pemkova had

17  been in communication, again, with Priore?

18  A    Yes.  And that she'd -- that she was advising me I

19  could expect a call from Priore.

03:49:24  20  Q    Do you have Exhibit 100 there?

21  A    Yes.

22  Q    What is it?

23  A    This is header information regarding the previous

24  e-mail.

03:49:39  25         MR. KOLE:  Your Honor, the Government offers

*DEBORAH D. PARKER, U.S. COURT REPORTER*

69

| | | |
|---|---|---|
| 03:49:40 | 1 | Exhibit 100. |
| | 2 | THE COURT:  Received. |
| | 3 | *(Plaintiff's Exhibit 100 received in evidence.)* |
| | 4 | BY MR. KOLE: |
| 03:49:46 | 5 | Q    I'm placing on top of Exhibit 99, Exhibit 100.  See if |
| | 6 | we can see them at the same time. |
| | 7 | Do you see on the screen, Agent Reitz, the text of |
| | 8 | the e-mail both above in Exhibit 100 and below in 99? |
| | 9 | A    Yes. |
| 03:50:04 | 10 | Q    Is the text the same? |
| | 11 | A    Yes, it is. |
| | 12 | Q    And were you looking for particular information in |
| | 13 | Exhibit 100, in that document? |
| | 14 | A    I was looking to find the IP address to see if this |
| 03:50:22 | 15 | e-mail had an interstate nexus to it. |
| | 16 | Q    Did you have any luck finding the IP address? |
| | 17 | A    Yes. |
| | 18 | Q    What does it say, the IP address, that it came from? |
| | 19 | A    From 71.53.164.191. |
| 03:50:41 | 20 | Q    Was that the same IP address that we discussed earlier, |
| | 21 | in regard to Ms. Pemkova? |
| | 22 | A    Yes. |
| | 23 | Q    Please, if you would, pull out Exhibit 37. |
| | 24 | A    *(Witness so complies.)* |
| 03:51:01 | 25 | MS. PEMKOVA:  77? |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

70

03:51:04   1          MR. KOLE:  37.

2             THE WITNESS:  I have that.

3     BY MR. KOLE:

4     Q     Is that another CD?

03:51:12   5     A     Yes, it is.

6     Q     Was it prepared in the same way and checked out by you

7     in the same way?

8     A     Yes.

9             MR. KOLE:  Government offers Exhibit 37.

03:51:20  10            THE COURT:  Received.

11         *(Plaintiff's Exhibit 37 received in evidence.)*

12         *(The audiotape was played.)*

13    BY MR. KOLE:

14    Q     Pausing the call there on the lower part of page 2.

03:53:01  15            Did you place or receive this call?

16    A     I received this call.

17    Q     Did the caller introduce themselves (sic) to you?

18    A     Yes.  She introduced herself as Dr. Priore from the

19    trading group in Frankfurt.

03:53:14  20    Q     In your investigation, did you later have an occasion

21    to meet Priore in person?

22    A     Yes.

23    Q     Did you speak to her then?

24    A     Yes.

03:53:21  25    Q     Did you spend a lengthy part of time with her?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:53:25   1   A     A lunch.

2   Q     Based on that, are you able to recognize her voice?

3   A     Yes.

4   Q     And listening to this recording, do you recognize the

03:53:34   5   voice as being that of Beata Priore?

6   A     Yes.

7   Q     Did she provide you with a fax number to fax to?

8   A     Yes.

9   Q     Was there an area code as part of it?

03:53:46  10   A     Yes.  516.

11   Q     Are you aware of where in the world that area code is

12   located?

13   A     That's generally assigned to Long Island, New York.

14         (The audiotape was played.)

03:53:58  15   BY MR. KOLE:

16   Q     Pause the call at the bottom of page 6.

17         Did you ask Priore to explain -- to explain

18   something about the investment?

19   A     Yes.

03:57:20  20   Q     What did you want to know about the investment?

21   A     Well, I had some general understanding of how it was

22   supposed to work, but I wanted to get some details, so I

23   asked her to provide me some.

24   Q     And when you asked her, did she seem ignorant about it,

03:57:33  25   unfamiliar with it?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

03:57:35  1   A      No.

        2   Q      How did she act?

        3   A      She said that -- well, she accounted in a way that she

        4   provided explanations on the transaction and the figures

03:57:44  5   involved.

        6   Q      Did she appear to be knowledgeable about it?

        7   A      Yes.

        8   Q      Familiar with it?

        9   A      Yes.  And with the people involved.

03:57:50  10  Q      Did she tell you who or to what entity the investment

        11  was supposed to go to?

        12  A      It was a company called TSI.  That was the company that

        13  was going to do the trading.

        14  Q      What would they do with the money?

03:58:02  15  A      They would trade the money and generate the profits.

        16  Q      Did she mention somebody there who was managing it, not

        17  by name but by sort of role?

        18  A      They described -- she described a big time trader who

        19  usually does billions of dollar transactions but had decided

03:58:19  20  to make smaller amounts available so people could help their

        21  communities.

        22      (The audiotape was played.)

        23  BY MR. KOLE:

        24  Q      Just pause the call there at the bottom of page 7.

03:59:22  25          Did Priore indicate to you that this was a very

03:59:27   1   risky, chancy deal?

2   A      No.

3   Q      What did she tell you?

4   A      She told us that it was -- excuse me.  She told me that

03:59:32   5   it was secure.

