1

1

2

3

4               UNITED STATES DISTRICT COURT

5              CENTRAL DISTRICT OF CALIFORNIA

6                   SOUTHERN DIVISION

7       THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

8                                 CERTIFIED TRANSCRIPT

9

10      UNITED STATES OF AMERICA,    )
                        Plaintiff,  }
11            vs.                     }
                                      }   SACR-08-180-DOC
        IRENE PEMKOVA,               )
12                      Defendant.  }   TRIAL DAY 6, VOL. 1
        ----------------------------}

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                Santa Ana, California

17                  June 9, 2015

18

19                  SHARON A. SEFFENS, RPR
                    United States Courthouse
20                  411 West 4th Street, Suite 1-1053
                    Santa Ana, CA  92701
21                  (714) 543-0870

22

23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1    APPEARANCES OF COUNSEL:

2    For the Plaintiff:

3    EILEEN DECKER
     United States Attorney
4    DENNISE D. WILLETT
     Assistant United States Attorney
5    Chief, Santa Ana Branch Office
     LAWRENCE E. KOLE
6    Assistant United States Attorney
     8000 United States Courthouse
7    411 West Fourth Street
     Santa Ana, CA  92701
8    (714) 338-3594

9    For the Defendant:

10   IRENE PEMKOVA, PRO SE

11   ALSO PRESENT:

12   H. DEAN STEWARD, STANDBY COUNSEL
     H. DEAN STEWARD LAW OFFICES
13   107 Avenida Miramar, Suite C
     San Clemente, CA  92672
14   (949) 481-4900

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                          I-N-D-E-X

 3    PLAINTIFF'S
      WITNESSES:            DIRECT    CROSS    REDIRECT    RECROSS
 4
      THOMAS REITZ
 5       (Continued)                  11

 6
      PLAINTIFF'S
 7    EXHIBITS:                                MARKED     RECEIVED

 8    (None)

 9    DEFENSE
      WITNESSES:            DIRECT    CROSS    REDIRECT    RECROSS
10
      (None)
11
      DEFENSE
12    EXHIBITS:                                MARKED     RECEIVED

13    Exhibit 200                              22
      Exhibit 4                                            81
14    Exhibit 5                                            82
      Exhibit 8                                            84
15    Exhibit 6                                            85
      Exhibit 7                                            86
16    Exhibit 9                                            88
      Exhibit 10                                           91
17    Exhibit 11                                           91

18

19

20

21

22

23

24

25
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

1   SANTA ANA, CALIFORNIA; TUESDAY, JUNE 9, 2015; 8:48 A.M.

2            (Jury not present.)

08:48   3            THE COURT:  If you would come forward,

08:48   4   Ms. Pemkova, and have a seat.

08:48   5            Deb, would the tell the jury we will be a few more

08:48   6   minutes, but then I need you right back because you're going

08:48   7   to place a phone call for me.

08:48   8            (Off-the-record discussion)

08:48   9            THE COURT:  All right, Ms. Pemkova is present.

08:48  10   Counsel are present.

08:48  11            Ms. Pemkova, I am going to start with the phone

08:49  12   number for Mr. Klika.

08:49  13            MS. PEMKOVA:  Your Honor, I bring it for you.  May

08:49  14   I bring it to you?

08:49  15            THE COURT:  Ms. Pemkova, I will take it, and we

08:49  16   will have a discussion.  Thank you, because I need that on

08:49  17   the record.

08:49  18            So for Mr. Klika, is that a 920?

08:49  19            MS. PEMKOVA:  No, (420).

08:49  20            THE COURT:  (420) 777 --

08:49  21            MS. PEMKOVA:  Your Honor, I have spoken with

08:49  22   engineer Klika around midnight, which is 9:00 in the

08:49  23   morning.  He was today the whole day in Austria in the bank

08:49  24   working on this appraisal, and he is being sent after

08:49  25   business hours to Romania for another appraisal.  That's why

08:50   1   right now he is driving.  It would be wise if you try to

08:50   2   call him or --

08:50   3            THE COURT:  It would be wise to call him now?

08:50   4            MS. PEMKOVA:  We can try.  You can try.  In case

08:50   5   it would not work, he would be still be on the highway.

08:50   6            THE COURT:  It would be a plus, wouldn't it?

08:50   7   Wouldn't it be a plus (420) 777 --

08:50   8            MS. PEMKOVA:  No.  I think 011 in Europe, Your

08:50   9   Honor.  I think you call 011 and 420 for the country code.

08:50   10           THE COURT:  Okay.  Why don't you come up here and

08:50   11  help Debbie for just a moment.  You're going to help her

08:50   12  place that call.

08:50   13           Please start the call.  Thank you.

08:51   14           (Court and clerk conferring)

08:53   15           THE COURT:  When you get the answer, let me talk

08:53   16  on your cell phone.

08:53   17           MS. PEMKOVA:  I can try leaving a message.

08:53   18           THE COURT:  I would like to speak to at least the

08:53   19  voice on the cell phone.

08:53   20           MS. PEMKOVA:  I don't think he has a voicemail,

08:53   21  but I will try one more time.  I will call him again.  I can

08:53   22  send him a text message asking him to call back when he

08:53   23  stops somewhere on the highway.  He is on the highway.

08:53   24           THE COURT:  Send him a text message and ask him to

08:53   25  call (714) 338-4545.

08:53  1      MS. PEMKOVA:  It just keeps ringing.  It doesn't

08:53  2  go to the voicemail.

08:53  3      THE COURT:  Do you mind if I also ask the

08:53  4  government agent at some point to also attempt to contact

08:54  5  him, as well as Mr. Steward, as well as the Court, so all of

08:54  6  us can see if we can at least get ahold of the gentleman and

08:54  7  see his availability.

08:54  8      MS. PEMKOVA:  No.  Objection.  I don't want

08:54  9  anybody contacting the witness.  That's experience from the

08:54  10  past.

08:54  11      THE COURT:  Well, I am going to contact him

08:54  12  through you, but I will exclude the government for just a

08:54  13  moment.

08:54  14      (Mr. Kole exits courtroom.)

08:54  15      (The following proceedings were under seal:)

08:56  16      (End of sealed portion.)

08:56  17      (Mr. Kole enters courtroom.)

08:56  18      THE COURT:  Let me say also in this process of a

08:56  19  trial you can ask as many questions on cross-examination --

08:56  20  I am not limiting you -- but I am wondering since you are

08:56  21  testifying or represent that you are going to testify what

08:56  22  impression you are making or where we are going with the

08:56  23  cross-examination.

08:56  24      In other words, no chilling effect, but by the

08:57  25  same token, isn't the jury going to be as interested or more

7

08:57  1  interested in your testimony, or do you plan to elicit it

08:57  2  through the agent, because many of the questions are partial

08:57  3  questions but part accusations, part opinion, and they get

08:57  4  interchanged?

08:57  5        So I keep asking the agent do you understand the

08:57  6  question?  Counsel quite frankly has made the appropriate

08:57  7  objection that 99 percent of the time I probably would have

08:57  8  sustained.  And the courts caution to treat the parties

08:57  9  equally, but really in practical reality, that doesn't

08:57  10  occur.  With a pro se, the Courts end up protecting the pro

08:57  11  se.

08:57  12        So at some point, I think that these rulings have

08:57  13  to change, and I need to abide by the evidentiary code of

08:57  14  the law.  When that happens, it creates the impression if I

08:57  15  start sustaining these objections, which many of them seem

08:57  16  absolutely appropriate, that you are asking improper

08:58  17  questions.  I really don't want that.  So I leave that to

08:58  18  your wisdom.

08:58  19        But you're going to be testifying shortly, or at

08:58  20  least you represented you were going to testify during your

08:58  21  case.  So I'm going to put the agent back up on the stand.

08:58  22  I'm just saying to you that this might be a time that you at

08:58  23  least reach out to Mr. Steward who may have a different

08:58  24  thought or the same thought and just ask a little bit about

08:58  25  tactics and wisdom and how you're presenting yourself to the

08:58  1  jury when you have the ability and distinct advantage of

08:58  2  being able to testify and lay out your entire story.  I am

08:58  3  going to let you do that.

08:58  4       Now, with the agent, it's coming in so

08:58  5  piecemeal -- and I humbly say this to you -- that I am not

08:58  6  certain that they're getting your side, but I will leave

08:58  7  that to you in your wisdom.

08:58  8       MS. PEMKOVA:  Your Honor, it would be very helpful

08:58  9  to have the time to read through properly what is in the

08:58  10  exhibits because this defendant didn't see it.  It would

08:59  11  tremendously shorten the period of asking the agent, asking

08:59  12  any witness, because due to the lack of time even just

08:59  13  reading through the exhibits, it means the defendant has to

08:59  14  catch what was said.

08:59  15       THE COURT:  I just humbly disagree with you.  You

08:59  16  know this case very well.  These are your conversations.

08:59  17  This is your voice.  You have had this discovery over a

08:59  18  period of time.  You have had a running battle, which is

08:59  19  much more complete -- and I say battle with Ms. Bass and

08:59  20  mean it.  Those in-camera hearings were quite startling to

08:59  21  the Court.  Mr. Steward's concerns were mild compared to the

08:59  22  issues expressed with Ms. Bass.

08:59  23       Although the government was not part of that

08:59  24  process, any person looking back at this record will see

08:59  25  that you not only were extraordinarily prepared but you were

08:59    1    adamant about the way the defense was going to be presented

09:00    2    and against the advice of Ms. Bass who repeatedly informed

09:00    3    you to the point of actually feeling harassed by you.

09:00    4         I have had the same running issue with

09:00    5    Mr. Steward.  I haven't inquired at least as much and in

09:00    6    depth as I did with Ms. Bass, but the same exacerbation has

09:00    7    occurred.  As far as you not knowing this case, I apologize,

09:00    8    but I just don't believe it.

09:00    9         You know this case extraordinarily well, and you

09:00   10    know these tapes extraordinarily well.  You have always been

09:00   11    of the same impression that these high-yield investment

09:00   12    schemes are valid and that they are to be defended and that

09:00   13    this money comes from transactions committed through the

09:00   14    banks and through the governments of Europe and the United

09:00   15    States.  That viewpoint has never changed.

09:00   16         MS. PEMKOVA:  Your Honor, this is the problem I am

09:00   17    stepping into.  It would be a good idea to read the docket

09:00   18    sheet.  Ms. Bass never provided me the discovery.  I was

09:01   19    getting bits and pieces.  Mr. Steward never provided me this

09:01   20    as well.  He gave me tapes which were without the

09:01   21    transcript.

09:01   22         I have read the first transcript and what is in

09:01   23    the discovery after I got it on the 26th.

09:01   24         THE COURT:  Well, it's up to you.  I am just

09:01   25    saying to you that if you want to continue for whatever

```
09:01   1    period of time with the agent, so be it, but you have got an
09:01   2    opportunity to tell your story in a concise or lengthy
09:01   3    fashion when you take the witness stand.  What's happening
09:01   4    here is somewhat disjointed frankly, but I will leave that
09:01   5    to you.
09:01   6              If you would be kind enough to get the jury,
09:01   7    please.
09:01   8              MS. PEMKOVA:  Your Honor, may I say something?
09:01   9    This is the e-mail --
09:01  10              THE COURT:  What else do you want to say, please?
09:01  11              MS. PEMKOVA:  I want to give you an e-mail from
09:01  12    engineer Klika saying to Mr. Steward that he was willing to
09:01  13    testify in writing, a confirmation.
09:01  14              THE COURT:  Who?
09:01  15              MS. PEMKOVA:  Engineer Klika's e-mail to
09:01  16    Mr. Steward.
09:02  17              THE COURT:  Mr. Klika is willing to testify.  I
09:02  18    would like to get him on the phone to arrange a date.  I am
09:02  19    not remiss to a short continuance if I can keep this jury
09:02  20    together, but --
09:02  21              MS. PEMKOVA:  On January 14th, he sent an e-mail
09:02  22    to Mr. Steward which --
09:02  23              MR. KOLE:  What date?
09:02  24              MS. PEMKOVA:  January 14, 2015, and said:  "I have
09:02  25    confirmed on 16 September 2013 to Diana Bass via e-mail I
```

09:02  1   will travel to the USA, and I will testify as" --

09:02  2              THE COURT:  Just a moment.  Now, that's what I'm

09:02  3   trying to get ahold of him about.  In other words, I try not

09:02  4   to set an arbitrary date.  I'm suggesting June 23rd.  I'm

09:02  5   going to ask the jury in humbleness if they can reassemble.

09:02  6              I want to take into account Mr. Steward's

09:02  7   operation because I want standby counsel and I want the same

09:02  8   standby counsel.  I think that's extraordinarily generous on

09:02  9   the Court's part.  As far as that declaration is concerned,

09:02  10  the Court is rejecting that.

09:03  11             (Jury present)

09:03  12             THE COURT:  Good morning.  How is everybody today?

09:03  13             Have a seat for just a moment.  I want to

09:03  14  apologize about this morning.  I've wasted a half hour of

09:03  15  your time.  It's my fault, totally my fault.  We started at

09:03  16  7:00 or little bit after, and I couldn't get to those

09:03  17  matters, so I humbly apologize.

09:03  18             We are going to continue the cross-examination.

09:03  19             Ms. Pemkova.

09:04  20        THOMAS REITZ, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

09:04  21               CROSS-EXAMINATION (Continued)

09:04  22  BY MS. PEMKOVA:

09:04  23  Q    Agent Reitz, will you please -- when we finished

09:04  24  yesterday, it was with Exhibit 111.

09:05  25             My question is in these various documents you were

09:05  1    always getting some fee agreements; correct?

09:05  2    A    In Exhibit 111?

09:05  3    Q    Well, in any of these documents, yes.  We start with

09:05  4    Exhibit 111.  But with these contracts and other paperwork,

09:05  5    were they always fee agreements?

09:05  6    A    No.  I received other documents by e-mail.  I received

09:05  7    the TSI contract, for example.

09:05  8    Q    Okay.  But when you were receiving the paperwork, how

09:05  9    many fees agreements you were signing or you were asked to

09:05  10   sign?

09:05  11   A    There were I believe three fee agreements total.

09:05  12   Q    Okay.  And who was asking for how much?

09:05  13   A    Mr. Pesic and Schaller were a million.  David & Goliath

09:05  14   had its own separate one for I believe 25 percent.  And then

09:05  15   there was one for Beata Priore that included J.S. and

09:06  16   Polly Kroeis.

09:06  17   Q    And who was J.S.?  Ever find out?

09:06  18   A    I never asked anybody who J.S. was.

09:06  19   Q    Did spending so much, Dr. Priore, she didn't disclose

09:06  20   where J.S. is living?

09:06  21   A    I didn't ask her who the J.S. was in the contract, in

09:06  22   the fee agreement.

09:06  23   Q    On any of these agreements have you seen anywhere

09:06  24   defendant Pemkova's name?

09:06  25   A    On the fee agreements?

09:06   1   Q    Yes.

09:06   2   A    No.

09:06   3   Q    Did she ever ask you for any agreement for her with

09:06   4   exception of that Florida deal 25 percent to Canadian deal?

09:06   5        MR. KOLE:  Objection.  Vague and ambiguous as to

09:06   6   who the she is.

09:06   7        THE COURT:  Sustained.

09:06   8   BY MS. PEMKOVA:

09:07   9   Q    During your examination and preparation of the case,

09:07   10  did you find anywhere any information that defendant Pemkova

09:07   11  was asking and providing any document for fees for her?

09:07   12  A    Not to Tom Moore, not that I recall.

09:07   13  Q    Okay.  You met with her in Beverly Hills.  Was there

09:07   14  any discussion regarding the fees for herself?

09:07   15  A    I don't recall that.

09:07   16  Q    How much do you recall from the meeting for Dr. Priore

09:07   17  in somewhere in 2006 when you met her in New York?

09:07   18  A    The discussion about fees?

09:07   19  Q    Yes.  You don't recall anything else?

09:07   20  A    I don't recall discussing fee agreements, and I don't

09:07   21  recall discussing fee agreements with Dr. Priore in New

09:07   22  York.

09:07   23  Q    Okay.  This Exhibit 111, it's Dr. Priore confirming she

09:08   24  will help you to go through the contract; correct?

09:08   25  A    I'm sorry.  Yes, that she'll help me go through the

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

09:08   1   contract.  Correct.

09:08   2   Q    Did defendant Pemkova ever propose any help to go over

09:08   3   the contract or help you to understand the contract?

09:08   4   A    I believe in one of the calls there was an offer to

09:08   5   call anytime if I had questions.

09:08   6   Q    Okay.  But exactly specifically regarding that

09:08   7   contract?

09:08   8   A    Well, yes, that we would go over it with Dr. Onciu on a

09:08   9   conference call.

09:08   10  Q    When this call occurred?  Before you send the contract

09:08   11  to her or after?

09:08   12  A    After.

09:08   13  Q    Okay.  Exhibit 112, please.  What is that?  You got a

09:09   14  contract from --

09:09   15  A    112 is an e-mail from Polly Kroeis, and it's the TSI

09:09   16  contract.

09:09   17  Q    It came from whom to whom?

09:09   18  A    It came from Kroeis to myself, copied to Dr. Priore.

09:09   19  Q    Is there anywhere defendant Pemkova's name?

09:09   20  A    No.

09:09   21  Q    While you were dealing with TSI, did ever her name

09:09   22  anyhow appear in this communications?  You had spoken

09:09   23  with -- according to the recordings you had spoken with the

09:09   24  judge, you have spoken with Mr. Schlag and Mr. Schaeffer and

09:09   25  the judge; correct?

09:09  1   A    Yes.

09:09  2   Q    Did anywhere appear her name?

09:09  3   A    Not in any of those conversations, no.

09:09  4   Q    Have you ever asked about her being involved in this?

09:10  5   A    Asked whom?

09:10  6   Q    The people who you spoke with -- the judge, the TSI

09:10  7   people.

09:10  8   A    The judge or the TSI people, no.

09:10  9   Q    Okay.  And you received this contract at 6:24 in the

09:10  10  morning on December the 12th; correct?

09:10  11  A    December 4th.

09:10  12  Q    Uh-huh.  What did you do with this contract?

09:10  13  A    I read through it and forwarded a copy to you asking to

09:10  14  discuss it.

09:10  15  Q    Why did you forward it to the defendant?

09:10  16  A    I wanted to see if you were familiar with it and if you

09:10  17  could discuss it with me.

09:10  18  Q    Does it make sense that someone who is not involved

09:10  19  would be giving Mr. Moore an impact if he came to the

09:10  20  meeting with the financial advisor?

09:11  21       MR. KOLE:  Objection.  Vague and ambiguous.

09:11  22       THE COURT:  Sustained.

09:11  23  BY MS. PEMKOVA:

09:11  24  Q    You asked her for the -- let's go over the contract one

09:11  25  more time, please.  You have said that it is a

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

09:11  1    self-liquidating loan; correct?

09:11  2    A    Correct.

09:11  3    Q    If we go on the first page of the contract, what do you

09:11  4    see here?

09:11  5    A    The word "loan" highlighted.

09:12  6    Q    Exactly, loan, meaning the contract was right on the

09:12  7    first page showing a loan; correct?

09:12  8    A    It's describing itself as a loan, yes.  That's how they

09:12  9    are describing it.

09:12  10   Q    On the page 3 of 15, the same exhibit, what do you see

09:12  11   there highlighted again right here (indicating)?

