1

2                        UNITED STATES DISTRICT COURT

3                       CENTRAL DISTRICT OF CALIFORNIA
                               SOUTHERN DIVISION
4

5
       UNITED STATES OF AMERICA,      )
6                                     )
              PLAINTIFF,              )
7                                     )
              V.                      ) CASE NO.:  SA CR 08-180-DOC
8                                     )
                                      ) SANTA ANA, CALIFORNIA
9      IRENE PEMKOVA,                 ) JUNE 10, 2015
                                      ) (12:39 P.M. TO 12:52 P.M.)
10                                    ) (1:36 P.M. TO 3:29 P.M.)
              DEFENDANT.             ) (4:05 P.M. TO 5:01 P.M.)
11     _____) (5:02 P.M. TO 5:08 P.M.)
                                        (5:11 P.M. TO 5:22 P.M.)
12                                      (5:23 P.M. TO 5:24 P.M.)

13

14                         JURY TRIAL – DAY 7
                               VOLUME III
15
                     BEFORE THE HONORABLE DAVID O. CARTER
16                        UNITED STATES DISTRICT JUDGE

17

18
       APPEARANCES:              SEE NEXT PAGE
19
       COURT REPORTER:           RECORDED; COURTSMART
20
       COURTROOM DEPUTY:         DEBORAH GOLTZ
21
       TRANSCRIBER:              DOROTHY BABYKIN
22                               COURTHOUSE SERVICES
                                 1218 VALEBROOK PLACE
23                               GLENDORA, CALIFORNIA  91740
                                 (626) 963-0566
24

25     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
       TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

```
 1    APPEARANCES:  (CONTINUED)
      FOR PLAINTIFF UNITED STATES OF AMERICA:
 2
          EILEEN DECKER
 3        UNITED STATES ATTORNEY
          LAWRENCE MIDDLETON, CHIEF
 4        CRIMINAL DIVISION
          ASSISTANT UNITED STATES ATTORNEY
 5        BY:  LAWRENCE KOLE
          ASSISTANT UNITED STATES ATTORNEY
 6        411 WEST FOURTH STREET
          SUITE 8000
 7        SANTA ANA, CALIFORNIA  92701

 8
      FOR THE DEFENDANT IRENE PEMKOVA:
 9
          IRENE PEMKOVA AKA PIMKOVA
10        PRO SE

11
      STAND-BY COUNSEL FOR DEFENDANT IRENE PEMKOVA:
12
          H. DEAN STEWARD LAW OFFICES
13        BY:  H. DEAN STEWARD
               ATTORNEY AT LAW
14        107 AVENIDA MIRAMAR
          SUITE C
15        SAN CLEMENTE, CALIFORNIA  92672

16
      ALSO PRESENT:
17
          THOMAS REITZ
18        SPECIAL AGENT, FBI

19

20

21

22

23

24

25
```

1                          I N D E X

2   SA CR 08-180-DOC                            JUNE 10, 2015

3   PROCEEDINGS:   JURY TRIAL – DAY 7; VOLUME III

4   THOMAS REITZ, GOVERNMENT WITNESS:                   PAGE

5       REDIRECT EXAMINATION BY MR. KOLE               17
        RECROSS-EXAMINATION BY MS. PEMKOVA             27
6
        DEFENSE OPENING STATEMENT BY MS. PEMKOVA       32
7       DIRECT EXAMINATION BY MS. PEMKOVA              73
        CROSS-EXAMINATION BY MR. KOLE                  93
8       REDIRECT EXAMINATION BY MS. PEMKOVA            117
        RECROSS-EXAMINATION BY MR. KOLE                118
9

10                       E X H I B I T S
                                                    RECEIVED
11
    GOVERNMENT EXHIBIT 197                             21
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            SANTA ANA, CALIFORNIA; JUNE 10, 2015; 12:39 P.M.

 2               (PRIOR PROCEEDINGS STENOGRAPHICALLY PREPARED

 3               IN VOLUMES I AND II.)

 4               THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

 5               MS. PEMKOVA, AFTER LUNCH, YOU HAVE THE OPPORTUNITY TO

 6   MAKE AN OPENING STATEMENT.  AND LET ME JUST TALK TO YOU A

 7   LITTLE BIT ABOUT THAT.

 8               YOU HAVE AN OPPORTUNITY TO EXPLAIN WHAT THE EVIDENCE

 9   WILL LOOK LIKE.  OKAY.

10               IT'S NOT EVIDENCE.  ALL THE EVIDENCE COMES WHEN

11   YOU'RE UNDER OATH FROM THE WITNESS STAND.

12               YOU CAN ALSO WAIVE YOUR OPENING STATEMENT IF YOU'D

13   LIKE.  AND YOU CAN TESTIFY FROM THE WITNESS STAND AND THAT IT

14   IS EVIDENCE.  IN OTHER WORDS, YOU CAN DO BOTH.

15               BUT WHAT YOU CANNOT DO IS JUST HAVE AN OPENING

16   STATEMENT AND THEN NOT TAKE THE WITNESS STAND UNDER OATH

17   BECAUSE THAT OPENING STATEMENT IN A SENSE IS A SUMMARY OF WHAT

18   EVIDENCE MIGHT BE PRESENTED.  AND EVERYTHING HAS TO COME UNDER

19   OATH OR AFFIRMATION.

20               SO, I'LL LEAVE THAT OPPORTUNITY TO YOU.  IT GIVES YOU

21   TWO OPPORTUNITIES TO TALK TO THE JURY IF YOU WANT TO.  ONE, YOU

22   CAN RECALL AGENT REITZ.  HE'LL BE BACK ON JUNE 23RD.  BECAUSE

23   I'M DETERMINED JUST FROM MY OWN CONSCIENCE TO MAKE CERTAIN THAT

24   WHOEVER IS COMING OR NOT COMING HAS THE OPPORTUNITY TO BE HERE

25   BY THE 23RD.
```

1              YOU MADE A COUPLE REPRESENTATIONS THIS MORNING.  AND

2    WE HAVE AN EMAIL -- I MEAN, A VOICE.  BUT IT'S NOT FROM KLIKA.

3    IT'S FROM SOMEBODY ELSE SPEAKING ON HIS BEHALF.

4              MS. PEMKOVA:  BECAUSE HE DOESN'T SPEAK ENGLISH, YOUR

5    HONOR, THE --

6              THE COURT:  MR. KLIKA DOES NOT SPEAK ENGLISH?

7              MS. PEMKOVA:  HE -- YOUR HONOR, IF I MIGHT.

8         HE --

9              THE COURT:  JUST A MOMENT.

10             MS. PEMKOVA:  OKAY.

11             THE COURT:  LET ME STAY ON FOCUS FOR ONE MOMENT.

12             MS. PEMKOVA:  SORRY.

13             THE COURT:  WE'LL GET TO THAT ISSUE IN A MOMENT.

14             MS. PEMKOVA:  UH-HUM.

15             THE COURT:  WHOEVER THAT PERSON WAS SAID HE WOULD BE

16   BACK ON FRIDAY.

17             MS. PEMKOVA:  YES.

18             THE COURT:  MAYBE SATURDAY.

19             MS. PEMKOVA:  UH-HUM.

20             THE COURT:  AND HE MADE NO REPRESENTATION ABOUT

21   WHETHER MR. KLIKA WOULD BE HERE, BUT AT LEAST WE HAVE A

22   CONTACT.  THANK GOODNESS.

23             I DON'T THINK I'M COMFORTABLE FROM THIS POINT FORWARD

24   COMMUNICATING WITH THAT PERSON IN ANY FORM.  IT'S ENOUGH THAT

25   THE COURT HAS MADE CONTACT.  AND HE'S PHONING INTO THE COURT.

1   HE CAN TALK TO YOU, MR. STEWARD, THE GOVERNMENT, THE AGENT,

2   NONE OF YOU, ALL OF YOU, OR SOME OF YOU.

3        BUT TENTATIVELY UNLESS HE CAN -- I CAN GET AHOLD OF

4   MR. KLIKA, I'M GOING TO SET THE MATTER FOR JUNE 23RD.   AND IF

5   HE'S HERE, I HOPE YOU CAN GET HIM HERE VOLUNTARILY, THEN, I

6   PROBABLY WILL LET HIM TESTIFY.

7        I DON'T KNOW THAT I'LL EVEN WORRY ABOUT THE RELEVANCY

8   OBJECTION.  BUT IF HE'S NOT HERE, I'M GOING TO MOVE ON WITH THE

9   CASE ON THAT DATE AND TIME.

10       THE -- I NEVER HEARD FROM MR. FAK.  BUT I WOULD

11  ADMONISH YOU IN THE SAME WAY THAT IF HE'S HERE ON JUNE 23RD, I

12  PROBABLY WON'T BE TOO CONCERNED ABOUT THE RELEVANCY ASPECT.  IF

13  HE SHOWS UP IN GOOD FAITH, I'M PROBABLY GOING TO LET HIM TAKE

14  THE STAND.

15       I UNDERSTAND THAT IT REQUIRES A MUCH CAREFUL ANALYSIS

16  BY A COURT USUALLY CONCERNING RELEVANCY.  AND QUITE FRANKLY,

17  SOME COURTS MIGHT SIMPLY EXCLUDE IT AS NON-RELEVANT.  BUT IF

18  THE PERSON IS MAKING THAT KIND OF JOURNEY, DOING SO VOLUNTARILY

19  -- AND IF YOU'VE REPRESENTED FOR THE LAST FOUR TO FIVE YEARS

20  THAT THESE WERE TWO OF THE PEOPLE THAT YOU WANTED TO SEE IN

21  COURT, KLIKA AND FAK, I'LL USE MY DISCRETION AND BE

22  EXTRAORDINARILY LENIENT.

23       THERE'S TWO OTHERS THAT BOTHER ME.

24       I'VE NEVER GOTTEN ANY CALL BACK FROM SIGURD LARSEN.

25  IF YOU CAN GET A HOLD OF HIM, I OFFER YOU THE SAME LENIENCY.

1           AS FAR AS MR. MUNDELL, THOUGH, WE'VE GOT AN ATTORNEY

2    CALLING FOR MR. MUNDELL.

3           MS. PEMKOVA:  I SAID --

4           THE COURT:  OKAY.

5           NOW, HAS THAT ATTORNEY PHONED YOU?  BECAUSE HE HASN'T

6    PHONED DEB.  AND I DON'T BELIEVE HE'S PHONED LINDA IN CHAMBERS.

7           (THE COURT AND CLERK CONFERRING.)

8           THE COURT:  AND I'M GOING TO CHECK AT 1:00 BECAUSE

9    SHE'S MONITORING THE PHONES.

10          MR. HUNTER YOU SAID YOU HAD CONTACT WITH.  AND YOU

11   SAID HE'D PHONE.

12          MS. PEMKOVA:  YES.  THREE --

13          THE COURT:  HAS HE PHONED?

14          MS. PEMKOVA:  I CAN SHOW YOUR HONOR THREE MISSED

15   CALLS -- OR TWO --

16          THE COURT:  WELL, JUST TELL ME.  HAS HE PHONED TODAY?

17          MS. PEMKOVA:  YES.

18          THE COURT:  OKAY.  WAS HE ONE OF THE PEOPLE ON THE

19   PHONE WHEN THE PHONE WAS RINGING?

20          MS. PEMKOVA:  YES.

21          THE COURT:  NOW, WE STARTED TO TALK TO MR. HUNTER.

22   AND THEN THE LINE WENT DEAD.

23          YOU SAID YOU LOST HIM.

24          MS. PEMKOVA:  YES.

25          THE COURT:  CAN WE CALL HIM BACK.

1          MS. PEMKOVA:  NO.

2          THE COURT:  OKAY.

3          MS. PEMKOVA:  I CANNOT.

4          I -- I -- YOUR HONOR, I SPOKE WITH HIM LAST NIGHT.

5    AND I ENCOURAGED HIM AFTER HE FOUND YOUR MESSAGE I ENCOURAGED

6    HIM TO CALL AS SOON AS IT'S POSSIBLE TO THE COURT.

7          THE COURT:  OKAY.

8          MS. PEMKOVA:  HE PROMISED NOT TO ME IT'S BETTER HE

9    TALK TO THE COURT.

10         AND I ASKED HIM TO DO IT AS SOON AS IT'S POSSIBLE.

11         THE COURT:  WE HAVE NOT RECEIVED THAT CALL.

12         MS. PEMKOVA:  MAY I FINISH, PLEASE, YOUR HONOR.

13         THE COURT:  YES.

14         MS. PEMKOVA:  BECAUSE HE'S STILL IN THE TRANSIT.

15   THIS IS WHAT HE TOLD ME.

16         THE COURT:  HE -- HE WHAT?

17         MS. PEMKOVA:  HE IS STILL IN THE TRANSIT.  REMEMBER I

18   TOLD YOU.

19         MR. HUNTER WAS HERE ON MONDAY.  AND HE WAS FLYING

20   BACK TO IRELAND THROUGH SOME STOP SOMEWHERE IN THE UNITED

21   STATES.

22         THE COURT:  NOW, I'M GOING TO GIVE YOU THE SAME

23   ADMONISHMENT.

24         IF HE'S HERE ON JUNE 23RD, IN ALL LIKELIHOOD I DON'T

25   EVEN KNOW IF I'M GOING TO GO THROUGH A RELEVANCY ANALYSIS.  I'M

1    PROBABLY JUST GOING TO LET HIM STAND.  AND I MEAN -- TAKE THE

2    WITNESS STAND.

3            BUT IF HE'S NOT, I'M NOT INCLINED TO PUT THE MATTER

4    OVER AGAIN, ESPECIALLY KNOWING THAT I'VE GOT A GOOD CHANCE OF

5    HAVING A JURY NOW GO BELOW 12.  YOUR STAND-BY COUNSEL ISN'T

6    AVAILABLE AFTER THE 30TH.  WE'VE HAD YEARS AND YEARS AND YEARS

7    TO HAVE PEOPLE PRESENT.

8            AND I HEAR THE OTHER SIDE.  AND THAT IS, YOU KNOW,

9    YOU'RE NOT -- YOU DIDN'T HAVE TIME TO PREPARE.  I UNDERSTAND

10   YOUR ARGUMENT.  MY VIEW YOU'VE HAD AN EXTRAORDINARY PERIOD OF

11   TIME.

12           AND THESE PEOPLE CAN IN FACT APPEAR.

13           THE GOVERNMENT HAS THE SAME STRESS, IF YOU WILL, FROM

14   THIS COURT, GETTING PEOPLE HERE ON TIME AND THE THREAT OF

15   EXCLUSION.  AND I THINK THAT THAT HAS TO BE COEQUAL TO HAVE

16   PEOPLE ATTEND.  I THINK IT'S EXTRAORDINARILY GRACIOUS TO HAVE

17   THESE TWO RECESSES.  ONE WAS CAUSED BY THE COURT FOR A WEEK.

18   BUT QUITE FRANKLY, THIS OTHER RECESS IS A RECESS THAT I THINK

19   IS DISCRETIONARY.  AND IT'S GIVING YOU THE OPPORTUNITY TO GET

20   ONE OR MORE PEOPLE IN HERE.

21           AND FINALLY THIS ATTORNEY, YOU KNOW, I -- IS IT

22   POSSIBLE TO CALL (310) 463-3918 OR WHOEVER THIS ATTORNEY IS WHO

23   SAID IF YOU HAVE HIS OR HER NUMBER AND SPEAK TO THEM FOR JUST A

24   MOMENT WITH ALL COUNSEL PRESENT.

25           MS. PEMKOVA:  YOUR HONOR, WITH ALL DUE RESPECT --

1              THE COURT:  WELL, NO.  THAT USUALLY MEANS THAT THERE

2    WAS NO RESPECT.  AND I'M JOKING WITH YOU A LITTLE BIT.

3              SO, YOU JUST TELL ME NOW THE FACTS OF THE SITUATION.

4              DO YOU HAVE HIS NUMBER?

5              MS. PEMKOVA:  NO, I DON'T.

6              THE COURT:  OKAY.

7              MS. PEMKOVA:  I DON'T KNOW THIS LAWYER.  AND I DON'T

8    WANT TO TALK TO MR. LAWYER.

9              MR. ROBERT -- MR. WILLIAM MUNDELL WOULD BE

10   SUBPOENAED.

11             THE COURT:  WELL, YOU'VE GOT UNTIL JUNE 23RD.

12             MS. PEMKOVA:  I HAVE HAD THAT.

13             THE COURT:  OKAY.  SO, MR. MUNDELL, WE'RE GOING TO

14   SUBPOENA.

15             MS. PEMKOVA:  YES.

16             THE COURT:  AND YOU DON'T WANT TO TALK TO HIS LAWYER;

17   IS THAT CORRECT?

18             MS. PEMKOVA:  NO.  BECAUSE I DON'T KNOW THE LAWYER.

19   AND I DON'T --

20             THE COURT:  OKAY.

21             MS. PEMKOVA:  -- WANT TO HEAR THE LAWYER.

22             THE COURT:  ALL RIGHT.  THEN I'M GOING TO SIMPLY PUT

23   THAT EFFORT ON THE COURT'S PART ASIDE.

24             IF YOU CAN REACH MR. HUNTER TODAY, WHO APPARENTLY HAS

25   TRIED TO CALL YOU YOU SAY, AND YOU HAD HIM ON THE LINE FOR A

1    BRIEF PERIOD OF TIME --

2              MS. PEMKOVA:  YEAH --

3              THE COURT:  -- IF WE CAN REACH HIM AGAIN TODAY, WE'LL

4    MAKE THE EFFORT.

5              ALL RIGHT.  NOW, MY SUGGESTION IS WE NOW KNOW THE

6    PARAMETERS.  IT'S JUNE 23RD.  I THINK THE COURT IS BEING

7    EXTREMELY LENIENT IN THAT REGARD, BUT IF YOU BLOCK YOUR CASE,

8    WE'LL MOVE FORWARD ON THAT DAY.

9              DO YOU HAVE ANY IDEA WHAT YOUR PREFERENCE IS AT 1:30?

10             WOULD YOU LIKE TO MAKE AN OPENING STATEMENT AND THEN

11   TESTIFY, OR WOULD YOU SIMPLY LIKE TO MOVE TO TESTIMONY UNDER

12   OATH?

13             WHAT IS YOUR PREFERENCE?

14             MS. PEMKOVA:  FIRST OF ALL, YOUR HONOR, WE HAVE TO

15   FINISH THE CROSS-EXAMINATION.

16             AM I RIGHT? -- GOVERNMENT AND --

17             THE COURT:  OH, I THOUGHT THAT HAD --

18             MS. PEMKOVA:  OR IT'S DONE?

19             THE COURT:  -- CONCLUDED, THE CROSS-EXAMINATION.

20             MS. PEMKOVA:  BUT WITH THE OTHER WITNESSES YOU HAD

21   ASKED ONE MORE TIME GOVERNMENT AND ONE MORE TIME DEFENSE.

22             IT DOESN'T APPLY IN THIS?

23             THE COURT:  WELL, NO.  THERE'S A REDIRECT AND A

24   RE-CROSS.

25             MS. PEMKOVA:  YES.

1              THE COURT:  BUT I -- I'M GOING TO LIMIT THE

2     GOVERNMENT NOW AT THIS POINT.  THIS IS UNDULY BURDENSOME.

3              I -- I JUST DON'T REALLY SEE RETRACING THIS EVIDENCE

4     OR MAKING THE ONE FINAL POINT.

5              DO YOU HAVE REDIRECT?

6              MR. KOLE:  I HAD -- I HAD A SMALL AMOUNT, YOUR HONOR.

7     IT WAS -- IT WAS QUITE BRIEF, BUT I UNDERSTAND THE COURT'S

8     POINT.

9              THE COURT:  ALL RIGHT.  I'LL CERTAINLY GIVE THAT TO

10    YOU.  BUT IT'S BRIEF.

11             MR. KOLE:  IT'S BRIEF.

12             THE COURT:  AND THE RE-CROSS --

13             MR. KOLE:  RIGHT.

14             THE COURT:  -- IS GOING TO BE EXTRAORDINARILY BRIEF.

15             MR. KOLE:  IT'S QUITE BRIEF.

16             THE COURT:  I THINK WE'RE DOWN TO MINUTIA FRANKLY.

17             AND THEN I'M GOING TO REASK THE QUESTION AGAIN.  THE

18    GOVERNMENT IS GOING TO BE RESTING SHORTLY.

19             MR. KOLE:  RIGHT.

20             THE COURT:  PROBABLY WITHIN MINUTES.

21             AND MY QUESTION IS YOUR RE-CROSS IS LIMITED TO THE

22    REDIRECT.  AND I THINK WE'RE GOING TO HOLD TO THAT.  AND WE'RE

23    GOING TO HOLD TO A BRIEF TIME PERIOD OF 10 TO 15 MINUTES AT THE

24    MOST WITH EACH OF YOU.  AND THAT'S IT.

25             MR. KOLE:  YOUR HONOR, THERE WAS THE ONE ISSUE WHERE

1    I INTERRUPTED --

2              THE COURT:  NO.  YOU STILL ARE.

3              NOW --

4              MR. KOLE:  I'M SORRY, YOUR HONOR.

5              THE COURT: -- I'M GOING TO COME BACK TO THE QUESTION.

6              YOU'RE GOING TO FIND VERY QUICKLY YOU'RE IN THE

7    POSITION OF DECIDING IF YOU'RE GOING TO MAKE AN OPENING

8    STATEMENT, WHICH IS NOT EVIDENCE, AND THEN TESTIFY UNDER OATH.

9    OR IF YOU WANT TO MOVE TO TESTIMONY UNDER OATH.

10             MS. PEMKOVA:  I HAVE AN OPENING STATEMENT AFTER THE

11   RECESS?

12             THE COURT:  YES.  AFTER THE GOVERNMENT RESTS.  SO, AS

13   SOON AS THE GOVERNMENT GOES THROUGH REDIRECT AND RE-CROSS, THE

14   GOVERNMENT WOULD REST.

15             COUNSEL IS GOING TO MAKE SOME MOTIONS ON YOUR BEHALF

16   TO PRESERVE THE RECORD, OR HE'LL TELL YOU WHAT THOSE MOTIONS

17   ARE UNDER RULE 27 AND -- 29.  I'M SORRY.

18             MS. PEMKOVA:  27?

19             MR. KOLE:  29.

20             THE COURT:  YEAH, 29.

21             AND IF NOT, I'LL MAKE THOSE MOTIONS ON YOUR BEHALF.

22   I WANT YOU PROTECTED EVEN IF COUNSEL WASN'T HERE.

23             BUT THEN I THINK WITHIN, YOU KNOW, A VERY SHORT

24   PERIOD OF TIME YOU'RE GOING TO HAVE TO MAKE THAT JUDGMENT CALL.

25             AND I DON'T WANT YOU FLOUNDERING IN FRONT OF THE

1    JURY.  SO, I PROBABLY DON'T NEED AN HOUR.  YOU GO -- OR NEED TO

2    KNOW THAT NOW.

3              YOU GO TO LUNCH.

4              MS. PEMKOVA:  THANK YOU.

5              THE COURT:  OKAY.  GO GET YOUR ENERGY FOR BOTH OF YOU

6    REFRESHED.  AND I'LL SIT HERE AND JUST WAIT FOR YOU.

7              HAVE A NICE LUNCH.

8              MS. PEMKOVA:  YOUR HONOR, ONE QUESTION.

9              WHEN ONE GOES THROUGH INDICTMENT, INDICTMENT HAS BEEN

10   NOT READ BY THE PROSECUTION AT THE BEGINNING OF THE TRIAL.

11             CAN WE DO IT NOW?

12             THE COURT:  COUNSEL.

13             MS. PEMKOVA:  I MEAN NOT NOW.  AFTER THE LUNCH?

14             MR. KOLE:  THE COURT HAD PREVIOUSLY SAID NOT TO DO

15   IT, BUT IF THE DEFENSE --

16             THE COURT:  I THOUGHT -- I THOUGHT --

17             MR. KOLE:  -- WOULD LIKE IT --

18             THE COURT:  -- THAT THIS INDICTMENT WAS PREJUDICIAL

19   TO YOU.

20             AND I WAS CONCERNED ABOUT THE PREAMBLE IN THIS

21   INDICTMENT, ET CETERA.  IT WAS -- IF YOU WILL, MY CONCERN THAT

22   IN THIS INDICTMENT THERE'S A LOT OF HEARSAY, A LOT OF

23   ACCUSATORY LANGUAGE.

24             AND IN A VERY OVERLY PROTECTIVE MANNER, QUITE

25   FRANKLY, I EXCLUDED THE GOVERNMENT BECAUSE I THOUGHT IT WOULD

1    BECOME CLEAR WHAT THE ESSENCE OF THE CHARGES WERE THROUGH THE

2    INSTRUCTIONS AND THE BARE-BONE CHARGES WHEN IT WENT TO THE

3    JURY.

4            AND, THEREFORE -- BUT IF YOU WANT TO READ THE

5    INDICTMENT, I'M NOT GOING TO STOP YOU.  BUT I JUST REALLY

6    CAUTION YOU TO TALK TO MR. STEWARD ABOUT THAT.

7            MS. PEMKOVA:  YOUR HONOR, MAY I -- WOULD YOU ALLOW ME

8    TO MAKE THE FINAL DECISION AFTER THE --

9            THE COURT:  ABSOLUTELY.

10           MS. PEMKOVA:  THANK YOU, YOUR HONOR.

11           THE COURT:  ABSOLUTELY.  YOU GO GET SOME REST AND

12   GET  --

13           MS. PEMKOVA:  I NEED THE REST.  I'M VERY TIRED.

