1

2                    UNITED STATES DISTRICT COURT

3                   CENTRAL DISTRICT OF CALIFORNIA
                          SOUTHERN DIVISION
4

5
     UNITED STATES OF AMERICA,      )
6                                   )
          PLAINTIFF,                )
7                                   )
          V.                        ) CASE NO.:  SA CR 08-180-DOC
8                                   )
                                    ) SANTA ANA, CALIFORNIA
9    IRENE PEMKOVA,                 ) JUNE 24, 2015
                                    ) (8:39 A.M. TO 10:05 A.M.)
10                                  ) (10:46 A.M. TO 11:56 P.M.)
          DEFENDANT.                ) (12:47 P.M. TO 12:52 P.M.)
11   _____) (1:24 P.M. TO 1:25 P.M.)
                                      (1:27 P.M. TO 1:28 P.M.)
12                                    (2:05 P.M. TO 2:06 P.M.)
                                      (2:17 P.M. TO 2:27 P.M.)
13
                          JURY TRIAL – DAY 9
14                             VOLUME I

15           BEFORE THE HONORABLE DAVID O. CARTER
                  UNITED STATES DISTRICT JUDGE
16

17

18

19   APPEARANCES:              SEE NEXT PAGE

20   COURT REPORTER:           RECORDED; COURTSMART

21   COURTROOM DEPUTY:         NANCY BOEHME

22   TRANSCRIBER:              DOROTHY BABYKIN
                               COURTHOUSE SERVICES
23                             1218 VALEBROOK PLACE
                               GLENDORA, CALIFORNIA  91740
24                             (626) 963-0566

25   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
     TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

```
 1   APPEARANCES:  (CONTINUED)
     FOR PLAINTIFF UNITED STATES OF AMERICA:
 2
         EILEEN DECKER
 3       UNITED STATES ATTORNEY
         LAWRENCE MIDDLETON, CHIEF
 4       CRIMINAL DIVISION
         ASSISTANT UNITED STATES ATTORNEY
 5       BY:  LAWRENCE KOLE
         ASSISTANT UNITED STATES ATTORNEY
 6       411 WEST FOURTH STREET
         SUITE 8000
 7       SANTA ANA, CALIFORNIA  92701

 8
     FOR THE DEFENDANT IRENE PEMKOVA:
 9
         IRENE PEMKOVA AKA PIMKOVA
10       PRO SE

11
     STAND-BY COUNSEL FOR DEFENDANT IRENE PEMKOVA:
12
         H. DEAN STEWARD LAW OFFICES
13       BY:  H. DEAN STEWARD
               ATTORNEY AT LAW
14       107 AVENIDA MIRAMAR
         SUITE C
15       SAN CLEMENTE, CALIFORNIA  92672

16   ALSO PRESENT:

17       THOMAS REITZ
         SPECIAL AGENT, FBI
18

19

20

21

22

23

24

25
```

3

1                              I N D E X

2    SA CR 08-180-DOC                          JUNE 24, 2015

3    PROCEEDINGS:   JURY TRIAL - DAY 9; VOLUME I
                                                      PAGE
4
        DEFENSE CLOSING STATEMENT BY MS. PEMKOVA          11
5       GOVERNMENT REBUTTAL CLOSING BY MR. KOLE           89

6

7
                           E X H I B I T S
8                                                 RECEIVED

9    EXHIBIT 243                                       86
     EXHIBIT 219                                      108
10   EXHIBIT 222                                      108

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1        SANTA ANA, CALIFORNIA; JUNE 24, 2015; 8:39 A.M.

2             (OUTSIDE THE PRESENCE OF THE JURY.)

3        THE COURT:  BUT WE'RE BACK ON THE RECORD IN MS.

4   PEMKOVA'S MATTER.

5        MS. PEMKOVA, GOVERNMENT COUNSEL ARE HERE AS WELL AS

6   MR. STEWARD AND THE INVESTIGATING AGENT.

7        NANCY, FOR THE RECORD, 205, UNREDACTED?

8        THE CLERK:  NO, YOUR HONOR.

9        THE COURT:  WE HAVE NOT RECEIVED IT?

10        THE CLERK:  NO, YOUR HONOR.

11        MS. PEMKOVA:  YOUR HONOR, I COULDN'T BRING THE

12   PRINTER UPSTAIRS.  THAT ONE DOESN'T WORK.  I STATED YESTERDAY

13   VERY CLEARLY THE HOTEL DOESN'T HAVE A PRINTING CAPACITY.

14        AND THE PRINTER, I ASKED THE CLERK OF THE COURT TO

15   HELP ME TO --

16        THE COURT:  BUT YOU HAVE IT IN AN UNREDACTED

17   CONDITION?

18        MS. PEMKOVA:  I HAVE IT IN THE MEMORY STICK, YES.

19        THE COURT:  YOU HAVE A MEMORY STICK.  SO, IF WE DID

20   THAT LITERALLY FOR YOU --

21        WELL, COUNSEL, HOW DO WE RESOLVE THAT AND GET THIS

22   TO THE JURY?

23        MR. KOLE:  IF -- IF MS. PEMKOVA --

24        THE COURT:  MR. STEWARD, IF YOU HAVE THAT MEMORY

25   STICK, I DON'T FEEL COMFORTABLE GIVING THIS TO THE UNITED

5

1    STATES ATTORNEY'S OFFICE.

2            MR. KOLE:  YES.  I --

3            THE COURT:  I DON'T FEEL COMFORTABLE HAVING THE

4    COURT HAVE IT.

5            I'M WONDERING IF CATHY DOWN IN THE -- OR ONE OF THE

6    HEAD COURT ADMINISTRATORS COULD HELP US WITH THIS ON THE

7    REPRESENTATION THAT THIS WOULD GO TO THE JURY IN AN

8    UNREDACTED FORM.  THAT'S THE ONLY SOLUTION I CAN THINK OF.

9            MR. STEWARD:  SURE.  I'M WILLING TO TRY THAT, YOUR

10   HONOR.

11           THE COURT:  OKAY.

12           OKAY.  NANCY, ASK ONE OF THE SUPERVISORS TO COME UP

13   AND QUIETLY SPEAK WITH MR. STEWARD.

14           AND IF YOU GIVE THE MEMORY STICK TO MR. STEWARD,

15   MAYBE HE CAN HELP YOU WITH THAT.

16           MS. PEMKOVA:  NO, HE CANNOT.  I HAVE TO -- I HAVE

17   TO PRINT IT BY MYSELF BECAUSE IT WOULD BE DIFFICULT TO FIND

18   IT ON THE STICK.

19           MR. KOLE:  IF MR. STEWARD WAS CAPABLE OF WITH THE

20   STICK EMAILING ME JUST THE DOCUMENTS -- BECAUSE I AGREE, I'D

21   PREFER NOT TO HAVE THE WHOLE DEVICE.  BUT IF THEY COULD EMAIL

22   ME THE DOCUMENTS, I'D BE HAPPY TO PRINT THOSE DOCUMENTS.

23           THE COURT:  ALL RIGHT.  I'M ASSUMING THAT THIS IS

24   COMING INTO EVIDENCE BECAUSE I'M NOT HEARING AN UNWILLINGNESS

25   FOR YOU TO PRODUCE THIS.

6

1              207, THE SAME SITUATION?

2              MS. PEMKOVA:  YES.

3              THE COURT:  20- -- 15, THE SAME?  YOU CAN PRODUCE

4   THEM.

5              MS. PEMKOVA:  ONE SECOND, YOUR HONOR.  LET ME --

6   215?

7              THE COURT:  2- -- 205, 207, 215.

8              MS. PEMKOVA:  215, YES, I CAN PRODUCE THIS.

9              THE COURT:  OKAY.  219 HAS THE ATTACHMENT.

10             HAVE YOU FOUND THAT?

11             MS. PEMKOVA:  OH, 219.  NO, 215 HAS AN ATTACHMENT.

12             THE COURT:  NO.  219 HAS THE ATTACHMENT.

13             MS. PEMKOVA:  YOUR HONOR, I'M VERY SORRY.  BUT I

14   BELIEVE IT'S 915 -- 215.

15             THE CLERK:  215.

16             THE COURT:  215, MY APOLOGIES.  MY NOTES ARE WRONG.

17   I'LL RETRACT THAT.  AND THANK YOU.

18             MY APOLOGY.  YOU'RE ABSOLUTELY RIGHT.

19             MS. PEMKOVA:  ONE SECOND, YOUR HONOR.

20             THE COURT:  215 HAS THE ATTACHMENT.

21             219, WILLING TO PRODUCE THAT UNREDACTED?  JUST A

22   MATTER OF GETTING IT OFF THE STICK.

23             MS. PEMKOVA:  I --

24             THE COURT:  YES OR NO?

25             MS. PEMKOVA:  YES.

1             THE COURT:  OKAY.

2             MS. PEMKOVA:  YES, I WILL PRODUCE IT.

3             THE COURT:  NOW, 221, THERE I FELT SOME PUSH-BACK

4    CONCERNING THE EARNHARDT DOCUMENT.

5             ARE YOU WILLING TO PRODUCE THAT OR NOT?

6             MS. PEMKOVA:  221 IS NOT A PROBLEM.  IT'S PAUL

7    CHOVANEC.  I -- I HAVE IT ON THE STICK.  I WILL PRODUCE IT.

8             THE COURT:  YOU'LL PRODUCE IT.  ALL RIGHT.

9             222.

10            MS. PEMKOVA:  222, YES.

11            THE COURT:  ALL RIGHT.

12            NOW, 250 I WANT TO LOOK AT AGAIN.  AND YOU CAN --

13   I'M GOING TO EVEN TENTATIVELY LET YOU ARGUE FROM IT.

14            AND 243, I'M GOING TO TENTATIVELY LET YOU ARGUE

15   FROM IT.  I'M JUST -- HAVE TO SEE IT TO LET IT INTO EVIDENCE.

16            SO, CAN WE GET STARTED WITH THE JURY.

17            MS. PEMKOVA:  ONE SECOND, YOUR HONOR.

18            243, YOU WILL ADMIT TO ARGUE WITH IT?

19            THE COURT:  YES.  I'M GOING TO USE ALL THE LATITUDE

20   I CAN.  I'M GOING TO LET YOU ARGUE WITH IT.  I JUST DON'T

21   KNOW IF IT'S COMING INTO EVIDENCE YET.  I CAN'T SEE IT.

22            MS. PEMKOVA:  YOUR HONOR, THERE'S THE -- OKAY.

23   THANK YOU.  AND --

24            THE COURT:  NOW, I'M NOT GOING TO LET YOU PUT IT UP

25   ON THE ELMO, THOUGH.  I MEAN, YOU CAN REFER TO IT.  BUT THE

8

1  JURY -- IT MAY GO RIGHT OVER THE TOP OF THEIR HEAD.

2           MS. PEMKOVA:  OKAY.

3           THE COURT:  YOU HAVEN'T GIVEN ME THE MEANS TO MAKE

4  A DECISION.  THAT'S WHY.

5           ALL RIGHT.

6           MS. PEMKOVA:  I --

7           THE COURT:  LET'S GET THE JURY.

8           MS. PEMKOVA:  AND G.I.D.?

9           THE COURT:  PARDON ME?

10          MS. PEMKOVA:  AND G.I.D., I CANNOT USE AS WELL,

11 CORRECT?  PLEASE.

12          THE COURT:  CAN I SEE 243 AND 250 FOR JUST A

13 SECOND.

14          NANCY, I DROPPED THAT ON THE FLOOR.  IF YOU WOULD

15 BE SO KIND.

16          THANK YOU VERY MUCH.

17          IS THIS 243, NANCY?

18          THE CLERK:  YES, YOUR HONOR.

19          THE COURT:  ALL RIGHT.

20          THE CLERK:  I'M SORRY.  THAT'S 250.

21          THE COURT:  THIS IS 250.

22          THIS IS THE GLACIER INTERNATIONAL DEPOSITORY BANK

23 FOR $600 MILLION.

24          AND ONCE AGAIN I HAD EXCLUDED THIS.  I HAD

25 REPEATEDLY EXCLUDED THIS BECAUSE OF FOUNDATION.

1               MS. PEMKOVA:  YOUR HONOR --

2               THE COURT:  IT WASN'T BECAUSE OF REDACTION.

3               MS. PEMKOVA:  YOU SAID REDACTION, YOUR HONOR.

4               THE COURT:  AND, ALSO, IT SEEMED TO BE OUTSIDE THE

5    TIME PERIOD.  IT WAS FEBRUARY 4TH OF 2008.

6               MR. KOLE:  RELEVANCE.

7               THE COURT:  I'M GOING TO CONTINUE TO EXCLUDE THAT.

8               MS. PEMKOVA:  YOUR HONOR, BUT IT WAS BEFORE THE

9    ARREST.  AND IT WAS WITH ROSE -- THE WORK WHICH HAS BEEN

10   DONE.  IT'S AN URUGUAY BANKING BUSINESS.

11              THE COURT:  WELL, LET ME SEE THE CONTENT OF THE

12   DOCUMENT.  AND IN READING THIS, ALL THE DATES PERTAIN TO THE

13   ORIGINAL CORPORATE LETTER OF CREDIT AND GUARANTY WAS -- A

14   MATURITY DATE OF 2008.  THIS LETTER IS DATED FEBRUARY 4TH OF

15   2008.

16              I'M GOING TO UPHOLD MY RULING.  IT'S IRRELEVANT.

17              LACK OF FOUNDATION.

18              I WILL CONSIDER ONCE AGAIN THIS PERCEIVED PROTOCOL

19   AT A COURT COMMISSIONER.  AND I MAY VERY WELL CHANGE MY MIND.

20   BUT I HAVE TO HAVE IT IN AN UNREDACTED FORM.

21              YOU CAN ARGUE FROM IT IN ITS REDACTED FORM AT THE

22   PRESENT TIME.  BUT I'M NOT REPRESENTING THAT I WILL RECEIVE

23   IT.  I JUST DON'T KNOW WHAT'S IN IT.

24              ALL RIGHT.  NANCY, PLEASE GET THE JURY.

25              AND, COUNSEL, DO YOU HAVE THE INSTRUCTIONS?

1          MR. KOLE:  YES, YOUR HONOR.  I GAVE THEM TO THE

2    CLERK THIS MORNING.

3          THE COURT:  ALL RIGHT.  THANK YOU.

4          (PAUSE IN PROCEEDINGS.)

5          MS. PEMKOVA:  YOUR HONOR, MAY I SAY SOMETHING.

6          I EXPLAINED I CANNOT GIVE THAT STICK TO MR. STEWARD

7    BECAUSE SOMEBODY ELSE WON'T BE ABLE TO PULL IT OFF THE STICK.

8    THERE ARE MANY DOCUMENTS I CANNOT TELL YOU ON THE TOP OF MY

9    HEAD HOW I'M -- WHAT IT IS --

10         THE COURT:  WELL, LET'S WORK TOGETHER THEN WITH

11   YOUR CONSENT AT THE RECESS.  AND --

12         MS. PEMKOVA:  OKAY.  THANK YOU.

13         THE COURT:  IS THAT OKAY?  LET'S DO THAT.  I'M

14   TRYING TO GET ANY PLAUSIBLE EVIDENCE THAT YOU HAVE IN FRONT

15   OF THE JURY IN THE MOST EXPANSIVE FORM.

16         (PAUSE IN PROCEEDINGS.)

17         THE CLERK:  ALL RISE.

18         (JURORS ENTERING COURTROOM.)

19         THE COURT:  ARE YOU TRAINED TO LINE UP IN ORDER

20   EACH TIME?

21         (LAUGHTER.)

22         A JUROR:  YOU WOULD THINK.

23         THE COURT:  ALL RIGHT.  WELL, FIRST GOOD MORNING.

24         PLEASE BE SEATED, COUNSEL AND MS. PEMKOVA.

25         AND LET ME ASSURE YOU THAT THE DELAY IS TOTALLY MY

11

1   RESPONSIBILITY AND MY FAULT.  IT DOESN'T REFLECT ON EITHER

2   PARTY.

3           THIS IS THE FINAL ARGUMENT BY MS. PEMKOVA.

4           MS. PEMKOVA.

5                   DEFENSE CLOSING STATEMENT

6           MS. PEMKOVA:  GOOD MORNING.

7           THE RECORDER:  MICROPHONE, PLEASE.

8           MS. PEMKOVA:  CAN YOU HEAR ME NOW.

9           THE COURT:  YES.

10          MS. PEMKOVA:  IS IT -- IS IT OKAY NOW?

11          GOOD MORNING, EVERYONE.

12          I'M SORRY IT WILL BE NOT THAT APPROPRIATE AS THE

13  ARGUMENT FOR MR. KOLE -- OF MR. KOLE.  THIS PRO SE WAS PUT ON

14  THE TRIAL AS A PRO SE 15 MINUTES BEFORE THE TRIAL.  BUT I

15  WILL DO MY BEST.

16          BEFORE GENERAL COMMENTS, I WOULD LIKE TO EMPHASIZE

17  TO JURY WHAT WAS SAID BY THE EXPERTS -- THE GOVERNMENT

18  EXPERTS EXPRESSING THEIR OPINION.

19          IT WAS CLEARLY SAID THAT HIGH-YIELD INVESTMENT

20  PROGRAMS ARE ON THE FEDERAL RESERVES BULLETIN.  RECOMMENDED

21  NOT TO PARTICIPATE.  BUT THEY ARE NOT THE LAW.  THEY HAVE

22  INFORMATIVE CORRECTOR.

23          MR. -- PROFESSOR BOND SAID VERY CLEAR HOW IMPORTANT

24  IS THE INTERDISCIPLINARY RESEARCH.  AND HE'S ENCOURAGING HIS

25  STUDENTS.  HE ENCOURAGED ALSO THAT IT'S IMPORTANT TO MAKE A

1    DISTINGUISHED DIFFERENCE BETWEEN THE HIGH INVESTMENT PROGRAM

2    IN REGULAR BUSINESS INCLUDING REAL ESTATE. THERE WAS A WHOLE

3    DISCUSSION ON THAT TOPIC.

4            PROSECUTION HAS MADE VERY CLEAR THAT AT THIS CASE

5    IT IS THIS DEFENDANT WHO IS A HALF OF THE CONSPIRACY.  NOT

6    EXACTLY.

7            AND WE HAVE BEEN WORK DILIGENTLY THROUGH THE

8    CONVERSATIONS IS FROM 1 TO 45 WHAT WAS DONE AND WE WILL VERY

9    QUICKLY GO THROUGH IT ONE MORE TIME.  WHO CALLED WHO AND WHY.

10           IN REALITY, THE CONVERSATIONS HAVE PROVEN CLEARLY

11   THAT MR. REITZ OR THOMAS MOORE WAS BASICALLY LOOKING AROUND

12   FOR DIFFERENT PEOPLE.  AND HE -- AND HE'S PROVIDED THE

13   DOCUMENTS TO MR. ELDER THROUGH MR. TORTOLI AND -- TORELLI AND

14   THROUGH THE RICHARD OTIS.

15           IT WAS A FIRST CONVERSATION ON FEBRUARY 24TH

16   BETWEEN MR. ELDER.  AND THERE WAS A SECOND CONVERSATION

17   SEVERAL DAYS LATER WHERE MR. -- I AM SORRY.  MY EYES -- WHERE

18   MR. MOORE MADE VERY CLEAR HE WANTS TO GET HELP AND

19   INTRODUCTION.

20           IN CONVERSATION NUMBER ONE ON PAGE 5, 9 TO 13, AND

21   ON THE PAGE 6 IN THIS FIRST CONVERSATION, LINE 1821, MR.

22   MOORE CLEARLY EXPRESSED HIS REQUEST FOR INFORMATION FOR

23   INTRODUCTION.  HE WANTS TO UNDERSTAND HOW IT WORKS.

24           HE WAS APPROACHING PEOPLE WHO WERE HELPFUL.  AND

25   MR. ELDER WAS NEVER AN ASSISTANT OF THE DEFENDANT.  BUT THEY

13

1   WORKED VERY CLOSELY ON VARIOUS TECHNOLOGIES, PROJECTS,

2   INCLUDING, BY THE WAY, THE COMPUTERS.  THE DEFENDANT HAS A

3   PASSIONS FOR BESIDES CARS, SCIENCE, COMPUTERS AS WELL.  AND

4   THEY HAVE A LONG HISTORY TOGETHER.  BUT IT DOESN'T MEAN HE

5   WAS AN ASSISTANT.

6          YES.  HE WAS DOING ALL PAPERWORK FOR ALL CLIENTS.

7   BUT WE HAVE ALREADY ESTABLISHED THAT DEFENDANT WAS AN EXPERT

8   IN HER FIELDS, WAS WORKING ON THE RESEARCH, AND WAS CLOSELY

9   WORKING WITH THE PROJECTS AND, SPECIFICALLY, TECHNOLOGIES

10  WHICH WERE LATER PROVIDED -- PROPOSED FOR THE ESTATE ON

11  FLORIDA.

12         IN THE SAME CONVERSATION IN NUMBER TWO WAS ON THREE

13  OCCASIONS -- CLEARLY MENTIONED DISCLOSURE.  IT WAS A PAGE.

14  IT'S CONVERSATION NUMBER 2, PAGE 3; PAGE 13, PAGE 15.  THREE

15  TIMES WAS CLEARLY CITE THAT THAT WOULD BE A DISCLOSURE AND

16  EXPLANATION IN PERSON TO HELP MR. MOORE AS WELL AS MANY

17  OTHERS WHO WERE ASKING FOR HELP TO UNDERSTAND WHAT TO LOOK

18  FOR, WHAT TO BE CAREFUL WITH.  PLUS, AT THE SAME TIME IT WAS

19  BASICALLY EASY SOURCE OF THE INFORMATION FOR THE RESEARCHER

20  FOR DR. PEMKOVA BECAUSE IT WAS A SITUATION ALIVE.

21         AT THE SAME TIME THERE WAS NO ONE SINGLE CLIENT OR

22  INVESTOR WHO WOULD BELONG TO HER.  AND IT HASN'T BEEN PROVED

23  BY THE -- BY THE PROSECUTIONER.

24         ALL THESE DOCUMENTS ARE COMING FROM MR. MOORE, MR.

25  THOMAS REITZ, ONE-MAN SHOW.  NO CROSS-EXAMINATION BY THE

1   PHONE RECORDS -- EARPHONE RECORDS.  NO CROSS-EXAMINATION BY

2   THE EMAILS, WHERE AND HOW THE COMMUNICATION WAS MOVING

3   BETWEEN ALL THREE IN BOTH PARTIES, INCLUDING MR. ELDER.

4           ON PAGE 4, YES, IN THAT CONVERSATION WHERE MR.

5   ELDER CALLED THE DEFENDANT, THERE WAS MENTIONED PROGRAM FOR

6   -- NOT PROGRAM -- IT WAS MENTIONED 10 MILLION INVESTMENT.

7   AND ON THE PAGE 4 IT CLEARLY SAID THIS IS NOT HIGH-YIELD

8   INVESTMENT PROGRAM.  IT IS A FOUNDATION.  TOTALLY

9   MISREPRESENTED BY THE PROSECUTIONER.  BECAUSE THERE ARE MANY

10  FOUNDATIONS WHO ARE -- WHO OWNS THE PROJECTS OR THEY OWN

11  TECHNOLOGISTS.  AND IT'S ABSOLUTELY NORMAL EUROPEAN STANDARD

12  AND VERY OFTEN USED EVEN IN UNITED STATES THAT VALUABLE

13  ASSETS, ESPECIALLY KNOW HOW AND INTELLECTUAL PROPERTY, IT'S

14  PLACED IN THE FOUNDATION OR IN THE -- IN THE TRUST.

15          AND, FOR EXAMPLE, THE MEDICAL DEVICES WHICH YOU

16  HAVE SEEN YESTERDAY WHICH WERE PLANNED FOR FLORIDA AND MANY

17  OTHER ENTITIES IN UNITED STATES, IT'S OWNED BY THE FOUNDATION

18  AS WELL.  AND THERE IS --

19          MR. KOLE:  OBJECTION.  I DON'T THINK THERE'S ANY

20  EVIDENCE ABOUT THE FOUNDATIONS OWNING THOSE THINGS.

21          THE COURT:  SUSTAINED.

22          PLEASE CONTINUE.

23          MS. PEMKOVA:  OKAY.

24          ON THE SAME CONVERSATION 2 ON PAGE 9, AGAIN, AND

25  PAGE 15 AND 19 MR. MOORE IS AGAIN EMPHASIZING HE JUST WANTS

1    TO SEE.  HE WANTS TO UNDERSTAND.  AND THIS IS HOW THIS ENTIRE

2    THING HAS BEEN CARRIED TO HELP HIM OUT.

3         AT THE SAME TIME HE PROVIDED THE EVIDENCE FOR 1

4    MILLION.  AND HAVING SOMEONE WHO IS GOING TO MANAGE THE

5    FAMILY OR WHO IS MANAGING FAMILY MONEY, OF COURSE, EVERYBODY

6    FEELS SORRY FOR HIM.  SOME WAY SOMEHOW.

7         THAT 10 MILLION FROM PAGE 4 WAS RELATED TO THE

8    HELICOPTERS.  AND PROFESSOR DR. BACHMANN WHO MR. MOORE

9    RECOGNIZED LATER IN CONVERSATION 24, I BELIEVE, IMMEDIATELY

10   WITHOUT EVEN SAYING A NAME WAS THE ONE WHO WAS PREPARING IT

11   FOR THE HELICOPTERS AND FUNDING THE LAST STAGE OF FINALIZING

12   THE RESEARCH.  YES, THESE THINGS -- THIS TYPE OF INVESTMENT

13   IN CASE IT IS DONE VIA TECHNOLOGY IS SECURED BECAUSE, FOR

14   EXAMPLE, THE HELICOPTER BEFORE THEY EVEN START FLYING, IT'S

15   INSURED AND MUST BE INSURED.

16        MR. KOLE:  OBJECTION.  THERE'S NO EVIDENCE ABOUT

17   INSURANCE FOR HELICOPTERS.

18        THE COURT:  SUSTAINED.

19        MS. PEMKOVA:  ON THE SAME CONVERSATION ON PAGE 9 IS

20   CLEARLY STATED -- AND IT IS STILL BEFORE THE CONVERSATION IN

21   BEVERLY HILLS THAT THE DEFENDANT IS TRAVELING TO ARIZONA.

22   AND SHE WILL PUT -- OR SHE CAN PUT THE MR. MOORE ON THE PHONE

23   WITH THE DIRECTOR WHO LIVES THERE PERSONALLY AND TEMPORARILY.

24        IT WASN'T DR. ONCIU.  AND IT -- THERE WERE NO DR.

25   ONCIU'S FOUNDATIONS OR WHATEVER HE IS -- IT WAS DR. BACHMANN.

1    BECAUSE DR. ONCIU LIVES PERMANENTLY IN UNITED STATES WHILE

2    DR. BACHMANN DOESN'T.

3            AND ON THE PAGE 15 ON LINES 17-19 IT WAS VERY CLEAR

4    -- CLEARLY EXPLAINED TO MR. MOORE.  BASICALLY ALL THIS

5    PAPERWORK IS JUST A SUBMISSION.  IT WAS SAID LATER IN MANY

6    CONVERSATIONS.  SUBMITTING THE DOCUMENTS DOESN'T MEAN

7    ANYTHING BESIDE YOU ARE EXPRESSING YOUR WILL.  AND SOMEBODY

8    WILL LOOK INTO IT.

9            ON PAGE 16 AND 17 IT MENTIONED BEVERLY HILLS.  THE

10   BEVERLY HILLS TRANSPIRED IN THIS CONVERSATIONS MANY TIMES.

11   BECAUSE IT WAS A PRIMARY INTEREST.  AND THIS IS WHAT AT THAT

12   TIME FOR RESEARCH AND OF COURSE EVEN LOOKING HOW PEOPLE ARE

13   REACTING IN THE LUXURY BEVERLY HILLS OFFICE, WELL-KNOWN NAME

14   OF MR. MICHAEL MILKEN AND PROFESSOR DR. MUNDELL AND

15   INVESTMENT WHICH MR. REITZ CHARACTERIZED AS A START-UP

16   COMPANY.

17           AND IT WASN'T THE TRUTH BECAUSE IT WASN'T A

18   START-UP COMPANY.  IT WAS USING A TREMENDOUS RESPONSIBILITY

19   -- SORRY, REPUTATIONAL AND ACHIEVEMENT OF MICHAEL MILKEN.

20   THERE WAS IN THAT HOUR AND A HALF GOING ON PRESENTATIONER WAS

21   SHOWN A BIG FILE WITH ALL DOCUMENTS RELATED TO AT LEAST THE

22   CORPORATE STRUCTURE LIKE AN UMBRELLA -- I'M AFRAID TO SAY HOW

23   MANY, A LOT, MAYBE 40, MAYBE 50 DIFFERENT COMPANIES OWNED BY

24   -- BY MICHAEL MILKEN.  I MIGHT BE WRONG BY THE NUMBER.  IT

25   WAS MANY YEARS AGO.  BUT THERE WAS A BIG PICTURE ENTIRE PAGE

17

1   OF THE SHOWING WHICH COMPANY BELONGS THERE.

2           AN ENTERPRISE IN BEVERLY HILLS WAS SET UP FOR TO

3   USE MR. MICHAEL MILKEN'S NAME, HIS REPUTATION --

4           MR. KOLE:  OBJECTION.  THIS -- ALTHOUGH MILKEN WAS

5   MENTIONED, THIS IS GOING BEYOND ANY EVIDENCE ABOUT MILKEN'S

6   ACTUAL INVOLVEMENT IN THE BEVERLY HILLS MEETING.

7           THE COURT:  SUSTAINED.

8           COULD I ASK YOU TO CONFINE IT TO THE EVIDENCE THAT

9   THE JURY HAS HEARD.

10          MS. PEMKOVA:  OKAY.  TAPES 17, 18 IS MENTIONED 5,

11  600 PERCENT.  AND IT WAS WITHIN SIX MONTHS.  AND IT WAS

12  COMING FROM A TECHNOLOGY OF THE LEARNING SOMEWHERE BEING

13  IMPLEMENTED IN VARIOUS COMPANIES.  AND BASICALLY SHARES WERE

14  RAISING FROM DOLLAR TO 30, 40 -- 40, 50 AND MORE.

15          AGAIN, BASED ON THE PREVIOUS ESTIMATE -- NOT

16  PREVIOUS -- BASED ON PREVIOUS EXPERIENCE WITH THE LEAPFROG

17  WHERE IT HAPPENED.

18          ON THE CONVERSATION THREE AND FOUR IS MR. -- MR.

19  ELDER IS COMMUNICATING PERSONALLY WITH MR. MOORE, FINISHING

20  SOME DOCUMENTS.  AND I SHOWED YOU YESTERDAY THAT THERE WAS

21  EVEN A FEES AGREEMENT WHICH THE DEFENDANT WASN'T AWARE OF --

22  SOMEWHERE IN BETWEEN, MEANING THERE WAS NOT A CLOSE

23  CORPORATION ON EVERYTHING BETWEEN DR. PEMKOVA AND MR. ELDER.

24          MR. ELDER IS AN INDEPENDENT UNRELATED ENTITY.  THEY

25  WORK ON CERTAIN AREAS.  AND I NAMED THEM -- PROJECTS,

18

1    TECHNOLOGIES, COMPUTERS, HEALTH.  HE WAS ACTUALLY WITH HIS

2    WIFE RUNNING A SORT OF THE HEALTH COMMUNITY IN VANCOUVER.

3            ON CONVERSATION 5 WHERE MR. MOORE CALLS IN

4    CONFIRMING THE MEETING WITH -- IN BEVERLY HILLS WITH DR.

5    PEMKOVA.  AND YOU HAVE HEARD SO MANY TIMES SECRET -- SECRET

6     -- AND CANNOT TALK.  AND THIS IS NOT THE TRUTH.