6   Q      And safe?

7   A      And safe, yes.

8   Q      And, in fact, if you wanted your money back, was there

9   a risk of losing it?

03:59:39  10   A      No.  There was a 5.5 percent per annum interest that

11   would be credited to me if I decided to pull my money out of

12   the investment and not proceed with it.

13          (The audiotape was played.)

14   BY MR. KOLE:

04:00:07  15   Q      Did you understand -- have an understanding of what

16   this exodus was that was being referred to?

17   A      It was people from every country coming to the

18   opportunity of TSI to get 6.5 times their money in 30 to 45

19   days.

04:00:23  20   Q      Because it was such a good opportunity?

21   A      Yes.  And because it was legal.

22          (The audiotape was played.)

23   BY MR. KOLE:

24   Q      So I've paused the call there, middle of page 9.

04:01:41  25          Did -- did you ask Priore about the level or

74

04:01:45  1    amount of profit on this deal?

2    A    Yes, I did.

3    Q    When you refer to "per annum," what does that mean?

4    A    "Per annum" means per year.  Typically, interest rates

04:01:56  5    are stated on a per annum basis:  6 percent, 5 percent, that

6    type of thing.  And what's typically being quoted to me in

7    these kinds of investment is you'll get 6.5 times your

8    money, or 6.5 points.  And so I'm always trying to draw out

9    from the person *When you say 6.5, what do you mean?*

04:02:16  10   Q    Because if you earned 6.5 percent per annum or

11   per year, would that, maybe, be similar to what you might

12   have been able to get in the past on a bond or a CD?

13   A    At points in the past, yes.

14   Q    So on a million dollars, 6 percent would be how much?

04:02:33  15   60,000?

16   A    $60,000.

17   Q    Over a year?

18   A    Yes.

19   Q    In this deal, they were talking about 6 percent, or

04:02:42  20   something else?

21   A    No.  They were talking about 650 percent and not on a

22   per annum basis.  That's over 30 to 45 days.  You would get

23   six-and-a-half times your money.

24   Q    And what type of financial activity did Priore say

04:02:59  25   could provide these spectacular returns?

04:03:03    1    A    It was trading in currencies and, specifically, in

            2    Euros.  That's how they were able to generate these huge

            3    profits.

            4    Q    Did she give any kind of details to you other than just

04:03:12    5    saying that?  About the trading and how it was so

            6    profitable?

            7    A    That the trading was being done on a much larger scale

            8    and that the million dollar transactions were all being

            9    bundled in, because the actual trading on the larger scale

04:03:33   10    was making much more money than the six-and-a-half times.

           11         (The audiotape was played.)

           12    BY MR. KOLE:

           13    Q    I've stopped the call at the top of page 13 there.

           14         Did Priore tell you that she had no idea if

04:06:09   15    anybody had ever actually made money out of this?  Did she?

           16    A    No, she didn't.

           17    Q    What did she actually tell you?

           18    A    She said that -- after I specifically asked her if she

           19    had seen people making these kinds of returns with these

04:06:22   20    kinds of dollar amounts, she said, Yes.

           21    Q    And had she seen that just recently or over a longer

           22    period of time?

           23    A    No.  Over several years.

           24    Q    When you asked her whether she had seen people make

04:06:38   25    this kind of return, did she respond with any qualification

04:06:43   1   or hesitation?

           2   A     No.

           3   Q     Did she say, *Oh, sure*?

           4   A     Yes, she did.

04:06:50   5   Q     And did she lead you to believe that she personally had

           6   actually made large sums of money because of this -- because

           7   of this investment?

           8   A     She said that she is paid in an escrow account as part

           9   of the transaction.  So given she's saying that that's where

04:07:10  10   they pay me, in the past, assuming that -- she's claiming

          11   that -- that she's already been paid in these transactions.

          12   Q     How much did she say that she was paid?

          13   A     20 percent.

          14   Q     And how much of that was her cut or her share?

04:07:25  15   A     She gets 5 percent.

          16   Q     Out of the profits?

          17   A     Out of the profits of the transaction, yes.

          18   Q     So if the profits for one round are 6-1/2 million,

          19   5 percent would be 325,000?

04:07:39  20   A     Yes.

          21         (*The audiotape was played.*)

          22   BY MR. KOLE:

          23   Q     Do you ask Priore about whether there was any risk in

          24   this transaction?

04:08:47  25   A     Yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

77

| | | |
|---|---|---|
| 04:08:47 | 1 | Q    What did she tell you? |
| | 2 | A    She said that it was pretty much risk-free. |
| | 3 | Q    If you wanted to get your money back, would you be able |
| | 4 | to? |
| 04:08:54 | 5 | A    Yes. |
| | 6 | Q    And if you got your money back, if you took this |
| | 7 | 5.5 percent payment taking your money out, would you |
| | 8 | actually have lost your investment at all? |
| | 9 | A    No. |
| 04:09:07 | 10 | Q    You just wouldn't get the big profits? |
| | 11 | A    Correct.  The 5.5 percent was a per annum rate that I |
| | 12 | was guaranteed no matter what happened with the transaction. |
| | 13 |     (The audiotape was played.) |
| | 14 | BY MR. KOLE: |
| 04:10:30 | 15 | Q    Stopping for a moment on page 16. |
| | 16 |        Did you ask Priore if anyone had ever lost money |
| | 17 | in these investments? |
| | 18 | A    Yes. |
| | 19 | Q    Did she tell you that that had happened? |
| 04:10:41 | 20 | A    She said that it has happened but in events when people |
| | 21 | did not send their money to a place that was secured. |
| | 22 | Q    Was that contrasted with this TSI investment? |
| | 23 | A    Yes. |
| | 24 | Q    Why? |
| 04:10:52 | 25 | A    She described how this investment had a Supreme Court |

04:10:57  1   barrister as their attorney who could not afford any

2   flack -- any kind of controversy or scandal and that the

3   trader involved was a man named Schaeffer, who was very

4   well-known in his business, plus the general beautiful

04:11:15  5   nature of the building of TSI in Frankfurt.