09:12  12            MR. KOLE:  Your Honor, I don't necessarily object

09:12  13   to the line of questioning, but I think the record should

09:12  14   reflect that it appears the defendant has annotated, made

09:12  15   some additional writing that is not on the actual exhibit.

09:12  16            THE COURT:  Just a moment.

09:12  17            MS. PEMKOVA:  No.  The highlighted line is on

09:12  18   there.

09:12  19            MR. KOLE:  I was referring to the handwriting that

09:12  20   says real estate.

09:12  21            THE COURT:  This is becoming a little consumptive

09:12  22   of time.

09:12  23   BY MS. PEMKOVA:

09:12  24   Q    Okay.  According to the conditions of the real estate

09:12  25   financing, brokerage is as follows; correct?

09:12   1    A    Yes.  That's how it reads.

09:13   2    Q    Financing for brokerage?

09:13   3    A    Yes.

09:13   4    Q    On page 6 discusses here several times?

09:13   5         MR. KOLE:  Your Honor, again I don't have a

09:13   6    problem and I don't object to Ms. Pemkova asking questions

09:13   7    with sort of a demonstrative aid -- she has now covered it

09:13   8    up.  Withdrawn.

09:13   9    BY MS. PEMKOVA:

09:13   10   Q    This is the original version.  In the disclosure and

09:13   11   the penalty which was discussed here several times, my

09:13   12   question is where was Thomas Moore allowed to discuss this

09:13   13   contract?

09:13   14        MR. KOLE:  Objection.  Vague and ambiguous.

09:14   15   BY MS. PEMKOVA:

09:14   16   Q    How did you understand the following sentence:

09:14   17   "Lending bank only.  Extent that it is required."  How did

09:14   18   you understand this part?

09:14   19   A    That information could only be shared with the lending

09:14   20   bank.

09:14   21   Q    Correct.  Meaning was it secret, completely secret?

09:14   22   A    Well, it's saying only the lending bank and isn't

09:14   23   providing -- and the parties are defined as myself, so it

09:14   24   tends to exclude other parties like accountants, lawyers,

09:14   25   and so on.

09:14  1  Q    Not necessarily an investor is always allowed to -- did

09:14  2  ever anybody tell you not to bring --

09:14  3       THE COURT:  That's not a question.  It's a

09:14  4  statement.  Ask a question.

09:14  5  BY MS. PEMKOVA:

09:14  6  Q    Did anybody ever tell you not to bring your account

09:14  7  under your advisor?

09:14  8  A    No, but I was told that these types of investments are

09:15  9  highly secretive.

09:15  10 Q    You were told they are secret?

09:15  11 A    Secretive.

09:15  12 Q    Do you know the difference between private and

09:15  13 confidential and secret?

09:15  14 A    Yes.

09:15  15 Q    If we go further, here is the interest rate; correct?

09:15  16 You were allowed to get an interest rate on your investment

09:15  17 -- or Mr. Moore would get interest on his investment;

09:15  18 correct?

09:15  19 A    Well, would receive interest if the transaction did not

09:15  20 occur.

09:15  21 Q    Correct.  On the page 9, it is an authorization for

09:15  22 authorizing to arrange the loan for Mr. Moore?  Yes or no?

09:16  23 A    Yes, that's basically what it is.  It's the principal,

09:16  24 Tom Moore, authorizing TSI to engage in this transaction.

09:16  25 Q    Correct.  Was Mr. Moore or any investor responsible for

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

09:16    1    the repayment of this loan?

09:16    2    A    TSI was responsible for repayment of the loan, but

09:16    3    Thomas Moore would receive the proceeds.

09:16    4    Q    Okay.  Now, Thomas Moore and any other investor has

09:16    5    even a right to withdraw; correct?

09:16    6    A    Yes.

09:16    7    Q    And there was -- Judge de la Vingne was providing some

09:16    8    kind of guarantee for the investment; correct?

09:16    9              MR. KOLE:  Vague and ambiguous.  Judge who?

09:16   10              MS. PEMKOVA:  De la Vingne, the one with whom

09:16   11    Mr. Moore spoke to several times -- no, one time, according

09:16   12    to the recording.

09:16   13              THE WITNESS:  He was providing an account that had

09:17   14    a trust that equaled the amount of money on deposit.

09:17   15    BY MS. PEMKOVA:

09:17   16    Q    That's why this contract has at least four -- in Thomas

09:17   17    Moore's opinion at least four important moments which made

09:17   18    it secure on the first look without verifying the account,

09:17   19    without verifying the status?

09:17   20    A    Well, I would say there was a lack of security in that

09:17   21    it was an agreement through which 10 million euros would be

09:17   22    loaned, and Thomas Moore would receive approximately

09:17   23    6 million and never have to repay that loan.

09:17   24              So there is security offered in the loan in this

09:17   25    transaction, that the money is assured by an attorney in

09:17   1   Belgium and so on.  But in terms of the overall investment,

09:17   2   no, it doesn't provide any kind of security.  It doesn't

09:18   3   appear to be -- it appears to be a high-yielding type

09:18   4   transaction.

09:18   5   Q    Meaning a real estate brokerage credit and loan is a

09:18   6   high-yield investment program?

09:18   7   A    Well, this is -- has many of the features of the

09:18   8   high-yield investment programs to it, yes.

09:18   9   Q    Yes, features.  But in reality, there was a real estate

09:18  10   brokerage credit loan lending bank to talk with; correct?

09:18  11   A    There were those things, yes.

09:18  12   Q    When Thomas Moore spoke with Judge de la Vingne, did

09:18  13   Thomas Moore ask all these important questions we just have

09:18  14   mentioned?

09:18  15   A    I don't recall getting too deeply into the specifics

09:18  16   with de la Vingne.  I thought his language ability was

09:18  17   difficult.

09:18  18   Q    When Thomas Moore had spoken with Dr. Onciu, did

09:18  19   Dr. Onciu mention on numerous occasions how to treat the

09:19  20   conversation with parties from TSI?

09:19  21          MR. KOLE:  Objection.  Vague and ambiguous.

09:19  22          THE COURT:  Sustained.

09:19  23   BY MS. PEMKOVA:

09:19  24   Q    Had Thomas Moore been warned what he has to look for in

09:19  25   any of these contracts?

09:19   1    A    Dr. Onciu suggested two things:  Talk to a lawyer and

09:19   2    make sure that Thomas Moore understands the full profit

09:19   3    picture involved in the transaction.

09:19   4    Q    Okay.  And what was defendant Pemkova suggesting?

09:19   5    A    Those two things.

09:19   6    Q    No.  You just have said it was Dr. Onciu, not defendant

09:19   7    Pemkova.

09:19   8    A    So before that phone call started, before Dr. Onciu was

09:19   9    put on the phone, you said:  I have read through it.

09:19   10   Dr. Onciu has a couple of things.  We have discussed it.  I

09:19   11   will put him on the phone now.  And then he did most of the

09:19   12   talking after that.

09:20   13   Q    Okay.  And Thomas Moore and Agent Reitz still don't

09:20   14   recall what was said, correct, in our conversation in

09:20   15   Beverly Hills?

09:20   16        MR. KOLE:  Objection.  The question is probably

09:20   17   okay.  It was just vague and ambiguous.  I think the words

09:20   18   are a little difficult to understand.

09:20   19        THE WITNESS:  I don't recall details.

09:20   20   BY MS. PEMKOVA:

09:20   21   Q    Agent Reitz and Thomas Moore do not remember anything

09:20   22   said within our conversation in Beverly Hills; correct?

09:20   23   A    From the conversation, not particularly.  What I recall

09:20   24   is meeting in Beverly Hills, having lunch, going to see

09:20   25   Mr. Robison, receiving an investment pitch that was very

09:20   1   different than anything I had heard before in connection

09:20   2   with Ms. Pemkova, and then speaking with Mr. Robison later

09:20   3   and saying I wasn't interested in his investment.

09:20   4   Q    Okay.  Thank you.

09:21   5        Why did you come with the term of a

09:21   6   self-liquidating loan in conjunction with this?

09:21   7        MR. KOLE:  Your Honor, I'm sorry to interrupt.  I

09:21   8   think Ms. Pemkova has placed a document on the screen that's

09:21   9   not yet in evidence or part of the exhibits, so could that

09:21   10  be removed?

09:21   11       THE COURT:  What number is that?

09:21   12       MS. PEMKOVA:  I can give it on the corner for you,

09:21   13  Your Honor.

09:21   14       THE COURT:  Well, it has to have a number.

09:21   15       MS. PEMKOVA:  It doesn't have a number yet because

09:21   16  the defense didn't have a chance to prepare the file, but

09:21   17  this is a detailed breakdown on that TSI --

09:21   18       THE COURT:  Just a moment.

09:21   19       Debbie, what number should we use?

09:21   20       THE CLERK:  No. 1?

09:21   21       MR. KOLE:  Your Honor, if I might just suggest

09:21   22  that we go with 200.

09:21   23       THE COURT:  Defense 200.  That way it won't

09:21   24  interfere or overlap with any other documents.

09:21   25       (Exhibit 200 marked for identification.)

09:21   1              THE COURT:  All right, you can display 200.

09:21   2   BY MS. PEMKOVA:

09:21   3   Q    Agent Reitz, will you please look into the details and

09:21   4   tell me in your opinion why did you call this a

09:22   5   self-liquidating loan where in Column 1 right here it's

09:22   6   clearly shown how the money was disbursed and where this

09:22   7   so-called high-yield investment came from?

09:22   8              MR. KOLE:  Your Honor, compound.

09:22   9              May I approach to hand Agent Reitz the document?

09:22   10             THE COURT:  Sustained.  Reask the question.

09:22   11  BY MS. PEMKOVA:

09:22   12  Q    Okay, one more time the question to be clear.  Do you

09:22   13  see the first column here?

09:22   14  A    Yes, but not -- I can't see the words.

09:22   15             (Ms. Pemkova and Mr. Kole conferring.)

09:22   16             MR. KOLE:  Your Honor, Ms. Pemkova asked me to

09:22   17  give a copy to Agent Reitz.  May I approach?

09:22   18             THE COURT:  You may.

09:22   19  BY MS. PEMKOVA:

09:22   20  Q    If you go to this area, you have the first position,

09:22   21  700.  You have a loan there, and here is the money which the

09:23   22  investor is getting.  It is a calculation made for the

09:23   23  defense by three different accountants checking how the

09:23   24  numbers in TSI worked.  Here is the spread.

09:23   25             Will you please explain, Agent Reitz, how do you

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

09:23   1   understand this area, the first column?

09:23   2   A    Well, equity from the investor is the million dollars.

09:23   3   These appear to all be in euros, which then as per the

09:23   4   contract triggers a 10,580,000 loan from the bank.  The

09:23   5   equity from the investors included in the cash inflow here

09:23   6   to my understanding would go -- would be held in escrow by

09:24   7   De la Vingne.

09:24   8   Q    Let me interrupt because your understanding -- in

09:24   9   reality, the investor, Thomas Moore, would be --

09:24   10            THE COURT:  A question now, please, not a

09:24   11  statement.

09:24   12  BY MS. PEMKOVA:

09:24   13  Q    How much was investor Moore getting?  It's right here.

09:24   14  A    Well, it's in the contract that before all of the fees

09:24   15  and interest and all of that are deducted that the gross

09:24   16  loan was 10,580,000 euros.

09:24   17  Q    But how much was left in TSI after paying out of the

09:24   18  loan to investor Moore?

09:24   19  A    How much was left in TSI?

09:24   20  Q    Right here.

09:24   21  A    I haven't prepared this spreadsheet.  This is the first

09:24   22  time I have seen it.

09:24   23  Q    Meaning if TSI would pay to Thomas Moore 650 percent;

09:25   24  correct?

09:25   25  A    TSI would pay 750 percent?

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

09:25  1   Q    No, 650 percent for it.

09:25  2   A    It was -- the net loan brokerage before a fee was 5.9

09:25  3   million euros, then a three percent fee, leaving about

09:25  4   5.6 million euros.

09:25  5   Q    Anyway, how much was left for TSI to work with after

09:25  6   paying any investor out?

09:25  7   A    Well, they took out 2.4 million euros and 2 million

09:25  8   euros and then 211,000 for various fees, so basically

09:25  9   4.4 million euros.

09:25  10  Q    Do you remember for how many years the loan was

09:26  11  arranged?

09:26  12  A    The term of the loan I believe was either 10 or 12

09:26  13  years.

09:26  14  Q    Correct.  We are in the last column.  If you break

09:26  15  everything down, what I assume Thomas Moore as well as the

09:26  16  financial advisor auditor, Mr. Karpinsky, have done is this

09:26  17  number, correct, is for profit to be created to repay the

09:26  18  loan?

09:26  19          MR. KOLE:  Objection.  Calls for speculation.

09:26  20  Lacks foundation.

09:26  21          THE COURT:  Sustained.

09:26  22  BY MS. PEMKOVA:

09:26  23  Q    Okay.  According to your expertise, does it look like a

09:26  24  self-liquidating loan?

09:26  25  A    Again, I haven't seen this chart before.  I would have

09:26   1    to look at it.  When I read the contract, the loan proceeds

09:26   2    generate the necessary dollar amounts followed by trading,

09:26   3    which I discussed with Mr. Schlag to generate enough profits

09:27   4    to pay off the loan so that when the million dollars is

09:27   5    given, Mr. Moore receives the money and has no further

09:27   6    obligations, receives $6 million for a million dollars with

09:27   7    no further obligation.  So that's what I refer to as a

09:27   8    self-liquidating loan, a loan that pays itself off with its

09:27   9    own proceeds.

09:27   10   Q    But on the spreadsheet, you have seen very clearly --

09:27   11   if Thomas Moore would analyze the contract, would he still

09:27   12   call it a self-liquidating loan, putting numbers together

09:27   13   like here?

09:27   14   A    Again, I haven't seen the numbers, but, yes, we still

09:27   15   refer to it as a self-liquidating loan.

09:27   16   Q    Okay.  In this case, maybe it would be wise to talk

09:27   17   about -- like we would be on the recordings.

09:27   18        Why was Dr. Pemkova asked to do any comments on

09:28   19   this contract?  She wasn't there.  She wasn't on the fees.

09:28   20   Why you let her in?

09:28   21   A    I wanted to see what Dr. Pemkova knew about the

09:28   22   contract, if she had any recommendations.  She was the one

09:28   23   that was introducing this whole transaction.

09:28   24   Q    Did she make any comments on her phone?

09:28   25   A    I'm sorry.  On what?

09:28   1   Q    Did she make any comments walking you through the

09:28   2   contract, any comments on that?

09:28   3   A    No.  I recall that that was left to Dr. Onciu in a

09:28   4   conference call in which Dr. Pemkova participated.

09:28   5   Q    In your opinion, did Dr. Pemkova do any other way the

09:28   6   contract from Thomas Moore?

09:28   7               MR. KOLE:  Objection, ambiguous.

09:28   8               THE COURT:  Sustained.

09:28   9   BY MS. PEMKOVA:

09:28   10  Q    What did Dr. Onciu tell Mr. Moore regarding his

09:29   11  knowledge about TSI?

09:29   12  A    Dr. Onciu said that he had learned about it from

09:29   13  Dr. Priore.

09:29   14  Q    This was the same conversation; correct?  Let's read

09:29   15  for a moment the contract, and let's go to the recordings,

09:29   16  please.  Would you play Recording No. 1?

09:29   17  A    I don't have the recordings here.  I have the CDs.

09:29   18  Q    Oh, sorry.  I'm sorry.  I didn't expect -- yes, would

09:29   19  you please play the CD.

09:29   20  A    I don't have a CD player.

09:29   21               MS. PEMKOVA:  It is necessary to play the

09:29   22  recording.

09:29   23               THE COURT:  How are we going to play the

09:29   24  recording?

09:29   25               MR. KOLE:  If you would like, Your Honor -- if you

09:29  1  would like me to assist, I could get my computer and plug it

09:29  2  in.  I probably just need maybe ten minutes to go downstairs

09:30  3  and get it and put it up.

09:30  4          THE COURT:  Would you accept that, Ms. Pemkova?

09:30  5          MS. PEMKOVA:  Yes, of course.

09:30  6          Can you bring the computer?

09:30  7          MR. KOLE:  Yes.  As I said, I need about ten

09:30  8  minutes.

09:30  9          MS. PEMKOVA:  Okay.

09:30 10  BY MS. PEMKOVA:

09:30 11  Q    In this first conversation, let's take the exhibit, the

09:30 12  transcript of the recordings, No. 1.  It is a conversation

09:30 13  with Mr. Elder?

09:30 14  A    Yes.

09:30 15  Q    How did you get to Mr. Elder?

09:30 16  A    I was referred to Mr. Elder by someone named Ron

09:30 17  Turruli.

09:30 18  Q    Do you recall Ron Turruli?

09:30 19  A    I recall him, yes.

09:30 20  Q    Is he part of the case?

09:30 21  A    No, he is not.

09:30 22  Q    Why not?

09:30 23  A    The reference from Mr. Turruli was to call Elder for a

09:31 24  potential deal that had no substance to it.

09:31 25  Q    Okay.  How in this case did Mr. Elder got the

09:31   1   documents?

09:31   2   A     I'm sorry.  What?

09:31   3             MR. KOLE:  Objection, vague and ambiguous.

09:31   4             THE COURT:  Sustained.

09:31   5   BY MS. PEMKOVA:

09:31   6   Q     Who else was involved in this communication between

09:31   7   Thomas Moore and Mr. Elder on the way to transfer the

09:31   8   documents from Thomas Moore to Mr. Elder?  You didn't send

09:31   9   it directly to Mr. Elder; correct?

09:31   10  A     Which documents?

09:31   11  Q     The first conversation where he calls you and he's

09:31   12  talking about some documents.

09:31   13  A     Yes.

09:31   14  Q     Did he get it from Mr. Moore directly?

09:31   15  A     Did he get documents from me directly?

09:31   16  Q     Before this call, he already had them; correct?  Based

09:32   17  on the call, it's clear he had some documents.  How did he

09:32   18  get it from Mr. Moore?

09:32   19  A     I don't recall.

09:32   20  Q     Did Mr. Moore send it directly prior to February 24,

09:32   21  2006, to Mr. Elder?

09:32   22  A     I don't believe so.

09:32   23  Q     Exactly.  Do you recall where Mr. Moore sends these

09:32   24  documents?

09:32   25  A     Where Moore sent these documents?

09:32  1    Q    Uh-huh.

09:32  2    A    You mean the documents that Elder is referring to?

09:32  3    Q    Yes.  How did they end up in Elder's hands?

09:32  4    A    I don't know.

09:32  5    Q    Okay.  Mr. Ron Turruli, where is he located?

09:32  6    A    I am not seeing where he is saying where he is located

09:32  7    except that there is a (604) area code.

09:33  8    Q    Meaning what in this case?

09:33  9    A    Potentially meaning it's in Canada.

09:33  10   Q    What about Roger Ortiz?

09:33  11   A    Yes.

09:33  12   Q    Do you recall the name?

09:33  13   A    I recall speaking to Roger Ortiz, yes.

09:33  14   Q    Why is he not part of the case?

09:33  15   A    He was several brokers before encountering Ron Turruli.

09:33  16   Q    Are you sure Roger Ortiz was far away from Mr. Elder?

09:33  17        MR. KOLE:  Objection.  That mischaracterizes the

09:33  18   testimony in regard to being far from Elder.

09:33  19        THE COURT:  Sustained.