14           THE COURT:  OKAY.

15           MR. KOLE:  YOUR HONOR, I'M SORRY.

16           AGAIN, IS IT --

17           THE COURT:  NO.

18           MR. KOLE:  I -- COUNSEL -- I'M SORRY.  IT WAS COUNSEL

19   STARTED TO INQUIRE ABOUT THESE EXHIBITS THAT WERE TRANSCRIPTS

20   FROM WHERE MS. PRIORE TESTIFIED IN ANOTHER CRIMINAL TRIAL.

21           AND I WAS JUST CONCERNED THAT DEPENDING ON WHERE SHE

22   WENT WITH THAT, IT COULD HAVE RAISED A WHOLE HOST OF ISSUES.

23   SHE ASKED A COUPLE OF QUESTIONS ABOUT WAS SHE A VICTIM.  I

24   THINK WE -- I JUST WANTED TO --

25           THE COURT:  MS. PEMKOVA'S TESTIMONY IN ANOTHER

1   CRIMINAL TRIAL IS HEARSAY.

2          MR. KOLE:  PRIORE'S TESTIMONY.

3          THE COURT:  AND MS. PRIORE'S TESTIMONY IS HEARSAY.

4          MR. KOLE:  EXACTLY.

5          THE COURT:  AND MOST OF THE OTHER TAPES PRODUCED BY

6   THE DEFENSE ARE TECHNICALLY HEARSAY.

7          SO, I THINK YOU SHOULD GO TO LUNCH.

8          MR. KOLE:  THANK YOU, YOUR HONOR.

9          THE COURT:  AND THOSE TAPES HAVE COME IN.  AND THE

10  GOVERNMENT HAS BEEN VERY GRACIOUS IN ALLOWING THEM IN.

11          (LUNCHEON RECESS, 12:52 P.M. TO 1:36 P.M.)

12          (JURORS ENTERING COURTROOM.)

13          THE COURT:  ALL RIGHT.  THE JURY IS PRESENT.  THE

14  ALTERNATES ARE PRESENT.  THE AGENT IS PRESENT.

15          IF YOU'D BE SEATED.

16          MS. PEMKOVA IS PRESENT.  MR. STEWARD AND MR. KALL --

17  OH, KOLE.  I'M SORRY.

18          AND THIS IS REDIRECT EXAMINATION.

19          AND COUNSEL HAVE BEEN FOREWARNED THAT THIS IS VERY

20  BRIEF.

21          COUNSEL.

22          MR. KOLE:  YES, YOUR HONOR.

23              (THOMAS REITZ, PREVIOUSLY SWORN.)

24

25

1                        REDIRECT EXAMINATION

2    BY MR. KOLE:

3    Q    AGENT REITZ, DURING YOUR CROSS-EXAMINATION YOU SAID THE

4    GOVERNMENT SUFFERED NO LOSS IN THE DEALINGS WITH MS. PEMKOVA,

5    PRIORE, AND ONCIU.

6    A    THAT'S CORRECT.

7    Q    WHY DID -- WHY WAS THERE NO LOSS IN THAT?

8    A    I WAS NOT AUTHORIZED TO SEND A MILLION DOLLARS TO THIS

9    TRANSACTION.

10   Q    DO YOU REMEMBER THERE'S BEEN A BIT OF DISCUSSION ABOUT

11   DAMJI, GARRICK, AND WENZEL.

12              DO YOU RECALL THAT?

13   A    YES.

14   Q    MS. PEMKOVA ASKED YOU ABOUT THOSE INDIVIDUALS AND YOUR

15   REQUEST TO BE INTRODUCED TO AN INVESTOR.

16              DO YOU REMEMBER THAT?

17   A    YES.

18   Q    WHY DIDN'T YOU CONTACT THOSE PEOPLE AS THE INVESTOR YOU

19   WERE LOOKING FOR?

20   A    THEY WEREN'T INVESTORS.  THEY WERE PROSPECTIVE INVESTORS.

21   THEY WERE APPLYING.

22   Q    WHAT WERE YOU LOOKING FOR?

23   A    I WAS LOOKING FOR PEOPLE WHO HAD ACTUALLY COMPLETED A

24   TRANSACTION.

25   Q    THERE WAS SOME DISCUSSION ON CROSS-EXAMINATION ABOUT A

1    SMALL START-UP COMPANY.  AND YOU SAID THAT SOMEBODY -- AN

2    INVESTOR COULD POTENTIALLY MAKE A SUBSTANTIAL PROFIT INVESTING

3    IN A SMALL START-UP COMPANY --

4    A    THAT'S --

5    Q    -- DO YOU RECALL THAT?

6    A    YES.

7    Q    WOULD SUCH AN INVESTMENT ENTAIL ANY RISK?

8    A    YES.

9    Q    AND WHAT ACTUALLY HAPPENS TO MOST SMALL START-UP

10   COMPANIES?

11   A    MOST OF THEM FAIL.

12   Q    DIRECTING YOUR ATTENTION NOW TO THE DISCUSSION ABOUT THE

13   BANK STATEMENTS THAT YOU SENT THAT SHOWED $10 MILLION OR A

14   LARGER AMOUNT.

15        DO YOU RECALL THAT?

16   A    YES.

17   Q    WHEN DID YOU AS TOM MOORE SEND THOSE STATEMENTS WITH THE

18   LARGER AMOUNTS TO MS. PEMKOVA.  WHAT MONTH?

19   A    SPECIFICALLY THOSE WERE IN AUGUST OF 2006.

20   Q    DID THAT FOLLOW A LENGTHY PERIOD WHERE THERE HAD BEEN NO

21   CONVERSATIONS BETWEEN YOU AND MS. PEMKOVA?

22   A    YES.

23   Q    WHY DID YOU SEND THOSE STATEMENTS?

24   A    SHE HAD ASKED ME TO SEND THEM.

25   Q    DURING THE CONVERSATION WHEN SHE ASKED FOR THOSE HAD YOU

1    FIRST ASKED FOR SOMETHING ELSE FROM HER?

2    A    YES.  I HAD ASKED FOR SOME CONTRACT DOCUMENTS.

3    Q    DID SHE CHANGE THE SUBJECT AND ASK FOR THE STATEMENTS?

4    A    SHE SAID IT WOULD BE BEST TO SEND A BANK STATEMENT, YES.

5    Q    AND IN THAT -- THAT AND THE CONVERSATION CLOSE TO IT, WAS

6    SHE PRESENTING A POSSIBILITY OF A NEW INVESTMENT IDEA?

7    A    YES.

8    Q    HOW LARGE?

9    A    ONE MILLION.

10   Q    DID YOU NEED 10 MILLION OR 85 MILLION FOR THAT INVESTMENT

11   ACCORDING TO HER?

12   A    NO.

13   Q    NOW, DIRECTING YOUR ATTENTION TO THE TSI CONTRACTS.

14   A    YES.

15   Q    KEEP IN MIND YOU GOT THE FIRST ONE FROM PALLE KROEIS OR

16   BEATA PRIORE?

17   A    YES.

18   Q    AND AT SOME POINT DID YOU SEND AT THE END A SIGNED VERSION

19   BACK?

20   A    YES.

21   Q    FROM THAT FIRST ONE YOU GOT TO THE SIGNED ONE YOU SENT

22   BACK, WERE THEY DIFFERENT?

23   A    THERE WERE NO MATERIAL DIFFERENCES.

24   Q    DO YOU RECALL MS. PEMKOVA REFERRING TO A PRELIMINARY TSI

25   CONTRACT AND A FINAL ONE?

1    A     YES.

2    Q     WAS THERE A PRELIMINARY AND A SEPARATE FINAL ONE?

3    A     NOT THAT I RECALL, NO.

4    Q     CAN YOU PLEASE TAKE EXHIBIT 197.

5          MR. KOLE:  AND THAT'S A NEW ITEM THAT HAS NOT BEEN

6    PUT IN EVIDENCE YET.

7          MS. PEMKOVA:  MAY I OBJECT.

8          OBJECTION.

9          AND, MR. KOLE, IT WAS DR. PRIORE WHO MENTIONED THE

10   WORD "PRELIMINARY CONTRACT" NOT DEFENDANT PEMKOVA.

11         THE COURT:  OKAY.

12         AND THE NUMBER AGAIN, COUNSEL.

13         MR. KOLE:  1-9-7.

14   BY MR. KOLE:

15   Q     AGENT REITZ, JUST TO FOLLOW UP ON MS. PEMKOVA'S COMMENT,

16   REGARDLESS OF WHO USED THE TERM "PRELIMINARY," MY QUESTION TO

17   YOU IS JUST AS A MATTER OF FACT, THE DOCUMENTS YOU GOT, WAS

18   THERE A PRELIMINARY VERSION THAT WAS LATER CHANGED INTO A FINAL

19   VERSION?

20   A     NO.  THEY WERE THE SAME.

21   Q     DO YOU HAVE 197?

22   A     YES.

23   Q     WHAT IS IT?

24   A     IT IS AN EMAIL FROM MYSELF TO DR. PEMKOVA ATTACHING THE

25   TSI CONTRACT.

1    Q    AND DOES IT INCLUDE BOTH THE EMAIL AND THE ATTACHMENT?

2    A    YES.

3    Q    NOW, EARLIER IN THE TRIAL DID I SHOW YOU, AND DID YOU LOOK

4    AT, AND DID WE OFFER IN EVIDENCE, ANOTHER COPY OF THIS SAME

5    ITEM?

6    A    YES.

7    Q    HOW IS THIS ONE DIFFERENT?

8    A    THIS ONE INCLUDES A PAGE -- PAGE 9 OF 16.  THERE WAS NONE

9    ON THE PRIOR COPY.

10   Q    WAS THE PRIOR ONE -- DID IT INADVERTENTLY OMIT THAT

11   PARTICULAR PAGE?

12   A    YES.

13   Q    NOW, TO CREATE THE VERSION THAT YOU'RE LOOKING AT, DID YOU

14   GO BACK TO THE ORIGINAL DIGITAL COMPUTER RECORDS OF THE EMAIL?

15   A    YES.

16   Q    AND HAVE YOU COMPARED THIS PRINT-OUT TO THAT ORIGINAL TO

17   SEE THAT THIS ONE IS A COMPLETE VERSION?

18   A    YES.

19           MR. KOLE:  GOVERNMENT OFFERS EXHIBIT 197, YOUR HONOR.

20           THE COURT:  RECEIVED.

21           (GOVERNMENT'S EXHIBIT 197 RECEIVED.)

22   BY MR. KOLE:

23   Q    DIRECTING YOUR ATTENTION NOW TO THE QUESTIONS MS. PEMKOVA

24   ASKED I THINK IT WAS THIS MORNING ABOUT CONTACTING THE LENDING

25   BANK.  AND SHE ASKED YOU IF YOU WERE PERMITTED UNDER THE TSI

1    AGREEMENT TO CONTACT THE BANK THAT WAS TO LEND THIS 10 OR 11

2    MILLION EUROS.

3                 DO YOU RECALL THAT?

4    A    YES.

5    Q    WAS THAT LENDING BANK THE ENTITY THAT WAS ACTUALLY GOING

6    TO SEND YOU THE MONEY, WAS THAT IDENTIFIED ANYWHERE IN THE

7    DOCUMENTS?

8    A    NOT THAT I RECALL.

9    Q    IF YOU HAD WANTED TO CONTACT THEM AS TOM MOORE, DID YOU

10   HAVE THE INFORMATION YOU NEEDED TO JUST GO AHEAD AND CONTACT

11   THEM?

12   A    NOT WHAT I WAS GIVEN, NO.

13   Q    DO YOU RECALL THE CONVERSATION, THE CONFERENCE CALL

14   BETWEEN YOURSELF AND MS. PEMKOVA AND ONCIU?

15   A    YES.

16   Q    AT THE BEGINNING OF THAT CONVERSATION DID MS. PEMKOVA

17   VOLUNTEER SOME INFORMATION ABOUT THE TSI CONTRACT?

18   A    SHE DID.

19   Q    DID THAT COME AFTER QUESTIONS THAT YOU POSED TO HER?

20   A    NO.

21   Q    DID SHE VOLUNTEER HER OPINION OF IT?

22   A    YES.

23                 MS. PEMKOVA:  OBJECTION.

24                 THERE WAS AN EMAIL ASKING TO COME IN OR MEET WITH THE

25   -- MR. THOMAS MOORE, WHICH HE SEND WITH THIS CONTRACT.  IT WAS

1   --

2           THE COURT:  THANK YOU.

3   BY MR. KOLE:

4   Q    JUST A -- JUST A FOLLOW-UP ON THAT.

5           YOU HAD SENT THE CONTRACT TO MS. PEMKOVA FOR HER TO

6   LOOK AT, RIGHT?

7   A    YES.

8   Q    BUT DURING THE ACTUAL CONVERSATION OVER THE PHONE, WERE

9   HER COMMENTS PRECEDED BY YOU ASKING QUESTIONS OF HER?

10  A    NO.

11  Q    NOW, LET'S TALK FOR A MOMENT ABOUT THIS BEVERLY HILLS

12  INVESTMENT WE'VE HEARD A LOT ABOUT.

13  A    YES.

14  Q    DO YOU REMEMBER THAT DISCUSSION?

15  A    YES.

16  Q    BEFORE YOU WENT TO BEVERLY HILLS AND MET WITH HER, DID

17  MS. PEMKOVA DESCRIBE TO YOU AN INVESTMENT THAT COULD MAKE 48

18  PERCENT PER MONTH OR MORE?

19  A    YES.

20  Q    DID YOU MEET WITH THIS MR. ROBISON AT SOME POINT?

21  A    YES.

22  Q    DID HE DESCRIBE TO YOU AN INVESTMENT THAT COULD MAKE 50

23  PERCENT PER MONTH OR MORE?

24           MS. PEMKOVA:  OBJECTION.

25           MR. KOLE, THERE WAS ONE MORE I THINK 500 PERCENT --

1    PLACEMENT IN BEVERLY HILLS.  IT WAS ONE AFTER.

2    BY MR. KOLE:

3    Q    WELL, LET'S TAKE THAT.

4            DID MR. ROBISON DESCRIBE TO YOU AN INVESTMENT THAT

5    WOULD YIELD 50 PERCENT PER MONTH OR EVEN 3- OR 4-, 500 PERCENT?

6    A    NO.

7    Q    WHAT TYPE OF INVESTMENT DID HE DESCRIBE WHEN YOU MET WITH

8    HIM?

9    A    IT APPEARED TO BE A STANDARD INVESTMENT IN A START-UP

10   COMPANY.

11   Q    AND WOULD THE INVESTOR IN THAT HAVE TO ACTUALLY SEND OR

12   GIVE SOME MONEY TO INVEST?

13   A    YES.

14   Q    COULD THE INVESTOR JUST LEAVE THE MONEY SITTING IN THEIR

15   OWN BANK ACCOUNT NOT EVER HAVING IT LEAVE AND STILL BE AN

16   INVESTOR ACCORDING TO MR. ROBISON?

17   A    MY RECOLLECTION IS, NO, THAT WAS NOT AN OPTION.

18   Q    DID YOU HAVE A CHANCE TO LOOK BACK AT DATA FOR DECEMBER OF

19   2006 TO SEE WHAT THE TYPICAL 10-YEAR TREASURY NOTE RATE WAS AT

20   THAT TIME?

21   A    YES.

22   Q    WHAT DID YOU FIND?

23   A    IT WAS 4.61 FOR TREASURY BILLS BETWEEN THE RANGE OF 1 TO

24   10 YEARS.

25   Q    AND WHAT ABOUT FOR A TYPICAL 30-YEAR RESIDENTIAL WHAT THEY

1    CALL "JUMBO MORTGAGE RATE," AT THAT SAME TIME WHAT WERE BANKS

2    LENDING AT?

3    A    APPROXIMATELY 6.23 PERCENT.

4    Q    DO YOU RECALL MS. PEMKOVA ASKING YOU ABOUT HER DESCRIPTION

5    JUST PRIOR TO GETTING THE TSI DOCUMENTS AND SHE WAS SAYING --

6    SHE DESCRIBED MONEY GOING TO A GERMAN BANK.  AND THE FUNDS

7    BEING GUARANTEED.

8             DO YOU REMEMBER THAT DISCUSSION?

9    A    YES.

10   Q    AND SHE WAS CONTRASTING -- DO YOU REMEMBER HER CONTRASTING

11   THAT WITH THE TSI DEAL?

12   A    YES.

13   Q    DID YOU AT SOME POINT TALK TO THIS MR. DE LA VINGNE, THE

14   ESCROW?

15   A    YES.

16   Q    DID HE USE THE TERM "GUARANTEE" TO DESCRIBE A TSI DEAL?

17   A    YES, HE DID.

18   Q    WHAT DID HE SAY ABOUT IT?

19   A    HE SAID THAT THE AMOUNT INVESTED IS GUARANTEED.

20   Q    AND MS. PEMKOVA I THINK ASKED YOU SOME QUESTIONS ABOUT

21   WHETHER YOU HAD EVER GOTTEN ANY CONTRACTS FROM HER.

22             DO YOU RECALL THAT?

23   A    YES.

24   Q    COULD YOU TAKE A LOOK AT EXHIBIT 122.

25   A    ALL RIGHT.  I HAVE THAT.

1   Q    DID WE DISCUSS THAT DOCUMENT BEFORE?

2   A    YES.

3   Q    WHAT WAS IT?

4   A    THIS IS AN EMAIL FROM DR. PEMKOVA TO TOM MOORE FROM

5   DECEMBER 11TH, 2006.  IT HAS AN ATTACHMENT.

6   Q    DID SHE SEND SOMETHING TO YOU WITH THAT EMAIL?

7   A    YES, AN ESCROW DEPOSIT AGREEMENT.

8   Q    DID IT LOOK LIKE A FORM OF A CONTRACT?

9   A    YES.

10          MS. PEMKOVA:  OBJECTION.  IT WASN'T A CONTRACT.  IT

11   WAS JUST ESCROW AGREEMENT.  BIG DIFFERENCE BETWEEN ESCROW

12   AGREEMENT AND CONTRACT.

13   BY MR. KOLE:

14   Q    AGENT REITZ, IS A CONTRACT A TYPE OF AGREEMENT?

15   A    YES.

16   Q    AND THEN FINALLY, DIRECTING YOUR ATTENTION TO THE

17   QUESTIONS MS. PEMKOVA ASKED YOU ABOUT THE INTERVIEW YOU DID

18   WITH HER AS YOURSELF, AS AGENT REITZ.

19   A    YES.

20   Q    SHE ASKED YOU WHETHER SHE WAS -- SEEMED TO BE HIDING

21   ANYTHING DURING THE INTERVIEW.

22   A    YES.

23   Q    DURING THE INTERVIEW DID YOU ASK HER ABOUT STATEMENTS SHE

24   HAD MADE TO TOM MOORE?

25   A    YES.

1    Q    AT THAT TIME WHEN YOU ASKED THOSE QUESTIONS, AT FIRST, HAD

2    YOU TOLD HER THAT THOSE CALLS HAD BEEN RECORDED?

3    A    I DID NOT.

4    Q    WHEN YOU ASKED HER ABOUT THOSE CALLS, DID SHE ACCURATELY

5    DESCRIBE WHAT HAPPENED DURING THEM?

6    A    NOT ALWAYS, NO.

7            MR. KOLE:  NOTHING FURTHER.

8            THE COURT:  AND DO YOU HAVE QUESTIONS OF THE WITNESS,

9    MS. PEMKOVA.

10           MS. PEMKOVA:  YES, I DO.

11                       RECROSS-EXAMINATION

12   BY MS. PEMKOVA:

13   A    AGENT REITZ, DO YOU RECALL THAT IN THIS FIRST -- SECOND

14   CALL WITH WILLIAM ELDER ARRANGING THE MEETING IN BEVERLY HILLS

15   THERE WERE SEVERAL TRANSACTIONS PROPOSED?

16   A    I RECALL A PRIVATE PLACEMENT BEING DIFFERENTIATED FROM THE

17   ONE THAT HAD THE 48 PERCENT MINIMUM --

18   Q    UH-HUM.

19   A    -- PER MONTH.

20   Q    UH-HUM.

21           DID YOU MAKE ANY -- ANY CONNECTION WITH THIS 5- TO

22   600 PERCENT WITHIN SIX MONTHS WHICH WAS STATED THERE?

23   A    I'M SORRY.  A CONNECTION, WHAT DO YOU MEAN?

24           MR. KOLE:  OBJECTION.  VAGUE AND AMBIGUOUS.

25           THE COURT:  WELL, DO YOU UNDERSTAND THE QUESTION?

1          THE DEFENDANT:  NO, SIR.  NOT WITH THE WORD

2    "CONNECTION."

3          THE COURT:  ALL RIGHT.

4          SUSTAINED.

5    BY MS. PEMKOVA:

6    Q    OKAY.  REGARDING THAT GERMAN BANK AND YOUR OWN -- MR.

7    MOORE'S OWN ACCOUNT IN GERMANY, IS IT A DIFFERENCE IN THE

8    COMPARISON OF -- AND MONEY GOING THROUGH ESCROW?

9          IS IT A DIFFERENCE?

10   A    YES, BECAUSE THE BELGIUM BANK WOULD BE UNDER THE NAME OF

11   THE --

12   Q    CORRECT.

13   A     -- ATTORNEY DE LA VINGNE.

14   Q    THANK YOU.

15          IN 2006 AND BEGINNING OF 2007 YOU HAVE SEEN THE LAST

16   NAME OF THE DEFENDANT PEMKOVA MANY, MANY TIMES, CORRECT?

17   A    YES.

18   Q    NOTWITHSTANDING IN 2008, YOU HAVE PRODUCED IN AUGUST --

19   NO, IN MARCH YOU HAVE PRODUCED THE INTERVIEW WITH THE DEFENDANT

20   WITH DIFFERENT SPELLING.

21   A    YES.

22   Q    WHY?

23   A    THAT -- THAT WAS A MISTAKE.  AND I -- YEAH, IT WAS A

24   MISTAKE IN THE TYPO.

25   Q    UH-HUM.  AND ON GRAND JURY INDICTMENT THERE IS A WRONG

1    NAME AS WELL.

2              WHY?

3    A    AGAIN, THAT -- THAT WAS AN ERROR USING THE "E" FOR PEMKOVA

4    INSTEAD OF "I."

5    Q    UH-HUM.

6              THANK YOU.

7              MS. PEMKOVA:  NO FURTHER QUESTIONS.

8              THE COURT:  OKAY.

9              YOU MAY STEP DOWN.  THANK YOU.

10             COUNSEL ON BEHALF OF THE GOVERNMENT.

11             MR. KOLE:  YOUR HONOR, THE GOVERNMENT RESTS.

12             THE COURT:  ALL RIGHT.

13             NOW, WE'VE BEEN GOING OVER THE EXHIBITS DURING THE

14   EVENING.  AND EACH OF YOU HAVE VIEWED THOSE EXHIBITS.

15             MS. PEMKOVA:  YOUR HONOR --

16             THE COURT:  PARDON ME?

17             MS. PEMKOVA:  MAY I FILE UNDER THE RULE 29 FOR THE

18   MOTION OF ACQUITTAL.

19             THE COURT:  YES.  AND I'LL TAKE THAT UP OUTSIDE THE

20   JURY FOR JUST A MOMENT.

21             MS. PEMKOVA:  THANK YOU.

22             THE COURT:  AND I APPRECIATE THAT.  WE'LL BOOKMARK

23   THAT.

24             DURING THE EVENING HOURS AND ALONG THE WAY I'VE ASKED

25   DEBBIE TO WORK WITH BOTH OF YOU.

1              ARE YOU SATISFIED ON THE GOVERNMENT'S PART THAT THE

2       EXHIBITS YOU'VE REQUESTED AND THE COURT HAS RECEIVED ARE

3       ACCURATE WITH THE COURT RECORDS?

4              MR. KOLE:  I WAS THROUGH IT LAST NIGHT, YOUR HONOR.

5       THE ONLY THING I DON'T KNOW OBVIOUSLY IS WHAT'S HAPPENED JUST

6       THIS MORNING AND TODAY.

7              THE COURT:  WELL, SUBJECT TO THE --

8              MR. KOLE:  CORRECT.

9              THE COURT:  -- DISCRETION OF THE COURT.

10             MS. PEMKOVA, UNTIL LAST EVENING, OF COURSE, I WANTED

11      EACH OF YOU TO GO HOME A LITTLE EARLY LAST EVENING INSTEAD OF

12      9:00 OR 10:00, THOSE EXHIBITS WERE UP TO DATE.

13             BUT JUST TO MAKE CERTAIN CONCERNING THE EXHIBITS

14      TODAY, SUBJECT TO THOSE EXHIBITS, ARE YOU SATISFIED WITH THE

15      COURT RECORD?

16             MS. PEMKOVA:  YES, YOUR HONOR.  BUT THERE WOULD BE

17      MOTION FILED FOR PUTTING PROSECUTION UNDER THE OATH TO CONFIRM

18      ALL EVIDENCE HAS BEEN DISCLOSED.

19             THE COURT:  ALL RIGHT.

20             THANK YOU.

21             WELL, THEN THE GOVERNMENT HAS RESTED.

22             OUT OF YOUR PRESENCE WE CAN GO OVER THE EXHIBITS

23      AGAIN FROM TODAY.  I DON'T NEED TO TAKE YOUR TIME OR HAVE YOU

24      GO BACK AND SIT.

25             MS. PEMKOVA, WOULD YOU LIKE TO MAKE AN OPENING

1    STATEMENT OR WOULD YOU LIKE TO PROCEED TO DIRECT TESTIMONY

2    UNDER OATH?

3              MS. PEMKOVA: -- OPENING STATEMENT.

4              BUT, YOUR HONOR, I WAS ASKING FOR AN INDICTMENT WHICH

5    HASN'T BEEN READ AT THE BEGINNING.

6              THE COURT:  I CAN DO THAT.  I THINK IF IT MEETS WITH

7    YOUR APPROVAL AND THE GOVERNMENT'S APPROVAL, I'D LIKE TO NOT

8    READ THE PREAMBLE TO THAT.

9              THERE ARE MANY THINGS IN THE PREAMBLE THAT ARE

10   CONCLUSIONARY AND SUBJECT TO A JURY.

11             I THINK IT WOULD BE SUFFICIENT AT THE PRESENT TIME IF

12   I HAD THE GOVERNMENT SIMPLY READ THE CHARGED ALLEGATIONS

13   BEGINNING WITH THE SUBSTANTIVE COUNT.

14             AND WOULD THAT MEET WITH YOUR APPROVAL?

15             MS. PEMKOVA:  NO.  I'M VERY SORRY, YOUR HONOR.  BUT

16   WE EITHER READ IT ALL OR WE DON'T -- OR WE DON'T READ IT AT

17   ALL.

18             MAYBE WE CAN SKIP IT.  THANK YOU, YOUR HONOR.

19             THE COURT:  ALL RIGHT.

20             THEN, WOULD YOU LIKE TO MAKE AN OPENING STATEMENT OR

21   WOULD YOU LIKE TO PROCEED TO TESTIMONY UNDER OATH?

22             MS. PEMKOVA:  I WILL GO FOR THE OPENING STATEMENT.

23             THE COURT:  ALL RIGHT.  PLEASE.

24             MS. PEMKOVA:  MAY I DO IT FROM THERE?

25             THE COURT:  YOU CAN REMAIN SEATED IF YOU'D LIKE TO