7            WHEN MR. MOORE WAS ASKING IF HE CAN BRING ANOTHER

8    PERSON, THERE WAS IN LINE 25 -- 22, 25 AND BEFORE 1420,

9    CLEARLY SAID OF COURSE.  NO PROBLEM IN CASE YOU TRUST THIS

10   PERSON BECAUSE THIS MR. GEORGE TARPINSKI HAS BEEN PRESENT AS

11   AN ACCOUNTANT, AS A TAX ADVISOR, AN AUDITOR.

12           AND ADDITIONALLY ONLY QUESTION WHICH THE DEFENDANT

13   HAS HAD WAS IF HE TRUST HIM.  BECAUSE THEY WOULD BE OUT OF

14   STATE.  AND IT WAS.  IT WAS SAID ALREADY BEFORE THAT THAT

15   MEETING IN BEVERLY HILLS BEFORE GOING TO THE OFFICE OF

16   GENERAL VINCENT TOOK ABOUT AN HOUR AND A HALF AS LONG AS IT

17   TOOK TO ORDER THE MEAL, EAT A BIG LUNCH AND FINISH IT AND

18   LEAVE.  THEY WERE EATING.  THE DEFENDANT WAS TALKING.

19           AND IN THE MEANWHILE WAS THE MEETING NEXT DAY -- OR

20   I WOULD SAY IT WAS MOST LIKELY THE 1ST OF MARCH AS MR. KOLE

21   SAID.  IT WAS THE MEETING WHICH I'M TALKING ABOUT.  IN THAT

22   MEETING BEFORE THE OFFICE IN THE BEVERLY HILLS IN THE

23   RESTAURANT RECORDING DOESN'T EXIST ACCORDING TO MR. MOORE AND

24   THOMAS REITZ.

25           IT'S INTERESTING BECAUSE IT WAS A QUIET PLACE.  AND

1    THERE WAS A LIVE COMPLETELY FOUNDATION FOR EVERYTHING WHAT

2    WAS DONE LATER -- FIRST OF ALL SPECIFYING WHAT DR. PEMKOVA

3    DOES, WHERE IS THE PART OF THE RESEARCH, WHERE IS THE PART OF

4    THE REALISTIC BUSINESS, AND SPECIFICALLY WHAT MR. MOORE HAS

5    TO WATCH FOR.  BECAUSE IN PREVIOUS CONVERSATIONS WITH MR.

6    ELDER AND EVEN THE DEFENDANT HE WAS ASKING FOR HELP.

7          THAT'S WHY KEY WORDS DOESN'T -- DON'T MEAN THAT

8    MUCH.  IT DOESN'T MATTER HOW THE DOCUMENTS READ.  AND THIS IS

9    WHAT -- ANOTHER PARTY WAS EXPLAINING BEVERLY HILLS.

10          IF YOU WANT TO EARN -- IT WAS WORDED THE DEFENDANT

11    SAID -- YOU HAVE TO UNDERSTAND WHAT TO LOOK FOR IN THE

12    STRUCTURE.  AND, SECONDLY, WHAT IS IN THE DOCUMENTS.

13          BECAUSE, FOR EXAMPLE, STRUCTURE, IF IT DOESN'T HAVE

14    VERTICAL WHICH WOULD RUN THE PROFIT -- MEANING TECHNOLOGY --

15    LOOK AT THE REAL ESTATE IN A LUCRATIVE PLACE.  NOT

16    EVERYWHERE.  OR INVENTION OR PATENT OR ANYTHING THAT WOULD

17    TRIGGER A HIGH PROFIT WHICH WOULD BE, OF COURSE, KEPT IN THE

18    MEANWHILE IN THE BANK.  BECAUSE NO PROJECT AND NO TECHNOLOGY

19    GOES RIGHT WITH HUNDREDS OF MILLIONS AND HUNDREDS OF

20    THOUSANDS.  IT'S USUALLY IN PHASES, IN SMALL -- SMALL

21    SEGMENTS.  IN THE MEANWHILE MONEY SITS IN THE BANK.  AND

22    BANKS WORK -- IT'S ABSOLUTELY NORMAL.

23          AMERICAN TRADING DESKS IN THE BANKS FROM THE

24    AMERICAN BANKS HAVE BEEN SOLD IN 2012.  BEFORE THAT AMERICAN

25    BANKS HAVE HAD A TRADING DESK.  THEY HAVE BEEN SOLD --

1    EUROPEAN DESK -- EUROPEAN BANKS STILL HAVE TRADING DESKS.

2    AND THIS IS WHERE MONEY STAY WHERE -- WHILE WAITING TO BE

3    INVESTED.

4              NEXT THING WHICH WAS VERY CLEARLY EXPLAINED.  BE

5    CAREFUL WITH THAT -- THAT MOMENT BECAUSE IF THERE IS NO

6    VEHICLE, AND SOMEBODY IS PROMISING YOU EVEN 15, 20 PERCENT,

7    BE CAREFUL -- THAT IT'S MOST LIKELY SCAM.  IT WAS A VERY

8    CLEAR DISTINGUISHED DIFFERENCE.  WHAT IS WORTH TO LOOK INTO

9    AND WHAT IS NOT.

10             THE SAME APPLIED ON THE PAPERWORK.  AND EVERYTHING

11   WHAT HAS BEEN SUBMITTED EVEN TSI CONTRACT -- AND THESE WERE

12   TWO THINGS WHICH THE DEFENDANT POINTED -- WAS CARRYING CLEAR

13   EVIDENCE THAT THESE ARE BROKERS' DOCUMENTS.

14             UNFORTUNATELY, MR. MOORE WASN'T LISTENING CAREFULLY

15   WHAT WAS SAID IN BEVERLY HILLS.  OTHERWISE, HE WOULD CATCH

16   IT.  AND WE WILL GO AT LEAST THROUGH THESE TWO DOCUMENTS

17   TODAY, WHAT WAS REALLY SAYING THERE.

18             IT WAS AN HOUR AND A -- OVER AN HOUR, HOUR, HOUR

19   AND A HALF LONG MEETING -- THERE WAS AGREED THAT -- THAT

20   COLLECTION OF ARTIFACTS AS DR. PEMKOVA CALLS IT MEANING

21   VARIOUS NICE DOCUMENTS, VARIOUS EVIDENCES, PROFESSOR BOND

22   SAID VERY CLEARLY THAT ONE OF THEM OR SOME OF THEM ARE EVEN

23   SOMEWHERE IN THE -- IN THE OFFICE AS A PICTURE.  YES.  SOME

24   -- SOME OF THESE DOCUMENTS ARE EXTREMELY BEAUTIFUL,

25   ESPECIALLY ALL BONDS.

1        IT WAS EXPLAINED AND IT WAS AGREED THAT THESE WOULD

2   BE SORT OF THE REIMBURSEMENT FOR THE WORK.  THAT'S WHY

3   NOWHERE IN THIS TRANSCRIPTS, NOWHERE IN THE DOCUMENTS EVER

4   TRANSPIRED ANY AGREEMENT, ANY CONFIRMATIONAL AND EVEN NO

5   QUESTION FROM MR. MOORE THAT THE DEFENDANT WOULD GET PAID.

6        HE NEVER ASKED THIS QUESTION DESPITE IF YOU GO

7   CLEARLY THROUGH ALL THIS TRANSCRIPTS HE ASKED EVERYONE EVEN

8   THAT JUDGE IN BELGIUM.  HE QUESTIONED THE PEOPLE FROM TSI WHO

9   HE SPOKE WITH.  BUT THERE IS NO ONE SINGLE TIME WHEN HE WOULD

10  ASK THE DEFENDANT.  BECAUSE IT WAS LIKE IN BEVERLY HILLS OUT

11  -- HOW IT WOULD WORK.

12        NEXT THING WHICH WAS CLEARLY EXPLAINED IN BEVERLY

13  HILLS WAS THE INVOLVEMENT OF THE TECHNOLOGIES, INVOLVEMENT OF

14  DIFFERENT PARTIES.  YES, MR. MOORE ASKED SPECIFICALLY FOR DR.

15  ONCIU.

16        AS I HAVE SAID, THE DEFENDANT HAS HAD KNOWLEDGE OF

17  EXISTENCE AT THAT TIME BECAUSE WE ARE IN MARCH.  BUT THERE IS

18  -- IF ANYONE WOULD DO THE CROSS-EXAMINATION OF THE EMAILS,

19  PHONE CALLS, AND EVERYTHING ELSE, YOU WILL SEE THAT THERE IS

20  NOTHING UNTIL MAY, END OF THE MAY, BEGINNING OF JUNE 2006

21  WHERE FROM THE HOUSE OF MR. PHILVARIEN MOON WHERE THE

22  DEFENDANT REQUESTED, THE SUBPOENA WASN'T GRANTED, TO GET HIM

23  TO THE COURT AND TESTIFY WAS -- WAS ORGANIZED PHONE

24  CONFERENCE BETWEEN GERARD HARPER -- MR. GERARD HARPER,

25  LONG-TERM FRIEND AND PARTNER OF MR. MOON.  MR. -- DR. CARL

1    JENSEN WHO DEFENDANT KNEW FROM YEARS AGO IN EUROPE AND FROM

2    HONG KONG AND DR. MOSES ONCIU.  IT WOULD BE ON THE RECORDS.

3    NOBODY PICKED UP THAT PART.

4              IT'S LIKE IN BEVERLY HILLS IT WAS PROMISED TO

5    ARRANGE THE INTRODUCTION OF.  BUT IT WOULD BE A LONGER WAY.

6    AND AS YOU HAVE SEEN, EVEN EXPLAINING WHERE IS THE OFFICE IN

7    BEVERLY HILLS, THE DEFENDANT WAS VERY EXPLICIT.  IT'S HER

8    NATURE.  SHE WASN'T TEACHING THAT MUCH -- THAT MUCH IN THE

9    UNIVERSITY WITH THE EXCEPTION OF TWO YEARS BECAUSE SHE WAS

10   PRACTICALLY WORKING ON HER OWN EDUCATION FOR ALL THOSE YEARS.

11   BUT SHE HAS HER HABIT TO EXPLAIN THINGS AND SHARE THE

12   KNOWLEDGE.

13             AND THIS WAS ALL SAID.  IT WAS EXPLAINED HOW -- HOW

14   BIG IS THE INVOLVEMENT OF PROFESSOR DR. BACHMANN ON SEVERAL

15   LEVELS SET.  FIRST OF ALL, BATHGATE CAPITAL PARTNERS AND

16   BATHGATE CAPITAL PARTNERS YOU HAVE SEEN IT YESTERDAY WAS THE

17   -- IS THE COMPANY WITH THE TRADER AT THAT TIME STEPHEN

18   SIGNAR WHO IS RESPONSIBLE FOR LOSS OF -- HARD TO SAY -- --

19   WHEN ACCIDENTALLY 62 STATEMENT HAVE BEEN SENT TO ONE OF THE

20   INVESTORS ACCIDENTALLY.  WE HAVE KNOWLEDGE OF 62, 65 PEOPLE

21   WHO LOST MONEY.

22             MR. BILLY "BRITTMAN" JUST BEFORE WE RECESS MR. KOLE

23   WAS ASKING ABOUT THAT EMAIL WHEN THE DEFENDANT MENTIONED THAT

24   MR. BRITT LOST MONEY.  YES, WITH BATHGATE CAPITAL PARTNERS.

25   WHERE THE TRADING HAS BEEN DONE BY AMERICAN LICENSE AND

1    SECURITY FIRM.  IN THE CONTRACT WAS THEY CAN SIGN -- THEY CAN

2    TRADE JUST U.S. TREASURIES ON LIMITED TRADING AUTHORIZATION

3    OF.  ACCOUNT IS INSURED FOR A HUNDRED THOUSAND -- AND,

4    ACTUALLY, A HUNDRED MILLION.  AND IT WASN'T.  THIS IS WHAT WE

5    ALL FOUND LIKE THAT.  AND THE DEFENDANT IS ONE OF THE

6    VICTIMS.

7           EACH OF -- DR. PETER WOLFGANG BACHMANN WAS ONE OF

8    THE SILENT PARTNERS.  AND HE BASICALLY GOT THE DEFENDANT

9    INVOLVED.  AS A LONG-TERM FRIEND YEARS BACK TO EUROPE THE

10   DEFENDANT WAS VOUCHING FOR MANY YEARS THAT STEPHEN SIGNAR

11   MAKING -- MAKING PROFIT BETWEEN 4 EVEN 15 EVEN 20 PERCENT PER

12   MONTH ON TRADING EXCLUSIVELY U.S. TREASURIES.  HE WAS

13   LICENSED IN -- OUT OF 50 STATES IN 49.

14           MR. KOLE:  OBJECTION.  THESE DETAILS ABOUT BATHGATE

15   WERE NOT BROUGHT IN EVIDENCE.

16           THE COURT:  SUSTAINED.

17           MS. PEMKOVA:  OKAY.

18           AND PROFESSOR -- DR.  BACHMANN WAS THE PART OF THAT

19   -- THAT INVESTMENT WHICH END UP TRAGICALLY.  AND A LOT -- A

20   LOT OF MONEY HAS BEEN LOST.

21           BESIDE THAT, DR. BACHMANN WAS INVOLVED WITH FLYING.

22   I MENTIONED YESTERDAY HE WAS ONE OF THE TWO PRIVATE OWNERS OF

23   FIGHTER JETS.  THAT'S WHY HE WAS COMING AND GOING TO ARIZONA.

24           AND MANY OTHER THINGS WHICH PUT INTERCOMMUNICATION

25   IN THE PROPER CONTEXT HAVE BEEN SAID IN BEVERLY HILLS.

1          THE SAME APPLIES TO THAT MEETING WITH GENERAL

2     BENSON.  ACCOUNTANT WHO WORKED FOR KPMG SHOULD BE CAPABLE TO

3     UNDERSTAND RIGHT AWAY HOW WAS THE SET UP IN THE BEVERLY

4     HILLS.  IT WASN'T.  AND GENERAL BENSON EVEN WAS PUT UP AS A

5     PERSON RUNNING LEGITIMATE START-UP COMPANY.

6          IN -- AFTER THE MEETING IN BEVERLY HILLS IT WAS

7     CLEAR AT LEAST IN DEFENDANT'S MIND THAT WE KNOW BOTH WHAT WE

8     ARE GOING TO DO.

9          ON CONVERSATION 5, 6, 7 GENERAL BENSON'S OFFICE WAS

10    CALLING BACK DESPITE THEY SPENT HOUR AND A HALF TO --

11    ACTUALLY, MAYBE MORE -- TWO HOURS TOGETHER WITH A VERY

12    EXPLICIT EXPLANATION, PRESENTATION WITH BEAUTIFUL FOLDERS AND

13    SCREENS AND THEN THEN.

14         ON CONVERSATION 9, ON MARCH 13TH IT'S ANOTHER

15    CLEARLY EDUCATIONAL PART WHICH WAS AGREED IN BEVERLY HILLS

16    WHEN DR. PEMKOVA -- MR. MOORE CALLS IN.  AND SHE'S -- HE'S

17    EXPLAINING AGAIN SHE WAS IN ARIZONA AND ASKED TO GO GENERAL

18    BENSON -- ASKED GENERAL BENSON TO PURCHASE THE -- OR AT LEAST

19    INQUIRE REGARDING THE CORPORATION.

20         MR. MOORE DOES IT WITH NO PROTEST.  TIME DIFFERENCE

21    BETWEEN CALL 9 AND CALL 10, IT'S 10 MINUTES.  SORRY.  18 --

22    18 MINUTES.  THE SAME DAY ON MARCH 3RD.  AND THERE IS A NICE

23    LONG CONVERSATION WHEN GENERAL BENSON IS EXPLAINING THE

24    DETAILS ASKING FOR THE CORPORATION 6- TO $800, WHICH IN A

25    NORMAL WORLD NOBODY WOULD BUY BECAUSE WHAT FOR.  WHY THE

25

1  INVESTOR WHO IS INVESTOR FROM -- FROM NEWPORT BEACH AND IS

2  RUNNING FAMILY MONEY FROM THE REAL ESTATE, WHY HE WOULD BE

3  BUYING IN NORMAL WORLD FOR CORPORATION -- NEVADA CORPORATION

4  FOR SUCH BIG MONEY.  IT WAS ONE OF THE PARTS AGREED IN

5  BEVERLY HILLS.

6          IN CONVERSATION WITH GENERAL BENSON WHAT WAS

7  CONVERSATION NUMBER 11 -- NUMBER 10, THE ASSISTANT WHEN MR.

8  MOORE CALLED TRANSFERRED THE CALL TO GENERAL BENSON.  AND

9  THIS IS THE NUMBER 11.

10          ON THE PAGE 3, 4 MR. MOORE -- AND IT'S CONFIRMING

11  THIS IS WHAT HE NEEDS, MEANING THE CORPORATION.  THIS IS A

12  VERY IMPORTANT MOMENT.  IF YOU WILL JUST SIMPLY FLIP THE

13  PAGES ONE AFTER OTHER OF THE CONVERSATIONS, IT'S PRACTICALLY

14  IN EVERY CALL MR. -- OR IN MOST OF THE CALL MR. MOORE IS

15  ASKING FOR CALLING BACK.  HE'S ASKING TO EMAIL.  BUT HE IS

16  BASICALLY HOLDING THE CONVERSATION AND GOING TO -- GOING TO

17  GO FURTHER.

18          AND WE HAVE NOW LONG CHAIN -- AFTER THAT WE HAVE A

19  LONG CHAIN OF THE EMAILS WHERE MR. MOORE KEEPS CALLING.

20          ON CONVERSATION NUMBER 12, MARCH 16TH, MR. MOORE

21  CALLS IN.

22          NUMBER 13, 17, MR. MOORE CALLS IN PROPOSING THE

23  DINNER.

24          NUMBER 14, 20TH OF MARCH, IT'S CUT OFF.  BUT STILL

25  CALLED IN TO DR. IRENE.

1            CONVERSATION 15 -- MARCH 20TH, AGAIN, CALL IN.

2            AND AFTER THAT ON THE 21ST, CONVERSATION 16, CALL

3    IS RETURNED.

4            IN CALL 17, MARCH 27, AGAIN, PROPOSITION FOR

5    MEETING.

6            AND IN CONVERSATION 18, AGAIN, CALL IN THE -- ON

7    MARCH 27.  AGAIN, THE DEFENDANT -- HIGH-YIELD INVESTMENT

8    PROGRAM.  IT'S EMPHASIZING GENERAL BENSON ON PAGE 1, PAGE 2

9    AND BEVERLY HILLS.

10           AND IT WILL SAY THAT SHE WAS BUSY AS SHE WAS BUSY

11   BECAUSE IT WAS A TIME WHEN THE CLINICS -- WHICH SHE WAS

12   TALKING ABOUT LATER -- HAVE BEEN MATERIALIZED FOR INDIAN

13   TRIBES FOR OBVIOUS REASONS.

14           MR. KOLE:  OBJECTION.  THERE'S NO EVIDENCE ABOUT

15   THAT.

16           THE COURT:  SUSTAINED.

17           MS. PEMKOVA:  CONVER- -- NUMBER 19, AGAIN, CALL IN

18   ON APRIL THE 4TH.  AND THERE IS A CALL BACK ON THE SAME DAY

19   CONVERSATION 10 -- 20, VERY SHORT ONE.

20           21, AGAIN, CALL IN MAKING -- ASKING FOR MEETING.

21           AGAIN, CONVERSATION 22, AGAIN, SHE IS BUSY.

22           CONVERSATION 23, MAY 2ND, AGAIN, CALL IN.

23           AND WE ARE COMING TO A MAY -- CONVERSATION 24.

24           IT WAS SAID YESTERDAY BY MR. KOLE THAT THERE WAS NO

25   GAP IN THE COMMUNICATION AND NO OUT OF THE BLUE.  THE

1    DEFENDANT CALLED.  THIS IS NOT THE TRUTH EXACTLY.  THIS IS

2    WHAT HAPPENED.

3            ON 20 -- IN CONVERSATION 24 IN -- ON MAY THE 2ND,

4    THERE WAS A CALL IN AND CONVERSATION.  YES, THERE WAS MENTION

5    WAITING LIST AS A -- ONE OF THE KEY WORDS -- SPECIFIED IN

6    BEVERLY HILLS.  BASICALLY A JOKE.  IF YOU ARE ON WAITING

7    LIST, YOU KNOW THAT NOT TOO MUCH IS GOING TO HAPPEN.  YOU

8    HAVE TO WAIT OR JUST DO SOMETHING ELSE.  THAT'S WHY THERE WAS

9    NO FURTHER COMMUNICATION ABOUT IT OR A QUESTION -- A QUESTION

10   OF WHAT DOES IT MEAN WAITING LIST.  IT DIDN'T MEAN THAT

11   SOMEBODY WAS TRYING TO GO AND DEFRAUD MR. MOORE AND GET --

12   GET HANDS ON HIS MONEY.  IT WASN'T TECHNICALLY EVEN POSSIBLE.

13   AND I WILL EXPLAIN IT LATER.

14           AND ON PAGE 1 IN LINE 23, 24 AND PAGE 2, LINE 1, 2,

15   MR. MOORE IMMEDIATELY RECOGNIZED WITHOUT EVEN BEING IT SAID

16   BY THE DEFENDANT THAT THERE IS A -- IS A DR. WOLFGANG

17   BACHMANN INVOLVED.  GOOD ILLUSTRATION.  HE WAS FAMILIAR WITH

18   HIS NAME.  AND HE KNEW EXACTLY HOW DR. BACHMANN WAS INVOLVED.

19           AND DR. BACHMANN RUNS THE FOUNDATION IN ARIZONA AND

20   ANOTHER FOUNDATION IN EUROPE.  LIVINGSTONE HAS A SMALL OFFICE

21   IN ARIZONA.  BUT MAINLY IT WAS A EUROPEAN FOUNDATION.  THAT'S

22   WHY LINKING IT GET IMMEDIATELY TO DR. ONCIU'S FOUNDATION WITH

23   VIVIAN GORIAGE AND HOPE MINISTRY WAS WRONG.  AND MR. MOORE

24   KNEW IT.

25           YES, AND THERE WAS ON THE PAGE 3, PAGE 4 AS I HAVE

1    SAID.  ONCE THE CONVERSATION WAS LONGER -- IT WAS LONGER.

2    AND BECAUSE IT WAS SORT OF THE TIME TO REVIEW WHAT WAS DONE

3    IN BEVERLY HILLS, THERE WAS AN INTERESTING CONVERSATION OF

4    TESTING THE REACTION ON THE FAMILY MONEY AND PARTNERSHIP.

5          BASICALLY IN ANY INVESTMENT IF IT IS REAL IT REALLY

6    DOESN'T MATTER IF IT IS A FAMILY MONEY OR IT IS A

7    PARTNERSHIP.  WHAT DOES MATTER WHAT IT -- HOW THE FUNDS ARE

8    PRESENTED ON THE ACCOUNT.  THIS DISCUSSION WOULDN'T TAKE ANY

9    -- IT WOULDN'T MAKE ANY OTHER SENSE THAN RESEARCHING.

10          AND, AGAIN, DISCLOSURE NUMBER -- LINE -- I MEAN,

11    PAGE 5 REGARDING HONG KONG, MEANING IF ALL THIS CONVERSATION

12    IS, DEFENDANT WAS CLEARLY DISCLOSING WHEN AND WHAT SHE'S

13    DOING WITHOUT ANY REASON FOR TO HIDE ANYTHING BESIDE

14    PRESERVING PRIVACY OF PEOPLE.

15          IT WAS SAID BY MR. KOLE THAT PEOPLE WERE COLLECTING

16    CONFIDENTIAL INFORMATION.  AND ALMOST IT WOULD BE POSSIBLE TO

17    MISUSE.  TECHNICALLY IMPOSSIBLE.  YOU DEFINITELY REMEMBER

18    THAT BOTH GOVERNMENT WITNESS EXPERT -- WITNESSES MENTIONED

19    THAT UNAUTHORIZED CALL TO THE BANK WOULD BE VIEWED AS A

20    SUSPICIOUS ACTIVITIES.  AND THE CARD WOULD BE TAKING OFF.

21    AND IT'S THE TRUTH.

22          HAVING EVEN THE BANKING DATA, NORMAL WAY IT'S

23    IMPOSSIBLE.  AND IT'S ACTUALLY VERY DANGEROUS TO CALL BECAUSE

24    BANKERS PROVIDE THE RECORDS IMMEDIATELY.

25          AND ON PAGE 8 -- ON PAGE 7, I'M SORRY.  ON PAGE 7

1    AND PAGE 8, THE 23, 24 LINE, MR. MOORE IS AGAIN ASKING FOR

2    MEETING AND FOR CALL BACK.

3         WHAT WAS ENOUGH FOR THE DEFENDANT TO STILL KEEP IN

4    THE BACK OF THE MIND THAT IT WOULD BE GOOD IDEA TO HELP THIS

5    MAN ON ONE SIDE.  ON THE OTHER SIDE, WILLIAM ELDER SHORTLY

6    AFTER THAT, SOMEWHERE IN THE BEGINNING OF THE SUMMER

7    DISCLOSED THAT THERE WAS ANOTHER EVIDENCE OF THE FUNDS FROM

8    MR. MOORE FOR 26 MILLION UNPRINTABLE UNFORTUNATELY.  BUT IT

9    WAS THERE.  AND IF ANYBODY WOULD MAKE A CROSS-REFERENCE ON

10   THE EMAILS WHERE THEY WERE SENT, IT WOULD TRANSPIRE.

11        AND IT WAS BASICALLY PIECE DE RESISTANCE FOR THE

12   CONVERSATION IN AUGUST 2000- -- AUGUST 24.  AND, YES, THERE

13   WAS THROWN EVERY POTENTIAL WORD FROM PINGING, SWIFTING,

14   HIGH-YIELD INVESTMENT, 502 MONEY BECAUSE IT WAS -- AS I HAVE

15   SAID, WE MET IN MARCH, APRIL, MAY, JUNE, JULY, AUGUST.  SIX

16   MONTHS.  AND ONCE THE RESEARCH IS DONE, IT'S WISE TO HAVE IT

17   INCREMENTS THREE, SIX MONTHS, THREE, SIX MONTHS.  CAPTURED.

18        IF THERE WOULD BE NO EVIDENCE OF THE FUNDS PROVIDED

19   BY MR. MOORE BEFORE TO WILLIAM ELDER, MOST LIKELY IT WOULD

20   END UP BY A VERY SHORT CALL.

21        THE ILLUSTRATION THAT IT IS THE FACT IF WE -- YOU

22   REMEMBER THE FLORIDA DEAL, ONCE IT DIDN'T GO WELL, THERE WAS

23   NO MORE CALL AND NO MORE PROPOSITION FROM THE DEFENDANT TO DO

24   ANYTHING, MEANING THE INTENTION TO DEFRAUD WASN'T THERE.

25   BECAUSE AS I EXPLAINED, IN HER MIND -- IN THE DEFENDANT'S

1    MIND, BASICALLY TRYING TO HELP THREE TIMES, IT'S ENOUGH.  SHE

2    DIDN'T FEEL ANY MORE OBLIGATED.  PLUS, EVEN THE RESEARCH WAS

3    OVER BECAUSE NO POINT TO KEEP REPEATING MORE AND MORE.

4    BASICALLY THE CYCLE WAS COMPLETED.  THREE, SIX AND THREE.

5            REACTION WASN'T VERY -- REACTION WASN'T WHAT WAS

6    EXPECTED.  BECAUSE MR. MOORE STARTED CALLING.  THERE WAS A

7    CALL ON NUMBER 26.  OH, I'M SORRY.  ONE MORE THING.

8            IN THE CONVERSATION 25, MR. MOORE WAS -- ON LINE --

9    LINE 20- PAGE 4, LINE 21, HE WAS INSERTING THE TRADING.  HE

10   WANTS TO HAVE THE TRADING CONFIRMED.  THAT IS VERY

11   INTERESTING -- INTERESTING PLACE -- STATE UNDER LINE 23, 24,

12   TRADING.  TRADING -- I MEAN, BY THE DEFENDANT -- TRADING.

13   TRADING.  BUT BASICALLY YES.

14           THE WAY HOW IT WAS PHRASED SHOULD BE CLEARLY

15   UNDERSTANDABLE FOR MR. MOORE.  AGAIN, BACK ON THE

16   CONVERSATION IN BEVERLY HILLS THAT THERE ARE TWO THINGS

17   CLEARLY SCAM.

18           WHEN PEOPLE TAKE TOP OF THIS BIG TRADINGS WITHOUT

19   THE FOUNDATION, WHAT IS TECHNOLOGY OR REAL ESTATE OR VEHICLE

20   WHICH WORKS OUT THE PROFIT.  AND THIS IS THE SCAM.  AND FOR

21   WHATEVER REASON, THE MONEY APPEARS FOR THE PROJECT TECHNOLOGY

22   INVESTORS, CREDIT LINE, GRANT.  THE MONEY STAYS IN THE BANK.

23   AND AT THE SAME TIME BANK IS WORKING IT.

24           IN THE SMALL SCALE, MOST LAWYERS ON THEIR TRUST

25   ACCOUNTS HAVE WHAT WAS CALLED --

1          MR. KOLE:  OBJECTION.  THERE'S NO EVIDENCE

2    PRESENTED ABOUT THIS MATTER.

3          THE COURT:  SUSTAINED.

4          MS. PEMKOVA:  OKAY.

5          (PAUSE IN PROCEEDINGS.)