6   Q    And were you also told about an escrow account where

7   the money would be secured?

8   A    Yes.

9        (The audiotape was played.)

04:11:27 10  BY MR. KOLE:

11   Q    Pausing at the top of page 17.

12        What was the Internet material that you were

13   asking about, Agent Reitz?

14   A    As I mentioned, the FBI and the Treasury Department and

04:12:22 15  the Federal Reserve Board have warnings on their websites

16   saying that high-yield investment programs and trading

17   programs offering risk-free investments through medium term

18   notes -- and they list several red flag terms -- that those

19   are scams and that people should avoid them.

04:12:41 20  Q    And how were you aware of that?  Had you read them?

21   A    I've read them.  I helped write some.  I've handed them

22   out to people who I've found to be engaged in these

23   high-yield investment programs as sort of a warning to stop

24   them from doing it.

04:12:57 25  Q    Now, when you asked Priore about this, did she act

*DEBORAH D. PARKER, U.S. COURT REPORTER*

79

04:13:02   1   shocked?

2   A     No.

3   Q     How did she respond?

4   A     She said that she has eight people a week coming to her

04:13:08   5   and each one of them is asking her about these kinds of

6   warnings and asking these kinds of questions.

7        (*The audiotape was played.*)

8   BY MR. KOLE:

9   Q     So, Agent Reitz -- stopping the call there at page 18,

04:14:44  10   bottom -- when you asked Priore about these government

11   warnings, did she tell you, *You're going to invest a million*

12   *dollars.  You should be careful with it*?

13   A     No.

14   Q     What did she say about these Internet warnings?

04:14:58  15   A     I specifically asked her about those warnings and if

16   she had seen it herself.  And she said, *I know.*  And then

17   paused and said she didn't need to clutter her psyche or

18   clutter her brain with basically what she described as

19   negativity, and said there's always naysayers and you should

04:15:19  20   avoid them.

21   Q     And did you understand these naysayers would be people

22   who would say, *You can't really make these profits*?

23   A     Yes.

24   Q     And did she tell you not to pay attention to those

04:15:28  25   people?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:15:29   1    A      Yes.

           2           (*The audiotape was played.*)

           3    BY MR. KOLE:

           4    Q      Pausing it there at the top of page 20.

04:16:31   5           Did Priore tell you that she was connected or

           6    involved with TSI?

           7    A      Yes.  She said that she was part of their office and

           8    earlier in the call she said that she was with the intake

           9    department.

04:16:58  10           (*The audiotape was played.*)

          11    BY MR. KOLE:

          12    Q      Pausing it on page 21.

          13           Why were you saying that was true?

          14    A      From my own perspective as an investor, if I could get

04:18:04  15    6 1/2 times my money in 30 to 45 days, I would probably stop

          16    working as well.

          17           (*The audiotape was played.*)

          18    BY MR. KOLE:

          19    Q      Pausing on page 23.

04:19:47  20           Did you again hear or were you again told that

          21    there was some need for strict confidentiality?

          22    A      Yes.  I asked if I could get any references who could

          23    tell me that these returns were real and were possible.  And

          24    I was told that the transactions are highly confidential and

04:20:07  25    that people who are making that kind of money wouldn't want

81

04:20:10   1   to speak to anybody or let anybody know that they made it,

2   otherwise they would have hands out of people asking them

3   for money.

4   Q     Did -- although if you spoke to someone on the phone or

04:20:20   5   e-mailed them, would you have any way of putting their hand

6   out to get money from?

7   A     Not that I can think of.

8   Q     Did Priore again tell you that she was part of TSI?

9   A     Yes, she did.  She said that "We operate out of TSI"

04:20:41   10  and that she was part of the TSI due diligence team.

11            (The audiotape was played.)

12  BY MR. KOLE:

13  Q     Pausing it right there at the top of page 24.

14            Did Priore indicate to you what state she was in?

04:21:14   15  A     Yes.  She said that she was in New York.

16            MR. KOLE:  And skipping over the address.

17            (The audiotape was played.)

18  BY MR. KOLE:

19  Q     Did you get any impression from Priore's comments about

04:21:52   20  her lifestyle or her means?

21  A     Yes.  That she lived in a very expensive part of

22  Long Island referred to as the "Gold Coast."

23  Q     Did she make a reference to Merrill Lynch living next

24  door to her?

04:22:06   25  A     To Merrill Lynch, Talbot Fashions, Nilsson, Doubleday

*DEBORAH D. PARKER, U.S. COURT REPORTER*

82

04:22:10  1   and other well-known names.

2   Q    Is there a person named "Merrill Lynch"?

3   A    There probably is somewhere.

4   Q    Have you heard of the former investment firm, Merrill

04:22:21  5   Lynch?