09:33  20   BY MS. PEMKOVA:

09:33  21   Q    When Mr. Elder was e-mailing you, did you ever see on

09:33  22   the e-mails below -- the one e-mail below which was sent

09:33  23   from Roger Ortiz to Mr. Elder which was in the Thomas Moore

09:34  24   documents?

09:34  25   A    I don't recall seeing that.

09:34   1    Q    Does Thomas Moore or Mr. Reitz recall that Roger Ortiz

09:34   2    was requesting to really pay attention to Mr. Thomas Moore?

09:34   3    A    I don't recall that.

09:34   4    Q    How long time ago would you recall you had spoken with

09:34   5    Mr. Roger Ortiz prior to this conversation on February 24th?

09:34   6    A    How much before February 24th?

09:34   7    Q    Yes.

09:34   8    A    I don't recall.

09:34   9    Q    Okay.  Did you talk to Roger Ortiz after speaking with

09:34   10   William Elder?

09:34   11   A    Not that I recall.

09:34   12   Q    Okay.  What was the purpose discussing with William

09:34   13   Elder all this investment?

09:34   14   A    Well, Mr. Elder called me and said that there were some

09:35   15   investments available that would earn between 6 to 12 points

09:35   16   twice a week.

09:35   17   Q    But it was based on the documents which Thomas Moore

09:35   18   provided to somebody else; correct?

09:35   19   A    Yes.

09:35   20   Q    Why is Roger Ortiz not part of the case?

09:35   21   A    I don't make charging decisions.  That decision is made

09:35   22   by the U.S. Attorney's Office.

09:35   23   Q    Why is William Elder not part of the case?

09:35   24   A    Again, the case was focused on TSI and had

09:35   25   conversations and transactions, e-mails with yourself and

09:35  1   other people, regarding the TSI contract.

09:35  2   Q    Meaning the TSI contract was the basis to start

09:35  3   charging?

09:35  4            MR. KOLE:  Objection, vague and ambiguous.

09:35  5            THE COURT:  Sustained.

09:35  6   BY MS. PEMKOVA:

09:35  7   Q    Meaning talking about in case the people talk about the

09:36  8   so-called high-yield investment programs and they send a

09:36  9   document, it is okay?

09:36  10  A    And they send them?

09:36  11  Q    Yes.

09:36  12  A    Again, who gets charged is really -- I am not saying

09:36  13  it's okay.  It's not okay.  In terms of a criminal

09:36  14  accusation, that's with the U.S. Attorney's Office, and the

09:36  15  Grand Jury makes the decision.

09:36  16  Q    On page 1, lines 19, 20, and 22, is William Elder

09:36  17  talking about a high-yield investment program?

09:36  18  A    On those lines, 19 through 21?

09:36  19  Q    Yes.

09:36  20  A    It's talking about private placement and then later on

09:36  21  discusses $10 million staying in my account.

09:37  22  Q    Later on these loans -- sorry -- on these lines, he is

09:37  23  talking about private placement and investment; correct?

09:37  24  A    Correct.

09:37  25  Q    Does it mean that every investment and every private

09:37   1   placement is a high-yield investment program?

09:37   2   A    He is not saying that every one is or is not, but it's

09:37   3   true that not every private placement is a high-yield

09:37   4   investment program.

09:37   5   Q    Correct.  Later he was talking about on page 2, line

09:37   6   20 -- he is talking about a deal or talking about a

09:37   7   transaction of 10 million; correct?

09:37   8   A    Correct.

09:37   9   Q    Did he ever propose to you besides talking about it

09:37   10  anything for 10 million?

09:37   11  A    Not that I recall, no.

09:37   12  Q    Correct, meaning it was just talk.  There is no

09:37   13  follow-up in documents; correct?

09:38   14  A    No follow-up in documents but specifically saying if

09:38   15  you have 10M or more funds stay in your account.  So always

09:38   16  referring to my opportunity, not in the third person where

09:38   17  these opportunities exist and I will explain them.  It's

09:38   18  always an investment opportunity for me.

09:38   19  Q    Yes, but Thomas Moore provided the statement for

09:38   20  10 million; correct?

09:38   21  A    Yes.

09:38   22  Q    And he provided a statement for 98 million; correct?

09:38   23  A    I believe so, yes.

09:38   24  Q    But William Elder never -- did William Elder ever

09:38   25  follow up on this 10 million statement provided by Thomas

09:38    1    Moore?

09:38    2    A    No, he did not that I recall.

09:38    3    Q    Did William Elder ever follow up with any

09:38    4    introductions, anything?

09:39    5    A    You mean on this 10M term note, trading, and so on?

09:39    6    Q    Yes.

09:39    7    A    No.  There were discussions asking for a tear sheet

09:39    8    later on but not any submission, what you would call

09:39    9    submission documents or anything like that.

09:39   10    Q    Okay.  When he is talking on page 3, line 13, that

09:39   11    something is based on buying and selling MTNs on the

09:39   12    secondary market in Europe -- do you see that line?

09:39   13    A    Yes.

09:39   14                MR. KOLE:  I'm sorry.  Which page?

09:39   15                MS. PEMKOVA:  Page 3 of 8, lines 12 to 14.

09:39   16    BY MS. PEMKOVA:

09:39   17    Q    He is talking about buying and selling MTNs on the

09:39   18    secondary market in Europe; correct?

09:39   19    A    Correct.

09:39   20    Q    Did Thomas Moore immediately understand it is a

09:39   21    high-yield investment program?

09:39   22    A    These are indicators, red flags of high-yield

09:39   23    investment programs, yes.

09:39   24    Q    Meaning the text which references at the beginning MTNs

09:40   25    advertised on the Deutsche Bank website is a high-yield

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

09:40  1    investment program as well?

09:40  2    A    No.  I heard that read, but this is different I believe

09:40  3    than what Deutsche Bank is offering because this is the

09:40  4    mechanism -- the MTNs that Mr. Elder is describing is the

09:40  5    mechanism by which 800,000 on 10 million -- eight percent is

09:40  6    earned twice a week.  I don't recall hearing those kind of

09:40  7    returns described on the Deutsche Bank website.

09:40  8    Q    Well, would the bank provide you a disclosure on what

09:40  9    they make?

09:40  10   A    On?

09:40  11   Q    Anything.  Thomas Moore or Agent Reitz, did they ever

09:40  12   find out that the bank provide a disclosure?

09:40  13               MR. KOLE:  Objection, vague and ambiguous.

09:40  14               THE COURT:  Sustained.

09:41  15               MS. PEMKOVA:  Can you get the recording, please?

09:41  16               MR. KOLE:  Your Honor, shall I get the computer

09:41  17   now?

09:41  18               THE COURT:  Well, we are going to take a recess

09:41  19   and get that recorder set up so we can continue on.  Please

09:41  20   don't discuss this matter amongst yourselves.  We will take

09:41  21   ten minutes just so I have that recording going.

09:41  22                      (Recess taken at 9:41 a.m.;

09:41  23                       proceedings resumed at 10:04 a.m.)

09:41  24               (Jury not present)

10:04  25               THE COURT:  We are on the record.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

10:04   1          Ms. Pemkova, you're present with counsel from both

10:04   2   sides.

10:04   3          Have you been able to reach any of these parties

10:04   4   over the recess?

10:04   5          MS. PEMKOVA:  I left them a voicemail.

10:04   6          THE COURT:  Have you been able to reach any of

10:04   7   these parties?

10:04   8          MS. PEMKOVA:  I left them messages.

10:04   9          THE COURT:  You left messages to whom?

10:04   10         MS. PEMKOVA:  To engineer Klika, and I left a

10:04   11  message for Mr. Mundell.

10:05   12         THE COURT:  Okay.  We're going to be here late

10:05   13  again tonight.

10:05   14         MS. PEMKOVA:  Your Honor, if I may say something,

10:05   15  it is necessary to reach them before 2:00, 3:00, in the

10:05   16  afternoon.  It's midnight in Europe.

10:05   17         THE COURT:  We'll keep calling.  We'll wake them

10:05   18  up if we need to.

10:05   19         MR. KOLE:  I might just note for the reporter's

10:05   20  benefit that when she is referring to Klika I think the word

10:05   21  she's using refers to engineer Klika; is that correct?

10:05   22         MS. PEMKOVA:  Yes.

10:05   23         THE COURT:  All right.  Hopefully we'll be

10:05   24  courteous and get them during the daytime.

10:05   25              (Jury present)

| | | |
|---|---|---|
| 10:06 | 1 | THE COURT:  The jury is present, the alternates, |
| 10:06 | 2 | and counsel. |
| 10:06 | 3 | Counsel, do you have the recording with you? |
| 10:07 | 4 | MR. KOLE:  I do, Your Honor. |
| 10:07 | 5 | THE COURT:  Do you want to play a portion of Tape |
| 10:07 | 6 | 1, Ms. Pemkova? |
| 10:07 | 7 | MS. PEMKOVA:  Yes. |
| 10:07 | 8 | THE COURT:  And what page would you like to play? |
| 10:07 | 9 | MS. PEMKOVA:  We will start from the beginning, |
| 10:07 | 10 | page 1.  I need to notify about the lines, Your Honor.  May |
| 10:07 | 11 | I, please? |
| 10:07 | 12 | THE COURT:  Please. |
| 10:07 | 13 | MS. PEMKOVA:  On page 1, pay attention to lines 19 |
| 10:07 | 14 | and 22; on page 3, line 13; on page 4, lines 10 to 19. |
| 10:07 | 15 | THE COURT:  Is it acceptable that those lines then |
| 10:07 | 16 | be read into the record and the jury have the transcript to |
| 10:08 | 17 | focus on those instead of playing the entire tape? |
| 10:08 | 18 | MS. PEMKOVA:  No, playing the tape but listening |
| 10:08 | 19 | to what is on these lines. |
| 10:08 | 20 | THE COURT:  All right.  Play the tape, Counsel. |
| 10:08 | 21 | MR. KOLE:  Yes, Your Honor. |
| 10:08 | 22 | (Portion of audiotape played) |
| 10:13 | 23 | MS. PEMKOVA:  Thank you. |
| 10:13 | 24 | BY MS. PEMKOVA: |
| 10:13 | 25 | Q   Mr. Reitz, Mr. Moore on lines 1 to 8 -- on page 1 of 8, |

10:13    1    lines 20 to 22, do you see it?

10:13    2    A    Yes.

10:13    3    Q    Is he talking about a high-yield investment program?

10:14    4    A    He is talking about private placement investments and

10:14    5    checking to see if there is still 1.5 million available.

10:14    6    Q    He was talking about 10 million, describing getting

10:14    7    some points.  And then, question:  "Did he ever provide any

10:14    8    paperwork, any introduction, for this 10 million?"

10:14    9    A    I recall getting some information from him, but I am

10:14   10    not sure if it was regarding this 10 million deal.

10:14   11    Q    Basically was there more than just a circulation of the

10:14   12    paperwork?

10:14   13    A    What do you mean by more than?

10:14   14    Q    If somebody sends the documents from Point A to B, it's

10:14   15    a circulation; correct?  It's moving a document from A to B.

10:14   16    Was there any more activities regarding this 10 million

10:14   17    coming from Mr. Elder?

10:15   18    A    Not that I recall, no.

10:15   19    Q    Was there anything coming from Dr. Priore regarding

10:15   20    this 10 million?

10:15   21    A    I'm not sure regarding the 10 million.  There were some

10:15   22    other discussions in between February and November about

10:15   23    various deals that were coming up that had very large dollar

10:15   24    amounts as well, but I don't know if it is distinctly

10:15   25    connected to this 10 million.

39

| | | |
|---|---|---|
| 10:15 | 1 | Q    Thank you.  On page 3 and page 4, does it look like |
| 10:15 | 2 | selling to Mr. Moore instead of helping to understand and |
| 10:15 | 3 | teaching? |
| 10:15 | 4 | A    I'm not sure I would call it teaching.  I would include |
| 10:15 | 5 | it more as selling because it's discussing "your funds."  In |
| 10:15 | 6 | other words, this is a transaction for me.  He is putting it |
| 10:15 | 7 | in the tense of this is something for you to do. |
| 10:15 | 8 | Q    But it never happened; correct?  Did it ever happen? |
| 10:15 | 9 | A    This 10M, I received some documents and so on, but |
| 10:16 | 10 | nothing came up solidly until the TSI deal in November. |
| 10:16 | 11 | Q    It was a theoretical discussion; correct? |
| 10:16 | 12 |         MR. KOLE:  Objection, mischaracterizes. |
| 10:16 | 13 | BY MS. PEMKOVA: |
| 10:16 | 14 | Q    Was it a theoretical discussion rather than something |
| 10:16 | 15 | more tangible? |
| 10:16 | 16 | A    I don't think it was theoretical because he is asking |
| 10:16 | 17 | for specific dollar amounts, giving specific returns.  I |
| 10:16 | 18 | don't think theoretical is the right word for it. |
| 10:16 | 19 | Q    Page number 5, lines 9 through 12. |
| 10:16 | 20 | A    Yes. |
| 10:16 | 21 | Q    Was Mr. Moore planning to invest based on what he has |
| 10:16 | 22 | heard? |
| 10:16 | 23 | A    Well, I'm not sure how to answer that.  I was never |
| 10:17 | 24 | going to send money ever, not the million or 10 million. |
| 10:17 | 25 | But what I am asking is I am interested in talking to other |

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

10:17   1   people to pursue it, so I am giving the impression that I'm
10:17   2   interested.
10:17   3   Q    Correct, meaning Thomas Moore wants to understand how
10:17   4   it works to get a fuller picture of exactly how it works and
10:17   5   meet with the people involved; correct?
10:17   6   A    Correct.
10:17   7   Q    Did Mr. Moore as well as Agent Reitz expect that people
10:17   8   would be helping him?
10:17   9   A    Providing the information requested, sure.
10:17  10   Q    Okay.  Dr. Priore, Dr. Onciu, and defendant Pemkova and
10:17  11   William Elder, did they look like people who were helpful in
10:17  12   Thomas Moore's opinion sharing and providing information he
10:17  13   asked for?
10:17  14   A    They were providing information regarding a high-yield
10:18  15   investment, a self-liquidating loan as I call it, so I
10:18  16   wouldn't -- and encouraging Tom Moore to swift his money as
10:18  17   soon as possible.
10:18  18   Q    I'm sorry.  If we can start with a self-liquidating
10:18  19   loan.  Would you be able and willing to provide any
10:18  20   information where it's possible to read about this
10:18  21   self-liquidating loan?
10:18  22   A    I believe that there were already witnesses here
10:18  23   regarding these high-yield type investments.
10:18  24   Q    You used the term "self-liquidating loan."
10:18  25   A    Yes.

| | | |
|---|---|---|
| 10:18 | 1 | Q    Would you be able and willing to provide any |
| 10:18 | 2 | information where it's possible to read about it? |
| 10:18 | 3 | MS. PEMKOVA:  Objection, relevance. |
| 10:18 | 4 | THE COURT:  Sustained. |
| 10:18 | 5 | BY MS. PEMKOVA: |
| 10:18 | 6 | Q    On the page 5, line 15, recording slips, what does it |
| 10:19 | 7 | mean?  Why did it happen if the recording was done in the |
| 10:19 | 8 | office; correct? |
| 10:19 | 9 | A    I don't know why there was a blip there. |
| 10:19 | 10 | Q    Okay.  On line 19, there was again some strange sound. |
| 10:19 | 11 | It wasn't readable for -- it wasn't possible to understand |
| 10:19 | 12 | it.  Why is there a "P" and a few lines?  What happened to |
| 10:19 | 13 | the recording there? |
| 10:19 | 14 | MR. KOLE:  Objection, mischaracterizes the |
| 10:19 | 15 | recording that there even was any problem at that point. |
| 10:19 | 16 | MS. PEMKOVA:  Can we hear it again, lines 17 to |
| 10:19 | 17 | 20, please? |
| 10:19 | 18 | THE COURT:  Let's move along now.  Ask a question. |
| 10:19 | 19 | BY MS. PEMKOVA: |
| 10:19 | 20 | Q    Okay.  On lines 21, 22, is it a private placement, the |
| 10:20 | 21 | entire investment? |
| 10:20 | 22 | A    He is discussing -- he says to be in the private |
| 10:20 | 23 | placement.  Yes, he is discussing that. |
| 10:20 | 24 | Q    Talking about a private placement; correct? |
| 10:20 | 25 | A    Yes. |

10:20    1   Q    And not every private placement is in the same program;
10:20    2   correct?
10:20    3   A    That's correct.
10:20    4   Q    Page 6 of 8, lines 18 to 22.
10:20    5   A    Yes, I see it.
10:20    6   Q    Is it a request by Mr. Moore for info, help, and
10:20    7   assistance?
10:20    8   A    For more information regarding the investment, yes, and
10:20    9   to understand how it works and to meet people who offer it.
10:20   10   Q    Meaning Thomas Moore was asking for information and
10:20   11   meeting with people; correct?
10:20   12   A    Well, yes, to pursue one of these high-yield
10:21   13   investments earning six to eight percent per transaction as
10:21   14   an investor.
10:21   15           MS. PEMKOVA:  Can we have the recording on page 5
10:21   16   of 8 and lines 17 to 20, please?
10:21   17           MR. KOLE:  Go back to page 5?
10:21   18   BY MS. PEMKOVA:
10:21   19   Q    On line 19, page 5 of 8, Mr. Elder did not finish the
10:21   20   word.  Why?  What happened with the recording there?
10:21   21   A    I don't know.
10:21   22           MS. PEMKOVA:  Can you play it again, please?
10:21   23           (Portion of audiotape played)
10:22   24           MR. KOLE:  For everyone's assistance, I believe I
10:22   25   am at the middle of page 5 right now.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:22 | 1 | (Portion of audiotape played) |
| 10:22 | 2 | BY MS. PEMKOVA: |
| 10:22 | 3 | Q    What was that? |
| 10:22 | 4 | A    It's a momentary interruption.  I don't know.  It |
| 10:22 | 5 | sounded like maybe Mr. Elder had call waiting, but I don't |
| 10:22 | 6 | know. |
| 10:22 | 7 | Q    He didn't. |
| 10:22 | 8 | MR. KOLE:  Objection, Your Honor. |
| 10:22 | 9 | THE COURT:  Strike the comment "He didn't." |
| 10:22 | 10 | BY MS. PEMKOVA: |
| 10:22 | 11 | Q    Okay.  Page 6 of 8, we just talked about it, correct, |
| 10:22 | 12 | 18 to 21?  Mr. Moore is asking for assistance; correct? |
| 10:23 | 13 | A    Correct. |
| 10:23 | 14 | Q    Page 7 of 8 is basically a disclosure of Elder's data; |
| 10:23 | 15 | correct? |
| 10:23 | 16 | A    Well -- his phone number. |
| 10:23 | 17 | Q    Phone number, yes. |
| 10:23 | 18 | Did Mr. Elder or anybody who you spoke with -- did |
| 10:23 | 19 | they try to hide their data, phone numbers, where they live? |
| 10:23 | 20 | A    Not when I spoke to them, no. |
| 10:23 | 21 | Q    Meaning everybody was disclosing basic personal |
| 10:23 | 22 | information to Thomas Moore; correct? |
| 10:23 | 23 | A    I don't think a phone number is personal.  It's not |
| 10:23 | 24 | what I would call personal information.  It's contact |
| 10:23 | 25 | information. |

44

10:23  1   Q    Okay.  And we can go to the next question.