```
 1   WITH YOUR NOTES.

 2              MS. PEMKOVA:  NO.  I WOULD PREFER TO STAND.

 3              THE COURT:  OKAY.  AND I'LL USE MY DISCRETION.

 4              AND WE'LL ASK THAT YOUR OPENING STATEMENT BE LIMITED

 5   BECAUSE YOU'RE GOING TO BE TESTIFYING APPARENTLY IN JUST A FEW

 6   MOMENTS.

 7              MS. PEMKOVA:  HOW MUCH LIMIT?

 8              THE COURT:  WELL, IT'S NOT A MATTER OF TIME.  IT'S A

 9   MATTER OF THAT THE JURY IS GOING TO HEAR TWICE.

10              AND LET ME INFORM YOU THAT MS. PEMKOVA IS NOT UNDER

11   OATH RIGHT NOW.  IT'S AN ODDITY.  SINCE SHE REPRESENTS HERSELF,

12   SHE'S ACTUALLY GIVING AN OPENING STATEMENT.  BUT IT'S NOT TO BE

13   ACCEPTED AS EVIDENCE.  THE EVIDENCE WILL COME IN A SHORT PERIOD

14   OF TIME WHEN MS. PEMKOVA IS UNDER OATH AND THEN TESTIFIES.

15              SO, YOU HAVE THIS ODDITY IN A SENSE OF HEARING

16   POTENTIALLY TWICE.

17              SO, MS. PEMKOVA.

18              MS. PEMKOVA:  YOUR HONOR, I WILL DO MY BEST FOR NOT

19   TO --

20              THE COURT:  PEMKOVA.

21              MS. PEMKOVA: -- COMBINE IT.

22                   DEFENSE OPENING STATEMENT.

23              MS. PEMKOVA:  HONORABLE JURORS AND HONORABLE JUDGE

24   CARTER AND PROSECUTION, SO FAR WE HAVE HEARD VERY BAD --

25              THE COURT:  NO.  NO.  THIS IS ABOUT EVIDENCE.
```

1       WHAT ARE YOU GOING TO PRESENT.

2       MS. PEMKOVA:  OKAY.

3       THE COURT:  IT'S NOT AN ARGUMENT NOW.

4       MS. PEMKOVA:  NO.  I'M NOT GOING TO ARGUE.

5       THE COURT:  PLEASE.

6       MS. PEMKOVA:  BECAUSE THERE WAS NO --

7       THE COURT:  MS. PEMKOVA.

8       MS. PEMKOVA:  BECAUSE THERE WAS NO PRESENTATION OF

9  THE PEOPLE INVOLVED, WHO THEY ARE AND WHO THEY ARE DOING.

10  LET'S TAKE IT AS A THREE MOVIES.

11       IN THE FIRST MOVIE I WILL TAKE IT IN OPENING

12  STATEMENT INTO THE BIG TRAVEL AROUND THE WORLD DESCRIBING WHO

13  DEFENDANT IS.

14       IN THE SECOND MOVIE I WILL TAKE YOU TO THE HORROR.

15       AND IN THE THIRD MOVIE I WILL HELP YOU TO IMPROVE

16  YOUR LOGICAL SKILLS.

17       WHO THE DEFENDANT IS.

18       BORN IN EUROPE IN GERMAN/FRENCH DESCENT FAMILY.  BORN

19  WITH A COMMUNITY -- AND CONSEQUENTLY LIVING IN A VERY SPECIAL

20  ENVIRONMENT RAISED BY UNIVERSITY PROFESSORS, GRANDPARENTS AND

21  THEIR PARENTS.

22       THANKS TO A VERY SPECIAL EDUCATION AND HER VERY HIGH

23  INTELLIGENCES SHE PROCEEDS TO THE -- DEFENDANT PROCEED TO THE

24  FIRST UNIVERSITY IN VERY -- VERY EARLY AGE.

25       WOULD GIVE HER AND -- GAVE HER AN EXCELLENT CHANCE TO

1  BE EXPOSED TO AN UNUSUAL POSSIBILITY OBSERVING VARIOUS

2  KNOWLEDGE, VARIOUS EDUCATION.

3       HER FIRST DESTINATION FOR THE FIRST UNIVERSITY WAS

4  MOSCOW.  TIME OF THE U.S.S.R. WHEN EVERYTHING WAS FOR FREE.

5  ANYONE WHO WAS WILLING THEN STUDY ANYWHERE HE WANTS AND

6  WHATEVER HE WANTS.  ONLY REQUIREMENT WAS TO STUDY EFFICIENTLY

7  -- WHAT ACTUALLY DEFENDANT WAS DOING.

8       IN A VERY SHORT PERIOD OF TIME SHE ACCOMPLISHED THE

9  FIRST UNIVERSITY.  SHE WENT TO THE SECOND ONE.  THE REASON WHY

10  SHE WAS ABLE TO DO THAT WAS AGAIN HER HEALTH ISSUE -- HEALTH

11  ISSUES.  AFTER FIRST YEAR HER HEALTH ISSUES CAUSED ALMOST A

12  BREAK, WHICH GAVE HER -- TO HAVE INDIVIDUAL PLAN, MEANING SHE

13  WAS STUDYING SIMULTANEOUSLY IN DIFFERENT UNIVERSITIES.

14       THIS VERY BROAD EXPOSURE TO KNOWLEDGE ON A VERY HIGH

15  LEVEL CAUSED THE FACT -- THAT EVEN IN HER FIRST "DECERTICY"

16  PAPERS SHE ACCOMPLISH OR SHE ATTEMPTED AND DID ACCOMPLISH A

17  VERY INTERESTING MOMENT INTERDISCIPLINARY RESEARCH.

18       AND PLEASE IMAGINE MOSCOW 1989 OR '88 WAS STILL A

19  COMMUNIST COUNTRY.

20       THE DEFENDANT TOOK A RISK TO CHALLENGE AND CRITICIZE

21  THE MAIN POLITICAL, ECONOMICAL, SOCIAL, ETHICAL DOCTRINE OF

22  COMMUNIST SYSTEM, CRITICIZING WHAT WAS WRONG, WHAT SHOULD BE

23  CHANGED.  SHE ACCOMPLISHED THE INTERDISCIPLINARY TASK AND

24  PRACTICALLY SHOULD BE HAVING DEGREE HIGHER THAN PHD, WHICH

25  DOESN'T EXIST IN THE UNITED STATES.

1           AND WHILE SHE WAS STUDYING A BROAD AREA OF THE

2     VARIOUS DISCIPLINES AND SHE UNDERSTOOD WHAT SHE ACCOMPLISHED --

3     PIECE OF PAPER WHICH SHE CAN GO -- WHICH SHE GOES THROUGH A

4     HUNDRED PERCENT BY THE BOSS, MEANING THERE WAS NOBODY AGAINST

5     IT.

6           SHE UNDERSTOOD SHE HAS A POSSIBILITY TO GO FURTHER

7     DESPITE HOW MEGALOMANIA IT MIGHT SOUND.  SHE MIGHT BE ABLE TO

8     PUT HER OWN AREA IN SCIENCE.  SHE IS NOT MARRIED.  SHE DOESN'T

9     HAVE KIDS.  HER LIFE WAS STUDYING, RESEARCHING, AND CREATING

10    SOMETHING.

11          THIS INTERDISCIPLINARY RESEARCH BROUGHT HER HEALTH

12    ISSUES, BROUGHT HER TO VARIOUS PLACES AROUND THE WORLD.  AGAIN,

13    IT WAS A COMMUNIST TIME.  AND SHE WAS AN EXCELLENT VERY YOUNG

14    STUDENT HAVING A CHANCE TO STUDY EVEN ON MONEY IN FRANCE, IN

15    ASIA, AND IN DIFFERENT COUNTRIES, EXPOSING HER TO VARIOUS

16    PHILOSOPHICAL SYSTEMS AND VARIOUS KNOWLEDGE WHICH SHE LATER

17    IMPLEMENTED IN HER OWN WORK.

18          STUDYING SIMULTANEOUSLY IN ONE OF HER UNIVERSITIES

19    SHE WAS STILL WORKING FOR TWO YEARS IN POLAND -- AGAIN, GETTING

20    PIECES OF INFORMATION FOR HER BROAD INTERDISCIPLINARY RESEARCH.

21    AND SHE WAS WORKING BASICALLY IN TWO VARIOUS AREAS -- NOT

22    EXACTLY MEDICINE, MEDICINE BUT RATHER A PROGRAM OF REJUVENATION

23    AND PSYCHOLOGICAL, PHILOSOPHICAL, POLITICAL, ECONOMICAL AREA

24    FOR CONNECTING BOTH INTERDISCIPLINARY RESEARCHES.

25          WHEN SHE STUDIED IN INDIA, IN CHINA, SHE GOT EXPOSED

1    TO A VERY SERIOUS IMPACT OF THE PHILOSOPHICAL SYSTEM, POLITICAL

2    SYSTEMS, AND, OF COURSE, CONTACTS.

3            WHEN SHE CAME BACK FROM THAT TRIPS, SHE WAS STILL

4    STUDYING.  BUT AT THE SAME TIME SHE STARTED OPENING HER OWN

5    COMPANY.  BECAUSE THE RESEARCH HAS BEEN DONE ON A HIGH-ENOUGH

6    LEVEL THAT SHE WOULD TAKE A RISK TO IMPLEMENT IT PRACTICALLY,

7    MEANING KNOWLEDGE ACHIEVED FROM THE TENS OF YEARS OF STUDY SHE

8    IMPLEMENTED PRACTICALLY.  AND WE GOT HER PROGRAM OF

9    REJUVENATION.

10           THIS IS A PHOTO OF HER BOOK MADE.

11           (ITEM DISPLAYED.)

12           MS. PEMKOVA:  THIS IS A BOOK MADE OUT OF ARTICLES

13   WRITTEN ABOUT HER AND HER COMPANY IN ONE COUNTRY.  SHE HAS

14   SEVERAL UNIVERSITY PAPERS, MEANING ACADEMIC PAPERS, ACADEMIC

15   ARTICLES.  THESE ARE ARTICLES ABOUT HER AND HER SUCCESS.  THIS

16   BOOK WOULD NEVER APPEAR IF SHE WOULDN'T DECIDE IN ONE DAY --

17   AND IT WAS 1997 -- TO ARRIVE -- TO TRAVEL AND TO POTENTIALLY

18   LIVE IN UNITED STATES.

19           BECAUSE SHE WAS A FOREIGNER SHE WAS REQUESTED TO

20   PROVIDE ADDITIONAL INFORMATION FOR IMMIGRATION AND

21   NATURALIZATION.  ARTICLES ABOUT HER AND HER PROGRAM WERE NOT

22   JUST A LITTLE TINY PIECE BUT FULL PAGE.  THIS IS FROM THE TIME

23   WHEN ARTICLE IN PRESTIGIOUS MAGAZINE, IT WASN'T A BLOG ON THE

24   INTERNET.  AND NONE OF THESE ARTICLES IS A P.R. OR FAKE

25   ADVERTISING.

1          WHEN SHE ARRIVED FROM HER MARKETABLE STUDIES TO A

2     LITTLE COUNTRY CALLED CZECHOSLOVAKIA.  AND THERE WAS A MAIN

3     OFFICE FOR FOUR YEARS WITH A LIMITED KNOWLEDGE OF LANGUAGE,

4     WHICH IS VERY COMPLICATED.  SHE STILL ESTABLISHED WITHIN ONE

5     YEAR EXTREMELY SUCCESSFUL COMPANY, COMPLETING THE INFORMATION

6     WITH HER TWO INDEPENDENT AREAS BASICALLY REJUVENATION OF

7     MEDICINE AND GOING TO THE POLITICAL, ECONOMICAL, PHILOSOPHICAL

8     ASPECT BECAUSE HER IDEA WAS TO CONNECT AS I KNEW DEPARTMENT IN

9     THE SCIENCE.

10          INS, IMMIGRATION AND NATURALIZATION REQUESTED FROM

11     HER TRANSLATIONS.  WHEN IT CAME TO THE LIGHT THAT WHAT WAS

12     POSSIBLE TO GATHER IT IN ONE AND A HALF YEAR OUT OF -- OUT OF

13     FIVE WAS ABOUT 700 -- 700 SOMETHING.  THEY ASKED ASSISTANCE TO

14     GET OUT OF THE MAGAZINES AND NEWSPAPERS.

15          SHE DIDN'T HAVE ANY ADVERTISING ON THE INTERNET

16     BECAUSE WHAT FOR.  IT'S A VERY PRIVATE, A VERY PERSON-ORIENTED

17     PROGRAM, WHICH IS BASICALLY SAYING IT IN A VERY SIMPLE WAY,

18     TEACHING PEOPLE HOW TO SLOW DOWN AGING PROCESS WITHOUT PLASTIC

19     SURGERY, MEDICATION, ET CETERA, ET CETERA.

20          IN UNITED STATES SHE DEVELOPED A VERY -- A VERY

21     SUCCESSFUL WEBSITE.  NAME OF THE COMPANY SHE MADE A BIG

22     MISTAKE.  SHE PUT IT UNDER HER OWN NAME.  AND IT CAUSED LATER A

23     LOT OF PROBLEMS.  BUT IF YOU WILL GO NOW ON THE SEARCH ENGINES

24     AND BREAK THE WORDS FROM HER WEBSITE, THERE WERE COMPANIES WHO

25     WERE COPYING IT JUST FOR -- TO GET ON TOP OF THE SEARCH ENGINE.

1    SHE WAS FORTUNATE.  FIRST TIME IN LAW SCHOOL AND TRAVELING AND

2    STUDYING AROUND THE WORLD.  AND SHE WAS VERY FORTUNATE THAT

3    CREATING THAT -- THAT SIDE AFTER PAINFUL LOSSES WHICH BY THEN

4    THE WEB MASTERS SHE COULD -- AND THE WEBSITE WAS ON THE TOP OF

5    ALL SEARCH ENGINES.

6         HERE IS A PART OF HER PROGRAM, BODY PART.  THIS

7    PROGRAM OF REJUVENATION HAS HAD A PHYSICAL, PHYSIOLOGICAL, AND

8    MENTAL PART.

9         THAT'S WHY WHEN SHE DECIDED BESIDE JUST COMING AND

10   GOING TO THE UNITED STATES SHE -- WHEN SHE DECIDED TO FILE FOR

11   AN ENTIRE PROCESS OF IMMIGRATION AND NATURALIZATION, SHE WAS --

12   BY INS IN THE HIGHEST CATEGORY OF ALIEN OF EXTRAORDINARY

13   ABILITY.

14        THIS IS SOMETHING WHAT -- IT'S -- BY INS FOR LAUREATE

15   -- LAUREATE OF NOBEL PRIZE TOPPED UP SPORTSMAN.  DEFENDANT

16   DIDN'T BELONG TO EITHER OF THESE CATEGORIES BUT STILL BRINGING

17   HER DIPLOMAS MADE THE -- THE INS OFFICERS TO WONDER.  AND SHE

18   PROVED HER ABSOLUTELY AUTOMATIC PHOTOGRAPHIC AUDIO MEMORY AND

19   VISUAL MEMORY.  PLUS, THEY -- THEY ORDERED HER TO PROVIDE AT

20   LEAST SOME TRANSLATIONS BECAUSE ABOUT 50 OF THEM OF HER

21   ARTICLES.

22        FROM 1997 TO 2000 SHE WAS FREQUENTLY TRAVELING STILL

23   AROUND THE WORLD BACK TO EUROPE RUNNING HER COMPANY, STUDYING,

24   COLLECTING MORE INFORMATION -- GOING ARTICLE BY ARTICLE, BOOK

25   BY BOOK SHE DECIDED TO MAKE SECOND BIG ENTRY TO THE SCIENCE

1    WITH THE NEW DEVELOPMENT OF THE NEW -- IF NOT FULL SCIENCE AT

2    LEAST DEPARTMENT OR PART OF ONE OF THE EXISTING SCIENCE.

3            FOR TO COMPLETE THAT VERY BROAD AND WIDE TASK SHE

4    TRAVEL IN 1999 FOR SIX MONTHS TO INDIA AND AGAIN CHINA FOR --

5    TO REINFORCE HER KNOWLEDGE FROM A VERY INTERESTING SCIENCE

6    CALLED AYURVEDA.  AND YOU MIGHT REMEMBER DR. DEEPAK CHOPRA WHO

7    YOU HAVE HEARD OF.

8            SHE WAS STUDYING AND TEACHING AT THE SAME TIME IN THE

9    UNIVERSITY IN INDIA.  AND SHE WAS TOLD BY THE SAME TEACHERS WHO

10   TAUGHT DEEPAK CHOPRA -- THE LEVEL WAS VERY, VERY HIGH.

11           IN 2000, AFTER DECIDING TO STAY IN UNITED STATES, SHE

12   MOVED TO BEVERLY HILLS.  AND -- A REGULAR LEGITIMATE WORK

13   PERMIT AS ALL HER IMMIGRATION WAS ALWAYS CLEAN.  NO PROBLEMS.

14   NO VIOLATIONS.  NOTHING.

15           FOR TWO YEARS SHE WAS LIVING IN BEVERLY HILLS WORKING

16   VERY QUICKLY WITH VARIOUS HIGHLY PROFILED INDIVIDUALS, EVEN

17   MOVIE STARS AND MOVIE DIRECTORS, DESPITE SHE WAS LATER ACCUSED

18   MAKING UP THE STORIES.  THERE IS TRUE EVIDENCE THAT YOU WILL

19   SEE ONE OF HER CLIENTS ALLOWED TO DISCLOSE WHO HE WAS.  AND HE

20   WAS ONE OF THE TOP COMEDIANS.

21           AND WHEN THE WORK PERMIT EXPIRED, INS DID NOT

22   EXTENDED THE TIME -- ON THE TIME LIMITER.  AND DEFENDANT HAS A

23   CHOICE OR SHE WOULD WORK ILLEGALLY IN UNITED STATES, EVEN

24   WORKING FOR HERSELF, OR SHE WOULD SHUT EVERYTHING DOWN.  THE

25   CHOICE WAS VERY CLEAR.  SHUT EVERYTHING DOWN.  SUCCESSFUL

1  WEBSITE, DOWN.  SUCCESSFUL COMPANY OR GROWING COMPANY IN

2  BEVERLY HILLS, DOWN.

3        WHEN LATER ON INS INTERVIEW SHE WAS ASKED WHAT DID

4  SHE DO BETWEEN YEAR 2002 AND 2005 -- '05/'06 ACTUALLY.  THE INS

5  OFFICERS HAVE A HARD TIME TO BELIEVE THAT SHE WOULD STOP THE

6  ACTIVITIES.  SHE HAS ONE -- WITH MY REPUTATION.  I DON'T WANT

7  TO HAVE ANYWHERE ON MY RECORDS THAT I WAS WORKING ILLEGALLY IN

8  THE UNITED STATES.

9        WHAT DID SHE DO? -- STARTED USING MORE OF HER

10  PERSONAL CONTACTS FROM YEARS OF STUDYING, TRAVELING AROUND THE

11  WORLD.  AND WE ARE ALREADY TALKING ABOUT ALMOST 25 YEARS OF

12  STUDIES.  AND SHE STARTED WORKING HARD AND GATHERING MORE

13  INFORMATION FOR THEM -- FOR HER INTERDISCIPLINARY RESEARCH FOR

14  THE NEW SCIENCE.

15        SHE MOVED TO LAS VEGAS BECAUSE THE CLIMATE AND

16  BECAUSE THE FACT THAT IT WAS NOT TECHNICALLY POSSIBLE TO JUST

17  CLOSE THE DOOR IN ONE DAY.  PEOPLE WOULD BE COMING.  SHE WOULD

18  BE WORKING.  SHE WOULD BE -- SHE WOULD BE REJECTING POTENTIAL

19  CLIENTS FOR HER REJUVENATION.  SHE DIDN'T WANT THAT.

20        IN VEGAS SHE WAS PRACTICALLY COMPLETELY BURIED IN HER

21  WORK.  AND ONE OF THE DIRECTIONS IN THE INTERDISCIPLINARY

22  RESEARCH WOULD BE PSYCHOLOGY OF INVESTMENT.  AND IT WOULD BE --

23  NOT IT WOULD BE -- WAS -- WAS THE FACT THAT EVERYONE HAS SEEN

24  ALL KIND OF INVESTMENT WARNINGS ON FEDERAL RESERVES OF THE

25  WEBSITES, ON THE INTERNET, DIFFERENT BARS OR BLOGS, ET CETERA,

1   ET CETERA.  BUT THERE IS NOTHING WHAT WOULD REALLY HELP PEOPLE

2   TO UNDERSTAND WHAT THEY SHOULDN'T DO -- WHY, WHEN, AND WHERE IS

3   THIS STRANGE MOMENT IN HUMAN MIND THAT DESPITE YOU KNOW IT --

4   YOU HAVE HEARD IT, YOU HAVE SEEN IT, YOU STILL GO FOR IT.

5            BECAUSE SHE HAS PRACTICALLY HER HANDS FREE, SHE

6   WASN'T WORKING WITH THE CLIENTS AS BEFORE.  SHE WAS LIKE

7   STUDENT AGAIN WITH ALL THE KNOWLEDGE, ALL THE POTENTIAL.  SHE

8   HAS HAD -- SHE LITERALLY DIVE IN IT BECAUSE HER IDEA AND HER

9   PARTIALLY MEDICAL BACKGROUND ALLOWED HER TO IMPLEMENT THAT IF I

10  WANT TO ESTABLISH NEW SCIENCE THERE HAS TO BE SUFFICIENT AMOUNT

11  OF CASES.

12           IT'S THE SAME AS WITH THE MEDICATION.  I DON'T KNOW

13  ABOUT UNITED STATES, BUT IN EUROPE BEFORE THE NEW MEDICATION

14  IT'S APPROVED, ON THE TESTING LEVEL IT HAS TO BE 10,000 CASES

15  AT LEAST.  AND BEING EUROPEAN, NEVER BEING IN UNITED STATES AS

16  AN -- UNTIL 1997, SHE DECIDED TO TAKE THE SAME PRINCIPLE.

17           AND IN INTERDISCIPLINARY RESEARCH THERE WAS

18  PRACTICALLY RESEARCH AT EVERY POTENTIAL ASPECT OF THE

19  INVESTMENT.

20           THE PSYCHOLOGICAL, PHILOSOPHICAL, AND SOCIOLOGICAL

21  EFFECTS WERE EXTREMELY INTERESTING -- COME THE CLOSEST TO HER

22  ORIGINAL AND FIRST UNIVERSITY.  IT WAS A UNIVERSITY OF --

23  POLITICAL PHILOSOPHY.  PHD AROUND THE WORLD WITH EXCEPTION OF

24  FORMER U.S.S.R. RUSSIA DOESN'T MEAN TOO MUCH -- NOT THAT AT THE

25  TIME.  BECAUSE FACULTY OF PHILOSOPHY WAS THE HARDEST FACULTY ON

1    THE SAME LEVEL LIKE LINEAR MATHEMATICS.  BECAUSE STUDENTS WERE

2    STUDYING FOR FOUR YEARS.  MATHEMATICS, FOUR YEARS.  PHYSICS,

3    FOUR YEARS.  CHEMISTRY, SIX YEARS.  LOGIC AND OTHER TOPICS,

4    MEANING THAT BROAD BACKGROUND HELP HER TO UNDERSTAND WHERE TO

5    GO IN THIS PSYCHOLOGICAL, PHILOSOPHICAL, ECONOMICAL STUDY AND

6    RESEARCH FOR THE AMOUNT OF MATERIAL.

7              THE COURT:  JUST ONE MOMENT.

8              MS. PEMKOVA, WOULD YOU LIKE THE COURT TO USE ITS

9    DISCRETION AND ALSO SWEAR YOU AND HAVE YOU GIVE THIS TESTIMONY

10   OR THIS OPENING STATEMENT UNDER OATH.  AND THEN GIVE YOU THE

11   OPPORTUNITY TO COME BACK AND LITERALLY DO IT AGAIN.

12             MS. PEMKOVA:  I'M SORRY, YOUR HONOR?

13             THE COURT:  IN OTHER WORDS, I CAN USE MY DISCRETION.

14   I CAN SWEAR YOU RIGHT NOW AND HAVE THIS PART OF YOUR TESTIMONY.

15             MS. PEMKOVA:  YOUR HONOR, IF I MIGHT SAY SOMETHING.

16             IT WOULD BE BETTER TO KEEP THE JURORS GOING.

17             THE COURT:  OKAY.

18             MS. PEMKOVA:  AND IT WOULD BE VERY SHORT.  THANK YOU

19   VERY MUCH --

20             THE COURT:  SURE.

21             MS. PEMKOVA: -- FOR PROPOSAL -- PROPOSAL.

22             THE COURT:  OKAY.

23             MS. PEMKOVA:  IT WOULD BE VERY SHORT IN THE

24   CROSS-EXAMINATION BY THE GOVERNMENT -- IN THE TESTIMONY BY --

25             THE COURT:  OKAY.  THANK YOU.

1          MS. PEMKOVA:  OKAY.  THANK YOU.

2          MEANING SHE WAS USING EVERYTHING WHAT SHE COULD DO TO

3    ACCOMPLISH INORDINATE CASES, INORDINATE INFORMATION.  AND SHE

4    WAS VERY FORTUNATE BECAUSE HER COMMUNICATIVE SKILL, HER

5    CONTACTS AND CONNECTIONS LED HER TO A VERY BROAD CIRCLES.

6          AND WHAT IS THE EASIEST WAY FOR THE RESEARCHER THAN

7    GETTING INFORMATION INTO HIS HANDS OR HER HANDS INSTEAD RUNNING

8    AROUND LOOKING.  THAT'S WHY.  THE MOMENT WHEN SHE CAME TO THE

9    LEVEL OF THIS INTERDISCIPLINARY RESEARCH APPROXIMATELY IN 2003

10   -- '02/'03, SOMETHING LIKE THAT WHEN THE MEDICAL PART WAS

11   ACTUALLY DONE.  SHE ESTABLISHED VERY QUICKLY USING HER OLD

12   CONNECTIONS PEOPLE WHO WERE BRINGING HER DIFFERENT INVESTMENTS,

13   DIFFERENT CASES.  AND NOT EVERYBODY WAS SUITABLE FOR THE

14   RESEARCH.  BUT EVERYBODY WAS SUITABLE FOR TO HAVE IT FILED.  IT

15   WAS THERE.

16         THIS WAS THE -- JUMPING FAR AHEAD -- IT WAS THE

17   REASON WHY SHE ASK FOR THE -- THE EVIDENCE OF THE FUNDS FROM

18   MR. MOORE.  AND THAT'S WHY THERE WAS A WORD.  I GIVE YOU MY

19   WORD IS JUST FOR MY --

20         WHILE SHE WAS WORKING ON THAT SHE CAME ACROSS

21   ABSOLUTELY AMAZING DOCUMENTS.  YOU MIGHT REMEMBER ON THE

22   TESTIMONY OF PROFESSOR BEN --

23         MR. KOLE -- PROFESSOR BEN, HE MENTIONED BY THE END OF

24   HIS TESTIMONY THAT SOME OF THIS FORGED DOCUMENTS ARE BEAUTIFUL.

25   ONE OF THEM IS EVEN HANGING -- SOME ON THE WALL.  ABSOLUTELY.

1            DEFENDANT STARTED TO CALL IT AS A COLLECTION OF

2    ARTIFACTS.  AND ON HER HOME COMPUTER AND DISKS WHERE SHE WAS

3    SAVING THIS INFORMATION YOU WILL FIND GOOD TO HUNDRED YEARS OF

4    VARIOUS DOCUMENTS SORT OUT, ORGANIZED.  IT WASN'T JUST

5    PROCESSING SOMETHING.  IT WAS PAPER FOR A WORK ON THE FINAL

6    VERSION OF THE BOOK.  AND AS I HAVE SAID, HER ASPIRATION WAS TO

7    CREATE MORE THAN BOOK.

8            IF YOU WOULD HAVE A CHANCE TO SEE HOW SHE WAS -- HOW

9    THE DEFENDANT WAS ORGANIZING THE COMPUTER YOU WILL SEE A VERY

10   GOOD IMPLEMENTATION OF LOGIC, SYSTEM, SYSTEM ANALYSIS.

11           IF YOU WOULD OPEN THE FILES, FOR EXAMPLE, SOMEBODY IS

12   ASKING TELL ME OCTOBER 2002.  IT TAKES TIME.  THE SYSTEM OF

13   FILING, IT'S VERY COMPLICATED.  BUT IT'S ALL THERE.

14           AT THE SAME TIME THE DEFENDANT CREATING ALL THIS

15   MASSIVE MATERIAL WAS ALL -- OF COURSE HAVING SOME AGREEMENT OR

16   DISCLOSURE WITH PEOPLE WHO WERE CLOSER TO HER OR PEOPLE WHO SHE

17   WORKED WITH -- FOR EXAMPLE, WILLIAM ELDER.

18           BY THE WAY, THEY MET OVER THE PHONE.  THEY MET IN

19   PERSON ABOUT 10 YEARS AFTER THEY WERE WORKING TOGETHER.  MAIN

20   INTERESTS WERE PROJECTS, TECHNOLOGIES, AND HEALTH BECAUSE MR.

21   ELDER IS LIVING IN VANCOUVER.  AND THIS IS A CITY WELL-KNOWN

22   FOR NEW DIRECTIONS.  COMMUNICATIONS WITH THEM WERE EXTENSIVE.

23           IF ANYONE WOULD DO A CROSS-EXAMINATION OF PHONE CALLS

24   PLACED FROM WILLIAM ELDER TO THE DEFENDANT AND VICE-VERSA,

25   UNBELIEVABLE AMOUNT.  BECAUSE THE MAIN TOPIC FOR THEM TO

1    DISCUSS WAS ABOUT HEALTH AND THIS HEALTH PROGRAM OF

2    REJUVENATION.  SHE HELPED HIS WIFE.  SHE HAS HELPED HIM.  HE

3    WAS, BY THE WAY, HAVING A LIVER ISSUE.

4         AT THE SAME TIME HE WAS ONE OF THE MAIN SOURCES OF

5    THE NEW INFORMATION, NEW CASES WITH SOME OF THESE PEOPLE WERE

6    -- VARIOUS AGREEMENTS.  FOR EXAMPLE, MR. BRITT, WHO WAS

7    MENTIONED IN THE -- IN THE EXHIBITS WAS A -- WONDERFUL

8    GENTLEMAN.  HE -- IN WAY.  HELP -- OR ACTUALLY GRATEFUL TO THE

9    DEFENDANT WHAT SHE WAS ABLE TO DO FOR HIS HEALTH.  AND HE WAS

10   ONE OF THE PEOPLE WITH WHOM SHE WAS CARRYING A LOT OF VARIOUS

11   EXPERIMENTS.  BECAUSE THE -- THIS PART OF HER RESEARCH WAS

12   BASICALLY SORTED OUT.  INVESTMENT WITH SECURITY FUNDS.

13   INVESTMENT WITH START-UP COMPANIES -- AGAIN, ORGANIZATION.

14        DEFENDANT, IF YOU WILL SEE HER LIVE ON HER COMPUTER

15   IS NOTHING BUT AN ORGANIZATION, MEANING WHEN IT'S NECESSARY TO

16   GET IT DOWN FOR THE INFORMATION IT'S RIGHT THERE.

17        AT THE TIME WHEN SHE WAS RESEARCHING BASICALLY

18   SECURITY FUNDS, ONE OF HER OLD FRIENDS -- IT WAS ABOUT 2004 --

19   ACTUALLY, RATHER, HIS PARENTS WERE FRIENDS OF HER GRANDPARENTS

20   -- WAS MAKING FOR HER AVAILABLE INFORMATION BATHGATE CAPITAL

21   PARTNERS.

22        AND THE DEFENDANT WAS WAITING FOUR YEARS.  HOW MR.

23   STEVEN CIGNA WAS GENERATING AMAZING PROFIT OF 15, 20 PERCENT

24   PER MONTH.  VERY INTERESTING RESEARCH.  LARGE INVESTMENT

25   COMPANY.  EXTREMELY SUCCESSFUL TRADER LICENSED IN 49 OF 50 U.S.

1    STATES.  VERY BRIGHT MAN WHEN THEY MET.

2              THERE WERE EARLY WARNING SIGNALS.  IT MIGHT BE NOT

3    THAT BEAUTIFUL AS IT WAS DESCRIBED.  BUT STATEMENTS SHE WAS

4    REVIEWING WITH HER THEN FRIEND PETER WOLFGANG BACHMANN.  YOU

5    HAVE HEARD THIS NAME BEFORE WHICH --

6              (THE COURT AND CLERK CONFERRING.)

7              THE COURT:  MS. PEMKOVA, COULD YOU -- WOULD YOU

8    EXCUSE ME FOR JUST A MOMENT.

9              MR. HUNTER IS ON THE PHONE.  AND I THINK THAT ALL THE

10   PARTIES WANTED TO SPEAK TO HIM FOR JUST A MOMENT.

11             AND, SO, LADIES AND GENTLEMEN, MY APOLOGIES FOR

12   INTERRUPTING.  THERE ARE A NUMBER OF PHONE CALLS COMING IN.

13             WOULD YOU BE KIND ENOUGH TO GO TO THE JURY ROOM FOR

14   JUST A MOMENT.

15             THANK YOU.

16             (JURY RETURNS TO JURY ROOM.)

17             THE COURT:  AND THEN, DEB, IF YOU'D COME RIGHT BACK

18   AND PUT MR. HUNTER ON THE PHONE.

19             (PAUSE IN PROCEEDINGS.)

20             THE CLERK:  DO YOU WANT ME TO HAVE HER TRANSFER IT IN

21   HERE?

22             THE COURT:  YES.  PLEASE.

23             (PAUSE IN PROCEEDINGS.)

24             (OUTSIDE THE PRESENCE OF THE JURY.)

25             THE COURT:  AND, DEBBIE, AS SOON AS THAT'S DONE --

1          CAN YOU HEAR MR. HUNTER?  IS HE ON THE PHONE?

2          (PHONE RINGS.)

3          THE COURT:  THERE WE GO.

4          THE CLERK:  JUDGE CARTER'S CHAMBERS.

5          (VIA TELEPHONE.)

6          MR. HUNTER:  YES.  THIS IS RAYMOND HUNTER.  I GOT A

7    MESSAGE YESTERDAY FROM JUDGE CARTER, DEBBIE, TO CALL.  AND I

8    WAS WONDERING MIGHT IT BE OKAY TO HAVE THE CONVERSATION

9    TOMORROW BECAUSE I'VE JUST ARRIVED IN.  I'M -- INTO THE HOUSE.

10   AND I'M -- I WOULD JUST -- LACK OF SLEEP AND TIREDNESS.  AND --

11         THE COURT:  MR. HUNTER -- MR. HUNTER, THIS IS JUDGE

12   CARTER.  THIS WILL JUST TAKE A MOMENT.

13         I'M GOING TO HAVE THE PARTIES IDENTIFY THEMSELVES,

14   STARTING WITH THE UNITED STATES ATTORNEY.

15         MR. KOLE:  THIS IS LAWRENCE KOLE, ASSISTANT UNITED

16   STATES ATTORNEY, FOR THE UNITED STATES.

17         THE COURT:  AGENT FOR THE FBI.

18         AGENT REITZ:  TOM REITZ WITH THE FBI.

19         THE COURT:  STAND-BY COUNSEL FOR MS. PEMKOVA.

20         MR. STEWARD:  DEAN STEWARD.

21         THE COURT:  AND MS. PEMKOVA.

22         MS. PEMKOVA:  YES.

23         THE COURT:  MR. HUNTER --

24         MR. HUNTER:  OKAY.

25         THE COURT:  -- IT'S BEEN -- IT'S BEEN REPRESENTED TO

1   THE COURT THAT YOU MAY BE WILLING TO VOLUNTARILY TESTIFY ON MS.

2   PEMKOVA'S PART.

3         I REALLY DON'T WANT TO GO ANY FURTHER THAN THAT

4   REPRESENTATION.  BUT THE COURT IS WILLING TO TAKE A VERY SHORT

5   RECESS IF THAT IS YOUR WISH.  BUT I CAN ONLY TAKE THAT RECESS

6   UNTIL JUNE 23RD.  ALTHOUGH, I COULD GO BACK INTO SESSION

7   POTENTIALLY ALSO MAYBE ON FRIDAY, JUNE 19TH.

8         MS. PEMKOVA:  NO.

9         THE COURT:  I'M TRYING TO GIVE A LITTLE BIT OF LEEWAY

10   FOR A NUMBER OF PEOPLE THAT MS. PEMKOVA HAS REACHED OUT TO.

11         MR. HUNTER:  OKAY --

12         THE COURT:  YEAH.  I KNOW YOU'RE IN IRELAND OR IT'S

13   REPRESENTED YOU'RE IN IRELAND RIGHT NOW.

14         AND IT WAS REPRESENTED ALSO THAT YOU WERE IN MY

15   COURT.  I UNFORTUNATELY DIDN'T SEE YOU.  THE CASE WAS TO RESUME

16   AT 12:00 NOON OR I WOULD HAVE HAD THIS DISCUSSION WHEN YOU WERE

17   HERE.

18         SO, IT'S SIMPLY TO INFORM YOU --

19         MR. HUNTER:  OKAY.  WHAT --

20         THE COURT:  -- THAT I'M WILLING TO -- I WILL RESUME

21   AT THE LATEST ON THE 23RD.

22         MR. HUNTER:  THE 23RD.

23         THE COURT:  AND THE EARLIEST ON JUNE 19TH.

24         MR. HUNTER:  WELL, FORTUNATELY, MURPHY'S LAW IS

25   KICKING, YOUR HONOR.  I WAS IN THE U.S. JUST FOR -- FOR A

1   NORMAL SEVEN WEEKS.  MY TICKET BACK IS BOOKED FOR THE 6TH OF

2   JULY.  AND EVEN THAT IS DARK AT THE MOMENT BECAUSE I GOT A

3   REQUEST TODAY.  I HAVE TO COORDINATE AND NEGOTIATIONS FOR A --

4   PLANT HERE IN IRELAND IN ADDITION TO EVERYTHING ELSE.

5            AND THEN IN MID-JULY -- THIRD WEEK OF JULY I HAVE TO

6   GO TO BRAZIL.

7            AND, YOU KNOW, IT'S JUST -- IT'S AT THE MOST AWKWARD

8   TIME OF THE YEAR BECAUSE EVEN AFTER BRAZIL I'M ON STANDBY FOR

9   SAUDI ARABIA.  I JUST -- I DON'T WANT TO PROMISE.  I DON'T --

10           THE COURT:  WELL, MR. HUNTER, I'M SIMPLY GOING TO

11   LEAVE THAT TO YOU.  THIS IS INFORMATION.

12           MR. HUNTER:  OKAY.

13           THE COURT:  AND RIGHT NOW I STILL HAVE THIS SET FOR

14   JUNE -- OR JUNE 20- --

15           MS. PEMKOVA:  3RD.

16           THE CLERK:  23RD.

17           THE COURT:  I'M SORRY.  JUNE 23RD.

18           I COULD RECONVENE ON JUNE 22ND.  AND I ALSO COULD

19   RECONVENE ON JUNE 19TH.  BUT IF I DON'T HEAR THAT YOU'RE

20   AVAILABLE ON ANY OF THOSE DAYS, THEN, I'LL SIMPLY MAKE THE

21   VALUED CHOICE BASED ON ANY OTHER WITNESSES WHO CALL MY COURT.

22           SO, THEREFORE, A COMFORT LEVEL FOR YOU AND ANYBODY

23   ELSE WHO WILL VOLUNTARILY COME, IT COULD BE AS EARLY AS JUNE --

24   JUNE 19TH.  IT COULD BE AS LATE AS JUNE 23RD.  AND I CAN ALSO

25   PUT IN JUNE 22ND.

1              MR. HUNTER:-- OKAY --

2              THE COURT:  -- REPRESENTATION ON YOUR PART, IF ANY OF

3    THOSE DAYS ARE GOOD, THEN, I MAY RESUME AS EARLY AS JUNE 19TH.

4    BUT THEN I'M NOT GOING TO HEAR -- YOU KNOW, IN THE FUTURE THE

5    PEOPLE --

6              MR. HUNTER:  RIGHT.

7              THE COURT:  -- OKAY.  JUST A COURTESY.

8              I'LL TURN THE REST OF THE CONVERSATION IN PRIVATE

9    OVER TO YOU AND MS. PEMKOVA TOMORROW.  IF --

10             MR. HUNTER:  AND YOUR HONOR --

11             THE COURT:  I'M SORRY?

12             PLEASE.

13             MR. HUNTER:  OKAY.

14             THANK YOU FOR THE COURTESY.  I APPRECIATE THAT A LOT

15    -- THE OFFER.  I JUST -- THE WAY THINGS ARE I DON'T THINK I'LL

16   BE ABLE TO MAKE ANY OF THOSE WORK.  I STILL DON'T --