6          MS. PEMKOVA:  THERE WAS CLEARLY EXPLAINED IN THAT

7    -- THAT MEETING.  AGAIN, HOW IT SHOULD WORK.  AND TRADING

8    WAS MEANT AS A TIME IN BETWEEN PROFIT CREATED BY THE

9    TECHNOLOGIES OR COMMITTEES OR WHATEVER AND OTHER TIME WHEN

10   BANK IS WORKING WITH MONEY -- WHERE IS NORMAL BANKING

11   BUSINESS.  AND IT WAS IN DETAILS EXPLAINED TO MR. MOORE AGAIN

12   IN BEVERLY HILLS.

13         IN CONVERSATION 27, YES, DR. PEMKOVA CALLED OUT.

14   AND SHE WAS GETTING WHAT SHE WAS BASICALLY WAITING FOR, THE

15   APPROVAL FUNDS FOR 10 MILLION AND 20- -- AND 98, SOMEWHERE

16   AROUND THAT TIME.

17         IF THERE WOULD BE INCLINATION TO DEFRAUD OR

18   SEARCHING THE WAY HOW TO EVEN MAKE SOME PROFIT OR FIND SOME

19   PROJECTS, FOR SURE, EVERY NORMAL BROKER WITH THIS IDEA IN THE

20   MIND -- NOT EVERYBODY -- MOST OF THE PEOPLE WOULD GO AND TRY

21   TO PLACE IT SOMEWHERE.  THAT WAS IN NO REACTION BECAUSE EVEN

22   IN THAT CONVERSATION 27 ON PAGE 3, LINE 19, 20, WAS CLEARLY

23   SAID YOU HAVE MY WORD.  IT'S FOR MY FILES.  IT DOESN'T GO

24   ANYWHERE ELSE INTO MY FILES.

25         AGAIN, REPOINTING OR POINTING HIS ATTENTION -- MR.

1    MOORE'S ATTENTION AGAIN, WHAT IS FOR THE RESEARCH.  WHAT GOES

2    FOR THE BUSINESS.  THERE WAS NEVER ANY INTRODUCTION MADE TO

3    MR. MOORE REGARDING THESE BIGGER AMOUNTS.

4           AND, YES.  COLLECTED.  DOCUMENTS HAVE BEEN PUT IN

5    THE FILES.  AND IT WAS FROM -- IT WAS EVEN SAID LATER TO

6    AGENT REITZ WHEN HE WAS INVESTIGATING THAT THERE WOULD BE A

7    BIG CHAPTER ABOUT MR. MOORE WHEN HE INVESTIGATED AS A --

8    AGENT REITZ.

9           AND WE WERE IN AUGUST 29.  AND MR. MOORE BECAUSE HE

10   PROVIDED THE APPROVAL FUNDS WE WERE EXPECTING SOME REACTION.

11   AND HE KEEPS CALLING, 28, SEPTEMBER THE 9TH, HE IS LOOKING

12   FOR ANY OPPORTUNITIES WHICH MIGHT BE THERE, DESPITE HE WAS

13   TOLD IT IS FOR THE FILE NOT FOR ANYTHING ELSE.

14          ON -- IN CONVERSATION -- LET ME BACK -- YES.

15   TRANSCRIPT 29, SEPTEMBER THE 13TH, HE IS WONDERING WHY

16   DEFENDANT DOESN'T -- DOESN'T CALL BACK.

17          ON TRANSCRIPT 30, 9, SEPTEMBER 22ND, YES, AGAIN,

18   THERE IS A MENTIONING THAT THERE ARE CHANGES BECAUSE THERE

19   WAS NOTHING AVAILABLE FOR HIS MILLION.  EVERYTHING ELSE WAS

20   NEVER MEANT FOR ANY KIND OF -- ANY KIND OF INVESTMENT FOR

21   HIM.

22          23 -- CONVERSATION 23 IS WHEN -- WHEN THE DR.

23   PEMKOVA CALLS BACK, MEANING IT WAS A REACTION ON FOR WHAT HE

24   WAS ASKING FOR.  IT WASN'T LIKE HE SHUT EVERYTHING DOWN.  I

25   AM FINE.  I DON'T WANT TO LEARN.  I DON'T WANT TO DO

1    ANYTHING.  IT WAS CONTINUANCE OF THE CONVERSATION.  YES, BIG

2    -- BIG MISTAKE OF DR. PEMKOVA WAS THAT SHE SHOULD NOT BE

3    ANYMORE LOOKING FOR ANY KIND OF INVESTMENT FOR 1 MILLION.

4    BUT WHAT WAS PROPOSED LATER HAD LEGITIMATELY GOOD BASIS.

5              AND ON NEXT CONVERSATION 32, AGAIN, ASKING FOR THE

6    CALL.  IT WAS IN NOVEMBER 20- -- THE 20- -- THE 29.

7              THAT FAMOUS CONVERSATION 23, WE HAVE BEEN THROUGH

8    IT YESTERDAY VERY -- VERY CLEARLY.  THERE WAS A BIG

9    DIFFERENCE AND MIXTURE OF RESEARCH CONVERSATION REGARDING

10   DR. BACHMANN AND THE 300 PERCENT -- WHICH YOU'LL SEE RIGHT

11   AWAY WAS CLEAR INDICATION WHERE IT BELONGS.  BECAUSE THE

12   TECHNOLOGY, THE MEDICAL DEVICES -- WHICH YOU HAVE SEEN

13   YESTERDAY -- AND THE SAME HELICOPTERS WERE BRINGING

14   TREMENDOUS PROFIT WHICH WOULD BE GIVING A CHANCE TO JUSTIFY

15   HOW MUCH INVESTOR IS GETTING.  BEHIND IT WAS SOMEONE WHO MR.

16   MOORE KNEW VERY WELL DR. BACHMANN.

17             PLUS, SECOND PART WAS BASICALLY AGAIN PART OF THE

18   RESEARCH.  THESE TWO THINGS GOING PARALLELLY WERE VERY CLEAR

19   FOR THE DEFENDANT AS WELL FOR MR. MOORE BECAUSE THEY HAD

20   CONVERSATION IN BEVERLY HILLS.

21             34 CONVERSATION.  THERE WAS A LONG CONVERSATION

22   WHEN DR. PRIORE APPEARS FIRST TIME.  AND HERE IS THE

23   INTERESTING THING.  DR. PEMKOVA DOESN'T SAY THE PROFIT.  IT

24   IS MR. MOORE, WHO IS SEEN ON THE PAGE 1, LINE 22, 24 300

25   PERCENT.

1          ON PAGE NUMBER 2 DEFENDANT IS SAYING SOMETHING LIKE

2     THAT.  THE FOUNDATION WHICH SHE KNEW AND THE DIRECTOR WHO

3     OWES HER FAVOR WAS DR. BACHMANN AS WELL AS MR. MOON WHO

4     ORIGINALLY INTRODUCED DR. ONCIU.  AND MR. MOORE KNEW IT FROM

5     BEVERLY HILLS.

6          IT IS ABSOLUTELY NORMAL, AT LEAST IN THE WORLD

7     WHERE THE DEFENDANT -- DEFENDANT COMES FROM THAT, IF HE --

8     SHE TALKS ABOUT SOMEONE AND ESPECIALLY PROVIDING INFORMATION

9     TO MR. MOORE SHE KNOWS THE NAME.  AND SHE ASKS DR. ONCIU

10    DETAILS.  BECAUSE SHE PROMISED BEFORE IN BEVERLY HILLS AS HE

11    ASKED THAT WHATEVER CONVERSATION IT WOULD BE WITH DIFFERENT

12    PARTIES ON HIS TOPIC, SHE WOULD -- SHE WOULD GIVE HIM THE

13    INFORMATION AND BASICALLY LIKE A FEEDBACK.  IT WAS A BAD

14    MISTAKE AS WELL.  SHE SHOULDN'T DO THAT.  BUT SHE WAS --

15    SHE'S AN OPEN PERSON.  AND SHE DID.

16          IF ANYONE WOULD DO CROSS-EXAMINATION OF THE PHONE

17    RECORDS FROM CAREERS AND EMAILS, THERE WAS NO DAILY

18    CONVERSATION BETWEEN DR. PRIORE AND DR. PEMKOVA.  KNOWING OF

19    SOMEONE DOESN'T MEAN WORKING WITH HIM.  BECAUSE IT WAS

20    CLEARLY ESTABLISHED HOW THE COMMUNICATION COULD BE ARRANGED

21    IN BEVERLY HILLS.  AND DR. ONCIU EVEN CONFIRM IT IN THAT LONG

22    CONVERSATION -- 45, I BELIEVE.  YES, 45.  THAT I ASK HIM -- I

23    MEAN, DEFENDANT ASK HIM, YES, HELPING MR. MOORE I ASKED HIM

24    -- DR. ONCIU IF HE CAN FIND SOMETHING -- WHAT WOULD WORK.

25    BECAUSE THE AREAS WHERE THE DEFENDANT WAS ABLE TO -- TO

1    ARRANGE THE INVESTMENT FOR MR. MOORE WOULD NOT -- WOULD NOT

2    BE OPEN AT THIS STAGE FOR MR. MOORE.  IT WAS ALL IN EUROPE.

3    IT WAS ALL IN TECHNOLOGIES.  AND AT THIS STAGE -- AT THIS

4    STAGE DEFENDANT WASN'T PREPARED TO HAVE MR. MOON TRANSFER

5    MONEY TO EUROPE AT ALL.

6             AND DR. ONCIU IN THAT CONVERSATION 45 SAID VERY

7    CLEARLY THAT HE APPROACHED THEIR FRIEND.  AND OUR -- HE SAID

8    OUR FRIEND DR. PRIORE.  AND IT WAS MISREPRESENTED BY THE

9    PROSECUTION THAT IT WAS FRIEND OF THE DEFENDANT AND DR.

10   ONCIU.  NOT THE TRUTH.

11            THE FACT IS THAT SEARCHING FOR INVESTMENT FOR DR.

12   -- FOR MR. MOORE, DR. ONCIU WAS LOOKING.  AND THERE WERE

13   INVOLVED PEOPLE -- WHAT YOU SAW LATER ON THE EXHIBITS OUT OF

14   THE DOCUMENTS TAKEN OUT OF DR. PEMKOVA'S DRIVE, YES, THERE

15   WAS A TIGHT GROUP OF PEOPLE.  EVERY SINGLE ONE WAS INVOLVED

16   WITH TECHNOLOGY.  MOST OF THEM WERE -- ALMOST ALL OF THEM

17   WERE VICTIMS OF BATHGATE OR SIMILAR SECURITY -- AMERICAN

18   SECURITY FIRMS FRAUD.

19            AND MR. DAMJI, THE PERSON WHO YOU HAVE SEEN ON THIS

20   ONE PULL-UP EXHIBIT WAS THE OWNER OF THE HOTEL IN CANADA.

21   MR. GARRICK IS A DEVELOPER FROM NORTH CAROLINA.  BY THE WAY,

22   BIG FAN OF NASCAR.  AND HE'S A REAL ESTATE DEVELOPER.  AND

23   MR. ERWIN WENZEL IS A GERMAN DEVELOPER WITH GREAT CONNECTIONS

24   IN THE BANKING WORLD.

25            AND THESE PEOPLE PLUS FEW MORE WERE BASICALLY A

1    TIGHT GROUP WHICH WAS HELPING TO CREATE MORE EVIDENCE -- OR

2    MORE EVIDENCE -- BRINGING MORE FILES, BRINGING MORE DOCUMENTS

3    FOR THE RESEARCH.  AT THE SAME TIME THEY WERE SEARCHING FOR

4    THEIR OWN POSSIBILITY TO MAKE MONEY FOR THEIR PROJECT.

5            AND THE MOST IMPORTANT THING WAS THAT EVERY SINGLE

6    ONE HAS HAD A STRONG CONNECTIONS WITH BANK.  BECAUSE YOU CAN

7    KEEP SUBMITTING YOUR DOCUMENTS AROUND -- BASICALLY FISHING --

8    AS LONG AS YOU HAVE A GOOD COMMUNICATION WITH THE BANK.  AND

9    NOTHING WILL HAPPEN TO YOUR ACCOUNT.

10           BY THE WAY, MR. DAMJI'S MONEY, WERE IN THE

11   SECURITIES ACCOUNT.  IT IS --

12           MR. KOLE:  OBJECTION.  THERE'S BEEN NO EVIDENCE

13   ABOUT THAT.

14           MS. PEMKOVA:  YES, THERE IS.

15           THE COURT:  I DIDN'T HEAR ANY EVIDENCE OF THIS

16   BEFORE THE JURY, MS. PEMKOVA.

17           SUSTAINED.

18           (PAUSE IN PROCEEDINGS.)

19           MS. PEMKOVA:  GOVERNMENT SUBMITTED EVIDENCE 179.

20   IT'S AN ACCOUNT FROM MR. DAMJI.

21           BUT ANYWAY, THAT'S WHY.  CONFIRMING THAT DR. PRIORE

22   IS IN -- IS IN NEW YORK.  IT WAS NOTHING OTHER THAN COURTESY

23   PROVIDING ADDITIONAL INFORMATION WHICH DR. PEMKOVA WAS ASKING

24   DR. ONCIU FOR.

25           WHEN THIS FAMOUS TSI CONTRACT CAME -- AND EVEN

1    FIRST DOCUMENTS FROM DR. ONCIU WITH HIS FOUNDATION FEES

2    AGREEMENT, THEY WERE COMING TO THE DEFENDANT FROM DR. ONCIU.

3         CROSS-EXAMINATION OF THE PHONE RECORDS AND THE

4    COMPUTER RECORDS WOULD SHOW THAT.

5         MR. KOLE:  YOUR HONOR, I JUST WANT TO SAY.

6    LOOKING AT EXHIBIT 179, FOR NOW I WILL WITHDRAW THE OBJECTION

7    OF MS. PEMKOVA WANTING TO REFER TO THE ACCOUNT STATEMENT THAT

8    WAS INCLUDED IN THAT.  THAT'S FINE.

9         THE COURT:  THANK YOU.

10        PLEASE CONTINUE.

11        MS. PEMKOVA:  THANK YOU.  I -- I REMEMBER.

12        NEXT CONVERSATION 35 WAS BASICALLY CONFIRMATION

13   THAT THE DOCUMENTS ARE IN.

14        IN CONVERSATION 36 IT WAS VERY CLEARLY STIPULATED

15   -- WHICH WAS ON NOVEMBER THE 19TH -- THE 29TH, ON PAGE 3, NO

16   OBLIGATIONS.  EVERYWHERE IN THIS COMMUNICATIONS TRANSPIRED

17   FROM DR. PEMKOVA, FROM DR. ONCIU, AND FROM DR. PRIORE,

18   SOMETHING ABOUT PRELIMINARY CONTRACT.  JUST SUBMISSION

19   DOCUMENTS.  IT WAS EMPHASIZED MANY, MANY TIMES.  AND IT'S

20   MENTIONED THE BANK CONTRACT.

21        WHAT WAS ANOTHER PART IN BEVERLY HILLS.  YOU CAN --

22   BASICALLY THE -- NOT AN INSTRUCTION BUT SUGGESTION WAS YOU

23   CAN SIGN WHATEVER YOU WANT WITH PEOPLE IN BETWEEN.  JUST

24   WATCH YOUR BACK THAT YOU DON'T PUT YOURSELF TO THE ADDITIONAL

25   OBLIGATIONS.  BUT WHERE YOU HAVE TO START WORKING ON YOUR

38

1    MONEY IS WHEN YOU REACH THE BANK.  UNFORTUNATELY, TO GET ON

2    THE BANK -- IN THE BANK IS NOT THAT EASY.  AND THIS IS THE

3    SECURITY FOR THE MONEY BESIDE INSURANCE WHICH HAS TO BE

4    THERE.

5            AND IN THIS CONVERSATION ON 36, WERE SAYING MANY

6    DIFFERENT THINGS.  YES, CIA PLATFORMS.  502 MONEY -- FOR VERY

7    SIMPLE REASON.  THERE WAS UPCOMING CONVERSATION FROM DR.

8    ONCIU OR WITH DR. ONCIU.  AND DR. ONCIU DURING THE

9    INTRODUCTION CONFIRMED THAT HE WAS LIVING IN -- I WANT TO SAY

10   -- HE WAS -- HE WAS IN MILITARY.  AND HE WAS SOME WAY

11   SOMEHOW INVOLVED WITH MILITARY.  MAYBE INTELLIGENCIA.  AND

12   THIS WAS A PART OF THE PHYSICAL EXPLANATION OF WHICH WAS SET

13   UP IN BEVERLY HILLS.  BE VERY CAREFUL.  THERE IS 5 PERCENT.

14   AND THEN IT GOES THROUGH THE BROKERS' CHAINS.  IT GROWS TO

15   SOMETHING ELSE.  DR. ONCIU WAS IN MILITARY, MEANING HE WOULD

16   BE MAKING CIA AGENT.

17           THIS STRUCTURE, HOW TO WORD WITH THE INFORMATION --

18   OR SITUATING ON ONE BROKERS WAS CLEARLY SET UP IN BEVERLY

19   HILLS.  THERE WAS EVEN EXPLAINED -- AND THERE WAS ONE MENTION

20   -- ONE TIME MENTIONED IN THE DOCUMENTS THAT THERE WAS A

21   RESEARCH DONE WHEN IT WAS CREATED THE DOCUMENT -- SORT OF THE

22   INTRODUCTION OF.  IT WENT THROUGH 25 PEOPLE.  AND AT THE END

23   EVERYONE HAD THEIR FEES.  THIS WAS EXPLAINED IN BEVERLY HILLS

24   AS WELL.

25           THAT'S WHY IN THIS CONVERSATION 36 WAS MENTIONED.

1            BESIDE ALL THIS PART OF THE RESEARCH AND BASICALLY

2    SOMETHING WHAT WAS AGREED AS A FORM OF THE PAYMENT AS I

3    EXPLAINED IN BEVERLY HILLS, THERE WAS MENTIONED PAGE 4,

4    SUBMISSION ONLY.  LINE 20 -- 12 AND 14, AGAIN, YOU HAVE TO

5    GET TO THE PROCESS AND SEE WHAT YOU WILL GET ON THE -- ON THE

6    END.

7            AND AT THE SAME TIME BECAUSE DR. ONCIU WAS

8    PRACTICALLY COMING IN THE PICTURE AT THE END OF PAGE 6, PAGE

9    7 DR. PEMKOVA WANTS TO HAVE IT DONE QUICKLY.  IT IS MR. MOORE

10   WHO IS POSTPONING THE CONVERSATION FOR LATER, FOR NEXT DAY.

11           AND ON THE PAGE 27 IT'S MENTIONED AGAIN -- I'M

12   SORRY. WRONG.  IT IS WRONG.

13           WE WERE IN THE CONVERSATION 36.

14           CONVERSATION 37 WAS A FIRST CONVERSATION WITH DR.

15   PRIORE.  YES, SHE DID CALL.  BUT THE ONE WHO WAS SITTING AND

16   HELPING TO ARRANGE THE -- THE TIMING WAS DR. ONCIU.

17   CROSS-EXAMINATION WOULD SHOW IT.

18           DEFENDANT ACKNOWLEDGED THAT THERE WAS OR MIGHT BE

19   DIRECT COMMUNICATION ON THE PHONE CONFERENCE WITH DR. ONCIU

20   AND DR. PRIORE BECAUSE DR. ONCIU SEVERAL TIMES MADE A COMMENT

21   OR ASKED THEM TO PROVIDE THE INTRODUCTION.  THERE WAS NO NEED

22   FOR IT.  THAT'S WHY DEFENDANT NEVER PURSUE IT.

23           IN 37 -- CONVERSATION 37 WITH DR. PRIORE -- WHAT

24   WAS THE SECOND -- ACTUALLY, DR. ONCIU, DR. PRIORE AND THE

25   DEFENDANT PEMKOVA, THERE WAS CLEARLY SAID ON PAGE 4, LINE 7,

1   9, SHE DOES -- DR. PRIORE DID NOT KNOW WHO PEMKOVA IS AND

2   EVEN WONDERED HOW IT WAS POSSIBLE TO OBTAIN THE PERMISSION

3   NOT TO TRAVEL TO GERMANY.  AND IT WAS RELATED TO SOMETHING

4   COMPLETELY DIFFERENT.  AND DR. -- AND MR. MOORE KNEW IT, THAT

5   THESE TWO THINGS ARE GOING PARALLEL.

6          NEXT FEW CONVERSATIONS WERE, AGAIN, ARRANGING THE

7   CALL WITH DR. ONCIU.

8          AND ON CONVERSATION 43, MR. MOORE IS CALLING BACK

9   CONFIRMING HE GOT A CONTRACT, LEAVING A MESSAGE ON THE

10  VOICEMAIL.  DEFENDANT EVEN DIDN'T CHECK IT.  CONTRACT WITH

11  THAT -- THAT TSI COMPANY, FIRST OF ALL, SHE DID NOT KNOW AT

12  THE TIME ABOUT THE TSI COMPANY.  WAS COMING DIRECTLY FROM

13  GERMANY, EVEN NOT THROUGH DR. PRIORE.

14         THE CONTRACT, WE HAVE SEEN IT YESTERDAY.  THE

15  CONTRACT WAS SUBMITTED FROM PALLE KROEIS TO MR. MOORE CC

16  DR. PRIORE.  NOT A WORD ABOUT THE DEFENDANT PEMKOVA.

17         NEXT CONVERSATION, 44, LINES 7, 8, 9, 10, 11, 13,

18  16, 18.  IT'S A SHORT CONVERSATION BETWEEN MR. MOORE AND

19  DEFENDANT PEMKOVA.  AND SHE WAS -- SHE WAS ASKING DID YOU

20  SEND -- OR WILL YOU SEND IT TO ME.  HE'S SAYING, NO, I

21  ALREADY HAVE SENT IT.  SHE'S ASKING TO READ IT -- WHAT IS

22  ACTUALLY -- ACTUALLY NORMAL.

23         AND WHEN HE -- WHEN MR. MOORE HAS FORWARDED IT OR

24  PROVIDED THE CONTRACT TO HER, THERE WAS INTERESTING TIMING.

25  HE RECEIVE IT FROM TSI AND SEND IT TO THE DEFENDANT PEMKOVA A

1    FEW MINUTES BEFORE HE HAD RECEIVED A REPLY FROM DR. PRIORE,

2    WHO WAS COPIED.  MEANING MR. MOORE WAS INTERESTED THAT

3    DEFENDANT PEMKOVA GETS THIS CONTRACT.  WHY?  AND HE EVEN ASK

4    IN SOME COMMENTS IN THAT -- IN THAT EMAIL WE HAVE READ

5    YESTERDAY.

6            IN CONVERSATION 45, IT WAS SAID THAT -- BY MR. KOLE

7    THAT THE DEFENDANT WAS TRYING TO -- THAT THE MOST IMPORTANT

8    THING WAS THE PROFIT.  THIS IS NOT THE TRUTH.  YES, DEFENDANT

9    READ THE CONTRACT.  AND WE READ THROUGH YESTERDAY.  VERY --

10   VERY -- VERY PARTICULARLY.  THERE WERE AT LEAST 10 POINTS

11   WHICH MADE THIS CONTRACT IMPORTANT AT LEAST TO READ.  AND

12   CHECK WHAT IS BEHIND.

13           THERE WERE TWO MOMENTS -- TWO THINGS WHICH OBJECTED

14   FROM THE BEGINNING.  BUT SHE DIDN'T GO INTO THE DETAILS.  IT

15   WAS EXPLAINED WHY.  BASICALLY ALL THESE CASES I HAVE BUILT ON

16   THE FACT THAT DEFENDANTS ARE BEING PUSHED TO PROVIDE

17   FINANCIAL ADVICE WHILE THEY DON'T HAVE A LICENSE TO BE A

18   FINANCIAL ADVISOR.  EXPRESSING OPINION IS A DIFFERENT THING.

19   THAT'S WHY THE DEFENDANT PEMKOVA DID KNOW THE ONE TO GO TO

20   THESE THINGS.  BUT SHE DISCUSSED IT WITH DR. ONCIU.

21   ABSOLUTELY.

22           AND SHE WARNED HIM THAT HE HAS TO EXPLAIN TO MR.

23   MOORE.  IN DEFENDANT'S OPINION IT WAS BANK -- THERE WERE

24   THREE -- TWO THINGS WHICH WERE CRUCIAL.  THIRD THING WAS

25   REQUESTED THE CHART.  AND I SHOWED IT YESTERDAY AND DAY

1    BEFORE.  THE CHART WAS SHOWING THAT THE TSI WAS APPLYING FOR

2    THE LOAN OF 10 MILLION SOMETHING, PAYING 5 SOMETHING, ALMOST

3    6 MILLION TO THE INVESTOR, KEEPING REMAINING MONEY.  PAYING

4    YEARLY INTEREST.  AND IT WAS NOT A SELF-LIQUIDATING LOAN.  IT

5    DOESN'T EXIST.  REMAINING ALMOST A HALF.  TSI -- TSI HAS HAD

6    LEFT TO WORK WITH FOR TO REPAY THE LOAN AFTER 12 YEARS.  HOW

7    ACTUALLY IT WAS IN THE PERCENTAGE REQUIRED TO WORK.  IT WAS

8    MINOR THING.  ACCOUNTANT SHOULD KNOW HOW TO DO NUMBERS,

9    CORRECT.

10           BUT THE MAIN THING WAS THE BANK FOR TO TAKE IT AS A

11   SERIOUS.  INVESTMENT WAS NECESSARY TO INQUIRE.  SAFETY OF THE

12   MONEY WHERE MR. MOORE WILL TRANSFER IT IN EUROPE.

13           AND, SECOND, WAS A BANK AGAIN, THE LOAN.  LOAN WAS

14   ON HIS -- ON THE -- FORMED ON BEHALF OF THE INVESTOR, AND

15   THAT IT WAS NECESSARY TO INQUIRE WHERE IS SAFETY THERE.

16   THESE ARE TWO THINGS.

17           IN THAT LONG CONVERSATION WITH DR. ONCIU, I WALK

18   YOU THROUGH YESTERDAY.  THERE WERE PAGES AND PAGES EVEN AT 17

19   PAGES AND 9 PAGES AND ANOTHER 11 PAGES WHEN THERE IS NOTHING

20   FROM DR. PEMKOVA.  BUT SHE STEPS TWICE AT THE BEGINNING EVEN

21   INTERRUPTING EXISTING DISCUSSION FOR TO POINT TO DR. ONCIU

22   TELL IT TO MR. MOORE.

23           DR. ONCIU READING THE TRANSCRIPT.  THE DEFENDANT

24   FOUND -- SHE -- HE PHRASED IT HIS OWN WAY.  HE WAS SUGGESTING

25   LETTER FROM THE ATTORNEY.  INSTEAD GOING TO THE BANK.  BUT

1    DEFENDANT WASN'T THERE.

2              IN THE INTERVIEW WITH AGENT REITZ IN 2008 SHE

3    MENTIONED THAT THE DR. ONCIU SAID ABOUT LAW- -- SAID ABOUT

4    LAWYER TWICE OR THREE TIMES.  THIS IS NOT THE TRUTH.  IF

5    DEFENDANT WOULD BE THERE, DR. ONCIU IN THAT CONVERSATION 45

6    MENTIONED LAWYER 20 TIMES IN THE TRANSCRIPT OF 40 PAGES.  ON

7    SOME PAGES EVEN 3 TIMES IS MENTIONED LAWYER.  GET THE LAWYER.

8    GET -- INVOLVE THE LAWYER -- WHAT ACTUALLY NEVER HAPPENED.

9              IF YOU WOULD READ THROUGH THE CONVERSATIONS WITH

10   DR. ONCIU AND DR. PRIORE, MR. MOORE NEVER SAID TO ANYONE THAT

11   HE DID NOT GET INVOLVED HIS LAWYER, THAT HE DID NOT DO WHAT

12   HE WAS TAUGHT.

13             ACTUALLY, RATHER, VICE VERSA.  IN CONVERSATION WITH

14   DR. ONCIU WHEN HE CALLED WAY LATER AFTER THAT CONVERSATIONS

15   IN THE BEGINNING OF DECEMBER WHEN THEY GO TO THE -- WHEN MR.

16   MOORE GOT A CONTRACT THERE WAS A HUGE GAP BETWEEN IN

17   CONVERSATION BETWEEN DR. ONCIU AND MR. MOORE.  AND THE SAME

18   WITH ELDER.

19             MR. MOORE HAS A -- MR. ONCIU CALL ON JANUARY THE

20   15TH WHEN HE CALLS DR. ONCIU.  76.

21             ON 77, DR. ONCIU INQUIRES WHO IS CALLING BACK --

22   WHO CALLED THAT NUMBER.

23             IN 78 THERE IS A CONVERSATION -- AGAIN, BACK AND

24   FORTH, 78, 79.  BASICALLY MESSAGES CALL ME BACK.  I AM

25   CALLING.

1          AND ON CONVERSATION 79, PAGE 1, 20, 24; AND PAGE 2,

2    1 TO 2, MR. MOORE IS CLEARLY MISLEADING DR. ONCIU.  THAT HE

3    IS FINE.  HE IS COMFORTABLE.  AND HE WILL GO AHEAD.  THAT'S

4    WHY HE GOT PEOPLE BELIEVING THAT HE MEANS IT SERIOUSLY.  AND

5    THEY WERE TRYING TO HELP.

6          (PAUSE IN PROCEEDINGS.)