6   A    In terms of the firm, Merrill Lynch, yes, I have heard

7   that name.  And that is not a person.  If you're referring

8   to the investment firm, it's actually several people:

9   Merrill, Lynch, Pierce, Fenner and Smith.

04:22:33 10             MS. PEMKOVA:  Objection.  Speculation.

11             MR. KOLE:  Is the objection overruled or

12   sustained?

13             THE COURT:  It is.

14             Thank you.  Please continue.

04:22:49 15   BY MR. KOLE:

16   Q    And Mr. Merrill, Mr. Lynch, did they actually die some

17   many decades ago?

18   A    Yes.

19        (The audiotape was played.)

04:23:15 20   BY MR. KOLE:

21   Q    Pause in the call on page 26.

22             Did Priore -- before she gave you a fax number, is

23   she now giving you a phone number?

24   A    Yes.

04:24:08 25   Q    Is that phone number, again, located in the New York

*DEBORAH D. PARKER, U.S. COURT REPORTER*

83

04:24:11   1    City area?

           2    A     The area is 516, which is a prefix for Long Island.

           3          (*The audiotape was played.*)

           4    BY MR. KOLE:

04:26:45   5    Q     Stopping the call at the bottom of page 29.

           6              Did Priore seem to be familiar with the process

           7    and with the contract for this TSI investment?

           8    A     Yes.

           9    Q     And did she indicate that she actually had some

04:27:00  10    involvement in preparing it by referring to it in the second

          11    person:  *We will do this?  We will send it to you?*

          12    A     Yes.

          13    Q     Please take out Exhibits 101, and -- why don't you take

          14    three of them out:  101, 102 and 103.

04:27:19  15    A     (*Witness so complies.*)  I have them.

          16    Q     What is 101?

          17    A     101 is a fax to Dr. Priore and on the fax number that

          18    she had asked me to send the client information form.

          19    Q     Is it a fax that you send a copy of it?

04:27:53  20    A     Yes.

          21    Q     And what is Exhibit 102?

          22    A     102 is an e-mail, dated November 30th, from Dr. Priore

          23    to me that had a fee agreement and a fee protection

          24    agreement.

04:28:09  25    Q     And, finally, what is Exhibit 103?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

84

04:28:13  1    A     103 is the Internet protocol header information for

       2    Exhibit 102.

       3    Q     And Exhibit 101 is that also dated November 30th?

       4    A     Yes.

04:28:28  5           MR. KOLE:  The Government offers Exhibits 101, 102

       6    and 103, Your Honor.

       7           THE COURT:  Each are received:  101, 102 and 103.

       8         *(Plaintiff's Exhibits 101, 102 and 103 received in*

       9         *evidence.)*

04:28:37 10   BY MR. KOLE:

      11    Q     Turning back to Exhibit 101, the fax --

      12    A     Okay.

      13    Q     -- did you send that by fax to the New York area code

      14    that Priore gave you?

04:28:51 15   A     Yes.

      16    Q     I placed the first page on the screen.  What's on the

      17    second page of that document?

      18    A     The second page is a message confirmation report that I

      19    obtained from the fax machine at the undercover location

04:29:13 20   after I sent the fax to Dr. Priore.

      21    Q     Does it show the number the fax was transmitted to?

      22    A     Yes.

      23    Q     Again, the New York area code?

      24    A     Yes.

04:29:27 25   Q     And please take a look at 102.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

85

| | | |
|---|---|---|
| 04:29:30 | 1 | A   *(Witness so complies.)*  Okay.  I have that. |
| | 2 | Q    Do you see it on the screen? |
| | 3 | A    Yes. |
| | 4 | Q    Does it show the time that the e-mail was sent? |
| 04:29:52 | 5 | A    Yes.  It shows 11:48 a.m. |
| | 6 | Q    Now, that time -- excuse me.  Let me start again. |
| | 7 |      This is an e-mail from who to who? |
| | 8 | A    This is from Dr. Priore to me. |
| | 9 | Q    And do you see on the screen -- I've zoomed in on that |
| 04:30:09 | 10 | upper left-hand portion of the e-mail? |
| | 11 | A    Yes. |
| | 12 | Q    Is your undercover e-mail address listed there again? |
| | 13 | A    Yes, it is. |
| | 14 | Q    And right above that, is there another e-mail address |
| 04:30:21 | 15 | we're now seeing for the first time? |
| | 16 | A    Yes.  Doctorbpriore@maxfoundation.us. |
| | 17 | Q    Was it your understanding that was an e-mail address |
| | 18 | used by Beata Priore? |
| | 19 | A    Yes. |
| 04:30:37 | 20 | Q    This e-mail was received by you.  What does the time |
| | 21 | reflect?  In other words, what -- do you know what time zone |
| | 22 | that was? |
| | 23 | A    It reflects the time where I was, which is -- was |
| | 24 | Pacific time, in California. |
| 04:30:54 | 25 | Q    And the call that -- that long call that we just |

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:30:58  1   listened to, Exhibit 37, between you and Priore, what time

2   did that start?

3   A     That started, November 30th, at 9:53 a.m. Pacific.

4   Q     Is that about two hours before Priore sent you this

04:31:09  5   e-mail?

6   A     Yes.

7   Q     And in the call, did Priore tell you that the e-mail

8   would be coming to you from her?