10:23  2         Mr. Moore, did in any way Dr. Pemkova appear in

10:24  3   this conversation?

10:24  4   A    In this conversation, no.  When you mean appear, you

10:24  5   mean speak?

10:24  6   Q    Talking or in between lines was there any indication

10:24  7   she will appear or she is involved?

10:24  8   A    Not in this conversation, no, not that I recall.

10:24  9   Q    That's why Thomas Moore rather encourage William Elder

10:24  10  to provide information and provide introductions; is it

10:24  11  correct?

10:24  12  A    Yes, to move forward with a potential investment.

10:24  13        MS. PEMKOVA:  Conversation No. 2, please.

10:24  14  BY MS. PEMKOVA:

10:24  15  Q    There was three days difference between the first

10:24  16  conversation and second, 24th of February and 27th of

10:25  17  February 2006?

10:25  18  A    Yes.

10:25  19        MR. KOLE:  Would you like me to skip the

10:25  20  introductory part?

10:25  21        MS. PEMKOVA:  No.  We can go as it is.

10:37  22        (Portion of audiotape played)

10:40  23        MS. PEMKOVA:  You can stop there.  There will be a

10:40  24  long description.

10:41  25        THE COURT:  Ms. Pemkova, your question.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

10:41   1          MS. PEMKOVA:  I would like to go back to the

10:41   2   record being shown on page 24 of 25.

10:41   3          MR. KOLE:  We are now for the record at page 24.

10:41   4   We are at lines 6 and 7.

10:41   5          (Portion of audiotape played)

10:41   6          MS. PEMKOVA:  You can stop it there.  There will

10:41   7   be a long discussion.

10:41   8   BY MS. PEMKOVA:

10:41   9   Q    Mr. Moore, in this conversation you met the first time

10:41  10   the defendant?

10:41  11   A    Yes.

10:41  12   Q    She has a thick accent; correct?

10:42  13   A    Yes.

10:42  14   Q    Difficult to understand; am I right?

10:42  15   A    Understandable.

10:42  16   Q    But in this conversation, it's very understandable;

10:42  17   correct?

10:42  18   A    Yes.  I believe so, yes.

10:42  19   Q    What was the sound which we have heard that sounds like

10:42  20   click, click?

10:42  21   A    When?

10:42  22   Q    In different places, there was a metallic sound.

10:42  23   A    I remember hearing the cell phone go off.  I don't

10:42  24   remember a click, click.

10:42  25   Q    This click, click which was there, you didn't hear

| | | |
|---|---|---|
| 10:42 | 1 | that? |
| 10:42 | 2 | A    Can you refer me to a particular -- |
| 10:42 | 3 | Q    I think if was on pages 14 and 15 of 25.  Anyway, there |
| 10:42 | 4 | was an additional sound on the tape.  Where did the sound |
| 10:42 | 5 | came from in case it was recorded by the computer in the |
| 10:42 | 6 | office? |
| 10:42 | 7 | A    I don't know, and I don't recall hearing the click, |
| 10:43 | 8 | click. |
| 10:43 | 9 | MS. PEMKOVA:  Mr. Kole, can you play page 14 and |
| 10:43 | 10 | 15 again?  I'm very sorry. |
| 10:43 | 11 | (Portion of audiotape played) |
| 10:43 | 12 | MR. KOLE:  That was 13. |
| 10:43 | 13 | For the record, we are now at page 14, line 8. |
| 10:43 | 14 | Is that fair?  Is that where you want?  Do you |
| 10:43 | 15 | want me to go farther back? |
| 10:43 | 16 | MS. PEMKOVA:  No, it's fine.  The notebook is |
| 10:43 | 17 | here. |
| 10:43 | 18 | (Portion of audiotape played) |
| 10:43 | 19 | THE COURT:  Just a minute.  It's extraordinarily |
| 10:43 | 20 | confusing, and the lack of coordination is unduly |
| 10:44 | 21 | consumptive of time. |
| 10:44 | 22 | MS. PEMKOVA:  Okay. |
| 10:44 | 23 | THE COURT:  You can read that portion.  But now we |
| 10:44 | 24 | have heard the tape.  We're not going to try to go back |
| 10:44 | 25 | between the two of you because we are not hitting the |

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

```
10:44   1    portions that we need.
10:44   2           So you read that portion for just a moment and
10:44   3    then ask the question.  I will refer the jury to the page
10:44   4    and line number.
10:44   5    BY MS. PEMKOVA:
10:44   6    Q    Page 1 of 25, lines 8 through 12.
10:44   7    A    Yes.
10:44   8    Q    Is there any reference to a high-yield investment
10:44   9    program?
10:44  10    A    Yes, the MTN transaction.
10:44  11    Q    In lines 7 to 10?
10:44  12    A    In lines 7 through 10, not to a MTN transaction.
10:44  13    Q    It is talking about two different transactions;
10:44  14    correct?
10:44  15    A    Correct.
10:44  16    Q    On the same page?
10:44  17           MR. KOLE:  Can I just have the page again, please?
10:45  18           MS. PEMKOVA:  Exhibit 2, page 1 of 25.
10:45  19    BY MS. PEMKOVA:
10:45  20    Q    Page 1 of 25?
10:45  21    A    Yes.
10:45  22    Q    Is it the meeting in Beverly Hills?
10:45  23    A    Yes.
10:45  24    Q    Did Thomas Moore attend the meeting in Beverly Hills?
10:45  25    A    Yes.
```

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:45 | 1 | Q    Okay.  Page 2, line 4 to line 15, William Elder is |
| 10:45 | 2 | struggling to get Dr. Irene on the phone; correct? |
| 10:45 | 3 | MR. KOLE:  Object, mischaracterizes the record. |
| 10:45 | 4 | THE COURT:  Sustained. |
| 10:45 | 5 | BY MS. PEMKOVA: |
| 10:45 | 6 | Q    Was it easy to get Dr. Irene on the line in Thomas |
| 10:45 | 7 | Moore's opinion? |
| 10:45 | 8 | A    Yes.  Of course, Thomas Moore had nothing to do with |
| 10:46 | 9 | putting her on the line.  Just waited about 15 seconds. |
| 10:46 | 10 | Q    Page No. 3 -- actually, I'm sorry.  Page No. 2, last |
| 10:46 | 11 | line, line 24, and Page No. 3, specifically line 2, to meet |
| 10:46 | 12 | with the principals; correct? |
| 10:46 | 13 | A    Yes. |
| 10:46 | 14 | Q    Who were the principals? |
| 10:46 | 15 | A    At that point, I wasn't really sure who they were.  I |
| 10:46 | 16 | was looking to speak to people of authority was what I |
| 10:46 | 17 | was -- |
| 10:46 | 18 | Q    Did you find out later who were the people in Beverly |
| 10:46 | 19 | Hills? |
| 10:46 | 20 | A    Yes. |
| 10:46 | 21 | Q    Okay.  Was it a high-investment program, the Beverly |
| 10:46 | 22 | Hills transaction? |
| 10:46 | 23 | A    The Robison ROI investment? |
| 10:47 | 24 | Q    Yes. |
| 10:47 | 25 | A    No.  It didn't appear to have any of the features, red |

| | | |
|---|---|---|
| 10:47 | 1 | flags, of a high-yield investment. |
| 10:47 | 2 | Q    And in Thomas Moore's opinion, it was a legitimate and |
| 10:47 | 3 | lawful investment? |
| 10:47 | 4 | A    On its face, I couldn't see anything that was along the |
| 10:47 | 5 | lines of a high-yield investment, and -- |
| 10:47 | 6 | Q    I'm sorry.  Go ahead. |
| 10:47 | 7 | A    On its face and what I heard was very different from |
| 10:47 | 8 | this conversation about MTN trading. |
| 10:47 | 9 | Q    How long did it last, the meeting in Beverly Hills? |
| 10:47 | 10 | A    Oh, about an hour with Mr. Robison. |
| 10:47 | 11 | Q    Lines 9 to 11 on the same page, page 3. |
| 10:48 | 12 | A    Yes. |
| 10:48 | 13 | Q    What was Dr. Irene promising? |
| 10:48 | 14 | A    To put me on the phone with one of the principals. |
| 10:48 | 15 | Q    And on line 9. |
| 10:48 | 16 | A    Explain everything. |
| 10:48 | 17 | Q    Did she explain anything? |
| 10:48 | 18 | A    Regarding? |
| 10:48 | 19 | MR. KOLE:  Everything or anything? |
| 10:48 | 20 | MS. PEMKOVA:  Everything, anything. |
| 10:48 | 21 | BY MS. PEMKOVA: |
| 10:48 | 22 | Q    What did she explain in that meeting? |
| 10:48 | 23 | A    At the meeting in Beverly Hills?  Again, I don't recall |
| 10:48 | 24 | that. |
| 10:48 | 25 | Q    You don't recall anything about that meeting, any |

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

10:48   1   explanations, nothing?

10:48   2   A     No.  What I recall was that what we discussed was very

10:48   3   different than what I was introduced to after the lunch at

10:48   4   Mr. Robison's office.

10:48   5   Q     Okay, lines 16 and 17.

10:48   6   A     Yes.

10:49   7   Q     Was there any -- so far in this conversation was there

10:49   8   any secrecy, any trying to hide the information from Thomas

10:49   9   Moore?

10:49   10  A     No, but there was no information provided either.

10:49   11  Q     Mr. Moore was expecting in the first meeting to have

10:49   12  all data provided?

10:49   13  A     In the meeting with the private placement, yes.

10:49   14  Q     Now we go on to page 4 of 25, from line 5 to line 11,

10:49   15  especially line 8.  Is there any indication of a program or

10:49   16  calling this investment opportunity a high-yield investment

10:50   17  program?

10:50   18  A     Well, the referral -- the reference to the 10 million

10:50   19  plus would later be elaborated as being the transaction that

10:50   20  would generate 6 to 12 percent per trade.  So that does

10:50   21  become a reference to a high-yield trading program.

10:50   22  Q     By appearance of certain elements, certain words, and

10:50   23  high return; correct?

10:50   24  A     Yes.

10:50   25  Q     Okay.  There is a reference on page 11 to European

10:50   1   foundations.  How did Thomas Moore understand that?

10:50   2   A    I'm sorry.  Page 11?

10:50   3   Q    Yes -- no.  Page 4 of 25, line 11:  "Investment

10:50   4   opportunity was created by one of the top European

10:51   5   foundations."  Will you please explain how Thomas Moore

10:51   6   understood this sentence?

10:51   7   A    That is another red flag indicator of high-yield

10:51   8   investment programs along with the 10 million and the top

10:51   9   European foundations, taking that as these charitable

10:51   10  entities that have to be involved in a high-yield

10:51   11  transaction.

10:51   12  Q    Meaning in Thomas Moore's mind European foundations are

10:51   13  not legitimate, legal entities?

10:51   14  A    No.

10:51   15         MR. KOLE:  Objection, mischaracterizes the

10:51   16  testimony.

10:51   17         THE COURT:  Sustained.

10:51   18  BY MS. PEMKOVA:

10:51   19  Q    In every transaction or every business activity where

10:51   20  there might be involved a European foundation, does it mean

10:51   21  that it is automatically taken as a high-yield investment?

10:51   22  A    No.

10:51   23  Q    Okay.  Lines 21 to 22, does it specify what

10:52   24  theoretically was involved with this Thomas Moore

10:52   25  transaction?

10:52  1   A    It says what isn't involved.  It says no 760 and no
10:52  2   joint ventures.
10:52  3   Q    Next page, page 5, line 2:  "The investor will be
10:52  4   allowed to collect the profit as long as he is using profit
10:52  5   by selling."
10:52  6        Did Thomas Moore understand that selling means
10:52  7   automatically selling of MTNs in a high-yield investment
10:52  8   program?
10:52  9   A    Well, the conversation leading up to this is European
10:52 10   foundations, tear sheets being required, and then onto this
10:53 11   sentence, be allowed to collect the profit as long as he is
10:53 12   using profit by selling.  I connected that with the
10:53 13   high-yield transaction that's trading, that's being
10:53 14   discussed.
10:53 15   Q    Meaning in Thomas Moore's and Agent Reitz's minds it is
10:53 16   not possible that a European foundation would be benefiting
10:53 17   from, for example, a commodities sale, a real estate sale?
10:53 18        MR. KOLE:  Objection, relevance in view of lack of
10:53 19   connection to this discussion here.
10:53 20        THE COURT:  Sustained.
10:53 21   BY MS. PEMKOVA:
10:53 22   Q    Have you seen during your stay as an accountant in
10:53 23   Europe or doing work as an agent of the FBI and case
10:53 24   agent -- did you see involvement of foundations, European
10:53 25   foundations, with technologies or various inventions to

10:53   1    create money for them?

10:53   2    A    To create money?

10:54   3    Q    Of course to help them to fund whatever they are doing.

10:54   4    A    I just don't have --

10:54   5          MR. KOLE:  Objection, Your Honor.  It's vague and

10:54   6    ambiguous as to who is being funded, the foundation or the

10:54   7    company.

10:54   8          THE COURT:  Sustained.

10:54   9    BY MS. PEMKOVA:

10:54   10   Q    When the government foundation -- did you link it

10:54   11   besides to the high-yield investment program?  Was there any

10:54   12   association?

10:54   13   A    That was the association.  It's a red flag indicator

10:54   14   for a high-yield investment.

10:54   15   Q    Okay.  From the perspective of the time going all the

10:54   16   way through 2008, how would Mr. Moore link it to what

10:54   17   foundation she might be talking about, the defendant might

10:54   18   be talking about?  Any idea?

10:54   19   A    I guess I don't understand the question.

10:54   20   Q    At that moment in Thomas Moore's mind, it was just a

10:54   21   red flag for a high-yield investment program.

10:55   22          Now, from the perspective of the time from 2006 to

10:55   23   2008, would Thomas Moore today link this sentence about a

10:55   24   European foundation to anything that he meant later?

10:55   25   A    Well, there were discussions of foundations.  The David

10:55  1   & Goliath Ministry was described as a foundation that was

10:55  2   required to participate in the TSI deal in order to gain

10:55  3   acceptance for Thomas Moore to participate in any way.

10:55  4          Again, use of a foundation in the real estate deal

10:55  5   in Florida that the defendant brought to Tom Moore, same

10:55  6   thing.  A foundation is necessarily a charitable endeavor

10:55  7   taking 25 percent of the profits.  So I see that all as a

10:55  8   continuum from here throughout Tom Moore's interactions with

10:55  9   the defendant.

10:55  10  Q   Would you please say the same thing in a short sentence

10:55  11  that is clear?

10:55  12  A   I saw the use of the term "foundations" throughout the

10:56  13  investigation by the defendant.

10:56  14  Q   Yes.  And you connected it to Thomas Moore, and

10:56  15  Mr. Reitz has connected it to David & Goliath, and the

10:56  16  Canadian -- not foundation but the trust, which asked for

10:56  17  25 percent from Florida; correct?

10:56  18  A   Correct.

10:56  19  Q   Thank you.

10:56  20         On the same page, 5 of 25, further down there's a

10:56  21  big explanation of how much it is making 12, 6, et cetera,

10:56  22  et cetera; correct?  Six percent, 12 percent?

10:56  23  A   Correct.

10:56  24  Q   Eight in average; correct?

10:56  25  A   Yes.

| | | |
|---|---|---|
| 10:56 | 1 | Q    Now, please do the math.  You will make at least -- |
| 10:56 | 2 | page 6, lines 3 and 4, is the defendant saying you will make |
| 10:56 | 3 | at least 12 percent the first month -- |
| 10:57 | 4 | THE COURT:  Just a moment.  You're asking what the |
| 10:57 | 5 | defendant is saying.  You will have an opportunity to |
| 10:57 | 6 | testify if you choose to.  This is referring to you.  This |
| 10:57 | 7 | isn't a proper question. |
| 10:57 | 8 | MS. PEMKOVA:  Okay.  I will make it shorter. |
| 10:57 | 9 | BY MS. PEMKOVA: |
| 10:57 | 10 | Q    Did Thomas Moore understand that he's getting |
| 10:57 | 11 | 12 percent per week? |
| 10:57 | 12 | A    In the beginning, yes, 12 percent per week of the |
| 10:57 | 13 | amount invested. |
| 10:57 | 14 | Q    Did he understand he will make 12 percent per month? |
| 10:57 | 15 | A    The first month would be 12 percent per week. |
| 10:57 | 16 | Q    And? |
| 10:57 | 17 | A    And then it increases.  The trades occur more |
| 10:57 | 18 | frequently to two trades per week, so that would be 12 to |
| 10:57 | 19 | 24 percent per week. |
| 10:57 | 20 | Q    And on the same page, there is a -- how Thomas Moore |
| 10:57 | 21 | understood line 16, per week per trade? |
| 10:58 | 22 | A    As an answer to the question right above it where I am |
| 10:58 | 23 | asking if this is an annual rate or a per annum rate that is |
| 10:58 | 24 | being quoted, then Dr. Pemkova is saying, no, it's per week |
| 10:58 | 25 | per trade, 6 to 12 percent. |

| | | |
|---|---|---|
| 10:58 | 1 | Q    Thank you.  Page 7, from lines 17 to 24, did Mr. Moore |
| 10:58 | 2 | take it as a sale, trying to sell him something? |
| 10:58 | 3 | A    It's instructions on preparing for an investment and |
| 10:58 | 4 | its various requirements. |
| 10:58 | 5 | Q    Meaning Thomas Moore understands instruction if |
| 10:59 | 6 | somebody is talking?  He perceives it as an instruction? |
| 10:59 | 7 | A    Yes, cash.  Your entire funds have to be in cash.  So |
| 10:59 | 8 | they have to be sitting on a savings account.  They cannot |
| 10:59 | 9 | be in a money market or overnight trading.  That's a |
| 10:59 | 10 | description of what has to be done in order for this to |
| 10:59 | 11 | occur. |
| 10:59 | 12 | Q    And in Thomas Moore's mind, it is an instruction and |
| 10:59 | 13 | not simply an explanation how it might work? |
| 10:59 | 14 | A    I think it's more of an instruction because this is |
| 10:59 | 15 | specifically talking about my bank account.  I was inquiring |
| 10:59 | 16 | about how much money I have in the bank, that these are |
| 10:59 | 17 | rates that people have earned in the past with Dr. Pemkova. |
| 10:59 | 18 | It's cash sitting in your savings account, so not -- cash |
| 11:00 | 19 | has to be in a savings account.  It's specifically saying my |
| 11:00 | 20 | savings account, so I took that as more of an instruction on |
| 11:00 | 21 | how to prepare for this. |
| 11:00 | 22 | Q    Meaning Thomas Moore was taking everything as personal, |
| 11:00 | 23 | as general information; correct? |
| 11:00 | 24 | MR. KOLE:  Objection, vague and ambiguous. |
| 11:00 | 25 | THE COURT:  Sustained. |

| | | |
|---|---|---|
| 11:00 | 1 | BY MS. PEMKOVA: |
| 11:00 | 2 | Q    Okay.  Page 8 of 25, line 4:  "If you will decide to go |
| 11:00 | 3 | forward," how did understand Mr. Moore that sentence?  An |
| 11:00 | 4 | order and instruction as well? |
| 11:00 | 5 | A    No, a description of what will happen if he invests. |
| 11:00 | 6 | Q    No.  Line 4, "If you will decide to go forward," is it |
| 11:00 | 7 | an instruction? |
| 11:00 | 8 | A    No.  It's a description of what will happen in order to |
| 11:00 | 9 | move forward.  In other words, it goes on to say:  "You will |
| 11:00 | 10 | have to see a notary and documents will have to be signed, |
| 11:00 | 11 | tear sheets and sweep accounts," and so on.  So it's a |
| 11:00 | 12 | discussion of what will happen if Tom Moore invests. |
| 11:01 | 13 | Q    It did not tell Thomas Moore that he has a choice if he |
| 11:01 | 14 | will decide to go forward? |
| 11:01 | 15 | A    It implies a choice, yes. |
| 11:01 | 16 | Q    Of course that was a choice. |
| 11:01 | 17 | A    Obviously there was a choice, yes. |
| 11:01 | 18 | Q    Page 9 of 25, lines 15 to 18. |
| 11:01 | 19 | A    Yes. |
| 11:01 | 20 | Q    Was Thomas Moore again asking for help and assistance |
| 11:01 | 21 | and explanations to see how it works? |
| 11:01 | 22 | A    Yes. |
| 11:01 | 23 | Q    How many times did Thomas Moore ask to have assistance |
| 11:01 | 24 | in this conversation? |
| 11:01 | 25 | A    Here trying to find out more information.  I think |

11:02  1   there were some other references to finding out more

11:02  2   information.