17             THE COURT:  I'LL -- I'LL LEAVE THOSE TO YOU AND MS.

18   PEMKOVA.  ALL RIGHT.

19             MR. HUNTER:  OKAY.

20             THE COURT:  AND, COUNSEL, MAYBE WE CAN DO THEN JUNE

21   19TH.  I'M WAITING FOR A NUMBER OF OTHER PEOPLE TO CALL IF THEY

22   WILL.

23             SIR, I WANT TO THANK YOU FOR THE COURTESY.

24             THE REST OF THE CONVERSATION WOULD BE A PRIVATE

25   CONVERSATION BETWEEN YOU AND MS. PEMKOVA.

1          MR. HUNTER:  OKAY.   WELL, THANK YOU VERY MUCH --

2          THE COURT:  THANK YOU, SIR.

3          (CONFERENCE PHONE CALL CONCLUDED.)

4          THE COURT:  ALL RIGHT.  WOULD YOU ASK THE JURY TO

5     COME BACK IN.

6          NOW, MS. PEMKOVA, IF YOU COULD NEGOTIATE ONE OF THOSE

7     THREE DATES WITH THE GENTLEMAN.  I'M AMENABLE TO ANY OF THOSE

8     DATES.  BUT OTHERWISE, IT MAY BE AS EARLY AS JUNE 19TH NOW

9     UNLESS I CAN GET A CONFIRMATION THAT SOMEBODY IS WILLING TO

10    COME ON THE 23RD.

11         MS. PEMKOVA:  YOUR HONOR, I STARTED NOTIFYING BASED

12    ON YOUR DECISION YESTERDAY AVAILABLE FOR 27TH.

13         THE COURT:  WELL --

14         MS. PEMKOVA:  NOW, WE ARE MOVING IT AGAIN FOR LATER

15    THAN THAT.

16         THE COURT:  I WILL HOLD TO THAT UNLESS I DON'T GET A

17    RESPONSE, MS. PEMKOVA.  IN OTHER WORDS, THE 23RD IS FINE.  BUT

18    I'M NOT GETTING A RESPONSE FROM ANYBODY.

19         MS. PEMKOVA:  YOUR HONOR, I MEAN TO FILE THE

20    SUBPOENA.

21         IF I WOULD -- IF I WOULD HAVE A CHANCE TO DO IT TODAY

22    --

23         THE COURT:  WELL --

24         MS. PEMKOVA:  -- IN THE -- THERE WAS NO TIME FOR ME.

25         THE COURT:  THANK YOU VERY MUCH.

1              I'LL BE RIGHT WITH YOU.

2              (PAUSE IN PROCEEDINGS.)

3              (JURY RETURNS TO THE COURTROOM.)

4              (IN THE PRESENCE OF THE JURY.)

5              THE COURT:  OH, THANK YOU VERY MUCH FOR YOUR

6    COURTESY.  AND THE JURY IS BACK IN SESSION.

7              MS. PEMKOVA, IF YOU WOULD LIKE TO CONTINUE, PLEASE.

8    YOU CAN PICK UP WHEREEVER YOU'D LIKE TO.  AND I'M SORRY FOR THE

9    INTERRUPTION.

10             (DEFENSE OPENING STATEMENT RESUMED.)

11             MS. PEMKOVA:  THAT'S FINE.

12             WE HAVE FINISHED THE CHRONOLOGY OVERVIEW OF WHAT

13   HAPPENED IN 2004 WHEN THE DEFENDANT WAS INVOLVED WITH BATHGATE

14   CAPITAL PARTNERS THROUGH HER THEN FRIEND WOLGANG BACHMANN AND

15   BATHGATE CAPITAL PARTNERS WHERE HE WAS PARTNERING.  YOU WILL

16   SEE RIGHT THERE IN THE EVIDENCE -- OF EVIDENCE.

17             AFTER OBSERVING FOR TENS OF YEARS STEADY PROFIT FROM

18    -- 1120 EVEN PERSON DEMANDS SHE DECIDED TO INVEST.  30,000

19   U.S. DOLLARS AND 5 MILLION EUROS.

20             AFTER THE INVESTMENT THINGS TURN VERY -- VERY SHORTLY

21   WITHIN THREE, FOUR MONTHS -- TURN VERY BADLY DESPITE HER FRIEND

22   PETER BACHMANN -- OR WOLFGANG BACHMANN WAS A PARTNER.  AND SHE

23   WAS IN BATHGATE CAPITAL PARTNERS.  AND SHE WAS EVEN PROMISED TO

24   HAVE SETTLED THE -- NOT EMPLOYMENT BUT CONFIRMATION SHE WAS

25   OFFICIALLY AUTHORIZED FOR BATHGATE TO PROVIDE INVESTMENT.  IT

1    WOULD BE EASIER FOR HER RESEARCH TO BE INVOLVED DIRECTLY

2    BECAUSE IT WAS INTERDISCIPLINARY RESEARCH BESIDE -- RESEARCH IN

3    THE INVESTOR SHE WAS RESEARCHING THE PROVIDER.  IT WOULD GIVE

4    HER MORE IN -- MORE PERSPECTIVE FROM -- WITH AN INSIGHT.

5            IT NEVER HAPPENED BECAUSE THE INVESTMENT -- THIS

6    BATHGATE CAPITAL PARTNERS IS A VERY LARGE COMPANY.  THEY'RE

7    COMPLETELY -- AND THE DEFENDANT GOT A CALL FROM -- REQUESTING

8    -- IT WAS ABOUT 2005 I BELIEVE -- GOT A CALL TO PROVIDE -- BUT

9    BEFORE -- SHE WILL PROVIDE THE INFORMATION SHE HAS ABOUT THE

10   BATHGATE.

11           AT THAT TIME THE DEFENDANT HAS NO KNOWLEDGE WHAT IS

12   THIS ABOUT BUT BEING -- REGARDING VERY AWARE SHE DECIDED TO DO

13   SO.  AND SHE PROVIDED 15 PAGES -- YOU WILL SEE LATER ON THE

14   EXHIBIT.  HERE IS A STAMP FROM THE COURT THAT THERE'S 15 PAGES

15   OF HER INSIDER CONFI- COMMUNICATION, EMAILS BETWEEN BATHGATE

16   PARTNERS AND HERSELF AND HER COLLEAGUE MAKE A BIG CHANGE.

17           THERE WAS GOING ON A LARGE LAWSUIT BETWEEN REFCO --

18   WHICH DOESN'T EXIST ANYMORE -- REFCO, R- -- E-F-C-O.  OKAY.

19   WHICH DOESN'T EXIST ANYMORE.  THERE WAS A LATER FILED

20   BANKRUPTCY.  THERE WAS ALSO BETWEEN BATHGATE CAPITAL PARTNERS

21   AND REFCO FOR FIVE, SIX SOMETHING LIKE THAT -- YES -- NEWARK --

22   LARGE NEWARK LEGAL FIRM WAS FIGHTING AGAINST BATHGATE DUE TO

23   THE FALSE STATEMENTS FOR THE COMMENCEMENT, ET CETERA, ET

24   CETERA.  THIS -- 15 PAGES PROVIDED BY THERESA DOHERTY CHANGED

25   THE CASE.  BATHGATE LOST.

1          AT THE SAME TIME PEOPLE WHO -- DR. PEMKOVA WAS --

2     DEFENDANT WAS -- DEFENDANT WAS -- INVESTING STARTED TO HAVE

3     PROBLEMS AS WELL.

4          BY THE WAY, HERE IS SADRUDIN DAMJI I BELIEVE.  HERE

5     IS THE NAME WHO YOU SAW LATER RIGHT HERE.

6          YES.  SADRUDIN DAMJI, THE NAME WHICH YOU SAW EARLIER

7     ON THE EXHIBITS TWICE.  CORRECT.

8          MR. DAMJI AND FEW OTHERS WERE SWEET, NICE, OLDER

9     PEOPLE.  EACH OF THEM HAVE HAD SOME INVESTMENT THROUGH --

10    HOTEL, FOR EXAMPLE.  MR. -- CLOSE TEAM WHO WAS INVOLVED IN

11    LOSSES WITH BATHGATE CAPITAL PARTNERS.  AND THEY WERE WILLING

12    TO SORT OF HELP OUT WITH THE RESEARCH FINDING THE -- WORKS.

13    ALL OF THEM ARE IN VERY CLOSE CONTACT WITH WILLIAM ELDER.  AND

14    EVEN THOUGH IT'S DR. -- WITH THE DEFENDANT BECAUSE, AGAIN, IT

15    WAS PART OF RESEARCH.  DIRECT TESTIMONY.  DIRECT COMMUNICATION

16    WITH THE INVESTOR.  DIRECT COMMUNICATION WITH THE PROVIDER OF

17    THE INVESTMENT, BATHGATE CAPITAL PARTNERS.

18         THE MOMENT WHEN BATHGATE CAPITAL PARTNERS FOUND

19    DEFENDANT TESTIFIED THEY PROMISED TO -- ARRANGE.  SHE WAS BORN

20    ON -- NUMEROUS OCCASIONS.  THEY WOULD TAKE CARE OF HER.  SHE

21    WOULD BE IN PRISON THROWN IN THE JAIL AND DEPORTED.  BAD IDEA.

22    NOT TO TAKE IT SERIOUSLY.  BUT AT THAT TIME DEFENDANT DID NOT

23    KNOW.

24         AND BECAUSE SHE FELT SORRY FOR HER OBJECT OF RESEARCH

25    OR PARTIES BEING RESEARCHED, MR. DAMJI AND ABOUT -- I DON'T

1    KNOW -- MORE PEOPLE, AT LEAST MAYBE HUNDRED, ALL TOGETHER

2    INTRODUCED TO BATHGATE CAPITAL PARTNERS, SHE DECIDED TO TESTIFY

3    SECOND TIME BECAUSE THESE PEOPLE WHO LOST MONEY WITH BATHGATE

4    STARTED SUING BATHGATE.

5            AND SHE PROVIDED SECOND TIME BY FEDEX TO THEIR THEN

6    LAWYER PACKAGE OF THE DOCUMENTS.  EVERYTHING WHAT SHE COULD,

7    FEELING SORRY FOR PEOPLE WHO LOST MONEY.

8            BATHGATE LOST AGAIN BUT TOOK TREMENDOUS ADVANTAGE

9    BECAUSE THEY DID NOT REFUND ONE TO ONE.  THERE WAS SOME

10   DISCOUNT.

11           DEFENDANT WAS PROMISED -- AGAIN.  AND BATHGATE

12   DESPITE SHE WAS AN INVESTOR STARTED SUING --

13           SHE HAS HAD NO FEAR, NEITHER FROM LEGAL SYSTEM NOR

14   FROM WHAT SHE HAS DONE.  THAT'S WHY SHE WAS GOING THROUGH THAT

15   LAWSUIT WITH ONE OF THE -- SHE WAS TOP LAWYERS, MR. TANNENBAUM,

16   PROVING AGAIN HER THEN WONDERFUL MEMORY, CAPABILITY TO KNOW THE

17   CASE AND KEEPING SEVEN PROMINENT LAWYERS -- NO, SEVEN LAWYERS

18   FROM BATHGATE ON THEIR TIPTOES ON HER CROSS-EXAMINATION.

19           SHE HAS NO PROBLEM TO DEAL WITH THE AUTHORITIES

20   GENERALLY.  BEFORE THAT IN 2001 AND 2003 OR '04 SHE PROVIDED ON

21   SEVERAL OCCASIONS INFORMATION TO FBI.  SHE EVEN TRIGGERED

22   SEVERAL INVESTIGATIONS.

23           WHEN HER FRIENDS AND THE PEOPLE WHO SHE WAS DEALING

24   WITH ON THE LEVEL OF HER RESEARCH AND SPECIFICALLY TECHNOLOGIES

25   FROM COMPUTERS TO CLEANING THE WATER -- BOTH IN TRAVELS SHE

1   HELPED AND SHE INITIATED OR SHE -- THE DEFENDANT ENCOURAGED ONE

2   OF THEM TO START INVESTIGATION.

3           FBI WAS COMING TO SEE HER FIVE TIMES.  SHE WAS ASKED

4   NEVER TO DISCLOSE WHO CAME, WHAT SHE DID.  SHE FOLLOWED WITH

5   ONE EXCEPTION.  SHE DID -- SHE SEND EVERYTHING -- SHE HAS GIVEN

6   THE CD'S, BUT SHE NEVER -- CD -- DURING THE INVESTIGATION OF

7   WHEN SHE WAS PROVIDING INFORMATIONAL SHE PROVIDED TO THE AGENTS

8   WHO CAME FROM NEW YORK SEVERAL CD'S WITH THE DOCUMENTS.  BESIDE

9   IT SHE WAS EMAILING IT.  SHE WAS ASKED TO RELEASE -- I MEAN, TO

10  REMOVE EMAILS.  NO LINKS.  NO STRINGS.  SHE DID DO THAT.  BUT

11  SHE DID KEPT WHAT SHE SENT BY EMAIL, MEANING IF SOMEBODY WOULD

12  BE CROSS-EXAMINING IN THE -- ON WHICH ONE.

13          OUR DOCUMENTS MENTIONED IN THIS CASE THEY WOULD FIND

14  IT BECAUSE THERE ARE SEVERAL LARGE FILES.  PART OF THE

15  INFORMATION, IT WAS PROVIDED BY THE DEFENDANT DIRECTLY DURING

16  THE MEETINGS IN -- AND SHE PROVIDED ABOUT AN INCH THICK OF

17  DOCUMENTS, STATEMENTS, ACCOUNTS, PASSPORTS, EVERYTHING WHAT IS

18  NEEDED FOR FURTHER RESEARCH REGARDING CHINESE INVESTMENT.

19          AMAZING WONDERFUL STORY YOU HAVE HEARD -- DRAGONS AND

20  BILLIONS, TRILLIONS AND -- AMAZING STORY.  AND ANYONE WHO IS

21  INTERESTED, IT'S WISE TO READ HOW FEDERAL RESERVES WERE BUILT.

22  THERE IS IN THIS BOOKS A LOT OF STORIES BECAUSE IT'S A BOOK.

23  BUT AT LEAST 50 AND MORE PERSON IS THE TRUTH.  THAT'S WHY A

24  LINK TO ORIENT IS NOT COINCIDENTAL.

25          AND THE DOCUMENTS WHICH SHE PROVIDED TO THE FBI

1    HELPED WITH ONE THING.

2              WHEN TWO INDIVIDUALS WHO WERE CAUGHT ON SWISS --

3    SWISS GERMAN BORDER WERE CAUGHT THERE, IT WAS PARTIALLY THANKS

4    TO THE INFORMATION PROVIDED BY THE DEFENDANT.  SEVEN, EIGHT

5    YEARS LATER -- EVEN MORE YEARS LATER IT WOULD BE DIFFICULT TO

6    FIND IT CAME FROM HER.  BUT THERE IS ONE INTERESTING THING IN

7    HER COMPUTER.  THERE IS STILL ORIGINAL FILE.  HOW THESE TWO

8    INDIVIDUALS -- BY THE WAY, BOTH OF THEM HIGHLY PROFILED ARE

9    PAID ON THESE ACCOUNTS.

10             THAT'S WHY HAVING THIS EXPERIENCE WITH SOME AMERICAN

11   AUTHORITIES AND BEING ABSOLUTELY CLEAR IN HER MIND IT WAS INS,

12   SHE HAS HAD NO FEAR TO START FIGHTING WITH BATHGATE.

13             ON HER DEPOSITION THERE WERE MANY STRANGE THINGS

14   ALMOST GETTING JUDGMENT FROM OVER THE PHONE.  SHE WAS QUITE

15   SURPRISED BECAUSE IN HER -- I'D SAY LEGAL MIND WITH HER

16   UNDERSTANDING OF ALL THERE IS A LAW.  THERE IS A CONSTITUTION.

17   THERE ARE RIGHTS AND LAWS.

18             NOW, SHE DIDN'T HAVE ANY -- ACTUALLY, SHE DID OBJECT.

19   BUT SHE AGREED THAT ON HER DEPOSITION IT WAS SWITCHED INTO

20   TESTIMONY.  FIRST OF ALL WAS TESTIFYING MR. SIGURD.  AND SHE AS

21   AN INVESTOR WHO LOST MONEY, SECOND ONE, THEN OTHERWISE --

22             SHE WAS HAVING A LOT OF PROBLEMS WITH HER HOUSE AS

23   MENTIONED BEFORE.  BUT AT THE SAME TIME SHE PROVIDED OR SHE WAS

24   GOING THROUGH A VERY HEALTHY LIFE-STYLE.  SEMI-VEGETARIAN,

25   YOGA, VERY ORGANIZED PERSON.  HER MIND WITH SOME CLEANSING,

1    INDIA.  BASICALLY, SHE DIDN'T WANT TO HAVE PROBLEMS.

2              AFTER THE DEPOSITION SHE MIRACULOUSLY FAILED.

3    ARRIVED HOME.  COULDN'T READ -- CD'S DOESN'T REMEMBER WHAT

4    HAPPENED.

5              AND AT THE SUMMERTIME -- IT WAS 2007 WAS A FINAL PART

6    WITH AGENT REITZ.  THE TIME WHEN SHE WAS -- ACTUALLY, THOMAS

7    MOORE.  AT THE TIME WHEN SHE WAS FINISHING WORK WITH BATHGATE

8    CAPITAL PARTNERS, NEXT LOGICAL AREA WHERE TO GO WOULD BE

9    PRIVATE PLACEMENT, TYPE OF BEVERLY HILLS, MEANING START-UP

10   COMPANY OR COMPANIES WHICH ARE ALREADY IN THE BUSINESS.  WHAT

11   DO THEY DO.  HOW THEY TREAT INVESTORS.  AS SAY BEFORE, WHERE IS

12   THE MOMENT WHICH MAKES PEOPLE TO FOLLOW IN -- NOT EVERYTHING IS

13   KOSHER.

14             INVESTOR THOMAS MOORE SHOWED IT VERY CLEARLY, AT

15   LEAST IN WHAT WAS SAID IN THIS CASE.  AND WHY -- WHY FINISHING

16   THE WORK -- ACTUALLY, THE PARTICULAR FIGHT REGARDS TO THIS

17   BATHGATE, SHE GOT INVOLVED WITH BEVERLY HILLS.  AT THE SAME

18   TIME SHE WAS WORKING ON THE RESEARCH AND GATHERING THE FILES.

19             MR. THOMAS MOORE APPEARED SEVERAL TIMES FROM

20   DIFFERENT DIRECTIONS, AT LEAST THREE OR MORE SIGNATURES.  HE

21   WASN'T AT THIS MOMENT AN INTERESTING OBJECT FOR HER RESEARCH

22   BECAUSE -- WASN'T BIG ENOUGH.  HE WAS SUPPOSEDLY SOME MANAGER

23   OF THE FAMILY MONEY.  THAT -- WAS CLOSED IN HER RESEARCH.

24             WITH ALL DUE RESPECT DEFENDANT DID NOT CONSIDER AND

25   NEVER WOULD CONSIDER SOMEBODY WITH -- INVESTOR.  AND FOR THEM

1    THEN TO SAY THEN THERE WAS A LAST STAGE WITH BATHGATE.  SHE WAS

2    PROPOSED A SUPPLEMENT OF 2 MILLION.  SHE WALKED AWAY.

3            WITH HER EXPENSIVE TASTE -- WHAT? -- EXPENSIVE TASTE

4    -- EXPENSIVE CLOTHES, HATS, TRAVELS AROUND THE WORLD, PRIVATE

5    STUDIES, SHE SAY TO HIM YOU TOOK MY 5.  KEEP 2.  I WILL MAKE

6    MORE.  ATTITUDE?  MAYBE.

7            THAT'S WHY IN HER MIND THE MILLION DOLLARS INVESTOR

8    WOULD NOT BE PREY AND DEFINITELY WON'T BE ANYONE WHO SHE WOULD

9    TRY TO DEFRAUD.

10           HER WHOLE PREVIOUS LIFE WAS RATHER HELPING PEOPLE

11   FROM REJUVENATION PROGRAM ALL THE WAY TO AT LEAST RECOVERING

12   WHAT WAS -- PARTIALLY WHAT WAS STOLEN BY BATHGATE AND HELPING

13   THEM TO FIND SOMETHING.  NO DISCOUNT.  BUT SOMETHING REAL --

14   WHAT WOULD WORK.

15           JOHN ROBISON WAS INTRODUCED TO HER VIA PEOPLE LEAVING

16   HER FROM CONFLICT WITH BATHGATE TO A LAWYER SHE HIRED, BARRARIA

17   -- SHE DIDN'T SEE AT THAT TIME, BEING SO FOCUSED ON WHAT SHE

18   WAS DOING.

19           JOHN ROBISON WAS PRODUCING A VERY NICE STORY.  IT WAS

20   A START-UP COMPANY.  AND IT WASN'T.  BECAUSE BEHIND THAT

21   INVESTMENT, 500, 600 PERCENT, IT WASN'T WITHIN 30 DAYS.  IT WAS

22   A LONGER PERIOD.  AND I DO BELIEVE THAT EVERYBODY FROM PEOPLE

23   PRESENTED HERE, REMEMBER LEAP FROG DEVICE OR LEARNING DEVICE

24   FOR CHILDREN.  SUPPOSED TO BE VERY -- VERY POPULAR ON AMERICAN

25   MARKET.

1           BEHIND THAT TECHNOLOGY WAS MICHAEL MILKEN.  THAT'S

2    WHY THE QUESTION TO BOTH GOVERNMENT WITNESSES REGARDING MICHAEL

3    MILKEN AND LINK TO POTENTIALLY HIGHER INVESTMENT OPPORTUNITIES

4    NOT THE PROGRAM.

5           ON THE FIRST LOOK IT LOOKED VERY INTERESTING.  IT WAS

6    THE NEXT STAGE OF THE RESEARCH.  THAT'S WHY TO BEVERLY HILLS

7    DEFENDANT BROUGHT AS AN INTRO SEVERAL PEOPLE.  GOING THROUGH

8    THAT FAST I WOULD SAY AT LEAST MAYBE 20.  MAYBE MORE.  ALL HER

9    -- SITTING AND WITH HER GOOD MEMORY MEMORIZING WHAT WOULD SAY.

10          LOOKED PERFECTLY.  EVEN AGENT REITZ AS A THOMAS MOORE

11   ACCOUNTANT WITH EXPERIENCE OF WORKING IN EUROPE DID NOT KNOW

12   THIS -- WHAT IS REALLY BEHIND.  NEITHER AGENT REITZ -- THOMAS

13   MOORE, NOR DEFENDANT AT THAT TIME.  IT WASN'T HER CASE.

14          SHE MADE VERY CLEAR DISCLOSURE.  AND YOU MIGHT

15   REMEMBER.  THE FIRST, SECOND, AND THIRD CONVERSATION WITH

16   WILLIAM ELDER AT THE VERY BEGINNING OF THE TRANSCRIPTS OF THE

17   RECORDINGS WHEN SHE CALLED CONFIRMING THEY ARE GOING TO MEET,

18   DEFENDANT MADE VERY CLEAR I WILL MAKE THE FULL DISCLOSURE.  WE

19   DON'T TALK ABOUT IT ON THE PHONE, BUT I WILL MAKE THE FULL

20   DISCLOSURE.

21          AND ON THAT MEETING WHICH NAMED THOMAS MOORE NOT

22   AGENT REITZ, REMEMBER WAS OUT OF STATE, DISCLOSING, EXPLAINING,

23   INCLUDING HER RESEARCH WORK, INCLUDING HER COLLECTION OF

24   ARTIFACTS, INCLUDING WHAT ARE IMPORTANT MOMENTS WHICH ANY

25   INVESTOR HAS TO WATCH.

1          YES, THERE WAS A LOT OF QUESTIONS ABOUT HIGH-YIELD

2     INVESTMENT, ALL THESE BIG NUMBERS -- BUYING, SELLING, FRESH CUT

3     -- THE KEY WORDS WHICH YOU HEAR FROM SCAM.

4          BUT THOMAS MOORE CAME AS A SOPHISTICATED INVESTOR AS

5     HE CALLED HIMSELF MANAGING FAMILY MONEY.  AND WE HAVEN'T HEARD

6     IT IN THE RECORDINGS THAT IT WAS -- IT WILL SAY SOMEWHERE

7     RECORDING DOESN'T EXIST.  THAT -- HIS SISTER IS MARRIED IN

8     HAWAII TO SOME ALCOHOLIC.  HE HAS TO TAKE CARE OF ALL HER

9     CHILDREN.  HE HAS A -- WHEN MR. MOORE HAS A GIFTED ARCHITECT

10    BROTHER WHO HAS AN ALCOHOL PROBLEM AS WELL.

11         AND MANAGING FAMILY MONEY HE WAS INTRODUCING THE

12    PARTY WHO WOULD GO WITH BEVERLY HILLS WITH HIM AS AN ACCOUNTANT

13    AND ACTUALLY FINANCIAL ADVISOR AND THE TAX LAWYER, AUDITOR,

14    MEANING IT DID NOT SHOW TOO MUCH INTEREST.  THAT'S WHY ALL THIS

15    COMMUNICATION IS MR. MOORE.

16         THE MOMENT DEFENDANT GOT INFORMATION VALUABLE FOR HER

17    RESEARCH SHE WASN'T INTERESTED.

18         AT THIS CONVERSATION WAS PLACED REQUEST BY THOMAS

19    MOORE AS MANY TIMES AFTER YOU HAVE HEARD THAT HE WAS CALLING

20    WHEN HE WAS ASKING -- FOR -- OR ENCOURAGING PEOPLE TO HELP.

21    THERE WAS A REQUEST TO -- IS THIS POSSIBLE TO INTRODUCE DR.

22    ONCIU.

23         DEFENDANT AT THAT TIME HAD -- HAS HEARD THE NAME.

24    SHE WAS FAMILIAR WITH THE NAME, BUT SHE NEVER SPOKE BACK IN

25    FEBRUARY 2006 TO DR. ONCIU.

1              IF AGENT REITZ CROSS-EXAMINING OR CHECKING THE CASE

2    WOULD CHECK THE PHONE RECORDS -- WHICH WERE ASKED TODAY -- HE

3    WILL FIND OUT THAT THE DEFENDANT WAS INTRODUCED TO DR. ONCIU

4    THROUGH A THIRD PARTY SOMEWHERE IN MAY 2006.  THAT'S WHY TODAY

5    YOU HAVE HER ASKING PRO SE DEFENSE ABOUT GENERAL HARPER.  AND

6    THERE IS ONE CONVERSATION WHICH CARLOS -- DR. JENSON, CARL

7    JENSON, THEY WERE THE PARTIES WHO WERE AT THE INTRO PLUS ONE

8    MORE GENTLEMAN.  AND DEFENSE IS HOPING TO GET HIM HERE AS A

9    SUBPOENA -- OR ON THE SUBPOENA.  THIS -- AT LEAST THIS

10   GENTLEMAN WOULD BE ABLE TO TESTIFY WHEN AND WHERE DR. ONCIU AND

11   DEFENDANT GOT INTRODUCED.  AND IT WAS SOMEWHERE MAY, JUNE.

12             THIS IS AN INTERESTING PART.  AND WE WILL GO THERE

13   LATER WHEN WE WOULD BE REVIEWING THE EVIDENCE.  BECAUSE THAT --

14   DEFENSE IS HOPING TO BE CAPABLE TO RETRIEVE SOME DOCUMENTS OR

15   FIND THE DOCUMENTS WHICH MIGHT BE STILL AVAILABLE IN THE

16   ARCHIVES.

17             AND DURING THE PERIOD WITH MR. MOORE THERE WAS

18   NOTHING REALLY INTERESTING FOR DEFENDANT TO WORK WITH.

19   OTHERWISE, SHE WOULD MAYBE PURSUE MORE.  BUT THE INITIAL

20   INFORMATION WAS TAKEN IN BEVERLY HILLS FEW TIMES.  THEY WERE

21   THROWING DOCUMENTS BECAUSE PART OF THIS CONVERSATION IN BEVERLY

22   HILLS WAS THAT BECAUSE SHE -- BECAUSE THE DEFENDANT WAS

23   NOTIFIED THERE WAS NO AGREEMENT TO GET PAID AS A JOKE WITH HER

24   SARCASTIC SENSE OF HUMOR.  THERE WAS MADE ARRANGEMENT THAT THIS

25   WOULD BE HER -- THAT WOULD BE SORT OF AGREEMENT.  EVERYONE WHO

1  SHE WAS WORKING WITH ON HER RESEARCH, THESE PEOPLE WERE LATER

2  OR SOONER NOTIFIED WHAT SHE'S DOING.  MUST -- IT MUST BE DONE

3  THIS WAY.  BECAUSE IN CASE IT WON'T BE DONE, THAT IT MIGHT BE

4  ILLEGAL CONSEQUENCES, CORRECT.  AND SHE WAS WRITING BOOKS AND

5  PREPARING TO MATERIALIZE HER BIG DREAM -- CREATING, AS I SAID,

6  PART OF THE SCIENCE OR MAYBE EVEN A NEW SCIENCE.

7          SO, HER LIFE IN BEVERLY HILLS AND THIS RESEARCH, SHE

8  HAS AN AMAZING POSSIBILITY TO GET INTRODUCED TO A BOARD OF THE

9  -- WHAT SAY? -- SCIENTISTS OR PROFESSORS OF AMERICAN --

10  PROFESSORS.  MAYBE SOME -- MOST LIKELY SOME OF -- ONE OF THEM

11  WOULD BE TESTIFYING HERE AS WELL.  DEFENSE WILL DO EVERYTHING

12  -- WE'RE DOING EVERYTHING FOR -- TO GET THIS GENTLEMAN HERE,

13  EVEN BY SUBPOENA.

14          AND THE MOMENT WHEN BASICALLY THE BASICS OF THE

15  RESEARCH COLLECTING CASES HAS BEEN DONE.  AT THE SAME TIME --

16  APPROXIMATELY IN THE SIMILAR TIME SHE UNDERSTOOD THAT HER MONEY

17  LOST WITH BATHGATE ARE LOST.  AND ON TOP OF THAT THERE WAS A

18  STILL DELAY WITH ISSUING HER IMMIGRATION DOCUMENTS.  SHE

19  DECIDED TO LEAVE THE COUNTRY BASICALLY.  THAT'S DONE.  MOST

20  PEOPLE WOULD SIMPLY LEAVE.  I WOULD SAY A LEGAL SENSE OF THE

21  DEFENDANT SHE -- SHE ORDERED A MEETING WITH INS OR SHE FILED

22  FOR THE MEETING WITH INS.  BROUGHT HER DOCUMENTS AND EXPLAINED

23  THAT IT WAS A VERY NICE TIME.  SHE'S VERY GRATEFUL FOR WHAT SHE

24  ACCOMPLISH HERE.  BUT AT THE SAME TIME SHE'S NOT WILLING TO

25  WAIT ANY LONGER FOR HER DOCUMENTS.  AND ALL THAT SHE'S

1    REQUIRING IS TO HAVE A LETTER FROM INS DEFINITELY RESIGNED FROM

2    OBTAINING GREEN CARD.  INSTEAD INS TERMINATED THE PETITION.

3          AGAIN, VERY PARTICULAR ABOUT HER REPUTATION.

4          MANY REASONS.  AND ONE OF THEM AS YOU HAVE SEEN THESE

5    ARTICLES HAVE BEEN WRITTEN ABOUT THE DEFENDANT.  AND PAPARAZZIS

6    AROUND THE WORLD HAVE A VERY BAD HABIT DIGGING SOMEWHERE.

7          WHEN THEY STARTED WRITING ABOUT HER BACK IN THE 90'S

8    -- AND THEY WERE DIGGING.  AND SHE KNEW THAT.  THAT'S WHY SHE

9    DID NOT WANT TO TAKE ANY RISK TO HAVE ANY SPOT ON HER

10   REPUTATION BECAUSE HER PLAN WAS TO CLOSE ALL AMERICAN

11   ACTIVITIES, TAKE THE RESEARCH WITH HER.  GO BACK TO EUROPE.

12   AND BASICALLY FINISH THAT.  SHE LOVED CALIFORNIAN CLIMATE.  SHE

13   LOVED -- SHE STILL LOVES VEGAS CLIMATE, BUT THERE ARE MANY

14   PLACES WHICH ARE WARM.  IT MAY BE NOT THAT NICE AS CALIFORNIA

15   AND NEVADA -- MADE A BAD MISTAKE BECAUSE DEFENDANT ANNOUNCED OR

16   TELL ALL IMPORTANT PARTIES SHE'S LEAVING.  AND SHE DIDN'T HAVE

17   A CHANCE.

18         SHE DID OBTAIN HER GREEN CARD IN 2006.  LESS THAN 30

19   DAYS AFTER MAKING THAT STATEMENT TO INS A MIRACLE HAPPENED.

20   HER GREEN CARD ARRIVED TO HER MAILBOX PHYSICALLY.  IT'S LESS

21   THAN 30 DAYS WHEN IT TAKES SIX MONTHS TO EIGHT MONTHS -- OR IT

22   TOOK AT THAT TIME SIX TO EIGHT MONTHS AFTER THE FINAL -- FINAL

23   APPOINTMENT.

24         SOMEWHERE IN THIS CASE YOU HAVE HEARD IN THE EMAILS

25   AND PHONE CALLS THAT SHE WAS -- THAT THE DEFENDANT WAS BUSY

1    TRAVELING AROUND THE WORLD.  THERE WAS MENTIONED HONG KONG.

2    AND NEITHER AGENT REITZ NOR THOMAS MOORE PAID ANY ATTENTION

3    BECAUSE IF ANYONE WOULD MAKE AN EXAMINATION OR

4    CROSS-EXAMINATION IT WOULD TAKE -- IT WOULD COME TO THE LIGHT

5    THAT SHE WAS MAKING HER -- THAT CARL JENSON -- AGAIN, THE NAME

6    WHO WAS IN DR. ONCIU'S EMAILS.

7           SHE WAS TRAVELING THERE WITH QUITE IMPORTANT PARTIES

8    FROM THE UNITED STATES.  AND IT WAS PURELY BUSINESS MEETING.

9    WHEN SHE ARRIVED THERE, BATHGATE HAS ALREADY -- FOR FINAL STAGE

10   OF CROSS-EXAMINATION WHICH HAPPENED IN 2007 -- SHE FILED.

11          THAT'S WHY THOMAS MOORE NOT BEING INTERESTING -- OR

12   THE DEAL WITH THOMAS MOORE WASN'T INTERESTING.  DEFENDANT WAS

13   WORKING ON COMPLICATED DIFFERENT THINGS.  DECIDED SHE WAS

14   CREATING WITH HER FRIENDS -- PEOPLE FROM FINANCIAL WORLD,

15   PEOPLE FROM TECHNOLOGY WORLD, A NEW STRUCTURE WHICH WOULD WORK

16   FOR SPECIAL PURPOSE VEHICLE WHICH YOU HAVE HEARD FROM DEUTSCHE

17   BANK WEBSITE.  THERE WAS A LITTLE QUOTE FROM WEBSITE DEUTSCHE

18   BANK INVESTMENT ABOUT -- AND SPECIAL PURPOSE NOTES.  WE CAN

19   READ IT LATER.  IT WOULD BE ON THE EXHIBITS.

20          THAT'S WHY SAYING THAT SHE'S WORKING ON THE LARGER

21   DEALS WAS RELATED TO LARGE DEAL AS HER BOOKS AND HER SCIENCE

22   AND AT THE SAME TIME NOT ON THE LEVEL OF BROKERS BUT BANKS,

23   LARGE ENTITIES, AND GOVERNMENTS CREATING A VEHICLE OR MAYBE NOT

24   CREATING BUT AT LEAST PARTICIPATING IN CREATION OF THE VEHICLE.

25   IT IS A LOT OF WORK -- TWO TO THREE YEARS WORK.  THAT'S WHY

1    THERE WAS ABSOLUTELY NO TIME IN DEFENDANT'S BUSINESS SCHEDULE

2    TO KEEP GOING BACK AND FORTH WITH INVESTOR WHO -- A POTENTIAL

3    INVESTOR WHO KEEPS ASKING QUESTIONS.  YOU MIGHT NOTE THIS IN

4    THE PHONE CALLS.  BUT VERY OFTEN DEFENDANT WAS EXCUSING

5    HERSELF.  SHE DIDN'T CALL BACK.  SHE DIDN'T SEND THE EMAIL BUT

6    SHE WOULD.

7            AND THE MOMENT WHEN ALL THIS RESEARCH WAS DONE,

8    UNFORTUNATELY, SHE COLLAPSED COMPLETELY.  AND FROM JANUARY --

9    SORRY, FROM FEBRUARY 14TH OF 2007 SHE WAS VERY ILL.  THAT

10   MYSTERIOUS COLLAPSE AFTER THE DEPOSITION IN DENVER, COLORADO

11   WHERE BATHGATE CAPITAL PARTNERS IS FROM -- TO EUROPE OR MAYBE

12   TO ASIA SHE WAS CONSIDERING EUROPE OR ASIA.  SHE STARTED

13   FIGHTING LITERALLY FOR HER LIFE.  IT IS NOT A PART OF THE CASE,

14   BUT OUT OF THE CURIOSITY MAYBE THE DEFENSE WILL PRESENT AMAZING

15   FACTORS PROVING ONE THING.  POTENTIAL MIND OR POTENTIAL OF

16   INTELLECTUAL MIND AND SPECIFICALLY WHAT HUMAN BODY IS CAPABLE

17   TO DO IF MIND IT'S DIRECTED IN ONE THING.  IT WASN'T IN HER

18   MIND TO DIE.  AND SHE DIDN'T DESPITE -- WOULD BE.  HOLDING YOUR

19   GRANDCHILDREN ON YOUR LAPS YOU CAN TELL THEM I SAW THE GHOST.

20   BECAUSE BY ALL -- PARAMETERS BETWEEN 2007, FEBRUARY AND MARCH

21   -- NO.  AND 2008 ALL THE WAY THROUGH 2009, THE PARAMETERS ON

22   HER BLOOD TEST WERE INDICATING THIS PERSON IS NOT ALIVE.  IT'S

23   NOT DEFENSE DECISION OR COMMENT.  IT IS DONE BY THE MEDICAL

24   DOCTORS.

25            ANYWAY, POWER OF THE MIND CARRYING THROUGH.  AT THAT

1    TIME SHE WAS CHANGING OR ALTERNATING WHEN SHE WAS ILL SHE WAS

2    ILL ON ALL KIND OF VARIOUS HERBAL TINCTURES -- MEANING LIQUIDS,

3    WHICH ARE 55, 65 PERCENT OF ALCOHOL.  AND WHEN SHE WAS FEELING

4    BETTER SHE WAS WORKING -- BASICALLY COMPLETING ALL THE FINAL

5    WORK ON THE RESEARCH.  SOME OF THE CLEANING THE FIELD WITH HER

6    CONTACTS, FRIENDS, ET CETERA, ET CETERA, GETTING READY TO LEAVE

7    BIG UNITED STATES.  BECAUSE THAT NEW VEHICLE WHICH WAS CREATED

8    OR WAS IN THE PROCESS OF CREATION COULD NOT BE FINALIZED IN THE

9    UNITED STATES.  IF IT WOULD, IT WOULD VIOLATE SECURITY EXCHANGE

10   COMMISSION RULES.  THAT'S WHY THE FINAL PART WAS MOVED TO

11   EUROPE.

12           AND THE QUESTION TODAY TO AGENT REITZ WHAT HE FOUND

13   IN DEFENDANT'S PURSE REGARDING THE BUSINESS CARDS WAS LED BY

14   THE FACT THAT THERE WAS OVER AN INCH OF VARIOUS BUSINESS CARDS

15   FROM VARIOUS BANKS NOT THE BROKERS.

16           SHE WAS GOING THROUGH A VERY HARD PERIOD OF SERIOUS

17   HEALTH ISSUES AT THE SAME TIME DEALING WITH ALL PROBLEMS

18   GENERATED BY BATHGATE CAPITAL PARTNERS.  AND THIS IS THE HORROR

19   PART.  BESIDE PROBLEMS AT HOME -- MULTIPLE CITIES TO WHICH

20   FLATS, CAR PROBLEMS, ALL KIND OF DIFFERENT DISASTERS IN HER

21   ORIGINALLY LIFE-STYLE -- ORIGINALLY NICE LIFE-STYLE KEPT

22   HAPPENING.  USED TO BE FOCUSED.  SHE WENT THROUGH.  PRACTICALLY

23   NEVER COMPLAINED.

24           AND WHEN SHE WAS -- WHEN SHE WAS ALREADY ABLE TO

25   TRAVEL, IT WAS 2008 -- BECAUSE 2007, THE DAY SHE COLLAPSED, AND

1    FROM HER ORIGINAL -- FROM HER LAST TRIP TO AUSTRIA WHERE SHE

2    WAS MEETING WITH FORMER BANK LAWYERS -- YOU MIGHT REMEMBER THE

3    NAME MR. BORGISH -- WALTER BORGISH.  HE IS ONE OF THE RETIRED

4    FORMER CENTRAL BANK LEGAL REPRESENTATIVES ON A VERY HIGH

5    POSITION.  ON THE WAY BACK SHE REALIZED HOW -- HOW ILL SHE IS.

6            SHE ARRIVED TO THE UNITED STATES.  AND THE SECOND

7    COLLAPSE WAS TOTAL.  NOTWITHSTANDING, FOCUSED, MADE A DECISION