7          MS. PEMKOVA:  MR. MOORE CALL -- SAID YESTERDAY THAT

8    THE DEFENDANT AS ALL OTHERS WERE TRYING TO DEFRAUD MR. MOORE

9    AND TRY TO GET -- GET ALL HIS MONEY.  AND THEY WERE ALWAYS

10   PROPOSING TO HELP.  NO, THAT IS NOT THE TRUTH.

11         AND THE LINE 40 -- IN THE 45 CONVERSATION WITH DR.

12   ONCIU, LINE 10, 11, 14, 17, MR. MOORE WAS THE ONE WHO FIGURED

13   OUT THAT THE DEFENDANT PEMKOVA WASN'T THERE.  IT WAS ACTUALLY

14   HE WHO THREE TIMES WAS TURNING OR ASKING HER -- IN THAT PAGE

15   40 HE WAS ASKING FOR HELP TO FIGURE OUT HOW IT WORKS.  IT

16   WASN'T THE DEFENDANT PROPOSING TO FIGURE IT.

17         ON PAGE 41, LINE 3, AGAIN, HE IS ASKING TO HAVE HIS

18   EMAIL.  AND, YES, SHE DOES PROMISE TO FIGURE IT.  THAT'S WHY

19   IT WAS MISCHARACTERIZED.

20         WHEN THIS CONVERSATION WAS OVER, THERE WAS A CALL

21   TO THE -- TO THE PRINCIPALS.  47 WAS THE CALL WITH THE JUDGE

22   IN BELGIUM.  AND MR. MOORE CLEARLY DIDN'T ASK WHAT HE SHOULD.

23   HE WAS RATHER INQUIRING HOW MUCH JUDGE MAKES.

24         THERE WAS A CALL WITH -- IT WAS A 50 -- 51 WAS A

25   CALL WITH JUERGAN SCHAEFFER AND TSI PRINCIPALS.  BASED ON

1    SOMEBODY SAYING OVER THE PHONE THAT IT IS AN MPN TRADING.

2    THERE WAS INSUFFICIENT INFORMATION IN THAT PHONE CALL.  MR.

3    MOORE AT LEAST BASED ON THE CALL DOCUMENTS AND BASED ON THE

4    TRANSCRIPTS NEVER EVIDENCED THAT THERE WAS ANY TRADING GOING

5    ON.  AND CONTRACT WAS CLEARLY SHOWING -- CONTRACT WAS CLEARLY

6    SHOWING THERE IS A REAL ESTATE LOAN.  AND EVERYTHING WOULD GO

7    THROUGH REGARDING THAT CONTRACT.

8           THERE WERE FEW MORE CALLS WITH DEFENDANT PEMKOVA.

9    ON 12 OF DECEMBER -- SORRY, 6 OF DECEMBER, CALL NUMBER 5,

10   YES, SHE CALLED OUT BECAUSE AFTER ALL WHAT SHE HAS HEARD FROM

11   DR. ONCIU, YES, SHE WAS UNCOMFORTABLE WITH THE FACT THAT MR.

12   MOORE SHOULD BE EVEN DEALING WITH TRANSFERRING THE MONEY.

13   LIKING THE CONTRACT DOESN'T MEAN TO ASK TRANSFER THE MONEY.

14   GO AND INVEST.  IT WAS AN OVERSIGHT AT LEAST BY THIS

15   DEFENDANT.  THERE WAS NEVER SAID GO AND DO IT.  BESIDE

16   SIGNING THE PAPERWORK.  PROVIDE THE PAPERWORK, EXPLAINING

17   WHY.  THAT IT IS BASICALLY INSIGNIFICANT.

18          THERE WAS A SECOND CALL AND TALKING ABOUT THE

19   CONTRACT.  54.  ON DECEMBER THE 11TH WAS CLEARLY DISCLOSED

20   FLORIDA DEAL.  THIS DEAL WAS PRESENTED BY MR. MOORE AS A

21   HIGH-YIELD INVESTMENT FRAUD FOR 32 MILLION OUT OF 1 MILLION.

22   IT WAS EVEN AS I FOUND TODAY PRESENTED ON THE GRAND JURY.

23   AND I HOPE I CONVINCE JURY VERY CLEARLY THAT BEHIND WAS A

24   REAL ESTATE IN FLORIDA WHICH WAS SECURED BY TWO DIFFERENT

25   WAYS.

1    I SHOWED YOU YESTERDAY JOHN DEVINE, WHO IS A REAL

2    ESTATE BROKER.  HE PROVIDED THE FIRST INFORMATION TO THE

3    DEFENDANT THAT SUCH A THING EXIST.  AND HE HAS A BUYER, MR.

4    SNOWER -- SNOWDEN WHO WAS ALREADY SORT OF THE PARTNERING WITH

5    EARNHARDT.  YES, DEFENDANT AT THAT TIME WAS SEARCHING FOR A

6    LARGE DEVELOPMENT -- REAL ESTATE DEVELOPMENTS IN UNITED --

7    SEARCHING -- BASICALLY FEW COLLEAGUES AND FRIENDS KNEW THAT

8    SHE WOULD LIKE TO GET INVOLVED AND CONTACTED BY THE PEOPLE

9    RELATED TO THE REAL ESTATE.  BECAUSE THE TECHNOLOGIES,

10   BECAUSE THE IMMUNITY BOOSTER, WHICH IT WAS CAPABLE TO PREVENT

11   ANY WOOD CONSTRUCTION FROM THE TERMITES, THE CONSTRUCTION

12   WHICH IS RESISTANT A HUNDRED DEGREES FAHRENHEIT TEMPERATURE

13   CHANGES WITH NO AIR CONDITIONING AND FEW OTHERS.

14       BY THE WAY, AMONG -- AMONG THE NON- -- NON-

15   FABRICS, THERE IS A TYPE OF THE FABRIC WHICH IS AN INSULATION

16   WHEN LESS THAN 1/5 OF INCH IT'S EQUAL TO 4 INCHES OF

17   POLYSTYRENE AND MANY OTHERS.  THAT'S WHY JOHN DEVINE -- JIM

18   DEVINE -- BY THE WAY, BROKER FROM NORTH CAROLINA WHO WAS

19   WORKING WITH MR. BILLY BRITT, PROVIDED THIS INFORMATION.

20       AND YOU MIGHT REMEMBER THAT YESTERDAY I HAVE SHOWN

21   SEVERAL CONVERSATIONS BETWEEN MR. SNOWDEN AND MRS. EARNHARDT

22   AS LONG AS IT DIDN'T REACH THE POINT THAT THE LAND WAS

23   SECURED AND THE CONTRACT SIGNED, THEY WERE FORWARDING TO THE

24   DEFENDANT.  BUT SHE DIDN'T STEP TO THE DIRECT CONVERSATION.

25       AND IN THAT CONVERSATION, 54 AND 55, WAS CLEARLY

1   STIPULATED ON SEVERAL PLACES WHAT IS SECURE, WHAT IS NOT

2   SECURE.  WATCH OUT.  AFTER ONE WEEK IT IS NOT REFUNDABLE.  IT

3   WAS SUGGESTED STAY ON THE SAFE SIDE.  AND MORE IMPORTANTLY,

4   GET INVOLVED YOUR LAWYER.

5        NOTWITHSTANDING MR. MOORE IN THAT SECOND

6   CONVERSATION GOT VERY UPSET FOR 25 PERCENT TO BE PAID AS WAS

7   SAID BY THE DEFENDANT ON -- ON MONITORING ACTIVITIES.

8        IN REALITY THIS 25 PERSON WERE ALREADY AGREED

9   PREVIOUSLY WOULD GO FOR FUNDING THAT MEDICAL DEVICES, THAT

10  NASCAR WILL HAVE THEM FOUND IN EVERY TRUCK THAT -- THAT --

11  WHAT THEY RACE AND IN EVERY -- THEY'RE IN EVERY COMPUTERS

12  THAT THEY SIT.  IT WOULD BE FUNDED BY THIS MONEY.  NOBODY WAS

13  GOING TO TAKE A DIME OUT OF IT.

14       FOR EASY PURPOSE IT WILL SAY HUMANITARIAN

15  ACTIVITIES BECAUSE AT LEAST DEFENDANT CONSIDERS THAT

16  PROVIDING 25 PERCENT ON MEDICAL DEVICES SAVING LIVES AND

17  TAKING FULL BLOOD TESTS WITHIN 3 -- 6 MINUTES WHERE IN A

18  NORMAL HOSPITAL IT'S NECESSARY AT LEAST A FEW HOURS FOR IT --

19  WAS AN EXCELLENT THING FOR SUCH AN ACTIVE SPORT AS NASCAR.

20       AND BECAUSE THIS CONVERSATION DIDN'T END UP VERY

21  WELL, IT WAS BASICALLY DONE.  BUT MR. MOORE CALLED BACK ON

22  12TH OF DECEMBER, 59, CREATING THE IMAGE OF THESE -- HE IS

23  ASKING, OF COURSE, WHAT IS PENDING WITH FLORIDA.  FLORIDA WAS

24  DONE AS WELL AS MR. MOORE FOR ANY FURTHER ACTIVITIES.  BUT

25  HE'S REPORTING REGARDING DR. PRIORE AND HIS COMMUNICATION

1    WITH DR. PRIORE.  WHY?  FOR THE PURPOSES OF THE CASE.

2          HE IMMEDIATELY -- THE NEXT DAY HE CALLS EVEN MR.

3    ELDER, NUMBER 6- -- 61 CONVERSATION.  WHY HE DIDN'T HAVE THE

4    CONVERSATION WITH MR. ELDER SINCE FEBRUARY BEFORE --

5    ACCORDING TO COURT DOCUMENTS -- I HAVE TO BE CAREFUL HERE.

6    ACCORDING TO THE COURT DOCUMENTS.  THERE WAS NO CONVERSATION

7    PROVIDED.  AND HE -- LATER IN THE -- DR. ONCIU AS I EXPLAINED

8    BEFORE.

9          THERE WERE TWO MORE CALLS MADE BY THE DEFENDANT --

10   YES.  CALL 86 AND 88 ON JANUARY THE 30TH AND JANUARY -- AND

11   FEBRUARY THE 2ND, 2007.  AND THERE WAS A GREETING CARD WHICH

12   I SHOWED YOU YESTERDAY WHICH WAS SIGHT -- SEND -- SENT FOR

13   THE CHRISTMAS.  AND THERE WAS ANOTHER GREETING CARD WHICH I

14   CANNOT FIND OUT ANYMORE FOR THANKSGIVING.  IT IS ELECTRONIC

15   SERVICE ONE TO THREE GREETING CARDS.  YOU CAN -- YOU CAN SET

16   IT UP IN ADVANCE.  AND IT WAS YESTERDAY SHOWED THEM THAT

17   EMAIL.  THAT'S WHY.

18         AT THE END OF USUALLY JANUARY THE DEFENDANT IS

19   CHECKING THE CARDS SENT, CARDS RECEIVED.  MR. MOORE'S CARDS

20   HAVEN'T BEEN PICKED UP, AT LEAST SEVERAL SHOWED THAT THEY

21   HAVEN'T BEEN PICKED UP.  BUT IT WAS LAST COMMUNICATION.

22   NOTHING MORE WAS EVER PRODUCED TO MR. MOORE.

23         ON THE OTHER HAND, IF MR. MOORE WOULD BE A LITTLE

24   BIT MORE STRAIGHTFORWARD AND MORE HONEST, THIS -- MAYBE NOT

25   HONEST -- MAYBE TELLING WHAT IS HAPPENING AND WHAT HE IS

1  SEARCHING FOR, HE WOULD BE DEFINITELY BENEFITING MUCH MORE.

2  BECAUSE IN THE ACCUSATION OF THE PROSECUTION THE DEFENDANT

3  HAS A CRIMINAL MIND.  AND IT'S THE PREDISPOSITION AND SET UP

4  FOR FRAUD AND NOT EXACTLY.

5           AS AN EXPERT IN EUROPE, SHE WAS MANY TIMES IN THE

6  COURTS AS A WITNESS EXPERT AND TESTIFYING FOR DIFFERENT

7  PEOPLE.

8           IN UNITED STATES SHE ARRANGE -- NOT ARRANGE --

9  INITIATED AND STARTED SEVERAL INVESTIGATIONS.  IN 2001, 2002,

10  AND 2003 IT WILL STATE IN THE TESTIMONY SHE HELPED HER

11  FRIENDS AND EVEN OTHER COMPANY WHERE SHE WAS ON THE BOARD AND

12  WORKING WITH TO GET STRAIGHTENED OUT THE INVESTMENT WHICH WAS

13  CAUSING PEOPLE A LOT OF MONEY.  THEY DIDN'T LOSE MONEY BESIDE

14  -- BESIDE THE SWIFT.  NO LOSSES HAVE BEEN DONE.

15           FBI FROM EAST COAST WAS COMING FIVE TIMES IN TOTAL.

16  SHE PROVIDED CRUCIAL INFORMATION ON 502.  AND THERE WAS A

17  STILL PILE ABOUT 3/4 OF INCH THICK OF VARIOUS ACCOUNTS WHICH

18  SHE COLLECTED AND PROVIDED.

19           IN THE DOCUMENTS IN FLORIDA, YOU SAW IT YESTERDAY.

20  MRS. LOU ANN EARNHARDT UNDERESTIMATED DEFENDANT'S SUSPICIOUS

21  MOMENTS WHICH THE DEFENDANT SHARED WITH LOU ANN DURING THE

22  PERSONAL MEETING IN FLORIDA REGARDING MR. SNOWDEN.  HE WAS

23  THE ONE WHO PICK HER UP IN THE BALTIMORE.  AND THEY DROVE

24  DEFENDANT ALL THE WAY THROUGH MR. MOON'S HOUSE -- MR. BRITT'S

25  HOUSE TO LOU ANN EARNHARDT'S HOME.  THIS MAN DIDN'T MAKE A

50

1   GOOD IMPRESSION AS WELL AS HIS DRIVER.  BUT LOU ANN WAS SURE

2   SHE IS DOING RIGHT THINGS.

3          ANYWAY, WHEN IN FEBRUARY TRANSPIRED THAT MR.

4   SNOWDEN WASN'T WHO HE SHOULD BE, IT WAS AGAIN DEFENDANT

5   PEMKOVA WHO REACTED AND PROVIDED THE DOCUMENTS AND HELP AND

6   INITIATED OR MOTIVATED LOU ANN TO GO AND TAKE LEGAL ACTIONS

7   ABOUT THE SITUATION.  THIS IS NOT A SET UP FOR CRIMINAL MIND.

8   THIS IS NOT A SET UP FOR SOMEONE WHO WOULD BE TRYING TO

9   DEFRAUD.

10          ADDITIONALLY, MISREPRESENTATIONS WHICH HAVE BEEN

11   MADE IN THE PROSECUTIONER.  GETTING SOMEBODY'S DOCUMENTS YOU

12   CANNOT GO IN THE BANK ACCOUNT.  BESIDE THAT, UNLESS YOU DO

13   SOME HACKING -- AND THERE IS NO ONE -- NO EVIDENCE.  AND I

14   ASK IN CROSS-EXAMINATION AGENT REITZ IF THERE WAS EVER ANY

15   EVIDENCE IN HIS RESEARCH OR INVESTIGATION THAT ANY

16   INFORMATION GETTING THROUGH THE SERVERS OR THE COMPUTERS OF

17   DR. ONCIU, DR. PRIORE, AND DR. PEMKOVA INITIATED OR INDICATED

18   ANY KIND OF BANK FRAUD, ANY KIND OF ATTEMPT TO REACH HIS

19   ACCOUNTS, HE SAID NO.  IT WASN'T TECHNICALLY POSSIBLE.  AND

20   NO ONE IN THEIR RIGHT MIND WOULD DO IT.

21          NEXT THING WHICH WAS -- WHICH WAS SAID, THAT

22   MISUSING THE PERSONAL INFORMATION FOR SOME IDENTITY STUFF

23   BACK IN THE OPENING, NOT POSSIBLE AS WELL.  THERE WAS

24   INSUFFICIENT INFORMATION.

25          ADDITIONALLY, AT LEAST THIS DEFENDANT HAS NO

1    CRIMINAL HISTORY OF ANY KIND OF THESE THINGS.  AND, BY THE

2    WAY, SHE'S A -- SHE'S A VICTIM OF IDENTITY THEFT BY HERSELF

3    BESIDE BEING A VICTIM OF -- OF BATHGATE CAPITAL PARTNERS, A

4    SCAM.  IT WAS NOTHING ELSE THAN THE SCAM.

5         AND I DO BELIEVE THAT EVERYONE WHO EVER LOST MONEY

6    AND IS A NORMAL PERSON WOULD NEVER CREATE IT FOR ANOTHER ONE.

7         DR. PRIORE -- OUT OF THE COURT DOCUMENTS TRANSPIRED

8    THEN DR. PRIORE LOST MONEY.

9         DR. ONCIU MENTIONED IN THAT LONG CONVERSATION AS

10   WELL THAT HE LOST MONEY, WHICH DEFENDANT WASN'T AWARE OF.

11        DR. PEMKOVA DID MENTION TO MR. MOORE IN BEVERLY

12   HILLS SHE DID LOST THE MONEY.  AND IT WAS PAINFUL.  IT WAS 5

13   MILLION AND PLUS 30,000 U.S. DOLLARS.  AND PEOPLE WHO CAME

14   THROUGH THE TRAGEDY WOULD NEVER TRY TO DEFRAUD ANYONE.

15        BESIDE THE CONVERSATIONS, WE HAVE EXHIBITS WHICH

16   MR. KOLE PROVIDED AS A EVIDENCE OF THE FRAUD.

17        AND I'M VERY SORRY.  I RAN YOU VERY EXHAUSTING WAY

18   THROUGH ALL KIND OF DOCUMENTS.  BUT THIS TWO -- NO, THIS FIVE

19   WHICH HAVE BEEN PUT UNDERNEATH OF THE COUNTS FOR MAIL FRAUD,

20   WE WOULD GO THROUGH ONE MORE TIME.  AND I APOLOGIZE FOR THAT.

21        FIRST EVIDENCE WAS 96.

22        (DISPLAYED.)

23        MS. PEMKOVA:  AND 96 IT IS AN EMAIL --

24        THE RECORDER:  MICROPHONE, PLEASE.

25        MS. PEMKOVA:  THANK YOU.

1              IT IS AN EMAIL FROM AMARTYK -- WHAT IS DR. I TO

2     THOMAS MOORE WITH ATTACHMENTS.  WE WILL GO THROUGH THEM

3     LATER.

4              AND IT SAID,

5              MR. MOORE, ATTACHED ARE SUBMISSION DOCUMENTS.

6              PLEASE SIGN AND PUT YOUR INITIALS IN BLUE INK

7              AND NOTARIZE REQUIRED PAGES.

8              RETURN THE COMPOSITE AS SOON AS POSSIBLE ALONG WITH

9     THE LAST MONTHS' STATEMENT FROM THE DEPOSITORY ACCOUNT AND

10    DAILY PRINTOUT/TEAR SHEET NO OLDER THAN TWO DAYS.

11             BEST REGARDS, DR. I."

12             (DISPLAYED.

13             MS. PEMKOVA:  AND THIS WAS THE COVER PAGE.  THIS IS

14    A SECOND PAGE, WHICH IS JUST END OF THE PAGE OF THAT EMAIL.

15    AND HERE WE GO THROUGH THE DOCUMENTS.

16             RIGHT HERE IT'S FIRST INDICATION THAT THESE

17    DOCUMENTS ARE BROKERS' DOCUMENTS BECAUSE HERE IS CLEARLY

18    STATED, CAPITAL LETTERS IN BLACK INK.

19             EVERY NORMAL PERSON INVOLVED ANYHOW WITH BANKING

20    BUSINESS KNOWS THAT NO ELECTRONIC TRANSMISSION IT'S

21    ACCEPTABLE WITH BLACK INK COULD BE FORGED.  EVEN THE BLUE INK

22    COULD BE FORGED.  BUT IT'S ALWAYS A REQUIREMENT FOR BLUE INK.

23    AND YOU HAVE HEARD IT WITH THE EMAIL INSTRUCTIONS TO MR.

24    MOORE.

25             GENERAL INFORMATION -- WHICH ACTUALLY IF YOU PAY

53

1    ANY TRACKING SERVER WOULD PROVIDE IT AS A SEARCHING --

2              IT IS THE SECOND PAGE OF THIS DOCUMENT BASICALLY

3    FURTHER INFORMATION.  ADDRESS, YES.  PHONE NUMBERS.  BANK

4    ACCOUNT.  BUT, AGAIN, IT WAS ACKNOWLEDGED EVEN BY THE -- BY

5    THE GOVERNMENT WITNESSES THAT ACCORDING TO SOMEBODY'S BANK

6    WOULD BE CONSIDERED AS A SUSPICIOUS ACTIVITIES.  AND, YES, IT

7    IS.

8              HERE IS ANOTHER VERY-- DOCUMENT WITH EVERY

9    TECHNOLOGY, EVERY BUSINESS -- NORMAL BUSINESS GOES A

10   CORPORATE SOLUTION IN CASE THE PARTNER IS A CORPORATE ENTITY.

11   THERE IS ABSOLUTELY NOTHING SPECIFIC, NOTHING SECRET ABOUT

12   IT.  IT'S USUALLY A DOCUMENT WHICH IS AUTHORIZING PARTICULAR

13   DIRECTOR OR PARTNER OF THE CORPORATION TO PARTICIPATE OR DO

14   ACTIVATE THIS FOR AND ON BEHALF OF THE CORPORATION HE'S

15   REPRESENTING.  ABSOLUTELY NORMAL STANDARD EVERYWHERE.

16             NEXT PAGE IS A LETTER OF INTENT.  AND HE IS FIRST

17   TIME TRANSFERRING IN MR. MOORE'S CASE NAME SCHALLER AND

18   PESIC.  IF IT IS A BANK WIRE FRAUD IT SHOULD BE GOING IN MR.

19   MOORE'S -- OR AGENT REITZ'S INVESTIGATION FILE, THAT THESE

20   TWO PEOPLE SHOULD BE DEFENDANT AS WELL BECAUSE THEY COMMITTED

21   WIRE FRAUD AS WELL.  AND THEY ARE NOT.

22             HOW THE DOCUMENT READS.

23             DEAR SIR/MADAME:

24             THIS IS TO CONFIRM OUR INTENT TO INVEST THE

25             ABOVE-REFERENCE -- ABOVE-REFERENCED FUNDS

1          IN A PRIVATE INVESTMENT PROVIDED THAT THE

2          INVESTMENT TERMS ARE SATISFACTORY IN OUR

3          OWN DISCRETION," MEANING IT HAS TO SATISFY ALL OF

4    THE REQUIREMENTS OF MR. MOORE OR INVESTOR.

5          "WE FURTHER CONFIRM THAT WE ARE WILLING, READY,

6          AND ABLE" -- TYPICAL BROKER'S TERM -- NEVER

7          MENTIONED BY BOTH GOVERNMENT WITNESSES AS WELL

8          AS MR. MOORE -- AS MR. REITZ AS AN EXPERT OR AS A

9          WITNESS.

10         "TO TRANSFER ABOVE-MENTIONED FUNDS AFTER -- AFTER

11         SIGNING THE INVESTMENT AGREEMENT" AND THIS IS THE

12    IMPORTANT PART --

13         "AND RECEIVING SUFFICIENT SECURITIES COVERING OUR

14         FUNDS PLUS INTEREST."

15         WHAT DOES IT SAY.

16         "THERE IS NO TRANSFER UNTIL CONTRACT IS

17         SATISFACTORY AND UNTIL THE OWNER OF MONEY

18         RECEIVES SUFFICIENT SECURITIES, WHATEVER RATE

19         WOULD BE ISSUED BY A BANK -- COVERING HIS

20         PRINCIPLES AND THE INTEREST."

21         EVEN IF THIS INVESTMENT WOULD BE REAL, THERE ARE

22    VERY SERIOUS PARAMETERS.  AND EVERY NORMAL INVESTOR IF HE

23    WOULD FOLLOW IT CANNOT GET INVOLVED WITH THIS SCAM.

24         IF THIS SENTENCE WOULDN'T BE THERE, IT WOULD BE A

25    RED FLAG.  AND BASED ON THE COMMUNICATION IN BEVERLY HILLS

1    THE DEFENDANT WOULD VERY CLEARLY SAY TO MR. MOORE DON'T WASTE

2    YOUR TIME.   THERE'S A BUNCH OF BROKERS BEHIND.

3              AS I HAD SAID, IT'S WORTH TO LOOK IN THE CONTRACT

4    IN CASE THERE ARE MOMENTS WHICH MAKE IT POSSIBLE REAL FURTHER

5    DOWN IN THE BANKING LEVEL.

6              IF YOU SEE IN THE CONTRACT JUST BROKER'S NONSENSE,

7    DON'T EVEN WASTE THE TIME UNLESS YOU ARE COLLECTING THE

8    ARTIFACTS.

9              "AND, FURTHER, WE FURTHER CONFORM THAT WE

10             HAVE NOT BEEN SOLICITED BY YOU NOR YOUR

11             ASSOCIATE."

12             ANOTHER IMPORTANT SENTENCE.

13             "PLEASE ARRANGE A MEETING IN FRANKFURT AS SOON

14             AS POSSIBLE."

15             THERE IS NOTHING ABOUT SENDING MONEY.   THERE IS

16   NOTHING ABOUT DEFRAUDING SOMEONE.   IT'S ARRANGING THE

17   MEETING.

18             AND IT WAS ANOTHER PART OF THE PROCEDURE WHICH WAS

19   CLEARLY EXPLAINED IN BEVERLY HILLS.   IT GOES THROUGH STAGES.

20             UNFORTUNATELY, IT'S NOT POSSIBLE ALWAYS TO JUMP

21   OVER.

22             NEXT PAGE:   IT'S THE FAVORITE -- FAMOUS

23   NON-CIRCUMVENTION NONDISCLOSURE AGREEMENT.

24             PURE CLEAN CLEAR INDICATIONER THAT AT THIS STAGE

25   MR. MOORE IS DEALING WITH BUNCH OF BROKERS.   BECAUSE VERBIAGE

1    AND ELEMENTS WHICH ARE THERE WERE CLEARLY SHOWING THAT THERE

2    IS NOT BANK YET.  BUT IF YOU WANT TO PLAY, CHECK WHAT IT IS.

3            HERE IS ANOTHER BEAUTIFUL PART.  AND IF MR. MOORE

4    AND DR. PEMKOVA WOULD MET, SHE WOULD EXPLAIN IT.  SHE IS A

5    REALLY SHARING PERSON EVEN THE --

6            RIGHT HERE.  THIS BEAUTIFUL PARAGRAPH IS ONE OF THE

7    ARTIFACTS WHICH WOULD BE IN THE COLLECTION.  THIS IS NOT

8    TECHNICALLY POSSIBLE.  IT'S A BROKER'S TALK.

9            WHEN THEY SPEAK INSIDE EVERYTHING WILL BE -- FOR TO

10   MAKE IT MORE IMPORTANT BECAUSE EVERY BROKER IN BETWEEN OR

11   MOST OF THEM THEY WANT TO SIGN THE AGREEMENT OR THEY WANT TO

12   BE SURE THAT THEY WILL GET PAID.  A BEAUTIFUL ARTIFACT FOR --

13   FOR EVERYONE WHO UNDERSTANDS THIS FINANCIAL BUSINESS.

14           AGAIN, SECOND PART OF THE AGREEMENT, THE SAME

15   THING, DOESN'T HAVE -- DOESN'T HAVE MORE VALUE THAN THE

16   BROKER'S TALK.

17           AND HERE IS THE AGREEMENT -- THE DOCUMENT WHICH

18   MAKES LITTLE BIT MORE SENSE.

19           IT WAS PROVIDED BY DR. ONCIU IF ANYONE WOULD MAKE

20   THE CROSS-EXAMINATIONER.  IT DID COME FROM DR. ONCIU TO DR.

21   PEMKOVA.  AND IT IS AN AGREEMENT FOR 25 PERCENT, SORT OF THE

22   FEES CONSULTANT AGREEMENT FOR I DO BELIEVE SOME OF HIS

23   FOUNDATION.

24           ANYWAY, DR. -- DR. ONCIU PUT HIS DATA THERE.  AND

25   IT SHOULD BE NOTARIZED.  AND HERE IS ANOTHER BEAUTIFUL PART.

1   THERE WAS NO -- NO WORD PRESENTED IN THE EVIDENCE THAT ANY OF

2   THESE THREE DEFENDANTS HAVE HAD ANY DIRECT AGREEMENT WITH TSI

3   OR TSI WOULD BE PROVIDING ANY MONEY.

4           IF YOU REMEMBER, WHAT I SHOWED JUST RIGHT NOW IT

5   WAS DR. ONCIU WHO WAS TRYING TO COLLECT HIS 25 PERCENT.  IT

6   WAS LATER DR. PRIORE.  BUT THERE IS NO SINGLE AGREEMENT OR

7   ATTEMPT TO HAVE AGREEMENT FROM THE DEFENDANT PEMKOVA'S SIDE.

8           WITH EXCEPTION NOW WITH DR. -- WHAT MR. KOLE HAD

9   MENTIONED ALREADY BEFORE, IN ONE OF THESE EMAILS DR. ONCIU

10  MENTIONED THERE IS TWO PERSON, ONE FOR YOU, ONE FOR ME.  THIS

11  IS HOW HE WROTE IT.  HE WROTE IT, BUT IT WAS NEVER DISCUSSED.

12  IT WAS NEVER COMPLETED.  AND WHEN THEY WERE -- WHEN DR. ONCIU

13  PROPOSED THAT I'M IN THE PHONE CONFERENCE, AS USUAL, THE

14  DEFENDANT -- IF YOU EVER MAKE ANY MONEY, KEEP IT FOR YOUR

15  HUMANITARIAN ACTIVITIES.

16          BY THE WAY, THE SAME THING SHE HAS DONE WITH THESE

17  WHOLE ARTICLES WRITTEN ABOUT HER -- I MEAN, YOU SAW THE PHOTO

18  OF THE BOOK, SHE WAS PROVIDING THE COLUMN -- REGULAR COLUMN

19  AND ONE HOUR LIFE SHE'LL TALK -- NOT SHOW BUT EXPECT --

20          MR. KOLE:  OBJECTION.  THIS IS GOING BEYOND THE

21  EVIDENCE.

22          THE COURT:  SUSTAINED.

23          I DON'T WANT TO INTERRUPT YOUR ARGUMENT.  IS THERE

24  A LOGICAL PLACE FOR YOU TO BREAK --

25          MS. PEMKOVA:  YES.  RIGHT NOW --

1           THE COURT: -- SO THE JURY CAN --

2           MS. PEMKOVA:  -- YOUR HONOR.  I WAS GOING TO --

3           THE COURT:  WOULD THIS BE GOOD?

4           MS. PEMKOVA:  YES, IT WOULD BE GOOD I FINISH BEFORE

5    WE GO TO THE NEXT EXHIBIT, YES.

6           THE COURT:  ALL RIGHT.

7           MS. PEMKOVA:  WE CAN BREAK IT NOW.

8           THE COURT:  ALL RIGHT.

9           THEN, LADIES AND GENTLEMEN, ABOUT 20 MINUTES.

10   WE'LL COME AND GET YOU AT 10:30.

11          PLEASE DON'T DISCUSS THIS MATTER AMONGST YOURSELVES

12   NOR FORM OR EXPRESS ANY OPINION CONCERNING THE CASE.

13          NANCY, I'LL NEED YOU RIGHT BACK.  I'M GOING TO CALL

14   --

15          (RECESS AT 10:05 A.M. TO 10:46 A.M.)

16          (JURORS ENTERING COURTROOM.)

17          THE CLERK:  ALL RISE.

18          THE COURT:  THE JURORS ARE PRESENT.  AND THE

19   ALTERNATE, OF COURSE, IF I MISSED -- DIDN'T MISS -- OR IF I

20   DID NOT STATE THAT THIS MORNING HAS BEEN PRESENT AT ALL

21   TIMES.

22          MS. PEMKOVA, IF YOU'D LIKE TO CONTINUE, PLEASE.

23                 CLOSING ARGUMENT (RESUMED)

24          MS. PEMKOVA:  THANK YOU, YOUR HONOR.

25           -- THE DOCUMENT WHICH WE ANALYZED JUST BEFORE THE

1    BREAK, WHICH YOU SAW IT, WAS CLEARLY SHOWING THERE WAS

2    NOTHING THAT WOULD SPECIFY ANY FRAUD.  RATHER, VICE VERSA, IT

3    WAS CLEARLY SHOWING THAT EVEN IF SOMEONE WOULD INVEST, IT

4    WOULD BE A SECURE INVESTMENT.

5            THERE WERE ON SEVERAL PAGES SHOWN THAT BASED UPON

6    THE -- BASICALLY THE DOCUMENTS BROKERS RECOMMEND AND DR.

7    ONCIU'S DOCUMENT WAS BASICALLY A FEES AGREEMENT, WHICH WOULD

8    BE PAID BY MR. MOORE OR ANY OTHER INVESTOR.  MEANING NO

9    CHANCE TO GET INVESTOR'S MONEY OR NO REASON TO DEFRAUD

10   INVESTOR BECAUSE HE WOULDN'T HONOR AGREEMENT WHICH WAS

11   SIGNED, CORRECT.

12           NEXT POINT.  EXHIBIT, WHICH WAS PUT UNDER THE COUNT

13   FOR FRAUD WIRE.  IT'S 99.  AND IT IS AN EMAIL -- IT IS AN

14   EMAIL WHICH WAS SENT BY THE DEFENDANT TO MR. MOORE

15   CONFIRMING:

16           "THANK YOU FOR YOUR PROMPT COOPERATION.