9   A     Yes.

04:31:17  10  Q     During the call, did she mention that she was in

11  New York state?

12  A     Yes, she did.

13  Q     Barring her getting on some type of Air Force jet, is

14  there any way she could have been in California two hours

04:31:33  15  after talking to you from New York?

16  A     No.

17  Q     Did she ask you to do something with the attached

18  documents?

19  A     Yes.  She asked me to send them back to her as soon as

04:31:43  20  possible, which I took to mean:  Fill them out and put my

21  letterhead on them.

22  Q     And how many attachments came with the e-mail?

23  A     She sent two attachments:  One called a Management Fee

24  Agreement and the other one called a Fee Protection

04:32:01  25  Agreement.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

87

04:32:06  1    Q    The first one of those, starting at page 2 of the

2    exhibit, "Management Fee Agreement," do you see that on the

3    screen now?

4    A    Yes.

04:32:22  5    Q    Now, do you see the second page?

6    A    Yes.

7    Q    And turn, please, to the second attachment, and I'm

8    placing the first page of it on the screen, which is page 4

9    of the exhibit.

04:32:35 10    A    Yes.

11    Q    Is there a reference there to what you were getting

12    involved in and what kind of deal you were getting involved

13    in?

14    A    Yes.  This is a private-placement/investment-trading

04:32:52 15    program that I'm getting involved in.

16    Q    And I'll turn -- turn now to the second page, which is

17    the page 5 of the exhibit.  I placed that on the screen.

18         In the bottom portion of that, does it refer to

19    fees?

04:33:11 20    A    Yes.