11:02  3   Q    Do you agree Agent Reitz and Thomas Moore get in these

11:02  4   first conversations on several occasions, and Mr. Thomas

11:02  5   Moore was showing lack of knowledge or insufficient

11:02  6   knowledge and asking for information and meetings and

11:02  7   introductions?

11:02  8   A    Well, Thomas Moore was looking for a high-yield

11:02  9   investment, so this was what was being described.  Again,

11:02  10  the entire description is you, your money, and so on, how

11:02  11  Thomas Moore will end up investing in one of these.

11:02  12  Q    Okay.  Thank you.

11:02  13       Page 9 of 25, line 24.  Let's say, for example --

11:02  14  for example, means in Thomas Moore's mind the sale, the

11:03  15  direct order to invest?

11:03  16  A    No.  It's a description of what would happen if I were

11:03  17  to sign the documents the next day and what would happen

11:03  18  after that.

11:03  19  Q    Meaning was it perceived by Thomas Moore as a

11:03  20  hypothetical discussion explaining the procedure?

11:03  21  A    No.  The hypothetical is if I were to sign the

11:03  22  documents the next day.  It's not that the transaction is

11:03  23  hypothetical.

11:03  24  Q    Thank you.  On page 10 of 25, lines 4 to 9, defendant

11:03  25  Pemkova is referring to Arizona.  From the perspective of

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

11:04    1    the time of the case, do you know why Thomas Moore would be

11:04    2    linking Arizona?

11:04    3    A    I'm sorry.  Would be what?

11:04    4    Q    Who do you think Thomas Moore looked at Pemkova meeting

11:04    5    in Arizona?

11:04    6    A    It's not clear from the information so far of who would

11:04    7    be in Arizona except that it's a foundation, a European

11:04    8    foundation, who happened to be in Arizona at the time.

11:04    9    Q    Correct.  From the perspective of time, Agent Reitz and

11:04   10    Thomas Moore would link it to whom?  At that moment there

11:04   11    was insufficient information, but afterwards where would you

11:04   12    link it?  Who was the foundation?  Who were the people in

11:04   13    Arizona?

11:04   14    A    Later there would be a foundation in Arizona called

11:04   15    David & Goliath Ministries.

11:04   16    Q    Thank you.  And she is referring to directors, and one

11:04   17    of them is temporarily in the United States; correct?

11:05   18    A    Yes.

11:05   19    Q    From the perspective of time, how would Thomas Moore

11:05   20    and Agent Reitz perceive this statement?  Who were the

11:05   21    directors?

11:05   22    A    Oh, it's not clear at this point in time who the

11:05   23    directors are.

11:05   24    Q    Did it get clear during the investigation and

11:05   25    Indictment?

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

11:05    1    A     As to who these people were?

11:05    2    Q     Yes.

11:05    3    A     It's hard to say because, again, later I would be

11:05    4    introduced to Dr. Onciu, but I am not sure who exactly this

11:05    5    was referring to at that time.

11:05    6    Q     From the perspective of time, it would be linked to Dr.

11:05    7    Onciu; correct?

11:05    8    A     Of which time?

11:05    9    Q     2008, after TSI.

11:05    10    A     I can just say it's possible to have been Dr. Onciu.

11:05    11    It describes his situation being in Arizona with a

11:05    12    foundation, but I don't know who it was.

11:05    13    Q     Thank you.

11:06    14          Page 10 -- from 10 all the way to 11, end of the

11:06    15    line, is it again a sale in Thomas Moore's mind, another

11:06    16    explanation and repetition of what was said before?

11:06    17    A     Again, in line 15, it says:  "You will collect first of

11:06    18    it."  Line 22:  "Your funds sitting in your account."  It's

11:06    19    not in my mind a theoretical discussion.  It is a proposal

11:06    20    for an investment opportunity and describing how that

11:06    21    investment opportunity would occur.

11:06    22    Q     Okay.  Let's go to page 13, please.  Actually we should

11:07    23    start on page 12, lines 23 and 24, because Mr. Moore was

11:07    24    asking for -- talking about it over the lunch; correct?

11:07    25    A     Yes.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

11:07  1    Q    Okay.  What did Thomas Moore and Agent Reitz remember

11:07  2    from over that lunch meeting and promise to disclose by

11:07  3    Dr. Irene?

11:07  4    A    I don't recall the details.

11:07  5    Q    Thank you.

11:07  6         The same page, 13 of 25, lines 3 to 5.

11:07  7    A    Yes.

11:07  8    Q    Is this perceived by Thomas Moore and Agent Reitz again

11:07  9    as a secrecy instead of respect for privacy?

11:07  10   A    Not particularly, no.

11:07  11   Q    Okay.  Meaning Thomas Moore as well as Agent Reitz

11:08  12   might consider the difference between privacy and secrecy?

11:08  13   A    No.  It says:  "I don't like to talk in details over

11:08  14   the phone."  There are people like that.  I am not taking

11:08  15   that as a secrecy or privacy.

11:08  16   Q    By the way, you met Dr. Priore.  You met Dr. Pemkova.

11:08  17   In Thomas Moore's opinion, how much are we talking?  Do they

11:08  18   share equally or each one shares differently the information

11:08  19   given?

11:08  20   A    I'm not sure how to rate the two.

11:08  21   Q    Okay.  When you met Dr. Priore and you spent with her a

11:08  22   fair amount of time on the phone and in the personal

11:08  23   meeting, was she sharing more information with you than

11:08  24   defendant Pemkova?

11:09  25   A    She was sharing more specific information about TSI.

62

| 11:09 | 1 | Q    What about general information about the so-called |
| 11:09 | 2 | high-yield investment programs? |
| 11:09 | 3 | A    Dr. Priore provided a lot of information about it and |
| 11:09 | 4 | described in the meeting how Thomas Moore can move from |
| 11:09 | 5 | 1 million to 20 million and then over into another set of |
| 11:09 | 6 | programs.  So she described it quite a lot. |
| 11:09 | 7 | Q    And Thomas Moore and Agent Reitz do not recall what was |
| 11:09 | 8 | said in that meeting by Dr. Irene in Beverly Hills; correct? |
| 11:09 | 9 | A    Correct. |
| 11:09 | 10 | Q    Thank you. |
| 11:09 | 11 |      Page 13 of 25, lines 7 to 10, did Thomas Moore |
| 11:10 | 12 | accept it or understood it as a disclosure or information of |
| 11:10 | 13 | what he needs to know? |
| 11:10 | 14 | A    I'm sorry.  This is page 13, lines 7 through 10? |
| 11:10 | 15 | Q    Yes, lines 7 to 8. |
| 11:10 | 16 | A    Okay. |
| 11:10 | 17 | Q    Is it a disclosure -- did Thomas Moore understood it as |
| 11:10 | 18 | a promise to talk to provide information? |
| 11:10 | 19 | A    Yes. |
| 11:10 | 20 | Q    Lines 9 to 10, did Thomas Moore understand it as |
| 11:10 | 21 | another potential introduction in person or to another |
| 11:10 | 22 | person? |
| 11:10 | 23 | A    Not in person but telephonically. |
| 11:10 | 24 | Q    Okay.  Meaning a possibility to provide information and |
| 11:10 | 25 | connection to another person; correct? |

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

11:10    1    A    Yes.

11:10    2    Q    Does it sound like a secrecy or hiding something?

11:10    3    A    Well, the investments in general have to move forward

11:11    4    to the next level.  So even though these high-yield

11:11    5    investments are secretive, it's common that Thomas Moore

11:11    6    would ask to be introduced to the next level.  It's not

11:11    7    necessarily secretive to meet or speak with somebody who is

11:11    8    also involved.

11:11    9    Q    This is what Thomas Moore and Agent Reitz think, what

11:11   10    you just have said?

11:11   11    A    Yes.

11:11   12    Q    Okay.  That introduction William Elder mentioned that

11:11   13    she's a secretary --

11:11   14    A    Yes.

11:11   15    Q    For whom Thomas Reitz found she's a secretary, or she

11:11   16    was a secretary?

11:11   17    A    It wasn't completely clear except that she was -- the

11:11   18    defendant was a secretary, and then a discussion went on

11:11   19    regarding high-yield investments and $10 million

11:11   20    opportunities.

11:11   21    Q    Does it mean in Thomas Moore's mind that not

11:12   22    necessarily every time it goes from one to higher and higher

11:12   23    it might be an equal level?

11:12   24    A    It doesn't have to be an -- it can be an equal level.

11:12   25    It doesn't have to be always an introduction up, but I have

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

11:12   1   seen that in other investigations.

11:12   2   Q    Meaning in Thomas Moore's mind it always has to go up

11:12   3   one to another one; correct?

11:12   4            MR. KOLE:  Objection.  That mischaracterizes what

11:12   5   he just said.

11:12   6            THE COURT:  Sustained.

11:12   7   BY MS. PEMKOVA:

11:12   8   Q    Okay.  On line 13, is there any secrecy with the --

11:12   9   Thomas Moore is asking the price.  Lines 14 and 15, is there

11:12   10  any attempt to hide where this person is?

11:12   11  A    No, but the terms are fairly general, Vegas and Los

11:12   12  Angeles.

11:12   13  Q    Of course.  Lines 23 and 24, is there any sharing or

11:13   14  providing more information about this party in Thomas

11:13   15  Moore's mind?

11:13   16  A    Yes.

11:13   17  Q    Next page, 14 of 25, lines 7 and 8, is it Thomas Moore

11:13   18  who is asking to postpone the meeting for another day?

11:13   19  A    Yes.

11:13   20  Q    In Thomas Moore's mind, is it a rush-rush sale, quick

11:13   21  sale, pressing somebody to buy something instead rather of

11:13   22  accommodating somebody?

11:13   23  A    This doesn't appear to -- I don't recall this one being

11:13   24  a rush-rush.

11:13   25  Q    Okay.  Generally in your experience with defendant

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

11:13　　1　　Pemkova, was she the one who would be pushing for a

11:13　　2　　rush-rush or requesting a rush-rush?

11:14　　3　　A　　Definitely in the TSI transaction as well as the

11:14　　4　　Florida real estate deal.

11:14　　5　　Q　　Okay.  Would you please specify what exactly different

11:14　　6　　levels pressing for TSI to be done fast.

11:14　　7　　A　　I received a phone call saying it was urgent.  Somebody

11:14　　8　　had fallen out of the transaction, and they needed to be

11:14　　9　　replaced right away, and the paperwork had to be completed

11:14　　10　　immediately.

11:14　　11　　　　　　Then with regard to the Florida deal, I received a

11:14　　12　　phone call from Dr. Pemkova saying again this is needed

11:14　　13　　right away.  The money has to be put in escrow.  It has to

11:14　　14　　be done quickly.  There is an opportunity.  If you don't

11:14　　15　　jump on this now, the opportunity will be gone.

11:14　　16　　Q　　You mentioned that there are recordings; correct?

11:14　　17　　A　　Yes.

11:14　　18　　Q　　We will go back.  Thank you.

11:15　　19　　　　　　Page 14, line 25 -- sorry, page 14, lines 19 to

11:15　　20　　21, is Thomas Moore asking again to send him documents or

11:15　　21　　send him some information?  He is asking Mr. Elder; correct?

11:15　　22　　A　　Yes.

11:15　　23　　Q　　Lines 22 to 23, does it look like William Elder was a

11:15　　24　　little hesitant to do so?

11:15　　25　　A　　No.

66

11:15  1   Q    Okay.  Page 15 of 25, it is the defendant's part.  She

11:15  2   is saying -- when she's saying that William does paperwork

11:16  3   for all her investors, how did Thomas Moore understand that

11:16  4   statement?

11:16  5   A    Just as that, that William Elder does paperwork for

11:16  6   Dr. Pemkova's investors.

11:16  7   Q    Okay.  How does Thomas Moore understand the word

11:16  8   "investors" for a high-yield investment program?

11:16  9   A    Based on the entirety of the conversation up to that

11:16  10  point, yes.

11:16  11  Q    Despite there was an original discussion regarding the

11:16  12  meeting in Beverly Hills, despite talking about private

11:16  13  placement and private investment, it was still in Thomas

11:16  14  Moore's mind immediately linked to the investors for a

11:16  15  high-yield investment program; correct?

11:16  16  A    In Thomas Moore's mind, he was interested in 12 percent

11:16  17  per trade per day.  So, yes, that for all the investors,

11:17  18  because Dr. Pemkova had said that in that type of investment

11:17  19  she just had a client who had been paid.  So for at least

11:17  20  that one, it was definitely for the high yield.

11:17  21  Q    Meaning Thomas Moore completely excluded the

11:17  22  possibility that it could be investors in real estate; it

11:17  23  could be investors in something else; and it could be even

11:17  24  investors in her clinics?

11:17  25            MR. KOLE:  What were the last two words?

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

11:17    1    Investors in what?

11:17    2            MS. PEMKOVA:  Her clinics because later Thomas

11:17    3    Moore mentioned clinics.

11:17    4            MR. KOLE:  Her clinics.  Thank you.  Sorry.

11:17    5            THE WITNESS:  Tom Moore didn't know about the

11:17    6    clinics at this point that I recall.  The primary focus of

11:17    7    the conversation up to this point -- there were suggestions

11:17    8    of private placement.

11:17    9            But as Thomas Moore, I don't know if that means

11:17   10    it's a high-yield investment being described as a private

11:18   11    placement.  There's all kinds of different words people can

11:18   12    use for high-yield transactions -- prime bank, high-yield

11:18   13    investment program, and so on.  So in terms of a private

11:18   14    placement or high-yield investment, I'm not sure which one

11:18   15    it is, and I'm not sure at this point that they're

11:18   16    different.

11:18   17    BY MS. PEMKOVA:

11:18   18    Q    Meaning Thomas Moore could not specify which kind of

11:18   19    investors they are, but at the same time, he linked it

11:18   20    automatically to a high-yield investment program; correct?

11:18   21    A    I linked it to what Tom Moore was interested in, which

11:18   22    Dr. Pemkova said she had actually realized.

11:18   23    Q    Page 15, lines 17, 18, and 19, did Thomas Moore

11:18   24    understand that basically this paperwork doesn't mean

11:19   25    anything?

11:19  1            MR. KOLE:  Objection, assumes facts.

11:19  2            THE COURT:  Sustained.

11:19  3    BY MS. PEMKOVA:

11:19  4    Q    Did Thomas Moore based on this conversation understand

11:19  5    that the paperwork is obligatory?

11:19  6    A    It's discussing that it doesn't matter whether William

11:19  7    sends them or you bring them.  That's the question.  That's

11:19  8    what doesn't matter.  It's not saying that the paperwork

11:19  9    isn't necessary.

11:19  10   Q    Okay.  Further on there was a long explanation on page

11:19  11   15 how to get there; correct?

11:19  12   A    Yes.

11:19  13   Q    Specifying the place of the meeting; correct?

11:19  14   A    Yes.

11:19  15   Q    Was there any secrecy which the defendant was showing?

11:19  16   A    Not particularly.

11:20  17   Q    Lines 15 to 19, the same page, did Mr. Moore understand

11:20  18   that he would be introduced to a completely different party?

11:20  19   A    Yes.

11:20  20   Q    Lines 21 to 24, did this investment sound like another

11:20  21   high-yield investment program?

11:20  22   A    To follow, on those two lines, a very substantial

11:20  23   amount on the small investment, and it's not clear whether

11:20  24   it's a high-yield investment.  But the next two pages talk

11:20  25   about a high-yield investment.

69

11:20  1    Q    Well, but she goes further.  On page 17, she's saying

11:21  2    it will be between 400 to 500 percent within six months.

11:21  3              Did Mr. Moore understand exactly how it is written

11:21  4    here?

11:21  5    A    400 to 500 percent, so four to five times the

11:21  6    investment within six months --

11:21  7    Q    Yes.

11:21  8    A    -- which would be an annual rate of 800 to 1,000

11:21  9    percent.

11:21  10   Q    Meaning at this moment in Thomas Moore's mind and Agent

11:21  11   Reitz's, this Beverly Hills opportunity would be a

11:21  12   high-yield investment program?  Small amount, returning in a

11:21  13   short time, and high return; correct?

11:21  14   A    That's what it sounded like, yes.

11:21  15   Q    Okay.  Meaning Thomas Moore at this moment would

11:21  16   immediately put it under the file of a high-yield investment

11:21  17   program; correct?

11:21  18   A    Based on these representations, that's very high, yes.

11:21  19   Q    Yes.

11:21  20   A    But it's not discussing necessarily the medium-term

11:22  21   notes, a foundation being involved, and so on.

11:22  22   Q    Thank you.  Meaning if a small amount brings in the

11:22  23   short time high return, even if it's missing words like

11:22  24   foundation and swift, it still goes under the alert of a

11:22  25   high-yield investment program; correct?

11:22  1   A    If somebody is offering 400 or 500 percent in six

11:22  2   months, that's a high-yield investment, yes.

11:22  3   Q    But you said before Thomas Moore and Agent Reitz --

11:22  4   that the high-yield investment could be legal, not

11:22  5   necessarily illegal; correct?

11:22  6            MR. KOLE:  Objection.  That mischaracterizes the

11:22  7   testimony.

11:22  8            THE COURT:  Sustained.

11:22  9   BY MS. PEMKOVA:

11:22 10   Q    Okay.  Page 17, lines 23 and 24 -- I'm sorry.  Start on

11:23 11   lines 18 to 21.  Did Thomas Moore understand any secrecy in

11:23 12   this statement?

11:23 13   A    No, not necessarily.

11:23 14   Q    Generally was defendant Pemkova rather forthcoming in

11:23 15   disclosing information when asked or when it was the

11:23 16   appropriate time to do so?

11:23 17   A    In this time period or --

11:23 18   Q    Generally, in your experience with defendant Pemkova,

11:23 19   was she providing information which Thomas Moore asked for?

11:23 20   A    Yes, I would say that's true.  There was an instance

11:23 21   where with Dr. Onciu Thomas Moore asked for someone who has

11:23 22   done it before, and it was mentioned that that could not be

11:23 23   requested.

11:24 24   Q    Had Dr. Pemkova ever spoke about her doing big deals in

11:24 25   billions, hundred billions, and any higher amounts?  Have

11:24   1   you ever heard any statement like that from her?