8    THAT SHE'S NOT GOING TO DIE SHE KEPT GETTING THROUGH.  AND IN

9    2008 SHE TRAVELED THREE TIMES TO EUROPE WHEN SHE WAS ABLE TO

10   TRAVEL.  SHE WAS ABLE TO FLY.

11           AND HAVING NO CONVERSATION WITH MR. MOORE SINCE THAT

12   FAMOUS CALL EARLY IN 2007 SHE DIDN'T HAVE PRACTICALLY ANY

13   REASON WHY SHE WOULD BE WORRIED ABOUT ANY CONSEQUENCES OR ANY

14   POTENTIAL INVOLVEMENT IN HER MIND OR WHAT SHE WAS DOING FOR ALL

15   THOSE YEARS.  SHE WAS ALWAYS WATCHING LEGAL SIDE.  KEPT PERFECT

16   ARCHIVE OVER EVERYTHING WHAT HAS BEEN DONE AND WAS VERY AWARE

17   OF, AT LEAST, SAW THE CONSTITUTIONAL RIGHTS ARE FOR IMPLEMENTED

18   IN DEMOCRATIC COUNTRY LIKE UNITED STATES.

19           THE COURT:  ALL RIGHT.  MS. PEMKOVA, I'M GOING TO ASK

20   YOU TO GET TO THE EVIDENCE IN THIS CASE.  ALL RIGHT.

21           MS. PEMKOVA:  UH-HUM.  OKAY.

22           THE COURT:  ALL RIGHT.

23           MS. PEMKOVA:  IN THE EVIDENCE YOU WILL HAVE -- YOU

24   WILL HAVE A CHANCE TO REVIEW -- FIRST OF ALL, INVOLVEMENT WITH

25   BATHGATE, INVOLVEMENT WITH VARIOUS -- HOPEFULLY WE'LL BE ABLE

1    TO RETRIEVE THE VARIOUS CLIENTS.  THERE WOULD BE EVIDENCE OF

2    TECHNOLOGIES WHICH ARE INVOLVED.  AND BECAUSE MR. -- PROFESSOR

3    BEN AND THE OTHER TESTIMONIES EMPHASIZE THAT NOT EVERY

4    TRANSACTION IS A HIGH-INVESTMENT PROGRAM.

5         THERE WILL BE PROVIDED COURT DOCUMENTS FROM EUROPE

6    SHOWING WHAT WAS ACTUALLY EXPLAINED, THAT IN CERTAIN PERIOD OF

7    TIME IT WAS POSSIBLE TO GENERATE WITHIN 30 DAYS -- UP TO 30

8    DAYS VERY HIGH RETURN.

9         THE REASON WHY IT WAS BRIEFLY MENTIONED DURING THE --

10   DURING THE CROSS-EXAMINATION.  AND THE FILE WOULD BE CREATED

11   PRIOR TO RECESS -- WILL BE -- PRIOR TO COURT RECESS -- PRIOR TO

12   THE 23RD OF JUNE.  AND BESIDE THAT THE DEFENSE WILL -- COULD

13   USE SOME OF THE EXHIBITS THAT YOU HAVE BEEN PROVIDED IN THAT

14   PILE OF THE PROSECUTION.  BECAUSE THERE IS NO TIME FOR PROPER

15   PREPARATION.  THE DECISION OF PRO SE HAS BEEN LIKE 15 MINUTES

16   BEFORE --

17        MR. KOLE:  OBJECTION.  THAT LAST PART I THINK IS

18   ARGUMENT.

19        THE COURT:  SUSTAINED.

20        MS. PEMKOVA:  UH-HUH.

21        ADDITIONALLY, IN THE EVIDENCE BECAUSE FOR ALL THOSE

22   EIGHT YEARS THERE WAS REJECTION OF FOUR WITNESSES.  SINCE 2006

23   ARE BEING ORGANIZED WITNESSES.  HOPEFULLY, YOU WILL HEAR THE

24   TESTIMONY FROM A REAL ESTATE APPRAISER, COURT CERTIFIED, AND

25   OTHER WITNESSES -- IF IT WILL BE POSSIBLE TO GET HIM -- THEM

1    HERE SO QUICKLY WOULD BE TESTIFYING ON BEVERLY HILLS INVESTMENT

2    ON THE TSI CONTRACT ONLY.  MIGHT BE COMPLICATED -- WE JUST

3    HEARD THAT THIS WITNESS IS BASICALLY NOT AVAILABLE.

4              BUT ANYWAY, TSI CONTACT.  AND THAT EXCEL SPREADSHEET

5    WHICH YOU HAVE SEEN WOULD BE PART OF THE EVIDENCE AS WELL.  ALL

6    OTHER ITEMS IN EVIDENCE HAVE TO BE PUT TOGETHER WITHIN THIS FEW

7    DAYS OR TWO WEEKS WHICH WOULD BE BETWEEN THE SESSION NOW AND

8    RECESS.

9              THE COURT:  ALL RIGHT.  THANK YOU.

10             NOW, MS. PEMKOVA, ARE YOU CALLING YOURSELF AT THIS

11   TIME AS A WITNESS?

12             MS. PEMKOVA: YES.

13             THE COURT:  ALL RIGHT.

14             IF YOU'D BE KIND ENOUGH TO RAISE YOUR RIGHT HAND,

15   PLEASE.

16             DEFENDANT IRENE PEMKOVA, SWORN:

17             THE DEFENDANT:  YES.  YES.

18             THE COURT:  MS. PEMKOVA, YOU CAN WALK ANYPLACE IN THE

19   COURTROOM.  BUT IF YOU'D COME UP AND BE SEATED IN THE WITNESS

20   STAND, PLEASE.

21             (PAUSE IN PROCEEDINGS.)

22             THE COURT:  THANK YOU.  PLEASE BE SEATED.

23             WOULD YOU STATE YOUR FULL NAME FOR THE JURORS,

24   PLEASE.

25             THE DEFENDANT:   QUESTION?

1              THE COURT:  WOULD YOU STATE YOUR FULL NAME, PLEASE.

2              THE DEFENDANT:  I-R-E-N-A P-I-M-K-O-V-A.

3              THE COURT:  AND WOULD YOU SPELL YOUR LAST NAME ONCE

4    AGAIN SLOWLY.

5              THE DEFENDANT:  P-I-M-K-O-V-A.

6              THE COURT:  LET ME EXPLAIN TO THE JURORS.

7              ALL RIGHT.  NORMALLY YOU WOULD HAVE A QUESTION AND

8    ANSWER.  A QUESTION AND AN ANSWER.

9              (THE COURT AND CLERK CONFERRING.)

10             THE COURT:  AND I'M GOING TO USE MY DISCRETION.

11             I'M GOING TO LET THE DEFENDANT TELL HER STORY IN A

12   NARRATIVE FORM.  NORMALLY, THAT WOULD BE SUBJECT TO OBJECTION.

13   AND COUNSEL FOR THE GOVERNMENT MAY OBJECT AT ANY TIME.

14             BUT I THINK IT'S ALMOST A FACADE OF GOING BACK AND

15   FORTH WITH MS. PEMKOVA ASKING HERSELF A QUESTION.  AND THEN THE

16   ANSWER BEING TURNED.

17             I THINK SOMETIMES WE NEED TO LOOK FROM PROCEDURE,

18   PROCESS, AND FORMALITY INTO WHAT GETS INFORMATION TO YOU AS

19   QUICKLY AND SUCCESSFULLY AS POSSIBLE.

20             SO, I'M GIVING PERMISSION FOR MS. PEMKOVA TO TELL HER

21    -- OR GIVE HER TESTIMONY IN A NARRATIVE FORM.  TALK TO ME.

22             MS. PEMKOVA.

23             THE DEFENDANT:  YOUR HONOR, MAY I ASK A QUESTION,

24   PLEASE.

25             THE COURT:  PLEASE.

1              THE DEFENDANT:  IT WOULD BE EASIER IF MR. KOLE WOULD

2   BE ASKING QUESTIONS.

3              I BASICALLY --

4              THE COURT:  WELL, HE'LL HAVE A CHANCE FOR

5   CROSS-EXAMINATION.

6              THE DEFENDANT:  OKAY.

7              THE COURT:  AND THAT'S WHAT I TRIED TO EXPLAIN.  IN

8   OTHER WORDS, YOU CAN GIVE AN OPENING STATEMENT.  AND THEN YOU

9   RETURN TO THE STAND UNDER OATH.  AND NOW YOUR TESTIMONY IS --

10             THE DEFENDANT:  HOW MUCH TIME DO I HAVE?

11             THE COURT:  YOU'VE GOT AS MUCH TIME AS YOU'D LIKE,

12  MS. PEMKOVA, AS LONG AS IT'S RELEVANT TO THE CHARGES.

13             THE DEFENDANT:  OKAY.  IS IT POSSIBLE THAT I WILL

14  MAKE IT SHORT.  AND MR. KOLE IS VERY WELCOME TO ASK ME --

15             THE COURT:  YES.

16             THE DEFENDANT:  -- AS MUCH AS HE WANTS.

17             THE COURT:  YES.   THAT'S YOUR CHOICE.  I'M NOT

18  PLACING A TIME LIMITATION ON YOU.

19             THE DEFENDANT:  THANK YOU.

20             THE COURT:  I WAS GETTING CONCERNED ABOUT THE DIRECT

21  EXAMINATION AND CROSS-EXAMINATION.  BUT AS YOU NOTICE, I

22  FINALLY DIDN'T LIMIT YOU.  SO, I SAID YOU COULD CONTINUE.

23             THE DEFENDANT:  YOUR HONOR, IS IT POSSIBLE THAT AFTER

24  THE EXAMINATION BY MR. KOLE IN CASE PRO SE DECIDE TO MAKE SOME

25  CROSS-EXAMINATION.

1                CAN I DO THAT OR NOT?

2                THE COURT:  WELL, WHAT HAPPENS IS THAT YOU'RE GOING

3     TO GIVE YOUR STORY --

4                THE DEFENDANT:  UH-HUH.

5                THE COURT: -- YOUR TESTIMONY.

6                THE DEFENDANT:  UH-HUH.

7                THE COURT:  HE CAN CROSS-EXAMINE YOU.

8                THE DEFENDANT:  UH-HUH.

9                THE COURT:  AND THEN YOU HAVE ANOTHER OPPORTUNITY --

10               THE DEFENDANT:  THANK YOU.

11               THE COURT:  -- ON REDIRECT --

12               THE DEFENDANT:  THANK YOU.

13               THE COURT:  -- BASED ON HIS CROSS-EXAMINATION.

14               THE DEFENDANT:  THANK YOU.

15               THE COURT:  AND I'M NOT EVEN GOING TO HOLD TO THE

16    PROCEDURAL RULINGS BINDING YOU TO THE CROSS.

17               SO, PLEASE.

18               THE DEFENDANT:  OKAY.  THANK YOU.

19               THE COURT:  I'M SORRY.  YOU'RE NOT CONFINED AT ALL.

20               MS. PEMKOVA, BUT I'D LIKE YOU TO RELATE TO THESE

21    CHARGES THAT HAVE BEEN BROUGHT.

22                    NARRATIVE DIRECT EXAMINATION

23               THE DEFENDANT:  THEY -- HAVING HEARD THE INDICTMENT

24    AT THE BEGINNING OF THIS CASE CHARGES ARE FOR FRAUD, ABETTING

25    AND CAUSING THE WRONGDOING CAUSED BY THE GRAND STYLE.

1          BASIC GROUND WAS LIED IN THE OPENING STATEMENT.

2     DEFENDANT WAS CARRYING SEVERAL ACTIVITIES IN HER ACTIVITIES IN

3     THE UNITED STATES GATHERING INFORMATION FOR THE BOOKS,

4     GATHERING THE INFORMATION FOR HER RESEARCH, AT THE SAME TIME

5     HELPING PEOPLE WHO HAVE HAD PROBLEMS LIKE HER -- LIKE HER

6     LOSING MONEY WITH OTHER SMALL INVESTMENT WITH FOREIGN ENTITY BY

7     WHICH BATHGATE CAPITAL PARTNERS, A LARGE BROKERAGE FIRM, AS

8     WELL AS MANY OTHERS -- BASICALLY ASSISTING OR ASSISTING --

9     TRYING TO BE A PART OF THE ROUTINE -- WHICH WAS TRYING TO FIND

10    SOMETHING THAT WORKS.  IT ACTUALLY NEVER DID BECAUSE IN THE

11    UNITED STATES IT'S IMPOSSIBLE DUE TO THE SEC REGULATION TO

12    CREATE A VEHICLE WHICH HAS TO BE BEHIND ANY INVESTMENT.

13         AND THIS WAS THE PART WHEN THOMAS MOORE APPEARED AND

14    HAS BEEN BROUGHT THROUGH WILLIAM ELDER -- FOR THE FIRST TIME.

15         WHAT THE DEFENDANT EXPLAINED IN BEVERLY HILLS IN ANY

16    INVESTMENT ON SMALLER AMOUNT -- AND A MILLION IS A SMALL AMOUNT

17    -- IN ANY OF THIS BIG SO-CALLED TRADINGS ON MTN'S THERE HAVE

18    TO BE -- THERE HAS TO BE A VEHICLE -- REAL ESTATE,

19    TECHNOLOGIES, INVENTION, ANYTHING WOULD AUTHORIZE THE COMPANY

20    TO ISSUE THEIR NOTES.  AND, OF COURSE, NOTES ARE HANDLED BY

21    BANKS.  BUT MOST OF THE PEOPLE --

22         MR. KOLE:  YOUR HONOR, OBJECTION.  FOUNDATION.  THIS

23    IS -- THIS IS NOW MORE LIKE EXPERT TESTIMONY AND --

24         THE DEFENDANT:  OKAY.

25         MR. KOLE:  -- BASED ON SPECIALIZED KNOWLEDGE.  AND I

1   DON'T THINK SHE'S ESTABLISHED A FOUNDATION THAT SHE IS -- HAS

2   THE KNOWLEDGE OF THE THINGS SHE WAS JUST TALKING ABOUT.

3          THE COURT:  WELL, I'LL LET THE JURY JUDGE THAT,

4   COUNSEL.  AND, ALSO, YOUR CROSS-EXAMINATION.

5          SO, PLEASE CONTINUE, MS. PEMKOVA.

6          THE DEFENDANT:  OKAY.

7          BASICALLY AT THE MEETING IN BEVERLY HILLS WHERE

8   THOMAS MOORE APPEARED WITH HIS ADVISOR, ACCOUNTANT AND

9   EX-LAWYER BOTH LIED AND SPELLED OUT CLEARLY WHAT TO WATCH.  AND

10  THIS WAS WHAT MADE A -- THE DEFENDANT TO ACKNOWLEDGE THE

11  CONTACT -- THE CONTRACT SHE -- SHE LIKES.

12         IN THAT CONTRACT FROM TSI WERE SEVEN IMPORTANT KEY

13  WORDS.  SEVEN IMPORTANT DOCUMENTS WHICH WOULD MAKE IT REAL,

14  WHICH WOULD MAKE IT SAFE IN CASE THIS IS REAL.  AND AS WELL AS

15  DR. ONCIU AND DEFENDANT EARLIER IN THE BEVERLY HILLS EMPHASIZE

16  DON'T BELIEVE ANYTHING.  YOU HAVE TO CHECK IT.  TALKING TO

17  BROKERS AROUND DOESN'T HELP.  IT'S HE SAID/SHE SAID.  GO TO THE

18  BANK.  GO TO THE PEOPLE WHO ARE RUNNING THAT.

19         BECAUSE THERE WAS A LONG MEETING IN BEVERLY HILLS

20  DEFENDANT WAS ABSOLUTELY SURE THOMAS MOORE REMEMBERS,

21  SPECIFICALLY WHEN HE WAS SAYING HE IS GOING TO PROCEED, THAT HE

22  IS GOING TO FOLLOW UP -- DECIDED IN BEVERLY HILLS WAS SAID

23  DEFENDANT DOES NOT KNOW DR. ONCIU.  BUT SHE KNOWS HOW TO GET TO

24  HIM.  SHE KNOWS HOW TO GET INTRODUCED.  AND SHE DID.  THIS

25  WOULD BE A PART OF THE EVIDENCE.

1              SHE DISCLOSED THAT SHE KNOWS OF DR. ONCIU RATHER

2    THROUGH TECHNOLOGIES AND AGAIN PROJECTS TO ORPHANAGES AND --

3    BECAUSE HER PREVIOUS INVOLVEMENT WITH THIS TYPE OF ACTIVITIES.

4              AND, AGAIN, IF ANYONE WOULD CROSS-EXAMINATE

5    CORRESPONDENCE BETWEEN DR. ONCIU --

6              MR. KOLE:  OBJECTION.  THIS -- THAT LAST SENTENCE WAS

7    ARGUMENT NOT A -- NOT A FACTUAL TESTIMONY.

8              THE DEFENDANT:  AH, SORRY.

9              THE COURT:  SUSTAINED.

10             THE DEFENDANT:  CROSS-EXAMINATION OF THE

11   COMMUNICATION WITH DR. ONCIU WOULD SHOW --

12             MR. KOLE:  SORRY.  SAME OBJECTION.

13             THE DEFENDANT:  OKAY.

14             THE COURT:  THAT'S SUSTAINED.

15             THE DEFENDANT:  OKAY.

16             AT THE SAME MEETING IN BEVERLY HILLS IT WAS DISCLOSED

17   THAT DEFENDANT IS NOT FAMILIAR WITH ACTIVITIES OF DR. ONCIU

18   BESIDE THE AREA THEY COMMUNICATE.

19             MR. KOLE:  YOUR -- YOUR HONOR, I DON'T NECESSARILY

20   OBJECT.  BUT, AGAIN, BECAUSE WE DON'T HAVE A QUESTION AND

21   ANSWER, IT'S NOT CLEAR WHETHER THIS ALLEGED DISCLOSURE SHE'S

22   MENTIONING IS SOMETHING SHE SAID OR SOMEONE ELSE SAID.  IT

23   MIGHT BE HEARSAY.

24             THE DEFENDANT:  UH-HUH.

25             MR. KOLE:  SHE MIGHT LACK FOUNDATION.

1          THE DEFENDANT:  UH-HUH.

2          MR. KOLE:  IF SHE COULD JUST SAY WHO DISCLOSED THIS,

3    IT WOULD BE HELPFUL.

4          THE DEFENDANT:  IN THE -- FROM TRANSCRIPTS FROM

5    COMMUNICATION WITH ELDER -- WITH MR. ELDER AND DIRECT THE

6    DEFENDANT WITH THOMAS MOORE PRIOR TO MEETING IN BEVERLY HILLS

7    THERE WAS CLEARLY SAID BY THE DEFENDANT SHE'S GOING TO DISCLOSE

8    EVERYTHING.  BUT SHE WON'T TALK ABOUT IT OVER THE PHONE.

9          WHEN THOMAS MOORE WAS LATER ASKING IN OTHER

10   CONVERSATION IF HE CAN BRING THE FRIEND OR COLLEAGUE IT WAS THE

11   ACCOUNTANT AND TAX AUDITOR.  THERE WAS NO OBJECTION -- IF YOU

12   MIGHT CALL -- WITH EXCEPTION ASKING -- DEFENDANT WAS ASKING

13   THOMAS MOORE.  IF YOU TRUST HIM, YOU ARE WELCOME.  DEFENDANT

14   JUST WANTED HIS PASSPORT DO WE KNOW -- KNOW TO WHOM SHE'S

15   TALKING.

16         YES, DURING THE MEETING WITH -- IN BEVERLY HILLS WITH

17   GENERAL BENSON AND HIS CEO, SHE WAS, OF COURSE -- I MEAN,

18   DEFENDANT WAS MEMORIZING EVERYTHING WHAT WAS SAID BECAUSE

19   THOMAS MOORE APPEARED WHAT FOR RESEARCH --

20         MR. KOLE:  I'M SORRY.  APPEARED WHAT?

21         THE DEFENDANT:  THOMAS MOORE WAS ACCEPTED ON THE 3RD

22   OR 4TH SUBMISSION OF HIS DOCUMENTS.  HE WAS ACCEPTED MORE FOR

23   RESEARCH THAN FOR FACTUAL -- FACTUAL INVESTMENT AND ONLY

24   INVESTMENT WHICH WAS EVER -- NOT EVEN PLANNED BUT EXPOSED TO

25   THE EXTENT OF PERSONAL INTRODUCTION AT THE BEGINNING WAS

1    BEVERLY HILLS.

2              AND LATER DURING THE CONVERSATION OF WHEN THERE WAS

3    PROMISED -- OR ACTUALLY DEFENDANT WAS ASKED TO FIND OR TO

4    INTRODUCE TO DR. ONCIU SHE PROMISED TO DO THAT.  BUT SHE

5    DISCLOSED ALL INVALUABLE INFORMATION WHICH HAS TO BE DONE.

6              SHE DISCLOSE ALSO ABOUT HER COLLECTION OF, AS I SAID,

7    OR ARTIFACTS SHE DISCLOSED ABOUT HER RESEARCH.  AND THEY

8    BASICALLY AGREED SOME WAY, SOMEHOW ON THE FACT THAT SHE WOULD

9    BE OCCASIONALLY ASKING FOR ADDITIONAL DOCUMENTS, WHICH SHE DID.

10             THAT EVIDENCE OF THE FUNDS FOR 10 MILLION AND 98

11   MILLION WITH ALL DUE RESPECT FOR THE ONE WHO HAS DONE IT, IT'S

12   VERY POOR.  YOU CAN SEE RIGHT AWAY IT'S AN ALTERATED DOCUMENT.

13   BUT IT LOOKS BEAUTIFUL.  IT WAS -- PART DEFENDANT GOT FROM MR.

14   MOORE.

15             MR. KOLE:  AS STATED, THIS IS ARGUMENT.  IT MIGHT BE

16   THAT THE DEFENDANT COULD STATE WHAT SHE THOUGHT RATHER THAN

17   ARGUING IT.

18             THE DEFENDANT:  SORRY.  IT WASN'T MEANT AS ARGUMENT.

19             RIGHT WHEN TSI CONTRACT CAME -- AS YOU REMEMBER, IT

20   WAS SENT TO THE DEFENDANT BY THOMAS MOORE ASKING HER TO COMMENT

21   DESPITE SHE DISCLOSED BEFORE SHE DOES NOT KNOW EVEN DR. ONCIU

22   IN BEVERLY HILLS.

23             THE DEFENDANT -- FROM THE POSITION OF THE DEFENDANT

24   PEMKOVA THERE WAS NEVER ANY IDEA TO DEFRAUD ANYONE.  IT IS NOT

25   IN HER -- AS WE'LL SEE BEFORE AS SOMEONE WHO WAS FAMILIAR --

1    AND DEFINITELY NOT TRY TO DEFRAUD SOMEONE WHO HAS JUST MILLION.

2     AND MORE IMPORTANTLY SOMEONE WHO IS DOING FAMILY MONEY.

3              WHAT THOMAS MOORE HAS DONE BRILLIANTLY WAS TO

4    CATCHING --

5              MR. KOLE:  OBJECTION.  THAT -- THAT LAST PART IS

6    GETTING INTO ARGUMENT AGAIN.

7              THE DEFENDANT:  OKAY.  SORRY.

8              DEFINITELY THE DEFENDANT PEMKOVA BELIEVED VERY DEEPLY

9    IN THE SITUATION WHERE MR. MOORE WAS WITH THE FAMILY MONEY AND

10   HIS PROBLEMS WITH THE SISTER AND THE BROTHER.

11             -- WHEN THE TSI CONTRACT WAS DISCUSSED WITH DR.

12   ONCIU -- MAYBE GO OVER LATER IN DEFENSE CASE -- YOU WILL SEE

13   VERY CLEARLY HOW MANY TIMES DEFENDANT PEMKOVA WASN'T ON THE --

14   ON THE LINE.

15             MR. KOLE:  EXCUSE ME.  DEFENDANT WAS?

16             THE DEFENDANT:  WAS NOT PARTICIPATING IN THE

17   CONVERSATION.

18             NOW, I THINK THAT THE TRANSCRIPT FROM THE FIRST PAGE

19   TO THE LAST ONE YOU WOULD SEE A VERY INTERESTING MOMENT THAT

20   WHEN SHE STEPS IN SHE GETS THE LAST WORD WHICH WAS SAID AND

21   LAST FEW WORDS BEFORE SHE PICKED UP THE PHONE -- OR SHE SAY

22   SOMETHING VERY GENERIC, VERY GENERAL.  BECAUSE WHEN THOMAS

23   MOORE -- INSTEAD OF CALLING DR. ONCIU DIRECTLY, HE ASKED TO

24   ARRANGE THE PHONE CONFERENCE.

25             AND AS YOU KNOW FROM HIS TWO LINES -- AT LEAST HER

1   PHONE AT THAT TIME, MEANING WHEN SHE WITH THOMAS MOORE AND DR.

2   ONCIU ON PHONE -- ON THE PHONE SHE COULDN'T CALL.  THAT'S WHY

3   WHEN SHE -- THE CONVERSATION AFTER THE FIRST THREE PAGES SHE

4   PUT THE PHONE DOWN.  AND ONCE IN A WHILE SHE PICK IT UP TO

5   CHECK THEY ARE STILL THERE AND IS IT BY A PERSON WITH WHO SHE

6   THINKS SHE IS.  SHE TRIED TO SHOW THAT SHE'S THERE.  THAT'S WHY

7   YOU WILL -- WOULD BE PRINTED -- THE NAME SCHLACK BECAUSE THIS

8   IS THE FIRST NAME THAT SHE HEARD WHEN SHE PICK UP THE PHONE.

9           AT THE END OF THE CONVERSATION SHE'S PARTICIPATING

10  WITH MOORE -- YOU WILL HEAR SOMETHING LIKE THAT.  BECAUSE SHE

11  -- FROM THE BOOK THEY KEPT TALKING, KEPT TALKING, KEPT

12  TALKING.  AND ALL COMMUNICATION IS WITH AGENT REITZ AND HER

13  FIRST DEFENDER -- THE PUBLIC DEFENDER DIANA BASS, EVEN WITH MR.

14  STEWARD, THE SECOND DEFENDER -- THE PUBLIC -- THE APPOINTED

15  LAWYER AND STAND-BY COUNSEL.  SHE MENTIONED THAT SHE WASN'T --

16  SHE WAS AWARE THAT DR. ONCIU MENTIONED SEVERAL TIMES TO TALK TO

17  LAWYER.  WHEN SHE WAS PREPARING FOR THE TRIAL IT IS MENTIONED

18  AT LEAST 22 TIMES.

19          MR. KOLE:  OBJECTION.  RELEVANCE.

20          THE DEFENDANT:  OKAY.

21          THE COURT:  SUSTAINED.

22          THE DEFENDANT:  WHEN IT COMES TO DR. PRIORE, ABOUT

23  THIS LADY, THIS DOCTOR, DEFENDANT FOUND THE MOST FROM THE CASE.

24  THEY WERE -- TWO MEETINGS IN PRESENCE OF THE COUNSELORS DURING

25  THE EIGHT YEARS.  DESPITE IT, THERE IS A POSSIBILITY THAT THERE

1    WAS A VERY SHORT CALL, OR MAYBE TWO, BECAUSE DR. ONCIU WAS

2    ALWAYS TRYING TO INTRODUCE THE DEFENDANT DIRECTLY.  AGAIN, IT

3    WASN'T IN HER --

4             MR. KOLE:  IN HER --

5             THE DEFENDANT:  DR. PEMKOVA HAS NO --

6             MR. KOLE:  EXCUSE ME.  IN HER WHAT?

7             THE DEFENDANT:  IN THE -- IT WAS HER ATTENTION.

8             DR. PRIORE WAS NOT A VALID PERSON OR VALID ASSET OR

9    VALID INFORMATION FOR DR. PEMKOVA IN THE RESEARCH.  SHE WAS --

10   PERSON IN BETWEEN NOT AN INVESTOR, NOT A PROVIDER OF THE

11   INVESTMENT -- MAKING HER -- TALKING TO HER WOULD BE WASTE OF

12   TIME.

13            AND I HOPE THAT IN THE OPENING STATEMENT WAS MADE

14   CLEAR THAT DEFENDANT WAS ALWAYS FOCUSED ON THE PRODUCTIVITY.

15   BECAUSE SHE LEARN IN HER TRAVELS AROUND THE TIME YOU CAN BUY

16   EVERYTHING, EVEN A HOUSE, WITH ONE EXCEPTION.  TIME.  THAT'S

17   WHY WHATEVER SHE WAS DOING SHE WAS TRYING TO BE MAXIMALLY

18   PRODUCTIVE.  MAXIMALLY HELPFUL.

19            IT WAS I WHO PRESENTED -- ENOUGH BY HER POSITION TO

20   BATHGATE AND ON NUMEROUS OCCASIONS.  IT WAS PRESENTED BY HER

21   STATEMENTS PROVIDED TO AGENT REITZ -- SORRY, TO MR. THOMAS

22   MOORE WARNING ABOUT, FOR EXAMPLE, FLORIDA DEAL.

23            IF YOU MIGHT RECALL, WE HAVE HEARD IT TODAY, SHE

24   POSITIONED AT LEAST TWICE HIS ATTENTION TO A RISK GOING FOR THE

25   SECOND WEEK IF HE WOULD BE -- IN THIS CONVERSATION COMPLETELY.

1    SHE WAS NOT SUGGESTING BECAUSE SHE WASN'T HIS ADVISOR, BUT SHE

2    WAS EMPHASIZING THAT IT WOULD BE VERY -- IT WOULD BE SAFE TO

3    STAY ONLY THE ONE WEEK WITH NO RISK.

4         REMEMBER THAT FAMOUS CONVERSATION REGARDING FLORIDA

5    -- AND I APOLOGIZE.  WHEN THE DEFENDANT WAS SMILING IT WASN'T

6    OUT OF THE DISRESPECT FOR JURY OR FOR JUDGE CARTER AND ANYBODY

7    ELSE -- IT WAS RATHER AMUSING.  AND I'M SORRY FOR THAT.

8         BUT THE FAMOUS FLORIDA DEAL WAS A VERY INTERESTING

9    STORY.  AND THOMAS MOORE KNEW ABOUT THIS INVOLVEMENT OF THE

10   DEFENDANT PEMKOVA SINCE BEVERLY HILLS CONVERSATION.  SHE'S AN

11   AVID DRIVER AND LOVES TO DRIVE.  THAT FLORIDA DEAL HAS LEFT

12   BEHIND NASCAR AND EARNHARDT FAMILY.  DALE EARNHARDT, JR. AND

13   LU ANN EARNHARDT, WHO IS A DEVELOPER, DESIGNER.  IT WAS A

14   FANTASTICAL OPPORTUNITY, WHICH, OF COURSE, HAD A COMPLICATED

15   COINCIDENT.  BUT THE IDEA TO MEET NASCAR PERSONALLY, THEIR

16   DRIVERS, WAS ENTICING TO EXPLAIN -- TO EXPLAIN THAT SHE --

17   EVERYTHING -- THE DEFENDANT -- FLEW TO BOSTON -- HAS BEEN

18   PICKED UP BY THE WAY SNOWDEN WHO PROVIDED THE ESCROW DRAFT.

19   THEY DROVE -- AND THEY DROVE HER FROM BOSTON ALL THE WAY TO

20   NORTH CAROLINA WHERE MR. BILLABRICK WAS LIVING.  HE'S A BIG

21   NASCAR FAN.  HE WAS.  HE DIED, UNFORTUNATELY.  HE WAS A BIG

22   NASCAR FAN AS WELL.  AND FROM THERE SHE -- SHE TRAVELED WITH

23   MR. SNOWDEN AND HIS -- OTHER PARTIES -- NOT IN THE CASE -- TO

24   MEET EARNHARDT FAMILY AND NASCAR DRIVERS.

25        AMAZING OPPORTUNITY.  WONDERFUL EVENING.  A COUPLE OF

1  DAYS IN MRS. LOU ANN EARNHARDT'S HOUSE.  AND HERE'S WHAT IT

2  WAS.  IT WAS THAT WETLAND -- EARNHARDT WETLAND WHICH SNOWDEN --

3          MR. KOLE:  I'M SORRY.  AGAIN, IT MAY NOT BE

4  OBJECTIONABLE.  BUT WITH NO SOURCE OF THE INFORMATION, IT'S

5  IMPOSSIBLE TO TELL WHETHER MS. PEMKOVA HAS PERSONAL KNOWLEDGE

6  OF THIS OR IF IT'S JUST HEARSAY FROM SOMEONE ELSE.

7          THE DEFENDANT:  NO.  IT'S ME.  IT'S THE DEFENDANT

8  WHO HAS THE KNOWLEDGE AND CROSS-EXAMINATION --

9          OH, DEFENDANT WAS PERSONALLY PRESENT WITH EARNHARDT

10  FAMILY.  DEFENDANT WAS PRESENT IN THE COMMUNICATION WITH

11  EARNHARDT'S FAMILY AND NASCAR WHY -- HOW THIS INVESTMENT WOULD

12  WORK.  IT WAS NOT A HEARSAY.  IT IS NOT A -- OR SECONDHAND

13  INFORMATION.

14          MAY I, YOUR HONOR?

15          THE COURT:  WELL --

16          THE DEFENDANT:  THAT'S WHY --

17          THE COURT:  PLEASE CONTINUE, MS. PEMKOVA.

18          THE DEFENDANT:  THANK YOU.

19          THAT'S WHY AT THE EARNHARDT'S HOME SHE EXACT IN THE

20  --

21          THE RECORDER:  EARNHARDT?

22          THE DEFENDANT:  EARNHARDT.  DALE EARNHARDT.

23          THE RECORDER:  DALE EARNHARDT?

24          THE DEFENDANT:  YES.  ACTUALLY, LOU ANN EARNHARDT.

25          LOU ANN EARNHARDT'S HOUSE, HIS HOUSE IS -- WAS THE

1    FIRST MEETING PRIOR TO THE -- WITH THE EXECUTIVES AND WITH THE

2    DRIVERS.  AND THERE WAS CLEARLY LAID OUT HOW IT WOULD WORK.

3              MR. KOLE:  OBJECTION.  HEARSAY.

4              THE COURT:  NOW --

5              THE DEFENDANT:  OKAY.

6              THE COURT:  -- THAT'S SUSTAINED.

7              THE DEFENDANT:  OKAY.  ANYWAY, DEFENDANT WAS QUITE

8    SURE THAT COMMUNICATING TO THOMAS MOORE ABOUT THE FLORIDA

9    INVESTMENT WAS A CLEAR REAL ESTATE TRANSACTION.  THAT WETLAND

10   WOULD BE TAKEN OUT OF THE WETLAND DEVELOPED AS A LUXURY LIVING

11   MADE BY A NEW COUNTRY CLUB FOR NASCAR DRIVERS NEARBY THEIR

12   TRACK.  THERE WAS A NEARBY TRACK WHEN NASCAR DRIVERS ARE

13   SPENDING TREMENDOUS AMOUNT OF TIME --

14             MR. KOLE:  OBJECTION.  THIS AGAIN I THINK IS GETTING

15   INTO MORE HEARSAY.  OBJECTION.

16             THE DEFENDANT:  OKAY.

17             THE COURT:  IT'S SUSTAINED.

18             THE DEFENDANT:  OKAY.

19             ANYWAY, BUT FOR THE -- FOR THE FLORIDA TRANSACTION

20   FOR THAT LAND -- THE REAL ESTATE TRANSACTION WAS BASED ON

21   TAKING OUT OF THE WETLAND THERE, ONE, AND DEVELOPING IT.  IT

22   DIDN'T HAPPEN BECAUSE THE WETLAND WASN'T ALLOWED TO BE TAKEN

23   OUT OF THE LAND.

24             EVERY OTHER REAL ESTATE DEAL WHICH APPEARED IN TSI

25   CONTRACT -- WHICH WAS ACTUALLY BEFORE THAT -- THAT FLORIDA DEAL

1   WAS BASED ON DEFENDANT'S KNOWLEDGE OF WHAT WAS HAPPENING IN

2   EUROPE.

3           YOU MIGHT REMEMBER IN --

4           MR. KOLE:  OBJECTION.  THAT LAST PART I THINK

5   MISCHARACTERIZED THE EVIDENCE OF TSI, THAT THERE WAS A NUMBER

6   OF REAL ESTATE TRANSACTIONS IN THE TSI DEAL.

7           THE COURT:  PLEASE CONTINUE.

8           THE DEFENDANT:  OKAY.

9           IN TSI CONTRACT WHICH THOMAS MOORE RECEIVED FROM SOME

10  PALLE KROEIS IN EUROPE, THIS CONTRACT WAS CC'D TO DR. BEATA

11  PRIORE.  BUT DEFENDANT PEMKOVA GOT IT FROM THE THOMAS MOORE.

12          WHEN SHE WAS GOING THROUGH THE CONTRACT AS THOMAS

13  MOORE ASKED HER WHEN HE CALLED HER TO DO SO, THE EMAIL WAS

14  ALREADY IN HER EMAIL BOX -- MY BOX.  BUT SHE WASN'T AWARE OF

15  IT.  AGAIN, THOMAS MOORE WASN'T A HIGH PRIORITY.

16          I'M SORRY, AGENT REITZ.

17          AND WHEN SHE LOOKED INTO THE CONTRACT SHE WAS LOOKING

18  FOR KEY MOMENTS WHICH WOULD MAKE THIS INVESTMENT REALISTIC TO

19  THE EXTENT IT'S WORTH TO GO AND LOOK AND CHECK.  IS IT JUST HE

20  SAY/SHE SAY.  NICE PAPERWORK.  OR THERE IS SOMETHING BEHIND.

21  BECAUSE SOME THINGS WHICH LOOK NICE ON THE -- ON THE PAPER NOT

22  ALWAYS ARE IN REALITY.  BUT THIS WASN'T DEFENDANT'S ROLE.

23  THOMAS MOORE APPEARED WITH THE ADVISOR -- FINANCIAL ADVISOR,

24  TAX DEFENDER MR. TAPINSKI.

25          KEY MOMENTS WHICH WERE IN THIS TSI CONTRACT WERE

1    MAKING IT STRONG ENOUGH BECAUSE IT WASN'T JUST HIGH PROFIT

2    GENERATED OUT OF THE MAGICAL TRADES.  THERE WAS A -- REAL

3    ESTATE.

4         AND THE REASON WHY DEFENDANT TOOK IT SERIOUSLY AND

5    MADE IT WAS TO GO AND CHECK IF MR. MOORE REALLY WANTS TO INVEST

6    WAS CAUSED BY THE FACT THAT BETWEEN THE -- BEFORE 1997 SHE WAS

7    PERMANENTLY IN EUROPE.  AND BETWEEN 1997, ALL THE WAY TO

8    2004/'05, SHE WAS FREQUENTLY TRAVELING.

9         IT WAS DISCLOSED THAT DEFENDANT WAS -- IS MIXED

10   ORIGIN, GERMAN/FRENCH.  AND SHE WAS PRESENT THROUGH HER

11   PRESENCE IN EUROPE AS THE -- AS THROUGH HER CLIENTS TO THE FACT

12   OF RESTITUTIONS -- THERE WERE -- OF HER EARLIER, MEANING AFTER

13   THE COMMUNIST SYSTEM FAILED IN EASTERN GERMANY, CZECHOSLOVAKIA,

14   POLAND, ENTIRE FORMER YUGOSLAVIA, ROMANIA, HUNGARY -- WAS THE

15   BASIS OF RESTITUTION, MEANING PEOPLE WHO HAVE A RIGHT TO GET --

16   BECAUSE THEY OWNED FACTORIES AND OTHER ASSETS WERE ENTITLED TO

17   BE SOLD.

18        ADDITIONALLY, IT WAS A TIME WHEN THE EURO HAS BEEN

19   ACCEPTED BY SEVERAL COUNTRIES.  AND THERE WAS ANOTHER HUGE JUMP

20   IN THE PRICE OF THE REAL ESTATE.  IT WAS PURCHASED ON A VERY

21   LOW PRICE IN THE LOCAL CURRENCY AND REPRICED IN EUROS.  AND

22   THERE WERE MANY, MANY OTHER SITUATIONS WHICH COULD IN REAL

23   ESTATE CREATE A HIGH PROFIT.  PLUS, THERE WERE SOME

24   TECHNOLOGIES WHICH DEFENDANT WAS INVOLVED WITH.  YOU WILL SEE

25   LATER ON THE -- ON SOME EXHIBITS.