17            YOUR FILE HAS BEEN SUBMITTED TOMORROW.

18            AND TOMORROW YOU CAN EXPECT A CALL FROM

19            DR. BEATA PRIORE, AND SHE WILL INSTRUCT

20            THE TIMEFRAME FOR YOU.  IF YOU NEED MY

21            HELP, FEEL FREE TO CALL ME ANYTIME.  I

22            WILL CALL YOU IN THE MORNING AND ARRANGE

23            THE PHONE CALL FOR DR. ONCIU."

24           THERE IS NO FRAUD AND NOTHING ABOUT ANYTHING ELSE

25   THAN THE DOCUMENTS AND CONFIRMING WHO WOULD CALL -- WHO WOULD

1    CALL.

2           THE MISREPRESENTATION WHICH HAS BEEN DONE, KNOWING

3    SOMEBODY'S NAME DOESN'T MEAN TO WORK WITH HIM.  AND I MADE IT

4    VERY CLEAR IN BEVERLY HILLS -- WHEN I WAS TALKING WITH

5    BEVERLY HILLS, IT WAS MADE VERY CLEAR TO MR. MOORE HOW THE

6    INTRODUCTION COULD BE MADE.

7           PLUS, THERE WAS A VERY CLEAR SPECIFICATION AND

8    DISCLOSURE THAT THE DEFENDANT DOESN'T TAKE ANY RESPONSIBILITY

9    FOR ACTIONS OF OTHERS BECAUSE SHE DOESN'T KNOW THEM BY NOW.

10   SHE DOESN'T HAVE ANY AGREEMENT.  SHE DOESN'T HAVE ANY

11   POSSIBILITY TO VERIFY.  PLUS, HE CAME WITH THE ACCOUNTANT.

12          THERE WERE TWO DOCUMENTS FROM THE DEFENDANT

13   PEMKOVA.  UNDER THE FRAUD WERE THREE MORE -- NUMBER 102 --

14   NUMBER 102 IS THE EMAIL FROM DR. PRIORE TO MR. MOORE WITH THE

15   ATTACHMENT FEES AGREEMENT.

16          AND IT SAYS:

17          "THOMAS MOORE, PLEASE SEND THIS BACK TO ME

18          ASAP.

19          REGARD, DR. PRIORE."

20          AND UNDER FEES PROTECTION -- OR FEES MANAGEMENT

21   HERE IS AGAIN SCHALLER AND PESIC, BUT IT CAME FROM DR. PRIORE

22   NOT DR. PEMKOVA.  AS YOU REMEMBER IN THE PREVIOUS DOCUMENT,

23   THERE WAS JUST AN ARRANGEMENT OF THE MEETING.  NOT EVER ABOUT

24   ANY FEES.

25          AND IT IS A REQUEST FOR 5 PERCENT.  AND HERE IS

```
 1   ANOTHER BEAUTIFUL WORD -- BEAUTIFUL WORD FROM THE BROKER'S
 2   WORD.
 3              "THIS LETTER IS OUR GUARANTY WITH FULL
 4              RESPONSIBILITY COVERING PAYMENT OF YOUR
 5              MANAGEMENT FEES."
 6              FIRST OF ALL, IT'S A BROKER'S TALK.  LETTER CANNOT
 7   GUARANTEE ANYTHING, AT LEAST NOT A LETTER OF THIS TYPE.
 8              AND, SECONDLY, IT WOULD BE SIGNED BY MR. MOORE,
 9   MEANING THE INVESTOR.  EVEN THESE PEOPLE AS WELL AS DR. ONCIU
10   WOULD BE PAID BY THE POTENTIAL INVESTOR OUT OF HIS PROFIT.
11   NO DIRECT PAYMENT FROM TSI.  AND IT WAS SAID IN ANOTHER
12   CONVERSATION BETWEEN MR. MOORE AND DR. PRIORE -- I BELIEVE IT
13   WAS -- OR SOMEWHERE AROUND, WHEN SHE SAID VERY CLEARLY THAT
14   THEY ARE NOT RESPONSIBLE -- EVEN TSI IS NOT RESPONSIBLE FOR
15   THESE ORAL AGREEMENTS IN BETWEEN.
16              THIS IS THE NEXT PAGE.
17              AND, AGAIN, LANGUAGE -- IT'S RATHER INDICATING THAT
18   IT IS SENT BY THE BROKERS.
19              AND HERE IS THE NEXT AGREEMENT, WHAT IS ACTUALLY
20   ANOTHER GOOD SIGN.  BECAUSE ANYONE WHO WAS NEARBY ANY BANK
21   TRANSACTION OR EVER HAS HAD ANY LARGE INVESTMENT ACCOUNTS,
22   SPECIALLY IN EUROPE, MAXIMUM TWO SIGNATURES, RARELY THREE.
23   AND MAXIMUM TO PEOPLE TO BE PAID.  NO MORE.
24              MR. KOLE:  OBJECTION.  THAT GOES OUTSIDE THE
25   EVIDENCE.
```

1            THE COURT:  SUSTAINED.

2            MS. PEMKOVA:  PAGE 4 IT'S SHOWING ANOTHER FEES

3    AGREEMENT.  AND HERE IS EVEN MORE BEAUTIFUL THING, A

4    PROMISSORY NOTE.  AND IT GOES TO SAN PALLE KROEIS.  AND PALLE

5    KROEIS ACCORDING TO THE COURT DOCUMENTS IS THE ONE WHO SENT

6    THE CONTRACT TO MR. MOORE.  MEANING IF THIS WAS A FRAUD, BY

7    THE FRAUD PALLE KROEIS SHOULD BE CHARGED AS A DEFENDANT AS

8    WELL.

9            AND MAX -- HARD TO SAY -- LANGUAGE, A LITTLE BIT

10   BETTER, BUT STILL HERE IS THE INDICATION OF NO PROMISSORY

11   NOTE.  NO ONE SHOULD TAKE IT SERIOUSLY.  PLUS, IT WASN'T A

12   BANK LEVEL.  BECAUSE MR. MOORE WAS-- CLEARLY EXPLAINED IN

13   BEVERLY HILLS.  NO REAL CONTRACT.  WHY YOU REALLY SEND YOUR

14   MONEY COMES THROUGH ANOTHER PARTY BESIDE THE ISSUER OF THE

15   CONTRACT.  AND THAT HAS TO BE THEN INVOLVED.

16           NEXT PAGE, IT'S PROVIDING ALL THE DIFFERENT TEXTS,

17   WHICH, AGAIN, DOESN'T GIVE TOO MUCH HOPE IT IS MORE THAN

18   BROKERS.  SOME DATA, 10 PERCENT.  AND HERE WE HAVE MAX

19   FOUNDATION PLUS GROUP.

20           OUT OF THE COURT DOCUMENTS TRANSPIRED THAT DR.

21   PRIORE WAS INVOLVED WITH MAX FOUNDATION, ACTUALLY SHE OPENED

22   IT AFTER HER SON WAS RELEASED FROM THE FACILITY WHERE HE WAS

23   TREATED FOR INVOLVEMENT WITH DRUGS AND ALCOHOL.

24           AND THIS IS THE BEAUTIFUL PART.  LAST PAGE.

25   THERE'S TWO PEOPLE ASKING FOR 5 AND 10 PERCENT.  WHEN DR.

1   PRIORE MENTIONED HERSELF -- EVEN WROTE BACK TO MR. MOORE AS

2   AN INTAKE OFFICE OR DUE DILIGENCE OFFICE -- PUT SUCH A

3   SENTENCE.

4           THIS IS ANOTHER GORGEOUS VERBIAGE TO THE COLLECTION

5   OF ARTIFACTS BECAUSE IF WE WOULD HAVE HERE ONE OF THE DEFENSE

6   WITNESSES WHO COULDN'T MAKE IT ON SUCH A SHORT TIME.  HE'S A

7   BANKER.  YOU WOULD HEAR FROM THE BANKER'S MOUTH.  NO BANK CAN

8   SEND SWIFT ON SUCH A MESSAGE.  EVEN GOVERNMENT WITNESS

9   MENTIONED WHAT THOMAS MOORE DID NOT KNOW AS WAS AGENT REITZ

10  WHAT ACTUALLY SWIFT IS.  SWIFT IS NOT JUST A WAY TO SEND

11  MONEY.  IT'S A MESSAGE.  AND THERE IS NO FORMAT FOR SUCH A

12  MESSAGE.

13          NEXT, EXHIBIT -- IT'S 110, WHICH WAS CONSIDERED BY

14  GOVERNMENT AS A WIRE FRAUD.  AND IT IS ON DECEMBER THE 1ST.

15  DECEMBER THE 1ST.  AND IT'S AN EMAIL TO MR. MOORE FROM DR.

16  PRIORE:

17          "THANK YOU, THOMAS.

18           IT WILL BE EARLY NEXT WEEK FOR THE CONTRACT

19           TO BE ISSUED FOR YOU.  THEN, WE WILL GO OVER

20           ALL PARTICULARS."

21           REGARD, DR. PRIORE."

22           IT'S BASICALLY ANNOUNCEMENT THAT STILL DOESN'T

23  SPECIFY ANYTHING ABOUT TSI.  BESIDE IT, THERE IS NO

24  CONNECTION AND NO LINK TO DR. PEMKOVA, THIS DEFENDANT.

25           AND THE LAST PAGE IS BASICALLY JUST REMAINING PART

64

1   OF DR. PRIORE'S DATA, SPECIFYING THAT SHE WAS -- WITH ALL

2   TRADES.  AUTOMATIC FARMING -- BASICALLY SOME -- MOST LIKELY

3   SOME PROJECTS AS WELL ACCORDING TO THE COURT DOCUMENTS SHE

4   WAS INVOLVED WITH.  SIMILAR THINGS.

5            AND THAT'S -- MR. KOLE, CORRECT.

6            NOW, 111 -- I'M SORRY.  THERE IS ONE MORE.  EXHIBIT

7   111.  AND THIS IS THE THIRD EMAIL WHICH IS CONSIDERED AS A

8   WIRE FRAUD FROM -- DATED AGAIN 12 OF -- DECEMBER 1ST.  AND

9   THIS IS EMAIL FROM DR. PRIORE TO MR. MOORE.  AND SHE'S

10   WRITING A NOTE FROM THE DUE DILIGENCE OFFICE.  SHE MISSPELLED

11   IT, YES.

12            "YOU SHOULD BE RECEIVING YOUR CONTRACT MOST

13            LIKELY SATURDAY A.M.  WHEN YOU WILL GET IT,

14            CALL ME.  THEN, I WILL WALK YOU THROUGH.

15            REGARDS, DR. PRIORE."

16            NO SPECIFICATION ABOUT -- AT LEAST AT THIS PART

17   ABOUT ANY TSI.  THE TSI TRANSFERS HERE, WHAT WAS POINTED BY

18   THE PROSECUTIONER, THAT EMAIL WHICH WAS BELOW WAS COMING FROM

19   PALLE KROEIS TO DR. PRIORE AND CONFIRMED APPOINTMENT.  AND,

20   YES, MR. DAMJI, MR. BURNS OR MR. GARRICK WERE PEOPLE WHO

21   WERE, AS I EXPLAINED SEVERAL TIMES BEFORE.  THEY WERE PART OF

22   THE GROUP, BUT EACH ONE HAS THEIR OWN BUSINESS -- THEIR OWN

23   PROJECT.  I JUST CONFIRM, AND MR. KOLE OBJECTED, THAT MR.

24   DAMJI HAS HIS FUNDS INVESTED IN THE BILL GRAGE FIRM, MEANING

25   THERE WAS NO REAL POSSIBILITY TO INVEST.  AND I THINK THAT HE

65

1    WAS PART OF THE GROUP WHO WAS RESEARCHING.

2              AND, YES, AT THE TIME WHEN WE WERE CONSIDERING TO

3    HELP MR. MOORE, THERE WERE PEOPLE WHO WERE WILLING TO GO FOR

4    -- AND CHECK WHAT IT ACTUALLY IS.

5              SILKA -- MR. WENZEL HAS A WONDERFUL DAUGHTER MRS.

6    SILKA WHO -- AS WERE MY WORK -- SEVERAL TECHNOLOGIES BECAUSE

7    THEY ARE DEVELOPERS.  THEY HAVE A WONDERFUL RELATIONSHIP WITH

8    CREDIT SUISSE.  FURTHER IN THE DOCUMENTS WAS PROVIDED

9    INFORMATION OF THEIR BANKING FROM CREDIT SUISSE.  AND MR.

10   WENZEL HAS HELPED DUE TO HIS BANKING CONNECTIONS.

11             THE RESULT SEVERAL POTENTIAL FRAUDS.  BECAUSE

12   BRINGING FRAUDULENT DOCUMENTS TO THE BANK --

13             MR. KOLE:  OBJECTION.  THIS LAST PART IT GOES

14   BEYOND THE EVIDENCE.

15             THE COURT:  PLEASE CONTINUE.

16             MS. PEMKOVA:  CAN I CONTINUE?

17             THE COURT:  THE LAST PORTION DOES GO BEYOND THE

18   EVIDENCE, BUT IF YOU'D LIKE TO CONTINUE?

19             MS. PEMKOVA:  YES, THANK YOU.

20             THE COURT:  ALL RIGHT.

21             MS. PEMKOVA:  BASICALLY HAVING GOOD RELATIONSHIP

22   WITH THE BANK IT'S EXTREMELY HELPFUL.  THAT'S WHY IN THIS

23   FLORIDA DEAL YOU HAVE SEEN THAT THE DEFENDANT WAS SENDING TO

24   LOU ANN EARNHARDT THE BANKING FROM MR. BILL'S BANKER, MR.

25   BILLY BRITT -- SORRY, MR. BRUCE SHARP.  BILLY BRITT WAS A

1    LAWYER.  BECAUSE MR. SHARP WAS A PRESIDENT OF THE -- REGIONAL

2    PRESIDENT AND GLADLY WELCOMING ANY INFORMATION, WHICH WE CAN

3    PROVIDE, WHICH WOULD HELP HIM TO PREVENT HIS CLIENTS FROM

4    POTENTIAL PROBLEMS.  BY THE WAY, THE DEFENDANT MET WITH MR.

5    SHARP ON SEVERAL OCCASIONS.  AND THAT'S WHY MR. BILLY BRITT

6    AUTHORIZED HER IMMEDIATELY TO CONTACT THE BANKER AND HELP

7    EARNHARDT.

8             THAT'S WHY SENDING DOCUMENTS AROUND OR PROVIDING

9    INFORMATION WHICH -- BANKING IN CASE IT IS COMING FROM PEOPLE

10   WHO ARE WILLING TO HELP IS NO CRIME AND OTHERWISE --

11            BY THE WAY, IN THE CROSS-EXAMINATION OF THE

12   GOVERNMENT WITNESSES YOU MIGHT REMEMBER THAT THE PRO SE

13   DEFENSE ASKED MANY QUESTIONS ABOUT VARIOUS FINANCIAL

14   INVESTIGATIONS, SCAMS AROUND THE WORLD.  AND EITHER

15   GOVERNMENT WITNESS DID NOT RECOGNIZE IT.  IT DOESN'T MEAN

16   THEY ARE -- YES, THEY ARE.  IN THEIR OWN AREA, BUT THEY

17   DIDN'T KNOW THEY WERE INTERNATIONAL --

18            WHAT IS ACTUALLY NORMAL.  LEONARDO DE VINCI WAS

19   ONLY ONE, AND PEOPLE HAVE -- DATA FIELD.  THAT'S WHY SENDING

20   THE DOCUMENTS, PROVIDING THE BANKING DATA DOES NOT

21   NECESSARILY MEAN TO TRY TO DEFRAUD ANYONE.  PLUS, THESE

22   DOCUMENTS, THAT'S WHY THEY HAVE BEEN PUT BY THE PROSECUTION

23   AS EVIDENCE OF THE WIRE FRAUD.  DO NOT PROVIDE ANYTHING ELSE

24   THAN GENERAL INFORMATION.  ON TOP OF THAT PEOPLE WHO ASK FOR

25   THESE FEES WOULD BE PAID FROM THE INVESTOR.

1      IN THAT EMAIL WHERE ONE MORE -- I THINK TWO MORE

2   ATTACHMENTS -- BASICALLY A MAP FOR THE INVESTOR HOW TO GET

3   THERE WITH SPECIFICATIONS.  VERY SIMILAR THING -- JUST

4   DIFFERENTLY --

5      AND FINAL PART OF THE BREAKDOWN OF DR. PRIORE --

6   NO.  TSI CONTACTING OTHERS.  SOMEBODY -- LATER EMAILS

7   TRANSPIRED THAT THAT TSI WAS PAYING EVEN FOR THE TAXES

8   SUPPOSEDLY.  AT THIS STAGE OF INVOLVEMENT OF THIS DEFENDANT

9   THERE WAS NOTHING CLEAR ABOUT WHAT IS BEHIND TSI BESIDE A

10  CONTRACT.  AND MR. MOORE -- MR. THOMAS REITZ MENTIONED IN HIS

11  CROSS-EXAMINATION THAT THERE WAS A PROBLEM LIKELY WITH TSI.

12  YES, THERE WAS.  BUT VERY DIFFERENTLY BECAUSE THE JUDGE

13  DARLING, THE JUDGE IN BELGIUM, DID NOT HAVE A SUFFICIENT

14  INSURANCE ON THE ACCOUNT.

15     THERE WAS MANY TIMES MENTIONED THAT SUPPOSEDLY MR.

16  MOORE WAS GOING TO BE DEFRAUDED AND PEOPLE -- RIGHT THING AND

17  THE RIGHT THING.  HE WAS EXPLAINING BEVERLY HILLS, THAT

18  ESPECIALLY REAL ESTATE AS WELL AS TECHNOLOGIES THEY HAVE --

19  TSI REAL ESTATE CONTRACT OR SAYING IT WAS A REAL ESTATE HAS

20  AN EXCELLENT CHANCE TO BE REAL BASED ON THE FOLLOWING FACT.

21  AND BOTH GOVERNMENT WITNESSES DID NOT RECOGNIZE AT THAT

22  MOMENT AS WELL AS MR. MOORE BECAUSE THEY WERE IN THE UNITED

23  STATES.

24     WHY THE CONTRACT WAS IN EUROPE.  IT WAS MENTIONED

25  IN THE CROSS-EXAMINATION.  2005, '6 ACTUALLY FROM PRACTICALLY

1    2000 ALL TO THE WAY TO 2012/13 THERE WAS A PROCESS WHERE

2    ESPECIALLY REAL ESTATE UNDER CERTAIN TERMS AND CONDITIONS

3    WOULD BRING -- BRING AMAZING PROFIT.  BECAUSE IT DOESN'T

4    EXIST IN THE UNITED STATES.  YOU HAVE APPRAISAL, AND THAT'S

5    IT.

6              IN EUROPE LAND GOES TO THREE CATEGORIES.  THAT'S

7    WHY THERE WAS A REQUEST FOR THE COURT-CERTIFIED APPRAISER WHO

8    DIDN'T MAKE IT BECAUSE TIME WAS TOO SHORT FOR THE DEFENSE.

9              THERE IS A NONAGRICULTURE LAND, AGRICULTURE LAND,

10   AND COMMERCIAL LAND.

11             MR. KOLE:  OBJECTION.  THIS IS BEYOND THE EVIDENCE.

12             THE COURT:  SUSTAINED.

13             MS. PEMKOVA:  YOUR HONOR ALLOWED ME TO TALK ABOUT

14   THE -- CONTRACT.

15             THE COURT:  PLEASE CONTINUE, MS. PEMKOVA.

16             MS. PEMKOVA:  OKAY.

17             WELL, REAL ESTATE IN EUROPE WOULD BE CAPABLE -- IS

18   CAPABLE BASED ON THE TSI CONTRACT.  CREATE A LARGE PROFIT

19   BASED ON REGISTERING THE LAND IN THE BUREAU OF LAND.  AND IT

20   DOESN'T TAKE MORE THAN 30 DAYS.

21             SIMILAR THING APPLIES TO OTHER TECHNOLOGIES WHICH

22   CAN DO THE SAME THING.  IN CASE THE TECHNOLOGY STARTS -- AND,

23   FOR EXAMPLE, THE HELICOPTER WOULD GO TO THE FINAL STAGE

24   INSURANCE COVERS EVERYTHING.  MEANING THE PROFIT IS BASICALLY

25   GUARANTEED AND CAN GO HIGH BECAUSE THERE IS A VEHICLE.

1            IF IT COMES TO FEDERAL EVIDENCE, I WON'T PUT ANY

2    MORE EXHIBITS, BUT WE WILL GO VERY QUICKLY WHAT WOULD BE THE

3    GOOD FOR -- GOOD IDEA FOR JURY TO LOOK AT THEM AT THE END.

4            EXHIBIT 112 WAS THE CONTRACT WHICH WAS PROVIDED TO

5    MR. MOORE FOR -- VIA PALLE KROEIS WHO WAS ASKING FOR THE

6    AGREEMENT AND CC DR. PRIORE.  AS WE ESTABLISHED, MR. MOORE

7    PROVIDED THIS DEFENDANT PEMKOVA EVEN BEFORE HE GOT ANY

8    FEDERAL ACTION, DESPITE THERE WAS NO REASON -- NO REASON FOR

9    IT.

10           EXHIBIT NUMBER 114 WAS THE TRANSMISSION -- WERE

11   ASKING THE DEFENDANT FOR ANY KIND OF COMMENTS WAS NOTHING

12   MORE THAN PULLING HER INTO THE RESPONSIBILITY AS A FINANCIAL

13   ADVISOR, WHICH SHE DID NOT -- DID NOT DO.

14           REGARDING FURTHER EVIDENCES, IT WOULD BE WISE TO

15   COMPARE 142, 143, 150 AND 168 AND 167, GOVERNMENT EXHIBITS.

16   BECAUSE THEY ARE SHOWING THAT THERE WAS ISSUED SUBPOENA BY

17   MR. KOLE IN 2012, 2010.  ONE IN 2008.  MR. REITZ WAS GETTING

18   SIMILAR RECORDS JUST VOLUNTARILY, MEANING WITHOUT A SUBPOENA.

19           SIMILAR THINGS APPLIES TO -- RECORDS IN 2010,

20   EXHIBIT 144, 145 BASED ON MR. KOLE'S SUBPOENA AND 151,

21   EXHIBIT ON 2008 PROVIDED VOLUNTARILY DESPITE THE WITNESS SAID

22   HE HAD THESE RECORDS.  THEY CANNOT PROVIDE WITHOUT -- WITHOUT

23   A SUBPOENA.

24           THERE WAS A VERY INTERESTING SITUATION WITH THIS --

25   FOR MOST PEOPLE TECHNICAL DISCUSSION -- WASN'T READY ENOUGH

1    FOR TO QUESTION THE WITNESS MORE THAN IT WAS DONE.

2          BUT STILL WE HAVE TWO -- WE HAVE TWO VERIFICATIONS

3    OF THE DRIVE.  INTERESTING MOMENT.  ACCORDING TO MR. REITZ'S

4    TESTIMONY, NO DRIVE -- NO SEIZED -- NOTHING WAS SEIZED FROM

5    DR. ONCIU'S COMPUTER.  NOTHING WAS SEIZED FROM DR. PRIORE'S

6    COMPUTER.  BUT IT WAS SEIZED FROM DEFENDANT PEMKOVA.

7          AND MORE IMPORTANTLY, THERE WAS TWICE DONE THE

8    SEARCH IN 2008 AND 2009, DESPITE SEARCH WARRANT WHICH I

9    SHOWED AT THE BEGINNING OF THE CASE WAS ISSUED ON 22ND OF

10   AUGUST 2008 FOR ON AND BEHALF -- ON OR FOR 10 DAYS.  AND

11   FILED ON 13TH OF JANUARY WHILE THE DEFENDANT WAS ARRESTED

12   JULY THE 2ND.

13         THE GOVERNMENT WITNESS LISA SCHMADTKE WHY THEY'RE

14   PROCESSING HER FOR EVERYTHING WHAT SHE HAS DONE AND WISH THE

15   FBI MORE AGENTS -- ACKNOWLEDGED THAT THERE WAS NO SEARCH

16   WARRANT IN HER HANDS.  BUT THERE WAS AN ARREST WARRANT AND

17   SOME "LEADS" AS SHE CALLED IT.

18         THERE ARE ITEMS WHICH DISAPPEARED MYSTERIOUSLY

19   BETWEEN THE ARREST AND NEVER HAVE BEEN RETURNED, INCLUDING

20   JURY PAPERWORK.  THERE WAS AN EXHIBIT, AND YOU WILL SEE IN ON

21   157 I BELIEVE.  WHAT IS A CEASE AND RETURN ITEMS FROM -- BY

22   MR. REITZ.  AND IT IS DONE ON FEBRUARY 25TH, 2009, WHILE THIS

23   -- AGAIN, SEARCH WARRANT WAS IN 2008 IN AUGUST.  AND IN

24   JANUARY THE DEFENDANT WAS HEAVILY REQUESTING THE THEN COUNSEL

25   DIANA BASS TO GET BACK THE DOCUMENTS AND GET BACK JURY

1    MISSING ITEMS.  UNTIL TODAY IT HASN'T BEEN RETURNED.

2              IN THAT 157 IS NO POINT TO WALK YOU THROUGH, BUT IF

3    YOU WANT, YOU CAN BASICALLY READ THE PAGES.  THEY'RE A VERY

4    INTERESTING THING.  I HOPE THAT THE -- PROVE TO YOU THE

5    DEFENDANT IS A WELL ORGANIZED AND CLEARLY LOGICALLY THINKING

6    PERSON.

7              IF YOU WILL GO THROUGH THE DOCUMENTS, YOU WILL SEE

8    DOCUMENTS -- PIECES OF THE LUGGAGE.  THERE WAS A BLUE -- BLUE

9    BAG -- BLUE LUGGAGE ON THE WHEELS, BLACK BAG, PURSE AND BROWN

10   BAG WHICH HAS -- GLASS AND SUNGLASSES.

11             DOCUMENTS WERE IN BLACK BAG -- FULL BLACK BAG

12   BECAUSE SHE WAS ON MEDICAL TRIP, RECOVERING FROM PROBLEMS SHE

13   GOT IN 2007 AFTER THE REQUISITION AS I EXPLAINED WITH

14   BATHGATE -- HOUSEWIVES.  AND AT THE SAME TIME THE DAYS WHEN

15   SHE WAS BETTER SHE WAS -- THE DEFENDANT WAS DOING WORK.

16   THERE WAS A WHOLE BUNCH LITERALLY PILE OF THE BUSINESS CARDS

17   AND DOCUMENTS.  WHEN IT WAS RETURNED DOCUMENTS ARE -- AND

18   THERE ARE INTERESTING THINGS -- KLEENEX IN THE LUGGAGE

19   BROUGHT OVER THE SEAT.  NOT AT ALL.  COSMETICS, MAKE-UP,

20   TOILETRIES.  NOTHING LIKE THIS.  EVERYBODY WHO FLIES

21   ESPECIALLY AT THAT YEAR KNOWS VERY WELL HOW DIFFICULT IT WAS

22   TO TAKE -- PLUS, THE DEFENDANT DOESN'T USE THE MAKE-UP MORE

23   THAN EYE MAKE-UP, SHADOWS AND CLEAN.  THAT'S ALL.  BECAUSE

24   SHE'S HEAVY ALLERGIC.

25             THAT'S WHY THESE ITEMS VERY STRANGE AS WELL AS THE

1   SEARCH ON THE DRIVE.  BECAUSE THE DRIVE HAS -- EVERYBODY WHO

2   FLIES KNOWS THAT.  ELECTRONICS HAVE TO BE PROVIDED TO THE --

3   FOR THE CONTROL -- AT THE MOMENT SEARCH THE PURSE.  THE DRIVE

4   WAS IN THE PURSE.  NOT IN THE BLUE -- BLUE BAG.

5   UNFORTUNATELY PREVIOUS COUNSEL NEVER WAS WILLING TO CLARIFY

6   ANY OF THESE ISSUES.  BUT IT'S THERE.  IT'S INTERESTING TO

7   SEE HOW IT WAS PUT TOGETHER.

8            THERE WERE MANY OTHER THINGS WHICH HAVE BEEN

9   REMOVED.  THAT'S WHY I CANNOT TALK ABOUT THAT.

10           AND WE WILL GO TO THE -- 162 IS THE EXHIBIT WHICH

11  IS LINKED WITH THE PREVIOUS SEARCH ON THE DRIVE.  ONE MORE

12  THING WHICH I WOULD SAY ABOUT THIS IT'S WISE TO HAVE A LOOK

13  BECAUSE IT IS FROM 2009.  162 IS FROM 2008, AND THE PREVIOUS

14  IT'S FROM 2009.  EVERYBODY WHO OPERATES A COMPUTER KNOWS IF

15  YOU PUT DR. ONCIU IN THAT SEARCH IT SHOWS YOU EVERYTHING WHAT

16  IS ON THE DRIVE.  THAT'S WHY GOING TWICE ON THE DRAFT --

17  DRIVE IT'S VERY SUSPICIOUS.  IT WOULD SHOW ALL FILES.

18           UNFORTUNATELY, THE DEFENSE WASN'T READY FOR THESE

19  QUESTIONS BECAUSE SHE NEVER SAW THE ACTUAL CONTENT OF THESE

20  FILES BEFORE.  OTHERWISE THIS QUESTION WOULD BE ASKED TO THE

21  -- TO THE EXPERT.