21    Q    What percentage fees are talked about?

22    A    So there'll be 15 percent taken as consulting fees

23    split between 10 percent to Palle Kroeis and 5 percent to

24    Max Foundation.

04:33:40 25    Q    And then, finally, turning to the last page, does that

*DEBORAH D. PARKER, U.S. COURT REPORTER*

88

```
04:33:46   1    have a place for signatures?

           2    A    Yes.

           3    Q    And I've placed it on the screen.  Do you see it?

           4    A    Yes.

04:33:53   5    Q    Is there a place there for you to sign?

           6    A    Yes, there will be when I put my letterhead on it.

           7    Q    And there is a place for this Piya Palle Kroeis (ph) to

           8    sign?

           9    A    Yes.

04:34:08  10    Q    On the bottom, on behalf of the Max Foundation, is it

          11    already signed?

          12    A    Yes.

          13    Q    By who?

          14    A    It's already signed by Dr. Beata Priore.

04:34:17  15    Q    Did this document confirm Priore's statement to you

          16    that she was supposed to get 5 percent of the profits?

          17    A    Yes.

          18    Q    Do you have Exhibit 103 there?

          19    A    Yes.

04:34:43  20    Q    Does Exhibit 103 correspond to Exhibit 102?

          21    A    Yes.

          22    Q    I'm placing Exhibit 103 on the screen.

          23         Do you see it -- the first page of it?

          24    A    Yes.

04:34:58  25    Q    Does this, again, have all of that Internet information
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:35:01   1    that we talked about?

           2    A    Yes.

           3    Q    And if I can find it, I'm zooming in now on the "from"

           4    and "subject" area.

04:35:17   5             Do you see that?

           6    A    Yes.

           7    Q    The "date," "time," "to" and "from" subject.

           8    A    Uh-huh.

           9    Q    Do those match Exhibit 102?

04:35:27  10    A    Yes.

          11    Q    Were you looking for some kind of information on this

          12    page?

          13    A    Yes.  I was looking to identify the server through

          14    which this e-mail passed and then eventually find its

04:35:52  15    physical location.

          16    Q    And I've zoomed in on a portion of it --

          17             Do you see that?

          18    A    Yes.

          19    Q    -- where it talks about the e-mail being received from

04:36:01  20    a computer?

          21    A    Yes.

          22    Q    Was there one of these IP addresses listed there?

          23    A    Yes.

          24    Q    What is it?

04:36:08  25    A    It's 68.178.232.243.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

90

04:36:19   1    Q     Okay.  And then is there also a second one that starts

           2    with "64"?

           3    A     Yes.  64.202.189.54.

           4    Q     Do you have an understanding of why there might be more

04:36:32   5    than one listed?

           6    A     My basic understanding is that e-mails can be routed

           7    through different -- several servers before ending up at

           8    that destination.

           9    Q     But in any event, was the 64.202 address one of those?

04:36:46  10    A     Yes.

          11    Q     Did you do some research on that address to find out

          12    where it was assigned?

          13    A     Yes, I did.

          14    Q     What did you find out?

04:36:52  15    A     I found out, again, using the Internet website "Who

          16    Is" -- I learned that that IP address range was assigned to

          17    "GoDaddy."  I called the GoDaddy legal department, and they

          18    confirmed that all of their servers were located in the

          19    state of Arizona.

04:37:15  20    Q     Please take out Exhibit 39.

          21    A     I have that.

          22    Q     And what is it?

          23    A     This is a CD containing a recording from November 30th,

          24    2006, pertaining to the undercover.

04:37:40  25              MR. KOLE:  Government offers Exhibit 39.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

91

04:37:44   1          (*The audiotape was played.*)

           2               MR. KOLE:  Sorry.

           3               THE COURT:  Received.

           4          (*Plaintiff's Exhibit 39 received in evidence.*)

04:37:47   5   BY MR. KOLE:

           6   Q    Could you also pull out Exhibit 38, too?

           7   A    I have that.

           8   Q    And what is 38?

           9   A    38 is a CD bearing a recording in connection with the

04:38:08  10   undercover from November 30th, 2006.

          11               MR. KOLE:  The Government offers Exhibit 38,

          12   Your Honor.

          13               THE COURT:  Received.

          14          (*Plaintiff's Exhibit 38 received in evidence.*)

04:38:17  15               MR. KOLE:  Now, playing 38.

          16          (*The audiotape was played.*)

          17   BY MR. KOLE:

          18   Q    Just pausing it there near the bottom of page 1, is

          19   this a voicemail you left for somebody?

04:39:58  20   A    It's a voicemail I left for Ms. Pemkova.

          21   Q    And what did you want to tell her about?

          22   A    I was trying to push along the phone call or

          23   introduction to Dr. Onciu.

          24   Q    And did you also tell her about something that had just

04:40:15  25   happened that day?

92

04:40:15   1    A    That I had just spoken to Dr. Priore and had an

2    informative phone call.

3    Q    I'll now direct your attention to Exhibit 39.

4         MR. KOLE:  And I'm playing it now.

04:41:17   5         (*The audiotape was played.*)

6    BY MR. KOLE:

7    Q    Did you have an understanding of what documents Priore

8    was referring to in this message?

9    A    Yes.  They were the documents that she had referred to

04:41:29  10    in the previous conversation.

11    Q    Were those the two fee agreements that we looked at a

12    minute ago –– the two fee agreements?

13    A    Yes.

14    Q    Please take out Exhibit 40.

04:41:43  15    A    (*Witness so complies.*)  I have that.

16    Q    What is it?

17    A    It is a CD containing the conversation, dated

18    November 30th –– not conversation, voicemail left with

19    Dr. Pemkova on November 30th, as part of the undercover.

04:42:03  20    Q    Left with her or from her?

21    A    Oh, I'm sorry.  It's from Dr. Pemkova to Mar Mesa.

22         MR. KOLE:  The Government offers Exhibit 40,

23    Your Honor.

24         THE COURT:  Received.

04:42:13  25         (*Plaintiff's Exhibit 40 received in evidence.*)

*DEBORAH D. PARKER, U.S. COURT REPORTER*

93

04:42:15   1              MR. KOLE:  Playing it now.

           2         (*The audiotape was played.*)

           3    BY MR. KOLE:

           4    Q    Was that a voicemail message left for you by

04:43:04   5    Dr. Pemkova?

           6    A    Yes.

           7    Q    Did -- from her message, did it appear that she was in

           8    close contact with Moses Onciu?

           9    A    Yes.  And that she knew his schedule and when he'd be

04:43:17  10    available and when he wouldn't be.

          11    Q    Can you take out four documents:  104 through 107.

          12    A    (*Witness so complies.*)  I have those.

          13    Q    What is Exhibit 104?

          14    A    104 is an e-mail from me to Dr. Priore, asking some

04:43:52  15    questions about the documents that she had sent me.

          16              MR. KOLE:  The Government offers Exhibit 104.

          17              THE COURT:  Received.

          18         (*Plaintiff's Exhibit 104 received in evidence.*)

          19    BY MR. KOLE:

04:43:59  20    Q    Is Exhibit 104, which I'm placing on the projector

          21    now -- is it a response by you to one of the e-mails we saw

          22    earlier from Priore?

          23    A    Yes.  From the e-mail where she sent me some documents

          24    and asked me to provide them as soon as possible.

04:44:22  25    Q    Why did you send this?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

94

04:44:25   1   A    I'm trying to make sure I fill out the document

           2   correctly.

           3   Q    And does it indicate in the upper right-hand corner

           4   what time you sent it?

04:44:37   5   A    Yes.  2:37 Pacific time, on November 30th.

           6   Q    And what is Exhibit 105?

           7   A    Exhibit 105 is an e-mail from me to Dr. Priore, on

           8   November 30th, again asking questions about the contracts.

           9          MR. KOLE:  The Government offers Exhibit 105.

04:45:03  10          THE COURT:  Received.

          11          (Plaintiff's Exhibit 105 received in evidence.)

          12   BY MR. KOLE:

          13   Q    What were you asking her about?

          14   A    I was required on one of the documents to sign in front

04:45:16  15   of a notary, and I noticed that nobody else was required to

          16   do that on the transaction, so I was asking why.

          17   Q    What time did you send it?

          18   A    I sent it at 2:40 p.m.

          19   Q    And please look now at Exhibits 106 and 107.

04:45:32  20   A    (Witness so complies.)  All right.

          21   Q    What are those?

          22   A    These are both e-mails dated November 30th, a few

          23   minutes apart.  The first one, that is Exhibit 106, is an

          24   e-mail from Dr. Priore to me.

04:45:53  25   Q    And who is the second one from?

04:45:56  1    A     The second one is also from Dr. Priore to me one minute

2    earlier.

3                   MR. KOLE:  Government offers Exhibits 106 and 107.

4                   THE COURT:  Each are received:  106 and 107.

04:46:10  5          *(Plaintiff's Exhibits 106 and 107 received in*