11:24   2   A    Well, billions I don't recall, but in this transcript,

11:24   3   there was discussion of someone doing 10 million.

11:24   4   Q    But you never have heard defendant Pemkova throwing big

11:24   5   numbers around, correct, billions, large transactions, et

11:24   6   cetera, et cetera?

11:24   7            MR. KOLE:  Objection, Your Honor.  Compound,

11:24   8   complex.

11:24   9            THE COURT:  Sustained.

11:24   10  BY MS. PEMKOVA:

11:24   11  Q    Okay.  Lines 23 and 24, did Thomas Moore understand

11:24   12  that he is being pressed for a quick sale or rather given a

11:25   13  choice to think about it or to move forward if he will like

11:25   14  it?

11:25   15  A    It says:  "You can make a decision on the spot or think

11:25   16  about it."

11:25   17  Q    Meaning Thomas Moore understood that he was given the

11:25   18  choice again for his own decisions?

11:25   19  A    I think that's inherent in an investment, that the

11:25   20  investor before writing a check has a choice.  It can be

11:25   21  done right away, or it can be done later.

11:25   22  Q    Okay.  Further down on that page is an explanation how

11:25   23  to enter the paperwork.  On page 18 of 25, Mr. Elder started

11:25   24  asking questions about the origin of the money.  The story

11:26   25  is described here, correct, regarding who was Thomas Moore

| 11:26 | 1 | and how he made money? |
| 11:26 | 2 | A    Yes. |

11:26   1   and how he made money?

11:26   2   A    Yes.

11:26   3   Q    Okay.  Where is the part in a recording when Thomas

11:26   4   Moore was explaining about his sister being married with

11:26   5   three children and the husband an alcoholic and a gifted

11:26   6   architect brother who is involved with alcohol as well?

11:26   7   Where is this part?  It was in conversations.

11:26   8   A    I don't have it here.

11:26   9   Q    Okay.  Dr. Onciu mentioned a very similar thing in his

11:26   10  trial.  The question is where is the recording, this part?

11:26   11  We don't see it here.  Where is it?

11:26   12          MR. KOLE:  Objection.  Assumes facts that there

11:26   13  was such a recording.

11:26   14          THE COURT:  Was there such a recording?

11:26   15          THE WITNESS:  Not that I recall.

11:26   16  BY MS. PEMKOVA:

11:26   17  Q    Where would Dr. Onciu take this information from?

11:27   18          MR. KOLE:  Objection, lacks foundation.

11:27   19          THE COURT:  I am going to sustain the objection.

11:27   20  BY MS. PEMKOVA:

11:27   21  Q    Meaning Thomas Moore and Agent Reitz don't have any

11:27   22  other recordings besides the record which I presented in

11:27   23  these transcripts?

11:27   24          MR. KOLE:  Objection.  That mischaracterizes the

11:27   25  testimony about the investigation overall.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:27 | 1 | THE COURT:  You may answer that question. |
| 11:27 | 2 | THE WITNESS:  These are all the recordings. |
| 11:27 | 3 | BY MS. PEMKOVA: |
| 11:27 | 4 | Q    Thank you.  Page 20 of 25 -- from 20 to practically |
| 11:27 | 5 | 24 -- at the end of page 21, Dr. Pemkova is describing |
| 11:27 | 6 | exactly how to get to the meeting; correct? |
| 11:27 | 7 | A    Yes. |
| 11:27 | 8 | Q    According to your experience with her, was she a rather |
| 11:28 | 9 | precise person, very specific in her descriptions? |
| 11:28 | 10 | A    It's hard to characterize.  Very specific -- |
| 11:28 | 11 | Q    Did you see any difference in your experience as Thomas |
| 11:28 | 12 | Moore and later Agent Reitz by talking to Dr. Priore, |
| 11:28 | 13 | Dr. Onciu, and defendant Pemkova in the way how they were |
| 11:28 | 14 | describing things if it comes to the amount of information |
| 11:28 | 15 | provided? |
| 11:28 | 16 | MR. KOLE:  Objection, vague and ambiguous. |
| 11:28 | 17 | THE COURT:  Do you understand the question? |
| 11:28 | 18 | THE WITNESS:  Not really, not fully. |
| 11:28 | 19 | THE COURT:  Sustained. |
| 11:28 | 20 | BY MS. PEMKOVA: |
| 11:28 | 21 | Q    Page 25 -- 24 and 25 -- these last three pages, in |
| 11:29 | 22 | Thomas Moore's mind, were they again sharing information |
| 11:29 | 23 | with the defendant? |
| 11:29 | 24 | A    Page 24? |
| 11:29 | 25 | Q    Yes, the end of the conversation from 24 to 25. |

74

| | | |
|---|---|---|
| 11:29 | 1 | A     Twenty-four to 25 is a description of the location and |
| 11:29 | 2 | so on. |
| 11:29 | 3 | Q     Exactly, again sharing the information, providing the |
| 11:29 | 4 | precise information; correct? |
| 11:29 | 5 | A     Yes. |
| 11:29 | 6 | Q     Thank you.  Recording No. 3, we don't have to play this |
| 11:29 | 7 | one.  We will just look through it.  Page 1, lines 15 -- |
| 11:30 | 8 | A     Yeah. |
| 11:30 | 9 | Q     -- to 22, did Thomas Moore perceive it again as a sale |
| 11:30 | 10 | instead of helping and assisting to complete the documents? |
| 11:30 | 11 | A     Well, the documents are required for Thomas Moore to |
| 11:30 | 12 | invest, so it's moving the transaction forward. |
| 11:30 | 13 | Q     Yes, but Thomas Moore should provide all information -- |
| 11:30 | 14 | did Thomas Moore provide all information needed to complete |
| 11:30 | 15 | it? |
| 11:30 | 16 | A     Yes.  Answering these questions, yes. |
| 11:30 | 17 | Q     Answering the questions.  But to complete the document |
| 11:30 | 18 | required William Elder to call Thomas Moore, correct, to |
| 11:30 | 19 | complete it? |
| 11:30 | 20 | A     Yes. |
| 11:30 | 21 | Q     Was it a plan that Thomas Moore always left something |
| 11:30 | 22 | behind to make people call back? |
| 11:30 | 23 | A     No, not that I recall.  He is calling specifically |
| 11:30 | 24 | about Lido Plaza and the bank there and asking for what the |
| 11:31 | 25 | exact street address was. |

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

11:31  1    Q    Okay.  On page 2, line 21, instead of completing the

11:31  2    documents with William Elder, Thomas Moore is asking about

11:31  3    the defendant; correct?

11:31  4    A    Correct.

11:31  5              MR. KOLE:  Object to the preamble as

11:31  6    argumentative.

11:31  7              THE COURT:  Sustained.

11:31  8    BY MS. PEMKOVA:

11:31  9    Q    Okay.  Was there any specific reason why Thomas Moore

11:31  10   inserted into the conversation about a document of the

11:31  11   defendant, the question about the defendant?

11:31  12   A    Trying to discern something about the defendant from

11:32  13   someone who works with her.

11:32  14   Q    Meaning for Thomas Moore it was better to get

11:32  15   secondhand information than directly from the meeting with

11:32  16   Dr. Irene?

11:32  17   A    It's important to get information from whoever could

11:32  18   provide it.

11:32  19   Q    In Thomas Moore's mind, information from secondhand is

11:32  20   not that good or it's better firsthand?

11:32  21   A    It depends on what's being requested.  If it's a

11:32  22   referral as to someone's business character and competency,

11:32  23   it might be better to get it from somebody else than

11:32  24   directly from the source.  That's what is going on here.

11:33  25   Q    In lines 5 and 6, was there any indication of the

11:33  1  amount beside high, high?

11:33  2  A    No, it's not high, high.  It's very, very high.

11:33  3  Q    Very, very high is subjective; correct?

11:34  4  A    As I mentioned before, yes, that is subjective.

11:34  5  Q    Okay.  There is a conversation regarding the licenses

11:34  6  on line 16, and on line 18 William Elder is saying that you

11:34  7  can be a licensee yourself.  How did Thomas Moore understand

11:34  8  this part?

11:34  9  A    This is in connection with discussion of 10B and 1B and

11:34  10  working directly with licensees.  Thomas Moore took this as

11:34  11  being another red flag indicator of a high-yield investment

11:34  12  program.

11:34  13  Q    These discussions about high amounts were theoretical?

11:35  14  A    I wouldn't say theoretical because I am asking if

11:35  15  "Dr. Pemkova had been successful at this to which Mr. Elder

11:35  16  said:  Quite, very, very high level, yes.  Yes.  This is,

11:35  17  how you say, as high as you can go."  So I wouldn't take

11:35  18  that as theoretical.  I am taking that as this is what

11:35  19  Dr. Pemkova does for a living.

11:35  20  Q    But does it specify in Agent Reitz's mind that talking

11:35  21  very, very high was about a high-yield investment which he

11:35  22  is researching, or Dr. Pemkova could be very, very high

11:35  23  elsewhere?

11:35  24  A    No, because it then goes on to talk about licensees and

11:35  25  1B or 10B requirements.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

11:35   1   Q    Excuse me.  It's later.  It's line 16.  This particular

11:35   2   part is very general without specifying it is an investment.

11:35   3   It is something else; correct?

11:36   4            MR. KOLE:  Objection, argumentative.

11:36   5   Mischaracterizes the document.

11:36   6            THE COURT:  Sustained.

11:36   7   BY MS. PEMKOVA:

11:36   8   Q    Okay.  In lines 16 to 18, the same page 3, how did

11:36   9   Thomas Moore understood that he can be a licensee yourself

11:36   10  or himself?

11:36   11  A    Well, Thomas Moore would need 1B or 10B in order to be

11:36   12  a licensee and deal directly in these transactions with

11:36   13  commitment orders.

11:36   14           MS. PEMKOVA:  Would you indicate this part to

11:36   15  listen from page 3 of 5, line 1 -- how exactly do I say it?

11:36   16           (Portion of audiotape played)

11:37   17           MR. KOLE:  We are now at page 3, lines 10 to 11.

11:37   18  Do you want that or a little earlier?  Ms. Pemkova, where

11:37   19  should I start?

11:37   20           MS. PEMKOVA:  Page 3, line 1.

11:37   21           MR. KOLE:  Okay.  I will go back a little bit.

11:37   22           (Portion of audiotape played)

11:37   23  BY MS. PEMKOVA:

11:37   24  Q    Did you hear the smile in -- Thomas Moore had a smile

11:38   25  which Mr. Elder put into the sentence.  Then you can be a

11:38   1   licensee by yourself?

11:38   2   A      Did I hear a smile?

11:38   3   Q      Uh-huh.

11:38   4            THE COURT:  Did he hear a smile?

11:38   5            MS. PEMKOVA:  He was smiling.  When he was saying

11:38   6   this sentence, he was smiling.  He was making a joke.

11:38   7            THE WITNESS:  I did, and I couldn't hear a smile.

11:38   8            MS. PEMKOVA:  Well, feel the smile.  The way he

11:38   9   was saying it, it wasn't said seriously.

11:38   10           THE COURT:  Just a moment.  At some point I need

11:38   11  to balance the right to a full and fair trial, and at some

11:38   12  point I need to balance the end of a consumption of time.  I

11:38   13  want to put you on notice I am going to give you some more

11:38   14  time and some more discretion.  The government took a long

11:38   15  time with these tapes, but at some point I am going to

11:39   16  escalate that warning into a finite period of time.

11:39   17           I am going to have you continue at this point, but

11:39   18  I want you to be cognizant of the time, the jury's time.  So

11:39   19  you may proceed.  You will have an opportunity to testify if

11:39   20  you would like to.  Please.

11:39   21           MS. PEMKOVA:  Your Honor, I apologize to Your

11:39   22  Honor.

11:39   23           THE COURT:  You don't have to apologize.  You are

11:39   24  representing yourself.  It comes down eventually to a

11:39   25  delicate balance by the Court in terms of the fairness of

11:39  1   your presentation and the consumption of the public's time.

11:39  2   BY MS. PEMKOVA:

11:39  3   Q   Okay.  On page 4 to 5, line 19s to 22, there is

11:39  4   mentioned foundation again.  Which foundation did Thomas

11:40  5   Moore understood it is?

11:40  6   A   At this point it's not clear.

11:40  7   Q   And later?

11:40  8   A   Later I was introduced -- Thomas Moore was introduced

11:40  9   to a foundation called David & Goliath Ministries.

11:40  10  Q   Okay.  Page 5, lines 2 to 5, did Thomas Moore

11:40  11  understand that he can be introduced through this person

11:40  12  based on William Elder's say?

11:40  13  A   I'm sorry.  I am just reading it now.  Could you repeat

11:40  14  the question?

11:40  15  Q   Okay.  Based on lines 2 to 5, did Thomas Moore

11:41  16  understand that Dr. Irene would lead Thomas Moore further to

11:41  17  more introductions?

11:41  18  A   Yes.

11:41  19  Q   During the communication with the defendant as Thomas

11:41  20  Moore and later as an agent, did she ever propose any

11:41  21  introduction to the bankers or did she talk ever about

11:41  22  bankers?

11:41  23  A   I am not recalling specifically a conversation about --

11:41  24  a statement by Dr. Pemkova about introducing to bankers.

11:41  25         MS. PEMKOVA:  Exhibit No. 4 -- not an exhibit.

11:41    1    Sorry.   Transcript No. 4, it is one later.   Would you start,

11:41    2    please, at the beginning -- the first five lines would be

11:42    3    fine -- of the recording, Mr. Kole?

11:42    4             MR. KOLE:   Yes, I will get it.   It will take me

11:42    5    just a second longer because I have the exhibits that the

11:42    6    government played in one place.   It will just take me a

11:42    7    second.

11:42    8             (Portion of audiotape played)

11:42    9    BY MS. PEMKOVA:

11:43   10    Q    This is the question.   Why is there so much time at the

11:43   11    beginning of the recording?

11:43   12    A    The computer had a buffer.   The computer was as it was

11:43   13    described to me constantly monitoring the phone line and had

11:43   14    a buffer, so when a call came in, it would include part of

11:43   15    the time where the call was not there, and that's the sound

11:43   16    of the banging.

11:43   17    Q    Why wasn't it on other calls?   When somebody was

11:43   18    calling Thomas Moore, there is a very different way how the

11:43   19    calls start.   The buffer wasn't being all the time the same.

11:43   20    A    Well, you mean compared to when Tom Moore called out?

11:43   21    Q    It's different.

11:43   22    A    It is different, yes.

11:43   23    Q    Of course.   When Thomas Moore calls out, the call

11:44   24    sounds different.

11:44   25    A    Yes.

| | | |
|--|--|--|
| 11:44 | 1 | Q    When somebody calls Thomas Moore, it sounds different |
| 11:44 | 2 | as well; correct? |
| 11:44 | 3 | A    Yes. |
| 11:44 | 4 | Q    When you compare different calls to Thomas Moore, why |
| 11:44 | 5 | is there a difference? |
| 11:44 | 6 | A    There was a problem with the recorder early on.  It was |
| 11:44 | 7 | cutting off ends of conversations and also changing the |
| 11:44 | 8 | amount of the buffering at the beginning, and then that was |
| 11:44 | 9 | fixed. |
| 11:44 | 10 | Q    Thank you.  In this conversation on lines 9 to 21, is |
| 11:44 | 11 | Mr. Elder helpful to Thomas Moore confirming the meeting? |
| 11:44 | 12 | MR. KOLE:  Your Honor, again I don't necessarily |
| 11:44 | 13 | object, but I think because this has not been played before, |
| 11:44 | 14 | this is not in evidence yet.  I just have an issue with it. |
| 11:44 | 15 | It should be probably formally put in evidence before the |
| 11:45 | 16 | witness is questioned about it. |
| 11:45 | 17 | MS. PEMKOVA:  On line 22, Evidence No. 4, maybe |
| 11:45 | 18 | you can put it into evidence. |
| 11:45 | 19 | MR. KOLE:  No objection. |
| 11:45 | 20 | THE COURT:  Received. |
| 11:45 | 21 | (Exhibit No. 4 received in evidence.) |
| 11:45 | 22 | BY MS. PEMKOVA: |
| 11:45 | 23 | Q    On line -- practically at the beginning of the |
| 11:45 | 24 | conversation, 1 to 21, Mr. Elder was assisting Mr. Thomas |
| 11:45 | 25 | Moore in arranging the meeting; correct? |

11:45    1    A    Yes.

11:45    2    Q    Okay.  Line 22, Mr. Moore is asking again where

11:45    3    Dr. Pemkova is.  Why?

11:45    4    A    Mainly looking for a question of venue in the future.

11:45    5    The federal law requires interstate communications.  In a

11:45    6    lot of calls in this undercover, I would ask people where

11:45    7    are you now?

11:45    8    Q    Because it was already the beginning of investigation,

11:46    9    correct, looking for someone who does high-yield?

11:46    10   A    It was an investigation from the beginning, yes.

11:46    11   Q    Conversation No. 5, was it admitted?

11:46    12            MR. KOLE:  No objection.

11:46    13            THE COURT:  Received.

11:46    14            (Exhibit No. 5 received in evidence.)

11:46    15   BY MS. PEMKOVA:

11:46    16   Q    What was this conversation about, Agent Reitz?

11:46    17   A    It was about having a friend of Tom Moore's come along

11:46    18   to the meeting, an accountant.

11:47    19   Q    Thank you.  Thomas Moore on line 14 to 16 has asked if

11:47    20   he can bring not the friend but an associate; correct?

11:47    21   A    Yes.

11:47    22   Q    Okay.  Was there any secrecy and refusal of bringing

11:47    23   another party into the meeting?

11:47    24   A    In this context, no.

11:47    25   Q    Okay, meaning there was no secrecy even for a second

11:47  1  party coming; correct?

11:47  2  A    Correct.

11:47  3  Q    Okay.  Lines 19 to 20, was any restriction given who

11:47  4  you can or cannot bring?

11:47  5  A    Yes.  It had to be someone I could trust.

11:47  6  Q    Correct, meaning someone Thomas Moore could trust would

11:47  7  be allowed to participate in the meetings; correct?

11:47  8  A    Right.  Correct.

11:47  9          MR. KOLE:  I just want to note for the record we

11:47  10  are on page 1 of Exhibit 5.

11:48  11  BY MS. PEMKOVA:

11:48  12  Q    Lines 22 to 24, did Thomas Moore understand that there

11:48  13  would be more information provided with disclosure on the

11:48  14  information?

11:48  15  A    Yes.

11:48  16  Q    And Thomas Moore and Agent Reitz still don't remember

11:48  17  what was said in our meeting before entering the meeting in

11:48  18  Beverly Hills; correct?

11:48  19          MR. KOLE:  Objection, asked and answered.

11:48  20          THE COURT:  Sustained.

11:48  21  BY MS. PEMKOVA:

11:48  22  Q    Okay.  Did Thomas Moore have any idea why Dr. Pemkova

11:48  23  was asking for the passport of the party?

11:48  24  A    It's not -- I am not seeing it here, the why.

11:48  25  Q    On page 1, line 14 and specifically 15, Mr. Moore

11:49  1   introduced this second person as an accountant; correct?

11:49  2   A    Correct.

11:49  3   Q    Was it specified in the meeting that this gentleman is

11:49  4   an accountant and tax advisor and CFO, something like that?

11:49  5   A    I don't recall the meeting.

11:49  6   Q    But he was an accountant?

11:49  7   A    Yes.