```
 1            AND IT IS BASICALLY THE SAME WHAT MR. MICHAEL MILKEN
 2   HAS DONE WITH HIS --
 3            MR. KOLE:  OBJECTION.  RELEVANCE.
 4            THE COURT:  SUSTAINED.
 5            MR. KOLE:  OH, WELL --
 6            THE COURT:  WELL --
 7            MR. KOLE:  WELL, I DIDN'T -- SHE'S GETTING BACK TO
 8   THE PRODUCT WITH ROBISON.
 9            I WITHDRAW THE OBJECTION.
10            THE COURT:  ALL RIGHT.
11            THE DEFENDANT:  OKAY.
12            MEANING IN THE UNITED STATES HAS BEEN PROVED BY MR.
13   MILKEN ON SEVERAL OCCASIONS AS WELL AS BY MR. GEORGE SORISH ON
14   SEVERAL OCCASIONS.
15            MR. KOLE:  OBJECTION.  RELEVANCE.  FOUNDATION.  LACKS
16   PERSONAL KNOWLEDGE.
17            THE DEFENDANT:  OKAY.
18            THE COURT:  I'M GOING TO LET YOU CONTINUE, MS.
19   PEMKOVA.
20            THE DEFENDANT:  OKAY.
21            THIS TWO EXAMPLES PROVED A POSSIBILITY TO CREATE IN
22   UNITED STATES A HIGH PROFIT WHICH WOULD ALMOST FALL IN THE
23   CATEGORY OF HIGH-YIELD INVESTMENT PROBLEMS IF PROPER VEHICLE IS
24   USED -- TECHNOLOGY, REAL ESTATE INVENTION.
25            FACEBOOK, IF YOU REMEMBER, HAS BEEN MENTIONED IN THIS
```

1    CASE SEVERAL TIMES.  AND DEFENDANT WAS VERY -- VERY AWARE THAT

2    OPPOSING OR TAKING INTO CONSIDERATION FACEBOOK AND JUST ON THE

3    -- IN THE ASPECT OF STOCK, YES, IT'S OKAY.  BUT THIS IS NOT

4    EXACTLY WHAT MR. ZUCKERBERG MADE.

5           THIS EVIDENCE OF AMERICAN VEHICLE CAPABLE TO CREATE A

6    LARGE PROFIT WAS TAKEN TO A FINAL PRODUCT, MEANING SHARES OR --

7    SORRY, STOCK, WHEN IN REALITY MR. ZUCKERBERG BECAME WITHIN LESS

8    THAN THREE YEARS BILLIONAIRE ACCORDING TO THE INFORMATION ON

9    THE INTERNET.  MOST LIKELY YES.  AND NOBODY CONSIDERED HOW MUCH

10   HE MADE AND WHY IN BETWEEN.  AND THE SAME APPLIES --

11          IF TSI CONTRACT WOULD BE RELATED TO A BUSINESS, REAL

12   ESTATE OR ANY TRANSACTION IN UNITED STATES, WHAT WOULD BE --

13   COMMENTS FROM DEFENDANT.

14          THE COURT:  NOW, MS. PEMKOVA, DO YOU WANT TO DIRECT

15   THE JURY'S ATTENTION TO YOUR ACTIONS OR ACTIVITIES IN THESE

16   MATTERS, IF ANY.

17          THE DEFENDANT:  WELL, I THINK I HAVE ALREADY SAID IT,

18   BUT OKAY.  FROM THE BEGINNING.

19          MR. THOMAS MOORE CAME TO THE DEFENDANT THROUGH

20   ANOTHER PARTY.  SHE NEVER REACHED HIM.  IT TOOK ACTUALLY TWO

21   CONVERSATIONS WITH MR. ELDER TO GET HER THERE.

22          DEFENDANT WAS TRYING TO ACCOMPLISH THOSE TASKS --

23   HELPING HIM AS WELL AS ACCOMMODATING HER OWN RESEARCH.  BECAUSE

24   TO THE CERTAIN POINT TO THE MEETING IN BEVERLY HILLS HE WAS AN

25   INTERESTING PARTY TO RESEARCH.  BUT IN BEVERLY HILLS CAME TO

1    THE LIGHT WHAT IS ACTUALLY BEHIND THE -- INTEREST WASN'T THERE.

2    YES, SHE WAS -- BECAUSE HER INTENT TO HELP HIM  AND TO HELP MR.

3    MOORE AND FIND BY WHATEVER INVESTMENT AND FOLLOWING HIS REQUEST

4    TO INTRO -- OR, ACTUALLY, WISH TO INTRODUCE HIM TO DR. ONCIU

5    DEFENDANT ESTABLISHED A CONNECTION WITH DR. ONCIU.  AT THE SAME

6    TIME BEING AWARE THAT DEFENDANT DISCLOSED IN BEVERLY HILLS WHAT

7    ACTUALLY THE RELATION IS WITH DR. ONCIU, HOW MUCH SHE KNOWS,

8    HOW MUCH SHE DOESN'T KNOW.  SHE WAS SURE -- SURE MR. MOORE

9    KNOWS IT.

10          WHEN THE TSI CONTRACT CAME, YES, SHE MADE A COMMENT

11   AS SHE DID.  BUT, AGAIN, RELATED TO BEVERLY HILLS.  THAT'S WHY

12   THERE WAS NEVER ANY FURTHER COMMENTS AFTER RECEIVING THE --

13   AFTER MR. MOORE RECEIVED THE CONTRACT FROM TSI AND THE

14   DEFENDANT PUT TOGETHER THE PHONE CONFERENCE OF DR. ONCIU, THERE

15   WAS NO FURTHER ACTIVITIES ON HER SIDE REGARDING TSI AND MR.

16   MOORE.

17          YES, THERE WERE THREE PROSPECTIVE -- AS MR. REITZ

18   CALLED IT TODAY -- PROSPECTIVE INVESTORS.  BUT THEY APPEARED IN

19   TSI -- ACTUALLY, TO SAY -- IN CONJUNCTION WITH MR. -- WITH DR.

20   ONCIU AND POTENTIAL CONTACT WITH DR. PRIORE AFTER THE MEETING

21   IN BEVERLY HILLS AND PERSONAL INTRODUCTION BETWEEN MR. MOORE

22   AND DEFENDANT HAPPENED.

23          BASICALLY ALL THESE COMMUNICATIONS WERE BASED ON THE

24   FACT TO FIND SOMETHING FOR MR. MOORE THAT WOULD WORK.  AND

25   BECAUSE MR. MOORE IN THE PERSONAL MEETING IN BEVERLY HILLS

1    ACTUALLY DID NOT SHOW -- HE'S A -- HE'S A SOPHISTICATED

2    INVESTOR, AT LEAST FOR DEFENDANT.  THAT'S WHY SHE WAS TRYING TO

3    HAVE AS WELL AS DR. ONCIU TO HAVE SOMEBODY GOING AHEAD CHECKING

4    WHAT THIS IS ABOUT.

5            YES, DEFENDANT ASKED DR. ONCIU TO FIND SOMETHING FOR

6    THOMAS MOORE.

7            YES, DEFENDANT WAS SENDING THE PAPERWORK WHICH SHE

8    GOT FROM DR. ONCIU.  BUT AT THE SAME TIME, AGAIN, BASED ON THE

9    DISCLOSURES AND EXPLANATIONS WHICH HAD BEEN DONE IN BEVERLY

10   HILLS.  THAT CONTRACT WHICH PROSECUTION CALLED CONTRACT, THE

11   REAL ESTATE ESCROW DRAFT WAS -- IT WAS NOT A CONTRACT.  IT

12   WASN'T A FINAL VERSION.  IT WAS BASICALLY AN EXAMPLE WHAT MIGHT

13   BE DONE.  BECAUSE, AGAIN, THOMAS MOORE WASN'T SOMETHING THAT

14   WOULD BE ATTRACTING THE DEFENDANT FINANCIALLY, TECHNICALLY, AND

15   AN ASPECT OF HER RESEARCH MORE THAN SHE HAS DONE.

16            ANYTHING ELSE, YOUR HONOR?

17            THE COURT:  PARDON ME?

18            THE DEFENDANT:  ANYTHING -- ANYTHING ELSE I SHOULD

19   SAY?

20            THE COURT:  NO.  I -- I WANT TO MAKE CERTAIN THAT YOU

21   HAVE RELATED YOUR TESTIMONY TO THE ACCUSATIONS THAT HAVE BEEN

22   BROUGHT AGAINST YOU.

23            THEN, HAVE YOU CONCLUDED AND MR. KOLE MAY ASK

24   QUESTIONS?

25            THE DEFENDANT:  I THINK SO.

1                THE COURT:  ALL RIGHT.

2                WE'RE GOING TO TAKE JUST A BRIEF RECESS.  I JUST WANT

3     YOU TO STRETCH FOR A MOMENT.

4                YOU ARE ADMONISHED NOT TO DISCUSS THIS MATTER AMONGST

5     YOURSELVES NOR FORM OR EXPRESS ANY OPINION CONCERNING THIS

6     CASE.

7                (JURY EXITING COURTROOM.)

8                THE COURT:  AND WOULD YOU STEP DOWN FOR JUST A

9     MOMENT.  JUST REST.

10               THE DEFENDANT:  YES.

11               THE COURT:  ALL RIGHT.

12               COUNSEL, WE'LL BE IN RECESS FOR 15 MINUTES.  WE'LL

13    COME AND GET YOU AT 3:45.

14               I'M NOT COUNSELING YOU, BUT YOUR CROSS IS SHORT.

15               MR. KOLE:  YES, YOUR HONOR.

16               MS. PEMKOVA:  YOUR HONOR, MAY I SAY SOMETHING.

17               THE COURT:  YES, MA'AM.  JUST ONE MOMENT.

18               MS. PEMKOVA.

19               MS. PEMKOVA:  I WOULD LIKE TO APOLOGIZE IF I MADE A

20    MISTAKE.  BECAUSE I ASK YOUR HONOR IT WOULD BE EASIER ON ME IF

21    MR. KOLE WOULD BE ASKING.

22               THE COURT:  HE'LL ASK YOU A FEW QUESTIONS.  BUT THEN

23    YOU'LL HAVE ANOTHER OPPORTUNITY.  I WANT TO MAKE CERTAIN THAT

24    YOU HAVE ENOUGH TIME.

25               MS. PEMKOVA:  THANK YOU.

1           THE COURT:  AND THERE'S NO LIMITATION ON THIS.

2           THANK YOU.

3           MS. PEMKOVA: YOUR HONOR, THANK YOU.

4           (RECESS AT 3:29 P.M. TO 4:05 P.M.)

5           THE COURT:  AND COUNSEL --

6           AND, DEB, IF YOU'D BE SO KIND.

7           THE CLERK:  SURE.

8           THE COURT:  AND, MS. PEMKOVA, WOULD YOU BE SO KIND AS

9   TO RETAKE THE STAND, PLEASE.

10          THE DEFENDANT:  THANK YOU.

11          THE COURT:  AND MR. KOLE WILL FINISH THIS EVENING.

12          MR. KOLE:  OH, YEAH.

13          THE COURT:  OKAY.

14          MR. KOLE:  NO.  DON'T WORRY ABOUT IT.  NOT GOING TO

15   BE CLOSE.

16          (THE COURT AND CLERK CONFERRING.)

17          (JURY ENTERING COURTROOM.)

18          THE COURT:  ALL RIGHT.  THE JURY IS PRESENT.  THE

19   ALTERNATES ARE PRESENT.

20          MS. PEMKOVA, IF YOU WOULD HAVE A SEAT.

21          COUNSEL ARE PRESENT.

22          PARDON ME FOR THE LENGTHY RECESS.  IT WAS MY FAULT.

23   MY RESPONSIBILITY.

24          COUNSEL, YOUR CROSS-EXAMINATION, PLEASE.

25          MR. KOLE:  YES, YOUR HONOR.

CROSS-EXAMINATION

BY MR. KOLE:

Q    MS. PEMKOVA, YOU STATED THAT ONE OF THE THINGS YOU WERE

TRYING TO DO WAS TO HELP PEOPLE WHO HAD HAD PROBLEMS BECAUSE

THEY HAD LOST MONEY IN LARGE INVESTMENTS.

THAT'S RIGHT, ISN'T IT?

A    YES, BUT NOT GENERALLY.  NOT TO EVERYBODY.

Q    SO, YOU WERE AWARE OF PEOPLE HAVING LOST MONEY IN

INVESTMENTS, RIGHT?

A    ABSOLUTELY.  THAT'S WHY I POINTED -- I POINTED THE

IMPORTANT MOMENTS WHICH EVERY INVESTOR HAS TO LOOK FOR IN THE

MEETING IN BEVERLY HILLS.  AND THAT'S WHY THE SEVEN POINTS

EMPHASIZED IN TSI CONTRACT WERE BASICALLY MARKERS.

Q    AND, IN FACT, IN A PRIVATE COMMUNICATION WITH ONCIU THAT

WE SAW DURING THE TRIAL, JUST BETWEEN THE TWO OF YOU, NO ONE

ELSE WAS SEEING IT, IN THAT COMMUNICATION WHEN HE TOLD YOU

ABOUT CERTAIN OPTIONS FOR INVESTMENTS YOU TOLD HIM ONLY ONE OF

THREE WOULD BE ACCEPTABLE TO PEOPLE YOU WERE WORKING WITH -- I

THINK YOUR CLIENTS YOU CALLED THEM -- BECAUSE PEOPLE HAD LOST

MONEY DOING THE OTHER TWO, RIGHT?  THAT'S WHAT YOU SAID.

A    OPTION -- NOT EXACTLY, BUT GENERALLY YES.

THE OPTION WHICH WOULD BE ACCEPTABLE WITH THE SOURCE

WHICH DEFINITELY I DON'T KNOW WOULD BE ONLY THE CONTROL OVER

THE MONEY UNLESS THE INVESTOR IS SOPHISTICATED AND HAS A

FINANCIAL ADVISOR, MEANING HE KNOWS WHAT HE IS DOING.

1  Q    YOU TOLD ONCIU IN THAT COMMUNICATION THAT PEOPLE WOULD

2  ONLY WANT TO DO AN INVESTMENT WHERE THEY LEFT THE MONEY IN

3  THEIR OWN ACCOUNT SO -- BECAUSE IT WOULD BE SAFER THERE, RIGHT?

4  A    NOT NECESSARILY.  IT WAS MEANT IN BROADER -- BROADER

5  CONTEXT IN OTHER CONVERSATION IS DR. ONCIU WHICH WE HAVEN'T

6  SEEN.  BECAUSE "ON ACCOUNT" WOULD MEAN ORIGINAL ACCOUNT WHERE

7  THE MONEY WAS DEPOSITED FOR THE ACCOUNT ON INVESTOR'S NAME, FOR

8  EXAMPLE, IN GERMANY IN THAT DISCUSSION JUST BEFORE TSI

9  CONTRACT.

10 Q    OH, I MEAN, WE CAN PULL THE EMAIL OUT IF WE NEED TO.  BUT

11 IN THE EMAIL HE HAD THREE OPTIONS.  THE SECOND ONE WAS LEAVING

12 THE MONEY IN THE PERSON'S OWN ACCOUNT, THE INVESTORS, AND

13 GIVING SOMEBODY ELSE SIGNING POWER.  IT'S STILL IN THEIR

14 ACCOUNT.

15         AND YOU INCLUDED THAT IN ONE OF THE UNACCEPTABLE

16 OPTIONS, RIGHT?

17 A    YES.  BECAUSE, AGAIN, WHEN I HAVE DISCUSSED IT WITH DR.

18 ONCIU, IN THAT SHORT COMMUNICATION YOU ARE REFERRING TO THERE

19 WAS NOT SPECIFIED THAT THIS ACCOUNT HAS TO BE IN UNITED STATES

20 OR IT HAS TO BE THE ACCOUNT WHERE MONEY WAS ORIGINALLY

21 DEPOSITED.

22         THE WAY HOW IT WAS MEANT IN CASE -- FOR EXAMPLE,

23 BEFORE TSI, THE GERMAN BANK WOULD PROVIDE THE ACCOUNT FOR THE

24 INVESTOR.  AND IT WOULD REMAIN UNDER HIS CONTROL.  IT WOULD BE

25 WISE TO LOOK INTO THE POTENTIAL INVESTMENT SUBJECT THERE IS A

1   VEHICLE WHICH CAN CREATE THE FUNDS, MEANING SOME -- WHAT WE

2   DISCUSSED -- REAL ESTATE, TECHNOLOGY, OR ANYTHING BECAUSE MONEY

3   DON'T GROW ON THE TREES, CORRECT?

4   Q    THE THIRD OPTION IN ONCIU'S EMAIL TO YOU WAS AN INVESTOR

5   MOVING THEIR MONEY TO SOME OTHER ACCOUNT IN EUROPE.

6   A    UH-HUH.

7   Q    AND YOU SAID THAT YOUR CLIENTS WOULD NOT WANT TO DO THAT,

8   RIGHT? -- BECAUSE THEY HAD HAD BAD EXPERIENCES, CORRECT?

9   A    WELL, I WOULD BE CAREFUL WITH THE WORD "CLIENTS."  BUT,

10  YES, I MENTIONED -- I MENTIONED -- YES.  I WAS USING SOMETIMES

11   "CLIENTS," BUT THAT DIDN'T MEAN EXACTLY THEY ARE MINE CLIENTS.

12         THE ACCOUNT IN -- THE MONEY MOVED TO ANOTHER ACCOUNT.

13  IT'S A BAD OPTION BECAUSE AT THIS MOMENT INVESTOR HAS TO VERY

14  CAREFULLY LOOK WHAT ARE TERMS AND CONDITIONS.  UNDER WHICH ONE

15  HE IS MOVING IT.  AND THAT'S WHY I EMPHASIZE BANK BECAUSE IN

16  PERSONAL OPINION OF -- OF THE DEFENDANT, IN MY PERSONAL

17  OPINION, ESCROW PROMISES IS JUST WORDS.

18         THE MAIN PLACE WHERE ANY INVESTOR HAS TO LOOK IS THE

19  BANK -- WHERE THE RECEIVING PARTY KEEPS THE MONEY.

20  Q    RIGHT.  MOVING MONEY -- AS YOU JUST SAID, MOVING MONEY TO

21  ANOTHER ACCOUNT IS A BAD IDEA.  AND ESCROW IS JUST WORDS.  AND

22  IN THE TSI DEAL, AGENT REITZ AS TOM MOORE WAS ASKED TO MOVE

23  MONEY TO ANOTHER ACCOUNT AND ALLEGEDLY WAS PROTECTED BECAUSE OF

24  AN ESCROW, RIGHT?  THAT'S --

25  A    NO.

1  Q    -- HOW THE DEAL WAS SET UP?

2  A    NO.  NO.  IT'S VERY -- VERY SIMPLIFIED.

3       BECAUSE AGENT -- I SAY MR. MOORE WAS WARNED BEFORE IN

4  BEVERLY HILLS WHAT ARE THE MARKERS.  HE PRESENTED HIMSELF AS A

5  SOPHISTICATED INVESTOR.  HE PRESENTED HIMSELF AS HAVING THE

6  FINANCIAL ADVISOR WHICH WAS -- IT WAS IN BEVERLY HILLS.

7       AS I FOUND DURING STUDYING THE CASE, DR. ONCIU

8  EMPHASIZED AS WELL TO VERIFY THE PARAMETERS OF THE TRANSFER.

9       THE REASON WHY I HAVE SAID I BASICALLY LIKE THE

10 CONTRACT, IT APPLIED TO THE FIRST PART IN THESE SEVEN POINTS,

11 WHICH I SHOWED BEFORE.  AND WE WILL -- GO OVER IN DEFENSE CASE.

12      IF ONE OF THESE -- IF MORE THAN TWO OF THESE POINTS

13 WON'T BE THERE, I WOULD SAY NO.  TOO SMALL AMOUNT.

14      AND I LEFT ON MR. MOORE HIS ADVISOR AND HIS LAWYERS

15 TO VERIFY IS THIS WHAT IS IN THE CONTRACT THE TRUTH OR NOT.

16 Q    THESE SEVEN POINTS THAT YOU HAVE REFERRED TO, ALTHOUGH WE

17 LISTENED TO -- WE SAT THROUGH A LOT OF MINUTES OR HOURS OF

18 RECORDINGS OF PHONE CALLS WITH YOU AND SAW MANY EMAILS, NOT A

19 SINGLE EMAIL, NOT A SINGLE CALL THAT WE LISTENED TO REFER TO

20 THESE SEVEN POINTS, DO THEY?

21 A    MR. KOLE, THERE WAS A MEETING --

22 Q    DO ANY OF THE EMAILS OR PHONE CALLS THAT WE SAW IN COURT

23 REFER TO THE SEVEN POINTS?

24 A    NO.

25 Q    THAT INCLUDES ONES THAT YOU PRESENTED, RIGHT? -- NONE OF

1    THEM REFER TO THEM; ISN'T THAT CORRECT?

2    A    NO.  BECAUSE IT WAS SAID IN BEVERLY HILLS PRIOR TO MEETING

3    WITH JOHN ROBISON TO BE CAREFUL WHAT TO WATCH.

4          AND IT WAS SPECIFICALLY EMPHASIZED BECAUSE IN

5    ROBISON'S -- JOHN ROBISON'S STRUCTURE INVESTOR WAS MOVING

6    MONEY.

7    Q    RIGHT.

8          AND GOING BACK TO YOUR DIRECT TESTIMONY FOR A MINUTE

9    --

10   A    UH-HUH.

11   Q    -- YOU SAID THAT THE TRANSACTION -- I BELIEVE YOU WERE

12   REFERRING TO THE TSI DEAL -- THE MAIN ONE WE'VE BEEN TALKING

13   ABOUT -- WOULD BE IMPOSSIBLE TO DO IN THE UNITED STATES.  IT

14   WOULD NOT BE PERMITTED TO DO HERE, RIGHT?

15   A    NO.  THIS IS NOT WHAT I SAY.  I'M VERY SORRY, MR. KOLE.

16   Q    WELL, YOU SAID THAT.  YOU SAID IT WOULD BE IMPOSSIBLE IN

17   THE UNITED STATES TO CREATE A VEHICLE TO DO THIS.

18   A    IT WAS MEANT BROADER.  BECAUSE REAL ESTATE AND FINANCIAL

19   VEHICLE BEHIND WOULD BE VERY DIFFICULT, MAYBE EVEN IMPOSSIBLE,

20   TO CREATE IN THE UNITED STATES SUBJECT FOR DEEPER VERIFICATION.

21   WE'LL FIND OUT IT MIGHT INTERFERE WITH OTHER -- IT DID NOT

22   APPLY IN EUROPE.  AND I EXPLAIN WHY, THAT PERSONAL KNOWLEDGE

23   FROM LIFE IN EUROPE AND EVEN PERSONAL FROM ANY KNOWLEDGE OF

24   RESTITUTIONS AND OTHER VEHICLES, INCLUDING INVENTIONS, ARE

25   CAPABLE TO DO SO.

1    Q    THE BEVERLY HILLS MEETING THAT YOU TALK ABOUT, THAT

2    OCCURRED ON MARCH 1ST OF 2006, RIGHT?

3    A    NO.  IT WAS EARLIER.  YOU HAVE TO CHECK THE EXHIBIT, BUT

4    IT WAS SOMEWHERE END OF FEBRUARY, I THINK.

5    Q    THAT'S FINE.

6         CAN YOU -- DO YOU HAVE THE TRANSCRIPT UP THERE.

7    COULD YOU LOOK, PLEASE, AT EXHIBIT 5 -- EXHIBIT 5-T OF THE

8    TRANSCRIPT OF EXHIBIT 5.

9    A    I HAVE TO GET MY BROKEN GLASSES.

10   Q    AND IF IT WOULD HELP YOU TO SEE IT LARGER, I'VE PLACED IT

11   ON THE SCREEN.  I DON'T KNOW IF YOU CAN SEE IT BETTER ON THE

12   COMPUTER SCREEN THERE.

13   A    YES.  THANK YOU.

14   Q    DO YOU SEE WHERE AGENT REITZ AS TOM MOORE SAYS,

15        TOM MOORE, WE HAVE --

16        THE RECORDER:  COUNSEL, MICROPHONE.

17        MR. KOLE:  SORRY.

18        I THOUGHT IT WAS LOUD ENOUGH -- I HAVE A BIG MOUTH.

19        THE RECORDER:  THANK YOU.  JUST TO BE SURE.

20   BY MR. KOLE:

21   Q    (READING:)

22        "TOM MOORE, WE HAVE AN APPOINTMENT TOMORROW AT

23        11:30."

24        AND YOU RESPOND YES.

25        AND THEN IT CONTINUES TALKING ABOUT THE APPOINTMENT.

1    A    UH-HUH.

2    Q    AND AGENT REITZ AS MOORE REFERS TO GEORGE COMING ALONG, AS

3    YOU'VE DISCUSSED BEFORE.

4         AND THEN ON THE SECOND PAGE NEAR THE END OF THE CALL

5    MOORE AGAIN SAYS,

6         "ALL RIGHT.  WE'LL SEE YOU TOMORROW."

7         AND YOU SAY,

8         "OKAY.  I AM LOOKING FORWARD TO MEETING TOMORROW,

9         MR. MOORE."

10   A    UH-HUH.

11   Q    ISN'T THAT BECAUSE THE NEXT DAY YOU WERE HAVING THE

12   BEVERLY HILLS MEETING?

13   A    MR. KOLE, AT THIS MOMENT I THINK SO.  I DIDN'T MEMORIZE

14   EXACTLY WHEN -- IT WAS SOMEWHERE AT THE END OF THE -- FEBRUARY,

15   BEGINNING OF MARCH.  MAYBE -- I AM NOT DISPUTING THIS PART.

16   Q    TURN FORWARD TO EXHIBIT 6 THEN, THE NEXT ONE, WHICH IS A

17   MESSAGE LEFT BY SOMEONE AT ROBISON'S OFFICE FOR TOM MOORE.

18   A    YES.

19   Q    ON MARCH 9TH.

20   A    UH-HUH.

21   Q    DOES THAT REFRESH YOUR RECOLLECTION THAT THE MEETING

22   HAPPENED SOMETIME BETWEEN MARCH 1ST AND MARCH 8TH?

23   A    YES, OF COURSE.

24   Q    AND ON YOUR -- IN YOUR DIRECT TESTIMONY YOU SAID YOU WERE

25   NOT INTRODUCED TO ONCIU UNTIL MAY -- MAY OR JUNE OF 2006,

1    RIGHT?

2    A    IT --

3    Q    YOU NEVER MET HIM BEFORE THAT, RIGHT?

4    A    NO.  THERE WAS INTRODUCTION MADE OUT OF ONE HOUSE IN

5    BEVERLY HILLS -- SORRY, IN LAS VEGAS.  AND THERE WAS A PHONE

6    CONFERENCE.  AND FIRST EMAILS EVEN ONE OF THEM WHICH WE HAVE

7    REVIEWED TODAY WAS SHOWING -- I WAS COPYING EMAILS TO DR.

8    ONCIU, TO MR. CARL JENSON, AND GERARD HARPER.  IT WAS SHORTLY

9    AFTER THE INTRODUCTION.

10   Q    SO, WE'RE CLEAR THEN IT'S YOUR TESTIMONY -- IS IT YOUR

11   TESTIMONY THAT BEFORE MAY OF 2006 YOU DIDN'T KNOW ONCIU?

12   A    I THINK SO.  I KNEW OF HIM.

13   Q    YOU --

14   A    I KNEW OF HIM.

15   Q    YOU HAD HEARD HIS NAME?

16   A    YES.

17   Q    BUT YOU HADN'T HAD PERSONAL COMMUNICATION WITH HIM?

18   A    I DEFINITELY DIDN'T MEET HIM.  I AM POSITIVE THAT IT WAS A

19   TIME WHEN HE COULD INTRODUCE.

20   Q    BUT YOU SAID AT THE END OF YOUR TESTIMONY THAT AT THIS

21   MEETING IN BEVERLY HILLS -- WHICH OCCURRED AT THE BEGINNING OF

22   MARCH -- YOU DISCLOSED YOUR RELATIONSHIP WITH ONCIU.

23        YOU SAID THAT JUST EARLIER TODAY.

24   A    MR. KOLE --

25   Q    AND YOU HADN'T EVEN MET FOR TWO OR THREE MORE MONTHS.

1    A    MR. KOLE, I SAID I KNEW OF HIM.  THE TOPIC OF DR. ONCIU

2    WAS FREQUENT -- NOT FREQUENT -- APPEARED ON MANY OCCASION AS --

3    IN COMMUNICATION WITH MR. MOORE.  THAT'S WHY I'M GOING TO

4    SUBPOENA MR. MOORE BECAUSE THAT CONVERSATION AND INTRODUCTION

5    FROM -- OF DR. ONCIU OCCURRED OUT OF HIS HOUSE IN LAS VEGAS.

6    Q    YOU DON'T HAVE A RELATIONSHIP WITH A PERSON WHERE YOU'VE

7    ONLY HEARD OF THEM.  AND YOU'VE NEVER ACTUALLY COMMUNICATED

8    WITH THEM; ISN'T THAT TRUE?

9    A    I WASN'T COMMUNICATING HIM IN PERSON, BUT HE COULD

10   INTRODUCE BY VERY RELIABLE SOURCES WHAT I DISCLOSED BEFORE.

11   Q    RIGHT.  BUT THAT OCCURRED IN MAY OR MAYBE JUNE OF 2006,

12   SEVERAL MONTHS AFTER THE BEVERLY HILLS MEETING.

13   A    YES.  IN MY -- I HAVE TO CROSS-EXAMINATE WITH THE

14   DATABASE, BUT I THINK SO.

15   Q    NOW, YOU DESCRIBED SEVERAL TIMES DURING YOUR TESTIMONY

16   THAT DURING THIS BEVERLY HILLS MEETING YOU MADE WHAT YOU SAID

17   WAS FULL DISCLOSURE, RIGHT?

18   A    IT WAS IN THE -- IN THE TRANSCRIPTS THAT I WAS -- THAT I

19   WAS PROMISING FULL DISCLOSURE.

20   Q    RIGHT.  AND THAT WOULD -- WE SAW -- WE'VE ALL -- IN THE

21   TRANSCRIPTS WE WERE ACTUALLY ABLE TO SEE THAT YOU SAID THAT,

22   RIGHT?

23   A    UH-HUH.

24   Q    YOU NEED TO ANSWER YES OR NO.

25   A    YES.

1    Q    BUT SINCE WE DON'T HAVE A TRANSCRIPT FROM THE BEVERLY

2    HILLS MEETING, WE HAVE YOUR TESTIMONY ABOUT WHAT HAPPENED

3    THERE.

4          AND WHAT YOU SAID WAS AT THE MEETING YOU GAVE FULL

5    DISCLOSURE TO TOM MOORE, RIGHT?

6    A    RIGHT.  OTHERWISE, WHY -- SORRY.  OTHERWISE, WHY I WOULD

7    BE ANNOUNCING THE DISCLOSURE TWICE, ONCE IN PHONE CALL WITH

8    WILLIAM ELDER.  SECOND TIME CONFIRMING THE MEETING WOULD TAKE

9    PLACE.

10   Q    AND YOU TOLD US THAT PART OF THAT DISCLOSURE, PART OF THE

11   FULL DISCLOSURE WAS YOU FULLY EXPLAINED TO HIM YOU HAD YOUR

12   BOOK DEAL YOU WERE WORKING ON.  YOU WERE DOING RESEARCH.  IT

13   WAS PART OF AN ACADEMIC EXERCISE.  YOU WERE INTERESTED IN

14   STUDYING INVESTORS.  YOU WERE DOING A CASE STUDY AS YOU

15   DESCRIBE, RIGHT?

16   A    YES.  BUT NOT IN SUCH A LARGE EXTENT.  I'M A REALLY

17   PRIVATE PERSON.  I MENTIONED THAT I AM DOING RESEARCH.  I PUT

18   THE POINTS TOGETHER BUT NOT INTO THE BIG LONG CONVERSATION.

19   Q    WELL, TO WHATEVER EXTENT YOU DESCRIBE IT --

20   A    UH-HUH.

21   Q    -- AT THE BEVERLY HILLS MEETING IN MARCH, YOU TOLD AGENT

22   REITZ AS TOM MOORE THAT YOUR INTERACTION WAS PART OF YOUR DOING

23   RESEARCH ON INVESTORS AND INVESTING, RIGHT?  THAT'S YOUR

24   TESTIMONY.

25   A    YES.  I MENTIONED THAT I'M COLLECTING THE ARTIFACTS, THAT

1    I'M -- THAT I'M -- I AM PREPARING THE BOOK.  YES, I MENTIONED

2    IT.  WHEN HE ASK ABOUT 10 MILLION AND LARGER TRANSACTIONS WHICH

3    HE WAS INTERESTED IN, I MENTIONED IT AS A LONG FUTURE

4    DISCUSSION.

5    Q    BUT IN EVERY PHONE CALL THAT WE'VE LISTENED TO --

6    A    UH-HUH.

7    Q    -- THAT YOU HAD WITH AGENT REITZ AS TOM MOORE, IN EVERY

8    EMAIL THAT WE'VE SEEN --

9    A    UH-HUH.

10   Q    -- IN AGENT REITZ'S DESCRIPTION OF WHAT YOU SAID TO HIM

11   WHEN YOU WERE INTERVIEWED, NEVER A SINGLE TIME DO YOU MENTION

12   ANYTHING ABOUT THIS RESEARCH, DID YOU?

13   A    WHY I SHOULD?

14   Q    WELL --

15   A    EXCUSE ME.  AGAIN, I'M A VERY PRIVATE PERSON.  AND SORRY

16   FOR A LONG EXPLANATION.

17        WHEN I WAS IN MY SECOND MONTH OF EVALUATION AND DR.

18   BRITT WAS ASKING ALL KIND OF QUESTIONS RELATED TO MY WORK, I

19   BROUGHT TO SHOW HER THE BOOK MADE OUT OF MY ARTICLES.  SHE WAS

20   VERY INTERESTED TO MAKE A COPY.  I TOLD HER NO.

21   Q    BUT YOU WERE COMPARING YOUR WORK TO THAT OF A MEDICAL

22   RESEARCHER TESTING A NEW DRUG, RIGHT?

23   A    IT'S VERY SIMPLIFIED.  THE --

24   Q    NO.  THAT WAS YOUR -- I'M NOT MAKING THAT UP -- THAT WAS

25   YOUR COMPARISON TODAY, RIGHT?

1  A    SAME THING.  IT WAS VERY SIMPLIFIED BECAUSE A

2  PHILOSOPHICALLY BASED COMPLETE PROGRAM OF REJUVENATION,

3  REGENERATION, AND WELLNESS WAS COMBINING VARIOUS AREAS --

4  PSYCHOLOGY, PHILOSOPHY, MEDICINE.

5          AND BACK IN MOSCOW WHEN I COMPLETE MY MOST IMPORTANT

6  DISSERTATES I SUCCESSFULLY COMPLETED INTERDISCIPLINARY

7  RESEARCH, FIRST ONE, IN CRITICIZING AND SUCCEEDING IN THIS -- I

8  WAS CRITICIZING THE BASIC, THE MOST IMPORTANT POLITICAL,

9  ECONOMICAL -- ESTHETICAL, MORAL DOCTRINE.  THAT'S WHY THE SAME

10 THING HAS BEEN -- THE PRINCIPLE HAS BEEN MOVED TO THIS

11 RESEARCH.

12          AND BASICALLY WHAT I WAS DOING ON PSYCHOLOGY OF

13 INVESTMENT WAS REINFORCING STATEMENTS MADE BACK IN THE

14  "DISSERTACY," WHEN ON THE -- I RISE THAT THERE ARE WEAK

15 POINTS.  THERE IS MORE RESEARCH.

16 Q    AND YOU DESCRIBED GETTING A NUMBER OF ACADEMIC DEGREES --

17 WHAT YOU'VE DESCRIBED AS DOCTORATE-LEVEL DEGREES THAT YOU

18 OBTAINED, RIGHT?

19 A    YES.

20 Q    YOU DESCRIBED THAT.

21          AND CERTAINLY -- AND DOING EXTENSIVE RESEARCH OVER

22 YEARS, TOO, RIGHT?  YOU DESCRIBE THAT.

23 A    OF COURSE BECAUSE I'M NOT MARRIED.  I DON'T HAVE CHILDREN.

24 ALL WHAT I WAS DOING WORKING.

25 Q    AND, SO, OF COURSE, YOU'RE AWARE THAT CERTAINLY A

1    RESEARCHER DOING WHAT YOU DESCRIBED, A CLINICAL RESEARCHER

2    TESTING A DRUG OR DOING SOMETHING LIKE THAT, WOULD CERTAINLY

3    NEVER HAVE PEOPLE BE PART OF AN EXPERIMENT WITHOUT DISCLOSING

4    TO THEM THAT THEY WERE PARTICIPATING IN AN EXPERIMENT.

5            IT WOULD BE UNETHICAL TO DO THAT, WOULDN'T IT?

6    A    IT DEPENDS TO WHICH EXTENT YOU GET INVOLVED PEOPLE.

7            IF YOU ARE DOING MEDICAL RESEARCH ON DRUGS OR ANY

8    KIND OF SUBSTANCES WHICH THEY ARE -- THEY ARE TAKING, OF

9    COURSE, YOU HAVE TO BE WAY MORE CAREFUL.  THIS WAS RATHER

10   RESEARCH WHICH IN MY MIND WAS NECESSARY TO HAVE TO PROVE

11   STIPULATIONS WHICH HAD BEEN MADE.

12           THIS RESEARCH NEVER ANYHOW INVOLVED PRIVACY -- OR NO

13   -- DIDN'T INVOLVE A RISK OF THE PRIVACY FOR PEOPLE I WAS

14   RESEARCHING.  IT WAS ALL BASED ON LATER OR SOONER PERSONAL

15   CONTACT VIA EMAIL, PHONE CALL, OR EVEN MEETINGS.  I STAYED

16   MAXIMARY ON THE POSITION OF RESEARCHER -- MEANING I CANNOT BE

17   THE ONE WHO APPROACHED THE INVESTOR FIRST AND -- OR THE PARTY

18   RESEARCH FIRST.  IT HAS TO BE BROUGHT TO MY TABLE LIKE IN MY

19   OFFICE.

20   Q    AND ON YOUR COMPUTER HARD DRIVE THAT WAS OBTAINED BY THE

21   FBI AND REVIEWED, IT CONTAINS HUNDREDS AND HUNDREDS OF COMPUTER

22   FILES.

23   A    UH-HUH.

24   Q    THERE'S NOT A SINGLE ONE THAT MAKES ANY REFERENCE TO THIS

25   SUPPOSED INVESTMENT WORK BEING PART OF A RESEARCH PROJECT, IS

1    THERE?

2    A    OF COURSE.  ON MY ORIGINAL DRIVE WHICH I HAD AT HOME WHICH

3    CRASHED IN 2010, I BELIEVE.  AND I HAVE OFFICIAL DOCUMENT --

4    WAS A LOT OF INFORMATION.  BESIDE THE DRIVE WHICH I HAVE IT

5    WITH ME -- I ASK ABOUT IT TODAY -- THERE WERE MY BOOKS.  THERE

6    WERE PARTIALLY THE RESEARCH RESULTS IN WRITING -- NOT THE

7    FILES.  I WOULD NEVER TAKE A RISK TO CARRY THROUGH A BORDER

8    SOMETHING THAT MIGHT BE LOST OR MISUSED.  BUT THIS INFORMATION

9    WAS THERE.

10   Q    WHEN YOU WERE FLYING BACK INTO THE COUNTRY YOU DIDN'T KNOW

11   YOU WERE GOING TO BE ARRESTED, DID YOU?

12   A    OF COURSE NOT.  I HAVEN'T DONE ANYTHING THAT WOULD -- THAT

13   WOULD BE WRONG.

14   Q    SO, YOU HAD NO REASON TO PREPARE YOUR HARD DRIVE IN SOME

15   WAY TO COVER UP WHAT WAS IN THERE.  YOU DIDN'T KNOW ANYBODY WAS

16   GOING TO BE TAKING IT, DID YOU?

17   A    MR. KOLE -- NO.  BUT ONE SECOND.  A WRONGLY POSITIONED

18   QUESTION.

19          IN FIRST PLACE, SOMEBODY THAT PRIVATE AS I WOULD

20   NEVER TAKE THIS INFORMATION ACROSS THE BORDER.  BECAUSE I WAS

21   -- DON'T FORGET ONE THING.  I WAS TRAVELING FOR MEDICAL

22   TREATMENTS.  I WAS TRAVELING FOR BUSINESS BUT NOT HIGH-YIELD

23   INVESTMENT AND NOT ANYTHING RELATED TO WHAT AGENT REITZ WAS

24   RESEARCHING OR WAS CREATING THE BASIS.

25          AND I WOULD BE VERY CAREFUL WITH THE INFORMATION

1    WHICH WAS ON MY DRIVE.

2    Q    WHEN YOU ARRIVED IN CHICAGO AT THE AIRPORT --

3    A    UH-HUH.

4    Q    -- THAT DAY IN JULY --

5    A    30TH.

6    Q    -- YOU HAD -- YOU HAD JUST FLOWN ACROSS THE BORDER

7    INTERNATIONALLY, RIGHT?

8    A    RIGHT.

9    Q    AND YOU HAD THE HARD DRIVE WITH YOU BECAUSE THAT'S HOW THE

10   GOVERNMENT GOT IT, RIGHT?

11   A    OF COURSE.

12   Q    RIGHT?

13   A    THEN -- ONE SECOND.  YOU HAVE TO BE VERY SPECIFIC.

14        I KNOW WHAT I HAVE HAD ON MY DRIVE.  FLYING TO EUROPE

15   THERE WAS A LOT OF INFORMATION PUT ON THAT DRIVE DURING MY

16   EUROPEAN STAY BECAUSE EVERY TIME I WAS ABLE TO WORK I WAS

17   WORKING.  BUT I DO KNOW WHAT WAS ON THIS DRIVE WHEN I ARRIVED

18   TO UNITED STATES.  BECAUSE I DID NOT CHECK THE DRIVE DURING THE

19   FLIGHT.  AND WHEN I STEPPED -- WHEN WE WERE WALKING OUT OF THE

20   AIRCRAFT, THE OFFICER WAS TELLING US TO TAKE THE PASSPORT AND

21   ANY AMERICAN DOCUMENT, WHICH WAS MY GREEN CARD, IN OUR HANDS.

22   I DID IT.  I WAS BROUGHT TO A QUICK CUSTOM WHICH PRACTICALLY

23   WASN'T A CUSTOM.  THEY JUST CHECK MY DOCUMENTS.  AND I WAS

24   IMMEDIATELY WALKED INTO THE INS OFFICE OR THE IMMIGRATION.

25        AND MY LUGGAGE AT THAT TIME WAS -- I EVEN DON'T KNOW

1    WHERE.  IF YOU RECALL I WAS ASKING LISA -- MRS. LISA SCHMADTKE

2    WHERE WAS THE LUGGAGE, WHERE WAS THE CART, AND HOW SHE GOT IT.

3    SHE DIDN'T RECALL IT.

4    Q    YOU JUST SAID THAT YOU MAY HAVE BEEN A PRIVATE PERSON, BUT

5    ON THAT HARD DRIVE THERE WAS EXTENSIVE PRIVATE INFORMATION OF

6    OTHER PEOPLE, WASN'T THERE?

7    A    NO.

8    Q    WE SAW A LOT OF IT HERE IN COURT.

9    A    NO.  I DID NOTHING --

10   Q    WELL, WE -- WAIT A MINUTE.

11        WE SAW PEOPLE'S PASSPORTS.  WE SAW THE CLIENT