22           AND FROM 169 ALL THE WAY THROUGH TO 189 -- THAT'S

23  EVEN MORE -- 194, THERE ARE FILES EXTRACTED FROM HER DRIVE

24  AND MISREPRESENTED AS WELL.  EVEN WHEN JUDGE CARTER PROPOSED

25  TO STRIKE THE EVIDENCE, IT WAS TOO LATE.  BOTH COUNSEL

1    REFUSED TO DO SO, DESPITE THAT THE DEFENDANT WAS HEAVILY

2    OBJECTING IT.  NOT BECAUSE THE DEFENDANT WOULD REFUSE

3    EXISTENCE OF THESE FILES.  NOT AT ALL.  BUT

4    MISREPRESENTATION.

5              FOR EXAMPLE, IN 169, EXHIBIT 169 IS AN EMAIL

6    BETWEEN DR. ONCIU AND DR. PEMKOVA.  I CANNOT READ NOW WHO WAS

7    EMAILING WHOM.  BUT THERE IS A QUESTION REGARDING WOLWER.

8    WOLWER WAS A COMPANY WHERE THE DEFENDANT WAS ON THE BOARD

9    MAYBE FOR 15 YEARS, 12 YEARS AT LEAST.  COMPUTER COMPANY FROM

10   TAIWAN AND A LINK TO A MAJOR DEVELOPMENT IN TAIWAN AND

11   SEVERAL OTHER COUNTRIES.  THEY BELONGED TO A BIG FAMILY

12   SIMILAR LIKE MY -- KIND OF HAS THE UMBRELLA OF HIS NORWEGIAN

13   --

14             MR. KOLE:  OBJECTION.  THIS PART'S GOING BEYOND THE

15   EVIDENCE IN THAT DOCUMENT.

16             THE COURT:  MS. PEMKOVA, I'M GOING TO SUSTAIN THE

17   OBJECTION.

18             MS. PEMKOVA:  OKAY.

19             THE COURT:  I'M GOING TO ASK YOU TO FOCUS ON THE

20   EVIDENCE IN THIS CASE CONCERNING THESE ALLEGATIONS OF

21   HIGH-YIELD INVESTMENTS.

22             MS. PEMKOVA:  UH-HUH.

23             BY THE WAY, THIS EXHIBIT 169 WAS A FIRST SORT OF

24   THE TEST, AND IT TRANSFERRED -- IF YOU READ THIS EMAIL, IT

25   TRANSFERRED OUT OF THERE THAT DR. PEMKOVA WAS BASICALLY

1    CHECKING -- NOT CHECKING -- SORT OF CHECKING THE WAY HOW

2    DR. ONCIU WORKS.  BECAUSE IT WAS DATED SHORTLY AFTER THE

3    INTRODUCTION.  AND YOU SEE IN THIS EMAIL JERRY HARPER AND DR.

4    CARL JENSEN, WHICH HAS -- THE TWO GENTLEMEN WHO HAVE BEEN

5    MENTIONED BEFORE.

6          NEXT EXHIBIT, VISUAL PROJECTS.  YES, MR. RON MOGEN

7    WAS A HIGHLY INTELLIGENT AND HIGHLY INVOLVED WITH THE VISUAL

8    PROJECT'S EXPERT, WHO WAS, BY THE WAY, A FRIEND -- BECAUSE --

9    AND THEY WERE CONNECTING THE ACTIVITIES IN NEW CONCEPT OF

10   HOME THEATERS, ANOTHER TECHNOLOGY WHICH I DIDN'T PRESENT

11   HERE.

12         THE MOST INTERESTING PARTNER IN THIS RESEARCH WAS

13   MR. KATRANJI, EXHIBIT 171 AND 174.  I MENTIONED IT YESTERDAY.

14   MR. KATRANJI IS A FORMER DIPLOMAT, STUDIED IN SEVERAL

15   COUNTRIES.  THEY KNOW EACH OTHER PERSONALLY.  THERE WERE MANY

16   EMAILS EXCHANGED, MANY TECHNOLOGIES, MANY EXHIBITS FOR --

17   ITEMS FOR THE RESEARCH.  AND TEST ON THAT PART WAS DONE BY

18   BASICALLY -- NOT EXACTLY MISREPRESENTING, BUT THERE IS

19   AMUSING -- BETWEEN 171 AND 174 WHEN DR. ONCIU -- THAT IS SUCH

20   HIGH AMOUNT, 5 BILLION, BECAUSE MR. KATRANJI WAS INVOLVED,

21   AND HE WAS PART OF THE OIL -- OIL BUSINESS FOR YEARS

22   REPRESENTING VERY LARGE OIL ENTITIES IN THE WORLD.

23         AND IT WAS ACTUALLY GOOD RESTORATION THAT DR. ONCIU

24   DIDN'T PRESENT AS A BUSINESS PERSON TOO MUCH INTEREST TO THE

25   DEFENDANT.  THAT'S WHY -- THAT SHE HIRED DR. ONCIU -- THIS

1    HIGH INVESTMENT PROGRAM -- DR. ONCIU WAS INTERESTING TO DR.

2    PEMKOVA FROM THE ASPECT OF HIS ORPHANAGES.  THEY HAD SIMILAR

3    IDEOLOGY.  THE ORPHANAGE IN CONCEPT OF THE CLINICS LOOKED A

4    LITTLE BIT DIFFERENTLY.  THERE WERE A FEW MORE ELEMENTS.

5         HE WAS -- DR. ONCIU WAS INTERESTED IN ASPECT OF HIS

6    PROJECT OF THE BOARD IN MEXICO, CREATING BASICALLY BRAND NEW

7    --

8         MR. KOLE:  OBJECTION.  THIS IS GOING BEYOND THE

9    EVIDENCE AT TRIAL.

10        THE COURT:  I'M GOING TO SUSTAIN THIS.

11        MS. PEMKOVA, I'M REALLY HUMBLY ASKING YOU TO TRY TO

12   CONFINE YOUR SUMMARY TO THE EVIDENCE.  AND AT SOME POINT,

13   UNFORTUNATELY, I'M GOING TO NEED TO POTENTIALLY LIMIT YOU.  I

14   DON'T WANT TO DO THAT YET.  BUT --

15        MS. PEMKOVA:  OKAY.  I WILL TRY TO SHORTEN IT AS

16   MUCH I CAN.

17        THE COURT:  WELL, IT'S NOT A MATTER OF SHORTNESS.

18   IT'S A MATTER OF FOCUSING IT.  AND I WANT YOU TO HAVE A FULL

19   PRESENTATION, BUT THIS IS BECOMING A LITTLE BIT OF A CONCERN.

20        WHICH IS NOT A REFLECTION, LADIES AND GENTLEMEN, ON

21   THE WEIGHT OF THE EVIDENCE.  THAT'S YOUR DETERMINATION.

22        BUT THIS NEEDS TO FOCUS.  SO, I'M NOT CERTAIN

23   WHETHER IT'S THE TIME LIMITATION OR GIVING YOU JUST A VERY

24   HUMBLE ADMONITION TO PLEASE FOCUS ON THE EVIDENCE.

25        MS. PEMKOVA:  YOUR HONOR, I WAS GOING TO GO VERY

1    QUICKLY THROUGH THE POSITIONS WHICH --

2              THE COURT:  WELL, I'M NOT GUIDING YOU.  JUST -- I'M

3    GOING TO GIVE YOU THE LATITUDE A LITTLE WHILE LONGER.  BUT --

4              MS. PEMKOVA:  OKAY.  IN THIS CASE I WILL JUST

5    SUMMARIZE IT.

6              FROM THE FILE PRACTICALLY 176 ALL THE WAY TO 196

7    THERE ARE PARTS WHICH HAVE BEEN TAKEN FROM THE DRIVE.  IF

8    ANYBODY WOULD COMPARE IT -- DESPITE IT WAS ALL IN THE SAME

9    PACKAGE OF HIGH INVESTMENT PROGRAM.  IT IS NOT THE TRUTH.  IF

10   YOU WOULD COMPARE THE CLIENT INFORMATION SHEET AND THE

11   DETAILS, EACH PACKAGE WAS DIFFERENT.  ON THE OTHER HAND, YES,

12   THEY TRANSPIRED THE SAME PESIC AND SCHALLER BECAUSE AS I SAID

13   BEFORE, THE SAME WAY HOW DR. ONCIU WAS TESTED BY WOLWER,

14   MEANING SOMEONE LIKE DR. PEMKOVA HAS A -- AND A LOT OF

15   CONTROL FOR NOT TO GET COMPANY -- THE POTENTIAL INVESTMENT

16   WITH DR. PRIORE -- ACTUALLY DR. ONCIU -- AT THAT TIME

17   DEFENDANT DID NOT KNOW THERE WAS A DR. PRIORE UNTIL FIRST

18   DOCUMENTS APPEAR.  IT WAS FOR TESTING, FOR HELPING.  BECAUSE

19   IT WAS VERY CLEAR FROM ALL THESE COMMUNICATIONS THAT MR.

20   MOORE, DESPITE CALLING HIMSELF A SOPHISTICATED INVESTOR,

21   WASN'T.

22             THAT'S WHY THE PROPOSITION OF FLORIDA CAME LATER

23   BECAUSE, ONE, THEY WERE THINKING ABOUT THE DETAILS AS DR.

24   ONCIU DIDN'T FIT MR. MOORE'S PROFILE.

25             I ALREADY MENTIONED THAT THE DOCUMENT -- THAT MR.

1    DAMJI'S FUNDS WERE INVESTED AS WELL AS MR. GARRICK HAS HAD --

2    THE SAME PERSON HAS A VERY STRONG SECURITY ON HIS ACCOUNT DUE

3    TO THE FACT OF THE GREAT RELATIONSHIP WITH THE BANKER.

4            WHEN -- LAST TIME MR. KOLE WAS PUTTING MR. BRITT,

5    AND I EXPLAINED THAT, AND MR. BRITT WAS A PART OF THE

6    RESEARCH.  YOU MIGHT REMEMBER HE WAS A SALE PERSON IN AMWAY.

7    AND THEY HAVE DONE A LOT OF WORK WITH THE DEFENDANT TO GET

8    HER BASICALLY ON PSYCHOLOGY GUIDANCE.  AS ON THE OTHER HAND,

9    HE WAS AN UNLIMITED SOURCE OF THE INFORMATION FOR THE

10   RESEARCH.  THAT'S WHY HE -- USE HIS BANKER.

11           MRS. SIRCA, ANOTHER -- AND MR. WENZEL, THE LAST TWO

12   VERY IMPORTANT THINGS.  FIRST OF ALL, BECAUSE THEY ARE IN

13   GERMANY, WHICH -- SHOULD GET CREDIT TO THIS.  THEY WERE GOOD,

14   AND THEY AGREED TO TEST THE SAME THING.  WHAT IS HAPPENING

15   WITH THE INVESTMENTS THROUGH DR. PRIORE.  AND BECAUSE THERE

16   WERE ALWAYS BANK -- PUT YOUR MONEY WHERE THEY GO, WHAT IS

17   HAPPENING LATER.  THERE WAS -- BECAUSE IT WAS A DIRECT

18   CONTACT.  KOLE -- NOT KOLE -- THE EMAIL 189 ON PAGE 5 WHERE

19   THE DEFENDANT IS STRONGLY RECOMMENDING THEY HAVE TO TALK WITH

20   MRS. SILKA.  SHE WOULD WAIT FOR THEM.  SHE WOULD CALL.

21   BECAUSE SHE WANTS TO REMIND MRS. SILKA AGAIN TWO WORDS, EVEN

22   GOING FOR SOME MEETING.

23           THERE WAS ONE MORE ASPECT WHICH HAS TO BE CAPTURED

24   IN HERE.  SOMEONE IN THIS CONVERSATION AFTER MR. MOORE CALLED

25   IN JANUARY I BELIEVE DR. ONCIU -- DR. ONCIU -- SPREAD OF

1    YELLOW SHEET WITH SOME KIND OF PROFIT.  HE CALLED IT VERY

2    INTERESTING WAY.  HE SAID A BANKER ACCEPTANCE CERTIFICATE.

3              THIS WAS THE TERMINOLOGY OF -- WHICH NEVER -- IN

4    RESEARCH.  THERE WAS -- BANK INVOLVED.  THAT'S WHY THE

5    DEFENDANT PAID LITTLE BIT MORE ATTENTION WHAT IT IS.  THERE

6    WAS AT THE TIME ONLY PERSON WHO CAN TEST IT.  AND IT WAS

7    SILKA, WENZEL -- WENZEL WAS THE -- MAINLY THEIR LONG-TIME

8    FRIEND LESS DR. PEMKOVA.  AND WILLIAM ELDER SENT THE EMAIL.

9    THAT IS THE LAST TRANSFER IN THIS CASE -- EXHIBIT NUMBER 193,

10   194 WHERE, YES, DEFENDANT SENT IT TO MRS. SILKA, BUT

11   CONFIRMING THAT IT WAS PRESENTED BY WILLIAM ELDER.  BECAUSE

12   IT WAS ACTUALLY WILLIAM ELDER WHO WAS CHOSEN TO USE MRS.

13   SILKA.

14             MR. KOLE:  OBJECTION.  THAT GOES BEYOND THE

15   EVIDENCE.

16             MS. PEMKOVA:  IT IS IN THE --

17             THE COURT:  SUSTAINED.

18             MS. PEMKOVA:  -- TEXT OF THE EMAIL.

19             MR. KOLE:  OBJECTION.  OBJECTION WITHDRAWN.

20             MS. PEMKOVA:  TAKE THIS FIRST LINE OF THE EMAIL.

21   AND, AGAIN, BANK CERTIFICATE -- BANKER'S ACCEPTANCE

22   CERTIFICATE WAS SOMETHING WHAT WAS EXTREMELY APPEALING AS A

23   TERM.  IF IT COMES TO HIGH INVESTMENT -- IN THE FINAL STAGE I

24   WOULD SAY -- I HOPE THE TECHNOLOGIES PRESENTED YESTERDAY,

25   PLUS THE POSSIBILITY TO CREATE MONEY VIA SELLING THE LAND OR

1    GETTING LAND AND PROPERTIES, REAL ESTATE AFTER THE

2    RESTITUTIONS AND GENERATING EVEN THE LOANS FOR TO GET THE

3    PRIZE ON THE FIRST STAGE AND SELLING IT ON THE SECOND STAGE

4    WAS A LEGITIMATELY -- BUSINESS.

5            NEXT THING WHICH WAS A LEGITIMATELY -- BUSINESS AND

6    REAL ESTATE EXPERT WHO DIDN'T LIKE IT WOULD CONFIRM IT.  WHEN

7    EUROPEAN UNION STARTED GROWING, AND THEY EXITED THE FORMER

8    CENTRAL EUROPEAN COUNTRIES FROM EASTERN BLOC, THERE WAS

9    ANOTHER TREMENDOUS OPPORTUNITY.  AND THESE COUNTRIES WERE

10   CHANGING EUROPE.  SLOVAKIA, I BELIEVE IT WAS 2009 WENT FOR

11   EUROS -- THERE WAS A LONG-TERM PERIOD.

12           THIS REAL ESTATE WAS WORKING IN CENTRAL EUROPE

13   MAINLY -- POLAND, CZECHOSLOVAKIA -- OR CZECHOSLOVAKIA,

14   HUNGARY. AND ESPECIALLY GERMAN COMPANIES WERE VERY WELL KNOWN

15   FOR GETTING -- FOR OLD CURRENCY -- PREVIOUS CURRENCY PRICE

16   AND --

17           MR. KOLE:  OBJECTION.  THIS IS NOW GOING BEYOND

18   THIS PARTICULAR -- THESE PARTICULAR FACTS SHE JUST MENTIONED

19   THERE'S NO EVIDENCE ON.

20           THE COURT:  IT IS.  SUSTAINED.

21           MS. PEMKOVA:  WELL, ANY KIND OF REAL ESTATE

22   TRANSACTIONS AND WHAT WAS HAPPENING IN EUROPE IS VERY EASY TO

23   FIND ON THE INTERNET.  BESIDE THE POSSIBILITY TO CREATE THE

24   PROFIT, AND HAVING LEGITIMATE BANKING BUSINESS, WAS SHOWN TO

25   YOU BEFORE AT THE BEGINNING OF THE OPENING.  ANYONE COULD GO

1  ON THE BANKING SITE, DEUTSCHE BANK.  AND UNDER THE INVESTMENT

2  YOU WILL FIND THAT THERE IS A MARKET OF MTNS.  THERE IS A

3  SPECIAL PURPOSE VEHICLE THAT IS A PROGRAM ADMINISTRATOR.  AND

4  THIS WAS A LEGITIMATE NORMAL PART OF THE BUSINESS WHERE

5  TECHNOLOGISTS ARE BEING FUNDED THROUGH A BANKING BUSINESS.

6  THERE IS, OF COURSE, NO PLACE FOR THE BANKER -- FOR THE

7  BROKERS.  AND THE CONTRACT HAS TO COME FROM THE BANK.

8          THAT'S WHY MR. MOORE IN BEVERLY HILLS IN SEVERAL

9  CONVERSATIONS WAS ALWAYS TAUGHT BANK, BANK, BANK -- EVEN IN

10  THAT FAMOUS CONVERSATION 24 -- I BELIEVE THERE WAS AGAIN THE

11  BANK, BANKING CONTRACT.

12          AND THIS NORMAL BUSINESS WAS EVEN AROUND IN UNITED

13  STATES ON CERTAIN LIMITED POSSIBILITIES.  AND ONE OF THESE

14  BANKS WAS G.I.D. BANK.  I ASKED THE BOTH GOVERNMENT WITNESSES

15  IF THEY ARE FAMILIAR G.I.D., GLACIER DEPOSITORY BANK.  NO,

16  THEY WERE NOT.  THEY EVEN DID NOT KNOW IF THERE IS ANY

17  FINANCIAL SCANDAL -- TO THIS BANK.  AND THERE WAS.  GLACIER

18  BANK WAS A BANK ON OFFSHORE -- OFFSHORE -- IN UNITED --

19          MR. KOLE:  OBJECTION.  THIS IS BEYOND THE EVIDENCE.

20          THE COURT:  SUSTAINED.

21          MS. PEMKOVA:  WELL, DEFENDANT IS AT LEAST TRYING TO

22  STEAL AND DEFRAUD MR. MOORE FOR THE PROFIT.  DEFENDANT HAS

23  HAD NO REASON TO DO SO BECAUSE SHE WAS RUNNING HER OWN

24  BUSINESS.  SHE WAS FAMOUS BEFORE IN EUROPE.  AND WHEN SHE WAS

25  ARRESTED IN 2008 SHE WAS CARRYING THE DOCUMENTS WHEN SHE WAS

1    MANAGING 601 BILLION DOLLARS IN THE INSTRUMENTS.

2            THIS IS WHERE FROM CAME THE INFORMATION WHEN YOU

3    OPEN ACCOUNT FOR THE SECURITIES, SPECIFIC SECURITIES, THE

4    BANK DOES DUE DILIGENCE IN ITS -- SERVICE.

5            OH, THIS CASE CAUSED A TREMENDOUS DAMAGE.  AND IT'S

6    A VERY SELECTIVE PROSECUTION.  OUT OF THE DOCUMENTS

7    TRANSPIRED CLEARLY THERE WAS PESIC AND SCHALLER WHO WERE EVEN

8    ASKING FOR MONEY.  NEVER PROSECUTED.

9            THERE WAS A WILLIAM ELDER ON AT LEAST ACCORDING TO

10   THE COURT DOCUMENTS SIX COMMUNICATIONS SENDING -- EVEN FEES

11   AGREEMENT.  NEVER PROSECUTED.

12           THERE WAS A JUERGAN SCHAEFFER WHO WAS ON THE

13   CONVERSATION WITH MR. MOORE FOR A LONG WHILE, ACKNOWLEDGING

14   EVEN HE IS -- FOR CHRISTMAS IN SANTA BARBARA.  HE HAS AN

15   AMERICAN WIFE.  AND HE WAS THE ONE WHO WAS ACKNOWLEDGING SOME

16   TRADING OF MTNS.  NEVER PROSECUTED.

17           WHICH OUT OF THE TRANSCRIPTS TRANSPIRED THAT DR.

18   PRIORE AT LEAST TWO MORE TIMES MENTIONED SOMETHING WITH --

19   POTENTIALLY SOMETHING WITH JUERGAN SCHAEFFER.  SHE MENTIONED

20   IN HER CONVERSATION THAT IT IS NOT ACTUALLY TSI.  AT THE SAME

21   TIME JUERGAN SCHAEFFER WAS NEVER PROSECUTED.

22           WHEN THE DEFENDANT -- THERE IS A VERY SELECTED

23   PROSECUTION.  SHE DID HER OWN RESEARCH AS USUAL, SPECIFICALLY

24   ON TSI AND FOUND VERY INTERESTING THINGS.  PRESENTED TO MR.

25   STEWARD AND IT WAS REJECTED THROUGH AND OUT BECAUSE IT

1    DOESN'T FIT THE MAKE-UP OF THE CASE.

2              MR. JUERGAN SCHAEFFER -- AND THERE IS EVIDENCE

3    WHICH COULD BE PRESENTED REJECTED BY MR. STEWARD.  BUT MR.

4    SCHAEFFER KEEPS DOING BUSINESS IN UNITED STATES AND QUITE

5    LARGE SCALE.

6              MR. KOLE:  OBJECT.  THIS IS -- THERE'S NO EVIDENCE

7    OF THIS.

8              THE COURT:  SUSTAINED.

9              MS. PEMKOVA:  OKAY.  THE --

10             THE COURT:  MS. PEMKOVA, I'M GOING TO ASK YOU TO

11   FOCUS ONCE AGAIN ON THE EVIDENCE IN THIS CASE.

12             MS. PEMKOVA:  AND HERE COMES THE HARDEST PART.  THE

13   DEFENDANT CAME AS AN EXPERT TO CONTRIBUTE NOT TO STEAL.  ALL

14   EVIDENCE HAS BEEN PULLED OUT OF THE CONTEXT, REPRESENTED

15   DIFFERENTLY.  AND THE PROBLEM WITH THE DEFENDANT WAS

16   FIGHTING, REQUESTING EVIDENCE, REQUESTING TO PRODUCE THE

17   WITNESSES.  IT WAS ALWAYS REJECTED.  THAT'S WHY THE DEFENSE

18   PROCESS IN THE LAST MOMENT OUT IS NOT PREPARED AND STILL HAS

19   TO MENTION ONE THING.  THIS CASE VIOLATED EVEN A BASIC UNITED

20   STATES RIGHT.  CONSTITUTION, AMENDMENTS TO THE CONSTITUTION

21   --

22             THE COURT:  MS. PEMKOVA, I WANT YOU TO FOCUS ON

23   THE EVIDENCE IN THIS CASE.

24             MS. PEMKOVA:  IN THIS CASE I KNOW, YOUR HONOR.

25             THE COURT:  NO, YOU -- I'M NOT TRYING TO CHILL YOU,

83

1    BUT BY THE SAME TOKEN THE EVIDENCE, THE EVIDENCE, PLEASE.

2            MS. PEMKOVA:  YOUR HONOR, MOST OF THE EVIDENCE OR

3    PART OF THE EVIDENCE HAS BEEN REMOVED YESTERDAY.  THAT'S WHY

4    THERE IS NOT TOO MUCH.  BUT I CAN EMPHASIZE ONE MORE TIME

5    VERY CLEARLY THAT THE -- MAYBE THE FLORIDA.  OKAY.  MAYBE THE

6    FLORIDA IS THE BEST AND EASIEST TO PROVE WHAT WAS REALLY

7    GOING ON IN THE CASE.  BECAUSE EARNHARDT'S FAMILY IT'S A

8    FAMOUS FAMILY.  IF THERE WOULD BE AN HOUR TIME IT WOULD BE

9    POSSIBLE TO PICK UP EVERY SINGLE CASE AND WALK THROUGH THE

10   SAME WAY.

11           FLORIDA CAME AS IN REAL ESTATE.  THE PROFIT WOULD

12   BE COMING FROM DEVELOPING IT, DEVELOPING THE LAND IN PHASES.

13   AND AS I HAVE SAID BECAUSE THE DEFENDANT MENTIONED -- SAW THE

14   WARNING SIGNALS FROM THE MEETING WITH MR. SNOWDEN DEFENDANT

15   CAME WITH ADDITIONAL PACKAGE OF TECHNOLOGIES.  AT THE MEETING

16   WITH EARNHARDT PEOPLE, OUT OF HER HEAD RIGHT AT THE MEETING.

17   AND IT WAS A SECONDARY SUPPORT.  ANY OF THESE TECHNOLOGIES

18   WOULD CREATE -- PROFIT IF IMPLEMENTED THEN EVEN THE LAND. AND

19   THIS WAS ALWAYS THE STRUCTURE WHICH WAS -- THAT'S ALL WHAT I

20   CAN SAY.

21           THE COURT:  OKAY.  AND, THEN, HAVE YOU CONCLUDED,

22   MS. PEMKOVA?

23           MS. PEMKOVA:  WELL, DEFINITELY GUILTY IN --

24   HELPING, PROVIDING INFORMATION.  NOT GUILTY IN WHAT IS THE

25   ACTUAL ACCUSATION.

1          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

2          MS. PEMKOVA:  THANK YOU.

3          THE COURT:  COUNSEL, YOUR REBUTTAL.  BRIEFLY.

4          MR. KOLE:  AND, YOUR HONOR, THE --

5          THE COURT:  COUNSEL, YOUR REBUTTAL BRIEFLY.

6          MR. KOLE:  I BELIEVE, THOUGH, THERE IS ONE MATTER

7     WE SHOULD MAYBE TAKE UP VERY BRIEFLY AT SIDEBAR WITH THE

8     COURT IN REGARD TO THESE EXHIBITS.

9          THE COURT:  I CAN GET TO THOSE EXHIBITS I THINK

10    LATER.  I'VE INDICATED -- UNLESS THERE'S SOME DISCUSSION

11    BETWEEN YOU AND MS. PEMKOVA AT THE RECESS.  IF THIS IS

12    NECESSARY, I'LL TAKE THAT SIDEBAR.

13         IS THIS NECESSARY?

14         MR. KOLE:  I THINK -- I THINK -- I THINK IT WOULD

15    BE WISE, YOUR HONOR.

16         THE COURT:  ALL RIGHT.  COUNSEL.

17         MR. KOLE:  JUST VERY BRIEFLY.

18         THE COURT:  EXCUSE US FOR ONE MOMENT, LADIES AND

19    GENTLEMEN.  JUST ONE MOMENT.

20         DEBBIE.

21         (SIDEBAR REPORTED STENOGRAPHICALLY.)

22         MS. PEMKOVA:  MAY I, YOUR HONOR?

23         THE COURT:  YOU MAY BRIEFLY, PLEASE.  AND YOU CAN

24    COMMENT ON THOSE OTHER ITEMS THAT WERE --

25         MS. PEMKOVA: -- UH-HUH.  IT WOULD BE --

85

1          THE COURT: -- IN DISCUSSION AND IN DEBATE.

2          BUT, PLEASE, SUMMARIZE THIS QUICKLY.

3          MS. PEMKOVA:  THERE WOULD BE ONE MORE DOCUMENT

4    WHICH I JUST GOT PERMISSION TO -- ARGUING.

5          REGARDING THE POTENTIAL HIGH PROFIT IN REAL ESTATE

6    TRANSACTION, THERE WAS A DOCUMENT WHICH IS A COURT-ISSUED

7    PROTOCOL BY THE COMMISSIONER, WHICH HAS IN EUROPE THE SAME

8    RULE -- RULES OF WRITING LIKE A JUDGE IN UNITED STATES.  AND

9    IT TRANSPIRED ABSOLUTELY COINCIDENTALLY.  STEPFATHER OF THE

10   DEFENDANT --

11         THE COURT:  JUST A MOMENT.

12         COULD I GET YOUR STIPULATION.  AND CAN WE BE

13   SOMEWHAT TRANSPARENT WITH THE JURY, THAT THIS MAY BE

14   ADMISSIBLE.  WE'RE STILL DISCUSSING THAT.

15         IS THAT CORRECT?

16         MS. PEMKOVA:  YES.  BUT, YOUR HONOR --

17         THE COURT:  COUNSEL.

18         MR. KOLE:  YES, THAT'S CORRECT, YOUR HONOR.

19         THE COURT:  ALL RIGHT.  NOW, YOU'VE RAISED IT.  SO,

20   LET'S DO IT RIGHT NOW.

21         MR. KOLE:  RIGHT.  THIS DOCUMENT MAY COME IN.

22         THE COURT:   THERE'S A DOCUMENT SUBMITTED TO THE

23   COURT THAT IT CAN'T READ.  IT'S BEEN REDACTED WITH BLACK INK.

24   SO, I CAN'T TELL WHAT'S BEHIND IT.  I CAN'T MAKE A RULING

25   ABOUT WHETHER IT'S ADMISSIBLE OR NOT.

1          I'M GIVING MS. PEMKOVA THE OPPORTUNITY TO ARGUE

2     THAT NOW.  IF I CAN GET AN UNREDACTED COPY, I MAY ALLOW IT

3     INTO EVIDENCE.  BUT WE'VE BEEN DEBATING BACK AND FORTH ABOUT

4     GETTING THAT COPY.  I THINK IT'S GOING TO COME TO ME JUST AS

5     YOU START YOUR DELIBERATIONS.

6          WOULD THAT BE ACCEPTABLE, MS. PEMKOVA?

7          MS. PEMKOVA:  ABSOLUTELY.  I WOULD DO MY BEST.

8          THE COURT:  GOVERNMENT?

9          MR. KOLE:  YES, YOUR HONOR.

10         THE COURT:  NOW, THE SECOND THING IS IF IT COMES TO

11    ME IN A REDACTED FORM, IF MS. PEMKOVA IS ARGUING THIS, IS

12    THERE OPPOSITION BY THE GOVERNMENT TO THIS DOCUMENT?

13         MR. KOLE:  THAT PARTICULAR DOCUMENT?

14         THE COURT:  YES.

15         MR. KOLE:  I THINK THAT DOCUMENT -- NO, YOUR HONOR.

16         THE COURT:  ALL RIGHT.  THEN, THAT'S GOING TO BE

17    RECEIVED.  IF YOU JUST GET IT TO ME IN AN UNREDACTED FORM,

18    MS. PEMKOVA --

19         MS. PEMKOVA:  I WILL DO SO.

20         THE COURT: -- I CAN READ IT.  I'M GOING TO LET THE

21    JURY SEE IT.

22         MS. PEMKOVA:  THANK YOU.

23         (EXHIBIT 243 RECEIVED.)

24         THE COURT:  OKAY.  SO, NOW IF YOU BRIEFLY ARGUE

25    THAT -- PLEASE.

87

1        MS. PEMKOVA:  YES.

2            THIS IS A DOCUMENT FROM THE COURT WHICH HAS A VALUE

3    OF THE COURT RULING ON A LAND.  AND IT'S A VERY IMPORTANT

4    DOCUMENT BECAUSE IT IS SHOWING THAT NONAGRICULTURE LAND WAS

5    FOR 0.40 CROWNS.  AND AT THE SAME TIME, THE SAME

6    NONAGRICULTURE LAND IF TURNED TO AN AGRICULTURE LAND GOES FOR

7    AT LEAST --

8        MR. KOLE:  OBJECT.  OBJECTION.  THIS -- THE FIRST

9    PART IT DOES REFER TO IT.  THIS LAST PART IS NOT IN THAT

10   DOCUMENT.

11       THE COURT:  JUST A MOMENT.  I CAN'T TELL.

12   REMEMBER 243 IS A DOCUMENT I CAN'T READ.  TURN TO PAGE 2 AND

13   3.

14           SO, PLEASE CONTINUE, MS. PEMKOVA.

15       MS. PEMKOVA:  OKAY.  I WILL.  THANK YOU.

16           IT MEANS THAT THE TSI CONTRACT, IF THEY WERE

17   BENEFITING FROM REAL ESTATE ON RESTITUTIONS OR SIMPLY MOVING

18   LAND FROM NONAGRICULTURE TO AGRICULTURE OR COMMERCIAL COULD

19   CREATE WAY HIGHER PROFIT.

20       MR. KOLE:  OBJECTION.  THERE'S NO EVIDENCE OF THAT.

21       MS. PEMKOVA:  OKAY.  COURT DOCUMENTS WHICH IS THERE

22   IT'S PROVING THAT EVEN IN 2013 -- AND IT COULD BE MUCH HIGHER

23   PRICE.  AND IT WAS MUCH -- MUCH -- SORRY, MUCH LOWER PRICE IN

24   2005 OR '6.  THE LAND COULD GO AS LOW AS 40 -- 0.40 CROWNS.