6          *evidence.)*

7    BY MR. KOLE:

8    Q     Now, why don't you keep -- make sure you have 104

9    available.  I'm placing the first page of 106 on the screen

04:46:19 10   now.

11                  Do you see it on the screen?

12   A     Yes.

13   Q     Do you see in the bottom portion of it the text from

14   your original e-mail listed there?

04:46:36 15   A     Yes.

16   Q     What does it say for the time on the e-mail you sent to

17   Priore that day?

18   A     On the e-mail I sent to Priore, it shows 5:37 p.m.

19   Q     And I'm putting Exhibit 104 on the screen now.

04:46:57 20                  Do you see the text is the same?

21   A     Yes.

22   Q     And moving it over to the time, what time does it say?

23   A     2:37 p.m.

24   Q     How do you compare those two to each other?

04:47:07 25   A     The 2:37 p.m. is the Pacific time where I was when I

04:47:11   1   sent it and the 5:37 is the time zone where Dr. Priore

           2   received it, which would be Eastern Time Zone.

           3   Q    So from that, did it appear to you that Priore was in a

           4   different part of the country from you?

04:47:27   5   A    Yes.

           6   Q    And specifically what area?

           7   A    Specifically on the East Coast.

           8   Q    Not in California?

           9   A    Not in California.

04:47:40  10   Q    If you look at Exhibit 107 and compare it to

          11   Exhibit 105, did you make the same type of observation?

          12   A    Yes.  That I sent an e-mail, Exhibit 105, 2:40 p.m.

          13   Pacific.  Received by Dr. Priore, 5:40 p.m., meaning Eastern

          14   Time.

04:48:21  15   Q    Again seeming to indicate that when you were

          16   communicating with her by e-mail, she was in a -- the

          17   opposite side of the country?

          18   A    Yes.

          19   Q    All right.  Please pull out Exhibit 41.

04:48:36  20   A    *(Witness so complies.)*  I have that.

          21   Q    What is it?

          22   A    This is a CD containing a voicemail message from

          23   Dr. Priore, left on November 30th.

          24            MR. KOLE:  The Government offers Exhibit 41.

04:48:54  25            THE COURT:  Received.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

97

| | |
|---|---|
| 04:48:54 | 1 |

04:48:54   1        *(Plaintiff's Exhibit 41 received in evidence.)*

2   BY MR. KOLE:

3   Q     I just played Exhibit 41.

4              Was that a message to you from Priore?

04:49:42   5   A     Yes.

6   Q     Did she appear in that message to be familiar with the

7   contract, how it was operated, what was being put into it?

8   A     Yes.  In that, I could set my own contract number and

9   that they would use that going forward.

04:49:59   10   Q     Please turn your attention now to Exhibit 42.

11   A     All right.  This --

12   Q     Exhibit 42.

13   A     Yes, I have it.

14   Q     Is it a CD?

04:50:17   15   A     Yes, it is.  It is a CD containing a phone call between

16   myself and Dr. Pemkova, on December 1st.

17              MR. KOLE:  Government offers Exhibit 42.

18              THE COURT:  Received.

19         *(Plaintiff's Exhibit 42 received in evidence.)*

04:50:28   20              MR. KOLE:  Your Honor, I believe I offered 41, I

21   hope.

22              THE COURT:  I received 41 already.

23              MR. KOLE:  Thank you.  I wanted to make sure.

24              We're going to play 42 now.

04:50:40   25         *(The audiotape was played.)*

04:50:41   1   BY MR. KOLE:

2   Q    Agent Reitz, this call occurred what date?

3   A    December 1st, 2006.

4   Q    Was that a Friday?

04:52:14   5   A    Yes.

6   Q    So the Monday that you're discussing with Ms. Pemkova

7   in this call would have been December 4th?

8   A    Yes.

9   Q    And did she indicate in this call, again, continued

04:52:24  10   close communication with Onciu?

11   A    Yes.

12   Q    Did it sound like she had talked to him a number of

13   times?

14   A    Yes.  She had spoke to him, knew he was traveling.

04:52:34  15   Regardless, spoke to him through a terrible connection and

16   was able to set up a meeting -- phone meeting with him the

17   following Monday.

18   Q    And did it sound like she was familiar even with his

19   personal habits?

04:52:46  20   A    Yes.  That he was an early bird.  Somebody that likes

21   to --

22        MS. PEMKOVA:  Objection.  Speculation and

23   interpretation.

24        THE COURT:  Well, early habits.  Just rephrase

04:53:00  25   that.

04:53:00   1   BY MR. KOLE:

           2   Q     Sure.  Did it appear that Ms. Pemkova knew when

           3   Dr. Onciu liked to get up in the morning?

           4   A     Yes.

04:53:13   5   Q     Please take Exhibits 109 and 110.

           6   A     (Witness so complies.)

           7         THE COURT:  Counsel, can you finish this volume

           8   and then recess at that time, that way we can change the

           9   volume that the jury has for the next volume this evening.

04:53:35  10         MR. KOLE:  That would, I think, be great,

          11   Your Honor.  The problem is Exhibit 45 is a lengthy call

          12   with Dr. Onciu.  It's going to take some time.

          13         THE COURT:  With your permission, I'm going to ask

          14   you to find a stopping place.  The reason for that, I want

04:53:49  15   to get the jury out of here before the civic center traffic.

          16         Why don't you finish this session, and that will

          17   be the recess.

          18         MR. KOLE:  Thank you, Your Honor.

          19   BY MR. KOLE:

04:53:58  20   Q     Agent Moore -- Agent Reitz, do you have Exhibits 109

          21   and 110?

          22   A     Yes.

          23   Q     What's 109?

          24   A     109 is a fax sent to Dr. Priore that -- Management Fee

04:54:11  25   Agreement attached, as well as the Fee Protection Agreement,

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:54:15  1    the two documents she had sent me with my signature and

2    corporate letterhead.

3              MR. KOLE:  Government offers Exhibit 109.

4              THE COURT:  Received.

04:54:22  5        (Plaintiff's Exhibit 109 received in evidence.)

6    BY MR. KOLE:

7    Q    Did you send it to her area code in New York?

8    A    Yes, I did.

9    Q    And what is Exhibit 110?

04:54:34 10   A    Exhibit 110 is an e-mail sent by Dr. Priore to me,

11   dated December 1st, at 10:13 a.m.

12             MR. KOLE:  Government offers Exhibit 110.

13             THE COURT:  Received.

14        (Plaintiff's Exhibit 110 received in evidence.)

04:54:51 15            MR. KOLE:  I'm placing it on the projector.

16   BY MR. KOLE:

17   Q    Was Priore's e-mail sent 10:13 a.m., December 1st,

18   2006, Pacific time?

19   A    Yes.

04:55:11 20   Q    And in the text, did she -- actually, before I ask

21   that, was it -- was her e-mail a response to the one you

22   sent?

23   A    Yes, it was.

24   Q    What were you telling her in yours?

04:55:26 25   A    I was telling her that I was faxing these contracts to

*DEBORAH D. PARKER, U.S. COURT REPORTER*

04:55:30  1   her, Exhibit 109.

2   Q    What did she tell you about the contract in her

3   response?

4   A    She said that one would be issued to me early next week

04:55:37  5   and then at that point we could discuss the particulars.

6         MR. KOLE:  Your Honor, I think that's probably a

7   good spot.

8         THE COURT:  Then, ladies and gentlemen, will 8:30

9   be okay again tomorrow?

04:55:52  10        Okay.  Then, you're admonished not to discuss this

11  matter amongst yourselves, nor form or express any opinion

12  concerning the case.

13        Just leave the large black notebook either on the

14  floor, at your feet, or on the seat so people don't stumble

04:56:04  15  over it and your notes.

16        And we'll see you tomorrow.  And, please, drive

17  carefully.

18      (*Jury out.*)

19      (*The following proceedings were had outside the*

04:56:15  20      *presence of the jury:*)

21        THE COURT:  Just a couple of questions while we're

22  still gathered:  When is a convenient time to start the jury

23  instructions?

24        And the only reason I'm asking is, I don't want to

04:56:42  25  bring you back in the interim week.  You're here.  But I

04:56:47  1    don't intend to impose that unnecessarily on you this
          2    evening.  And I don't --
          3            I think that Ms. Pemkova is going to need
          4    Mr. Steward's help and attendance at all times with those
04:57:00  5    instructions.
          6            So what are your thoughts, Mr. Steward and
          7    Ms. Pemkova and Mr. Kole.  I would rather remain focused on
          8    the case now.  In other words, if I can get you home, get
          9    you some sleep, keep you fresh -- you got a 100-mile
04:57:16  10   drive -- I would rather do that right now; and then stay
          11   focused.  But just -- let's take this up tomorrow.  Let's
          12   not waste any time.  Let's get you on the road now.
          13           MS. PEMKOVA:  Thank you.
          14           MR. KOLE:  A very brief comment, Your Honor.
04:57:26  15           It may not be much of an issue.  Mr. Steward and I
          16   previously discussed and I filed a joint set.  Other than
          17   one instruction that he might want to propose, I think we
          18   were in agreement on everything else.
          19           MS. PEMKOVA:  No.  I'm in charge.
04:57:39  20           MR. KOLE:  That's true, you are, so it's up to
          21   you.
          22           MS. PEMKOVA:  Your Honor, please give me a time to
          23   prepare it.  I don't sleep for two nights.  I would be
          24   again --
04:57:46  25           THE COURT:  You didn't hear me.  I'm going to do

103