11:49  8   Q    He was introduced as an accountant; correct?

11:49  9   A    Yes.

11:49  10  Q    And it was Mr. Karpinsky; correct?

11:49  11  A    Yes.

11:49  12  Q    Thank you.

11:49  13        We can go to Exhibit No. 8.  Would you please

11:49  14  explain what it is?

11:50  15  A    It's a transcript from a recorded phone call from the

11:50  16  undercover.

11:50  17  Q    Who is calling who?

11:50  18  A    This is someone named --

11:50  19        MR. KOLE:  Excuse me.  I object to the substantive

11:50  20  inquiry until it's put in evidence, and I would stipulate to

11:50  21  its admission.

11:50  22        THE COURT:  It's received.

11:50  23        (Exhibit No. 8 received in evidence.)

11:50  24        THE COURT:  Ms. Pemkova.

11:50  25  BY MS. PEMKOVA:

11:50   1   Q      Okay, on March 9 -- you met Dr. Pemkova on February 26?

11:50   2   A      Yes, I believe it was around that time.

11:50   3   Q      Yes, around that time.

11:50   4          On March 9, Thomas Moore is receiving the phone

11:50   5   call from whom?

11:50   6   A      March 9 is Exhibit 6 from Deborah, who works for John

11:51   7   Robison.

11:51   8   Q      Thank you.

11:51   9          MS. PEMKOVA:  Exhibit No. 7, it wasn't submitted

11:51   10  as well, Mr. Kole?

11:51   11         MR. KOLE:  No, but in the last question, Ms.

11:51   12  Pemkova had asked the agent to go to Exhibit 8, which is

11:51   13  what I thought we were just talking about, but Agent Reitz

11:51   14  just referred back to Exhibit 6, so I'm not sure if we want

11:51   15  Exhibit 6 or not.

11:51   16         THE COURT:  Which exhibit?

11:51   17         MS. PEMKOVA:  The first exhibit was Exhibit 6,

11:51   18  first call from -- sorry, the transcript, 6, first call from

11:51   19  John Robison's office to Thomas Moore.

11:51   20         MR. KOLE:  The government would stipulate to the

11:51   21  admission of Exhibit 6.

11:51   22         THE COURT:  Received.

11:51   23           (Exhibit No. 6 received in evidence.)

11:51   24  BY MS. PEMKOVA:

11:51   25  Q      And, Agent Reitz, it was the first call to Mr. Thomas

11:52   1   Moore, correct, from that location, from that phone number?

11:52   2   A    From that series of calls from Deborah.

11:52   3   Q    Yes, Transcript No. 7.

11:52   4   A    Yes.

11:52   5   Q    Thomas Moore is receiving a second call from the same

11:52   6   party; correct?

11:52   7          MR. KOLE:  Same point.  If it's being offered in

11:52   8   evidence, the government would have no objection to its

11:52   9   admission.

11:52   10          THE COURT:  It's received.

11:52   11          (Exhibit No. 7 received in evidence.)

11:52   12   BY MS. PEMKOVA:

11:52   13   Q    By the timing, it was a second -- it was the day after.

11:52   14   The 9th was Exhibit 6.  The 10th was Exhibit 7, the next

11:52   15   day, with the phone number; correct?

11:52   16   A    Yes.

11:52   17   Q    Transcript No. 8, what is it?

11:52   18   A    It's a voicemail received by the undercover location.

11:53   19   Q    Two days or the third day after the second call;

11:53   20   correct?

11:53   21   A    Yes.

11:53   22   Q    Why, Agent Reitz -- why didn't Thomas Moore return the

11:53   23   third call from the party asking to talk to him?

11:53   24   A    At that point after hearing the presentation from John

11:53   25   Robison, Thomas Moore was not interested in that investment

11:53  1  because it lacked indicators of being a high-yield

11:53  2  investment program.

11:53  3  Q    Despite the high return which Dr. Irene mentioned in

11:53  4  the conversation before the meeting?

11:53  5           MR. KOLE:  Objection.  That assumes facts that the

11:53  6  earlier discussion was about the Robison investment.

11:53  7  BY MS. PEMKOVA:

11:53  8  Q    Early discussion was about meeting in Beverly Hills,

11:53  9  and in that conversation, Dr. Pemkova said very clear it's

11:53  10  an interesting investment with 500 to 600 percent return;

11:53  11  correct, Agent Reitz?

11:54  12  A    Yes.

11:54  13  Q    It was related to Beverly Hills.

11:54  14           MR. KOLE:  Objection, argumentative.  Is that

11:54  15  intended as a question?

11:54  16           THE COURT:  Sustained.

11:54  17  BY MS. PEMKOVA:

11:54  18  Q    Did Agent Reitz return the call to John Robison at a

11:54  19  certain point of communication?

11:54  20  A    At some point, yes, I spoke to Mr. Robison on the

11:54  21  phone.

11:54  22  Q    Okay.  Thank you.  Transcript No. 9, it is a call when

11:55  23  Dr. Pemkova is calling Thomas Moore; correct?

11:55  24           MR. KOLE:  Your Honor, same point.  If it's

11:55  25  offered in evidence, the government would have no objection

11:55  1   to its receipt.

11:55  2            THE COURT:  It's received.

11:55  3               (Exhibit No. 9 received in evidence)

11:55  4   BY MS. PEMKOVA:

11:55  5   Q    It is -- this transcript is from March 13, and Dr.

11:55  6   Pemkova called Thomas Moore; correct?

11:55  7   A    No.  I think it's Thomas Moore calling Dr. Pemkova.

11:55  8   Q    Okay.  Why?

11:55  9   A    Thomas Moore had received a voicemail from William

11:55  10  Elder who said you had some solution that wouldn't require a

11:55  11  new company.

11:55  12  Q    Where is the voicemail?  We have seen voicemails

11:55  13  before, and we don't see a voicemail from that.  Where are

11:55  14  they?

11:55  15  A    I don't know.  I think he might have called my cell

11:55  16  phone and left a voicemail, and those were not recorded.

11:56  17  Q    How often was Agent Reitz using under Thomas Moore a

11:56  18  cell phone instead from which we are recording?

11:56  19            MR. KOLE:  Objection, mischaracterizes the

11:56  20  testimony that he was using it.

11:56  21            THE COURT:  Sustained.

11:56  22  BY MS. PEMKOVA:

11:56  23  Q    Do you recall what this company was?

11:56  24  A    I recall that there was -- there is more discussion

11:56  25  about that with Mr. Robison in a following call, that a new

11:56  1   company would be needed by Thomas Moore to start working on

11:56  2   a particular transaction.

11:56  3   Q   Okay.  Why would Dr. Pemkova be assisting you with the

11:56  4   company?  Why?

11:56  5         MR. KOLE:  Calls for speculation to the extent

11:56  6   she's asking about why she was doing it.  But if it's why it

11:56  7   came into the transaction, I have no objection.

11:57  8         THE COURT:  Concerning the transaction, you can

11:57  9   answer.

11:57  10        THE WITNESS:  I'm not recalling right now, but

11:57  11  there was discussion of a corporation being necessary to

11:57  12  move a transaction forward.

11:57  13  BY MS. PEMKOVA:

11:57  14  Q   Where in the exhibits is there any document providing

11:57  15  an e-mail or anything tangible that there was a

11:57  16  communication regarding the corporation, why there was

11:57  17  proposing the corporation?

11:57  18        MR. KOLE:  Objection, compound.  If she's just

11:57  19  asking the last question, I have no objection.

11:57  20        THE COURT:  You may answer.

11:57  21        THE WITNESS:  I don't recall now why this new

11:57  22  company was necessary, but it was part of a conversation at

11:57  23  some point.

11:57  24  BY MS. PEMKOVA:

11:58  25  Q   Thank you.

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

11:58  1    Part of the conversation -- is there any paperwork

11:58  2  or anything what would indicate that William Elder has a

11:58  3  reason to introduce a possibility to buy a company to Thomas

11:58  4  Moore?

11:58  5  A    Not that I can recall.

11:58  6  Q    Besides Thomas Moore simply received a phone call and

11:58  7  started to clarify what is this company about?

11:58  8  A    I got the voicemail, and I am following up with

11:58  9  Dr. Pemkova to see if it's really necessary.

11:58  10  Q    Okay.  The page -- in the same exhibit from page 1,

11:58  11  line 27, to page 2, somewhere to 18, was Dr. Pemkova trying

11:59  12  to be helpful to Thomas Moore even if he needs the company?

11:59  13  A    I'm sorry.  At line 18 on page 1?

11:59  14    THE COURT:  That calls for unfortunately

11:59  15  speculation about what Pemkova is thinking.  You will have

11:59  16  an opportunity to testify if you'd like about what your

11:59  17  thoughts were, but it's an improper question of this

11:59  18  witness.

11:59  19    MS. PEMKOVA:  Thank you, Your Honor.

11:59  20  BY MS. PEMKOVA:

11:59  21  Q    Let's go to Exhibit 10, Transcript 10.

11:59  22    (Ms. Pemcova and Mr. Kole conferring)

11:59  23  BY MS. PEMKOVA:

12:00  24  Q    Transcript No. 10, Thomas Moore is returning or calling

12:00  25  to John Robison; correct?

```
12:00    1              MR. KOLE:  Same objection as before, Your Honor,
12:00    2    but I would stipulate to the admission of Exhibit 10.
12:00    3              THE COURT:  Exhibit 10 is received.
12:00    4              (Exhibit No. 10 received in evidence.)
12:00    5    BY MS. PEMKOVA:
12:00    6    Q    Thomas Moore was calling in this call to Robison's
12:00    7    office.  Why?
12:00    8    A    Returning the numerous phone calls I had received.
12:00    9    Q    Thank you.
12:00   10              MS. PEMKOVA:  Exhibit 11, Transcript 11, this I
12:01   11    would ask you to play from the beginning to the end.
12:01   12              MR. KOLE:  Are you offering it in evidence?
12:01   13              THE COURT:  Exhibit 11?
12:01   14              MS. PEMKOVA:  Transcript 11.
12:01   15              MR. KOLE:  Are you offering the recording,
12:01   16    Exhibit 11, into evidence?
12:01   17              MS. PEMKOVA:  Yes.
12:01   18              MR. KOLE:  No objection.
12:01   19              THE COURT:  It's received.
12:01   20               (Exhibit No. 11 received in evidence.)
12:01   21              THE COURT:  Counsel, play 11.
12:01   22              MR. KOLE:  Yes, Your Honor.
12:01   23              (Portion of audiotape played)
12:01   24              MS. PEMKOVA:  Thank you.
12:06   25    BY MS. PEMKOVA:
```

12:06  1   Q    This conversation took place after Thomas Moore and

12:06  2   this accountant spent a couple of hours in Beverly Hills;

12:06  3   correct?

12:06  4   A    Yes.

12:06  5          THE COURT:  I am going to send the jury to lunch

12:06  6   and ask them to come back at 1:00.  I want counsel and

12:06  7   Ms. Pemkova to remain over the lunch hour.

12:07  8          You are admonished not to discuss this matter

12:07  9   amongst yourselves nor to form any opinions about the case.

12:07  10  We'll see you at 1:00.  I plan on letting you go at 4:30

12:07  11  promptly today or a little bit earlier.  Thank you.

12:07  12          (Jury not present)

12:07  13          THE COURT:  Now, first, the jury is no longer

12:07  14  present.  Once again this idea that you have propounded to

12:07  15  the Court and the constant refrain that you are not prepared

12:07  16  is somewhat ludicrous.  You know these page numbers.  You

12:08  17  know specific areas.  You are very well familiar with these

12:08  18  transcripts.  What I am a little concerned about is the

12:08  19  record you're constantly setting concerning unpreparedness.

12:08  20  The Court finds that that is simply not true.

12:08  21          Ms. Pemkova, what is your -- well, I would like to

12:08  22  speak to you outside the presence of the government for a

12:08  23  moment, and I would like to just have that discussion so

12:08  24  that your strategy is not disclosed.  I would like the

12:08  25  government to remain out in the hallway, and I am going to

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

12:08   1   summon you back in.

12:08   2          So, Counsel, you're not going to lunch.  Okay?

12:08   3   You'll be out in the hallway.  This matter is sealed

12:08   4   certainly for review of a Circuit Court or any other Court

12:08   5   but not for the government.

12:08   6          (Mr. Kole exits courtroom.)

12:08   7          (The following portion was under seal:)

12:08   8          (End of sealed portion.)

12:08   9          (Mr. Kole enters courtroom.)

12:22  10          THE COURT:  Mr. Kole, let me tell you what we're

12:22  11   discussing.  I don't think it's fair at this point other

12:22  12   than a warning that the Court limit the presentation by the

12:22  13   defendant, but if you're watching the jury, which neither of

12:22  14   you are, they fell asleep.  That's why we called an abrupt

12:22  15   recess.  I was going to go until 12:30.  Debbie saw it.  I

12:23  16   saw it.

12:23  17          Just in fairness, I am afraid that Ms. Pemkova is

12:23  18   losing the jury, but it's not fair for me to limit because

12:23  19   you took a long time with tapes.  You set the stage with no

12:23  20   criticism of the Court.  You brought in collateral issues

12:23  21   concerning other investors, three other investors.

12:23  22          So it's not fair that I impose a time limitation,

12:23  23   but it's already been expressed by one or more jurors

12:23  24   informally to Debbie that they're having problems going

12:23  25   forward.  They have other matters.  So the case didn't fit

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

12:23  1    into the nice cubbyhole the Court thought it would.  It's as
12:23  2    simple as that.  With a pro se, maybe I shouldn't have had
12:23  3    that expectation.
12:23  4           I talked to Ms. Pemkova about June 23rd, but she
12:24  5    said to the Court, you know, Judge, that's just too little
12:24  6    time.  I have Mr. Steward on June 30th with an operation,
12:24  7    and I'm not having him hustling back to court.  He is not
12:24  8    hustling for a while.  The recovery time for that is a good,
12:24  9    you know, two months.
12:24  10          Oh, he'll be back up on his feet, believe me.
12:24  11   Most of my friends have had the operation.  He'll be fine
12:24  12   quicker than he thinks, but not for a long period of time.
12:24  13   He is going to need to get up and walk around and move, and
12:24  14   he's going to have other clients that he has to service that
12:24  15   are crying for his needs, you know, while he's inoperative,
12:24  16   so it's not fair to counsel.
12:24  17          I can't substitute standby counsel at this point.
12:24  18   I can't bring in another standby counsel who is not familiar
12:24  19   with the case, and I can't bring back Ms. Bass because
12:24  20   whatever Mr. Steward's issues were with Ms. Pemkova, they
12:25  21   pale in comparison to Ms. Bass's issue.
12:25  22          I can go to a third standby counsel, but that
12:25  23   means I start all over again.  In other words, I am not
12:25  24   willing not to have her with standby counsel, and I'm not
12:25  25   going to bifurcate my standby counsel.  So you start seeing

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

12:25  1    time parameters and warps that we're in.

12:25  2            I can probably get a mistrial out of both of you

12:25  3    and start over again, but if I do that, then there's no

12:25  4    reason not to start in January or, you know, as she's

12:25  5    requesting.  Ms. Pemkova said to me, Judge, if you gave me a

12:25  6    continuance -- I mean, after the cross-examination today,

12:25  7    after she takes the stand, which apparently she's going to

12:25  8    do -- until September, then I could get all these people in

12:25  9    here.

12:25  10           Now, I am starting to believe that that's

12:25  11   fictional.  I have to bluntly state that.  If these people

12:25  12   exist, which I think they do, and she has placed a phone

12:26  13   call, I doubt that they're coming, but I can't presume that.

12:26  14   First of all, I doubt that many of them are coming because

12:26  15   if they are involved in any of these conversations and I'm

12:26  16   the FBI, I have got a potential conspiracy charge.  People

12:26  17   are smart enough to figure that out, and they're not going

12:26  18   to wander into the United States and give the United States

12:26  19   jurisdiction.  Second, if they're not involved in this, they

12:26  20   may still not come.

12:26  21           So for all the phone calls we have been trying and

12:26  22   attempting, I haven't seen any result.  I haven't seen one

12:26  23   person of five -- somebody is going to Canada; somebody is

12:26  24   going to Romania.  So it's creating this impression in the

12:26  25   Court's mind that, yeah, the people are there, but they're

| | | |
|---|---|---|
| 12:26 | 1 | just not responding and they're not coming whether it's |
| 12:26 | 2 | June 23rd or August 23rd or November 23rd. |
| 12:26 | 3 | Now, let me help you for a moment. I want to |
| 12:26 | 4 | assume from your standpoint there was a conviction, and |
| 12:27 | 5 | Ms. Pemkova said, Judge, I really don't want to be taken |
| 12:27 | 6 | into custody pending appeal. I am not prejudging that, but |
| 12:27 | 7 | in fairness, I would have to look at the last seven years |
| 12:27 | 8 | and say whatever has occurred in her life, she has come to |
| 12:27 | 9 | court. She doesn't offer a danger to the community. Why |
| 12:27 | 10 | would I take her into custody? |
| 12:27 | 11 | So you have got to think about what this record |
| 12:27 | 12 | looks like as well as I do, but I have got to look and make |
| 12:27 | 13 | sure it's fair besides that. I am not sure this is a fair |
| 12:27 | 14 | trial. The problem is I am not certain if I start over |
| 12:27 | 15 | again it's a fair trial. I am not sure if we're in any |
| 12:27 | 16 | better position in January or whatever. |
| 12:27 | 17 | Ms. Pemkova is not inclined to start over again, |
| 12:27 | 18 | by the way. So June 23rd, let's just take that date for a |
| 12:28 | 19 | moment. |
| 12:28 | 20 | MR. KOLE: I'm very sorry to interrupt. I just |
| 12:28 | 21 | want to ask for clarification. When the Court just said |
| 12:28 | 22 | you're not sure if this is a fair trial, what were you |
| 12:28 | 23 | referring to, Your Honor? |
| 12:28 | 24 | THE COURT: I am not sure that it's a fair trial |
| 12:28 | 25 | for you. You see, it's reversed. I am not certain that |

12:28    1   coming back at a future date is fair to the testimony being

12:28    2   presented today as the jury looks back at your testimony two

12:28    3   months from now.

12:28    4          MR. KOLE:  Thank you for the clarification.

12:28    5          THE COURT:  You know, so far quite frankly the

12:28    6   Court has been very lenient, and I'm going to use even a

12:28    7   worse word, "protective," quite frankly of Ms. Pemkova on a

12:28    8   number of the rulings.

12:28    9          A number of the rulings I made yesterday are

12:28   10   absolutely on point.  It's kind of the hesitancy with a pro

12:28   11   se and the predicament we're in.  Now, you've seen a little

12:28   12   bit of change in the Court today.  Most of your objections

12:28   13   are being sustained.  They should have been sustained

12:28   14   yesterday.

12:28   15          What's your wisdom?  I can't really rely on

12:29   16   Mr. Steward because there has been an exacerbation between

12:29   17   his client and himself.  But given the length of time, I

12:29   18   don't feel comfortable limiting her at this point because

12:29   19   you took a day and a half.  I can't measure it by time.

12:29   20          Number two, she wants to fill in the blanks.  She

12:29   21   asked the agent about that, why you're playing certain tapes

12:29   22   and not others.  She has a timing issue.

12:29   23          June 23rd, do I press that?

12:29   24          MS. PEMKOVA:  Not enough of time for --

12:29   25          THE COURT:  Just a moment.  Now I am speaking to

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

12:29   1   counsel.  I am going to get his wisdom, too.