12   INFORMATION SHEETS WITH THEIR BIRTH DATES, THEIR PLACE OF

13   BIRTH, THEIR BANK ACCOUNT NUMBERS.  WE SAW -- WE SAW ALL THAT

14   TAKEN OFF OF THE HARD DRIVE, RIGHT?

15   A    MR. KOLE, I CAN TESTIFY THAT I DON'T BELIEVE THE

16   INFORMATION RETRIEVED FROM THE DRIVER -- HARD DRIVE WAS

17   RETRIEVED FROM THAT HARD DRIVE.  IT WAS RETRIEVED FROM THE

18   COMPUTER DRIVE WHICH WASN'T WITH -- ONLY ME.

19        AND I HAD NO REASON TO BRING TO EUROPE THESE

20   DOCUMENTS.  I BROUGHT MY BOOKS -- I MEAN, BOOKS -- NOT BOOKS.

21   I BROUGHT WITH ME ADDITIONAL DOCUMENTS WHICH WERE RELATED TO MY

22   RESEARCH.  THERE WAS ALREADY PARTIAL WRITE-UP AND ADDITIONAL

23   TECHNOLOGIES WHICH I WAS WORKING ON.

24   Q    WE -- WE SAW HERE IN COURT BOTH DOCUMENTS FROM THE HARD

25   DRIVE --

1    A    UH-HUH.

2    Q    -- AND DOCUMENTS THAT DID NOT COME FROM THE HARD DRIVE.

3    DOCUMENTS THAT WERE EMAILED BACK AND FORTH TO AGENT REITZ AS

4    TOM MOORE --

5    A    UH-HUH.

6    Q    -- CLIENT INFORMATION SHEETS THAT WERE ESSENTIALLY

7    IDENTICAL.  THEY WERE DIFFERENT PEOPLE, BUT EXACT SAME FORM

8    SHOWING YOU EMAILING DOCUMENTS AND RECEIVING DOCUMENTS THAT

9    LOOKED JUST LIKE THINGS ON THE HARD DRIVE.

10            YOU HAD PEOPLE'S PRIVATE INFORMATION ON THAT HARD

11   DRIVES.

12            YOU CAN'T DISPUTE THAT, CAN YOU?

13   A    YOU'RE -- MR. KOLE, AGAIN, YES, I WAS SENDING THE

14   DOCUMENTS TO VARIOUS PEOPLE, RECEIVING THEM BACK.  BUT AT THE

15   SAME TIME I HAVE HAD ABSOLUTELY NO WHATSOEVER REASON IN 2008 IN

16   JUNE I BELIEVE 1ST, 2ND WHEN I WAS FLYING TO EUROPE TO TAKE

17   THIS INFORMATION WITH ME BECAUSE IT WAS NOT ANYMORE HELPFUL FOR

18   ME.  BUT IT WAS INFORMATION FROM 2005, '06.  AND IT WAS 2008.

19   I KNOW IT WAS FOUND ON THE DRIVE.  BUT I DIDN'T PUT IT THERE.

20            FACT IS THAT DURING THIS STAY IN EUROPE IF WE GO SO

21   DEEPLY, THEY DON'T GET STAY IN EUROPE.  I HAD VERY SERIOUS

22   COMMUNICATIONS WITH SEVERAL EUROPEAN PARTIES WHO BROUGHT ME

23   THERE OR INVITED ME THERE.  I WAS USING SOMEBODY'S COMPUTER.

24   MY COMPUTER FAILED.

25   Q    COULD YOU LOOK, PLEASE, AT EXHIBIT 51, THE TRANSCRIPT OF A

1  CALL BETWEEN AGENT REITZ AS TOM MOORE AND THE GERMAN INDIVIDUAL

2  STAHL -- SCHLAG AND SCHAEFFER, EXCUSE ME.

3  A    51.

4  Q    51-T IS THE TRANSCRIPT.

5  A    I DON'T HAVE IT HERE.

6           MR. KOLE:  OH, TOM.  CAN YOU BRING --

7           (PAUSE IN PROCEEDINGS.)

8           THE DEFENDANT:  51.  BECAUSE I DON'T SEE IT HERE.

9  I'M SORRY.

10           (EXHIBIT PROVIDED TO WITNESS.)

11           THE COURT:  THANK YOU.

12           I'LL ASK THE AGENT TO STAY CLOSE BY.

13           AGENT REITZ:  YES, SIR.

14           THE COURT:  AND IF YOU COULD HELP GETTING THE

15  EXHIBITS, IT WOULD BE APPRECIATED.

16           THE DEFENDANT:  THANK YOU.

17           THE COURT:  THERE'S A BLACK CHAIR OVER THERE, IF YOU

18  WOULD --

19           THE DEFENDANT:  I INVITE MR. KOLE TO -- ACTUALLY, NO

20  GO AHEAD.

21  BY MR. KOLE:

22  Q    DO YOU HAVE -- YOU FOUND THAT THERE?

23  A    YES, 51.  UH-HUH.

24  Q    AND DIRECT YOUR ATTENTION TO PAGE 17 -- WELL, ACTUALLY,

25  LET ME ASK YOU A QUESTION BEFORE YOU DO THAT.

1    A    UH-HUH.

2    Q    KEEP -- KEEP AT THE BEGINNING OF IT.

3         THE TSI INVESTMENT YOU'VE MENTIONED A NUMBER OF TIMES

4    THAT YOU CHARACTERIZED IT AS A REAL ESTATE TRANSACTION OR BASED

5    ON REAL ESTATE, RIGHT?

6    A    MR. KOLE, WE HAVE TO BE SPECIFIC.

7         I MADE THESE CHARACTERISTICS -- EXCUSE ME, BASED ON

8    WHAT I HAVE SEEN IN THE CONTRACT AFTER THOMAS MOORE SEND IT TO

9    ME.  I DID NOT READ THE CONTRACT PROPERLY.  I JUST READ QUICKLY

10   THROUGH.  AND I WAS CHECKING FOR THIS IMPORTANT MOMENT -- REAL

11   ESTATE, BROKERAGE LOAN, BANK LOAN, POSSIBILITY TO COMMUNICATE

12   WITH BANK.  AND IT WAS THERE.

13   Q    MANY TIMES DURING THE TRIAL YOU HAVE REFERRED TO THE TSI

14   DEAL AS BASED ON OR GETTING VALUE FROM REAL ESTATE, RIGHT?

15   A    I TOOK IT FROM THE CONTRACT WHICH AGENT REITZ SENT TO ME.

16   IT'S THERE ON FIRST OR SECOND PAGE.

17   Q    BUT I'M ASKING YOU NOW ABOUT YOUR TESTIMONY AND YOUR

18   STATEMENTS HERE IN COURT.

19   A    UH-HUH.

20   Q    YOU'VE DESCRIBED IT, THE TSI DEAL IS BASED ON REAL ESTATE

21   -- BUT THAT'S THE VALUE -- THAT THAT'S WHERE IT DERIVES ITS

22   VALUE FROM, RIGHT?

23   A    THIS IS WHAT I FOUND IN THE CONTRACT.  AND I MADE MY

24   TESTIMONIES BASED WHAT WAS IN THE CONTRACT.

25   Q    NOW, TURN TO PAGE 17 OF EXHIBIT 51.  AND I PLACED THE TOP

1   PART OF PAGE 17 ON THE SCREEN.

2   A    UH-HUH.

3   Q    SCHAEFFER, WHO IS SPEAKING TO AGENT REITZ AS TOM MOORE --

4   A    UH-HUH.

5   Q    -- WHO IS SAID TO BE THE ACTUAL PERSON DOING THE TRADING,

6   MAKING THE PROFIT THAT WOULD PAY OFF THIS LOAN IN THE TSI DEAL,

7   WAS ASKED HERE BY AGENT REITZ, "HOW DO YOU MAKE ALL THAT MONEY

8   TO PAY THE LOAN BACK."

9        AND WHAT DOES HE SAY?  DOES HE SAY IT'S REAL ESTATE?

10   NO.  DOESN'T HE ACTUALLY SAY MOSTLY IT'S MEDIUM TERM, NO

11   TRADING.  YES.  THAT'S WHERE THE PROFIT IS COMING FROM.

12        ISN'T THAT HOW WE DESCRIBED IT? -- MEDIUM TERM, NO

13   TRADING --

14   A    NO --

15   Q    -- NOT REAL ESTATE.

16   A    NO.  IT IS NOT PRECISE.  AND WITH ALL DUE RESPECT, LET ME

17   CLARIFY IT.

18        FIRST OF ALL, I READ TSI CONTRACT AS SENT TO ME TO

19   MR. MOORE.  WHEN I WAS CHECKING THE TRANSCRIPTS, YES, IT WAS

20   HERE AS YOU SAID.  BUT LATER IN -- EITHER IN THE SAME

21   DISCUSSION OR IN THE NEXT DISCUSSION WITH MR. SCHAEFFER HE

22   MENTIONED HE IS JUST A TRANSLATOR.

23        AND MORE IMPORTANTLY, A PERSON IN BETWEEN TSI AND

24   DR. PRIORE MENTIONED HE'S A BANKER.  HE'S A TRADER.  IRRELEVANT

25   INFORMATION ACCORDING WHAT WAS SAID DURING THE THOMAS -- THOMAS

1    MOORE ERA AND EVEN THIS -- THIS CASE.  PERSON IN BETWEEN SAYING

2    SOMETHING LIKE DR. PRIORE FOR ME IS INFORMATION LESS IMPORTANT.

3    THAT'S WHY I STATE ON ALL MY TESTIMONIES BASED ON WHAT WAS SAID

4    BY PEOPLE WHO WERE SIGNING OR CREATING THE CONTRACT.

5    Q    SCHAEFFER WAS DESCRIBED AS THE TRADER A NUMBER OF TIMES,

6    WASN'T HE?

7    A    YES, BUT BY WHOM.  BY WHOM IT WAS DESCRIBED WASN'T

8    RELEVANT FOR ME.

9         IF MR. MOORE WOULD TALK TO SCHAEFFER EVEN IN THAT

10   CONVERSATION, AND SCHAEFFER WOULD CONFIRM HE'S A TRADER, I

11   WOULD TAKE IT WAY MORE SERIOUSLY.

12   Q    LET ME JUST ASK YOU THIS.

13   A    UH-HUH.

14   Q    GO BACK TO THIS TO MAKE SURE WE'RE CLEAR.

15        THIS RESEARCH PROJECT THAT YOU TALKED ABOUT --

16   A    UH-HUH.

17   Q    -- THE ONLY TIME THAT YOU SAY YOU DISCLOSED THIS -- SAID

18   THAT'S WHAT YOU REALLY WERE DOING WAS DOING RESEARCH -- NOT

19   TRYING TO GET PEOPLE TO GIVE MONEY.  YOU WERE DOING RESEARCH.

20        THE ONLY TIME YOU SAY YOU SAID THAT WAS AT THIS

21   MEETING IN BEVERLY HILLS THAT WE HAPPEN TO NOT HAVE A RECORDING

22   OF; ISN'T THAT TRUE?

23   A    NOT EXACTLY.  BECAUSE --

24   Q    WHEN ELSE DID YOU SAY IT?

25   A    BECAUSE -- WELL, IT'S POSSIBLE TO SAY MANY DIFFERENT

1   THINGS.  AND IT'S POSSIBLE TO WRITE MANY DIFFERENT THINGS.  BUT

2   BEHAVIOR AND REACTIONER IS MORE VALID THAN SAID AND WRITTEN.

3   BECAUSE PEOPLE RATHER DISCLOSE THEIR ONLY ACTION.

4           AND IF YOU WOULD PUT -- I CANNOT TELL YOU WHERE IT

5   WAS.  BUT I WAS MENTIONING IN ONE COMMUNICATION WITH MR. MOORE

6   DESCRIBING THE PROGRAM AND RIGHT AWAY THINKS 300 PERCENT WITH

7   NO HESITATION.  WHEN I LOOK AT MY NOTES I CAN -- I CAN POINT IT

8   OUT.

9           LATER JUST BEFORE TSI IT WAS THOMAS MOORE WHO WAS

10  ASKING ME HOW MUCH.  AND AT THIS MOMENT IF YOU HEAR THE

11  CONVERSATION OR YOU READ IT, I WAS HESITANT.  I EVEN SAY WE'RE

12  NOT SUPPOSED TO TALK ABOUT IT.  WHY?  BECAUSE IT WAS ANOTHER

13  EXAMPLE, THAT THERE WERE TWO COMPLETELY UNRELATED VENUE.  ONE

14  WAS COLLECTING INFORMATION FOR RESEARCH AND PRACTICAL EXAMPLES

15  FOR MY BOOK, ALLEVIATING VARIOUS CONTRACTS AND REVIEWING THE

16  ARTIFACTS AS I CALLED IT.

17          AND THE SECOND ONE WAS BASICALLY TRYING TO HELP

18  MYSELF AS WELL AS OTHER PEOPLE WHO I KNEW THEY LOST MONEY WITH

19  BATHGATE AND MANY OTHERS.  AND I HAVE PROVEN -- ONE MORE TIME.

20  THAT FAMOUS 98 MILLION -- APPROVAL FUNDS WENT, YES, I ASK FOR

21  IT.  BECAUSE, AGAIN, AS A GOOD PSYCHOLOGIST AND PHILOSOPHER I

22  JUST KNEW THAT MR. MOORE MIGHT HAVE SOMETHING -- PLUS, I WROTE

23  SOMETHING TO -- FROM HIM.  IF I WAS WORKING SO MUCH ON HIM --

24  AND I NEVER ASK FOR ANY MONEY HE WAS AT LEAST CONTRIBUTING

25  SOMETHING.

1           AND I SAID IN THAT CONVERSATION I DIDN'T KNOW WHAT

2    AND JUST FROM MY ARCHIVE.

3    Q    THAT BEVERLY HILLS MEETING WAS THE ONLY TIME THAT YOU AND

4    AGENT REITZ ACTING AS TOM MOORE WERE TOGETHER IN PERSON, RIGHT?

5    A    YES.  BUT THOMAS MOORE WAS ON NUMEROUS OCCASIONS TRYING TO

6    GET ME TO ANOTHER MEETING.

7    Q    AND THE OTHER INTERACTIONS YOU HAD WITH HIM WERE PHONE

8    CALLS THAT WERE RECORDED OR EMAILS THAT WE HAVE IN A COMPUTER.

9           AND IN ALL OF THOSE MEMORIALIZED WRITTEN

10   COMMUNICATIONS AND RECORDED COMMUNICATIONS THERE'S NO REFERENCE

11   TO THIS RESEARCH PROJECT, RIGHT?

12   A    YES.  AND IT CANNOT BE THERE.  BECAUSE IF I WOULD BE

13   EMPHASIZING MORE -- MORE AND MORE AND MORE, I WOULD BASICALLY

14   ALTERATE THE RESEARCH.

15          PERSON -- IF I -- IF I WAS GOING TO -- AND ANY

16   RESEARCHER, IF YOU WOULD USE THE INFORMATION YOU ARE GATHERING

17   AS A FACT FOR FUTURE SCIENTIFIC DISPUTE, YOU CANNOT BE PUTTING

18   TOO MUCH IMPACT.  IT'S A BASIC OF NORMAL -- AT LEAST IN MY

19   WORLD WHERE I STUDY -- IT'S A NORMAL PARAMETER.

20          YOU NOTIFY THE PARTIES YOU ARE DEALING WITH AT THE

21   BEGINNING.  AND LATER YOU ARE OBSERVING THEIR ACTIONS.  IF YOU

22   WILL KEEP NOTIFYING THEM, YOU WILL TAMPER WITH THE RESULT OF

23   THE RESEARCH.

24   Q    SO, THE ONLY TIME YOU TOLD HIM WAS THE ONE MEETING WE HAVE

25   NO RECORD OF, RIGHT?

1    A    AGAIN, I SAID IT EXPLICITLY.  I THINK THAT ON THE WAY TO

2    BEVERLY HILLS -- I MEAN, FROM THE HOTEL ACROSS THE STREET

3    WALKING THROUGH THIS -- THE -- CROSSING THE STREET -- WALKING

4    OR DRIVING -- TAKING THE LIFT TO ROBISON'S OFFICE AND IN THE

5    OFFICE IN THE LITTLE BREAKS THERE MIGHT BE SOME ADDITIONAL

6    COMMUNICATION.  BUT I DON'T RECORD IT.

7    Q    AND THAT WAS THE ONLY TIME?

8    A    YES.  BECAUSE, AGAIN, IN THESE TWO SITUATIONS WHICH I HAVE

9    JUST DESCRIBED, APPROVAL FUNDS AND THE RECORD -- AND THE

10   ARCHIVE, BOTH -- SORT OF THE IMPULSE FOR MR. MOORE TO

11   UNDERSTAND WHAT I AM DOING, I WAS -- HIS REACTION.  DOES HE

12   REMEMBER OR HE DOESN'T REMEMBER.  HE DIDN'T OBJECT HERE,

13   REMEMBER.

14   Q    BUT IT'S NOT ON ANY OF THE RECORDINGS, IS IT?

15   A    MR. KOLE, I --

16   Q    IS IT ON ANY OF THE RECORDINGS?

17   A    NO.

18           MR. KOLE:  NO FURTHER QUESTIONS.

19           THE COURT:  NOW, YOU HAVE ANOTHER OPPORTUNITY ON WHAT

20   WE CALL REDIRECT TO TESTIFY.

21           THE EVIDENTIARY RULES LIMIT THAT USUALLY TO THE AREA

22   OF THE CROSS-EXAMINATION THAT JUST TOOK PLACE.  BUT IN THIS

23   CASE I'LL USE MY DISCRETION.  AND IF YOU HAVE ANYTHING ELSE

24   THAT YOU'D LIKE TO TESTIFY TO, THIS WOULD BE THE TIME.

25           MS. PEMKOVA:  OKAY.

1                    REDIRECT EXAMINATION.

2              THE DEFENDANT:  DURING THE ENTIRE STAY IN UNITED

3      STATES, I WAS BASICALLY TRYING TO UTILIZE MY TIME FOR GATHERING

4      -- NORMAL WAY AVAILABLE INFORMATION FOR ANY TOPIC I WAS

5      RESEARCHING.

6              WHEN I WAS WORKING ON MY BEVERLY HILLS CLIENTS FOR MY

7      REJUVENATION PROGRAM, OF COURSE, ALL OF THEM WERE SOME WAY

8      SOMEHOW GETTING A PART OF MY RESEARCH WHICH DOESN'T MEAN

9      NECESSARILY I WOULD BE DISCLOSING THEIR NAMES.  I EVEN

10     COULDN'T.

11             IN THE FUTURE BOOK AS WELL AS THE THESIS AND

12     EVERYTHING ELSE WHAT WAS UNDER THE PREPARATION NOW, I WAS

13     ALWAYS -- AS MUCH I COULD THE PRIVATE ASPECT. I DEFINITELY

14     DIDN'T WANT TO BE SUED BY ANYONE.

15             THAT'S WHY IN THE BOOK AS WELL AS THE RESEARCH IT

16     WOULD GO AS A CASE NUMBER OR PERSON NUMBER.  BUT DEFINITELY NOT

17     -- NOT DISCLOSURE OF THE NAME.

18             I CONDUCTED THIS TYPE OF RESEARCH IN DOING -- DOING

19     THE EXTENSIVE STUDIES.  AND THERE WAS NEVER ANY PROBLEM.

20     THAT'S WHY I DON'T THINK THAT IT WOULD BE NECESSARY TO PROVIDE

21     ANY FURTHER INFORMATION OR ANY FURTHER DISCLOSURE TO ANY PARTY.

22             IF IT COMES TO DISCUSSING WITH MR. MOORE AND MORE

23     EXPLICITLY WHAT I WAS DOING WITH HIM, AS I SAID, IT WOULD

24     CHANGE THE RESULT OF THE RESEARCH AS WITH EVERYBODY ELSE.

25             FOR EXAMPLE, WITH MR. BRITT, WE MET MAYBE 20 TIMES.

1        AND JUST ONCE IN THE BEGINNING WE HAD DISCUSSED THE

2    PARAMETERS.  AND HE WAS A VERY BRIGHT MAN.  AND SOMETIMES HE

3    WAS ASKING ME WHERE I AM.  BUT IT WAS GENERAL DISCUSSION.  I

4    DIDN'T SEE NECESSARILY TO MAKE ANY FURTHER DISCLOSURE.  IF MR.

5    MOORE WOULD ASK ME I WOULD AT LEAST ADDRESS IT.  BUT EVEN I

6    RECALL THAT CONVERSATION REGARDING 98 MILLION, THERE WAS NO

7    PROBLEM.

8        BY THE WAY, WITH THAT 98 MILLION, IT WAS AN

9    INTERESTING EMAIL.  I CANNOT RIGHT NOW EXACTLY, BUT BASICALLY

10   HERE IT IS.  THEY -- THE NAME OF IT IS -- JUICY OUT THERE OR

11   SOMETHING IN THIS -- IN THIS ASPECT.

12       WE WILL HAVE THIS LATER IN THE EXHIBITS FOR DEFENSE

13   CASE.

14       HE WAS BASICALLY ENCOURAGING ME TO FIND SOMETHING

15   IMPORTANT FOR HIM.  AND BECAUSE HE WROTE THAT, I UNDERSTOOD

16   THAT HE -- HE REMEMBERS THE PARAMETERS.

17       QUESTIONS.  I HAVE NO FURTHER.

18       THE COURT:  OKAY.

19       THANK YOU.

20       THIS WOULD BE REDIRECT THEN BY -- OR STRIKE THAT.

21       RECROSS BY THE GOVERNMENT.

22       (PAUSE IN PROCEEDINGS.)

23                    RECROSS EXAMINATION

24   BY MR. KOLE:

25   Q    PLEASE DIRECT YOUR ATTENTION TO EXHIBIT 176.

1          AGENT REITZ:  TRANSCRIPT.

2          THE DEFENDANT:  I CAN FIND IT, AGENT REITZ.  THANK

3   YOU.

4          OH, NO.  IT'S NOT IN THE FILE.

5   BY MR. KOLE:

6   Q    I PLACED PAGE 2 OF 176 ON THE -- ON THIS PROJECTOR AND

7   HAVE ZOOMED IN ON --

8   A    UH-HUH.

9   Q    -- YOUR EMAIL OF OCTOBER 12TH OF 2006 --

10  A    UH-HUH.

11  Q    -- AT THE BOTTOM.

12         CAN YOU SEE IT?

13  A    YES, I DO.  THANK YOU.

14  Q    THIS WAS A PRIVATE COMMUNICATION BETWEEN YOU AND ONCIU.

15         NO ONE ELSE IS COPIED ON THIS, RIGHT?

16  A    IT LOOKS LIKE.  I DON'T HAVE THE ORIGINAL EMAIL.  I HAVE

17  TO CHECK IT.  BUT, YES, FROM WHAT YOU HAVE PROVIDED, YES.

18  Q    AND IN IT YOU TELL ONCIU -- SAY TO HIM -- MR. BRITT --

19         NOW, THAT'S BILLY BRITT YOU WERE JUST --

20  A    YES.

21  Q    -- WHO YOU WERE JUST TALKING ABOUT, RIGHT?

22  A    YES.  YES.  YES.

23  Q    (READING:)

24         MR. BRITT HAS LOST TENS OF MILLIONS BY HAVING A

25         COSIGNATORY ON HIS ACCOUNT --

1    A    UH-HUH.

2    Q    (READING:)

3            -- INVESTING WITH A WELL-RECOGNIZED BROKERAGE FIRM

4            AND SENDING HIS FUNDS TO MAJOR EUROPEAN BANK.

5            IT WASN'T JUST RESEARCH, WAS IT?  PEOPLE LOST MONEY,

6    DIDN'T THEY?

7    A    MR. KOLE, THANK YOU.

8            YES.  MR. BRITT WAS ONE OF THE VICTIMS OF BATHGATE

9    CAPITAL PARTNERS SCAM WHEN THEY LOST MONEY ACCORDING TO MY

10   KNOWLEDGE AS AN INVESTOR OF AT LEAST 62 PEOPLE.  AND MR. BRITT

11   WAS TAKEN TO THIS INVESTMENT VIA HIS LAWYER BILLY BREW OR

12   WILLIAM BLUE.

13           AND BECAUSE MR. BRITT WAS A CHARMING OLD GENTLEMAN HE

14   DID TRUST MR. BREW COMMUNICATING WITH STEVE NASINGER FROM

15   BATHGATE CAPITAL PARTNERS.  THAT'S WHY MR. BRITT ACCORDING TO

16   MY KNOWLEDGE WAS THE LARGEST LOSER WITH BATHGATE CAPITAL

17   PARTNERS.  HE WAS AT LEAST 32 MILLION WHAT I WAS TOLD.  I AM

18   NOT ABLE TO JUSTIFY ON THE AMOUNT BECAUSE THIS IS WHAT HE SAID.

19           BUT LATER WHEN WE TRAVELED FOR NASCAR DEAL TO

20   FLORIDA, AND IT WAS -- IT WAS -- THIS EMAIL WAS BEFORE, I FOUND

21   THAT MR. BRITT'S WIFE, PEGGY BRITT, WAS BEHIND HIS BACK

22   COMMUNICATING --

23           MR. KOLE:  YOUR HONOR, NOW THIS IS HEARSAY AND

24   COMPLETELY NON-RESPONSIVE.

25           THE COURT:  DID YOU WANT TO RE-ASK THE QUESTION.

1          MR. KOLE:  I DON'T THINK I NEED TO.  SHE ANSWERED AT

2   FIRST BEFORE LAUNCHING OFF INTO THE TANGENT --

3          THE DEFENDANT:  WHAT I DID -- OKAY.  I DIDN'T FINISH

4   YET.

5          MR. BRITT WAS A VICTIM -- ONE OF THE LARGEST VICTIM

6   OF BATHGATE CAPITAL PARTNERS.  AND BECAUSE I WAS WITH HIM VERY

7   CLOSE AS COLLEAGUES, ALMOST FRIENDS, I KNEW A LOT OF FROM HIS

8   AMWAY ACTIVITIES, FROM HIS PERSONAL LIFE.  I KNOW HIS WIFE -- I

9   KNEW HIS WIFE.  AND HE WAS ONE OF THE PARTIES WHO WERE

10  PARTICIPATING IN BOTH.

11  BY MR. KOLE:

12  Q    AND THERE WAS LITIGATION ABOUT BATHGATE IN COLORADO,

13  RIGHT?

14  A    YES, VERY LARGE ONE.

15  Q    BECAUSE IT WAS AN AMERICAN FIRM?

16  A    YES.  BUT ONE SECOND.

17          MR. BRITT --

18  Q    YOU -- YOU --

19  A    SORRY.

20  Q    THANK YOU.  YOU'VE ANSWERED THAT QUESTION.

21          AND DURING YOUR STATEMENT YOU SAID --

22          OH, YOU SAID THAT YOU ALSO LOST MONEY WITH --

23  A    YES.

24  Q    -- BATHGATE, RIGHT?

25  A    YES.

Q    AND YOUR WORDS YOU SAID YOU WANTED TO RECOVER WHAT WAS

STOLEN FROM YOU BY BATHGATE; ISN'T THAT RIGHT?

A    NO.  I DIDN'T --

Q    THAT'S -- THAT'S WHAT YOU SAID.

     I WANTED TO RECOVER WHAT WAS STOLEN BY BATHGATE.  YOU

SAID THAT TODAY, DIDN'T YOU?

A    I MENTIONED IT -- IN FOLLOWING ASPECT.

     WHEN I WAS TRYING TO RECOVER MY MONEY -- WELL, WHEN I

WAS TRYING TO REGAIN THE MONEY WHICH I LOST WITH BATHGATE I WAS

DOING A DIFFERENT ACTIVITIES RELATED TO THE INVESTMENT BUT

HAVING NOTHING TO DO WITH HIGH-YIELD INVESTMENT PROGRAMS WHICH

MR. REITZ WAS RESEARCHING.

     AND FOR THIS REASON I WAS IN MANY EUROPEAN BANKS

DURING MY STAY IN 2007, JUNE, AND FROM JANUARY 2008.  WHEN I

WAS ABLE TO FLY AGAIN I WAS THREE, MAYBE FOUR TIMES IN EUROPE.

I HAVE TO RECORD OUT OF THE DATABASE.  WHEN I WAS ILL I WAS

ILL.  THE DAYS WHEN I WAS GOOD I WOULD MEET -- GOOD -- I WAS

MEETING AGAIN WITH THE BANKERS.  THAT'S WHY I WAS DOING SEVERAL

ACTIVITIES.

     AND I WAS RELYING AFTER THAT EXPERIENCE WITH BATHGATE

AND MANY OTHERS I WAS ACTUALLY TRYING TO CREATE WITH THIS

LARGER DEAL WHICH I MENTIONED TO AGENT -- TO THOMAS MOORE.  I

WAS WITH -- IN CONJUNCTION WITH EUROPEAN BANKS AND LARGER

ENTITIES, INCLUDING GOVERNMENT ENTITIES IN EUROPE TRYING TO

CREATE WITH HELP OF DEUTSCHE BANK AND A FEW OTHERS A VEHICLE

1  WHICH WOULD HELP INVESTORS TO INVEST SAFELY.

2  Q    YOU SAID YOU WANTED TO RECOVER WHAT WAS STOLEN FROM YOU BY

3  BATHGATE, RIGHT?

4  A    YES.  BUT RECOVERED BY ME THAT I AM ABLE TO MAKE MORE

5  MONEY.  THAT'S WHY I WALK AWAY FROM THE PROPOSITION OF

6  2-MILLION SETTLEMENT ON THE SETTLEMENT CONVERSATION.

7         BUT DEFINITELY IT DIDN'T MEAN THAT I WAS GOING TO

8  RECOVER IT STEALING MONEY OR TRYING TO STEAL MONEY FROM THOMAS

9  MOORE AND SIMILAR.

10         MR. KOLE:  NO FURTHER QUESTIONS.

11         THE COURT:  ALL RIGHT.

12         MS. PEMKOVA, THANK YOU.

13         YOU MAY STEP DOWN.

14         MS. PEMKOVA:  THANK YOU.

15         (PAUSE IN PROCEEDINGS.)

16         THE COURT:  COUNSEL WILL REMAIN.  MS. PEMKOVA, YOU'LL

17  REMAIN THIS EVENING CONCERNING JURY INSTRUCTIONS, WHICH I THINK

18  WE'VE GONE OVER NOW ON NUMEROUS OCCASIONS.

19         ALL THE EXHIBITS WE'LL MAKE CERTAIN THAT DEBBIE IS

20  CORRECT WITH BOTH OF YOU THIS EVENING.

21         LET ME SPEAK TO THE JURY FOR JUST A MOMENT.  AND THEN

22  PERHAPS MEET WITH EACH OF YOU BEFORE THEY LEAVE.  BUT I DON'T

23  THINK IT'S NECESSARY.

24         I'VE MADE A VALUE JUDGMENT EARLY ON THAT THERE NEEDED

25  TO BE A CONTINUANCE FOR A PERIOD OF TIME.  YOU'VE HEARD ME

1  STRUGGLE WITH THAT IN YOUR PRESENCE.  I WASN'T CERTAIN OF THE

2  DATE.  AND I WASN'T SO NAIVE JUST TO BELIEVE THAT WE COULD GET

3  ALL 14 OF YOU BACK TOGETHER.  SO, FOR THOSE WHO -- WHO CAN'T

4  JOIN US ON THE CERTAIN DATES I'M GOING TO TALK ABOUT, THANK YOU

5  FOR MAKING THE ATTEMPT.

6        I'M GOING TO HOLD TO JUNE 23RD.  I REPRESENTED THAT

7  DATE EARLY ON.  AND IF I GO BEYOND THAT DATE I'M VERY CONCERNED

8  ABOUT STAND-BY COUNSEL'S AVAILABILITY.  IF I GO TO SEPTEMBER,

9  I'M NOT CERTAIN I LOSE MORE OF YOU.  AND, YET, IN FAIRNESS, I

10  CAN'T SCHEDULE IT ANY TIME BEFORE THAT.  I CAN'T MOVE IT THE

11  WEEK BEFORE.  AND I KNOW YOU'VE GOT AN OBLIGATION.  AND I

12  BELIEVE YOU'VE GOT -- I'M MISSING -- ONE OF YOU HAS AN

13  OBLIGATION.

14        NOW, I'M GOING TO GIVE MY BEST ESTIMATE OF WHEN

15  YOU'RE GOING TO FINISH WHICH SO FAR HAS BEEN A MISERABLE

16  FAILURE.

17            (LAUGHTER.)

18            THE COURT:  I'M NOT CERTAIN IF THERE ARE ANY FURTHER

19  WITNESSES.

20            (JUDGE CARTER SPEAKING INFORMALLY TO JURY.)

21            THE COURT:  BUT TO AFFORD BOTH PARTIES THAT

22  OPPORTUNITY, AND THE REASON FOR THE CONTINUANCE IS TO PROVIDE

23  SOME PERIOD OF TIME -- I THINK IN FAIRNESS IT LETS PEOPLE GET

24  TO COURT FOR EITHER OF THE PARTIES IF THEY CAN COME TO COURT.

25            I THOUGHT THIS WEEK WAS TOO ABRUPT.  NEXT WEEK WAS

1    TOO ABRUPT.  AND I HAVE CHOSEN JUNE 23RD.  AND I HOPE THAT IN

2    FAIRNESS TO EVERYBODY -- CORRECTED ON THAT.

3            THERE'S EVERY PROBABILITY THAT THIS CASE IS GOING TO

4    BE ARGUED TO YOU ON JUNE 23RD EARLY IN THE MORNING.  AND YOU'RE

5    GOING TO HAVE THIS CASE FOR YOUR DELIBERATIONS BY 10:30 OR

6    11:00.

7            THE COURT:  AND THERE IS SOME PROBABILITY THAT IF--

8    PEOPLE -- DO COME TO THIS COURT, THAT IT COULD BE THE

9    AFTERNOON.

10           NOW, AS SOON AS I SAY THAT WE'LL SEE YOU IN THE YEAR

11   2016.  I'M JUST TEASING YOU ABOUT THAT.

12           BUT I'M PRETTY CONFIDENT IT'S GOING TO YOU ON THAT

13   DAY.

14           THERE ARE NO WITNESSES THAT I KNOW ARE AVAILABLE FOR

15   EITHER PARTY AT THIS TIME TODAY.

16           IS THAT CORRECT, COUNSEL?  MS. PEMKOVA?

17           MR. KOLE:  YES, FOR THE GOVERNMENT.

18           MS. PEMKOVA:  NO WITNESSES HAVE BEEN --

19           THE COURT:  BUT NOT TODAY?  THERE'S NO WITNESSES

20   TODAY; IS THAT --

21           MS. PEMKOVA:  NO.  NO WITNESSES TODAY.

22           THE COURT:   OKAY.

23           -- JUROR'S PRESENCE.

24           I THINK THERE'S AN AWFULLY GOOD PROBABILITY IT'S

25   GOING TO BE --

1               NOW, I'M GOING TO ASK YOU TO REMAIN FOR JUST A

2      MOMENT.  I NEED TO MAKE A RECORD.

3               AND FORGIVE ME FOR JUST A MOMENT.  I NEED TO MAKE A

4      RECORD AND MAKE SURE --

5               PLEASE DON'T DISCUSS THIS MATTER.  I KNOW IT'S HARD.

6               PLEASE DON'T FORM OR EXPRESS ANY OPINIONS UNTIL THE

7      CASE IS -- IT'S HARD.

8               YES, MA'AM.

9               A JUROR:  WOULD THAT BE AT 8:30 ON THE 23RD?

10              THE COURT:  YOU KNOW, IF I COULD SQUEEZE A HALF HOUR

11     OUT OF ALL OF YOU, I'D --

12              A JUROR:  EIGHT O'CLOCK?

13              THE COURT:  EIGHT O'CLOCK, YEAH.  AND I'LL TRY NOT TO

14     KEEP YOU WAITING, BUT.  SO, LET'S TRY FOR 8:00.  OKAY.

15              I'LL START MY CALENDAR AT 7:00.  I GET LOTS OF PEOPLE

16     WHO COME IN --

17              BEYOND THAT, I JUST DON'T WANT TO SAY ANYTHING MORE.

18              I'M GOING TO ASK YOU ONCE AGAIN PLEASE DON'T FORM OR

19     EXPRESS AN OPINION -- AND CERTAINLY DON'T TALK TO ANYBODY ABOUT

20     THE CASE.

21              AND A LITTLE RESPONSIBILITY FOR THIS TIME, THAT'S

22     MINE.  I WOULD -- CASE FRANKLY TWO AND A HALF WEEKS -- SO, MY

23     APOLOGIES TO YOU.  THAT'S A JUDGE'S RESPONSIBILITY.  I'VE GOT

24     TO MAKE CERTAIN THAT THE TRIAL IS FAIR.

25              AND IN LIGHT OF THAT, WE'RE IN RECESS.

1          SO, GO HOME.

2          LEAVE YOUR NOTES ON THE SEAT YOU OCCUPY.  THE BOOKS

3   ON THE SEAT.  I WILL HAVE NUMEROUS OTHER CASES, BUT I DON'T

4   THINK THERE'S ANOTHER JURY COMING IN.  I MAY START ANOTHER

5   TRIAL JUST --

6          (JURY ADJOURNS AT 4:54 P.M.)

7          THE COURT:  COME ON OVER AND HAVE A SEAT.  YOU'RE NOT

8   QUITE LEAVING YET.

9          (LAUGHTER.)

10          THE COURT:  BUT I'M PRETTY CERTAIN IF -- I'M PRETTY

11   CERTAIN BOTH MS. PEMKOVA AND THE GOVERNMENT ARE GOING TO BE

12   KIND TO YOU.

13          LET ME JUST -- WE'RE ALMOST THERE.  BUT WE'RE NOT

14   SEEKING TO IMPOSE FINANCIAL HARDSHIP ON YOU, OBVIOUSLY.  YOU

15   INFORMED ME THROUGH --

16          WE ALMOST MADE IT.  AND BUT/FOR MY DECISION WE WOULD

17   BE THERE.  I JUST HAVE TO MAKE SURE THIS IS AS FAIR A TRIAL AS

18   I CAN POSSIBLY MAKE IT.

19          YOU'VE GOT AN OBLIGATION OF SOME KIND ON THE 23RD.

20   YOU MIGHT --

21          A JUROR:  IT'S ACTUALLY ON THE 20TH.

22          THE COURT:  ON THE 20TH.

23          MR. STEWARD:  YOUR HONOR, COULD YOU BOTH SPEAK UP.

24          MS. PEMKOVA IS HAVING SOME TROUBLE HEARING YOU.

25          THE COURT:  YEAH.  I'M SORRY.  YOU'VE GOT A --

1          THE GENTLEMAN HAS AN OBLIGATION --

2          DO WE HAVE A MICROPHONE THAT ACTUALLY WORKS IN THIS

3   PLACE?

4          (LAUGHTER.)

5          THE COURT:  WE SEEM TO HAVE BATTERY PROBLEMS ALL THE

6   TIME.

7          AND WE USED TO HAVE A BUNNY RABBIT THAT RAN AROUND

8   CLAPPING THEIR HANDS ON T.V. AND THE BATTERY NEVER RAN OUT.

9          (PAUSE IN PROCEEDINGS.)

10          THE COURT:  OKAY.  WE'LL TRY AGAIN.

11          (THE COURT AND CLERK CONFERRING.)

12          THE COURT:  IT WAS ASLEEP.  NOW, IT'S WOKEN UP.

13          HERE YOU GO.

14          YOU'RE LEAVING THE 20TH.

15          A JUROR:  I AM LEAVING ON THE 20TH.  I'M FLYING TO

16   SEATTLE TO GO TO ALASKA FOR A WEEK.

17          THE COURT:  VACATION?

18          A JUROR:  VACATION --

19          THE COURT:  PRE-PLANNED?

20          A JUROR: -- A LONG-AWAITED HONEYMOON FOR MY WIFE 10

21   YEARS BACK --

22          THE COURT:  WHAT --

23          (LAUGHTER.)

24          A JUROR: -- ET CETERA.

25          THE COURT:  I'VE HEARD SO MANY REASONS FOR YOU TO BE

1  EXCUSED I DON'T KNOW WHERE TO START.

2            MS. PEMKOVA, WOULD YOU EXCUSE THIS GENTLEMAN.

3            AND, MR. KOLE, WOULD YOU EXCUSE THIS GENTLEMAN?

4            MR. KOLE:  YES.  THE GOVERNMENT WILL STIPULATE.

5            MS. PEMKOVA:  ABSOLUTELY.  HONEYMOON AFTER 10 YEARS,

6  ABSOLUTELY.

7            A JUROR:  I'M SORRY.

8            THE COURT:  NO --

9            A JUROR:  I WOULD -- I WOULD PREFER TO STAY.  AND --

10           THE COURT:  QUITE THE OPPOSITE.

11           A JUROR:  AND I WAS SAD WHEN YOU SAID THE DATE OF

12  JUNE --

13           THE COURT:  YEAH.  I SAW YOU KIND OF CRINGE.  AND,

14  YOU KNOW, I DON'T KNOW WHERE WE FIND ALL YOU GOOD FOLKS IN THE

15  AMERICAN PUBLIC.  I JUST -- YOU'RE AN AMAZING COUNTRY -- WE ARE

16  ANYWAY.  AND I JUST THANK YOU.

17           A JUROR:  IS THERE ANY CHANCE TO COME BACK FOR THE

18  TOUR AFTERWARDS?

19           THE COURT:  ABSOLUTELY.

20           (LAUGHTER.)

21           THE COURT:  ABSOLUTELY.  IN FACT, IF YOU COME BACK --

22           A JUROR:  FASCINATING --

23           THE COURT:  IF YOU COME BACK SINGLELY, JUST TELL

24  DEBBIE -- LEAVE HER A PHONE NUMBER.  TELL ME YOU'RE COMING IN.

25  AND JUST MAKE SURE I'M HERE SO I CAN TAKE YOU AROUND.  OKAY.

1          A JUROR:  ALL RIGHT.

2          THE COURT:  I WANT TO THANK YOU FOR YOUR SERVICE.

3          ALL RIGHT.  AND THAT WAS AWFULLY NICE OF YOU.

4          A JUROR:  THANK YOU.

5          THE CLERK:  WHAT SEAT NUMBER ARE YOU?

6          A JUROR:  ELEVEN.

7          THE COURT:  AND THE GENTLEMAN IS EXCUSED THEN?

8          MR. KOLE:  YES -- YES, YOUR HONOR.

9          THE COURT:  HONEYMOON.

10         MR. KOLE:  YES, YOUR HONOR.

11         THE COURT:  PREPAID VACATION.  OKAY.

12         NOT SO FAST NOW.  WE WANT TO TALK TO YOU.  AND YOU'RE

13  ONE OF OUR ALTERNATES.

14         ALTERNATE JUROR 1:  YES.