25   FOR EASY MATHEMATICS, LET'S SAY 40 CENTS ON A DOLLAR.

1    $4,000.  AND THIS IS WHAT IT SAID IN THIS DOCUMENT.  PROVING

2    A POTENTIAL FOR A VERY LARGE PROFIT.

3             IF I'M UNABLE TO ARGUE MORE, I WOULD EXPLAIN.

4    BECAUSE, AGAIN, UNITED STATES AS WELL AS AGENT REITZ AND BOTH

5    WITNESSES -- FAK OF THE DIFFERENCES BETWEEN EUROPEAN MARKET,

6    EUROPEAN SITUATION AND UNITED STATES SITUATION IN THE REAL

7    ESTATE AS WELL AS IN THE INVESTMENT IN STOCK.

8             YOU MIGHT REMEMBER ALL THESE ARGUMENTS WERE NOTHING

9    -- NOT ARGUMENTS -- DISCUSSIONS OR CROSS-EXAMINATIONS OF THE

10   WITNESSES WAS NOTHING ELSE THAN TURNING EVERYTHING TO THE

11   HIGH RISK, HIGH PROFIT.  THIS IS NOT EXACTLY TRUE IN AMERICA

12   -- IN THE EUROPEAN MARKET.  IN AMERICAN, YES.  EUROPE WORKS

13   DIFFERENTLY.

14            THAT'S WHY IN THE CROSS-EXAMINATION IT WAS MANY

15   TIMES ODD IF AGENT REITZ EVER HAS AN ACCOUNT, INVESTMENT

16   ACCOUNT OR PURCHASE ANY PROPERTY.

17            UNFORTUNATELY, REAL ESTATE EXPERT WHO WOULD TESTIFY

18   ON THE PRICE RANGE -- AND IT COULD BE VERIFIED IN ANY

19   INTERNET SITE -- FROM THEIR -- EUROPE HAS PARAGRAPHS AND

20   FACTS.  IT IS ON THE INTERNET.  THERE IS A SPREADSHEET WHICH

21   TELLS WHAT IS THE PRICE.  YOU CAN COUNT.

22            THAT'S BASICALLY ALL.  THANK YOU.

23            THE COURT:  ALL RIGHT.  THANK YOU.

24            NOW, COUNSEL, ON BEHALF OF THE GOVERNMENT.

25

GOVERNMENT REBUTTAL CLOSING

1

2          MR. KOLE:  LET'S TALK FOR A MINUTE ABOUT SOME OF

3   THE THINGS THAT THE DEFENSE AND MS. PEMKOVA HAS SAID WERE THE

4   CASE AND LET'S TALK ABOUT HOW THAT COMPARES TO THE EVIDENCE

5   THAT YOU'VE ACTUALLY -- THAT YOU'VE ACTUALLY HEARD.

6          YOU HEARD HER SAY EARLIER THAT -- DURING HER

7   TESTIMONY THAT SHE FOUND TOM MOORE TO NOT BE AN INTERESTING

8   SUBJECT, THAT THE AMOUNT OF MONEY HE WAS OFFERING TO INVEST

9   WAS TOO SMALL.  THAT SHE THOUGHT HE WAS MAYBE INTERESTING

10  UNTIL THAT MEETING IN BEVERLY HILLS THAT SHE'S TALKED ABOUT A

11  LOT.  BUT, THEN, SHE SAW THAT HE DIDN'T HAVE THE INTEREST IN

12  THE INVESTMENTS.  AND SHE DECIDED TO BACK AWAY.  AND THAT SHE

13  SAID BY MAY OF 2006 -- REMEMBER, MAY OF 2006, FIVE OR SIX

14  MONTHS BEFORE THE TSI TRANSACTION.  THAT'S THE MAIN FOCUS

15  HERE -- THAT SHE DECIDED TO BACK AWAY.  SHE WANTED HER -- HIM

16  TO LEAVE HER ALONE.

17          BUT WHAT DID THE EVIDENCE ACTUALLY SHOW.  THAT

18  DURING THAT TIME SHE WOULD APPROACH HIM, CALL HIM AND TALK TO

19  HIM ABOUT ONE DEAL AND ANOTHER DEAL AND ANOTHER DEAL.  AND

20  THAT, IN FACT, THOSE OFFERS QUITE TO THE CONTRARY OF HER NOT

21  THINKING HE WAS OF INTEREST BECAUSE OF NOT HAVING AS MUCH

22  MONEY, THOSE TRANSACTIONS KEPT GETTING SMALLER TO TRY TO MEET

23  THE AMOUNT OF MONEY THAT HE SAID THAT HE HAD.  REMEMBER AT

24  THE BEGINNING THEY WERE TALKING ABOUT MANY MILLIONS, THEN 10

25  MILLION.  IN THE END I HAVE AN EXCITING OPPORTUNITY NOW.  YOU

1   CAN GET IN FOR 1 MILLION.

2            WHAT DID SHE TELL YOU ABOUT THIS BEVERLY HILLS

3   MEETING.  SHE SAID THAT SUPPOSEDLY AT THAT MEETING SHE

4   DISCLOSED EVERYTHING.  SHE TOLD HIM ABOUT HER RESEARCH WORK

5   AND WHAT SHE WAS DOING.  AND THAT THIS WAS PART OF A RESEARCH

6   PROJECT, THAT THERE WOULD BE CONSEQUENCES IF SHE DIDN'T FULLY

7   DISCLOSE WHAT SHE WAS INVOLVED WITH AND WHAT SHE WAS DOING.

8   TOLD HIM THAT SHE WAS DOING RESEARCH.

9            BUT WHAT DID YOU ACTUALLY HEAR IN THE PHONE CALLS,

10  WHAT DO YOU ACTUALLY SEE IN THE TRANSCRIPTS AND IN THE EMAILS

11  AND HEAR FROM AGENT REITZ'S TESTIMONY.  IN NONE OF THOSE

12  THINGS -- AND EVERYTHING OTHER THAN THAT ONE MEETING HAS A

13  RECORD, EITHER WRITTEN OR RECORDED.  NOWHERE IN ANY OF THAT

14  IS THERE ANY REFERENCE TO ANY KIND OF A RESEARCH OR THIS IS

15  PART OF AN EXPERIMENT OR ANYTHING LIKE THAT.  HOW CONVENIENT.

16           THE ONLY TIME THROUGHOUT THIS WHOLE YEAR-LONG

17  PROCESS OF WHICH EVERYTHING IS RECORDED IN EMAILS EXCEPT FOR

18  THAT MEETING, THE ONLY TIME THAT EVER CAME UP AT THAT

19  MEETING.  IS THAT CONSISTENT WITH THE EVIDENCE.

20           SHE TALKED ABOUT THE -- IN NOVEMBER OF 2006 --

21  REMEMBER IN NOVEMBER, LATE NOVEMBER, WHEN THEY WERE STARTING

22  TO GET INTO THE -- WHAT BECAME THE TSI DEAL -- THE REFERENCE

23  TO THIS FOUNDATION, AND THAT YOU HAVE TO TRAVEL TO GERMANY,

24  BUT AGENT REITZ AS TOM MOORE DIDN'T WANT TO DO THAT, COULDN'T

25  DO THAT.  AND, SO, SHE TOLD HIM, WELL, I'LL GO TO THE

91

1    FOUNDATION AND GET AN EXCEPTION FOR YOU.

2              MS. PEMKOVA WAS CHARACTERIZING, DESCRIBING THAT AS,

3    WELL, THAT WAS A DIFFERENT FOUNDATION.  THAT WAS THIS MR.

4    BACHMANN.  THAT WASN'T ONCIU'S FOUNDATION.

5              BUT WHAT DO YOU ACTUALLY SEE IN THE EVIDENCE.

6    THEY HAVE THE CONVERSATIONS AT AROUND 9:00 AND 10:00 IN THE

7    MORNING ON THE 29TH.  AND YOU SAW THAT IN THE -- HEARD THAT

8    IN THE CALLS, SAW THAT IN THE TRANSCRIPT.  THAT'S WHEN MOORE

9    FIRST -- FOR THE FIRST TIME HEARS ABOUT THIS TRAVEL.  THAT

10   MORNING, AROUND 9:00, 10:00 A.M.

11             BY 12:30 THAT SAME DAY, JUST A FEW HOURS LATER, YOU

12   SAW IN EXHIBIT 96 MS. PEMKOVA IS SENDING AN EMAIL WITH

13   DOCUMENTS, AND ONE OF THEM HAS A FEE AGREEMENT WHAT FOR

14   FOUNDATION -- ONCIU'S FOUNDATION.  NOT BACHMANN, NOT SOME

15   OTHER THING.  THAT SAME DAY WITHIN JUST A FEW HOURS AFTER

16   THIS ISSUE COMES UP IT'S ONCIU AND HIS FOUNDATION.  IT'S NOT

17   BACHMANN'S FOUNDATION.  IT'S THE SAME FOUNDATION.  IT'S

18   ONCIU'S.  IT'S QUITE CLEAR THAT'S THE CASE WHEN YOU LOOK AT

19   THAT.

20             AND, THEN, CONTINUING FORWARD, THAT'S CONFIRMED

21   AGAIN IN THAT EXHIBIT 111.  REMEMBER THE ONE THAT I'VE COME

22   BACK TO A NUMBER OF TIMES THAT SHOWS THE OTHER INDIVIDUALS --

23   DAMJI, WENZEL AND GARRICK -- NOT INVESTIGATORS, ACTUAL PEOPLE

24   OUT THERE.  THAT DOCUMENT SHOWS THE THREE OF THEM AND THEN

25   MOORE'S NAME.  AND WHAT DOES IT SAY.  DAMJI, GARRICK, WENZEL

1    TRAVELING TO FRANKFURT, GOING TO GERMANY.

2            AGAIN, GERMANY MENTIONED BY MS. PEMKOVA.  GERMANY

3    MENTIONED IN THE DOCUMENTS SHE SENT THAT SAME DAY.  GERMANY

4    WHERE THEY'RE TRAVELING TO -- IN EXHIBIT 111 -- JUST A COUPLE

5    OF DAYS LATER.  AND, THEN, MOORE IS LISTED RIGHT BELOW, AND

6    IT SAYS THERE HE'S NOT TRAVELING.  IT SAYS HE'S GOING TO DO

7    HIS BY DOCUMENT INSTEAD.

8            THE EXACT ISSUE.  NOT WANTING TO GO TO GERMANY.

9    DEALING BY DOCUMENT INSTEAD.  RIGHT IN THAT -- RIGHT IN THAT

10   EXHIBIT.

11           SO, IT'S QUITE CLEAR THAT THIS WHOLE DISCUSSION WAS

12   ALL ABOUT THE SAME THING.  IT WAS ABOUT TSI.  IT WAS ABOUT

13   ONCIU AND ONCIU'S FOUNDATION.  THERE'S NOTHING IN ANY OF THAT

14   EVIDENCE THERE THAT SAYS ANYTHING ABOUT SOME OTHER PERSON OR

15   THIS BACHMANN THAT SHE WAS TALKING ABOUT.

16           NOW, WHAT ABOUT THIS ISSUE OF WAS THIS TESTING HIS

17   REACTION, WAS THIS RESEARCH.  YOU KNOW, THE IDEA WAS

18   MENTIONED THAT THIS DISCUSSION OF HIGH-YIELD INVESTMENTS WAS

19   PART OF THE RESEARCH.  IT WAS TESTIMONY HIM AGENT REITZ AS

20   TOM MOORE TO SEE HOW HE WOULD RESPOND.

21           BUT WHAT ACTUALLY HAPPENED.  MS. PEMKOVA PUT TOM

22   MOORE AND TALKED WITH OTHER PEOPLE WHO WERE TALKING TO HIM

23   ABOUT SENDING HIS MONEY TO EUROPE.  PRIORE DID THAT.  THE

24   PEOPLE OVER IN EUROPE, SHAFER AND SCHLAG, DID THAT.

25           AND WHEN THOSE CALLS WERE HAPPENING, WHEN THOSE

1    CONVERSATIONS WERE HAPPENING, MS. PEMKOVA WASN'T EVEN ON

2    THOSE.  SO, HOW'S SHE TESTING HIS REACTION.  SHE'S NOT EVEN

3    THERE.  SHE'S NOT EVEN INVOLVED.

4            IT'S OBVIOUS WHEN YOU LOOK AT THAT THAT THEY'RE

5    TALKING ABOUT TRYING TO GET HIM TO MAKE A DEAL AND SEND HIS

6    MONEY.  THIS ISN'T SOME RESEARCH EXPERIMENT.  IT'S PEOPLE

7    TALKING ABOUT GETTING SOMEONE TO INVEST IN WHAT THEY CLAIM IS

8    A HIGH-YIELD PROGRAM TO GET HIS MONEY.

9            AND, AGAIN, WHAT ELSE DOES SHE SAY ABOUT THE DEAL

10   WHEN SHE WAS TALKING ABOUT IT.  ALTHOUGH SHE ON ONE HAND

11   REFERS TO THIS AS BEING SOME SORT OF RESEARCH OR EXPERIMENT,

12   WHEN SHE GOT INTO THE NITTY-GRITTY OF THE CONTRACT SHE TALKS

13   ABOUT THINGS LIKE THE FACT THAT IT WAS IMPORTANT TO HER THERE

14   WAS A BANK INVOLVED.  BECAUSE THE BANK COULD BE HELD

15   RESPONSIBLE.  THAT THE DEAL WAS GOOD ENOUGH -- THE TSI DEAL

16   WAS GOOD ENOUGH TO LOOK INTO BECAUSE SHE SAID THERE'S

17   REFERENCES TO REAL ESTATE AND TO A LOAN.

18           SHE WAS TALKING ABOUT THAT TRANSACTION AS LOOKING

19   AT IT LIKE A TRANSACTION.  SHOULD YOU DO IT OR NOT DO IT.

20   SHE EMPHASIZED THE FACT THAT HE SHOULD CONTACT HIS ATTORNEY.

21   DO DUE DILIGENCE.  LOOK INTO IT.

22           AGAIN, ALL THINGS THAT YOU WOULD TALK ABOUT IF YOU

23   WERE DISCUSSING WHETHER TO ACTUALLY INVEST, NOT IF IT WAS

24   JUST SOME EXPERIMENT, SOME RESEARCH.

25           AGAIN, THERE'S NO REFERENCE TO THIS RESEARCH OR

1    EXPERIMENTATION IN THE DOCUMENTS.  IT JUST HAPPENS THAT

2    THERE'S THIS ONE MEETING WHERE THERE WASN'T A REPORT.  SO, WE

3    GET TO TALK ABOUT WHAT SHE SAID HAPPENED AT THAT MEETING.

4         I'M NOT GOING TO GO BACK THROUGH -- I THINK WE WENT

5    THROUGH IT IN PLENTY OF DETAIL YESTERDAY -- THE DIFFERENT

6    DOCUMENTS, THE DIFFERENT CONVERSATIONS THAT YOU HAD HEARD IN

7    THE EVIDENCE, WHICH ESTABLISHED BEYOND A REASONABLE DOUBT

8    THAT MS. PEMKOVA IS GUILTY OF THOSE OFFENSES.

9         I JUST WANTED TO LEAVE YOU WITH A COUPLE OF THINGS

10   THAT SHE SAID TO KEEP IN MIND THAT I THINK THAT ILLUSTRATES

11   -- ILLUSTRATE BOTH WHAT'S IMPORTANT, WHAT SHE'S THINKING

12   ABOUT.

13        SHE SAID THINGS THAT LOOK NICE ON PAPER ARE NOT

14   ALWAYS SO IN REALITY.  AND THAT'S CERTAINLY TRUE HERE WITH

15   THIS CONTRACT AND WITH THESE HIGH-YIELD PROGRAMS.

16        SHE SAID IT WOULD BE IMPOSSIBLE IN THE UNITED

17   STATES TO CREATE A VEHICLE TO DO THIS.  WELL, THAT'S TRUE

18   TOO.  I WOULD AGREE WITH THAT.  AND YOU HEARD FROM THE EXPERT

19   WITNESSES THAT MARKETS, RISK AND RETURN, THOSE THINGS ARE NOT

20   DIFFERENT HERE THAN IN EUROPE, THAT FINANCIAL MARKETS WORK

21   THE SAME.  THOSE SAME PRINCIPLES APPLY.  YOU CAN'T GET THESE

22   INCREDIBLY HIGH RETURNS, AND YOU CAN'T GET HIGH PROFITS

23   WITHOUT A GREAT DEAL OF RISK.  THEY JUST -- ONE THING GOES

24   WITH THE OTHER.

25        AND SHE ALSO MADE THE REFERENCE TO THAT BATHGATE

95

1    SITUATION SHE WAS INVOLVED WITH AND SAID THAT SHE LOST MONEY

2    THERE.  AND SHE SAID SHE WANTED TO RECOVER WHAT WAS STOLEN

3    FROM HER BY BATHGATE.

4            THE COURT:  ALL RIGHT.

5            THEN, I'M GOING TO HAVE YOU START DELIBERATING, BUT

6    WE'RE GOING TO HAVE THE COURT SECURITY OFFICER --

7            BOB, IT'S GOOD TO SEE YOU AGAIN.  BUT WOULD YOU

8    IDENTIFY YOURSELF FOR THE RECORD, PLEASE.

9            COURT SECURITY OFFICER:  ROBERT YOUNG, Y-O-U-N-G.

10           THE COURT:  WOULD YOU BE KIND ENOUGH TO RAISE YOUR

11   RIGHT HAND, PLEASE.

12                        BOB YOUNG, CSO, SWORN:

13           THE BAILIFF:  I DO.

14           THE COURT:  CONCERNING THAT ONE LAST DOCUMENT THAT

15   WE DON'T HAVE IN UNEDITED FORM, IS IT ACCEPTABLE IF THE JURY

16   BEGINS THEIR DELIBERATION AND WE GET THAT DOCUMENT TO THEM AS

17   SOON AS WE CAN HAVE THAT TRANSPOSED INTO A READABLE FORM.

18           WOULD THAT ACCEPTABLE, MR. KOLE AND MS. PEMKOVA?

19           MR. KOLE:  YES, FOR THE GOVERNMENT.

20           MS. PEMKOVA:  YES.

21           THE COURT:  ALL RIGHT.

22           THERE'S GOING TO BE ONE ADDITIONAL PIECE OF

23   EVIDENCE THAT COMES TO YOU PROBABLY RIGHT AFTER YOU TAKE

24   LUNCH.

25           NOW THAT YOU'VE BEEN SWORN, THE GOOD TAXPAYERS OF

96

1    THIS COUNTRY CAN TAKE YOU TO LUNCH -- CHICKEN, LOBSTER, STEAK

2    -- I'M JUST KIDDING YOU.

3              (LAUGHTER.)

4              THE COURT: -- IN THE CAFETERIA.  IT'S EXCELLENT

5    FOOD.

6              SO, WE'LL HAVE YOU EAT IN THE BUILDING.  BUT WE CAN

7    DO THAT -- WE CAN'T DO THAT BEFORE YOU'RE SWORN.

8              AND MY SUGGESTION IS, BOB, THAT YOU GET THE JURORS

9    SITUATED.  AND THEY GO RIGHT DOWN TO LUNCH BECAUSE IT WILL

10   LET US WORK THROUGH THE LUNCH HOUR -- JUST WITH THE THINGS

11   LIKE TRANSPORTING.

12             SO, WHEN YOU'RE AT LUNCH WHAT YOU'LL SEE WHEN YOU

13   COME BACK ARE A SET OF JUROR INSTRUCTIONS.  THEY'RE MY ONLY

14   COPY SO RETURN THAT TO ME WHEN YOU'RE DONE.

15             YOU'LL SEE A VERDICT FORM, WHICH IS TWO COUNTS,

16   GUILTY OR NOT GUILTY ON EACH COUNT.  AND THEN YOU'LL SEE

17   EVIDENCE.

18             BY THAT TIME I THINK ALL OF THE EVIDENCE WILL BE

19   COMPLETE.  WE JUST NEED THIS ONE LAST DOCUMENT SO WE CAN GET

20   THAT TO YOU AT ONE TIME.  OKAY.

21             NOW, YOU CAN TAKE YOUR NOTES WITH YOU.

22             COUNSEL, CAN THEY TAKE THE BINDERS WITH THEM?

23   THEY'VE BEEN TAKING BINDER NOTES THROUGHOUT THE PROCEEDINGS.

24   BUT IT'S UP TO EACH OF YOU.

25             MR. KOLE:  I --

1            THE COURT:  WITH A STIPULATION YOU CAN DO ANYTHING.

2     WITHOUT A STIPULATION YOU CAN'T DO ANYTHING.  IT HAS TO BE

3     RECORDED.

4            MR. KOLE:  YES, YOUR HONOR.  I THINK WITH SOMETHING

5     LIKE RECORDINGS THEY SHOULD BE PLAYED IN OPEN COURT.  AND

6     SINCE THE TRANSCRIPTS ARE A GUIDE TO THOSE, I THINK IF THEY

7     NEEDED TO SEE THOSE, IT SHOULD HAPPEN HERE IN COURT.

8            THE COURT:  ALL RIGHT.

9            WELL, IF THE PARTY THEN FEELS THAT WAY, THAT'S WHAT

10    WE'LL DO.  SO, IF YOU NEED A RECORDING PLAYED, BUT THE

11    QUESTION IS THEN YOU DON'T WANT THEM TO HAVE THE TRANSCRIPTS.

12            IS THAT CORRECT?

13            MR. KOLE:  NOT WITH THEM IN THE JURY ROOM.  IF THEY

14    NEED TO REFER TO THEM, THEY CAN COME BACK INTO THE COURTROOM

15    AND REFER TO THEM HERE.

16            THE COURT:  ALL RIGHT.

17            WELL, THEN, LEAVE THE BINDERS OF THE RECORDINGS

18    HERE IN COURT.  JUST LEAVE THEM ON THE SEAT THAT YOU OCCUPY.

19    THAT IS THE APPROPRIATE RULE.  THERE'S NOTHING IMPROPER ABOUT

20    REQUESTING THAT.  IN FACT, IT WOULD BE THE OPPOSITE -- IF I

21    LET YOU DO THE OPPOSITE, IT'S NOT THE RULE.  OKAY.  SO -- AND

22    FOR VERY GOOD REASONS.

23            SO, JUST LEAVE YOUR BINDERS ON THE SEATS.  IF YOU

24    NEED A RECORDING, WE'LL DO THAT FOR YOU.  OKAY.

25            ALL RIGHT.  THEN, YOU'LL BEGIN YOUR DELIBERATIONS.

1           BUT, BOB, YOU CAN TAKE THEM TO LUNCH AT ANY TIME.

2           THE CLERK:  ALTERNATES.

3           THE COURT:  OH, WOULD THE ALTERNATE, I WANT YOU TO

4    REMAIN FOR JUST A MOMENT.  BECAUSE YOU'RE GOING TO START

5    RUNNING LAPS AROUND THE BUILDING.

6           (LAUGHTER.)

7           THE COURT:  I'M JUST JOKING WITH YOU.

8           (JURORS EXITING TO COMMENCE DELIBERATIONS.)

9           THE COURT:  COUNSEL, HAVE A SEAT.

10          THIS IS SILLY, BUT WE CAN'T TAKE YOU TO LUNCH

11   BECAUSE YOU'RE NOT A MEMBER OF THE JURY.  SILLY RULE.

12          AND I CAN'T SEND YOU HOME RIGHT NOW, BUT MAYBE AT

13   THE END OF THE DAY I CAN TALK TO COUNSEL ABOUT PUTTING YOU ON

14   CALL.  I DON'T KNOW WHAT THE JURY IS GOING TO DO.  SO, YOU'RE

15   HERE TODAY.  LET'S SEE WHAT THE JURY SAYS, IF ANYTHING, LATER

16   TODAY.  I'LL GET A BETTER IDEA.

17          IF THEY'RE COMING BACK TOMORROW, THEN, LET ME SEE

18   IF I CAN NEGOTIATE WITH COUNSEL, SEND YOU HOME.  THE PROBLEM

19   WITH THAT IS IF WE NEED YOU, IT TAKES A LONG TIME TO GET YOU

20   TO COURT.  AND WE DON'T WANT YOU EXPOSED TO ANY INPUT.  SO, I

21   TRUST THE FACT YOU WOULDN'T SHARE INFORMATION UNTIL THE JURY

22   REACHED A VERDICT.  AND I ALSO, FRANKLY, TRUST THE FACT THAT

23   YOU WOULDN'T FORM OR EXPRESS AN OPINION IN YOU OWN MIND ABOUT

24   THE CASE.

25          AND THE REASON FOR THAT IS RATHER SIMPLE.  IF ONE

99

1    OF THE JURORS CAN'T RETURN, YOU BECOME THE JUROR.  AND THEY

2    HAVE TO START THEIR DELIBERATIONS ALL OVER AGAIN.  THEY DON'T

3    KNOW THAT YET.  WHICH MEANS, YOU KNOW, YOU COULDN'T GO HOME

4    AND MAKE UP YOUR MIND, AND THEY COULDN'T SAY TO YOU, WELL,

5    WELCOME, MR. TWELFTH JUROR, WE'VE ALREADY DECIDED X, Y, AND

6    Z.  NO, NO, NO.  THEY START ALL OVER AGAIN.  IT'S A BRAND NEW

7    JURY WHEN ANYONE IS ADDED.

8            SO, IN CAUTION I'M GOING TO KEEP YOU HERE.  I THINK

9    MY BEST THOUGHT IS JUST TO HAVE YOU GO SOMEPLACE UNTIL TWO

10   O'CLOCK OR 1:30, WHATEVER YOUR CONVENIENCE IS.  BUT MAYBE AT

11   TWO O'CLOCK YOU COME BACK TO THE COURT BY THAT TIME.  AND

12   JUST CHECK IN AT THE BACK.  OKAY.  AND LET ME SEE WHAT'S

13   HAPPENING, IF ANYTHING, BY THAT TIME.  I DOUBT THAT THE JURY

14   WILL SEND OUT A NOTE OR WHATEVER, BUT.  OKAY.

15           SO, WE'LL SEE YOU ABOUT TWO O'CLOCK.  THANK YOU.

16           (ALTERNATE EXITING COURTROOM.)

17           THE COURT:  NOW, WHAT I REALLY NEED NOW IS THAT

18   UNREDACTED COPY.  AND I NEED THAT AS QUICKLY AS POSSIBLE.

19           MS. PEMKOVA:  YOUR HONOR --

20           THE COURT:  NANCY, WHAT WE'RE HAVING IS AN

21   ORGANIZATIONAL ISSUE HERE.

22           MR. STEWARD, DO YOU HAVE THAT THUMB DRIVE?

23           MR. STEWARD:  I DO NOT, YOUR HONOR.

24           THE COURT:  MS. PEMKOVA, DO YOU HAVE THE THUMB

25   DRIVE?

```
 1              MS. PEMKOVA:  I'M SORRY?

 2              THE COURT:  WITH THE 243 ON IT.

 3              MS. PEMKOVA:  YES.  I WOULD LIKE TO GO UPSTAIRS.

 4    MAYBE THE COMPUTER WORKS.

 5              THE COURT:  WHERE IS THAT THUMB DRIVE NOW?

 6              MS. PEMKOVA:  IN MY PURSE.

 7              THE COURT:  OKAY.

 8              MS. PEMKOVA:  I HAVE IT ON ME.  IT JUST DIDN'T

 9    WORK.  I WILL GO --

10              THE COURT:  WHERE ARE WE GOING TO GO TO GET THIS

11    PRINTED OUT QUICKLY SO THAT ALL OF THE EXHIBITS CAN GO BACK?

12              MS. PEMKOVA:  YOUR HONOR, MAY I TRY TO GO UPSTAIRS

13    AND SEE IF THE COMPUTER WILL TAKE IT THIS TIME?

14              THE COURT:  AND IF --

15              NANCY, CAN THEY GO DOWNSTAIRS TO THE CLERK'S OFFICE

16    AND STICK THIS IN A COMPUTER AND GET A PRINT-OUT.

17              THE CLERK:  YES, YOUR HONOR.

18              THE COURT:  GOOD.

19              MR. STEWARD, IS THERE -- ARE THERE ADEQUATE

20    RESOURCES UP THERE ON THE 10TH FLOOR?  I HAVEN'T BEEN UP

21    THERE IN A WHILE.

22              MR. STEWARD:  NO, IT'S -- IT'S BEEN INADEQUATE FOR

23    YEARS, YOUR HONOR.  IT'S SO HIT AND MISS.  HALF THE TIME THEY

24    DON'T EVEN WORK.

25              THE COURT:  YOU KNOW, TELL ME THAT -- YOU OR CJA
```

1   COUNSEL, TELL ME THAT IN THE FUTURE.  I'LL MAKE SURE THAT

2   THAT'S KEPT UP FOR ALL OF YOU.  I DIDN'T KNOW THAT.  AND

3   THANK YOU FOR THAT INFORMATION.

4           THEN, NANCY, YOU'RE GOING TO TAKE THE EXHIBITS

5   BACK.  YOU'RE GOING TO TAKE THE JURY INSTRUCTIONS BACK AND

6   THE VERDICT FORM BACK.

7           WOULD YOU DO THAT RIGHT NOW AND COME BACK.

8           THE CLERK:  YES, I PREFER THAT THEY LOOK AT THESE

9   EXHIBITS ONE MORE TIME BEFORE I SEND THEM BACK.  IF THAT'S

10  OKAY?

11          THE COURT:  IT CERTAINLY IS.  THEY CAN SIT HERE AND

12  DO THAT.

13          AND, MS. PEMKOVA, THE PROBLEM IS THAT I'VE GOT HER

14  TIED UP NOW.  AND I CAN'T GET THE EXHIBIT TO THE JURY, NANCY.

15  I NEED THIS ONE EXHIBIT.

16          MS. PEMKOVA:  YOUR HONOR, ONE SECOND -- ONE SECOND.

17          (PARTIES DISCUSSING.)

18          THE COURT:  HOW AM I GOING TO ACCOMPLISH THAT?

19          OKAY.  GET A -- GET A SUPERVISOR UP HERE.  SHE CAN

20  GO -- WELL, NO, THAT TAKES TIME.

21          WELL, COUNSEL, WORK THIS OUT FOR ME.  HOW AM I

22  GOING TO DO THIS?

23          MR. KOLE:  WELL, TWO THINGS, YOUR HONOR.

24          WHILE THE JURORS AT LUNCH I SUPPOSE WE HAVE A

25  LITTLE BIT OF TIME WHILE THEY'RE EATING.

1           THE COURT:  NO, NO, NO.  I'M GOING TO SIT HERE AND

2      MAKE SURE THIS IS DONE.

3           MR. KOLE:  NO, WE'LL GET IT DONE.  BUT I MEAN --

4           THE COURT:  NO, YOU WON'T.  I'M SITTING HERE

5      WAITING FOR IT TO GET DONE.

6           MR. KOLE:  OF COURSE.  BUT I'M JUST SAYING, IF THE

7      JURY -- WE'LL GET THE - I THINK WE HAVE A MOMENT TO GO

8      THROUGH THE EXHIBITS RIGHT NOW BECAUSE THE JURY WOULDN'T BE

9      HERE TO LOOK AT THEM ANYWAY.

10          THE COURT:  GO THROUGH THE EXHIBITS RIGHT NOW WITH

11     MS. PEMKOVA AND WITH NANCY.

12          MR. KOLE:  AND, THEN, YOUR HONOR, WE HAVE --

13          THE COURT:  COUNSEL, GO THROUGH THE EXHIBITS RIGHT

14     NOW --

15          MR. KOLE:  YES.

16          THE COURT: -- WITH MS. PEMKOVA AND NANCY.

17          MS. PEMKOVA, STEP OVER WITH COUNSEL AND GO THROUGH

18     THE EXHIBITS ONE MORE TIME WITH NANCY.

19          (MR. KOLE, MS. PEMKOVA AND CLERK CONFERRING.)