```
04:57:49   1    that, obviously.  You're the one who will eventually help

           2    decide these instructions, but I'm only suggesting and

           3    asking a time to start that.  You're going to have all the

           4    time you need.  So if you want to do that tonight, that's

04:58:07   5    fine.

           6              MS. PEMKOVA:  No.  I need to sleep.  Please.

           7              THE COURT:  All right.  So let's get on the road,

           8    and let's think about when.

           9              So talk to Mr. Steward and give me a time

04:58:15  10    tomorrow.

          11              MS. PEMKOVA:  Thank you.

          12              THE COURT:  Thank you very much.  Good night.

          13         (At 4:58 p.m., proceedings were adjourned.)

          14

04:58:18  15                            -oOo-

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

104

                              CERTIFICATE

04:58:18   1

           2          I hereby certify that pursuant to Section 753,

           3    Title 28, United States Code, the foregoing is a true and

           4    correct transcript of the stenographically reported

04:58:18   5    proceedings held in the above-entitled matter and that the

           6    transcript page format is in conformance with the

           7    regulations of the Judicial Conference of the United States.

           8

           9    Date:  March 20, 2016

04:58:18  10

          11

          12                        _____/s/DEBORAH D. PARKER_____
                                    DEBORAH D. PARKER, OFFICIAL REPORTER
          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

                    *DEBORAH D. PARKER, U.S. COURT REPORTER*