12:29   2          Do I press for June 23rd and create in Ms.

12:29   3   Pemkova's mind, first, unfairness, and second, a record

12:29   4   where she says I can't get my witnesses into court?  And

12:29   5   since she's out of custody, do I get to try this again in

12:29   6   two years?

12:29   7          Now, I'm just joking with you, but I'm not.  Do I

12:29   8   press for August when Mr. Steward is not available and have

12:30   9   her proceed by herself?  I am not comfortable without her

12:30  10   having standby counsel.  Do I take her semi-offer because

12:30  11   she really wants January and bargain with the jury and try

12:30  12   to get a date in September, late September, to bring them

12:30  13   back?

12:30  14          I want you to talk to the agent because he is

12:30  15   every bit a part of this.  I need his wisdom also.  I don't

12:30  16   know your availability.  I am not trying to be rude to the

12:30  17   agent at all.  I think so often we negotiate with counsel,

12:30  18   and, Agent Reitz, quite frankly, you know, you're left out.

12:30  19   I don't want that.

12:30  20          MS. PEMKOVA:  Your Honor --

12:30  21          THE COURT:  Just a moment, Ms. Pemkova.  I'm going

12:30  22   to come back to you.  You're probably going to get a

12:30  23   five-minute recess, and that's about it.

12:30  24          MR. KOLE:  Your Honor, two comments.  What would

12:30  25   appear to me to be the simplest solution -- I realize the

12:31    1    Court already rejected it, but I would like to raise it

12:31    2    again if the Court would indulge me.

12:31    3             THE COURT:  Sure.

12:31    4             MR. KOLE:  I haven't had the chance because I

12:31    5    haven't dealt with it in another case to look into this

12:31    6    standby counsel issue.  It does seem to me that it might be

12:31    7    the case that under the law, given the very limited role of

12:31    8    standby counsel as really a legal advisor -- as Mr. Steward

12:31    9    said, he is equivalent to a law book sitting on the table --

12:31   10    it might not be error for the Court to allow someone to take

12:31   11    his place as standby counsel.

12:31   12             THE COURT:  Well, it might not, and that's one

12:31   13    reason I pressed through the jury instructions last evening.

12:31   14    I wanted to get part of the decision-making process out of

12:31   15    the way with the jury instructions.  I'm pretty certain we

12:31   16    have a fairly good set of instructions.

12:31   17             MR. KOLE:  I would also say in regard to that that

12:31   18    if we continue forward and the government's case is

12:31   19    essentially done, if Ms. Pemkova puts on her case,

12:31   20    Mr. Steward might be able to still be present through all of

12:31   21    the evidence.  Now, I realize there is the witness issue.

12:31   22    But if it was just arguments and Mr. Steward might be

12:31   23    available to consult by phone also if necessary, it just

12:32   24    seems that that might be worth considering.

12:32   25             THE COURT:  It's ingenious.  Let me help you.  No.

| | | |
|---|---|---|
| 12:32 | 1 | Let me dress that up better.  The Court declines the |
| 12:32 | 2 | government's offer. |
| 12:32 | 3 | MR. KOLE:  I figured that, but I wanted to just |
| 12:32 | 4 | throw it out. |
| 12:32 | 5 | THE COURT:  All right. |
| 12:32 | 6 | MR. KOLE:  The second point is on the June 23rd. |
| 12:32 | 7 | I think that's reasonable.  Ms. Pemkova already had the one |
| 12:32 | 8 | week when the Court was dark last week to do additional |
| 12:32 | 9 | preparation.  As the Court said to her, even though she's |
| 12:32 | 10 | pro se, she's acting as a lawyer and is held to the same |
| 12:32 | 11 | responsibilities as a lawyer would be. |
| 12:32 | 12 | THE COURT:  Let me say both of you if we got |
| 12:32 | 13 | through the cross-examination and your examination, then it |
| 12:32 | 14 | would appear to me that June 23rd is a good date for the |
| 12:32 | 15 | Court for two reasons.  One, it would let me know that |
| 12:32 | 16 | you've had enough time to find these people which we have |
| 12:33 | 17 | been frantically calling last night and today, et cetera. |
| 12:33 | 18 | Then the first thing that happened is I wouldn't |
| 12:33 | 19 | be in any worse or better position, but one or two of them |
| 12:33 | 20 | might be able to come.  They might not be able to come, by |
| 12:33 | 21 | the way. |
| 12:33 | 22 | MS. PEMKOVA:  No, no. |
| 12:33 | 23 | THE COURT:  Listen.  You're already shaking your |
| 12:33 | 24 | head.  You're already saying no so the record reflects that. |
| 12:33 | 25 | That's a constant refrain.  But your options are narrowing |

12:33   1   now.

12:33   2           Then if I had somebody on the phone who said you

12:33   3   know, Judge, I can't get here until -- I'm Mr. Fak, and I

12:33   4   can't get here until September, then you have got an even

12:33   5   better record.  I either have to determine that that witness

12:33   6   is irrelevant -- now, pay attention to me.  Put down your

12:33   7   cell phone for a moment.

12:33   8           MS. PEMKOVA:  I was going to call them.

12:33   9           THE COURT:  No.  Thank you very much.

12:33   10          You have an even better record because the Court

12:33   11  would have had to make a determination that this witness is

12:33   12  totally irrelevant, wasn't going to provide the opportunity

12:33   13  to come to court, but at least I'd know or have a

12:33   14  conversation with or contact with this person, and this

12:33   15  person by phone might say, yes, I am willing to come, Judge,

12:34   16  but I will come in September.

12:34   17          Well, that's a very difficult predicament for the

12:34   18  Court.  There I might have to kick the case again, which is

12:34   19  the last thing I want to do until September.  But right now

12:34   20  you're giving me nothing.  You're giving me no contact.

12:34   21  You're giving me no people.  Eventually -- you're shaking

12:34   22  your head again.  I love the adamancy.  I think brilliance

12:34   23  meets obstinacy sometimes, and that's what's happening here.

12:34   24  So let's quit shaking your head now.

12:34   25          Let me say to you your options are narrowing so

12:34    1    significantly that right now we are just proceeding through,

12:34    2    and I really don't want to do that.  I really want these

12:34    3    people on the phone or give you an attempt to have me talk

12:34    4    to them, and you're not doing that.  You haven't been

12:34    5    willing to do that other than placing a call with people who

12:34    6    won't respond.

12:34    7            I am about to limit you.  I'm not going to give

12:35    8    you an arbitrary time yet, but it's hours on the

12:35    9    cross-examination.  Then if you're going to be testifying, I

12:35   10    think I have got an adequate record that your full story

12:35   11    will be told while you're on the witness stand, but it may

12:35   12    be today.

12:35   13            Now, I am going to have you respond so you have a

12:35   14    complete record, but it's your opportunity.

12:35   15            MS. PEMKOVA:  Your Honor, I provided you as you

12:35   16    requested yesterday the list of the potential witnesses,

12:35   17    their phone numbers.  Again, from May 26th to June 8th or

12:35   18    9th is not enough time to get these people who are all over

12:35   19    the country or out of the country.

12:35   20            THE COURT:  I don't know that because you haven't

12:35   21    provided me the opportunity to talk to them.

12:35   22            MS. PEMKOVA:  Call them, Your Honor, anytime you

12:35   23    want.

12:35   24            THE COURT:  No, I won't do that.  It's your

12:35   25    responsibility.

| | | |
|---|---|---|
| 12:35 | 1 | MS. PEMKOVA:  I told you where engineer Klika is. |
| 12:35 | 2 | He can call you I would say at the latest after he comes |
| 12:36 | 3 | back from that business trip. |
| 12:36 | 4 | THE COURT:  Well, I am waiting for his call now. |
| 12:36 | 5 | MS. PEMKOVA:  Anyway, Your Honor, until June |
| 12:36 | 6 | 23rd -- |
| 12:36 | 7 | THE COURT:  I am waiting for the call from any one |
| 12:36 | 8 | of those five witnesses now.  In fact, I think we were in |
| 12:36 | 9 | session until 9:00 or 9:30.  I am happy to wait until |
| 12:36 | 10 | midnight tonight.  You don't know that. |
| 12:36 | 11 | MS. PEMKOVA:  Well, if you want to have a dead |
| 12:36 | 12 | body here, you will get it, Your Honor. |
| 12:36 | 13 | THE COURT:  Well, I don't think so.  I also am |
| 12:36 | 14 | passing through your dead-body routine.  I think we're all |
| 12:36 | 15 | done with that now and the oxygen that you need and passing |
| 12:36 | 16 | out, et cetera, and the breakdowns.  I think that we're all |
| 12:36 | 17 | through with that nonsense.  You're not going to die. |
| 12:36 | 18 | MS. PEMKOVA:  Your Honor, you haven't read the |
| 12:36 | 19 | medical report from the doctor regarding hepatic |
| 12:36 | 20 | encephalopathy. |
| 12:36 | 21 | THE COURT:  Have him come in here, please, and |
| 12:36 | 22 | I'll be happy to listen to him.  Otherwise, you're |
| 12:36 | 23 | proceeding. |
| 12:36 | 24 | MS. PEMKOVA:  I am asking you to give me an |
| 12:36 | 25 | extension, please. |

104

| 12:36 | 1 | THE COURT:  That's denied.  Now, the options are |
| 12:37 | 2 | narrowing, and I would encourage you to talk to Mr. Steward. |
| 12:37 | 3 | You don't have to rely upon his advice, but I don't think |
| 12:37 | 4 | you realize how quickly these options are narrowing. |
| 12:37 | 5 | MS. PEMKOVA:  Your Honor, you proposed the 23rd of |
| 12:37 | 6 | June.  Can you do at least that and give me a chance to get |
| 12:37 | 7 | these -- |
| 12:37 | 8 | THE COURT:  Until when?  I didn't hear you. |
| 12:37 | 9 | MS. PEMKOVA:  I was asking for September.  You |
| 12:37 | 10 | refused that.  I was asking for January.  You refused that. |
| 12:37 | 11 | Can you at least give to the 23rd of June? |
| 12:37 | 12 | THE COURT:  You just said June and September -- |
| 12:37 | 13 | you tossed both dates. |
| 12:37 | 14 | MR. KOLE:  Your Honor, if -- |
| 12:37 | 15 | THE COURT:  No, Counsel, I don't need your help |
| 12:37 | 16 | now.  I am tired of the government interrupting. |
| 12:37 | 17 | I actually gave you that option.  What I am not |
| 12:37 | 18 | willing to do is continue this matter until January.  That's |
| 12:37 | 19 | denied. |
| 12:37 | 20 | I told you you might have an opportunity for |
| 12:37 | 21 | September but I needed more information.  You didn't listen. |
| 12:37 | 22 | You just started shaking your head as usual.  I said, you |
| 12:37 | 23 | know, if I knew more on June 23rd and I had a witness |
| 12:37 | 24 | actually on the phone and I actually found that that witness |
| 12:38 | 25 | might be relevant, I might accede to September, but you're |

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

12:38    1    not giving me that opportunity.  You shook your head at

12:38    2    that.

12:38    3          So apparently when I toss out June 23rd as a date

12:38    4    for more information, to get your witnesses here, to give me

12:38    5    something concrete, anything I say meets with obstinacy.

12:38    6    Your options are narrowed, and you've created this problem

12:38    7    for yourself.

12:38    8          Now, on June 23rd, I explained to you that you

12:38    9    would have this Court in a very difficult predicament not

12:38   10    because of the law but just because of my fairness.  If I

12:38   11    thought that there was any reasonable expectation of

12:38   12    relevancy and I had somebody to talk to on the phone who

12:38   13    said, you know, Judge, one or two of us could come in here

12:38   14    on June 23rd or I'm Dr. Fak or whomever and I can't be here

12:38   15    until September, I then really have to think about that.  I

12:39   16    have to see if the jury can come back.

12:39   17          I can't even go through that sorting process until

12:39   18    you give me that opportunity.  You're not going to do that.

12:39   19    So, therefore, I am going to have to be the judge who just

12:39   20    unfortunately now sets some time limits for you.  Unless I

12:39   21    hear some reasonableness on your part and also take into

12:39   22    account the fairness to the government, I am going to limit

12:39   23    you.

12:39   24          MS. PEMKOVA:  Your Honor, I said very clearly that

12:39   25    if we could have a recess until at least September.  The

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER

12:39   1   moment when people arrive where they can call from, I will

12:39   2   make them call.

12:39   3        THE COURT:  Not without an interim date in June.

12:39   4   I am just not appearing again in September after

12:39   5   five-and-a-half years of these kinds of representations and

12:39   6   have this same kind of discussion with you.  Judge, you

12:39   7   know, he can be here in September, but he is traveling

12:39   8   again.  I want to have clarity.

12:40   9        In other words, if you can get people on the phone

12:40  10   today or tomorrow, I might consider September.  But right

12:40  11   now June 23rd seems to be a pretty fair date.  For one

12:40  12   reason, it gives you another week and a half on top of the

12:40  13   week you already had.  I still have Mr. Steward's services.

12:40  14   I know with clarity if they're coming back.  I'm not even

12:40  15   certain that the jury can come back June 23rd.  I might be

12:40  16   in the position of just having a mistrial here, and then

12:40  17   it's probably going to go over until January frankly.

12:40  18        MS. PEMKOVA:  Your Honor, I will do my best to get

12:40  19   at least somebody here via subpoena.  Then you will give me

12:40  20   until the 23rd of June?

12:40  21        THE COURT:  Yeah.  Then if somebody else is not

12:40  22   available but in good faith we're talking to them on the

12:40  23   phone, I'm going to consider September.

12:40  24        MS. PEMKOVA:  Your Honor, the moment when they

12:40  25   arrive, I will do everything and I will actually connect the

12:40  1    call.  If you would allow me, I would make sure that this

12:40  2    person is on the phone.  I will connect it, and they can

12:40  3    call you back.

12:40  4          THE COURT:  Here is what we're going to do.  I

12:40  5    don't accept that they're ever going to call this Court

12:41  6    right now.  I just don't have faith in that.  If I can get

12:41  7    them on the phone today, tonight -- you won't believe my

12:41  8    hours.  I will stay until midnight.

12:41  9          MS. PEMKOVA:  Your Honor, I'm sorry for

12:41  10   interrupting, but I have said Raymond Hunter is in transit

12:41  11   from the United States to the UK.

12:41  12         THE COURT:  Now, just a moment.  He is not in

12:41  13   transit for the next 48 hours.  We can reach him.

12:41  14         MS. PEMKOVA:  One second, Your Honor.  He lives in

12:41  15   Ireland, and I don't know how he flew in.  I don't know

12:41  16   that.  Anyway, the same thing -- let me say it this way.

12:41  17   Engineer Klika is the witness who I need the most, and I

12:41  18   told you what I have done.  He is --

12:41  19         THE COURT:  Well, get him on the phone then and

12:41  20   let me talk to him.  Quite frankly, my position might change

12:41  21   if he said, you know, Judge, I can't come until -- I am not

12:41  22   even hearing that.

12:41  23         MS. PEMKOVA:  This is what I am doing, Your Honor,

12:41  24   only in different places.

12:42  25         THE COURT:  The record should reflect we're

12:42  1  calling Rudolf Klika again.

12:42  2       MS. PEMKOVA:  Your Honor, he was from early

12:42  3  morning in Austria somewhere in the banks on his business,

12:42  4  and he was delegated by an Austrian bank to Romania for two

12:42  5  days.  He left last night, meaning today.  He is somewhere

12:42  6  on the highway.

12:42  7       THE COURT:  You say he left last night.  I have no

12:42  8  belief that he can't be reached by text or by cell phone.

12:42  9       MS. PEMKOVA:  I am trying.  Try by yourself.  He

12:42  10  has a cell phone.  He is traveling with his cell phone.

12:42  11  Please don't make me responsible for roaming and all the

12:42  12  functioning or malfunctioning of the technique.

12:42  13       THE COURT:  But after five-and-a-half years, which

12:42  14  is startling, and hearing these people repeatedly through

12:42  15  Diane Bass outside the presence of the jury -- these are

12:42  16  redundant names.  You supposedly have close contact with

12:42  17  them.  You supposedly are able to get ahold of them.  You've

12:42  18  had past dealings with them.  Now suddenly we can't find

12:43  19  them.  You have to understand I am losing faith.

12:43  20       MS. PEMKOVA:  No, it is not like that.  Your

12:43  21  Honor, on the 26th of May, I found I can have here

12:43  22  witnesses.  None of these people was immediately available

12:43  23  to come.  Otherwise, I would have them here.  Mr. Hunter

12:43  24  flew in.  It didn't work out.  Engineer Klika was booked.

12:43  25       THE COURT:  Why can't I talk to engineer Klika and

12:43    1    hear that myself?

12:43    2              MS. PEMKOVA:  I am trying, Your Honor.

12:43    3              THE COURT:  Keep trying.

12:43    4              Now, at the end of the day, I am going to start

12:43    5    talking to the jury eventually about their availability.  I

12:43    6    have no problem giving you a slight continuance and, if

12:43    7    necessary, a longer continuance if I can get Fak.

12:43    8              MS. PEMKOVA:  Please listen, Your Honor.

12:43    9              (Ms. Pemkova attempting to make a call.)

12:43   10              THE COURT:  Leave a message for him to call the

12:44   11    Court, (714)338-4545.

12:44   12              MS. PEMKOVA:  You see?  Unfortunately, Your Honor,

12:44   13    roaming by whatever they are using in Europe -- roaming is

12:44   14    very low quality.

12:44   15              THE COURT:  Just a moment.  Can you leave a

12:44   16    message?

12:44   17              MS. PEMKOVA:  This is what I am trying to explain

12:44   18    to you.  Roaming doesn't leave a message.  I will call one

12:44   19    more time.  It gave me an answering machine that he is not

12:44   20    available, and it didn't give me a message.  I texted him.

12:44   21              THE COURT:  Call him again.  Now you have texted

12:44   22    him.  You can certainly receive a text.

12:44   23              (Cell phone recording played)

12:44   24              THE COURT:  The record should reflect that we're

12:44   25    getting a recording.  The recording basically doesn't have

12:44   1    the ability to leave a message apparently, so my inquiry is
12:45   2    you can certainly send a text.
12:45   3              MS. PEMKOVA:  Your Honor, I can try a different
12:45   4    thing.  I can try to send an e-mail and ask him to call the
12:45   5    number which you have provided.
12:45   6              THE COURT:  Why don't you go take a 15-minute
12:45   7    recess, both of you.  We'll see you at 1:00.  But I am
12:45   8    warning you that I am about to limit you, and it's a couple
12:45   9    hours at the most.  I'm not going to make that record yet,
12:45   10   but you're close.
12:45   11             Thank you.
12:45   12             (Recess taken at 12:45 p.m.)
12:45   13                        *    *    *

1

2

3

4

5                              CERTIFICATE

6

7          I hereby certify that pursuant to Section 753,

8    Title 28, United States Code, the foregoing is a true and

9    correct transcript of the stenographically reported

10   proceedings held in the above-entitled matter and that the

11   transcript page format is in conformance with the

12   regulations of the Judicial Conference of the United States.

13

14   Date:  May 12, 2016

15

16                              /s/   Sharon A. Seffens  5/12/16

17                              _____

18                              SHARON A. SEFFENS, U.S. COURT REPORTER

19

20

21

22

23

24

25

SHARON SEFFENS, U.S. DISTRICT COURT REPORTER