15         THE COURT:  AND I'M JUST GOING TO REFER TO YOU AS

16  ALTERNATE NUMBER 1 FOR A MOMENT.

17         YOU'RE IN COMMUNITY COLLEGE.  AND YOU START CLASS THE

18  22ND, DON'T YOU?

19         ALTERNATE JUROR 1:  YEAH, IT'S A SUMMER COURSE.

20         THE COURT:  SUMMER COURSE.

21         AND TELL ME ON THE 23RD -- BECAUSE I THINK WE'RE SO

22  CLOSE TO THE FINALITY, YOU DON'T -- ON THE 23RD.

23         ALTERNATE JUROR 1:  WELL, I'M NOT SURE YET BECAUSE

24  IT'S ONLY -- SINCE IT'S A SUMMER COURSE IT'S ONLY SIX WEEKS.

25         THE COURT:  YEAH.  AND, SO, IT'S COMPACTED --

1        ALTERNATE JUROR 1:  YEAH.

2        THE COURT:  IS IT ONE COURSE OR TWO OR THREE?

3        ALTERNATE JUROR 1:  OH, JUST ONE.  BUT IT'S FROM --

4    WELL, IT'S NOT THAT LONG.  IT'S FROM 8:00 IN THE MORNING TILL

5    12:45.

6        THE COURT:  DO YOU KNOW IF IT'S ON TUESDAYS EVERY DAY

7    OF THE WEEK?

8        ALTERNATE JUROR 1:  IT'S ON MONDAY THROUGH THURSDAY.

9        THE COURT:  MONDAY THROUGH THURSDAY.

10       SO, YOU WOULD MISS TUESDAY, WOULDN'T YOU?

11       ALTERNATE JUROR 1:  YES.

12       THE COURT:  COULD YOU TELL ME WHAT THE COURSE IS.

13       ALTERNATE JUROR 1:  IT'S ACTUALLY -- I HAVE TO TAKE

14   IT FOR MY GENERAL ED.  IT'S JUST AN ART COURSE.

15       THE COURT:  WELL, NOT JUST.  IT'S AN ART COURSE.

16       ALTERNATE JUROR 1:  IT'S AN ART COURSE.

17       THE COURT:  IT'S AN ART COURSE.  OKAY.  NOT JUST.

18   IT'S AN -- IT'S AN ART COURSE.

19       AND YOU'RE GETTING YOUR A.A. DEGREE, RIGHT?

20       ALTERNATE JUROR 1:  YEAH.  I'M GETTING IT NEXT

21   SPRING.

22       THE COURT:  HOW ARE YOU DOING WITH THAT?

23       ALTERNATE JUROR 1:  I'M DOING GREAT.  I'LL BE DONE BY

24   THE SPRING.  I'M EXCITED.

25       THE COURT:  WOULD YOU LET US TALK ABOUT YOU A LITTLE

1   BIT OUTSIDE THE PRESENCE.

2           WOULD YOU JUST GO BACK IN THE JURY ROOM FOR A MOMENT.

3           ALTERNATE JUROR 1:   OKAY.

4           THE COURT:   WE'LL COME BACK AND GET YOU.

5           THANK YOU.

6           (OUTSIDE THE PRESENCE OF ALTERNATE JUROR 1.)

7           THE COURT:   ON THE ONE HAND THAT'S A CLOSER CALL.   IT

8   IS NOT A PREPAID VACATION.   IT IS NOT A HONEYMOON.   BUT YOU

9   HAVE A YOUNG LADY TRYING TO GET HER EDUCATION.   SELFISHLY,

10  SHE'S A SAFETY VALVE.   LET ME DRESS THAT UP A LITTLE BIT.   SHE

11  OFFERS AN OPPORTUNITY TO MAKE SURE THAT WE DON'T GO BELOW 12

12  PEOPLE.   BY THE SAME TOKEN, YOUNG PEOPLE, EDUCATION, GETTING

13  HER A.A. DEGREE.

14          HER CLASS IS FROM 12:00 TO -- OR 8:00 TO 12:00.   I

15  WOULD ADVANCE THIS A DAY OR EVEN TO THE INCOMING FRIDAY, BUT I

16  DON'T THINK IT'S FAIR.   AND I THINK MS. PEMKOVA IS RIGHT.

17          WHEN I STARTED TO DO THAT I REPRESENTED THE 23RD,

18  IT'S THE 23RD.

19          MS. PEMKOVA:   THANK YOU, YOUR HONOR.

20          THE COURT:   IT'S THE 23RD.

21          AND IT'S A PLEASURE, MS. PEMKOVA.   I -- I REPRESENTED

22  THAT AND NEED TO STAY WITH THAT AND NOT BE STAMPEDED BECAUSE OF

23  CONVENIENCE.   OKAY.

24          MS. PEMKOVA:   THANK YOU, YOUR HONOR.

25          THE COURT:   SO, YOUR THOUGHTS, MS. PEMKOVA, MR. KOLE.

1    IF YOU -- IF YOU WANT HER EXCUSED, YOU JOINTLY STIPULATE, WE'LL

2    GO WITH 12.  HOPEFULLY, THEY ALL COME BACK.  AND WE ROLL.

3           YOU ALSO NEED TO DO SOME RESEARCH IF THE COURT CAN

4    DROP BEFORE -- BELOW 11.  THAT'S HAPPENED ON OCCASION.  BUT

5    WHEN YOU DROP -- I MEAN, BELOW 12.  BUT WHEN THAT HAPPENS,

6    THERE HAS TO BE AN AWFULLY GOOD REASON FOR THE EXCUSE OF

7    JURORS.  AND IT'S A RARITY.

8           SO, WHY DON'T YOU TALK TO THE AGENT BECAUSE YOU TWO

9    COULD BE BACK WITH ME AGAIN.

10          AND, MS. PEMKOVA, WHY DON'T YOU SPEND JUST A MOMENT

11   WITH MR. STEWARD.  AND I'M GOING TO STEP OVER IN THE CORNER --

12          MS. PEMKOVA:  THANK YOU.

13          THE COURT:  -- AND SEE WHAT YOUR THOUGHTS ARE.

14          (PAUSE IN PROCEEDINGS.)

15          THE COURT:  NOW, WE'RE BACK ON THE RECORD.

16          (THE COURT AND CLERK CONFERRING.)

17          THE RECORDER:  NOW WE'RE ON THE RECORD.

18          THE COURT:  OKAY.  WE'RE ON THE RECORD.

19          AND, MR. KOLE, AND, MS. PEMKOVA, WHAT ARE YOUR

20   THOUGHTS ABOUT THIS YOUNG LADY.

21          MR. KOLE:  YOUR HONOR, I THINK WE SHOULD KEEP HER.

22   AND HERE'S -- HERE'S -- I DON'T THINK WE SHOULD MAKE HER MISS

23   CLASS.  SO FAR IN THIS TRIAL WE'VE HAD TWO DAYS WHERE WE'VE

24   STARTED AT NOON.  I DON'T THINK IT WOULD BE A PROBLEM TO START

25   AT 1:30.  LET HER GO TO HER CLASS.  COME IN.  WE'VE GOT --

1          THE COURT:  I'VE ALREADY TOLD THE JURY --

2          MR. KOLE: -- FOUR TO SIX HOURS.

3          THE COURT:  I'VE ALREADY TOLD THE JURY EIGHT O'CLOCK.

4   I CAN'T DO THAT.

5          NOW, YOU KNOW, IF I WOULD HAVE HEARD BEFORE, I WOULD

6   HAVE BEEN WISER AND LET HER COME IN.  NO.  YOU'RE IN THE

7   POSITION NOW OF DECIDING BECAUSE IT'S EIGHT O'CLOCK.  I CAN'T

8   GET THEM BACK.  UNLESS YOU WANT TO RUN OUT IN THE PARKING LOT

9   WITH MS. PEMKOVA SO IT'S COEQUAL AND ROUND THEM UP, THAT'S

10  FINE.  BUT --

11         NOW, MAYBE WE'VE GOT PHONE NUMBERS.  BUT THEN YOU'RE

12  NOT FINISHING POTENTIALLY.

13         WELL, RIGHT NOW IT'S EIGHT O'CLOCK.  SO, I'M NOT

14  ADAMANT ABOUT THAT.  IT'S A GOOD SUGGESTION.

15         MS. PEMKOVA, WHAT ARE YOUR -- WHAT ARE YOUR THOUGHTS?

16         MS. PEMKOVA:  I WOULD LET HER GO.  IN MY OPINION, YOU

17  KNOW, YOUR HONOR, I WOULD LET EVERYBODY STUDY -- EVERY STUDENT

18  TO STUDY.  LET HER GO.

19         THE COURT:  EDUCATION.

20         MS. PEMKOVA:  ABSOLUTELY EDUCATION FIRST --

21  ESPECIALLY IN HER POSITION.  MR. STEWARD MADE NICE SUGGESTION.

22  SHE DOESN'T LOOK LIKE SHE'S VERY -- IT'S IMPORTANT FOR HER.

23  SHE'S VERY EXCITED.  I WOULD LET HER GO.

24         MR. STEWARD:  YOUR HONOR, I DON'T --

25         THE COURT:  I'M NOT GOING TO DO THAT WITH THE CONCERN

1    OF THE GOVERNMENT AT THIS TIME.  UNLESS THERE'S A JOINT

2    STIPULATION, YOU HAVE THE EQUAL RIGHT IN MY OPINION TO NOT TAKE

3    THAT RISK.

4             AND ALTHOUGH IT'S WITH, YOU KNOW, A HEAVY HEART, IT'S

5    STILL TAXPAYER MONEY.  IT'S A CASE THAT I MADE A VALUE

6    JUDGMENT.  DESERVES A CONTINUANCE TILL JUNE 23RD -- NOT BEYOND

7    THAT DATE.  AND I HOPE THAT EACH OF YOU UNDERSTAND NOW THAT

8    I'VE DRAWN THAT LINE IN THE SAND.  PEOPLE HAVE TO BE HERE.

9             IF THEY'RE NOT HERE, MS. PEMKOVA, YOU CAN ANTICIPATE

10   THE COURT HEARING A MOTION FOR MORE TIME.  I EXPECT YOU TO SAY

11   THAT.  BUT REALLY TAKE MY WORDS TO HEART.  THE CASE WAS GOING

12   TO REQUIRE WITNESSES HERE ON JUNE 23RD.

13            KNOWING WHAT I KNOW NOW, I HAVE TO SAY TO YOU I WOULD

14   HAVE MADE THAT JUNE 19TH, JUNE 22ND.  I JUST DIDN'T HAVE THAT.

15   AND I SET THAT DATE BECAUSE IT WAS A TUESDAY WHERE WE STARTED

16   TRIAL AGAIN AND MUDDIED YOUR CALENDAR.

17            SO, THEREFORE, YOU KNOW IF I WOULD HAVE HAD MORE

18   INFORMATION.

19            NUMBER TWO, BEFORE THE JURY LEFT AT 12:00 I'M -- IT

20   MIGHT HAVE BEEN FINE.  BUT NOW I JUST WORRY ABOUT MAKING THAT

21   REPRESENTATION.  AND CAN I REALLY GET A HOLD OF ALL THE JURORS.

22   WHAT HAPPENS IF I MISS ONE.  WHAT HAPPENS IF I GET 11 IN HERE

23   AND I DON'T GET THE 12TH.  WHAT HAPPENS IF ONE GOES ON VACATION

24   IN THE MEANTIME AND DOESN'T GET THE MESSAGE.  IT PUTS ME IN A

25   -- IN A DIFFICULT BIND.

1           AND I DON'T LIKE THE RECORD IN TERMS OF HAVING

2    REPRESENTED THE WHOLE TIME JUNE 23RD.  BECAUSE IF THE WORD HAS

3    GONE OUT IT'S THE 23RD, I'VE GOT A GOOD RECORD OF PEOPLE

4    ATTENDING.  THEY KNOW.  THERE'S BEEN COMMUNICATION REGARDLESS.

5           THE NON-PREPAREDNESS, IT JUST MEETS WITH DEAFNESS ON

6    MY PART RIGHT NOW AFTER WATCHING THE TAPES.

7           SO, I THINK IN GOOD FAITH I -- AS A JUDGE I FEEL IT'S

8    VERY FAIR TO PROCEED ON THE 23RD.  IF I PUSH IT TO THE 22ND,

9    19TH, I'M DOING IT STRICTLY NOW FOR CONVENIENCE.  OKAY.

10          I THINK YOU EITHER HAVE TO TAKE YOUR CHANCE ON 12 BY

11   STIPULATION OR THAT -- IF YOU'RE OBJECTING I NEED TO TAKE THE

12   POSITION THAT THIS JUROR ISN'T LEAVING.  OKAY.

13          IF YOU CHANGE YOUR MIND, YOU KNOW, GIVE ME OR GIVE

14   DEBBIE A CALL.  AND WE CAN EXCUSE THAT JUROR BY PHONE.  IT

15   GIVES BOTH OF YOU A CHANCE TO TALK ALSO WITHOUT HAVING TO MAKE

16   THAT DECISION.  I KNOW YOU DON'T FEEL GOOD ABOUT THAT.  THAT'S

17   NOT THE ISSUE.  IT'S STILL A CASE THAT IF IT'S RETRIED AGAIN

18   IT'S EXPENSIVE.  IT'S PREJUDICIAL FOR BOTH SIDES.  OKAY.

19          I'M GOING TO BRING THE YOUNG LADY BACK IN AND IMPART

20   TO HER THE BAD NEWS.  I'M GOING TO PLACE IT ON MY SHOULDERS NOT

21   YOURS.

22          MS. PEMKOVA:  YOUR HONOR, AFTERWARDS, MAY I ASK YOU

23   FOR A FAVOR TO LET ME GO QUICKLY TO THE BATHROOM.

24          THE COURT:  OH --

25          MS. PEMKOVA:  PLEASE.  AFTER YOU --

1           THE COURT:  YEAH.  RIGHT AFTER.  FOR SURE.

2           MS. PEMKOVA:  THANK YOU, YOUR HONOR.

3           THE COURT:  IN FACT, WE MAY JUST EXCUSE OURSELVES FOR

4    THE NIGHT AS LONG AS YOU COME BACK AND DO THE JURY

5    INSTRUCTIONS.  I JUST WANT TO TALK ABOUT ONE INSTRUCTION.  AND

6    THAT'S THE GOOD FAITH INSTRUCTION.

7           MS. PEMKOVA:  YES.  I JUST NEED TO GO FOR A FEW

8    MINUTES TO THE BATHROOM.

9           THE COURT:  OKAY.

10          MS. PEMKOVA:  AND YOU ARE VERY WELCOME TO DO WHATEVER

11   YOU WISH.

12          (ALTERNATE JUROR 1 RETURNS TO THE COURTROOM.)

13          THE COURT:  HI.  YOU SEE HOW GUILTY I LOOK AND HOW

14   BADLY I FEEL.

15          WE'RE GOING TO ORDER YOU BACK ON TUESDAY MORNING.  IF

16   WE -- THAT'S MY RESPONSIBILITY.  IT'S MY DECISION NOT COUNSEL

17   OR MS. PEMKOVA'S.  AND I'M THE BAD PERSON IN THAT.  I CAN'T GO

18   BELOW 12.  AND IF I DO, WE START ALL OVER AGAIN.

19          I TRULY BELIEVE THAT THIS CASE IS GOING TO YOU ON

20   JUNE 23RD.  OKAY.  AND -- FOR YOUR CONSIDERATION.  AND I'M

21   HOPING THAT THAT'S IN THE MORNING, BUT IT MAY NOT BE.  THERE

22   MAY BE A WITNESS OR WITNESSES WHO APPEAR.  I JUST DON'T KNOW

23   YET.  BUT WE'LL SEE VERY SHORTLY.

24          SO, YOU ARE ORDERED BACK JUNE 23RD.  I HUMBLY

25   APOLOGIZE TO YOU.  OKAY.  WE'LL SEE YOU ON THAT DAY.

1               ALTERNATE JUROR 1:  THANK YOU.

2               THE COURT:  8:00.  8:00.  OKAY.

3               ALTERNATE JUROR 1:  8:00.

4               THE COURT:  AND PLEASE DON'T DISCUSS THIS MATTER NOR

5     FORM OR EXPRESS AN OPINION CONCERNING THE CASE.

6               OKAY.

7               (THE COURT AND CLERK CONFERRING.)

8               THE COURT:  NO.  GO ON.  GO USE THE BATHROOM.

9               MS. PEMKOVA:  THANK YOU.

10              THE COURT:  OKAY.

11              MR. STEWARD:  I'M GOING TO RUN AS WELL.

12              THE COURT:  THIS WILL ONLY TAKE 2 SECONDS.

13              (PAUSE IN PROCEEDINGS, 5:08 P.M. TO 5:11 P.M.)

14              THE COURT:  WE'RE BACK ON THE RECORD.

15              HERE'S WHAT I NEED.  I'M GOING TO GIVE THE ENTRAPMENT

16    INSTRUCTION OBVIOUSLY THAT I REFERRED TO.

17              COULD YOU PULL THAT UP ON THE SCREEN FOR JUST A

18    MOMENT.

19              GREAT.

20              MR. KOLE:  YOUR HONOR --

21              THE COURT:  AND WHAT ENTRAPMENT IS, AS MR. STEWARD

22    WILL INFORM YOU, IT STATES:

23              THE DEFENDANT CONTENDS THAT SHE WAS ENTRAPPED BY

24              THE GOVERNMENT AGENT.

25              THE GOVERNMENT HAS THE BURDEN OF PROVING BEYOND A

1      REASONABLE DOUBT THAT THE DEFENDANT WAS NOT

2      ENTRAPPED.

3      THE GOVERNMENT MUST PROVE EITHER, ONE, THAT THE

4      DEFENDANT WAS PREDISPOSED TO COMMIT THE CRIME BEFORE

5      BEING CONTACTED BY THE GOVERNMENT AGENTS OR, TWO,

6      THAT THE DEFENDANT WAS NOT INDUCED BY THE GOVERNMENT

7      AGENTS TO COMMIT THE CRIME.

8      WHEN A PERSON INDEPENDENT OF AND BEFORE GOVERNMENT

9      CONTACT IS PREDISPOSED TO COMMIT THE CRIME, IT IS NOT

10     ENTRAPMENT IF THE GOVERNMENT AGENTS MERELY PROVIDED

11     AN OPPORTUNITY TO COMMIT THE CRIME.

12     IN DETERMINING WHETHER THE DEFENDANT WAS PREDISPOSED

13     TO COMMIT THE CRIME BEFORE BEING APPROACHED BY

14     GOVERNMENT AGENTS, YOU MAY CONSIDER THE FOLLOWING:

15     ONE, WHETHER THE DEFENDANT DEMONSTRATED RELUCTANCE TO

16     COMMIT THE OFFENSE.

17     TWO, THE DEFENDANT'S CHARACTER AND REPUTATION.

18     THREE, WHETHER GOVERNMENT AGENTS INITIALLY SUGGESTED

19     THE CRIMINAL ACTIVITY.

20     FOUR, WHETHER THE GOVERNMENT ENGAGED IN THE CRIMINAL

21     ACTIVITY FOR PROFIT.

22     AND FIVE THE NATURE --

23     MR. STEWARD:  EXCUSE ME, YOUR HONOR.

24     NUMBER FOUR IS WHETHER THE DEFENDANT NOT THE

25     GOVERNMENT.

1          THE COURT:  I'M SORRY.  MY APOLOGIES.

2          WHETHER THE DEFENDANT -- THANK YOU -- ENGAGED IN THE

3          CRIMINAL ACTIVITY FOR PROFIT.

4          AND, FIVE, THE NATURE OF THE GOVERNMENT'S INDUCEMENT

5          OR PERSUASION.

6          IN DETERMINING WHETHER THE DEFENDANT WAS INDUCED BY

7          THE GOVERNMENT AGENTS TO COMMIT THE OFFENSE, YOU MAY

8          CONSIDER ANY GOVERNMENT CONDUCT CREATING A

9          SUBSTANTIAL RISK THAT AN OTHERWISE INNOCENT PERSON

10         WOULD COMMIT AN OFFENSE, INCLUDING PERSUASION,

11         FRAUDULENT REPRESENTATIONS, THREATS, COERCIVE

12         TACTICS, HARASSMENT, PROMISES OF REWARD OR PLEAS

13         BASED ON NEEDS, SYMPATHY, OR FRIENDSHIP."

14         IS THAT INSTRUCTION ACCEPTABLE TO YOU, MS. PEMKOVA?

15         MS. PEMKOVA:  YOUR HONOR, I NEED TO THINK ABOUT IT.

16    I THINK SO, BUT I --

17         THE COURT:  OKAY.  YOU TALK TO MR. STEWARD.  BUT

18    RIGHT NOW I'M GOING TO GIVE THAT INSTRUCTION.  I THINK IT'S

19    ALMOST SUA SPONTE NOW.

20         MR. STEWARD:  JUST WANTED TO NOTE FOR THE RECORD,

21    YOUR HONOR, WHAT'S BEING DISPLAYED NOW IS THE ATTACHMENT THAT I

22    EMAILED TO COUNSEL AND MS. PEMKOVA LAST NIGHT.

23         THE COURT:  OKAY.  INCLUDE THAT IN THE PACKET,

24    PLEASE.

25         MR. STEWARD:  YES.

1          THE COURT:  AND I DON'T THINK I NEED TO GET YOU AND

2     MR. STEWARD BACK IN HERE ON A SPECIAL TRIP FOR THAT OR MS.

3     PEMKOVA AND INCONVENIENCE YOU.

4          SO, MAKE SURE IT'S IN THE PACKET FOR MONDAY.  COME UP

5     TO COURT IF IT'S ACCEPTABLE, MS. PEMKOVA, MR. STEWARD.

6          GET IT IN THE PACKET IN A LOGICAL ORDER, IF YOU

7     WOULD, MR. KOLE.

8          AND YOU CAN WORK WITH THE COURT CLERK.

9          AND I'LL EXCUSE MS. PEMKOVA FROM COMING IN UNLESS YOU

10    WANT TO DRIVE IN FOR THAT.

11          MS. PEMKOVA:  NO.

12          MR. KOLE:  YOUR HONOR --

13          MR. STEWARD:  TUESDAY --

14          MR. KOLE: -- YOU SAID MONDAY.  DID YOU MEAN TO SAY

15    THAT?

16          THE COURT:  YEAH.  WELL, I'D LIKE IT IN THE PACKET BY

17    MONDAY, JUNE 22ND SO WE'RE NOT DOING THIS ON THE 23RD, TAKING

18    ANOTHER RECESS.

19          SECOND, YOU ALREADY INFORMED ME.  AND I THINK FROM MY

20    MEMORY I RECALL THERE'S THE GOOD FAITH INSTRUCTION ALREADY

21    INCLUDED.

22          MR. STEWARD, LET ME LEAN ON YOUR WISDOM FOR A MOMENT.

23          ARE THERE ADDITIONAL INSTRUCTIONS THAT YOU COULD

24    THINK OF THAT THE COURT SHOULD BE INSTRUCTING ON?

25          MR. STEWARD:  NO, YOUR HONOR.

1          I LOOKED AT MULTIPLE CONSPIRACIES.  MR. ONCIU, THAT

2     WAS ONE OF HIS ISSUES.  AND I LOOKED AT THE NINTH CIRCUIT

3     OPINION ON THAT.

4          THE COURT:  YEAH.

5          MR. STEWARD:  AND I'M CONVINCED THAT THE COURT WAS --

6     NOT TO KISS UP -- BUT THE COURT WAS CORRECT IN ITS RULING.

7     AND, OBVIOUSLY, IT WAS APPROVED BY THE CIRCUIT.  SO, I DON'T

8     THINK THAT THAT --

9          THE COURT:  WHAT I CALL THE WHEELS WITHIN THE WHEELS.

10         MR. STEWARD:  CORRECT.  CORRECT.

11         FACTUALLY, I DON'T -- I DON'T THINK WE'RE THERE.

12         THE COURT:  YEAH.

13         MR. STEWARD:  BUT THE GOOD FAITH AND THE ENTRAPMENT,

14    I STRONGLY FEEL THAT BOTH OF THOSE --

15         THE COURT:  OKAY.

16         MR. STEWARD:  -- ARE APPROPRIATE.

17         THE COURT:  NOW, THE SECOND THING IS.

18         THERE'S NO REASON FOR ME TO CALL YOU BACK INTO

19    SESSION, YOU KNOW, IN A HALF AN HOUR OR HAVE YOU SITTING HERE

20    WHILE I DO WORK BACK HERE.

21         MY THOUGHT IS, MS. PEMKOVA, YOU AND MR. KOLE GO OVER

22    THE EXHIBITS.  CATCH UP.  MAKE CERTAIN THAT THE RECORD'S

23    CORRECT.  IF IT IS, I SIMPLY NEED YOUR SIGNATURE ON THE EXHIBIT

24    FORM.  GO ON YOUR WAY.

25         IF YOU SEE A PROBLEM, THEN, I'LL GO BACK INTO SESSION

1    AT 6:30 OR 7:00 OR WHATEVER TIME YOU WANT.

2            BUT YOU JUST NEED TO LOOK AT THOSE, MR. KOLE, AND MS.

3    PEMKOVA, AND MAKE SURE THAT WE'RE NOT DOING THAT ON TUESDAY

4    MORNING, ALSO.

5            ALL RIGHT.  MR. KOLE.

6            MR. KOLE:  I PLACED A GOOD FAITH INSTRUCTION IN CASE

7    THE COURT WANTED TO LOOK AT IT.

8            THE COURT:  OH, I --

9            MR. KOLE:  THAT'S -- THAT'S THE COPY.  THAT'S THE

10   FILED SET.

11           THE COURT:  IT'S IN -- IT'S IN THE BACK OF OUR BRAIN.

12           BUT ONE ISSUE I THINK THAT WE DO HAVE, YOUR HONOR,

13   THAT WE NEED TO DO SOMETHING -- WE SHOULD DO SOMETHING ABOUT

14   WHILE WE'RE HERE TODAY IS THE DEFENDANT STARTED TO MAKE HER

15   RULE 29 MOTION.

16           THE COURT SAID WE'LL TAKE THAT UP OUTSIDE THE JURY'S

17   PRESENCE.

18           I THINK UNDER RULE 29 WHILE THE COURT CAN RESERVE

19   RULING --

20           THE COURT:  I'M RESERVING RULING.

21           MR. KOLE:  OKAY.

22           THE COURT:  OKAY.  THAT WAY I'M NOT HAVING YOU STAY

23   UNTIL 6:00 THIS EVENING.

24           TENTATIVELY I WOULD SAY TO YOU IT WOULD BE DENIED IN

25   ALL LIKELIHOOD.  BUT --

1          MR. STEWARD:  YOUR HONOR, WE'RE GOING TO DO A BELT

2    AND SUSPENDERS THING.

3          AND MS. PEMKOVA HAS PREPARED A WRITTEN RULE 29.

4          THE COURT:  OKAY.

5          MR. STEWARD:  IT'S A TWO-PAGER.

6          WE'LL GET THAT FILED ASAP.

7          THE COURT:  THEN I RESERVE THAT.  I'M ENTITLED TO

8    RESERVE THAT UNTIL THE CONCLUSION OF THE DEFENSE CASE.

9          I WOULD APPRECIATE THAT TO THE COURT NO LATER THAN

10   JUNE 19TH -- OKAY -- SO I CAN SEE IT BEFOREHAND.  AND THAT WAY

11   YOU'RE NOT JUST SITTING HERE WATCHING ME DO THE WORK.  I'LL GET

12   TO IT ON THE 19TH, THE 20TH, THE 21ST, THE 22ND AND HAVE A

13   RULING FOR YOU WHEN YOU COME INTO COURT.

14         FAIR ENOUGH?  THAT GIVES YOU TIME --

15         MS. PEMKOVA:  THANK YOU, YOUR HONOR.

16         THE COURT: -- TO PREPARE.

17         MS. PEMKOVA:  YES.

18         THE COURT:  IT GIVES YOU TIME TO WRITE.

19         SIMULTANEOUS.  IT'S DUE TO ME BY JUNE 18TH, NO LATER

20   THAN 4:00 IN THE AFTERNOON.

21         MR. STEWARD:  THAT'S FINE, YOUR HONOR.

22         MS. PEMKOVA:  MAY I ASK A QUESTION, YOUR HONOR.

23         THE COURT:  NOW, I CAN CALL YOU --

24         JUST ONE MOMENT.

25         I CAN CALL YOU INTO SESSION EARLIER, BY THE WAY.

1              MS. PEMKOVA:  NO.

2              THE COURT:  IN OTHER WORDS, I CAN CALL YOU IN SESSION

3    MONDAY, TUESDAY, WEDNESDAY OF THAT WEEK.

4              MS. PEMKOVA:  HUH-UH.

5              THE COURT:  I JUST DON'T SEE THE NEED OR REASON TO.

6              MS. PEMKOVA:  UH-HMM.

7              THE COURT:  AND ONCE AGAIN LET ME SAY TO YOU, MS.

8    PEMKOVA, I KNOW YOU DISAGREE WITH JUNE 23RD.  AND -- AND I

9    THINK YOU'RE ABSOLUTELY RIGHT.  HAVING REPRESENTED THAT AT ONE

10   TIME, I THINK THAT'S FAIR WARNING FOR EVERYBODY.

11             I STARTED TO ADVANCE THAT UNTIL THE 22ND, THE 19TH OR

12   EARLIER.  I STARTED FEELING, QUITE FRANKLY, THE PRESS OF MR.

13   STEWARD'S NEEDS, THE JURY'S NEEDS, NOT WANTING TO DROP BELOW

14   12,  I'LL HOLD TO THE 23RD.

15             BUT I HAVE TO -- I HAVE TO TELL YOU IN THE STRONGEST

16   TERMS -- BARGAIN, CAJOLE, TALK TO THESE PEOPLE IF YOU BELIEVE

17   THAT THEY'LL COME FORWARD.  AND IN ALL LIKELIHOOD I'LL LET THEM

18   GET ON THE STAND.  I DON'T KNOW IF I'LL EVEN GO THROUGH A

19   RELEVANCY ANALYSIS.

20             NOW, MS. PEMKOVA, YOU OR MR. KOLE, AND THEN I'M GOING

21   TO TURN YOU LOOSE WITH DEBBIE AND HAVE YOU GO ABOUT YOUR

22   BUSINESS.

23             MS. PEMKOVA:  MAY I ASK A FEW QUESTIONS, YOUR HONOR.

24             THE COURT:  PLEASE.

25             MS. PEMKOVA:  I AM GOING TO READ THIS NINTH CIRCUIT

1    INSTRUCTION WITH 500 PAGES WHICH MR. STEWARD SHOWED ME.

2              IF I WILL FIND ANYTHING, WHAT I WOULD LIKE TO STILL

3    ENCLOSE --

4              THE COURT:  I WANT THAT IN WRITING, THOUGH.

5              MS. PEMKOVA:  -- CAN I DO THAT TO MR. KOLE --

6              THE COURT:  YOU DO THAT TO MR. KOLE.  AND I GET A

7    COPY AND THE COURT.

8              AND MR. STEWARD KNOWS HOW TO DO THAT.  FOR GOODNESS

9    SAKES, PICK UP THE PHONE AND ASK HIM HOW TO DO THAT.  OKAY.

10             MS. PEMKOVA:  HE'S -- THANK YOU.

11             HE HELPED ME TO FIND THE LINK.  WHEN YOU ASKED US TO

12   GO BEFORE THE HOUR AND A HALF, I LITERALLY FLEW THROUGH.  AND I

13   WOULD -- SO, I WOULD LIKE TO READ A LITTLE BIT MORE.

14             THE COURT:  OKAY.  WELL, THEN --

15             MS. PEMKOVA:  AND MAY I SAY ONE MORE THING, PLEASE.

16             THE COURT:  PLEASE.

17             MS. PEMKOVA:  YOUR HONOR, THE ONLY REASON WHY I WAS

18   OBJECTING 23RD NOT BECAUSE I DON'T HAVE PERSONALLY AN HOUR OF

19   TIME.  I DO.  FOR MY -- TO FINISH MY PREPARATION I WOULD BE

20   FINE.

21             THE ONLY REASON WAS THAT IT WOULD BE EXTREMELY

22   DIFFICULT TO GET PEOPLE WHO ARE ALREADY SOME OF THEM -- AND --

23   BUT I DO MY BEST.  AND I HELP YOU.

24             THE COURT:  I UNDERSTAND.  WE'VE BOTH MADE OUR

25   RECORDS.

1          I JUST -- I'M JUST IMPLORING YOU THAT YOU REALLY HEAR

2     ME ON THIS.  AND I'M NOT CERTAIN THAT YOU ARE ACCEPTING WHAT

3     I'M SAYING.  SO, THAT'S WHY I'M REPEATING THIS OVER AND OVER

4     AGAIN AND HOPING THAT YOU HEAR THAT THE JUNE 23RD IS THE DATE.

5     OKAY.

6               NOW, ANYTHING ELSE?

7               MR. KOLE:  VERY BRIEFLY, YOUR HONOR.

8               AND I DON'T -- MAYBE THIS IS UNNECESSARY.

9               MS. PEMKOVA HAS EMAILED TO ME A COUPLE OF DOCUMENTS

10    THAT SHE STYLED AS MOTIONS.  BUT I'VE NEVER SEEN THEM ACTUALLY

11    HAVING BEEN FILED.

12              MR. STEWARD:  WE'RE GOING TO TAKE CARE OF THAT.

13              MR. KOLE:  OKAY.

14              THE COURT:  OKAY.  NOW, LASTLY, THE INDICTMENT.

15              I WANT TO BRING UP THE REASONS, MS. PEMKOVA, THAT I

16    DIDN'T WANT THE INDICTMENT READ.  I THOUGHT IT WAS PREJUDICIAL

17    TO YOU.

18              IT HAS A WHOLE PREAMBLE IN A SENSE.  AND I THINK IT'S

19    ENOUGH THAT THE CHARGES ARE IN FRONT OF THE JURY.  AND I THINK

20    IT'S ENOUGH THAT THOSE CHARGES ARE SET FORTH NOW IN THE

21    INSTRUCTIONS THEMSELVES.  IT AVOIDS ANY PREJUDICE IN THE

22    CHARGING DOCUMENT ITSELF.

23              IT'S CLEAR WHAT THE CHARGES ARE TO THE JURY.  THEY'LL

24    NOW SEE THEM IN A VERDICT FORM WHICH THE GOVERNMENT WILL

25    PREPARE AND GIVE TO THE DEFENSE BY THE 18TH --

1          MR. KOLE:  CERTAINLY.

2          THE COURT:  -- AT 4:00.

3          OKAY.  IF YOU WANT THE INDICTMENT READ, I CAN

4     CERTAINLY DO THAT.  BUT I'D REALLY COUNSEL YOU WITHOUT BEING

5     YOUR COUNSEL TO TALK TO MR. STEWARD ABOUT THAT.

6          SO, WE'LL LEAVE THAT AT THE PRESENT TIME.

7          NOW, IS THERE ANYTHING ELSE?  OTHERWISE, I CAN COME

8     BACK AND JOIN YOU LATER ON, BUT IT'S TIME FOR ME TO DO

9     SOMETHING.

10          MR. KOLE:  I THINK WE COVERED EVERYTHING.

11          THANK YOU, YOUR HONOR.

12          THE COURT:  OKAY.  MR. KOLE.  MS. PEMKOVA.

13          THEN WORK WITH DEBBIE.

14          DEBBIE, THEY'RE SIMPLY GOING TO SIGN THE BACK OF THE

15     EXHIBIT FORM IF THE EXHIBITS ARE IN ORDER AND THEY AGREED TO

16     THEM.  AND THEN THEY'RE GOING TO GO ON THEIR WAY.  OKAY.

17          THE CLERK:  SO, WHAT'S DUE ON THE 18TH?  I HEARD YOU

18     MENTION SOMETHING.

19          THE COURT:  RULE 29 MOTIONS IN WRITING BY MS.

20     PEMKOVA.

21          MR. STEWARD:  VERDICT FORM.

22          THE COURT:  VERDICT FORM.

23          AND I THINK THAT THAT'S IT.

24          THE CLERK:  OKAY.

25          THE COURT:  OKAY.

1          NOW, THE GOVERNMENT -- SINCE SHE'S FILING ON THE

2    18TH, HE CAN RESPOND IN WRITING IF YOU'D LIKE TO BY THE 22ND.

3    YOU NEED A COUPLE OF DAYS TO SEE WHAT'S HAPPENING OR THE

4    WEEKEND.

5          OR IF YOU WANT TO RESPOND, I CAN BRING EVERYBODY BACK

6    IN HERE ON THE 22ND.  I CAN BRING YOU IN HERE ON THE 19TH.  I

7    CAN BRING YOU IN HERE ANY DAY THAT WEEK.

8          MR. KOLE:  I THINK IN WRITING WORKS FINE.  AND THE

9    COURT CAN RULE WHEN WE'RE HERE FOR THE TRIAL.

10          THE COURT:  OKAY.  OKAY.

11          (THE COURT AND CLERK CONFERRING.)

12          THE COURT:  YOU CAN HAVE THEM SIGN OFF ON THE BACK OF

13    THAT FORM FIRST SO I HAVE THEIR SIGNATURE.  AND THEN YOU CAN

14    TYPE -- JUST KEEP THE BACK OF THAT FORM.

15          THE CLERK:  OKAY.

16          THE COURT:  OR YOU CAN HAVE A BLANK PIECE OF PAPER

17    THAT THEY SIGN, YOU KNOW, BASED ON THIS, BUT -- AND YOU CAN

18    SHOW THEM THE WRITTEN FORM LATER ON.  YOU DON'T HAVE TO DO THE

19    WRITTEN FORM TONIGHT.

20          THE CLERK:  OKAY.

21          THE COURT:  BUT I JUST WANT TO KNOW WHEN THEY LEAVE

22    THAT THAT'S REALLY BEEN RESOLVED.  OTHERWISE, I'VE GOT TO CALL

23    YOU BACK INTO SESSION ON THE 19TH.

24          NOW, DEBBIE, IF YOU'RE CONCERNED, I'M JUST GOING TO

25    BRING THEM BACK ON THE 19TH.  I CAN DO THAT.

1            THE CLERK:  NO.

2            THE COURT:  OKAY.  OKAY.  OKAY.  THAT'S IT.

3            THE CLERK:  THANK YOU.

4            MR. KOLE:  THANK YOU, YOUR HONOR.

5            THE COURT:  ALL RIGHT.  YOU TWO START WORKING

6    TOGETHER.  BUT I WANT TO TALK TO DEBBIE FOR JUST A MOMENT.

7            (THE COURT AND CLERK CONFERRING.)

8            THE CLERK:  OFF.

9            (PROCEEDINGS ADJOURNED AT 5:22 P.M. TO 5:23 P.M.)

10           THE COURT:  YEAH.  WE'RE BACK ON THE RECORD.

11           MS. PEMKOVA:  I'M SO SORRY.

12           MAY I ASK YOU FOR PERMIT TO CHECK IT WITH MRS. DEBBIE

13   AND MR. KOLE ELECTRONICALLY VIA EMAIL AND SIGN IT JUST BEFORE

14   THE START OF THE TRIAL BECAUSE THERE ARE MANY CHANGES.  I DON'T

15   HAVE THE DOCUMENTS WITH ME.  I DON'T HAVE A MAGNIFYING GLASS.

16   I CANNOT READ IT.

17           THE COURT:  WHAT -- I'M SORRY.  I DON'T UNDERSTAND

18   WHAT YOU'RE ASKING.

19           MS. PEMKOVA:  IS IT POSSIBLE THAT WE CONFORM IT --

20   CONFORM THE EXHIBITS BETWEEN MR. KOLE AND MRS. DEBBIE AND

21   MYSELF ELECTRONICALLY --

22           THE COURT:  NO.

23           MS. PEMKOVA:  -- AND PHYSICALLY SIGN IT --

24           THE COURT:  ABSOLUTELY NOT.

25           ABSOLUTELY NOT.  IT'S TODAY IN COURT.  AND I'M TRYING

1  TO AVOID BRINGING YOU BACK IN.  IT'S WHEN DEBBIE IS HERE.  I'M

2  STILL IN THE BUILDING.  IT GETS DONE TONIGHT.  AND WE'RE IN

3  SPECIAL (COUGHING.)

4          MS. PEMKOVA:  CAN WE DONE IT -- CAN WE DO IT BEFORE

5  THE START OF THE NEXT TRIAL?

6          THE COURT:  CERTAINLY.  YOU COME BACK IN THE 19TH IF

7  YOU'D LIKE TO.  I'LL ORDER YOU BACK HERE ON FRIDAY.

8          MS. PEMKOVA:  OKAY.  THANK YOU, YOUR HONOR.

9          THANK YOU, YOUR HONOR.

10          THE COURT:  WHICH WOULD YOU LIKE?

11          MS. PEMKOVA:  I WILL TRY TO DO IT TONIGHT.

12          THE COURT:  OKAY.  EITHER ONE IS FINE.

13          (PROCEEDINGS ADJOURNED AT 5:24 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25

152

1                    C E R T I F I C A T E

2

3           I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
    FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE
4    ABOVE-ENTITLED MATTER.

5

6    /S/ DOROTHY BABYKIN                      7/30/16
    _____      _____
7    FEDERALLY CERTIFIED TRANSCRIBER          DATED
    DOROTHY BABYKIN
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25