20          THE COURT:  BOB, YOU TAKE THE JURY DOWN ANY TIME

21     YOU WANT.

22          (COURT AND MR. YOUNG CONFERRING.)

23          (INFORMAL DISCUSSION WITH MR. KOLE, MR. STEWARD,

24          MS. PEMKOVA AND CLERK.)

25          (RECESS, 11:56 A.M. TO 12:47 P.M.)

1          THE COURT: -- RECORD.

2          MS. PEMKOVA IS PRESENT.  MR. STEWARD IS PRESENT.

3    THE GOVERNMENT IS PRESENT.  AND THE INVESTIGATING OFFICER IS

4    PRESENT.

5          EXHIBIT NUMBER 205.  DO WE HAVE THAT NOW IN AN

6    UNREDACTED CONDITION?

7          MS. PEMKOVA:  I WASN'T ABLE TO PRINT THAT, YOUR

8    HONOR.  I HAVE TO GO UP AND FINISH PRINTING.  MR. KOLE -- MR.

9    STEWARD ASKED ME TO COME DOWNSTAIRS.  HE TEXTED ME.  I WAS IN

10   THE MIDDLE OF THE PRINTING.  PRINTER WORKS.  COMPUTER WORKS.

11   IF I WILL GO BACK, I WILL --

12         THE COURT:  DO YOU HAVE 207 IN AN UNREDACTED

13   CONDITION?

14         MS. PEMKOVA:  I THINK I DO, BUT I DIDN'T HAVE A

15   CHANCE TO CHECK THIS ONE.  I PRINTED FOR YOU SO FAR --

16         THE COURT:  DO YOU HAVE 207 IN AN UNREDACTED

17   CONDITION?

18         MS. PEMKOVA:  I THINK SO.  I DIDN'T CHECK IT YET.

19         THE COURT:  HAND IT TO ME, PLEASE.

20         MS. PEMKOVA:  I -- NO, NO, NOT RIGHT NOW.  I DON'T

21   HAVE IT PRINTED YET.

22         THE COURT:  NO, RIGHT NOW.  THE CLERK IS GOING TO

23   APPROACH YOU.  GIVE ME 207.

24         MS. PEMKOVA:  I DON'T HAVE IT PRINTED YET.  I JUST

25   EXPLAIN, YOUR HONOR.  I WAS ASKED TO COME DOWNSTAIRS, AND I

1   DID -- IN THE MIDDLE OF PRINTING.  BUT I HAVE --

2            THE COURT:  DO YOU HAVE 215?

3            MS. PEMKOVA:  215.  ONE SECOND.

4            THE COURT:  AND THE ATTACHMENT TO IT.

5            MS. PEMKOVA:  YES, I PRINTED THE ATTACHMENT.

6            THE COURT:  COULD I SEE IT, PLEASE.

7            MS. PEMKOVA:  YES, THIS IS THE -- 215.  ONE SECOND.

8   LET ME JUST CHECK THAT I'M GIVING YOU RIGHT THING.

9            (PAUSE IN PROCEEDINGS.)

10           MS. PEMKOVA:  YES.  RESERVATIONS -- THIS IS THE

11  EXCEL SHEET.

12           THE COURT:  NOW, SHOW THAT TO COUNSEL -- OR JUST A

13  MOMENT.

14           MR. KOLE, COME UP HERE.

15           NANCY, DO YOU HAVE A COPY OF 215?

16           THE CLERK:  YES, YOUR HONOR.

17           THE COURT:  AND THIS IS 215; IS THAT CORRECT?

18           MS. PEMKOVA:  THIS IS THE EXCEL SPREADSHEET FOR ON

19  --

20           THE COURT:  ALL RIGHT.

21           DO YOU HAVE 219?

22           MS. PEMKOVA:  219.  ONE SECOND, PLEASE.

23           NO, I DIDN'T FINISH THIS ONE.  I HAVE IT.  I CAN GO

24  UP --

25           THE COURT:  DO YOU HAVE 221?

105

1        MS. PEMKOVA:  221.  YES, I DID -- I DO.

2        THE COURT:   COULD YOU HAND THAT TO THE CLERK.

3   PLEASE.

4        AND, MR. KOLE, STEP UP HERE NOW AND LOOK AT THIS,

5   PLEASE.

6        MR. KOLE:  YES, YOUR HONOR.

7        THE COURT:  DO YOU HAVE 222?

8        AND IS THIS 222?

9        MS. PEMKOVA:  I DIDN'T GET TO THE PRINTING OF THAT,

10  BUT I SHOULD HAVE IT.  I SHOULD BE ABLE TO PRINT IT.  WHEN I

11  WILL GO BACK I CAN PRINT IT.

12       THE COURT:  DO YOU HAVE 243?

13       MS. PEMKOVA:  243, IS THAT --

14       THE COURT:  THAT'S THE ONE YOU'VE BEEN CONTENDING

15  SHOWS THE RELATIONSHIP OF THE PROPERTY --

16       MS. PEMKOVA:  YES.  YOUR HONOR, I HAVE IT PRINTED.

17  BUT THIS DOCUMENT CONTAINS -- WHEN I REPRINTED IT -- ONE,

18  TWO, THREE, FOUR, FIVE PEOPLE ALL PERSONAL DATA.

19       PAGE 1 --

20       THE COURT:  I'M NOT INTERESTED IN YOUR CONCERNS

21  ABOUT THIS.  MY CONCERN IS THAT UNREDACTED DOCUMENTS SHOULD

22  BE COMING INTO EVIDENCE, MS. PEMKOVA.

23       MS. PEMKOVA:  YOUR -- I'M ASKING YOU FOR PERMISSION

24  TO REMOVE PERSONAL DATA --

25       THE COURT:  NO.

1           MS. PEMKOVA: -- FROM THESE FIVE PEOPLE.

2           THE COURT:  I WILL NOT DO THAT.  I WILL ALLOW THE

3   FULL DOCUMENT.  OR IF YOU WANT TO WITHDRAW IT, NONE OF IT.

4           MS. PEMKOVA:  I CANNOT TAKE A RISK, YOUR HONOR, TO

5   PUT OTHER PEOPLE --

6           THE COURT:  ARE YOU WITHDRAWING THAT DOCUMENT THEN?

7           MS. PEMKOVA:  YES.

8           THE COURT:  ALL RIGHT.

9           MS. PEMKOVA:  I HAVE TO.

10          THE COURT:  THAT WILL BE WITHDRAWN THEN.  AND

11  THAT'S BECAUSE OF MS. PEMKOVA'S UNWILLINGNESS TO PRODUCE THAT

12  IN AN UNREDACTED FORM.

13          NOW, THAT LEAVES THE REMAINDER.  I'LL LEAVE THIS TO

14  MR. KOLE.

15          MR. KOLE, WE CAN SEND MS. PEMKOVA UP AGAIN FOR A

16  REDACTED -- OR AN UNREDACTED COPY OF 205, 207.  YOU HAVE THE

17  ATTACHMENT TO 219, I BELIEVE -- OR 215.  I'M SORRY.

18          WE CAN SEND HER BACK UP FOR 219 AND 222.  AND IF

19  YOU'D LIKE TO DO SO, THAT'S FINE.

20          MR. KOLE:  I THINK WE SHOULD.

21          AND, ALSO, THE --

22          THE COURT:  ALL RIGHT.

23          NOW, MS. PEMKOVA, HOW LONG WILL THIS TAKE?

24          MS. PEMKOVA:  I DON'T KNOW HOW QUICK THE PRINTER --

25          THE COURT:  ALL RIGHT.  MR. STEWARD IS GOING WITH

1    YOU AND MR. KOLE IS GOING WITH YOU.  BOTH OF YOU ARE ORDERED

2    UP TO THE 10TH FLOOR.

3              NANCY, GET A SUPERVISOR UP THERE.  I WANT TO MAKE

4    SURE THIS IS DONE WITH FAIRNESS -- OR YOURSELF.  OKAY.

5              THE CLERK:  YES, YOUR HONOR.

6              THE COURT:  ALL RIGHT.  COUNSEL, 20 MINUTES.

7              (INFORMAL DISCUSSION AMONG PARTIES.)

8              RECESS, 12:52 P.M. TO 1:24 P.M.)

9              THE COURT:  ON THE RECORD.

10             AND COUNSEL ARE PRESENT, MS. PEMKOVA IS PRESENT.

11             AND, COUNSEL, DO WE HAVE 205?

12             MR. KOLE:  YES, WE DO, YOUR HONOR.

13             THE COURT:  ALL RIGHT.  WOULD YOU HAND THAT TO

14   NANCY, PLEASE, IN AN UNREDACTED FORM.

15             I LET MS. PEMKOVA ARGUE THAT.  SO, I INDICATED I

16   WOULD RECEIVE IT IF UNREDACTED.

17             207, DO YOU HAVE THAT?

18             MR. KOLE:  YES, I HANDED THE WHOLE --

19             THE COURT:  NANCY --

20             MR. KOLE:  -- THE CLERK HAS THE WHOLE GROUP.

21             THE COURT:  I'M SORRY.

22             NANCY, I WANT A BETTER RECORD.

23             DO YOU HAVE 207, NANCY?

24             THE CLERK:  YES, YOUR HONOR.

25             THE COURT:  THANK YOU.

1              UNREDACTED, NANCY?

2              THE CLERK:  YES, YOUR HONOR.

3              THE COURT:  DO YOU HAVE THE ATTACHMENT TO 215 THAT

4    YOU WERE CONCERNED ABOUT?

5              MR. KOLE:  YES, IT'S THERE.

6              THE COURT:  OKAY.

7              DO YOU HAVE 219 THAT'S UNREDACTED?

8              MR. KOLE:  219.  NO, YOUR HONOR.  BUT AS WE

9    DISCUSSED PREVIOUSLY, WE'LL STIPULATE TO THE USE OF THE

10   REDACTED ONE.

11             THE COURT:  ALL RIGHT.  THEN, IT CAN BE SUBMITTED

12   -- RECEIVED.

13             (EXHIBIT 219 RECEIVED.)

14             THE COURT:  221, UNREDACTED.

15             MR. KOLE:  YES.

16             THE COURT:  ALL RIGHT.

17             AND THE 222 UNREDACTED?

18             MR. KOLE:  NO.  I THINK THAT WAS ONE THAT SHE WAS

19   UNABLE TO DO.  SO WE WOULD --

20             MS. PEMKOVA:  NO TIME, YOUR HONOR.

21             MR. KOLE:  WE'LL STIPULATE TO THAT ONE.

22             THE COURT:  MS. PEMKOVA, YOU'VE HAD PLENTY OF TIME.

23             BUT THANK YOU FOR THE GRACIOUSNESS OF THE

24   GOVERNMENT, IT'S NOW RECEIVED.

25             (EXHIBIT 222 RECEIVED.)

1          THE COURT:  250 WAS WITHDRAWN AND 243 IS NOT

2     ALLOWED.

3          ALL RIGHT.  ALL THE EVIDENCE IS COMPLETE.

4          AND IF YOU WILL WAIT FOR THE CONTACT FROM THE JURY.

5          THANK YOU.

6          (RECESS, 1:24 P.M. TO 1:27 P.M.)

7          THE COURT:  THIS EVENING THE COURT WILL ALLOW THE

8     JURY TO BE EXCUSED WHEN THEY CHOOSE TO.  SO, WHETHER IT'S

9     3:30 OR 5:00, WE'LL KEEP BOTH THE GOVERNMENT AND MS. PEMKOVA

10    INFORMED SO WHEN YOU CAN GO HOME WHEN THEY GO HOME.

11         BUT IN THE MEANTIME I WANT YOU ON THE COURTHOUSE

12    PREMISES SO THAT YOU'RE READILY REACHED.

13         SO, EACH OF YOU INDICATE TO NANCY WHERE YOU'LL BE.

14         IS THAT ACCEPTABLE TO YOU, MR. KOLE AND MS.

15    PEMKOVA?

16         MR. KOLE:  YES, IT IS, YOUR HONOR.

17         MS. PEMKOVA:  YES, YOUR HONOR.  I WILL BE ON THE --

18         THE COURT:  ALL RIGHT.  AND WE WILL BE COURTEOUS

19    AND INFORM EACH OF YOU WHEN THEY GO HOME.  AND WE'LL INFORM

20    EACH OF YOU WHEN THEY RETURN TOMORROW.

21         IS THAT ACCEPTABLE TO EACH OF YOU?

22         MR. KOLE:  YES, YOUR HONOR.

23         THE COURT:  OKAY.  THANK YOU VERY MUCH.

24         (RECESS, 1:28 P.M. TO 2:05 P.M.)

25         THE COURT:  ALL RIGHT.  THEN, WE'RE ON THE RECORD.

1       MR. KOLE IS PRESENT, THE INVESTIGATING OFFICER, THE

2   DEFENDANT AND, OF COURSE, MR. STEWARD.

3       WE RECEIVED A NOTE FROM THE JURY.  IT STATES THE

4   FOLLOWING:

5           "THE JURY REQUESTS THE FOLLOWING:

6           CLARIFICATION OF WHICH SPECIFIC EXHIBITS

7           CORRESPOND TO THE SPECIFIC COUNTS TWO

8           THROUGH SIX."

9       MR. KOLE.

10      MR. KOLE:  WELL, THAT'S THE PROBLEM WITH THEM NOT

11  HAVING ANY VERSION OF THE INDICTMENT.  I DID PUT THE CHART

12  WITH THAT UP ON THE SCREEN DURING THE -- DURING MY CLOSING.

13      MY SUGGESTION WOULD BE THAT WE GIVE THEM A REDACTED

14  FORM OF THE INDICTMENT THAT MAYBE JUST HAS THE --

15      THE COURT:  I AGREE.

16      MR. KOLE: -- COUNT PORTION.

17      THE COURT:  COULD I SEE THAT REDACTED FORM RIGHT

18  AWAY.

19      MS. PEMKOVA:  OBJECTION, YOUR HONOR, IF I MIGHT.

20  INDICTMENT SHOULD BE READ BEFORE OR NOT AT ALL.

21      THE COURT:  OH, THANK YOU VERY MUCH.

22      COULD I GET A REDACTED FORM --

23      MR. KOLE:  SHOULD I GO CREATE THAT --

24      THE COURT:  YEAH.  I WANT THE PREAMBLE STRICKEN.

25      MR. KOLE:  RIGHT.

1        MS. PEMKOVA:  WHAT IS IT EXACTLY?  CAN I GET AT

2    LEAST COPY?

3        MR. KOLE:  YEAH, OF COURSE, I'LL BRING COPIES.

4        THE COURT:  WELL, YOU'VE GOT A COPY OF THE

5    INDICTMENT.  THAT WAS MADE AVAILABLE TO YOU.

6        MS. PEMKOVA:  BUT NOT THE REDACTED VERSION, YOUR

7    HONOR.

8        THE COURT:  NO, OF COURSE NOT.  YOU'LL SEE THAT.

9        MR. KOLE, I WANT SPEED THOUGH.

10        MR. KOLE:  YES.

11        THE COURT:  HASTE.

12        (RECESS, 2:06 P.M. TO 2:17 P.M.)

13        THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

14        MR. KOLE IS PRESENT AND THE PARTIES ARE PRESENT.

15        MR. KOLE, IN YOUR ABSENCE, I PROPOSED THE

16    FOLLOWING.  WHILE YOU WERE GONE THE COURT DID SOME WORK.

17        FIRST, THE REASON THAT THE COURT WAS CONCERNED

18    ABOUT THE INDICTMENT WAS I BELIEVED THAT THERE WAS PREJUDICE

19    CONCERNING THE INTRODUCTION, WHICH WAS INAPPROPRIATE FOR

20    SUBMISSION TO THE JURY ON A CONSPIRACY.

21        AND ON PAGES 1 AND 2 AND 3 -- AND I THINK THAT

22    CONTAINS SURPLUSAGE MATTER.  THAT'S WHY I ENCOURAGED THIS NOT

23    TO BE GIVEN TO THE JURY.  BECAUSE THE OBJECT OF THE

24    CONSPIRACY, PERHAPS RELEVANT.  THE MEANS OF THE CONSPIRACY.

25    AND, OF COURSE THE OVERT ACTS ARE RELEVANT.

1            BUT THEY DIDN'T ASK FOR THAT.  THEY ASKED FOR COUNT

2       TWO.  AND I PROPOSE THE FOLLOWING.

3            YOU HAVE A COPY OF WHAT THE COURT HAS DONE.  I'VE

4       TAKEN OUT ANY INFERENCE CONCERNING THE GRAND JURY, WHICH I

5       THINK IS PREJUDICIAL.

6            SO, WHAT WE HAVE IS BEGINNING ON PARAGRAPHS 14, 15

7       -- IT SETS FORTH COUNTS TWO, THREE, FOUR, FIVE AND SIX.  IT

8       GIVES THE DATES.

9            AND I THINK THE ONLY WAY THAT THE QUESTION CAN BE

10      RESPONDED TO -- THE QUESTIONS BEING, "CLARIFICATION OF WHICH

11      SPECIFIC EXHIBITS CORRESPOND TO THE SPECIFIC COUNTS TWO

12      THROUGH SIX."

13           THE COURT CANNOT ANSWER THAT.  BECAUSE IF I LEAVE

14      OUT AN EXHIBIT, I BELIEVE IT'S IMPROPER.  PLUS, I'M NOT

15      CERTAIN WHAT THEY WOULD RELATE CONCERNING DEFENSE EXHIBITS TO

16      COUNTS TWO THROUGH SIX.

17           SO, THE BEST I THINK WE CAN DO IS GIVE THEM COUNT

18      TWO.  AND, NOW, OF COURSE, IF THERE'S OBJECTIONS, PLEASE LET

19      ME KNOW.

20           MR. KOLE.

21           MR. KOLE:  TWO ISSUES THAT OCCURRED TO ME.

22           ONE, YOUR HONOR, IS I ATTEMPTED TO TAKE OUT THE

23      REFERENCES TO THERE BEING MORE THAN ONE DEFENDANT.  AND IN

24      THE ORIGINAL IT HAS ALL THREE DEFENDANTS.

25           THE COURT:  OH, THAT'S A GOOD IDEA.

1        DO YOU HAVE THAT CLEANED-UP COPY?

2        MR. KOLE:  I BELIEVE IN THE VERSION THAT I JUST

3   CREATED IT DOES --

4        THE COURT:  WELL, I'M NOT WILLING -- YOU SEE, I'M

5   NOT WILLING TO GIVE COUNT ONE --

6        MR. KOLE:  IF YOU JUST TAKE THE LAST TWO PAGES,

7   YOUR HONOR.  JUST LIKE YOU DID,  TAKE THE LAST TWO PAGES OF

8   THE VERSION I CREATED --

9        THE COURT:  WELL, LOOK AT PAGE 2 AND LOOK AT PAGE

10  2, PARAGRAPH 3.  LOOK AT PAGE 2, SUBSECTION 2.  IT NAMES

11  DEFENDANT ONCIU AND PRIORE.  DEFENDANT ONCIU AND PRIORE.

12        I'M RIGHT BACK TO THE SAME --

13        MR. KOLE:  BUT IT DOESN'T CALL THEM DEFENDANTS.  IT

14  JUST MENTIONS -- JUST MENTIONS THEIR NAMES AS BEING INVOLVED.

15        THE COURT:  IT STATES "DEFENDANT."  OH,"DEFENDANT,

16  ONCIU AND PRIORE."

17        ALL RIGHT.  OF COURSE THAT WOULD BE FOR THE

18  CONSPIRACY COUNTS.

19        BUT THEY'RE NOT CALLING FOR THAT NOW, ARE THEY?

20        MS. PEMKOVA:  UH-UH, NO.

21        MR. KOLE:  NO.

22        THE COURT:  IN OTHER WORDS, WHATEVER THEY'VE DONE

23  IN TERMS OF CONSPIRACY, THEY'RE THROUGH THAT.

24        OR IF THEY HAVEN'T EXAMINED IT, AND IF THEY ASK FOR

25  IT, I THINK THEY'RE JUST ASKING FOR COUNTS TWO THROUGH SIX.

1          MR. KOLE:  AND I THINK THE TWO PAGES THAT ARE THE

2    LAST TWO PAGES OF WHAT I JUST PREPARED, WHICH ARE THE SAME AS

3    WHAT THE COURT HAD, EXCEPT THAT I CHANGED THE PARAGRAPH

4    NUMBERS --

5          THE COURT:  WELL --

6          MR. KOLE:  -- ALTHOUGH THAT'S JUST STILL --

7          MS. PEMKOVA:  NO.

8          MR. KOLE:  AND THERE'S NOW -- PRIORE IS NOT

9    REFERRED TO AS A DEFENDANT ON THOSE TWO PAGES, SO.

10          THE COURT:  JUST A MOMENT.

11          BUT YOU STILL HAVE THE GRAND JURY ON IT, DON'T YOU?

12          MR. KOLE:  THERE'S A REFERENCE TO FOREPERSON.

13    DOESN'T SAY THE WORDS "GRAND JURY" THOUGH.

14          WE CAN TAKE -- YEAH, WE COULD MAKE A COPY WITH THAT

15    COVERED UP, I GUESS.

16          MS. PEMKOVA:  YOUR HONOR, IF I MIGHT SAY SOMETHING.

17          THE COURT:  NO, JUST A MOMENT.  AND THEN I'LL GIVE

18    YOU ALL THE TIME YOU'D LIKE.

19          SO -- THE QUESTION, MR. STEWARD IN YOUR WISDOM AS

20    WELL AS MS. PEMKOVA, IS WHETHER I SHOULD INCLUDE IN COUNT TWO

21    THROUGH SIX THE FACT THAT DEFENDANT PEMKOVA, ONCIU, AND

22    PRIORE WERE CHARGED.

23          SO, LOOK AT PARAGRAPH 8.  ALSO, LOOK AT PARAGRAPH

24    9.

25          MS. PEMKOVA:  YOUR HONOR, MAY I?

1            THE COURT:  PLEASE.

2            MS. PEMKOVA:  I WOULD PREFER YOU GIVE THEM WHAT

3    COULD THE COURT PREPARED.

4            THE COURT:  GIVE THEM WHAT?

5            MS. PEMKOVA:  THE VERSION WHICH YOU PREPARED.

6            THE COURT:  THE VERSION THAT I PREPARED.  THAT

7    STILL HAS -- WELL, FIRST OF ALL, I'VE BEEN VERY CAREFUL --

8    I'VE CAREFULLY TAKEN OUT EVERY REFERENCE TO THE GRAND JURY.

9            IS THIS VERSION THAT I PREPARED ACCEPTABLE?

10           MS. PEMKOVA:  YES.  YES, YOUR HONOR.

11           THE COURT:  ALL RIGHT.

12           MS. PEMKOVA:  I WOULD PREFER YOUR VERSION.

13           MR. KOLE:  I JUST NOTICED, YOUR HONOR, AT LINE 8 IT

14   STILL DOES REFER TO THE GRAND JURY.

15           THE COURT:  ON LINE --

16           MR. KOLE:  8 OF PAGE 8.

17           THE COURT:  8.  THANK YOU.

18           (PAUSE IN PROCEEDINGS.)

19           THE COURT:  SO, IT WOULD READ: "WITH OTHERS KNOWN

20   AND UNKNOWN, KNOWINGLY AND WITH INTENT TO DEFRAUD" -- IT JUST

21   GOES ON IF I EXCISE THAT PORTION.

22           IS THAT CORRECT?

23           MR. KOLE:  YES.

24           THE COURT:  ALL RIGHT.

25           NOW, YOU NOTICE ON LINE 8 I'VE TAKEN OUT ANY

1    REFERENCE TO THE GRAND JURY, MS. PRIORE.  I JUST DON'T WANT

2    -- MS. PEMKOVA.  I JUST DON'T WANT THE JURY TO BELIEVE

3    ANOTHER BODY HAS FOUND YOU GUILTY OF THIS OFFENSE.  AND

4    THERE'S A TREMENDOUS CONFUSION WITH THE GRAND JURY AND MY

5    IMPRESSION.  I DON'T THINK MOST JURORS UNDERSTAND WHAT THEY

6    ARE.

7              IS IT ACCEPTABLE IF I TAKE OUT THOSE WORDS?

8              MS. PEMKOVA:  NO, YOUR HONOR.  I WOULD PREFER IT

9    STAYS AS IT IS AND PREFERABLY GOES DIRECTLY FROM THE PREVIOUS

10   INDICTMENT AS IT WAS.

11             THE COURT:  YOU WANT "OTHERS KNOWN AND UNKNOWN TO

12   THE GRAND JURY".

13             MS. PEMKOVA:  AGREE WITH THAT.

14             THE COURT:  I'M GOING TO DECLINE TO DO THAT.  AT

15   SOME POINT JUST SUA SPONTE REGARDLESS OF YOUR REQUEST I'M

16   GOING TO TAKE OUT A REFERENCE TO THE GRAND JURY.  IT CAN ONLY

17   HAVE A PREJUDICIAL EFFECT.

18             SO, ONE MORE COPY -- OR FOUR MORE COPIES IF YOU

19   WOULD.  THANKS.

20             (COUNSEL CONFERRING.)

21             THE COURT:  I'LL JUST SAY "TO THE GRAND JURY."

22   THAT'S ALL ON PAGE 8.  I DON'T WANT TO USE MY COPY.

23             MR. KOLE:  RIGHT, IN YOUR COPY.

24             THE COURT:  TRYING TO GET RID OF ALL REFERENCE TO

25   THE GRAND JURY.

1           MR. KOLE:  RIGHT.

2           THE COURT: I THINK THAT'S PREJUDICIAL.

3           NOW, WE'RE GOING TO -- WHILE YOU'RE DOING THAT

4    CYNTHIA, I CAN CALL IN THE JURY.  BECAUSE I CAN GIVE THEM MY

5    COPY IN THE MEANTIME.

6           ALL RIGHT.  BOB, IF YOU'D CALL IN THE GRAND JURY

7    I'D APPRECIATE IT.

8           (PAUSE IN PROCEEDINGS.)

9           (COURT CONFERRING WITH CLERK.)

10          MR. KOLE:  AND, SO, THIS ONE STILL --

11          THE COURT: MR. KOLE, PLEASE.

12          (COURT CONFERRING WITH CLERK.)

13          THE COURT:  NOW, MR. KOLE.

14          MR. KOLE:  THANK YOU, YOUR HONOR.

15          AND THE RECORD I THINK IS CLEAR THAT MS. PEMKOVA

16   DOES NOT OBJECT TO THE REFERENCE TO DEFENDANTS IN THE PLURAL,

17   WHICH IS STILL IN THE DOCUMENT.  SHE, HERSELF, DURING HER

18   CASE REFERRED TO OTHER DEFENDANTS AS WELL.

19          THE COURT:  AND THAT'S CORRECT, MS. PEMKOVA?

20          MS. PEMKOVA:  YES, I DID REFER TO OTHER DEFENDANTS.

21          THE COURT:  OKAY.

22          MR. KOLE:  THANK YOU.

23          (JURY ENTERING COURTROOM.)

24          THE COURT:  WELL, THE JURY IS PRESENT.  AND THE

25   ALTERNATE, OF COURSE, IS NOT.  SHE'S IN THE BUILDING AT THE

118

1    PRESENT TIME.

2         WE THINK THE WAY TO RESOLVE THE QUESTION FROM THE

3    JURY WHICH ASKED THE FOLLOWING:

4         "A CLARIFICATION OF WHICH SPECIFIC EXHIBITS

5         CORRESPOND TO THE SPECIFIC COUNTS TO COUNTS TWO,"

6    THREE, SIX -- "TWO THROUGH SIX."

7         THE FIRST THING IS WE'RE GOING TO GIVE YOU COUNTS

8    TWO THROUGH SIX, AND THAT WILL LIST THE DATES.  AND REMEMBER

9    WHEN I GIVE YOU THIS, IT'S A CHARGING DOCUMENT.  YOU'RE THE

10   ONES WHO WILL FIND GUILT OR INNOCENCE.  WE DON'T WANT YOU TO

11   BE INFLUENCED BY THE FACT THAT A CHARGING DOCUMENT IS COMING

12   TO YOU.

13        AND IN THAT IT SETS FORTH COUNT TWO, COUNT THREE,

14   COURT FOUR, COUNT FIVE, AND COUNT SIX.  IT GIVES

15   CORRESPONDING DATES.  YOU'LL SEE THAT.  AND IT STATES WHICH

16   EMAIL IT CORRESPONDS TO.

17        HERE'S THE PROBLEM.  I DON'T WANT TO GIVE YOU THE

18   EXACT EXHIBIT NUMBER BECAUSE IF I MISS AS AN EXHIBIT, I'VE

19   COMMITTED ERROR.

20        AND IT WOULD ALSO NOT BE FAIR BECAUSE THERE MIGHT

21   BE A DEFENSE EXHIBIT THAT I MISSED BY EXPLICITLY SAYING LOOK

22   AT EXHIBIT X.

23        BUT THIS WILL GIVE YOU ALL THE GUIDANCE.  IN OTHER

24   WORDS, YOU'LL HAVE THE DATE AND REFER TO WHAT THE GOVERNMENT

25   IS SPECIFICALLY CHARGING.

1           AND, SO, THE WAY I'LL OF COURSE RESPOND IS INSTEAD

2    OF THE SPECIFIC EXHIBITS, I'M SIMPLY GOING TO HAND YOU THE

3    CHARGING DOCUMENTS WITH EXHIBITS TWO THROUGH 6.  OKAY.

4           I'LL GIVE THAT TO NANCY.

5           AND THANK YOU VERY MUCH.

6           (JURY EXITING COURTROOM.)

7           THE COURT:  OKAY.  COUNSEL, EACH OF YOU HAVE A COPY

8    OF THAT.

9           AND WE'LL WAIT FOR ANY WORD FROM THE JURY.

10          MR. KOLE:  YES, YOUR HONOR.

11          (PROCEEDINGS ON THE RECORD CONCLUDED 2:27 P.M.)

12          (JURY IN DELIBERATIONS.)

13

14

15

16

17

18

19

20

21

22

23

24

25

120

1

2

3                       C E R T I F I C A T E

4

5

6           I CERTIFY THAT THE FOREGOING IS A CORRECT

7   TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE

8   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

9

10

11  S/S  DOROTHY BABYKIN                    7/31/16

12  _____        _____

13  FEDERALLY CERTIFIED TRANSCRIBER         DATED

14  DOROTHY BABYKIN

15

16

17

18

19

20

21

22

23

24

25